## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) Case No. 20-10553 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## DEBTORS' MOTION FOR
## ENTRY OF INTERIM AND FINAL ORDERS
## (I) AUTHORIZING THE DEBTORS TO (A) CONTINUE TO
## OPERATE THEIR CASH MANAGEMENT SYSTEM, (B) HONOR CERTAIN
## PREPETITION OBLIGATIONS RELATED THERETO, AND (C) MAINTAIN
## EXISTING BUSINESS FORMS AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion (this "Motion"):

### Relief Requested

1.     The Debtors seek entry of an interim order (the "Interim Order") and a final order (the "Final Order"), substantially in the forms attached hereto:  (a) authorizing the Debtors to (i) continue to operate their Cash Management System, (ii) honor certain prepetition obligations related thereto, and (iii) maintain existing Business Forms in the ordinary course of business; and (b) granting related relief.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

2.      In addition, the Debtors request that the Court schedule a final hearing within approximately 25 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

### Jurisdiction and Venue

3.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The bases for the relief requested herein are sections 105, 345, 363, 503, and 507 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004, and Bankruptcy Local Rules 2015-2 and 9013-1(m).

### Background

6.      The Debtors operate 169 locations, including 92 furniture and mattress showrooms and 77 freestanding mattress and specialty locations.  The Debtors do business under brand names, including Art Van Furniture, Pure Sleep, Scott Shuptrine Interiors, Levin Furniture, Levin Mattress, and Wolf Furniture.  The Debtors were founded in 1959 and was owned by its founder, Art Van Elslander, until it was sold to funds affiliated with Thomas H. Lee Partners, L.P. ("THL")

2

in March 2017.  Pennsylvania based Levin Furniture and Wolf Furniture were acquired by Art Van in November 2017.  As of the Petition Date (as defined below), the Debtors operate stores throughout Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia. The Debtors are headquartered in Warren, Michigan and have approximately 4,500 employees as of the Petition Date (as defined below).

7.    On March 8, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of David Ladd, Executive Vice President and Chief Financial Offer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with this Motion and incorporated by reference herein.  Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

**The Cash Management System**

**I.    Overview.**

8.    In the ordinary course of business, the Debtors operate an integrated and centralized cash management system, which is depicted on **Exhibit 1** annexed to the Interim Order and the Final Order  (the "Cash Management System").   The Cash Management System is typical of multi-store retail operations and is comparable to the centralized cash management systems used by other similarly sized retail companies to manage the cash flow of operating units in a

3

cost-effective, efficient manner.  The Debtors use their Cash Management System in the ordinary course to collect, transfer, and distribute funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.  The Debtors' treasury department maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds, including in connection with Intercompany Transactions (as defined below).  Additionally, the treasury department regularly reconciles the Debtors' books and records to ensure that all transfers are accounted for properly.

9.       As of the Petition Date, the Cash Management System consists of 45 active bank accounts (the "Bank Accounts"), all of which are located in the United States.  The Cash Management System is centralized around a main operating account (ending in 1220) (the "Primary Operating Account") at Bank of America ("BOA").  The Primary Operating Account is funded on an as-needed basis by the Debtors' ABL administrative agent, issuing bank, and collateral agent Wells Fargo Bank, National Association (the "Credit Line") and likewise zero balances daily into the Credit Line.

10.      The Cash Management System is similar to those commonly employed by businesses comparable in size and scale to the Debtors.  Indeed, large multinational businesses use integrated systems to help control funds, ensure cash availability for each entity, and reduce administrative expenses by facilitating the movement of funds among multiple entities.  The Cash Management System is vital to the Debtors' ability to conduct their operations throughout the globe.  Any disruption of the Cash Management System would be materially detrimental to the Debtors' operations, as their businesses require prompt access to cash and accurate cash tracking.

## II.    The Bank Accounts and Flow of Funds.

11.      The Cash Management System is tailored specifically to meet the Debtors' operating needs—enabling the Debtors to control and monitor corporate funds, ensure cash

availability and liquidity, comply with the requirements of their financing agreements, reduce administrative expenses by facilitating the movement of funds, and enhance the development of accurate account balances.   These controls are critical given the significant volume of cash transactions managed through the Cash Management System each day.

12.     The Cash Management System, generally, is based around (a) a Master Collections Account held by Debtor Art Van Furniture, LLC, which collects incoming funds from the Debtors' deposit accounts, and (b) a Primary Operating Account held by Debtor Art Van Furniture, LLC, through which the Debtors manage their worldwide operating disbursements.

13.     The Cash Management System is seamlessly integrated with the Debtors' prepetition ABL Facility (as defined herein).   The Debtors collect funds from various collections accounts, which are collected in the Master Collections Account as described below.   By the close of the business day, any funds that are held in the Master Collections Account are automatically swept by the ABL Agent (as defined herein) and applied to pay down the ABL Facility.   As related to disbursements, each day, the Debtors estimate their required daily cash expenditures and submit a request to the ABL Agent to draw such amount from the ABL Facility.   Any request—including multiple requests, as needed—to draw on the ABL Facility made prior to 2:00 p.m., prevailing Eastern Time, are deposited into the Primary Operating Account (or such other disbursement account as directed by the Debtors) on the same day.   The Debtors use these funds to make disbursements from their various disbursement accounts.   The Debtors maintain any excess cash not disbursed on a given day in the Primary Operating Account and the Subsidiary Operating Account ending in 2448, as the case may be on any given day, and account for such cash when submitting a request for funding on future days.   As of the Petition Date, the Debtors have approximately $11.1 million in the Bank Accounts across the Cash Management System.

13156889 v3

14.    As of the Petition Date, the Cash Management System includes a total of 45 Bank

Accounts, which are held at 6 Cash Management Banks, maintained by the Debtors.  The Debtors

hold their Bank Accounts at various entities across the organizational structure.  The Bank

Accounts are identified on **Exhibit 2** annexed to the Interim Order and the Final Order.[2]  The

following is a table summarizing the number of Bank Accounts and holder:

| Entity Name | # of Bank Accounts |
|---|---|
| Art Van Furniture, LLC | 14 |
| Sam Levin Inc | 8 |
| AV Mattress World, LLC | 5 |
| AV Conner LLC | 3 |
| AVF Franchising, LLC | 3 |
| Avasi, Inc | 2 |
| AV Midwest, LLC | 2 |
| AV Pure Sleep Franchising, LLC | 2 |
| Comfort Mattress LLC, Liberty Finance LLC, AV Mattress Express LLC, AVF Holding Company, Inc., LF Trucking Inc, Wolf Parent LLC | 1 (each) |

15.    The Debtors' primary Cash Management Banks are BOA and PNC Bank, but the

Debtors have Bank Accounts with 5 other banking institutions to facilitate their Cash Management

System, as summarized in the following table:

| Cash Management Banks | # of Bank Accounts |
|---|---|
| BOA | 24 |
| PNC Bank | 15 |
| First Commonwealth | 2 |
| M&T Bank | 2 |
| Huntington National Bank | 1 |
| Wells Fargo | 1 |

---

[2]    As of the Petition Date, the Cash Management System includes 45 Bank Accounts; however, in the ordinary course, the Debtors may close existing accounts or open new accounts.

16.    Pursuant to the respective credit agreements and other loan documents (including intercreditor and deposit account control agreements) governing the Debtors' prepetition asset-based revolving credit facility (the "ABL Facility") and the Debtors' term loan credit facility ("Term Loan Facility"), substantially all of the cash held in the Bank Accounts is subject to properly-perfected security interests in favor of Wells Fargo Bank, N.A., solely in its capacity as administrative agent under the ABL Facility (the "ABL Agent"), and Virtus Group, LP, solely in its capacity as administrative agent under the Term Loan Facility.

17.    Each of the Bank Accounts serves dedicated functions as described in the following table:

| Account | Account Description |
| --- | --- |
| **Primary Operating Account**<br><br>Bank of America<br><br>Account ending 1220<br><br>Art Van Furniture LLC | The Debtors' Primary Operating Account is the Debtors' primary account for funding operations. On a daily basis, the Debtors estimate their required daily cash expenditures and submit a request to the ABL Agent to draw such amount from the ABL Facility. Any request or requests made prior to 2:00 p.m., prevailing Eastern Time, are funded into the Master Operating Account (or such other disbursement account as directed by the Debtors) on the same day. That cash is used to fund disbursements to the General Disbursement Accounts and the Payroll Disbursement Accounts. |
| **Master Collections Account**<br><br>Account ending 0556 | The Master Collections Account is the Debtors' primary collections concentration account. Funds in the various other collection accounts are swept daily into the Master Collections Account. At approximately 11:00 p.m., prevailing Eastern Time, each day, any funds that are held in the Master Collections Account are automatically swept by the ABL Agent and applied to pay down borrowings under the ABL Facility. |
| **Subsidiary Operating Accounts**<br><br>Accounts ending 2448, 5739, 7292, 5527, 9601, 4307, 4466, 5331, 3447, and 7406 | The Subsidiary Operating Accounts are funded by the Debtors' Primary Operating Account or the ABL Facility for funding operations of the Sam Levin and Wolf subsidiaries. Any excess funds from the subsidiary's operations are collected and disbursed from this account via ACH on an as needed basis. |

| Account | Account Description |
|---|---|
| **Collections Accounts**<br><br>Accounts ending 3376, 5126, 8476, 8513, 9791, 3523, 7508, 7586, 0563, 4987, 5260, 2774, 5388, 7386, 5284, 2779, 1305, 6305, 3169, 1597 | The Debtors' Collection Accounts receive revenue from the Debtors' daily retail, and online transactions. As shown on **Exhibit 1** to the Interim Order.<br><br>Funds from these Collection Accounts are swept into the Master Collection Account in one of two different manners based on needs.  These consist of: (1) eleven automatic Zero-Balance Accounts ("ZBA") and (2) nine manual ACH Sweep Accounts ("ACH").[3]  Generally, the ZBA funds are swept on one day are available the next day in the Master Collections Account. ACH funds are generally sweep on a weekly or as needed basis. |
| **General Disbursement Accounts**<br><br>Accounts ending 8027, 6758, 3866, 1282, 5000, 8068, 0082, 6268, 1300, 5739 | The Debtors' General Disbursement Accounts are funded from the Primary Operating Account and are used to make payments related to the Debtors' financing facilities, including principal and interest payments, and general operating costs, including general expenses, professional fees, and rent payments.  These General Disbursement Accounts are funded on an as-needed basis as described above.<br><br>Payments related to the Debtors' expense management reimbursement tool, employee benefits, and federal and state taxes are automatically debited from the account ending 8027 on a daily basis. |

18.     The Debtors propose to continue using the Bank Accounts described above and listed on **Exhibit 2** annexed to the Interim Order and the Final Order after the Petition Date, subject to their right to open and close accounts in their discretion (which is further subject to the consent of the ABL Agent).

## III.     The Cash Management System.

### 1.     *Cash Collections.*

19.     Cash collections from sales at each of the Debtors' brick and mortar locations are deposited daily into the applicable store's designated Depository Account.  Each Depository

---

[3]     A Zero-Balance Account is an account that the proceeds of which are automatically rolled into the Master Collections Account at the end of each day so that the account maintains no overnight balance.  An ACH Sweep Account is an account that utilizes the ACH product offering of certain banks to sweep transfer balances on an as needed basis to the Master Collections Account.  Funds from the ACH Sweep Account are available the day after such sweep.

Account then manually ACH or ZBA into the Primary Depository Account, which then sweeps to the ABL Facility.

20.     The Debtors request funding from the ABL Facility daily and requested funds are wired transferred into the Primary Operating Account.

### 2.     *Credit Card Collections.*

21.     Credit card sales at the Debtors' brick and mortar locations and purchases on the Debtors' e-commerce website are deposited approximately every day after the credit card sale into the designated Depository Account.  Credit card companies deduct certain "upfront" processing fees, chargebacks, and returns from those receipts *before* they are swept into the Primary Depository Account; such upfront fees total approximately 3% of the gross receipts.  Meanwhile, "back-end fees" (together with the "upfront" fees, the "Processor Fees"), transaction fees, debit fees, and other administrative fees, are paid monthly and range from $570,000 to 700,000 per month based on the volume of credit card transactions.  The Debtors reserve all rights in connection with the Processor Fees.

22.     The Debtors use payment processors to process credit card payments  pursuant to certain agreements (collectively, the "Payment Processing Agreements").  Those agreements permit, among other things, the imposition of fines by credit card companies and for breaches of certain terms in the Payment Processing Agreements by merchants (the "Fines").  Although the Debtors do not expect to incur any prepetition Fines, for the avoidance of doubt, the Debtors assert that any Fines on account of prepetition breaches of the Payment Processing Agreements are prepetition claims that are subject to the automatic stay imposed by section 362 of the Bankruptcy Code and, therefore, credit card companies are not permitted to collect, net, withhold, or setoff such prepetition Fines absent obtaining relief from the Court.

**B.      Disbursements.**

23.      The Debtors make substantially all disbursements from the Primary Operating Account and the Subsidiary Operating Account to meet the Debtors' ordinary course obligations, including operating expenses, vendor and shipper payments, company credit card payments, back-end credit card processing fees, loan payments, accounts payable rent, payroll, payroll taxes and other employee obligations.  The Primary Operating Account only disburses funds via wire, direct deposit, checks, ACH and other similar fund-transfer mechanisms.

## IV.    Bank and Processor Fees.

**A.      Bank Fees.**

24.      In the ordinary course of business, the Debtors incur periodic service charges and other fees in connection with maintaining the Cash Management System (collectively, the "Bank Fees").  The Debtors incur approximately $35,000 per month on account of the Bank Fees.  As of the Petition Date, the Debtors estimate that they owe approximately $87,000 on account of unpaid Bank Fees, the entirety of which is expected to become due and payable within 25 days of the Petition Date.  The Debtors seek authority to continue paying the Bank Fees, including the prepetition Bank Fees, in the ordinary course on a postpetition basis, consistent with historical practices.

**B.      Processor Fees.**

25.      As described above, the Debtors incur both daily and monthly Processor Fees in connection with the Payment Processing Agreements.  As of the Petition Date, the Debtors estimate that they owe approximately $185,000 on account of unpaid Processor Fees, the entirety of which is expected to become due and payable within 25 days of the Petition Date.  The Debtors

10

seek authority to continue paying the Processor Fees, including the prepetition Processor Fees, in the ordinary course on a postpetition basis, consistent with historical practices.

**V.      Company Cards.**

26.      As part of the Cash Management System, the Debtors provide certain employees with credit cards issued by American Express ("Amex") (the "Amex Company Cards") and Wells Fargo ("Wells") (the "Wells Company Cards" and, together with the Amex Company Cards, the "Company Cards").

27.      As of the Petition Date, approximately twelve (12) employees, all of Debtor Art Van Furniture, LLC, have active Amex Company Cards. The Amex Company Cards are corporate guarantee cards for which the relevant employees do not have personal liability. The employees use the Amex Company Cards for approved and legitimate business expenses, including expenses related to travel, supplies procured on behalf of the Debtors in the ordinary course of business, and certain third-party vendor obligations on a discretionary basis.

28.      As of the Petition Date, approximately 140 employees, all of Debtor Sam Levin, Inc., have active Wells Company Cards. The Wells Company Cards are corporate guarantee cards for which the relevant employees do not have personal liability. The employees use the Wells Company Cards for approved and legitimate business expenses related to travel, supplies procured on behalf of the Debtors in the ordinary course of business, and certain third-party vendor obligations on a discretionary basis.

29.      Historically, the Debtors have incurred approximately $207,000 per month in obligations arising from the Company Cards and have a $800,000 monthly credit limit. The expenses incurred on the Company Cards are essential to the operation of the Debtors' business.

30.      The Debtors have policies whereby their employees seek reimbursement or file expense reports for the Debtors' payment of business related expenses. The expenses are ordinary

course expenses that the Debtors' employees incur in performing their job functions, including all expenses incurred on the Company Cards. It is essential to the continued operation of the Debtors' business that the Debtors be permitted to continue reimbursing, or making direct payments on behalf of, employees for such expenses.

31.     As an essential part of the operation of their business, the Debtors require employees to use the Company Cards to pay for the Debtors' procurement of items, such as office supplies, which are used in the Debtors' ordinary course of business. Use of the Company Cards is an integral part of the Debtors' Cash Management System, and continuation of the ability of the Debtors' employees to use the Company Cards for procurement is essential to the continued operation of the Debtors' business.

32.     As of the Petition Date, the Debtors estimate that they owe approximately $420,000 on account of unpaid obligations under the Company Cards, the entirety of which is expected to become due and payable within 25 days of the Petition Date. The Debtors seek authority to continue using the Company Cards and to pay any undisputed prepetition amounts in connection therewith, including all related prepetition charges and fees, in the ordinary course of business consistent with prepetition practices.

## VI.     Business Forms.

33.     In the ordinary course of their business, the Debtors utilize a variety of preprinted correspondence and business forms, such as letterhead and checks (collectively, the "Business Forms"). The Debtors also maintain books and records to document their financial results and a wide array of operating information. To avoid a significant disruption to their business operations and to minimize unnecessary additional expenses to their estates, the Debtors request that the Court authorize the Debtors' continued use of their Business Forms to the limited extent they are preprinted and in existence before the Petition Date, without reference to the Debtors' status as

debtors in possession, rather than requiring the Debtors to incur the unnecessary expense and delay of ordering entirely new forms as required by the *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees* (the "U.S. Trustee Guidelines").  If the Debtors exhaust their existing supply of preprinted Business Forms during these chapter 11 cases, the Debtors will print or order such forms with the designation "Debtor in Possession" and the corresponding bankruptcy case number.  Further, if the Debtors or their agents print certain Business Forms themselves, then the Debtors shall begin printing "Debtor in Possession" legend on such Business Forms as soon as practicable.

## VII.    Compliance with U.S. Trustee Guidelines and Bankruptcy Code.

34.    Section 345 of the Bankruptcy Code governs a debtor's cash deposits during a chapter 11 case and authorizes deposits of money as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment."  For deposits or investments that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code requires the estate to obtain, from the entity with which the money is deposited or invested, a bond in favor of the United States and secured by the undertaking of an adequate corporate surety, or "the deposit of securities of the kind specified in section 9303 of title 31," unless the Court "for cause" orders otherwise. 11 U.S.C. § 345(a)-(b).[4]  Additionally, the U.S. Trustee Guidelines generally require chapter 11 debtors to, among other things, deposit

---

[4]    Strict compliance with the requirement of section 345(b) of the Bankruptcy Code would, in a case such as this, be inconsistent with section 345(a), which permits a debtor in possession to make such investments of money of the estate "as will yield the maximum reasonable net return on such money."  Thus, in 1994, to avoid "needlessly handcuff[ing] larger, more sophisticated debtors," Congress amended 345(b) of the Bankruptcy Code to provide that its strict investment requirements may be waived or modified if the Court so orders "for cause."  140 Cong. Rec. H. 10,767 (Oct. 4, 1994), 1994 WL 54773.

all estate funds in an account with an authorized depository that agrees to comply with the U.S. Trustee's requirements.

> **A. The Bank Accounts Are All Either (1) at Authorized Depositories or (2) Hold a Daily Balance Below the FDIC-Insured Level, and Therefore Comply with Section 345**.

35.     The Bank Accounts comply with the requirements of section 345(b) of the Bankruptcy Code. All but 2 of the Debtors' 45 Bank Accounts are maintained at banks that have executed a Uniform Depository Agreement ("UDA") with, and are designated as authorized depositories by, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), pursuant to the Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "U.S. Trustee Operating Guidelines").  Likewise, all of the Bank Accounts are located in the U.S. and are insured by the Federal Deposit Insurance Corporation ("FDIC"), and the 2 Bank Accounts not maintained with an authorized depository hold a daily balance that does not exceed the applicable FDIC-insured amount.  Thus, the Debtors believe that any funds that are deposited in the Bank Accounts are secure, and, therefore, the Debtors are in compliance with section 345 of the Bankruptcy Code with respect to such Bank Accounts.

## VIII.  Intercompany Transactions.

36.     In the ordinary course of business, the Debtors maintain business relationships with each Debtor and non-Debtor entity, conducting transactions from time to time that result in intercompany receivables and payables (the "Intercompany Balances") and/or are on account of capital contributions, equity investments, or distributions on account of equity investments (all such transactions, collectively, the "Intercompany Transactions").  Intercompany Transactions are made either (a) to reimburse certain Debtors or non-Debtors for various expenditures associated with their businesses, (b) to fund certain Debtors' or non-Debtors' accounts in anticipation of such expenditures, as needed, or (c) to transfer excess funds up to the Primary

Operating Account and/or Credit Line when such excess revenue is available.  Accordingly, at any given time there may be Intercompany Balances owing by one Debtor or non-Debtor to another Debtor or non-Debtor.  This system not only maximizes efficiency but also simplifies third-party interactions with the Debtors as an enterprise.

37.     The Debtors, with the assistance of their restructuring advisor, Alvarez and Marsal, LLC ("A&M"), also have established monitoring systems to track postpetition intercompany transfers.  If the Intercompany Transactions were to be discontinued, the Cash Management System and the Debtors' operations would be unnecessarily disrupted to the detriment of the Debtors, their creditors, and other stakeholders.

## Basis for Relief

**I.      Maintaining the Existing Cash Management System Is Essential to Maximizing the Value of the Debtors' Estates.**

38.     The U.S. Trustee Guidelines require debtors in possession to, among other things: (a) establish one debtor-in-possession bank account for all estate monies required for the payment of taxes, including payroll taxes; (b) close all existing bank accounts and open new debtor-in-possession accounts; (c) maintain a separate debtor-in-possession account for cash collateral; and (d) obtain checks that bear the designation "debtor in possession" and reference the bankruptcy case number and type of account on such checks.  These requirements are designed to provide a clear line of demarcation between prepetition and postpetition claims and payments and help protect against the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the Petition Date.

39.     Considering, however, the integrated Cash Management System that the Debtors have in place for the transfer and distribution of funds, which ties into the Debtors' existing corporate accounting and cash forecasting reporting, enforcement of this provision of the

15

U.S. Trustee Guidelines during these chapter 11 cases would disrupt the Debtors' ability to efficiently administer these chapter 11 cases.  Accordingly, the Debtors respectfully request that the Court allow them to operate each of the Bank Accounts listed on **Exhibit 2** annexed to the Interim Order and the Final Order as they were maintained in the ordinary course before the Petition Date.

40.      Continuation of the Cash Management System is permitted pursuant to section 363(c)(1) of the Bankruptcy Code, which authorizes the debtor in possession to "use property of the estate in the ordinary course without notice or a hearing." 11 U.S.C. § 363(c)(1). Bankruptcy courts routinely treat requests for authority to continue utilizing existing cash management systems as a relatively "simple matter." *In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987).  Additionally, courts recognize that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in part and rev'd in part*, 997 F.2d 1039 (3d Cir. 1993).  The United States Court of Appeals for the Third Circuit has agreed, emphasizing that requiring a debtor to maintain separate accounts "would be a huge administrative burden and economically inefficient."  *Columbia Gas*, 997 F.2d at 1061; *see also In re Southmark Corp.*, 49 F.3d 1111, 1114 (5th Cir. 1995) (noting that maintaining an existing cash management system allows debtors "to administer more efficiently and effectively its financial operations and assets").

41.      Here, requiring the Debtors to adopt a new, segmented cash management system during these chapter 11 cases would be expensive, burdensome, and unnecessarily disruptive to the Debtors' operations.  Importantly, the Cash Management System provides the Debtors with

the ability to instantaneously track and report the location and amount of funds, which, in turn, allows management to track and control such funds, ensure cash availability, and reduce administrative costs through a centralized method of coordinating the collection and movement of funds.  Any disruption of the Cash Management System could have a negative effect on the Debtors' restructuring efforts.  New bank accounts would increase operating costs, and the delays that would result from opening new accounts, revising cash management procedures, and redirecting daily store deposits would negatively impact the Debtors' ability to operate their business while pursuing these arrangements.  Further, the Debtors would be subject to significant administrative burdens and expenses because they would need to execute new signatory cards and depository agreements and create an entirely new manual system for issuing checks and paying postpetition obligations, all as would otherwise be required by the U.S. Trustee Guidelines.  *See* U.S. Trustee Guidelines, at pp. 2–3.

42.    Moreover, the Debtors respectfully submit that parties in interest will not be harmed by their maintenance of the Cash Management System, including maintenance of the Bank Accounts, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred before the Petition Date.  Specifically, with the assistance of their advisors, the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of the Debtors' treasury department.  In light of such protective measures, the Debtors submit that maintaining the Cash Management System is in the best interests of their estates and creditors.

43.    Courts in this district routinely allow large debtors in chapter 11 cases to maintain their existing cash management systems. *See, e.g.*, *In re Destination Maternity Corporation,* No.

19-12256 (BLS) (Bankr. D. Del. Nov. 12, 2019) (authorizing the debtors to continue using the cash management system maintained by the debtors prepetition); *In re Forever 21, Inc.*, No. 19-12122 (KG) (Bankr. D. Del. Oct. 1, 2019) (same); *In re Blackhawk Mining, LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Aug. 3, 2019) (same); *In re PES Holdings, LLC*, No. 19-11626 (KG) (Bankr. D. Del. Jul. 23, 2019) (same); *In re Z Gallerie*, *LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (same); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 26, 2019) (same).[5]

## II.    Authorizing the Debtors to Continue Using Debit, Wire, Credit Card, and ACH Payments Is Warranted.

44.    The Debtors request that the Court grant further relief from the U.S. Trustee Guidelines to the extent they require the Debtors to make all disbursements by check.  In particular, the U.S. Trustee Guidelines require that all receipts and all disbursements of estate funds must be made by check with a notation representing the reason for the disbursement.  As discussed above, in the ordinary course of business, the Debtors conduct transactions through wires, ACH, direct deposits, Company Cards, and other similar methods.  If the Debtors' ability to conduct transactions by these methods is impaired, the Debtors may be unable to perform under certain contracts, and payments to vendors could be delayed, resulting in unnecessary disruption to their business operations and the incurrence of additional costs to their estates.

## III.   Authorizing the Cash Management Banks to Continue to Maintain, Service, and Administer the Bank Accounts in the Ordinary Course Is Warranted.

45.    The Debtors respectfully request that the Court authorize the Cash Management Banks to continue to maintain, service, and administer the Bank Accounts as accounts of the

---

[5]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

Debtors as debtors in possession, without interruption and in the ordinary course.  In this regard, the Cash Management Banks should be authorized to receive, process, honor, and pay any and all checks, and other instructions and drafts payable through, drawn, or directed on such Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto; *provided* that any check, ACH transfer, draft, or other notification that the Debtors advise the Cash Management Banks to have been drawn, issued, or otherwise presented before the Petition Date may be honored by the Cash Management Banks only to the extent authorized by order of the Court.

46.     The Debtors further request that the Court authorize the Bank Accounts to accept and honor all representations from the Debtors as to which checks, drafts, ACH transfers, or wires should be honored or dishonored consistent with any order of the Court and governing law, whether such checks, drafts, ACH transfers, or wires are dated before or subsequent to the Petition Date.  The Debtors also request that, to the extent a bank honors a prepetition check or other item drawn on any account either (a) at the direction of the Debtors, (b) in a good-faith belief that the Court has authorized such prepetition check or item to be honored, or (c) as a result of a mistake made despite implementation of customary item handling procedures, such bank will not be deemed to be liable to the Debtors, their estates, or any other party on account of such prepetition check or other item honored postpetition.  The Debtors respectfully submit that such relief is reasonable and appropriate because the Cash Management Banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise.

47.     Moreover, the Debtors request that the Court authorize the Debtors to pay any prepetition Bank Fees on account of prepetition transactions that are charged postpetition, and

authorize the Cash Management Banks to: (a) continue to charge the Debtors the Bank Fees; and (b) charge-back returned items to the Bank Accounts, whether such items are dated before, on, or subsequent to the Petition Date, in the ordinary course.

## IV.   The Requested Waivers Are Appropriate.

### A.   Cause Exists to Waive the U.S. Trustee Guidelines Regarding Authorized Depositories and Section 345(b) of the Bankruptcy Code.

48.    To the extent the Cash Management System does not strictly comply with the U.S. Trustee Guidelines and section 345 of the Bankruptcy Code, the Debtors seek a waiver of the deposit requirements set forth therein and the U.S. Trustee Guidelines.  Section 345(a) of the Bankruptcy Code authorizes deposit or investment of money of estates, such as cash, as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a).  For deposits that are not "insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code provides that the estate must require from the entity with which the money is deposited or invested a bond in favor of the United States secured by the undertaking of a corporate security, "unless the court for cause orders otherwise." 11 U.S.C. § 345(b).

49.    Courts may waive compliance with the Bankruptcy Code section 345 and the U.S. Trustee Guidelines for "cause."  In evaluating whether "cause" exists, courts have considered a number of factors, such as: (a) the sophistication of the debtor's business; (b) the size of the debtor's business operations; (c) the amount of the investments involved; (d) the bank rating (Moody's and Standard & Poor) of the financial institution where the debtor in possession funds are held; (e) the complexity of the case; (f) the safeguards in place within the debtor's own business for ensuring the safety of the funds; (g) the debtor's ability to reorganize in the face of a failure of

20

one or more of the financial institutions; (h) the benefit to the debtor; (i) the harm, if any, to the estate; and (j) the reasonableness of the debtor's request for relief from section 345(b) requirements in light of the overall circumstances of the case. *See In re Serv. Merch. Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).

50.     Here, "cause" exists because, among other things:  (a) all of the Debtors' Cash Management Banks are highly rated, reputable banks that are subject to supervision by national banking regulators; (b) the Debtors have internal safeguards in place through their treasury department to ensure the safety of the funds and also retain the right to open and close accounts with the Cash Management Banks and establish new bank accounts as needed; and (c) requiring the Debtors to transfer the funds to a designated authorized depository would place a needless administrative burden on the Debtors that would unnecessarily divert the attention of the Debtors' management away from the critical sale and store closure processes.  On balance, the benefits of a waiver would far outweigh any potential harm to the estates from noncompliance with section  345(b).

51.     Further, all but 2 of the Debtors' Bank Accounts are maintained at banks that are authorized depositories.  Although eight of the non-consolidated Depository Accounts are at banks not designated as authorized depositories in the District of Delaware, the Debtors submit that they are well-capitalized and financially-stable institutions insured by either the FDIC or CDIC, and do not exceed the insured limits.  Therefore, the Debtors submit that cause exists to waive the U.S. Trustee Guidelines and allow the Debtors to continue to maintain the Bank Accounts in the ordinary course of business.

52.     Courts in this district have regularly waived the U.S. Trustee Guidelines on the grounds that they may be potentially disruptive to a debtor's postpetition business operations and

restructuring efforts. *See, e.g.*, *In re Destination Maternity Corporation,* No. 19-12256 (BLS) (Bankr. D. Del. Nov. 12, 2019) (granting waiver of section 345(b) of the Bankruptcy Code) *In re Forever 21, Inc.*, No. 19-12122 (KG) (Bankr. D. Del. Oct. 1, 2019) (same); *In re Blackhawk Mining, LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Aug. 3, 2019) (same); *In re PES Holdings, LLC*, No. 19-11626 (KG) (Bankr. D. Del. Jul. 23, 2019) (same); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 26, 2019) (same); *In re VER Techs. Holdco LLC*, No. 18-10834 (KG) (Bankr. D. Del. May 4, 2018) (same).[6]

B.     **The Court Should Authorize the Debtors to Continue Using Their Existing Business Forms.**

53.     The U.S. Trustee Guidelines and Bankruptcy Local Rule 2015-2(a) also require debtors in possession to obtain checks that bear the designation "debtor in possession" on such checks.   To avoid disruption of the Cash Management System and unnecessary expense, the Debtors request that they be authorized to continue to use the Business Forms substantially in the form existing immediately before the Petition Date, without reference to their status as debtors in possession.   The Debtors submit that parties in interest will not be prejudiced by this relief.   Parties doing business with the Debtors undoubtedly will be aware of their status as debtors in possession and, thus, changing Business Forms is unnecessary and would be unduly burdensome.   If the Debtors exhaust their existing supply of checks during these chapter 11 cases, the Debtors will print or order checks with the designation "Debtor in Possession" and the corresponding bankruptcy number.   Further, if the Debtors or their agents print certain Business Forms

---

[6]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

themselves, then the Debtors shall begin printing "Debtor in Possession" legend on such Business Forms as soon as practicable.

54.     In other chapter 11 cases, courts in this district have allowed debtors to use their prepetition business forms without the "debtor in possession" label. *See, e.g.*, *In re Destination Maternity Corporation,* No. 19-12256 (BLS) (Bankr. D. Del. Nov. 12, 2019) (authorizing debtors' continued use of preprinted check stock without a "Debtor in Possession" marking until the supply is exhausted); *In re Forever 21, Inc.*, No. 19-12122 (KG) (Bankr. D. Del. Oct. 1, 2019) (same); *In re Blackhawk Mining, LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Aug. 3, 2019) (same); *In re PES Holdings, LLC*, No. 19-11626 (KG) (Bankr. D. Del. Jul. 23, 2019) (same); *In re Z Gallerie*, *LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (same).

## Processing of Checks and Electronic Fund Transfers Should Be Authorized

55.     The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral.  Under the Debtors' existing cash management system, the Debtors have made arrangements to readily identify checks or wire transfer requests relating to the Cash Management System, as applicable.  Accordingly, the Debtors believe that checks or wire transfer requests that are not related to authorized payments will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

## The Requirements of Bankruptcy Rule 6003(b) Are Satisfied

56.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003.  For the reasons discussed above, authorizing the

Debtors to (a) continue to operate their Cash Management System; (b) honor certain prepetition obligations related thereto; and (c) maintain existing Business Forms in the ordinary course of business that accrued prior to the Petition Date, and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases smoothly. Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

57.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Reservation of Rights

58.     Nothing contained in this Motion or any actions taken by the Debtors pursuant to any order granting the relief requested by this Motion is intended or should be construed as:  (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied

24

pursuant to this Motion are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's Interim Order and Final Order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

## Notice

59.     Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Bankruptcy Local Rules, and is sufficient under the circumstances. Without limiting the foregoing, due notice will be afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties-in-interest, including: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agents under the Debtors' prepetition secured facilities and counsel thereto; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the state attorneys general for states in which the Debtors conduct business; (g) the Debtors' Banks; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

60.     No prior motion for the relief requested herein has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

13156889 v3

WHEREFORE, the Debtors respectfully request that the Court enter interim and final orders, substantially in the forms attached hereto, respectively, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Dated:  March 8, 2020
Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

    */s/ Gregory W. Werkheiser*
Gregory W. Werkheiser (DE No. 3553)
Michael J. Barrie (DE No. 4684)
Jennifer Hoover (DE No. 5111)
Kevin Capuzzi (DE No. 5462)
John C. Gentile (DE No. 6159)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: gwerkheiser@beneschlaw.com
       mbarrie@beneschlaw.com
       jhoover@beneschlaw.com
       kcapuzzi@beneschlaw.com
       jgentile@beneschlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*