## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) Case No. 20-10553 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

### DEBTORS' MOTION FOR
### ENTRY OF INTERIM AND FINAL ORDERS
### (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION
### EMPLOYEE WAGES, SALARIES, OTHER COMPENSATION,
### AND REIMBURSABLE EMPLOYEE EXPENSES AND (B) CONTINUE
### EMPLOYEE BENEFITS PROGRAMS AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors")
respectfully state the following in support of this motion (this "Motion"):

### Relief Requested

1.    The Debtors seek entry of an interim order (the "Interim Order") and a final order
(the "Final Order"), substantially in the forms attached hereto:  (a) authorizing the Debtors to
(i) pay prepetition wages, salaries, commissions, other compensation, and reimbursable employee
expenses and (ii) continue employee benefits programs in the ordinary course, including payment
of certain prepetition obligations related thereto, in an aggregate amount not to exceed $12,585,000
pursuant to the Interim Order and $20,406,000 pursuant to the Final Order; and (b) granting related
relief.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509);
AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC
(8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising,
LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location
of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

2.      In addition, the Debtors request that the Court schedule a final hearing within approximately 25 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

### Jurisdiction and Venue

3.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012 (the "Amended Standing Order").  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The bases for the relief requested herein are sections 105(a), 362(d), 363(b), 507(a), and 541(b)(1) of chapter 11 of title 11 of the United State Code (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004, and Bankruptcy Local Rule 9013-1(m).

### Background

6.      The Debtors operate 169 locations, including 92 furniture and mattress showrooms and 77 freestanding mattress and specialty locations.  The Debtors do business under brand names, including Art Van Furniture, Pure Sleep, Scott Shuptrine Interiors, Levin Furniture, Levin Mattress, and Wolf Furniture.  The Debtors were founded in 1959 and was owned by its founder,

Art Van Elslander, until it was sold to funds affiliated with Thomas H. Lee Partners, L.P. ("THL") in March 2017.  Pennsylvania based Levin Furniture and Wolf Furniture were acquired by Art Van in November 2017.  As of the Petition Date (as defined below), the Debtors operate stores throughout Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia. The Debtors are headquartered in Warren, Michigan and have approximately 4,500 employees as of the Petition Date (as defined below).

7.    On March 8, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of David Ladd, Executive Vice President and Chief Financial Offer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with this Motion and incorporated by reference herein.  Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

### The Debtors' Workforce

8.    As of the Petition Date, the Debtors employ over 4,535 employees (the "Employees"), including approximately 3,910 full-time employees and 625 part-time employees.

3

9.      The Employees perform a variety of functions critical to the preservation of value and the administration of the Debtors' estates.  In many instances, the Employees include personnel who are intimately familiar with the Debtors' businesses, processes, and sales procedures, and who cannot be easily replaced.  Without the continued, uninterrupted services of the Employees, the ability of the Debtors to maximize creditor recoveries through an orderly accounts receivable collection, the sale or other disposal of assets, and the general administration of the Debtors' estates will be materially impaired.

10.     Additionally, many of the Employees rely on their compensation and benefits to pay their daily living expenses.  Thus, the Employees will be exposed to significant financial hardship if the Debtors are not permitted to continue paying the Employees' compensation and providing the Employees with health and other benefits.  Without the continued, uninterrupted services of their Employees, the Debtors' efforts to consummate the store closings and wind down process will be threatened.  Consequently, the Debtors respectfully submit that the relief requested herein is necessary and appropriate under the facts and circumstances of these chapter 11 cases.

### Employee Compensation and Benefits

11.     To minimize the personal hardship the Employees could suffer if prepetition Employee-related obligations are not paid when due or as expected and to maintain stability in the Debtors' workforce during the administration of the Debtors' chapter 11 cases, the Debtors, by this Motion, seek authority to:  (a) pay and honor certain prepetition claims relating to, among other things, wages, salaries, commissions, and other compensation, payroll services, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, and taxes), reimbursable expenses, health insurance, retirement health and related benefits, workers' compensation benefits, life insurance, short and long-term disability

4

coverage, auxiliary benefits, time off policies, and other benefits that the Debtors have historically

provided in the ordinary course (collectively, the "Employee Compensation and Benefits"); and

(b) pay all costs incidental to the Employee Compensation and Benefits, collectively in an

aggregate amount not to exceed $12,585,000 pursuant to the Interim Order and $20,406,000

pursuant to the Final Order.

12.    Subject to approval of the relief requested herein, the Debtors intend to continue

their applicable prepetition Employee Compensation and Benefits in the ordinary course.  Out of

an abundance of caution, the Debtors further request authority to modify, change, and discontinue

any of their Employee Compensation and Benefits and to implement new programs, policies, and

benefits in the ordinary course during these chapter 11 cases without the need for further Court

approval, subject to the Bankruptcy Code and any other provisions of applicable law.

13.    By this Motion, the Debtors seek authority to make the following payments related

to prepetition amounts owed on account of the Employee Compensation and Benefits:

| Employee Obligation | Interim Amount | Final Amount |
|---|---|---|
| **Employee Compensation** | | |
| Unpaid Compensation | $3,053,000 | $3,053,000 |
| Non-Insider Commissions | 4,479,000 | 5,539,000 |
| Unpaid Withholding Obligations | 1,225,000 | 1,364,000 |
| Unpaid Independent Contractors | 30,000 | 30,000 |
| Unpaid Payroll Processing Fees | 11,000 | 11,000 |
| Unpaid Reimbursable Expenses | 9,000 | 27,000 |
| **Benefits** | | |
| Unpaid Health Benefit Plans | $2,687,000 | $2,687,000 |
| Unpaid FSA/HSA Costs | 36,000 | 36,000 |
| Unpaid Voluntary Additional Benefits | 83,000 | 83,000 |
| Unpaid Workers' Compensation Obligations | 716,000 | 716,000 |
| Unpaid 401(k) Plan Deduction | 256,000 | 256,000 |
| Unpaid Paid Time-Off | | 6,622,000 |

| Employee Obligation | Interim Amount | Final Amount |
|---|---|---|
| **Total** | **$12,585,000** | **$20,424,000** |

14.     As of the Petition Date, the Debtors estimate the total amount outstanding on account of the Employee Compensation and Benefits is approximately $20,406,000.  The Debtors do not believe any Employee is owed Employee Compensation (as defined herein) in excess of the $13,650 priority wage cap imposed by section 507(a)(4) of the Bankruptcy Code (the "Priority Cap").

**I.      Employee Compensation and Withholding Obligations.**

      **A.      Unpaid Compensation.**

15.     In the ordinary course, the Debtors incur obligations to their Employees for, among other things, wages, salaries, overtime, sales commissions, and other obligations described herein (collectively, the "Employee Compensation").  The Debtors' historical average monthly gross Employee Compensation, including wages, salaries, and related compensation, has been approximately $13,000,000.  As of the Petition Date, the Debtors estimate that they owe approximately $3,053,000 pursuant to the Interim Order and $3,053,000 pursuant to the Final Order on account of unpaid Employee Compensation earned by Employees prior to the Petition Date (the "Unpaid Compensation").  As described above, loss of the Unpaid Compensation that the Employees are owed could cause such Employees to experience financial hardship.  In light of the substantial benefit the Employees will continue to provide to the Debtors' estates, the Debtors wish to avoid imposing such a hardship.

16.     Accordingly, by this Motion the Debtors seek authority, but not direction, to pay their Employees any Unpaid Compensation in the ordinary course and consistent with past practice and to continue the Employee Unpaid Compensation practices on a postpetition basis in the

13165068 v3

ordinary course of the Debtors' business and consistent with past practice. For the avoidance of doubt, the Debtors do not believe they owe any Employee Unpaid Compensation in excess of the Priority Cap and do not seek to pay Unpaid Compensation to any Employee in excess of the Priority Cap by this Motion.

**B.      Non-Insider Commissions.**

17.      The Debtors maintain a number of commission programs to drive performance among their Employees, primarily in the form of sales commissions for store sales associates (collectively, the "Non-Insider Commissions").[2]  The Non-Insider Commissions typically offset hourly wages for the applicable Employees. Currently, there are over 1,360 employees eligible to receive commissions. The specifics of the Non-Insider Commissions may vary slightly based on the Debtor administering the program. However, the Non-Insider Commissions typically follow the structure below:[3]

- Volume Commission: The Debtors' sales associates typically earn a commission as a function of the volume of sales delivered in a given month (the "Volume Commissions"). The amount of the Volume Commission owed to a sales associate varies based on a graduated scale as a percentage of the total sales attributable to the sales associate.

- Warranty Bonuses: The Debtors' sales associates typically earn a bonus as a percentage of certain warranty sales attributable to the sales associate (the "Warranty Bonuses").

- Spiff Bonuses: Certain of the Debtors' sales associates may earn an immediate bonus or "spiff" in connection with sales of specific products such as bedding or mattress pads (the "Spiff Bonuses"). The Spiff Bonuses vary depending on product and model.

---

[2]  The Debtors are not seeking relief to pay any Employee that is an insider, as such term is defined in section 101(31) of the Bankruptcy Code, under these programs.

13165068 v3

18.    The Debtors estimate that they currently have approximately $5,539,000 in outstanding obligations to Employees on account of the Non-Insider Commissions and that approximately $4,479,000 will become due and payable within the Interim Period.  The Non-Insider Commissions are critical to incentivizing Employee performance, particularly in the context of these chapter 11 cases.  Further, because commissions typically offset hourly wages to sales associates, such Employees depend on the Non-Insider Commissions for their regular income.   Accordingly, the Debtors seek authority to pay in a manner consistent with historical practice any unpaid prepetition amounts on account of the Non-Insider Commissions and to continue the Non-Insider Commissions in the ordinary course during the administration of these chapter 11 cases.

C.    **Withholding Obligations.**

19.    During each applicable payroll period, the Debtors routinely deduct certain amounts from Employees' paychecks, including garnishments, child support, and similar deductions, as well as other pre-tax and after-tax deductions payable pursuant to certain employee benefit plans discussed herein, legally ordered deductions, and miscellaneous deductions (collectively,  the "Payroll Deductions"),  and  forward  such  amounts  to  various  third-party recipients.

20.    In addition to the Payroll Deductions, certain federal and state laws require that the Debtors withhold certain amounts from Employees' gross pay related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, or local taxing authorities.  The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for federal and state unemployment insurance and

Social Security and Medicare taxes (together with the Employee Payroll Taxes, the "Payroll Taxes").  The Payroll Taxes are generally processed and forwarded to the appropriate federal, state, and local taxing authorities at the same time the Employees' payroll checks are disbursed.

21.    As of the Petition Date, the Debtors estimate that they will have approximately $3,792,000 in unpaid Payroll Deductions and Payroll Taxes (together, the "Withholding Obligations") outstanding, $3,226,000 of which would come due within the first 25 days of these chapter 11 cases.  By this Motion, the Debtors seek authority to pay in a manner consistent with historical practice any unpaid Withholding Obligations and to continue to honor the Withholding Obligations in the ordinary course during the administration of these chapter 11 cases.

**D.    Independent Contractors.**

22.    In addition to the Employees, as of the Commencement Date, the Debtors retained from time to time specialized individuals as independent contractors (collectively, the "Independent Contractors") to fulfill certain duties, including marketing, accounting, finance, and information technology functions for the Debtors.  As of the Commencement Date, the Debtors retained approximately 25 Independent Contractors.  The Independent Contractors rely on the compensation received to pay their daily living expenses.  The Employees rely on the support of the Independent Contractors to complete certain tasks in furtherance of the Debtors' businesses.  The Debtors believe the authority to continue paying their Independent Contractors is critical to maintaining and administering their estates.  These individuals could experience significant financial hardship if the Bankruptcy Court does not permit the Debtors to continue paying their compensation.

13165068 v3

23.    As of the Petition Date, the Debtors estimate that they owe approximately $30,000 on account of unpaid independent contractor payments (the "Unpaid Contractor Amounts"), all of which will come due within the first 25 days of these chapter 11 cases.

### E.    Payroll Processing

24.    Certain Withholding Obligations for the Debtors' Employees are processed by ADP ("ADP").   The majority of Employee Compensation obligations are satisfied by direct deposit through the electronic transfer of funds from the Debtors' payroll department directly to each Employee's bank account, with the balance of Employees receiving checks.   The Debtors pay approximately $22,000 per month for such services.   As of the Petition Date, the Debtors estimate that they owe approximately $11,000 on account of prepetition payroll services (the "Unpaid Payroll Processing Fees"), all of which will come due within the first 25 days of these chapter 11 cases.   By this Motion, the Debtors seek authority to pay the Unpaid Payroll Processing Fees in the ordinary course and consistent with past practice and to continue payroll processing in the ordinary course during the administration of these chapter 11 cases.

### F.    Reimbursable Expenses.

25.    Prior to the Petition Date and in the ordinary course, the Debtors reimbursed Employees or paid credit card invoices[4] of certain Employees for approved expenses incurred on behalf of the Debtors in the scope of their employment (the "Reimbursable Expenses").   The Reimbursable Expenses are largely on account of costs incurred related to employee travel for reasonable business related purposes and certain other work-related expenses.   Employees who

---

[4]    For further discussion of the Debtors' credit cards, please see *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Existing Business Forms, And (II) Granting Related Relief*, filed contemporaneously herewith.

13165068 v3

pay up front for Reimbursable Expenses apply for reimbursement by submitting an expense report to the Debtors. Once they have determined that the charges are for legitimate reimbursable business expenses, the Debtors reimburse Employees for these expenses. Types of reimbursable travel expense include airfare, hotel, car rental, personal car mileage, business meals, and other business related purchases.

26. The Debtors' inability to reimburse such expenses could impose hardship on such individuals, who incurred the obligations for the Debtors' benefit. Certain Employees have been issued American Express Corporate Cards (the "Amex Cards") based on the requirements of their job functions. The Debtors and the Employee are jointly liable for all card transactions. All approved Amex Card charges are paid by the Debtors directly to American Express Corporate Card Services. Though these cards are directly reimbursed by the Debtors, the Debtors request authority to continue the program and to continue to pay the Amex Card expenses in the ordinary course during the administration of these chapter 11 cases.

27. On average, the Debtors also pay Reimbursable Expenses of approximately $18,000 per month in the aggregate to the Employees. As of the Petition Date, the Debtors estimate that they owe approximately $9,000 in aggregate Reimbursable Expenses, all of which would come due within the first 25 days of these chapter 11 cases.

28. Although the Debtors ask that reimbursement requests be submitted promptly, sometimes submission delays occur and Employees may submit reimbursement requests for prepetition expenses after the Petition Date. Employees incurred the Reimbursable Expenses on the Debtors' behalf and with the understanding that such expenses would be reimbursed fully. Accordingly, to avoid harming Employees who incurred the Reimbursable Expenses and who may become personally liable for such expenses, the Debtors request authority to pay the Reimbursable

11

Expenses and to continue to pay the Reimbursable Expenses in the ordinary course during the administration of these chapter 11 cases.

## II.    Benefits.

29.    The Debtors offer their Employees and certain eligible dependents the ability to participate in a number of benefits programs, including, among other programs, medical, dental, prescription drug, and vision plans, flexible spending accounts, a health savings account, basic life and accidental death and dismemberment insurance, disability benefits, workers' compensation, retirement plans, time off, and other employee benefit plans (collectively, the "Benefits").

30.    As described above, failure to continue the Benefits could cause Employees to experience severe hardship.  In light of the substantial benefit the Employees have provided and will continue to provide to the Debtors' estates, the Debtors wish to avoid imposing such a hardship.  Accordingly, by this Motion, the Debtors seek authority to:  (a) pay any unpaid amounts due with respect to the Benefits; and (b) continue to provide the Benefits in the ordinary course during the administration of these chapter 11 cases.  As of the Petition Date, the Debtors estimate that they owe approximately $10,400,000 on account of the Benefits, $3,778,000 of which will come due within the first 25 days of these chapter 11 cases.  The Benefits are described in greater detail below.

### A.    Health Benefit Plans.

31.    The Debtors offer their Employees the opportunity to participate in a number of health benefit plans, including medical, vision, dental, and prescription drug plans (collectively, the "Health Benefit Plans").  The Debtors self-fund the Health Benefits Plans through Employee and Debtor contributions.  Specifically, the Debtors provide the following:

- Healthcare Plans:  The Debtors' offer three comprehensive medical plan options, one minimum essential coverage medical plan option,

12

and a prescription benefits plan (collectively, the "<u>Healthcare Plans</u>"), which are administered by Blue Cross Blue Shield of Michigan ("<u>BCBSMI</u>").    The Debtors pay approximately $1,314,000 per month related to the Healthcare Plans.  As of the Petition Date, the Debtors estimate that they owe approximately $2,496,000 under the Healthcare Plans.

- <u>Dental Plan</u>:    The Debtors offer their Employees the option of participating in a dental plan (the "<u>Dental Plan</u>") administered by Delta Dental of Michigan ("<u>Delta</u>").    The Debtors pay approximately $91,000 per month related to the Delta Plan.  As of the Petition Date, the Debtors estimate that they owe approximately $136,500 under the Dental Plan.

- <u>Vision Plan</u>:  The Debtors also offer their Employees the option of participating in a vision plan (the "<u>Vision Plan</u>") administered by the BCBSMI and Vision Services Plan ("<u>VSP</u>").  The Debtors pay approximately $36,000 per month related to the Vision Plan.  As of the Petition Date, the Debtors estimate that they owe approximately $54,000 under the Vision Plan.

32.    In total, the Debtors estimate that they owe approximately $2,687,000 on account of the Health Benefit Plans, all of which they estimate will come due within the first 25 days of these chapter 11 cases.  By this Motion, the Debtors seek authority to honor prepetition obligations on account of the Health Benefit Plans and continue the Health Benefit Plans on a postpetition basis in the ordinary course of business.

**B.    Flexible Spending Accounts.**

33.    The Debtors also provide Employees who participate in certain of the Health Benefit Plans with the ability to participate in either of two flexible spending accounts, a "Health FSA" or a "Dependent Care FSA" (together, the "<u>FSAs</u>"), administered by Discovery Benefits. The FSAs allows such Employees to contribute pre-tax dollars for eligible healthcare expenses.

**C.    Because the Debtors do not contribute to Employees' FSAs, the Debtors believe the FSA amounts are generally held in trust by the Debtors and are not property of their estates.  However, over the course of each year, Employees may utilize the FSA amounts held by the Debtors to pay for a wide variety of health and dependent care not otherwise covered by the Health Benefit Plans.**

13

**When an Employee seeks to use their elected FSA amounts, the Debtors' remit such amount to the requested healthcare provider through Discovery Benefits, Inc., the FSA administrator.  Health Savings Accounts.**

34.    For certain Employees who participate in the Debtors' high-deductible Healthcare Plan option, the Debtors offer access to a health savings account (the "HSA") serviced by Health Equity.  Participating Employees can opt to make pre-tax contributions to their individual HSA through payroll deductions to cover reimbursements under the program up to the maximum amount permitted by the Internal Revenue Service.  The Debtors have a matching program for their HSA (the "Company HSA Contributions") that caps out at $500 annually for individual associate plans and $1,000 for "associate plus one," "associate plus children," or "family coverage."

35.    On an average monthly basis, the Debtors collect and withhold approximately $66,000 per month of voluntary contributions from employees paychecks for both the FSA and HSA programs.  As of the Petition Date, the Debtors believe they owe approximately $15,300 in accrued but unpaid FSA and HSA Amounts (collectively, the "FSA/HSA Costs"), all of which may become due within 25 days of the Petition Date.  Accordingly, by this Motion, the Debtors seek authority to continue to pay and/or remit the FSA/HSA Amounts and to continue the HSA, including the Company HSA Contributions, in the ordinary course during the administration of these chapter 11 cases.

**D.    Other Insurance, Disability Benefits, and Employee Assistance Programs.**

**Life and AD&D and Disability Insurance Programs.**

36.    The Debtors provide, at no cost to their Employees, basic life and accidental death and dismemberment insurance (the "Basic Life and AD&D Insurance") to Employees through

14

Hartford ("Hartford").  Employees are also provided the Basic Life and AD&D Insurance if any

dismembered or loss of senses results from an accident that prevents an Employee from working.

37.      Employees may choose to purchase voluntary supplemental life insurance and

accidental death and dismemberment insurance (the "Supplemental Life and AD&D Insurance")

with coverage of up to $200,000 in the event of death of an Employee, up to $30,000 in the event

of the death of a spouse, and $10,000 in the event of a death of a child.  The Debtors' Supplemental

Life and AD&D Insurance is an optional benefit for Employees that wish to supplement the Basic

Life and AD&D Insurance.  The Supplemental Life and AD&D Insurance is completely funded

by participating Employees but administered by the Debtors.  Because Employees pay for all costs

of Supplemental Life AD&D, the Debtors do not believe that they owe any amounts with respect

to the Supplemental Life and AD&D Insurance as of the Petition Date. Nevertheless, out of an

abundance of caution, they seek authority to continue to offer this benefit in the ordinary course

during the administration of these chapter 11 cases.

**Disability Benefits.**

38.      The Debtors provide Employees with short- and long-term disability benefits

(the "Disability Benefits") through Hartford.  The short-term disability benefit is funded by the

Debtors.   For eligible Employees, short-term disability benefit replaces a portion of such

Employee's income (60 percent of pre-disability earnings to a maximum of $600 per week) on the

eighth calendar day after the Employee is unable to work due to injury or sickness at a maximum

coverage period of twenty-six weeks.  The Debtors also offer Employees the option to purchase

long-term disability coverage.   This benefit provides extended income protection while an

employee is unable to work as a result of disabilities lasting longer than six months.   There is a

180 calendar day waiting period and a benefit maximum of 60 percent of pre-disability earnings

13165068 v3

for a maximum of $2,500 per month up to such Employee's return to work or age sixty-five (or longer depending on the age at which the disability began).

**Other Insurance and Company Offered Programs**

39.     The Debtors offer certain voluntary insurance products provided by Hartford and Unum including critical illness insurance, accident insurance, whole life insurance and hospital indemnity insurance (collectively, the "Additional Voluntary Products").    The Additional Voluntary Products are paid by the participating Employees to the applicable insurer through the Payroll Deductions.

40.     In addition, the Debtors offer certain other miscellaneous benefits, which the Debtors fund, including basic legal assistance, identity protection, (the "Miscellaneous Programs," and, together with the Voluntary Insurance Programs, the "Auxiliary Benefits").

41.     On an average monthly basis, the Debtors collect and withhold approximately $360,000 per month of voluntary contributions from employees paychecks for their participation in the other insurance, disability, EAP and other programs listed above (collectively the "Voluntary Additional Benefits").    The Debtors further estimate that they currently owe approximately $83,000 to the Voluntary Additional Benefits service providers as of the Petition Date.  By this Motion, the Debtors seek the authority to continue to honor employees' voluntary participation and remit withholdings to the Voluntary Additional Benefits service providers in the ordinary course of business during the pendency of these Chapter 11 cases.

    **E.      Workers' Compensation Program.**

42.     The Debtors maintain workers' compensation insurance for their Employees (or are otherwise self-insured) at the statutorily-required level for each state in which the Debtors have Employees.  Specifically, the Debtors (a) self-insure for workers compensation in the State of

Michigan under a program administered by CompOne Administrators, Inc. (b) pay directly to the Ohio Workers Compensation Board, (c) maintain a workers compensation policy through Phoenix Insurance Company for workers other than in Michigan and (d) maintain an excess Workers Compensation program through Safety National Group (collectively, the "Workers' Compensation Program").

43.    The Debtors pay approximately $1,527,000 per year in premiums, fees, and claims annually to maintain the Workers' Compensation Program (the "Workers' Compensation Premiums").  As of the Petition Date, the Debtors estimate that they owe approximately $716,000 in installment payments and policy renewals for the Workers' Compensation Program (including annual renewals of the Phoenix Insurance and Safety National programs) all of which will come due within 25 days of the Petition Date.

44.    The Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements.

45.    Because the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that disrupt the restructuring process.  The Debtors seek authority to:  (a) continue the Workers' Compensation Program in the ordinary course of business on a postpetition basis;[5] (b) modify the

---

[5]    The Debtors' Workers' Compensation Program may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder.  By this Motion, the Debtors request authority to continue the Workers' Compensation Program postpetition, including making any changes to current policy and practices that become necessary, subject to applicable law.

13165068 v3

automatic stay solely to allow Employees to assert claims under the Workers' Compensation Program; and (c) pay all Unpaid Workers' Compensation Premiums.

### F.    401(k) Plan.

46.    The Debtors offer eligible Employees the opportunity to participate in a 401(k) plan (the "401(k) Plan"). The 401(k) Plan is administered by Massachusetts Mutual Life Insurance Company ("MassMutual") and generally provides for automatic pre-tax and post-tax wage deductions of eligible compensation up to the limits set forth by the Internal Revenue Code. The Debtors have the discretion to match an Employee's 401(k) Plan contributions (the "401(k) Contributions"). The Debtors generally match the first three percent of 401(k) Contributions dollar for dollar and the next two percent of 401(k) Contributions at fifty cents on the dollar.

47.    Each pay period, the Debtors deduct the Employees' 401(k) Plan contributions from the Employees' paychecks (the "401(k) Deductions") and hold such amounts in trust until they are forwarded to MassMutual. The Debtors deduct approximately $720,000 in the aggregate each month from Employee's paychecks on account of the 401(k) Deductions. As of the Petition Date, the Debtors estimate that they owe approximately $256,000 on account of the 401(k) Deductions (the "Unremitted 401(k) Deductions").

48.    The Debtors retain MassMutual to act as a 401(k) administrator and record keeper, paying them annually in an aggregate amount of approximately $500 per year.

49.    Many Employees' retirement savings solely consist of the 401(k) Plan. Thus, the Debtors believe that continuing the 401(k) Plan is essential to maintaining Employee morale and protecting Employee expectations. In addition, the Debtors believe that the 401(k) Deductions are generally held in trust by the Debtors and are not property of their estates.

50.     Accordingly, by this Motion, the Debtors seek the authority to (a) continue the 401(k) Plan, (b) remit all Unremitted 401(k) Deductions collected in the ordinary course of business during the administration of these chapter 11 cases, and (c) pay MassMutual for prepetition administrative and record keeping services, substantially all of which will come due within 25 days of the Petition Date.

### G.     Time-Off Policies.

51.     In the ordinary course of business the Debtors provide certain eligible Employees with time off for reasons such as vacation, personal illness, illness of a family member, personal needs, jury duty, birthdays, holidays, bereavement, and other reasons (the "Time-Off Policies"). In addition, as part of the Time-Off Policies, the Debtors provide certain other forms of paid and unpaid leave, including, for example leave under the Family and Medical Leave Act, and other paid and unpaid leaves of absence for personal reasons, including those required by law. Importantly, these other forms of paid and unpaid leave do not involve incremental cash outlays beyond standard payroll obligations.

52.     By this Motion, the Debtors seek authority to pay out any amounts earned but unused in accordance with the Time-Off Policies, and as required under applicable law, in the ordinary course.  For the avoidance of doubt, the Debtors seek authority to pay out any amounts required under applicable law with respect to earned but unused paid time off in excess of the Priority Cap solely pursuant to the Final Order.

53.     The Debtors believe that the continuation of the Time-Off Policies is essential to maintaining Employee morale during these chapter 11 cases.  Further, the Time-Off Policies are broad-based programs upon which Employees have come to depend.  As of the Petition Date, the Debtors estimate there is approximately $6,622,000 accrued on account of the Time-Off Policies.

19

The Debtors anticipate that their Employees will utilize any accrued paid time off in the ordinary course of business. Accordingly, the Debtors seek authority to continue the Time-Off Policies and to allow eligible Employees to use paid time and unpaid time off in the ordinary course of business on a postpetition basis.

## Basis for Relief

I.     **Sufficient Cause Exists to Authorize the Debtors to Honor the Employee Compensation and Benefits.**

A.     **Certain Employee Compensation and Benefits Are Entitled to Priority Treatment.**

54.     Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle priority treatment to certain of the Employee Compensation and Benefits. The Debtors are required to pay such priority claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(b) (requiring payment of certain allowed unsecured claims for (a) wages, salaries, or commissions, including sick leave pay earned by an individual and (b) contributions to an employee benefit plan). Thus, granting the relief sought herein should only affect the timing of certain payments to the Employees and should not negatively affect recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of the Employee Compensation and Benefits at this time enhances value for the benefit of all interested parties.

B.     **Payment of Certain Employee Compensation and Benefits Is Required by Law.**

55.     The Debtors seek authority to pay the applicable Withholding Obligations to the appropriate third-party entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' paychecks on

13165068 v3

another party's behalf.  *See* 11 U.S.C. §§ 541(b)(1), (d).  Further, federal and state laws require the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority.  26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its Employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes).  Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Withholding Obligations on account of the Employees to the proper parties in the ordinary course of business.

56.     Similarly, state laws require the Debtors to maintain the Workers' Compensation Program.  If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states.  Payment of all workers' compensation amounts is therefore crucial to the Debtors' continued operations and the success of the Debtors' ongoing chapter 11 process.

## II.     Payment of the Employee Compensation and Benefits Is Proper Pursuant to Section 363(b) of the Bankruptcy Code and the Doctrine of Necessity.

57.     Section 363(c)(1) of the Bankruptcy Code expressly grants the Debtors the authority to "enter into transactions . . . in the ordinary course of business" and "use property of the estate in the ordinary course of business without notice or a hearing."  Therefore, the Debtors believe they are permitted to pay all postpetition amounts due pursuant to the Employee Compensation and Benefits as such actions are in the ordinary course of the Debtors' business.  Out of an abundance of caution, however, the Debtors seek entry of an order granting the relief requested herein to avoid any disruptions to their business operations.

58.     The relief requested herein may be granted by the Court pursuant to sections 363(b) and 105(a) of the Bankruptcy Code.  Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Under section 363(b), courts require only that the debtor "show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (internal citations omitted) (requiring that the debtor show a "sound business purpose" to justify its actions under section 363 of the Bankruptcy Code); *see also In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987).  Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

59.     In addition, the Court may authorize payment of prepetition claims in appropriate circumstances under section 105(a) of the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of a bankruptcy court, empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  The Court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of the Employee Compensation and Benefits under the "necessity of payment" rule (also referred to as the "doctrine of necessity").

60.     The United States Court of Appeals for the Third Circuit recognized the "necessity of payment" doctrine in *In re Lehigh & New England Ry. Co.* 657 F.2d 570, 581 (3d Cir. 1981).

22

13165068 v3

The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. *Id.* (stating a court may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment").

61.     The necessity of payment doctrine is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of toolmakers as "necessary to avert a serious threat to the Chapter 11 process").

62.     Payment of the Employee Compensation and Benefits is warranted under this authority and the facts of these chapter 11 cases. The majority of the Employees rely exclusively on the Employee Compensation and Benefits to satisfy their daily living expenses. Consequently, Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee Compensation and Benefits. Additionally, continuing ordinary course benefits will help maintain Employee morale and minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' ongoing business operations.

23

63.    Moreover, Employees provide the Debtors with services necessary to conduct the Debtors' business, and the Debtors believe that absent the payment of the Employee Compensation and Benefits, the Debtors may experience turnover and instability at this critical time in these chapter 11 cases.  The Debtors believe that without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships these Employees may face.  Such Employees may then elect to seek alternative employment opportunities.  Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—efforts that might not be successful given the overhang of these chapter 11 cases.  The Debtors therefore believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their business in these chapter 11 cases.

64. Indeed, courts in this district have recognized the importance of satisfying employee obligations in cases requesting relief similar to that requested here.[6]  *See, e.g.*, *In re Destination Maternity Corporation* 19-12256 (BLS) (Bankr. D. Del. Oct. 22, 2019) (authorizing debtors to continue employee compensation and benefit programs and pay certain prepetition obligations related thereto on a postpetition basis on an interim basis);  *In re Forever 21, Inc.*, 19-12122 (KG) (Bankr. D. Del. Oct. 1, 2019) (same); *In re Z Gallerie LLC*, No. 19-10488 (KBO) (Bankr. D. Del. Mar. 11, 2019) (same); *In re RMBR Liquidation, Inc.* , No. 19-10234 (KG) (Bankr. D. Del. Feb. 7, 2019) (same); In re Charming Charlie Holdings Inc., No. 17-12906 (CSS) (Bankr. D. Del. Dec.

24

11, 2017) (same).[7]    Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay and continue the Employee Compensation and Benefits in the ordinary course of business and consistent with past practice.

### III.    A Limited Waiver of the Automatic Stay for Workers' Compensation Claims Is Appropriate Here.

65.    Section 362(a)(1) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . .

Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause."  11 U.S.C. § 362(d)(1).

66.    The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit their Employees to proceed with their claims against the Workers' Compensation Program in the appropriate judicial or administrative forum.  The Debtors believe that cause exists to modify the automatic stay because staying the Employee's workers' compensation claims could have a detrimental effect on the financial well-being and morale of the Employees and lead to the departure of certain Employees who are critical at this juncture.  Such departures could cause a severe disruption in the Debtors' business to the detriment of all stakeholders.  In addition, as noted above, if the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states.  Accordingly, the Debtors request a limited waiver of the automatic stay for purposes of allowing the Debtors' Workers' Compensation Program to proceed.

---

[7]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

13165068 v3

## Processing of Checks and Electronic Fund Transfers Should Be Authorized

67.    The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral.  Under the Debtors' existing cash management system, the Debtors have made arrangements to readily identify checks or wire transfer requests relating to the Employee Compensation and Benefits.  Accordingly, the Debtors believe that checks or wire transfer requests that are not related to authorized payments will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

## The Requirements of Bankruptcy Rule 6003 Are Satisfied

68.    Bankruptcy Rule 6003 empowers a court to grant relief within the first 25 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003.  For the reasons discussed above, authorizing the Debtors to pay (a)  prepetition wages, salaries, other compensation, and reimbursable employee expenses and (b) the cost of Benefits in the ordinary course, that accrued prior to the Petition Date and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases smoothly.  Failure to receive such authorization and other relief during the first 25 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

13165068 v3

## **Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

69.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h)

## **Reservation of Rights**

70.     Nothing contained in this Motion or any actions taken by the Debtors pursuant to any order granting the relief requested by this Motion is intended or should be construed as:  (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

13165068 v3

## **Notice**

71. Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Bankruptcy Local Rules, and is sufficient under the circumstances.  Without limiting the foregoing, due notice will be afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties-in-interest, including:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agents under the Debtors' prepetition secured facilities and counsel thereto; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) the state attorneys general for states in which the Debtors conduct business; (h) the Debtors' payroll processor; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

72.    No prior Motion for the relief requested herein has been made to this or any other court.


[*Remainder of page intentionally left blank*]

28

WHEREFORE, the Debtors respectfully request that the Court enter interim and final orders, substantially in the form**s** attached hereto, respectively, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Dated: March 8, 2020
Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

   _/s/ Gregory W. Werkheiser_
Gregory W. Werkheiser (DE No. 3553)
Michael J. Barrie (DE No. 4684)
Jennifer Hoover (DE No. 5111)
Kevin Capuzzi (DE No. 5462)
John C. Gentile (DE No. 6159)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: gwerkheiser@beneschlaw.com
      mbarrie@beneschlaw.com
      jhoover@beneschlaw.com
      kcapuzzi@beneschlaw.com
      jgentile@beneschlaw.com

_Proposed Counsel to the Debtors and Debtors in Possession_

13165068 v3