## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) Case No. 20-10553 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## DEBTORS' MOTION FOR
## ENTRY OF INTERIM AND FINAL
## ORDERS (I) AUTHORIZING DEBTORS
## TO PAY CERTAIN PREPETITION SPECIFIED
## LIENHOLDER CLAIMS AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>")

respectfully state as follows in support of this motion (this "<u>Motion</u>"):

### <u>Relief Requested</u>

1.     The Debtors seek entry of an interim order (the "<u>Interim Order</u>") and a final order

(the "<u>Final Order</u>"), substantially in the forms attached hereto:  (a) authorizing the Debtors to pay,

in the ordinary course of business, certain prepetition Specified Lienholder Claims (as defined

herein) in aggregate amount of approximately $1,154,000 on an interim basis and $3,462,000 on

a final basis; (b) authorizing financial institutions to receive, process, honor, and pay all related

checks and electronic payment requests for payment of certain prepetition Specified Lienholder

Claims; and (c) granting related relief.

---

1    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509);
AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC
(8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising,
LLC (6325); LF Trucking, Inc. (1484);  Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location
of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

2.    In addition, the Debtors request that the Court schedule a final hearing within approximately 25 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

### Jurisdiction and Venue

3.    The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.    The bases for the relief requested herein are sections 105, 362, 363, 546(b), 1107(a), and 1108 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004(h), and Bankruptcy Local Rule 9013-1(m).

### Background

6.    The Debtors operate 169 locations, including 92 furniture and mattress showrooms and 77 freestanding mattress and specialty locations.  The Debtors do business under brand names, including Art Van Furniture, Pure Sleep, Scott Shuptrine Interiors, Levin Furniture, Levin Mattress, and Wolf Furniture.  The Debtors were founded in 1959 and was owned by its founder, Art Van Elslander, until it was sold to funds affiliated with Thomas H. Lee Partners, L.P. ("THL")

in March 2017. Pennsylvania based Levin Furniture and Wolf Furniture were acquired by Art Van in November 2017. As of the Petition Date (as defined below), the Debtors operate stores throughout Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia. The Debtors are headquartered in Warren, Michigan and have approximately 4,500 employees as of the Petition Date (as defined below).

7.     On March 8, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of David Ladd, Executive Vice President and Chief Financial Offer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with this Motion and incorporated by reference herein. Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

### Overview of the Specified Lienholder Claimants

8.     The Debtors' business depends on the uninterrupted flow of inventory and other goods through their supply chain and distribution network, including the purchase, importation, storage, and shipment of the Debtors' merchandise (the "Merchandise") and other personal property. The vendors and suppliers that the Debtors rely on to deliver products to customers are located around the world. Not only do the Debtors rely heavily on these vendors to deliver current orders, but they also rely on such vendors for all future deliveries.

9.      Additionally, because of the worldwide locations of the Debtors' vendors, the Debtors must pay charges and fees related to the importation of such goods in order to ensure a stable supply chain.  It is, therefore, absolutely essential to the Debtors' successful wind down that the supply chain remains uninterrupted, as even a short-term disruption could be catastrophic to the Debtors' efforts to facilitate orderly store closings.  The Debtors and their stakeholders, in turn, will be harmed by any impairment in the value of the Debtors' business at this critical juncture. The relief requested by this Motion is of great importance to the continued viability of the Debtors' business.  Accordingly, the Debtors request authorization to pay the Lien Claims and the Import Claims (each as defined herein) (collectively, the "Specified Lienholder Claims," the holders of such claims, the "Specified Lienholder Claimants").

## I.      The Lien Claimants.

10.      Generally, the Debtors contract with various foreign vendors to design and source the Merchandise from foreign manufacturers, located predominantly throughout the Americas, Asia, and certain other international jurisdictions.  In certain circumstances, the Debtors contract with foreign manufacturers directly.  The movement of merchandise throughout the Debtor's supply chain, including the importation of Merchandise and other goods, uses the services of freight forwarders, ocean shipping lines, trucking companies, customs brokers, and other logistics parties.  The flow of Merchandise from the country of origin to the Debtors' distribution centers and, ultimately, to (a) stock the Debtors' domestic brick and-mortar stores, (b) fulfill orders placed online with the Debtors, (c) supply inventory to the Debtors depends on the services provided by, among others, various freight forwarders, common carriers, shipping lines, trucking companies, custom brokers, and other logistics service providers, or (d) to stock the Debtors' leased locations (collectively, the "Shippers").

11.     Under certain non-bankruptcy laws, the Shippers may be able to assert liens on the goods in their possession or against the Debtors' property to secure payment of the charges or expenses incurred in connection with the Lien Claims.[2]  In the event the Lien Claims remain unpaid, the Lien Claimants are likely to attempt to assert such possessory liens and may refuse to deliver or release goods in their possession or continue providing services until their claims are satisfied and their liens redeemed.  The Lien Claimants' possession (and retention) of the Debtors' goods and supplies or a cessation of their services would disrupt the Debtors' operations and affect the Debtors' ability to efficiently administer these chapter 11 cases.  The cost of such disruption to the Debtors' estates would likely be far greater than the applicable Lien Claims.  Further, pursuant to section 363(e) of the Bankruptcy Code, the Lien Claimants may be entitled to adequate protection of any valid possessory lien, which would drain estate assets at this critical juncture.

12.     The Debtors intend to pay prepetition Lien Claims only where they believe, in their business judgment, that the benefits to their estates from making such payments will exceed the costs that their estates would incur by bringing an action to compel the turnover of such goods and the delay associated with such actions.

13.     Accordingly, the Debtors seek authority, but not an obligation, to pay, on a case-by-case basis, the Lien Claims in an aggregate amount up to $1,154,000 on an interim basis and up to $3,462,000 on a final basis.  For the foregoing reasons, the Debtors submit that payment of the Lien Claims is necessary to preserve and enhance the value of the Debtors' business for the benefit of all parties in interest.

---

[2]   For example, section 7-307 of the Uniform Commercial Code provides, in pertinent part, that "[a] carrier has a lien on the goods covered by a bill of lading or on the proceeds thereof in its possession for charges after the date of the carrier's receipt of the goods for storage or transportation, including demurrage and terminal charges, and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law."  *See* U.C.C. § 7-307(a) (2003).

14.    For the avoidance of doubt, the Debtors seek authority to pay only those amounts that they determine are necessary or appropriate to (a) obtain release of critical or valuable goods and property, (b) maintain a reliable, efficient, and smooth distribution system, and (c) induce the Lien Claimants to continue to carry goods and make timely delivery.

**II.    The Debtors Import & Logistics Network.**

15.    In the ordinary course of business, the Debtors predominantly import inventory, including Merchandise and other goods (collectively, the "Imported Goods") from certain foreign vendors.  The Debtors utilize the services of select importation and customs transportation service providers (the "Logistical Importers").  The Debtors typically import approximately 7,000-9,000 shipping containers of Imported Goods a year with assistance of the Logistical Importers.

16.    Once the Imported Goods are landed in the United States, the Debtors utilize the services of select in-bound transportation and logistics providers (the "Inbound Providers") to transport the shipping containers by either rail or truck to one of the Debtors six (6) distribution centers (the "Distribution Centers") throughout the United States.   The Debtors incur approximately $15.4 million dollars a year in inbound freight costs.

17.    Once the Imported Goods arrive at the Distribution Centers, and depending on customer and retail needs, the Imported Goods are distributed throughout the country on utilizing the services of select third-party trucking companies (the "Outbound Providers").  The Debtors cost of services with the Outbound Providers typically exceeds $1.4 million per month in the ordinary course of business.

18.    Given the complexity and breadth of the Debtors' import and logistics network, maintenance and continuation of this logistics network, including without limitation (i) the uninterrupted movement of the Imported Goods and (ii) timely payment of the Specified Lienholder Claims contemplated herein to the Logistical Importers, Inbound Providers, and

Outbound Providers is critical to both Debtors' business operations. Any disruption or delay would adversely affect the Debtors' business operations and affect the Debtors' ability to efficiently administer these chapter 11 cases.

19.    Accordingly, the Debtors seek authority to pay, on a case-by-case basis, the Specified Lienholder Claims in an aggregate amount of $1,154,000 on an interim basis and $3,462,000 on a final basis. For the foregoing reasons, the Debtors submit that payment of the Specified  Lienholder Claims is necessary to preserve and enhance the value of the Debtors' business for the benefit of all parties in interest.

**III.    The Debtors' Conditions on Payment Claimants.**

20.    The Debtors seek authority to pay certain prepetition Specified Lienholder Claims solely to the extent that such payments are needed to ensure that a particular vendor continues to provide necessary goods and services to the Debtors during the wind down process. Additionally, the Debtors seek authority, following entry of a final order, to continue to pay or honor any prepetition amounts owed on account of certain Specified Lienholder Claims in the ordinary course of business on a postpetition basis.

21.    In return for paying the Specified Lienholder Claims, the Debtors will seek to require the applicable Specified Lienholder Claimants to (a) provide trade terms for the go-forward delivery of goods and services in accordance with trade terms at least as favorable to the Debtors as those practices and programs (including credit limits, pricing, timing of payments, availability, and other terms) between the parties in the ordinary course prepetition in the 180 days prior to the petition date (collectively, the "Customary Trade Terms"), (b) waive and release, to the extent their Specified Lienholder Claims are satisfied, all liens against any property of the Debtors, (c) and release and deliver any property held by or in control of the Specified Lienholder Claimants to its destination as directed by the Debtors consistent with their customary practices in the

7

ordinary course of business.  The Debtors therefore request authority to condition payment upon such parties agreement to continue supplying goods or services on Customary Trade Terms for the duration of these chapter 11 cases.

22.     If any party accepts payment pursuant to the relief requested by this Motion and thereafter (a) does not continue to provide goods or services on Customary Trade Terms, (b) refuses to waive and release, to the extent its Specified Lienholder Claims are satisfied, a lien against any property of the Debtors or (c) fails to release and deliver any property held by or in control of the Specified Lienholder Claimants, then:  (i) such payment may be deemed to be an improper postpetition transfer on account of a prepetition claim, and therefore, immediately recoverable by the Debtors in cash upon written request; (ii) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; and (iii) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by the Motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

## Basis for Relief

I.      **The Court Should Grant the Relief Requested in this Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code.**

23.     Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate.  *See, e.g.*, *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017) (noting that courts have approved payment of prepetition invoices of essential suppliers); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (finding that payment of prepetition claims to certain trade vendors was "essential

to the survival of the debtor during the chapter 11 reorganization"); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a bankruptcy court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."); *Armstrong World Indus., Inc. v. James A. Phillips, Inc.,* (*In re James A. Phillips, Inc.*), 29 B.R. 391, 398 (S.D.N.Y. 1983) (granting the debtor the authority to pay prepetition claims of suppliers who were potential lien claimants).  In so doing, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims as requested herein.

24.     Pursuant to section 363(b) of the Bankruptcy Code, payment of prepetition obligations may be authorized where a sound business purpose exists for doing so.  *See Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification); *In re James A. Phillips, Inc.*, 29 B.R. at 397 (relying upon section 363 as a basis to allow a contractor to pay the prepetition claims of suppliers who were potential lien claimants).  Indeed, courts have recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition claim."  *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).

25.     The Court may also authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code.  Section 105(a) codifies the Court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  Under section 105(a), courts may authorize payments of prepetition obligations prior to confirmation of a plan or emergence from chapter 11 when essential to the continued operation of a debtor's business.  *See Just for Feet*, 242 B.R. at

825. Specifically, the Court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity"). *Ionosphere Clubs*, 98 B.R. at 176.

26.    Indeed, the United States Court of Appeals for the Third Circuit recognized the "necessity of payment" doctrine in *In re Lehigh and New England Railway Co.* 657 F.2d 570, 581 (3d Cir. 1981).   The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. *Id.* (stating courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Penn Central Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims have been paid"); *Just for Feet*, 242 B.R. at 824–25 (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to continued operation of business); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (same).

27.    The relief requested herein is appropriate and warranted under the circumstances. The authority to satisfy the Specified Lienholder Claims in the initial days of these cases without disrupting the Debtors' operations will maintain the integrity of the supply chain, facilitate the sale of inventory and the Debtors' accounts receivable collection, and allow the Debtors to efficiently administer these chapter 11 cases.  Failure to pay the Specified Lienholder Claims could potentially destroy value that would otherwise inure to the benefit of the Debtors' estates.  Where, as here, debtors have shown that the payment of prepetition claims is critical to maximize the value of their estates, courts in this district have routinely authorized payments to prepetition vendor claimants.

*See, e.g.*, *In re Destination Maternity Corporation* No. 19-12256 (BLS) (Bankr. D. Del. Nov. 12, 2019) (authorizing payment of certain prepetition lien claimants and vendor claimants); *In re Forever 21, Inc.*, No. 19-12122 (KG) (Bankr. D. Del. Oct. 1, 2019); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (same); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 26, 2019) (same); *In re ATD Corp.*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 24, 2018) (same); *In re VER Technologies Holdco LLC*, No. 18-10834 (KG) (Bankr. D. Del. May 4, 2018) (same).[3]

28.    Based on these circumstances, the Debtors submit that the relief requested herein represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under sections 105(a) and 363(b) of the Bankruptcy Code.

## II.    Failure to Make Timely Payment of Lien Claims Would Threaten the Debtors' Ability to Operate and May Subject the Debtors' Assets to the Perfection of Liens.

29.    As noted above, certain Lien Claimants may be entitled under applicable non-bankruptcy law to assert certain possessory liens on the Debtors' goods, equipment in their possession, or property (notwithstanding the automatic stay under section 362 of the Bankruptcy Code) in an attempt to secure payment of their prepetition claim.  Under section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.[4]  As a result, the Debtors anticipate that certain of the Lien Claimants may assert or perfect liens, simply refuse to turn over goods in their possession, or stop performing their ongoing obligations.  Even absent a valid lien,

---

[3]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

[4]    *See* 11 U.S.C. § 546(b)(1)(A) (providing that a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection.").

to the extent certain Lien Claimants have possession of the Debtors' inbound inventory or outbound products, mere possession or retention would disrupt the Debtors' operations.

30.    Furthermore, paying the Lien Claims is unlikely to impair unsecured creditor recoveries in these chapter 11 cases.  In instances where the amount owed to Shippers or Maintenance Workers is less than the value of the property held to secure a Shipper or Maintenance Worker claim, such parties may be fully secured creditors of the Debtors' estates.  In such instances, payment only provides such parties with what they might be entitled to receive under a plan of reorganization, only without any interest costs that might otherwise accrue during these chapter 11 cases.  Conversely, all creditors will benefit from the seamless transition of the Debtors' operations into bankruptcy and the ultimate delivery and sale of inventory in the Debtors' stores and on their e-commerce platform.

31.    Where debtors have shown that the payment of prepetition claims is critical to maximize the value of their estates, courts in this district have routinely authorized payments to shippers and maintenance workers under similar circumstances. *See, e.g.*, *In re Destination Maternity Corporation* No. 19-12256 (BLS) (Bankr. D. Del. Nov. 12, 2019) (authorizing payments to shippers and maintenance workers); *In re Forever 21, Inc.*, No. 19-12122 (KG) (Bankr. D. Del. Oct. 1, 2019) (same) *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (same); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 26, 2019) (same); *In re VER Technologies. Holdco LLC*, No. 18-10834 (KG) (Bankr. D. Del. May 4, 2018) (same); *In re Charming Charlie Holdings, Inc.*, No. 17-12906 (Bankr. D. Del. Jan. 10, 2018) (authorizing payments to shippers).

**III.     The Court Should Authorize the Payment of Import Claims.**

32.     Further, the Import Claims would likely be paid in full under any plan of reorganization pursuant to Bankruptcy Code section 507(a)(8), which provides eighth priority status to the claims of a governmental unit based on a customs duty arising out of the importation of certain Merchandise.  Thus, payment of the Import Claims merely accelerates the distribution that the Import Claimants would receive in any event upon confirmation of a plan of reorganization.  Therefore, granting the Motion with respect to the Import Claims would have no substantial effect on the relative distribution of the Debtors' estates' assets.

33.     For these reasons, courts in this district have authorized the payment of prepetition import claims under similar circumstances in recent retail chapter 11 cases. *See*, *e.g.*, *In re Destination Maternity Corporation* No. 19-12256 (BLS) (authorizing payment of prepetition import claims); *In re Forever 21, Inc.*, No. 19-12122 (KG) (Bankr. D. Del. Oct. 1, 2019) (same); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 26, 2019) (same); *In re Charming Charlie Holdings, Inc.*, No. 17-12906 (Bankr. D. Del. Jan. 10, 2018) (CSS) (authorizing payment of certain prepetition import claims); *In re Pac. Sunwear of Cal., Inc*, No. 16-10882 (LSS) (Bankr. D. Del. Apr. 8, 2016) (approving payment of charges incurred in connection with the transportation of merchandise); *In re Sports Auth. Holdings, Inc.*, No. 16-10527 (MFW) (Bankr. D. Del. Mar. 29, 2016) (approving payment of customs duties, detention and demurrage fees, tariffs and excise and related taxes to third party vendor).

## Processing of Checks and Electronic Fund Transfers Should Be Authorized

34.     The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations

and anticipated access to cash collateral.[5]  Under the Debtors' existing cash management system, the Debtors have made arrangements to readily identify checks or wire transfer requests relating to an authorized payment in respect of the Specified Lienholder Claims, as applicable.  Accordingly, the Debtors believe that checks or wire transfer requests that are not related to authorized payments will not be honored inadvertently.  Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

### The Requirement of Bankruptcy Rule 6003 Are Satisfied

35.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003.  For the reasons discussed above, authorizing the Debtors to pay the Specified Lienholder Claims and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases smoothly. Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

36.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and

---

[5]    NTD:  To update depending on financing outcome.

that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Reservation of Rights

37.     Nothing contained in this Motion or any actions taken by the Debtors pursuant to any order granting the relief requested by this Motion is intended or should be construed as:  (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's Interim Order and Final Order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

### Notice

38.     Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Bankruptcy Local Rules, and is sufficient under the circumstances.  Without limiting the foregoing, due notice will be afforded, whether by facsimile, electronic mail, overnight courier or

hand delivery, to parties-in-interest, including:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agents under the Debtors' prepetition secured facilities and counsel thereto; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the state attorneys general for states in which the Debtors conduct business; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

39.    No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter interim and final orders, substantially in the forms attached hereto, respectively, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Dated: March 8, 2020
Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

*/s/ Gregory W. Werkheiser*

Gregory W. Werkheiser (DE No. 3553)
Michael J. Barrie (DE No. 4684)
Jennifer Hoover (DE No. 5111)
Kevin Capuzzi (DE No. 5462)
John C. Gentile (DE No. 6159)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: gwerkheiser@beneschlaw.com
        mbarrie@beneschlaw.com
        jhoover@beneschlaw.com
        kcapuzzi@beneschlaw.com
        jgentile@beneschlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*