**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) Case No. 20-10553 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DECLARATION OF**
**DAVID LADD, EXECUTIVE VICE PRESIDENT AND**
**CHIEF FINANCIAL OFFICER OF ART VAN FURNITURE, LLC,**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, David Ladd, hereby declare under penalty of perjury:

1.      I am the Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC ("Art Van"), one of the above-captioned debtors and debtors in possession (collectively, the "Debtors" or the "Company").

2.      I have served in this role since October 10, 2016.  In my current position, I oversee financial planning, accounting and the management of financial risk for the Company and its brands.  Prior to serving in this capacity, I had over twenty years of financial experience in the retail sector, during which time I served in various roles, including as an auditor for Kmart and as Vice President of Finance for various divisions of Sears.  Most recently, I served as the Vice President of Finance for 1,500 Sears and Kmart stores.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484);  Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

3.      I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I submit this declaration (this "<u>Declaration</u>") to assist the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and the relief requested pursuant to the motions and applications filed on the first day of these cases (collectively, the "<u>First Day Motions</u>").

4.      Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my discussions with the other members of the Company's management team and the Company's advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, restructuring initiatives, or my opinions based upon my experience and knowledge.  I am over the age of eighteen and authorized to submit this Declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth herein.

### Preliminary Statement

5.      Art Van is a brick-and-mortar furniture and mattress retailer headquartered in Warren, Michigan.  The Company operates 169 locations, including 92 furniture and mattress showrooms and 77 freestanding mattress and specialty locations.  The Company does business under brand names, including Art Van Furniture, Pure Sleep, Scott Shuptrine Interiors, Levin Furniture, Levin Mattress, and Wolf Furniture.  The Company was founded in 1959 and was owned by its founder, Art Van Elslander, until it was sold to funds affiliated with Thomas H. Lee Partners, L.P. ("<u>THL</u>") in March 2017.  As part of this transaction, THL acquired the operating assets of the Company and certain real estate investment trusts, who closed the transaction alongside THL, acquired the owned real estate portfolio of the Company, and entered into long-term leases with Art Van.  The proceeds from the sale-leaseback transaction were used to fund the purchase price

paid to the selling shareholders.  Pennsylvania-based Levin Furniture and Wolf Furniture were acquired by Art Van in November 2017 through similar transaction structures.  As of the Petition Date, the Company operates stores throughout Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia.

6.    In the wake of extreme market conditions and faced with limited liquidity, the Company has commenced these chapter 11 cases to effectuate a going-concern sale of approximately 44 stores and two distribution centers operating under the Wolf and Levin banners and to wind down its remaining store locations and other operations through a going-out-of-business sales process.  Given continuously declining profitability and operational challenges over the past three years, and despite the best efforts of the Company and its advisors to secure the capital necessary to preserve the entire business as a going concern, the Company is simply unable to meet its financial obligations.  The Company has worked in concert with its secured lenders to develop a budget for the use of cash collateral to facilitate an expedited sale and orderly wind down process that will maximize value and recoveries for stakeholders in these cases.

7.    Art Van's declines in sales, profits, and cash flow were driven by a combination of several factors.  *First*, the Company has faced significant macro-related revenue headwinds, as well as local microeconomic headwinds, that have led to sustained negative "same-store sales," a key measure of retail health, during every quarter since June 2016.  These macro-related headwinds include broad-based declining retail foot traffic, market share losses of brick and mortar furniture outlets to online sellers such as Wayfair and Amazon.com, and increased fragmentation and intense competition in mattresses leading to decreased profitability.  On a local level, Art Van has faced increased retail competition, as key competitors such as Ashley HomeStore, Bob's Discount

Furniture, and Mattress Firm opened at least 30 stores in Michigan and Illinois over the last three years

8.      **Second**, while Art Van revenues have declined approximately 27% cumulatively on a same-store basis since fiscal year 2016 through January 2020, expenses have increased significantly due to, among other things, over $8 million in tariff costs in fiscal year 2019 (which continued and escalated in fiscal year 2020) and an increase in marketing expenses intended to stem same-store sales declines.

9.      **Third**, the business suffered numerous operational challenges in the course of the Company's effort to grow and navigate a challenging retail environment.  In continuing to support the existing management team and growth initiatives that had driven the Company's success over the prior decade, the Company invested significant capital, but many of the initiatives failed to meet expectations and were insufficient in offsetting countervailing headwinds.  These operational challenges included, among other things:

- **Expansion**.  The Company began an expansion into Chicago in fiscal year 2013 that continued through fiscal year 2018, which ultimately led to market oversaturation as new stores cannibalized revenues from preexisting locations.  Despite spending significant capital and gaining material revenue share in this market, the Company was not able to achieve sustained profitability in Chicago.

- **Leadership Turnover**.  The Company lost eight of its top nine executive leaders in fiscal years 2017 and 2018 through unplanned and, in many cases, voluntary departures.

- **Required Changes to Marketing Strategies**.  In June 2017, the Company ceased certain of its historically successful marketing practices after becoming aware they violated the Telephone Consumer Protection Act ("TCPA"), and in early 2018, the Company settled a class-action lawsuit on account of an alleged violation of the TCPA.

- **St. Louis Franchise Acquisition**.  In fiscal year 2018, the Company entered into an operating agreement with its largest franchisee, based in St. Louis, Missouri, due to financial distress being experienced by the franchisee.  The Company acquired the operations of the franchisee in fiscal year 2019 to help stabilize performance and avoid further deterioration, but Art Van was unable to stabilize the revenues of the St. Louis stores or generate a profit in the market after such acquisition.

- **Levin/Wolf Integration**.  In fiscal year 2019, the Company's management attempted to integrate the operations of Wolf Furniture into Levin Furniture.  The integration involved a significant overhaul of many fundamental aspects of the Wolf business, including human capital management, furniture assortments, distribution/delivery, and technology systems. These actions were taken in an effort to improve the business and align its operations with those of Levin, but they created significant strain on the Wolf business, which led to same-store sales declines of approximately 22% in Wolf in the second half of fiscal year 2019, as well as meaningful turnover of tenured sales staff.

- **Changes to Inventory Mix and Showroom Layout**.  In the same year, the Company turned over approximately 60% of its furniture assortment and reorganized many of its flagship showroom floors by "lifestyle" instead of by category of product, which negatively impacted sales and led to increased markdowns from product that was not easily saleable.

As a result of these challenges, the Company's Adjusted EBITDA decreased significantly in each fiscal year since 2016 and dropped to negative for the twelve months ended December 31, 2019.

10.     Faced with rapidly declining profitability, the Company made key leadership changes in summer 2019 that it deemed necessary to stem the downward trajectory and recover sales and profits.  In August 2019, the Company's board of directors (the "Board") terminated the Company's then-current Chief Executive Officer, its Chief Merchant, its Head of Stores, and several other executives.  It promoted a Company veteran to the role of Chief Merchant in August 2019, and, in September 2019, the Board hired a mattress industry turnaround executive as Chief Executive Officer.  The Board also named Gary Van Elslander, the former President of Art Van, as Chairman of the Board, in an effort to improve morale and re-establish a connection between the Company's employees and customers with the namesake of the business.  During this period, the Company also launched a new marketing campaign intended to differentiate the business against a competitive landscape, and it improved its e-commerce operating systems, including its website.

11.     In the summer and fall of 2019, the Company took further actions to create additional liquidity and extend the runway for management to execute on a sales-led operational turnaround:

- In November, 2019, the Company amended its asset-backed loan ("ABL") facility with Wells Fargo Bank, National Association ("Wells Fargo") to increase the size of the facility from $60 million to $82.5 million.

- In summer 2019, the Company engaged Evercore Group L.L.C. ("Evercore") as investment banker and undertook a review of strategic alternatives, including efforts to identify potential buyers for all or portions of the business.

- In December 2019, the Company secured an amendment to its term loan credit facility, which allowed the Company to suspend cash interest payments and mandatory amortization under the term loan.[2]

- In the fall and winter of 2019, the Company also was implementing a cost reduction and profit improvement plan, which was predicated on (a) reducing marketing expenses as a percentage of sales; (b) increasing gross margin through improved coordination of the merchandising, marketing, and in-store sales teams; and
(c) decreasing occupancy costs.

12.    Throughout this time, the Company also was focused on optimizing its lease portfolio and reducing rent expense:

- With the assistance of its financial advisor, Alvarez & Marsal North America, LLC ("A&M") the Company created a store footprint optimization analysis that supported store closure plan.

- The Company hired real estate restructuring advisers Jones Lang LaSalle ("JLL") and Newmark Knight Frank to lead discussions with key landlords to reduce rent expense given the Company's decline in sales and to close 49 underperforming locations (including 31 mattress locations), consistent with and supported by the above-referenced store closure plan.

- The Company hired an accounting advisory firm in November, 2019, to create standardized and reliable schedules of store-level financials needed for JLL and Newmark Knight Frank to be able to engage in productive negotiations with the Company's lessors. This effort was completed in January, 2020, and the real estate brokers began discussions with key lessors shortly thereafter.

---

[2]    Despite these liquidity enhancements, the Company also faced offsetting liquidity challenges. Certain companies, including The CIT Group ("CIT"), which provided accounts receivable factoring services to the Company's suppliers, refused to factor receivables owed by the Company unless the Company issued CIT and other factoring companies letters of credit under its ABL facility. These letters of credit reduced availability under the Company's ABL facility by $10 million, further exacerbating the Company's liquidity constraints.

13.     In late January, 2020, the Company unexpectedly faced further liquidity constraints due to a reduction in the Company's "borrowing base," which is required collateral support for borrowing under the ABL facility.  At the same time, certain financial partners of the Company began to demand additional collateral and tightened access to credit as a result of the Company's weak financial results.   These financial partners included credit card processing companies, including Bank of America Merchant Services and PNC Merchant Services—who are critical to the Company's ability to accept credit cards in stores and on-line for customer purchases—as well as providers of consumer credit.  In total, this group demanded approximately $33 million in collateral through holdbacks to fund reserves and letters of credit.

14.     As a result of the impending liquidity crisis created by the shrinking borrowing base, poor operating cash flow, and the collateral demands, the Company was unable to issue "clean" audited financial statements (*i.e.*, without a potential "going concern" qualification), which led to a default under the Company's ABL facility, as well as various other contractual arrangements, including certain leases.  Wells Fargo agreed to forbear from exercising remedies on account of such default until February 28, 2020, to give the Company time to explore opportunities to raise additional capital and restructure its debt obligations.  As part of this short forbearance, Wells Fargo required the Company to comply with cash dominion, and also required the Company to begin immediate preparations for a "going-out-of-business" liquidation in the event ongoing efforts to raise capital did not materialize before the forbearance period expired.

15.     Against this backdrop, with the assistance of Evercore and A&M, the Company held discussions with at least 31 potential buyers and investors, including its term loan lender, FS KKR Capital Corp. and affiliates ("KKR"), about potential transactions to recapitalize or sell all

or parts of the business.[3]  Following a short evaluation period, KKR declined to make a new money investment in Art Van pursuant to any recapitalization transaction.  The most likely and promising alternative that emerged was an out-of-court recapitalization transaction involving a consortium of investors that included a new-money investment from THL, the Van Elslander family, and three important suppliers to the Art Van business (the "Consortium").  The transaction contemplated the Consortium investing significant new capital into the Company and refinancing the existing ABL facility.[4]  The Consortium also sought and received support for the transaction from the Company's five largest lessors (the "Master Lessors"), in which the Master Lessors agreed to reduce rent obligations on the company and allow Art Van to close certain underperforming locations.  The Consortium submitted a letter of intent to the Company outlining the details of its proposal on February 20, 2020, followed by a further letter of intent on February 26, 2020, discussing the Consortium's progress in arranging the transaction.  Unfortunately, the Consortium ultimately failed to secure the necessary capital commitments due to a variety of circumstances, including, but not limited to, the significant equity market impact of the coronavirus during the week of February 24, 2020, and the resulting deleterious effect on Consortium investors' willingness to contribute capital.  Over the weekend of March 1, 2020, the Company, its Board, and the Company's advisors worked with JLL and the Master Lessors to attempt to replace the deficit in the Consortium investment with a new money investment from the Master Lessors in the form of a lease incentive investment, but on Monday, March 2, 2020, certain Master Lessors declined to participate in the proposed transaction as revised.

---

[3]    Immediately prior to the Petition Date, KKR assigned the claims and obligations under the term loan to HGB AVF Lending, LLC, which is an affiliate of Hilco Merchant Resources, LLC.

[4]    KKR also agreed to participate in the Consortium Bid by exchanging its term loan into a percentage of the pro forma equity and new debt *pari passu* with the Consortium investment.

16.     After the Company's forbearance with Wells Fargo expired on February 28, 2020, the Company went into default under its credit facilities and focused its attention on launching a going-out-of-business process to preserve value.  Based on the expected timing for commencing the liquidation process, any delay in a launch of the going-out-of-business sales could have caused the process to continue into May and, therefore, necessitate the payment of May rent at locations still active in the liquidation at that time.  The Company also had not received substantial shipments of new product since early February given it was no longer making payments to vendors, and, as such, sales were decreasing and weekly cash burn was increasing.

17.     With no actionable alternatives, and given the urgency with which Wells Fargo was pressing the Company and its advisors to proceed, the Company began executing on plans for an orderly wind-down of the Company's operations and a liquidation of its inventory (the "Wind Down").  The Company and its advisors negotiated extensively with the Company's secured lenders to ensure that customer deposits, credits, and/or refunds, as well as payment of certain administrative costs, were contemplated by the agreed budget for the Wind Down process.  In particular, as a result of these negotiations, the Company has implemented a process for addressing customer deposits whereby customers can elect to: (a) receive the merchandise they purchased if such merchandise is present in the Art Van warehouses; (b) receive a credit in an amount equal to their deposits that can be used to purchase alternative merchandise at discounted prices during the Wind-Down, if the originally purchased merchandise is not available; or (c) cancel their order and submit a request to refund their deposit, which request would be processed as soon as practicable depending on the volume of refund requests, required processing times, and the timing and availability of cash proceeds generated by the Wind Down.[5]

_____
[5]    The relief requested with respect to the customer deposits, credits and/or refunds is set forth in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Certain*

18.     To facilitate the Wind Down, the Company and its advisors solicited bids from potential liquidators to conduct store closing sales, and received bids from various parties, including a proposal from certain parties to acquire certain of the Company's intellectual property and other assets.  After discussions with several firms that specialize in store closings and inventory dispositions, and with input from its secured lenders, the Company entered into a consulting agreement with a contractual joint venture (as amended and restated, the "Consultant Agreement") of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (together, "Consultant") to conduct the store closing sales.  The Consultant Agreement is an expense-based arrangement in which the Consultant will provide reimbursement of all supervisor costs, reasonable and documented travel expenses, and general legal fees subject to the caps set forth in the Consultant Agreement.  The Debtors expect to move swiftly through these chapter 11 cases to minimize costs, with an expected timeline for completing the store closing sales of approximately six to eight weeks.  To maximize recoveries and minimize administrative expenses, the Company announced and initiated a soft launch of the store closing sales on March 5, 2020,[6] and seeks to expedite the remaining store closure sales in order to complete them within six to eight weeks.

19.     In parallel with preparations for the Wind-Down, the Company continued to engage with interested parties regarding alternative transactions, which ultimately resulted in a proposal to preserve the Levin business segment and a portion of the Wolf business segment as a going-

---

*Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief*, filed contemporaneously herewith, and remains subject to approval by the Bankruptcy Court.

[6]     Upon commencement of the store closing sales, Bank of America, N.A., Banc of America Merchant Services, LLC ("BAMS"), one of the company's credit card processors, immediately issued notice of its intent to hold 100 percent of all sale proceeds as a reserve.  The filing of petitions on March 8, 2020, initiated an automatic stay against any action to control property of these estates and the Debtors reserve all rights and causes of action against BAMS, including with respect to potential preference claims.  In addition, on March 6, 2020, Broadstone AVF Illinois, LLC, and Broadstone AVF Michigan, LLC (collectively, "Broadstone"), two of the Company's Master Lessors, initiated a lawsuit against the Company in Illinois federal court, alleging, among other things, various defaults under their respective leases related to the commencement the store closing sales.

concern.  In the days leading up to the Petition Date, the Company, with the assistance of its

advisors, extensively negotiated and reached an agreement-in-principle with Robert Levin, the

former owner of Levin Furniture, regarding a going-concern sale of certain of the assets of Sam

Levin, Inc. and LF Trucking, Inc. (the "Levin-Wolf Sale").  The key terms of the Levin-Wolf Sale

are set forth in a letter of intent, dated as of March 4, 2020, a copy of which is attached hereto as

**Exhibit B** (the "Levin-Wolf LOI").  As set forth in the Levin-Wolf LOI, the Levin-Wolf Sale will:

- provide for cash and non-cash consideration, including the assumption of liabilities related to customer deposits, employee obligations, specified cure costs, and potential claims under section 503(b)(9) of the Bankruptcy Code;

- preserve nearly 1,000 jobs; and

- provide for the continued operation of approximately 44 retail store locations under the Wolf and Levin store banners and two related distribution centers.

20.    The Company expects to move forward with definitive documentation for, and

approval of, the Levin-Wolf Sale on an expedited basis.  The Company believes effectuating the

Levin-Wolf Sale on an expedited basis is critical to avoiding employee attrition and other potential

value leakage related to the simultaneous Wind Down of the Company's other operations.  The

Levin-Wolf Sale is supported by the Company's secured lenders.

21.    To familiarize the Court with the Debtors, their business, the circumstances leading

to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions (defined

below and filed contemporaneously herewith) this Declaration is organized as follows:

- **Part I** provides a general overview of the Debtors' corporate history and business operations;

- **Part II** provides an overview of the Debtors' prepetition capital structure;

- **Part III** provides a discussion of the circumstances leading to these chapter 11 cases and the Debtors efforts to pursue alternate restructuring options; and

- **Part IV** sets forth the evidentiary basis in support of the relief requested in each of the First Day Motions.

I.    **The Company's Corporate History and Business Operations.**

A.    **Corporate History**

22.    Mr. Art Van Elslander founded Art Van Furniture in 1959 with the first location on Gratiot Avenue and 10 Mile Road in East Detroit, Michigan.  From 1959 through the 1970s, Mr. Van Elslander focused on building the foundation for his furniture store footprint.  During this time he opened additional stores and acquired the current corporate headquarters and distribution center in Warren, Michigan.  From 1980 to 2000, Art Van Furniture focused on its expansion in the state of Michigan and introduced the first Art Van credit card, the clearance center concept, and ArtVan.com.  By 1997, following growth in the early to mid-1990s, the Company had increased in size to a total of twenty-six stores with over 2,600 employees.  Further, in the following decade the Company would open seven more stores for a total of 33 stores in 2009.  In this most recent decade, the Company experienced its most intense growth phase under former CEO Kim Yost, who led the business from 2009 until his departure in 2018.  In 2010, the Company began to execute on its freestanding PureSleep mattress store thesis.  From 2011–2015, the Company acquired 27 Mattress World stores, began franchising, and entered the Chicago market.  Upon Art Van Elslander's sale of the Company in 2017, the enterprise had 113 stores, more than triple the amount of stores than it did in 2009.  Around this time, the Company was ranked as number nineteen on Furniture Today's "Top 100 list."

23.    In 2016, founder and sole owner Art Van Elslander decided to explore exit opportunities and engaged in a transaction to sell the Company and its owned real estate to THL

for $612.5 million, which transaction closed in March 2017 (the "2017 Transaction").  At the closing of the 2017 Transaction, THL acquired the operating assets of the business and certain real estate investment trusts acquired the owned real estate portfolio.  The proceeds from the sale-leaseback transaction were used to fund the purchase price paid to the selling shareholders.  Later in 2017, the Company acquired two Pennsylvania-based furniture companies:  Levin, with operations in greater Pittsburgh and Cleveland, and Wolf, with operations in eastern Pennsylvania, Maryland, and Virginia.  The Company continued its growth strategy through further geographic expansion and new store openings, and it also invested in e-commerce capabilities to bolster the brand and improve consumer experiences.  As of the Petition Date, the Company has 92 total furniture showrooms and 77 freestanding mattress and specialty locations.

**B.**     **The Company's Products.**

24.     Since its founding, Art Van Furniture has focused on retailing high-quality, made-to-last furniture that is available to customers across all price points.  Art Van Furniture delivers an array of merchandise and uses a "Good-Better-Best" approach to pricing, which allows the Company to play up and down the value spectrum.  The Debtors' store locations feature a seasonally refreshed assortment that has both exclusive and national brands, traditional and fashion-forward merchandise, and an optimal mix to maximize sales per square foot performance.  To support the customer experience, Art Van Furniture has a financing program to offer customers flexibility in purchasing larger and more expensive items.  Key comparable companies in the industry include Ashley Furniture, Raymour & Flanigan, Haverty's, Mattress Firm, and Rooms To Go.  Other relevant companies in the industry include Bob's Discount Furniture, IKEA, Ethan Allen, Restoration Hardware, and Gardner White.

**C.    The Company's Brands.**

25.    The Company operates stores under five primary retail nameplates: Art Van®, Art Van PureSleep®, Scott Shuptrine Interiors, Levin, and Wolf.  The respective stores operate as follows:



**Art Van** features high-quality, made-to-last furniture featuring deals on furniture for every room in your home.



**Pure Sleep** features top brand mattress and other sleep and bedding related goods and products at accessible prices.



**Scott Shuptrine** is primarily a store-within-a-store format offering exclusive and custom designed home furniture and furnishings



**Levin Furniture**, including the **Levin Mattress** nameplate, features a wide selection of modern and stylish living room, dining room, and bedroom furniture, including mattresses, with operations in the greater Pittsburgh and Cleveland area.



**Wolf Furniture** features a wide selection of eclectic furniture from around the country, including Amish made furniture, with operations in Pennsylvania, Maryland and Virginia.

The Art Van and Art Van PureSleep nameplates have their own standalone stores and operate under the website artvan.com.  Both Levin Furniture (including Levin Mattress) and Wolf Furniture nameplates operate their own standalone stores and operate under the websites levinfurniture.com and wolffurniture.com, respectively.

**D.    The Company's Business Operations.**

26.    The Company markets and sells its merchandise through a variety of different channels, including stand-alone stores, franchised locations, and their e-commerce platforms.

### 1. Brick-and-Mortar Presence.

27.     ***Stand-Alone Stores.***    The Company maintains a substantial domestic presence.  Currently, the Company operates 169 stores across 9 states.  Of these, 92 are showroom and 77 are freestanding sleep and specialty stores.  Certain furniture showroom locations have attached Clearance Center & Outlet stores to sell discounted products and merchandise.



28.     ***Franchise Stores.***  The Company also has arrangements with franchisees (each, a "<u>Franchise Store</u>").   There currently are 20 Franchise Stores across the United States.   The Franchise Stores are subject to franchise agreements with the Company, pursuant to which the Company supplies franchisees with product and receives a royalty on sales.

### 2. E-Commerce Platform.

29.     In addition to its physical footprint, the Company maintains a user-friendly and well-curated e-commerce platform with the goal of facilitating a complete, omnichannel customer experience to help educate them before they arrive at a showroom.  Customers can seek out the latest home furnishing trends, explore different options for an array of different furniture styles, and purchase furniture online.  In 2019, e-commerce accounted for approximately 2% of sales.



### 3.    Distribution Centers

30.    The Company primarily operates from two principal distribution centers, one of which is co-located with Art Van's headquarters in Warren, MI.  The second distribution center is located in Smithon, PA.

## II.    The Company's Prepetition Corporate and Capital Structure.

31.    A summary chart depicting the Debtors' corporate structure is attached to this Declaration as **Exhibit A**.  As of the Petition Date, the Debtors' capital structure consists of outstanding funded-debt obligations under the Prepetition ABL Credit Facility and the Prepetition Term Loan (each as defined herein) in the aggregate principal amount of approximately $208.5 million.  The following table summarizes the Debtors' outstanding funded-debt obligations as of the Petition Date:

| Funded Debt | Maturity | Principal Outstanding as of the Petition Date |
|---|---|---|
| Prepetition ABL Credit Facility | March 1, 2022 | $33.5 million |
| Prepetition Term Loan | March 1, 2024 | $175 million |
| Total Funded Debt | | $208.5 million |

## A.    The Prepetition ABL Credit Facility.

32.    The Debtors are party to that certain amended and restated senior secured revolving credit facility, dated as of March 1, 2017 (as amended from time to time the "Prepetition ABL Credit Agreement"), by and among AVF Holdings II, LLC, AVF Parent, LLC, as borrower agent, certain of its subsidiaries, as subsidiary borrowers, certain of its subsidiaries, as guarantors, and Wells Fargo, as administrative agent collateral agent, and issuing bank, and the Lenders party thereto.  The Prepetition ABL Credit Agreement provides for total revolving credit commitments of $82.5 million with a maturity date of March 1, 2022 (the "Prepetition ABL Credit Facility").

Approximately $33.5 million is currently outstanding in principal under the Prepetition ABL Credit Facility.

33.     The obligations under the Prepetition ABL Credit Facility are secured by a security interest in substantially all of the Debtors' assets.  However, solely with respect to liens on certain of the Debtor's fixed assets, the liens securing the Prepetition ABL Credit Facility on such assets are subordinated, to the extent set forth in that certain intercreditor agreement, dated March 1, 2017 (as amended from time to time, the "Intercreditor Agreement"), to the payment in full of the obligations in respect of the Prepetition Term Loan.  The Prepetition ABL Credit Agreement contains various affirmative and negative covenants, representations, and warranties, including a covenant that the Debtors maintain a certain amount of excess availability.  Due to the Debtors' deteriorating financial performance, Wells Fargo increased certain reserves in the months leading up to the Petition Date.

**B.     The Prepetition Term Loan.**

34.     The Debtors are party to that certain term loan credit agreement (the "Prepetition Term Loan Agreement"), by and among AVF Holdings II, LLC, AVF Parent, LLC, as borrower, certain of its subsidiaries, as guarantors, Virtus Group, LP ("Virtus"), as administrative agent and collateral agent, and the lenders party thereto.  The Prepetition Term Loan matures on March 1, 2024 (the "Prepetition Term Loan").  Approximately $175 million is currently outstanding in principal on the Prepetition Term Loan.

35.     Obligations under the Prepetition Term Loan are secured by a security interest in substantially all of each Debtor's assets.  However, solely with respect to liens on the Debtor's trade receivables, inventory, cash intangibles and other assets collectively referred to as ABL Priority Collateral in the Intercreditor Agreement, the liens securing the Prepetition Term Loan on

such assets are subordinated, to the extent set forth in the Intercreditor Agreement, to the payment in full of the obligations in respect of the Prepetition ABL Credit Facility.

36.     The Prepetition Term Loan Agreement was subsequently amended, including on February 5, 2020 (the "Term Loan Amendment").  Among other things, pursuant to the Term Loan Amendment, Virtus and certain of the Prepetition Term Loan lenders agreed to extend the deadline to deliver the 2019 annual financial statements to February 28, 2020.

### III.    Additional Information Regarding the Debtors' Efforts to Pursue Alternate Restructuring Options.

37.     Recognizing the need to explore strategic alternatives, the Debtors worked closely with THL and their advisors to evaluate available solutions to the Debtors' deteriorating circumstances, including efforts to continue the business as a going concern by means of one or more out of court transactions.

#### 1.    Prepetition Marketing Process.

38.     The Debtors, with the assistance of their advisors, Evercore and A&M, engaged in discussions with various parties considered to be potential investors in the business.  Evercore and A&M compiled diligence information and responded to a high volume of diligence requests from multiple interested parties.

39.     Prior to the Petition Date, Evercore and members of the Board contacted at least 31 potentially interested strategic, financial, corporate and individual parties, including at least 19 parties interested in the whole company and at least 12 parties interested in Levin and/or Wolf. Many of these parties entered into confidentiality agreements with the Debtors and received various confidential information documents, and thus began the diligence process.  As discussed above, the Debtors made substantial progress towards consummation of the Consortium Proposal, but due to market conditions and the uncertain financial viability of the business, the Debtors were

unable to secure investments needed for an actionable going-concern reorganization of the entire business.

**2.    The Expedited Levin-Wolf Sale.**

40.    Prior to the Petition Date, Robert Levin, the former owner of the Levin entities, submitted a written proposal, and the Debtors worked to finalize the Wolf-Levin LOI, pursuant to which Robert Levin will purchase substantially all of the assets of Debtors Sam Levin, Inc. and LF Trucking, Inc., excluding inventory located at the eight Maryland and Virginia Wolf locations (the "Assets"), as part of an expedited sale process under section 363 of the Bankruptcy Code. The purchase price consists of a combination of cash consideration and assumed liabilities, including: a cash payment equal to 82.25% of the agreed value of Wolf and Levin's actual cost of goods and freight, the amount of allowed section 503(b)(9) claims related to the Assets, the amount of any cure costs for executory contracts or unexpired leases assumed as part of the Levin-Wolf Sale, and an incremental payment of $3,650,000. The Levin-Wolf Sale also contemplates the assumption of customer deposits and employee obligations related to the Wolf and Levin business.

41.    After hard-fought negotiations, the Debtors and Robert Levin reached an agreement on material terms and are currently moving toward definitive documentation. The Debtors are commencing an expedited sale process to close the Levin-Wolf Sale to prevent continued diminution of value and mitigate the risk of employee and customer attrition as the Debtors contemporaneously pursue the Wind-Down with respect to the Art Van store portfolio. The Levin-Wolf Sale contemplates the following timeline:

- the Debtors shall file a motion to approve a private sale of the Assets to Robert Levin no later than five (5) days following the Petition Date;

- the buyer and Debtors shall enter into an asset purchase agreement for the sale of the Assets no later than ten (10) days following the Petition Date; and

- the Court shall enter an order approving the asset purchase agreement no later than twenty-one (21) days following the Petition Date.

42.     The Debtors expect the Levin-Wolf Sale to maximize recoveries for the Debtors' creditors as well as to preserve jobs and the Levin and Wolf brands.

### 3.    Store Closings.

43.     Due to the challenges discussed above, and at the direction of Wells Fargo, the assets not included in the Levin-Wolf Sale will be subject to going-out-of-business sales conducted in accordance with the Consultant Agreement.  To avoid incurring any unnecessary administrative expenses with respect to certain facilities where the Debtors are no longer operating and retain no assets of value, the Debtors expect to take a number of steps to reduce their expenses moving forward, including filing contract and lease rejection motions, pursuant to which the Debtors will seek to reject store leases and contracts that the Debtors and their advisors have determined are no longer be necessary to the Debtors' business operations.

### IV.    Relief Sought in First Day Motions.

44.     Contemporaneously herewith, the Debtors filed the First Day Motions seeking relief that the Debtors believe is necessary to enable them to efficiently administer their estates with minimal disruption and loss of value during these chapter 11 cases.  The Debtors request that the relief requested in each of the first day motions be granted as critical elements in ensuring the maximization of value of the Debtors' estates.  A list of the First Day Motions is attached hereto as **Exhibit C**.

45.     These First Day Motions seek authority to, among other things, obtain the use of cash collateral on an interim basis, honor employee-related wages and benefit obligations, and ensure the continuation of the Debtors' cash management systems and other business operations without interruption.  I believe that the relief requested in the First Day Motions is necessary to

give the Debtors an opportunity to work towards successful chapter 11 cases that will benefit all of the Debtors' stakeholders.

46.     Several of these motions request authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent that relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  Other relief will be deferred for consideration at a later hearing.

47.     I am familiar with the contents and substance of each First Day Motion (including the exhibits thereto), and the statements and facts set forth in each of the First Day Motions are true and correct to the best of my knowledge.  I believe that the relief sought in each First Day Motion:  (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of value; and (b) best serves the interests of the Debtors' stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

*[Remainder of Page Intentionally Blank]*

Dated:  March 8, 2020
Wilmington, Delaware

*/s/ David Ladd*

Name: David Ladd
Title:   Executive Vice President and Chief Financial
          Officer