**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (CSS) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO IMPLEMENT AND ADMINISTER
ESSENTIAL CUSTOMER PROGRAMS AND HONOR CERTAIN PREPETITION
OBLIGATIONS RELATED THERETO AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state the following in support of this motion (this "Motion"):

**Relief Requested**

1. The Debtors seek entry of an interim order (the "Interim Order") and a final order (the "Final Order"), substantially in the forms attached hereto: (a) authorizing the Debtors to implement and administer the Essential Customer Programs (as defined herein) and to pay and honor certain prepetition obligations related thereto; and (b) granting related relief.

2. In addition, the Debtors request that the Court schedule a final hearing within approximately 25 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

13167715

**Jurisdiction and Venue**

3.  The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012 (the "Amended Standing Order"). The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.  The bases for the relief requested herein are sections 105(a) and 363(b) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 6003, and Bankruptcy Local Rule 9013-1(m).

**Background**

6.  The Debtors operate 169 locations, including 92 furniture and mattress showrooms and 77 freestanding mattress and specialty locations. The Debtors do business under brand names, including Art Van Furniture, Pure Sleep, Scott Shuptrine Interiors, Levin Furniture, Levin Mattress, and Wolf Furniture. The Debtors were founded in 1959 and was owned by its founder, Art Van Elslander, until it was sold to funds affiliated with Thomas H. Lee Partners, L.P. ("THL") in March 2017. Pennsylvania based Levin Furniture and Wolf Furniture were acquired by Art Van in November 2017. As of the Petition Date (as defined below), the Debtors operate stores throughout Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland,

2

Missouri, and Virginia. The Debtors are headquartered in Warren, Michigan and have approximately 4,500 employees as of the Petition Date (as defined below).

7.      On March 8, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of David Ladd, Executive Vice President and Chief Financial Offer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with this Motion and incorporated by reference herein. Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

### Description of Existing Customer Programs

8.      The Debtors have historically provided certain incentives, warranties, discounts, promotions, coupons, and accommodations (collectively, the "Original Customer Programs") to their customers to attract and maintain positive customer relationships. These obligations are principally comprised of customer deposits, discounts or other similar obligations owed by the Debtors to their customers as described in further detail below.

**A.    Customer Deposits.**

9.      The Debtors enable customers to pay amounts toward the purchase of furniture, mattresses, flooring, bed accessories, and other home furnishings, with the remainder of the purchase price being due at a later date (the "Original Customer Deposit Program"). The

Debtors generally require a minimum $100 deposit to reserve and ship this merchandise. As of the Petition Date, the Debtors have received deposit amounts for merchandise purchases and have reserved certain of such items corresponding to such purchases, but the customers have not remitted the remaining purchase price to complete the sale or the merchandise has not been delivered to the customer. The Debtors estimate that as of the end of February 2020 there were approximately $35.2 million of customer deposits, consisting of the following: (a) approximately $16.9 million associated with the operation of the Debtors' Levin Furniture and Wolf Furniture branded stores; and (b) approximately $18.3 million associated with the operation of the Debtors' Art Van Furniture stores.

10.     In the days leading up to the Petition Date, the Company, with the assistance of its advisors, extensively negotiated and reached an agreement-in-principle with Robert Levin, the former owner of Levin Furniture, regarding a going-concern sale of certain of the assets of Sam Levin, Inc. and LF Trucking, Inc. (the "Levin-Wolf Sale"). The proposed Levin-Wolf Sale provides for, among other benefits to the Debtors' estates, the continued operation of 44 retail store locations under the Wolf Furniture and Levin Furniture banners and two related distribution centers to continue in operation, the preservation of nearly 1,000 jobs, and, importantly for present purposes, the buyer's assumption of liabilities relating to customer deposits. Hence, once the Levin-Wolf Sale closes, the Debtors expect to be relieved of further obligations relating to the bulk of those customer deposits and the underlying purchase orders relating to the inventory for which such customer deposits were made.

11.     Except for those customer deposits that may be assumed by the purchaser of the Wolf Furniture and Levin Furniture business lines upon closing of the Levin-Wolf Sale, the Debtors' financial and operational circumstances are such that the Debtors are not presently able

to offer customers cash refunds on account of such deposits. Shortly before the Petition Date, the Debtors commenced an orderly wind-down and inventory liquidation at all of their retail locations other than those that are the subject of the Levin-Wolf Sale (the "Wind Down"), which Wind Down, subject to Court approval, is expected to continue on a postpetition basis.[2] The Wind Down encompasses all Art Van Furniture, Pure Sleep, Scott Shuptrine Interiors branded stores and their associated inventory and assets, as well as the inventory and other assets of eight Maryland and Virginia Wolf Furniture locations that are excluded from the Levin-Wolf Sale. With respect to those customer deposits provided at locations that are the subject of the Wind Down, the Debtors and their advisors negotiated extensively with the Company's secured lenders to ensure that essential customer program obligations were contemplated by the agreed cash collateral budget to support, *inter alia,* the Wind Down. In particular, as a result of these negotiations, the Debtors have implemented a process for addressing customer deposits whereby customers can elect to: (a) receive the merchandise they purchased if such merchandise is present in the Art Van warehouses;[3] or (b) if the originally purchased merchandise is not available, receive a credit in an amount equal to their deposits that can be used toward the purchase of alternative merchandise during the Wind-Down. In addition, in the discretion of the Debtors (taking into account, among other factors, the volume, timing and magnitude of such refund requests and the availability of cash proceeds to complete refund requests) or as required by applicable law, certain of the Debtors' may permit customers to cancel their order and submit a

---

[2] The Levin-Wolf Sale excludes the inventory and other assets of eight Maryland and Virginia Wolf Furniture locations and, accordingly, such assets are included in the Wind Down.

[3] This procedure is not to the exclusion of the remedies afforded customers through the traditional bankruptcy claims process. If a customer either (i) cancels an order on account of which the Debtors have the subject merchandise on-hand and available for delivery, or (ii) refuses to accept completion/delivery of either such merchandise, the affected customer can file a claim in the chapter 11 cases for the full amount of such customer's deposit (unless such customer deposit obligation is otherwise satisfied).

request to refund their deposit, which request would be processed as soon as practicable depending on the volume of refund requests, required processing times, and the timing and availability of cash proceeds generated by the Wind Down (collectively as described in this paragraph, the "Wind Down Customer Deposit Program").

12. Accordingly, the Debtors seek authority, in their discretion, to honor obligations relating to customer deposits only in accordance with the Wind Down Customer Deposit Program. *For the avoidance of doubt, however, as to those retail locations that are part of the Levin-Wolf Sale and subject to closing of the Levin-Wolf Sale, the purchaser of the locations included in the Levin-Wolf Sale is assuming the associated Original Customer Deposit Program obligations.*

    **II.**    **Art Van Signature Card.**

13. In the ordinary course of business, the Debtors have offered discounts, special promotions, and other benefits through the ArtVantage Rewards Program (the "ArtVantage Rewards Program"). Customers were eligible to participate in the ArtVantage Rewards Program by virtue of obtaining the private label credit card offered by the Debtors (the "Art Van Signature Card").[4] Once a customer was approved to receive the Art Van Signature Card and the card is activated, the customer could elect to participate in the ArtVantage Rewards Program. Participating customers who made purchases with the Art Van Signature Card at the Debtors' stores earned points (the "Rewards Points") for each purchase.

14. In light of the contemplated discontinuation of the Debtors' businesses (other than those part of the Levin-Wolf Sale) and the Debtors' difficult financial circumstances, the Debtors terminated the ArtVantage Reward Program effective immediately upon the commencement of

---

[4] The Art Van Signature Card is issued by a third-party bank and the Debtors have no liability to the bank for credit losses provided that purchases are made in accordance with the bank's standard credit procedures.

the Wind Down. Accordingly, the Debtors are not at this time requesting any authority with respect to the ArtVantage Rewards Program.

### III. Refund and Exchange Policies.

15. In the ordinary course of business prior to the commencement of the Wind Down, the Debtors maintained a refund and exchange policy in connection with the operation of their retail stores (the "Original Refund and Exchange Policy").  The Debtors allowed customers to return or exchange certain merchandise within seven days of receipt, so long as it is returned in its original condition and in the original packaging.  Pursuant to the Original Refund and Exchange Policy, customers were provided an exchange or refund in the original form of payment with a customer's original or emailed receipt.  The Debtors permitted the Original Refund and Exchange Policy to be modified on a case-by-case basis at the store level to ensure customer satisfaction.

16. The Original Refund and Exchange Program is subject to change as a result of Wind Down, including the Debtors' store closing sales, the specific terms of which are set forth in the proposed interim and final orders (collectively, the "Store Closing Orders") related to the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Approving Procedures for Store Closing Sales, (II) Authorizing Customary Bonuses to Employees of Closing Stores, (III) Authorizing Assumption of the Consulting Agreement, (IV) authorizing the debtors to retain the consultant as Special Asset Disposition Advisors to the Debtors Pursuant to §327(a) of the Bankruptcy Code, and (V) Granting Related Relief*  (the "Store Closing Sale Motion"), filed concurrently herewith.  In view of the Wind Down and the contemplated Store Closing Orders, the Debtors have determined that the Original Refund and Exchange Program must be modified as follows:

- During the initial seven (7) days following the Petition Date (the "Postpetition Return Period"), customers will have the opportunity to return merchandise sold prior to the Petition Date, whether such merchandise was delivered prior to or after the Petition Date ("Returned Merchandise").  Such Returned Merchandise will be accepted in a manner consistent with the Debtors' customary practices and policies in effect on the Petition Date; *provided however,* no pricing adjustments, or returns of inventory sold prior to the Petition Date followed by the customer's attempt to repurchase the item (or item of the same sku) at the discounted price shall be accepted or honored.

- All customer requests for cash refunds or merchandise credits in respect of any Returned Merchandise shall be processed exclusively through Company's point-of-sale system.

- No returns of merchandise sold prior to the Petition Date shall be accepted or allowed outside of the Postpetition Return Period.

(such modified refund and exchange policy, the "Wind Down Refund and Exchange Policy").

17. The Debtors are unable to continue with the Original Refund and Exchange Policy in place.  Accordingly, the Debtors are seeking authorization to honor refunds and exchanges only to the extent provided in the Wind Down Refunds and Exchange Policy.  *For the avoidance of doubt, however, as to those retail locations that are part of the Levin-Wolf Sale and subject to closing of the Levin-Wolf Sale, the purchaser of the locations included in the Levin-Wolf Sale is expected to assume refund and exchange obligations associated with merchandise purchased from the locations being acquired through the Levin-Wolf Sale.*

**IV.  Warranties.**

18. Historically, the Debtors have provided protection plans and service contracts to customers (collectively, the "Warranties"). Customers purchased protections plans for furniture, mattresses, and adjustable bed bases.  For example, customers may purchase a bronze, silver, or gold protection plan with each plan providing different durations and scope of coverage for accidental stains and damage.  The Debtors also provided a variety of cleaning services for furniture and flooring for both homeowners and businesses located in certain markets.

19. Under the circumstances, the Debtors are unable to honor Warranty obligations from the Petition Date forward. *For the avoidance of doubt, however, as to those retail locations that are part of the Levin-Wolf Sale and subject to closing of the Levin-Wolf Sale, the purchaser of the locations included in the Levin-Wolf Sale is expected to assume Warranty obligations associated with merchandise purchased from the locations being acquired through the Levin-Wolf Sale.*

### V.    Gift Card Program.

20. The Debtors maintained a gift card program (the "Original Gift Card Program") pursuant to which customers could purchase physical, pre-paid gift cards in various denominations, typically between $25 and $500 (collectively, the "Gift Cards"). The Debtors sold and accept the Gift Cards both in their retail stores and on their e-commerce website.[5]

21. The Debtors maintain a liability on their books and records for unredeemed Gift Cards. The Debtors estimate that as of the Petition Date, approximately $1.2 million in issued Gift Cards are outstanding, of which approximately $500,000 relates to Art Van Furniture branded stores and approximately $700,000 relates to Levin Furniture or Wolf Furniture branded stores.

22. By this Motion, the Debtors seek authority, but not direction, to honor only those Gift Cards that are presented on or before April 15, 2020. No additional Gift Cards have been or will be sold from the stores that are part of the Wind Down (such modified Gift Card program, the "Wind Down Gift Card Program"). *For the avoidance of doubt, however, as to Levin Furniture and/or Wolf Furniture branded Gift Cards, subject to closing of the Levin-Wolf Sale, the purchaser of the locations included in the Levin-Wolf Sale is expected to assume the*

---

[5] Upon the commencement of the Wind Down, the Debtors discontinued their e-commerce websites, except for the e-commerce websites operated for the Levin Furniture and Wolf Furniture brands.

*associated Gift Card obligations for the Levin Furniture and Wolf Furniture branded businesses.*

VI.     **Credit Card and Other Payment Processors.**

23.     In addition to cash, the Debtors accept the following methods of payment from customers at in-store and online points of sale: (a) Visa, MasterCard, Discover, and American Express credit cards; and (b) Art Van Signature Cards (collectively, the "Non-Cash Payments"). To process the Non-Cash Payments, the Debtors are party to certain agreements (collectively, the "Payment Processing Agreements") with payment processors (collectively, the "Payment Processing Companies"). Pursuant to the Payment Processing Agreements, the Debtors generally receive the net customer sales less any Chargebacks (as defined herein), returns, and processing fees charged. The processing fees charged by each company vary, but are in the range of 1.2% - 3.2% (the "Processing Fees"). The Processing Fees owing to the Payment Processing Companies are set off from the funds that are remitted to the Debtors on account of the Non-Cash Payments on a daily basis.

24.     When customers either return merchandise to the Debtors following a purchase made by Non-Cash Payment or dispute charges with a Payment Processing Company, the Debtors may be obligated to refund to such Payment Processing Company the purchase price of the returned or disputed merchandise, subject to certain adjustments (collectively, "Chargebacks," and together with the Processing Fees, the "Processing Obligations," and together with the Wind Down Customer Deposit Program, the Wind Down Refund and Exchange Policy, and the Wind Down Gift Card Program, the "Essential Customer Programs"). Generally, Chargebacks are satisfied by netting the amount charged against pending payments owed by a Payment Processing Company to the Debtors. It is possible that certain Processing

Obligations incurred by the Debtors immediately prior to the Petition Date may not have been fully netted out against the payments received by the Debtors prior to the Petition Date.

25. The Debtors' continued acceptance of Non-Cash Payments is essential to the operation of the Debtors' business because the majority of the Debtors' sales—indeed, the majority of all retail sales—are made using Non-Cash Payments. Requiring all purchases to be made in cash would have a severe negative effect on the Debtors' ongoing operations and effectively eliminate the Debtors' ability to continue their e-commerce platform, the cost of which would be borne by their estates. To avoid disrupting these vital payment processing services, the Debtors seek authority to continue paying the Processing Obligations in the ordinary course of their business pursuant to the terms of the Payment Processing Agreements, and request that the Court authorize the Payment Processing Companies to continue to set off the Processing Obligations against amounts remitted to the Debtors, whether arising before or after the Petition Date, in a manner consistent with past practices.

**Basis for Relief**

**I.    Continuing to Honor Customer Programs as Set Forth Herein Is Warranted under Sections 105(a) and 363(b) of the Bankruptcy Code.**

26. The Court may grant the relief requested herein pursuant to section 363 of the Bankruptcy Code, which provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C.§ 363(b)(1). Under this section, a court may authorize a debtor to pay certain prepetition claims. *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (discussing prior order authorizing payment of prepetition wage claims pursuant to section 363(b) of the Bankruptcy Code). To do so, "the debtor must articulate some business justification, other than the mere appeasement of major creditors." *Id*.

27. The Court may also authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code, which codifies the equitable powers of the bankruptcy court, empowers the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Under section 105(a) of the Bankruptcy Code, courts may permit pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's business. Specifically, the Court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity").

28. The United States Court of Appeals for the Third Circuit recognized the "necessity of payment" doctrine in *In re Lehigh & New England Ry. Co.* 657 F.2d 570, 581 (3d Cir. 1981). The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. *Id.* (stating courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (recognizing necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until its pre-reorganization claims have been paid"); *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to continued operation of business); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (same).

29. The rationale for the necessity of payment rule—the rehabilitation of a debtor in reorganization cases—is "the paramount policy and goal of Chapter 11." *Ionosphere Clubs*,

98 B.R. at 176; *see also Just for Feet*, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process"). Accordingly, the Court can authorize the Debtors to continue the Customer Programs and pay prepetition claims related thereto pursuant to sections 363(b) and 105(a) of the Bankruptcy Code.

30. In the Debtors' business judgment, continuing the Essential Customer Programs without interruption during these chapter 11 cases, while discontinuing the Original Customer Programs, is both prudent and necessary given the fiscal restraint necessary for the Debtors to implement an orderly Wind Down of those portions of their businesses not included in the Levin-Wolf Sale. Indeed, the ability of the Debtors to maximize the value of their assets and implement an orderly liquidation requires a delicate balance between maintaining the loyalty of their customers while maximizing the value of the Debtors' inventory. If the Debtors are unable to honor customer expectations at least to the extent of the Essential Customer Programs, customers may not come to the Debtors' stores during the going out of business sales, and the Debtors' ability to implement an orderly liquidation would be irreparably harmed.

31. While the Debtors would prefer to retain more of their Original Customer Programs, the dire financial circumstances that have precipitated the commencement of these chapter 11 cases make it impossible for them to do so. Nevertheless, the Debtors believe that the steps they are able to take by implementing and administering the Essential Customer Programs will help them mitigate the impact on customers during the Wind Down to the fullest extent possible under the circumstances.

32. Courts in this district routinely authorize the implementation of customer programs. *See, e.g.*, *In re Destination Maternity Corp.*, No. 19-12256 (BLS) (Bankr. D. Del. Nov. 12, 2019) (entering interim order authorizing debtors to maintain existing customer programs); *In re Forever 21, Inc.*, No. 19-12122 (KG) (Bankr. D. Del. Oct. 1, 2019) (same); *In re Z Gallerie LLC*, No. 19-10488 (KBO) (Bankr. D. Del. Mar. 11, 2019) (approving continuation of customer programs); *In re RMBR Liquidation, Inc.*, No. 19-10234 (KBO) (Bankr. D. Del. Feb. 7, 2019) (same); *In re Charming Charlie Holdings Inc.*, No. 17-12906 (CSS) (Bankr. D. Del. Jan. 10, 2018) (same). Moreover, this court has granted such relief even in circumstances, such as those existing here, in which certain costumer programs are continued in modified form in furtherance of the Debtors' efforts to maximize value primarily through an orderly inventory liquidation process. *See, e.g., General Wireless Operations Inc., d/b/a RadioShack,* No. 17-10506 (BLS) (Bankr. D. Del. March 27, 2017); *In re Coldwater Creek Inc.,* No. 14-10867 (BLS) (Bankr. D. Del. April 14, 2014); *In re Filene's Basement, LLC*, No. 11-13511 (KJC) (Bankr. D. Del. Nov. 4, 2011).

33. Accordingly, the Debtors submit that the benefit conferred on the Debtors' estates by the Essential Customer Programs warrants the authority to honor the Essential Customer Programs and any customer obligations relating thereto, whether arising prepetition or

postpetition, and respectfully request the authority to implement the Essential Customer Programs and honor prepetition commitments related thereto.

### Processing of Checks and Electronic Fund Transfers Should Be Authorized

34.     Under the Debtors' cash management system, the Debtors have made arrangements to readily identify checks or wire transfer requests relating to the Essential Customer Programs, as applicable.  Accordingly, the Debtors believe that checks or wire transfer requests that are not related to authorized payments will not be honored inadvertently.  Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

### The Requirements of Bankruptcy Rule 6003 Are Satisfied

35.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 25 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003.  For the reasons discussed above, authorizing the Debtors to implement and maintain the Essential Customer Programs and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases smoothly and maximize value for their creditors.  Failure to receive such authorization and other relief during the first 25 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

36.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a)

and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Reservation of Rights

37. Nothing contained in this Motion or any actions taken by the Debtors pursuant to any order granting the relief requested by this Motion is intended or should be construed as: (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

### Notice

38. Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Bankruptcy Local Rules, and is sufficient under the circumstances.  Without limiting the foregoing, due notice will be afforded, whether by facsimile, electronic mail, overnight courier

or hand delivery, to parties-in-interest, including: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agents under the Debtors' prepetition secured facilities and counsel thereto; (d) counsel to the Consultant under the Consulting Agreement; (e) the United States Attorney's Office for the District of Delaware; (f) the Internal Revenue Service; (g) the state attorneys general for states in which the Debtors conduct business; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

39. No prior motion for the relief requested herein has been made to this or any other court.

[*Remainder of the page intentionally left blank*]

13167715

WHEREFORE, the Debtors respectfully request that the Court enter interim and final orders, substantially in the forms attached hereto, respectively, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

| | |
|---|---|
| Dated: March 8, 2020<br>Wilmington, Delaware | **BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP** |

*/s/ draft*
Gregory W. Werkheiser (DE No. 3553)
Michael J. Barrie (DE No. 4684)
Jennifer Hoover (DE No. 5111)
Kevin Capuzzi (DE No. 5462)
John C. Gentile (DE No. 6159)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: gwerkheiser@beneschlaw.com
      mbarrie@beneschlaw.com
      jhoover@beneschlaw.com
      kcapuzzi@beneschlaw.com
      jgentile@beneschlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

13167715