# <u>EXHIBIT B</u>

## DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT

This **DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT** (this "Agreement"), dated the 10th day of March, 2020, is entered into by and between Sam Levin, Inc., a Pennsylvania corporation ("Borrower"), and Levin Furniture LLC, a Pennsylvania limited liability company ("Lender").

### Recitals

**WHEREAS,** Borrower has encountered financial difficulties and, together with certain of is affiliates, has filed for bankruptcy protection under chapter 11 of 11 U.S.C. § 101, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are the subject of a request for joint administration under Case No. 20-10553 (CSS) (collectively, the "Bankruptcy Cases");

**WHEREAS,** Lender has agreed to provide post-petition debtor-in-possession financing (the "DIP Financing") to Borrower as more fully set forth herein and as set forth in the Financing Orders (as defined in Section 1 hereof), which Financing Orders shall be in form and substance acceptable to Lender in Lender's sole discretion, such DIP Financing to be used to pay certain expenses of Borrower during the Bankruptcy Case on the terms set forth below;

**WHEREAS,** in return for the DIP Financing, Lender requires that Borrower obtain entry by the Bankruptcy Court of the Financing Orders, specifically granting Lender, among other things, a secured superpriority administrative expense claim against Borrower and its assets only pursuant to Section 364(c) of the Bankruptcy Code with respect to the DIP Financing; and

**WHEREAS,** Borrower and Lender each acknowledge and agree that the terms of this Agreement must be approved by the Bankruptcy Court and that the Interim Financing Order (as defined in Section 1 hereof) be entered by the Bankruptcy Court before this Agreement is enforceable.

**NOW THEREFORE,** in consideration of the mutual covenants and undertakings herein contained, the receipt and sufficiency of which are hereby acknowledged, Borrower and Lender hereby agree as follows:

### Agreement

Borrower and Lender each agree that the foregoing Recitals are true and correct.

1.    **Definitions**.    For purposes of this Agreement the following terms shall have the following meanings:

"Additional Credit" shall have the meaning set forth in Section 10(b) hereof.

"Advances" shall mean loans made pursuant to the terms of this Agreement under the Revolving Credit Note.

"Agreement" shall have the meaning set forth in the Preamble hereof.

"Approved Amount" shall mean, as of any date, the maximum amount of Advances that are authorized pursuant to the terms of the Interim Financing Order or the Final Financing Order, as the case may be.

"Bankruptcy Case" shall have the meaning set forth in the Recitals hereof.

"Bankruptcy Code" shall have the meaning set forth in the Recitals hereof.

"Bankruptcy Court" shall have the meaning set forth in the Recitals hereof.

"Borrower" shall have the meaning set forth in the Preamble hereof.

"Borrower Group" shall have the meaning set forth in Section 15(l) hereof.

"Business Day" shall mean any day other than Saturday or Sunday or a legal holiday on which commercial banks are authorized or required by law to be closed for business in Pittsburgh, Pennsylvania.

"Cash Collateral Order" shall mean that certain *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* entered by the Bankruptcy Court in connection with the Bankruptcy Case.

"Charges" shall mean all taxes, charges, fees, imposts, levies or other assessments, including, without limitation, all net income, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation and property taxes, custom duties, fees, assessments, liens, claims and charges, together with any interest and any penalties, additions to tax or additional amounts, imposed by any taxing or other similar governmental authority, domestic or foreign, upon the Collateral, the Borrower or any affiliates of the Borrower.

"Claims" shall have the meaning set forth in Section 15(l) hereof.

"Closing" shall mean the closing of the DIP Financing and the other transactions to be consummated on the Closing Date, as contemplated by this Agreement.

"Closing Date" shall mean the date on which all conditions to the effectiveness of this Agreement are satisfied, but in no event shall such date be later than seven (7) days after the Petition Date.

"Collateral" shall mean and include all of the following personal property assets of the Borrower, whether now in existence or hereafter acquired or arising, and wherever located:

(a)    all inventory of the Borrower purchased solely with the proceeds of any Advances made hereunder;

(b)    all receivables of the Borrower arising out of the sale of inventory referred to in clause (a) above;

(c)    all right, title and interest in and to (i) all inventory returned or rejected by customers previously sold by the Borrower giving rise to receivables referred to in clause (b) above; (ii) all of Borrower's rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lienor, including stoppage in transit, setoff, detinue, replevin, reclamation and repurchase with respect to any of the foregoing (a) or (b); (iii) all additional amounts due to Borrower from any customer relating to the receivables set forth in clause (b) above; (iv) other property, including warranty claims, relating to any

of the foregoing (a) and (b); (v) all of Borrower's contract rights, rights of payment which have been earned under a contract right, instruments (including promissory notes), documents, chattel paper (including electronic chattel paper), warehouse receipts, deposit accounts, letters of credit and money relating to any of the foregoing (a) and (b); (vi) all commercial tort claims (whether now existing or hereafter arising) relating to any of the foregoing (a) and (b); and (vii) if and when obtained by Borrower, all real and personal property of third parties in which Borrower has been granted a lien or security interest as security for the payment or enforcement of receivables referred to in clause (b);

(d)    ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computer software (owned by Borrower or in which it has an interest and in which the granting of a security interest therein is not expressly prohibited), computer programs, tapes, disks and documents relating to (a), (b) or (c) of this definition; and

(e)    proceeds and products of (a), (b), (c) or (d) of this definition in whatever form, including, but not limited to: cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents and tort claim proceeds.

Notwithstanding anything to the contrary in this Agreement, the term "Collateral" shall not include any lease, license, contract, property right or agreement (or any of its rights or interests thereunder) if and to the extent that the grant of the security interest shall, after giving effect to Sections 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code (or any successor provision or provisions), the Bankruptcy Code or any other applicable law, constitute or result in (i) the abandonment, invalidation or unenforceability of any right, title or interest of Borrower therein or (ii) a breach or termination pursuant to the terms of, or a default under, any such lease license, contract, property rights or agreement; provided, however, that (y) the Collateral excluded hereby shall not include any and all proceeds of such property rights or agreements or any right, title or interest of Borrower therein, and (z) the security interest shall attach immediately at any such time as the restriction resulting in abandonment, invalidation or unenforceability or breach or termination shall be removed or any condition thereto (including any consent) shall be satisfied.

"Contract Rate" shall mean a fixed interest rate equal to **[9 percent (9.00%)]** per annum based on a three hundred sixty (360) day year.

"Default" shall mean an event which, with the giving of notice or passage of time or both, would constitute an Event of Default.

"Default Rate" shall have the meaning set forth in Section 3(e)(ii) hereof.

"DIP Financing" shall have the meaning set forth in the Recitals hereof.

"Event of Default" shall mean the occurrence of any of the events set forth in Section 12 hereof.

"Final Financing Order" shall mean a Financing Order that is a Final Order entered in the Bankruptcy Case after notice and final hearing pursuant to Rule 4001(c) of the Federal Rules of Bankruptcy Procedure and applicable local rules.

"Final Order" shall mean an order or judgment of the Bankruptcy Court duly entered in the docket of the Bankruptcy Case that (a) has not been modified or amended without the consent of the

Lender, or vacated, reversed, revoked, rescinded, stayed or appealed from, except as the Lender may otherwise specifically agree, (b) with respect to which the time to appeal, petition for certiorari, application or motion for reversal, rehearing, reargument, stay, or modification has expired, (c) no petition, application or motion for reversal, rehearing, reargument, stay or modification thereof or for a writ of certiorari with respect thereto has been filed or granted or the order or judgment of the Bankruptcy Court has been affirmed by the highest court to which the order or judgment was appealed and (d) is no longer subject to any or further appeal or petition, application or motion for reversal, rehearing, reargument, stay or modification thereof or for any writ of certiorari with respect thereto or further judicial review in any form.

"Financing Orders" shall mean the Interim Financing Order and such other interim, final, permanent and/or supplemental orders, including the Final Financing Order, satisfactory to the Lender entered by the Bankruptcy Court in the Bankruptcy Case after notice pursuant to Section 364 of the Bankruptcy Code relating thereto or authorizing the granting of credit by the Lender to the Borrower pursuant to the terms of this Agreement.

"GAAP" shall mean generally accepted accounting principles in the United States of America in effect from time to time.

"Governmental Body" shall mean any nation or government, any state or other political subdivision thereof or any entity exercising the legislative, judicial, regulatory or administrative functions of or pertaining to a government.

"Indebtedness" of a Person at a particular date shall mean all obligations of such Person which in accordance with GAAP would be classified upon a balance sheet as liabilities  and in any event, without limitation by reason of enumeration, shall include all indebtedness, debt and other similar monetary obligations of such Person whether direct or guaranteed, and all premiums, if any, due at the required prepayment dates of such indebtedness, and all indebtedness secured by a Lien on assets owned by such Person, whether or not such indebtedness actually shall have been created, assumed or incurred by such Person.  Any indebtedness of such Person resulting from the acquisition by such Person of any assets subject to any Lien shall be deemed, for the purposes hereof, to be the equivalent of the creation, assumption and incurring of the indebtedness secured thereby, whether or not actually so created, assumed or incurred.

"Interim Financing Order" shall mean the order entered by the Bankruptcy Court on or about the date hereof in the form of Exhibit A attached hereto, with such changes thereto as may be approved by the Lender.

"Lender" shall have the meaning set forth in the Preamble hereof.

"Lender Group" shall have the meaning set forth in Section 15(l) hereof.

"Lien" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, security interest, lien (whether statutory or otherwise), Charge, claim or encumbrance, or preference, priority or other security agreement or preferential arrangement held or asserted in respect of any asset of any kind or nature whatsoever including, without limitation, any conditional sale or other title retention agreement, any lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction.

"Material Adverse Effect" shall mean a material adverse effect on (a) the financial condition, results of operations, business or prospects of Borrower or (b) the Lender's Liens on the Collateral taken as a whole or, subject to Permitted Encumbrances, the priority of any such Lien; it being understood that the commencement of the Bankruptcy Case and events and conditions which customarily occur as a result of events leading up to and following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code (including, without limitation, reduction in payment terms by suppliers and reclamation claims) shall not be deemed a material adverse effect.

"Maximum Advance Amount" shall mean **Seven Million and 00/100 Dollars ($7,000,000.00)**.

"Notice" shall have the meaning set forth in Section 15(b) hereof.

"Obligations" shall mean and include advances, debts, liabilities, obligations, covenants and duties (absolute, contingent, matured or unmatured) owing by the Borrower to the Lender or to any other direct or indirect subsidiary or affiliate of the Lender of any kind or nature, present or future (including, without limitation, any interest accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether or not evidenced by any note, guaranty or other instrument, arising under this Agreement or the Other Documents, whether or not for the payment of money, whether arising by reason of an extension of credit, opening of a letter of credit, loan or guarantee, or arising under any hedging contract or in connection with any cash management or treasury administration services or agreements, whether arising out of overdrafts or deposit or other accounts or electronic funds transfers (whether through automated clearing houses or otherwise) or out of the Lender's non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository transfer check or other similar arrangements, whether direct or indirect, absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, regardless of how such indebtedness or liabilities arise, whether evidenced by any other agreement or instrument, including, but not limited to, any and all of Borrower's Indebtedness and/or liabilities under this Agreement or the Other Documents and any amendments, extensions, renewals or increases and all costs and expenses of the Lender incurred in the documentation, negotiation, modification, enforcement, collection or otherwise in connection with any of the foregoing, including but not limited to, reasonable attorneys' fees and expenses and all obligations of Borrower to the Lender to perform acts or refrain from taking any action, in each such case solely with respect to and/or arising in connection with the Collateral.

"Other Documents" shall mean the Revolving Credit Note, each agreement pursuant to which the Lender is granted a Lien to secure the Obligations and any and all other agreements, instruments and documents, including, without limitation, guaranties, pledges, powers of attorney, consents and all other writings heretofore, now or hereafter executed by Borrower and/or delivered to the Lender in respect of the transactions contemplated by this Agreement whether or not specifically mentioned herein or therein, in each case as amended, supplemented, amended and restated or otherwise modified from time to time.

"Permitted Encumbrances" shall mean (a) Liens in favor of the Lender; (b) Liens for taxes, assessments or other governmental charges not delinquent or being contested in good faith and by appropriate proceedings and with respect to which proper reserves have been taken by Borrower in accordance with GAAP; provided, that, such Liens shall have no effect on the priority of the Liens in favor of the Lender or the value of the assets in which the Lender has such a Lien and a stay of enforcement of any such Lien shall be in effect; (c) deposits or pledges to secure obligations under worker's compensation, social security or

similar laws, or under unemployment insurance or general liability or product liability insurance; (d) deposits or pledges to secure bids, tenders, contracts (other than contracts for the payment of money), leases, statutory obligations, performance bonds, surety and appeal bonds and other obligations of like nature arising in the ordinary course of Borrower's business; (e) zoning restrictions, easements, encroachments, rights of way, restrictions, leases, licenses, restrictive covenants and other similar title exceptions or Liens affecting real property, none of which materially impairs the use of such real property or the value thereof, and none of which is violated in any material respect by existing or supporting structures or land use; (f) Liens of the Prepetition Secured Parties as set forth in the Cash Collateral Order; (g) other Liens permitted by the Cash Collateral Order; and (h) Liens disclosed on Schedule 1(f) attached hereto provided that the principal amount secured thereby is not hereafter increased to an amount greater than the amount outstanding on the Closing Date, and no additional assets become subject to such Liens except as otherwise specifically identified on Schedule 1(f).

"Person" shall mean any individual, sole proprietorship, partnership, corporation, business trust, joint stock company, trust, unincorporated organization, association, limited liability company, institution, public benefit corporation, joint venture, entity or government (whether federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof).

"Petition Date" shall mean March 8, 2020.

"Preamble" shall mean the introductory paragraph of this Agreement.

"Prior Event" shall have the meaning set forth in Section 15(l) hereof.

"Purchasers" shall have the meaning set forth in Section 10(d) hereof.

"Revolving Credit Note" shall mean the promissory note referred to in Section 3(a) hereof, together with all amendments, restatements, extensions, renewals, replacements, refinancings or refundings thereof in whole or in part.

"Sale Agreement" shall have the meaning set forth in Section 10(d) hereof.

"Sale Motion" shall have the meaning set forth in Section 10(d) hereof.

"Sale Order" shall have the meaning given set forth Section 10(f) hereof.

"Sellers" shall have the meaning set forth in Section 10(d) hereof.

"Superpriority Claim" shall mean indebtedness or other claim arising out of credit obtained or debt incurred by the Borrower in the Bankruptcy Case having priority in accordance with the provisions of Section 364(c)(1) of the Bankruptcy Code over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

"Term" shall have the meaning set forth in Section 14(a) hereof.

"Uniform Commercial Code" shall mean the Uniform Commercial Code or other similar law of the Commonwealth of Pennsylvania as in effect on the date of this Agreement and as amended from time to time.

13172237 v2

2.    **Accounting Terms.** As used in this Agreement, the Revolving Credit Note or any certificate, report or other document made or delivered pursuant to this Agreement, accounting terms not defined herein shall have the respective meanings given to them under GAAP.

3.    **The DIP Financing**.

(a)    <u>Advances</u>.  Subject to the terms and conditions set forth in this Agreement, Lender will make Advances to the Borrower in aggregate amounts outstanding at any time equal to the lesser of (x) the Maximum Advance Amount and (y) the Approved Amount.  The Advances shall be evidenced by a secured promissory note substantially in the form attached hereto as <u>Exhibit B</u> (the "<u>Revolving Credit Note</u>").

(b)    <u>Procedure for Borrowing Advances</u>.  Borrower may notify Lender prior to 12:00 p.m. (eastern time) on a Business Day of Borrower's request to incur, on that day, an Advance hereunder.  Should any amount required to be paid as interest hereunder, or as fees or other charges under this Agreement or any Other Document, or with respect to any other Obligation, become due, same shall be deemed a request for an Advance as of the date such payment is due, in the amount required to pay in full such interest, fee, charge or Obligation under this Agreement or any Other Document, and such request shall be irrevocable.

(c)    <u>Disbursement of Advance Proceeds</u>.  During the Term, Borrower may use the Advances by borrowing, repaying and reborrowing, all in accordance with the terms and conditions hereof.  The proceeds of (i) each Advance requested by Borrower to the extent Lender makes such Advance, shall be made available to Borrower on the day so requested by way of credit to Borrower's operating account at Bank of America in immediately available funds and (ii) each Advance deemed to have been requested by Borrower under Section 3(b) hereof shall be disbursed to Lender to be applied to the outstanding Obligations giving rise to such deemed request.

(d)    <u>Maximum Advances</u>.  The aggregate balance of outstanding Advances outstanding at any time (i) pursuant to the Interim Financing Order shall not exceed the lesser of (a) **Three Million Five Hundred Thousand and 00/100 Dollars ($3,500,000.00)** and (b) the Approved Amount and (ii) pursuant to the Final Financing Order shall not exceed the lesser of (a) the Maximum Advance Amount and (b) the Approved Amount.

(e)    <u>Interest on Advances</u>.

(i)    Interest charges shall be computed on the actual principal amount of Advances outstanding during the calendar month and shall bear interest for each day at a rate per annum equal to the Contract Rate.

(ii)    Upon and after the occurrence of an Event of Default, and during the continuation thereof, the Obligations shall bear interest at the Contract Rate plus two percent (2.00%) per annum (the "<u>Default Rate</u>").

(iii)    If any payment to be made hereunder becomes due and payable on a day other than a Business Day, the due date thereof shall be extended to the next succeeding Business Day and interest thereon shall be payable at the Contract Rate during such extension.

(iv)    In no event whatsoever shall interest and other charges charged hereunder exceed the highest rate permissible under law.  In the event interest and other

13172237 v2

charges as computed hereunder would otherwise exceed the highest rate permitted under law, such excess amount shall be first applied to any unpaid principal balance owed by the Borrower, and if then remaining excess amount is greater than the previously unpaid principal balance, the Lender shall promptly refund such excess amount to the Borrower and the provisions hereof shall be deemed amended to provide for such permissible rate.

(f)     Repayment of Advances.

(i)     The Advances shall be due and payable in full on the last day of the Term.  Borrower shall pay principal, interest, and all other amounts payable hereunder, or under any related agreement, without any deduction whatsoever, including, but not limited to, any deduction for any setoff or counterclaim.

(ii)    All payments of principal, interest and other amounts payable hereunder, or under any of the Other Documents shall be made to Lender not later than 11:00 A.M. (eastern time) on the due date therefor in lawful money of the United States of America in immediately available funds.  Lender shall have the right to effectuate payment on any and all Obligations due and owing hereunder by charging the Borrower or by making Advances as provided in Section 3(b) hereof.

(iii)   The aggregate balance of outstanding Advances at any time in excess of the maximum amount of such Advances permitted hereunder shall be immediately due and payable without the necessity of any demand, whether or not a Default or Event of Default has occurred.

4.     **Use of Funds**.  The funds available under the DIP Financing may be used to purchase inventory in the ordinary course of business of Borrower during the administration of the Bankruptcy Case in accordance with the terms of any order regarding Borrower's use of cash collateral or the Financing Orders.

5.     **Collateral; General Terms**.

(a)     Security Interest in the Collateral.  Pursuant to the Interim Financing Order and the Final Financing Order and in accordance with the terms thereof, to secure the prompt payment and performance to the Lender of the Obligations, Borrower hereby assigns, pledges and grants to the Lender a continuing security interest in and to all of its Collateral, whether now owned or existing or hereafter acquired or arising and wheresoever located.  Borrower shall promptly provide the Lender with written notice of all commercial tort claims, such notice to contain the case title together with the applicable court and a brief description of the claim(s).  Upon delivery of each such notice, Borrower shall be deemed to hereby grant to the Lender a security interest and lien in and to such commercial tort claims and all proceeds thereof.

(b)     Perfection of Security Interest.  Borrower shall take all action that may be necessary or desirable, or that the Lender may request, so as at all times to maintain the validity, perfection, enforceability and priority of the Lender's security interest in the Collateral or to enable the Lender to protect, exercise or enforce its rights hereunder and in the Collateral, including, but not limited to, (i) immediately discharging all Liens on the Collateral other than Permitted Encumbrances, (ii) delivering to the Lender, endorsed or accompanied by such instruments of assignment as the Lender may specify, and stamping or marking, in such manner as the Lender may specify, any and all chattel paper, instruments, letters of credits and advices thereof and documents evidencing or forming a part of the Collateral, (iii) entering into warehousing, lockbox and other custodial arrangements satisfactory to

the Lender as and to the extent required hereunder, and (iv) executing and delivering control agreements, instruments of pledge, notices and assignments, in each case in form and substance satisfactory to the Lender, relating to the creation, validity, perfection, maintenance or continuation of the Lender's security interest in Collateral under the Uniform Commercial Code or other applicable law. The Lender is hereby authorized to file financing statements in accordance with the Uniform Commercial Code from time to time. By its signature hereto, Borrower hereby authorizes the Lender to file against Borrower, one or more financing, continuation, or amendment statements pursuant to the Uniform Commercial Code to perfect Liens in the Collateral securing Obligations arising hereunder in form and substance satisfactory to the Lender. All charges, expenses and fees the Lender may incur in doing any of the foregoing, and any local taxes relating thereto, shall be charged to the Borrower as an Advance and added to the Obligations (notice thereof shall be provided to the Borrower thereafter), or, at the Lender's option, shall be paid to the Lender immediately upon demand.

(c)     Disposition of Collateral. Borrower will safeguard and protect all Collateral for the Lender's general account and make no disposition thereof whether by sale, lease or otherwise except as may be otherwise permitted under this Agreement.

(d)     Preservation of Collateral. Following the occurrence and during the continuation of an Event of Default in addition to the rights and remedies set forth in Section 13(a) hereof, the Lender: (i) may at any time take such steps as the Lender deems necessary to protect the Lender's interest in and to preserve the Collateral, including the hiring of such security guards or the placing of other security protection measures as the Lender may deem appropriate; (ii) may employ and maintain at any of Borrower's premises a custodian who shall have full authority to do all acts necessary to protect the Lender's interests in the Collateral; (iii) may lease warehouse facilities to which the Lender may move all or part of the Collateral; (iv) may use Borrower's owned or leased lifts, hoists, trucks and other facilities or equipment for handling or removing the Collateral; and (v) shall have, and is hereby granted, a right of ingress and egress to the places where the Collateral is located, and may proceed over and through any of Borrower's owned or leased property. Borrower shall cooperate fully with all of the Lender's efforts to preserve the Collateral as permitted in the foregoing sentence and will take such actions to preserve the Collateral as the Lender may direct. All of the Lender's expenses of preserving the Collateral in accordance with the foregoing, including any expenses relating to the bonding of a custodian, shall be charged to the Borrower as an Advance and added to the Obligations, or, at the Lender's option, shall be paid to the Lender immediately upon demand.

(e)     Ownership of Collateral. With respect to the Collateral, at the time the Collateral becomes subject to the Lender's security interest: (i) Borrower shall be the owner of and fully authorized and able to sell, transfer, pledge and/or grant a security interest having the priority set forth in the Financing Orders in each and every item of its Collateral to the Lender; and, except for Permitted Encumbrances, the Collateral shall be free and clear of all Liens and encumbrances whatsoever; (ii) each document and agreement executed by Borrower or delivered to the Lender in connection with this Agreement shall be true and correct in all material respects; (iii) all signatures and endorsements of Borrower that appear on such documents and agreements shall be genuine and Borrower shall have full capacity to execute same; and (iv) Borrower's inventory shall be located as set forth on Schedule 5(e) attached hereto (as such Schedule may be updated from time to time) and shall not be removed from such location(s) without the prior written consent of the Lender except with respect to the sale of inventory in the ordinary course of business and with respect to inventory in transit from (a) a supplier to one location identified on Schedule 5(e) (as such Schedule may be updated from time to time) or (b) one location identified on Schedule 5(e) to another location identified on Schedule 5(e).

(f)     Defense of Lender's Interests. Until (i) indefeasible payment and performance in full of all of the Obligations and (ii) termination of this Agreement, the Lender's interests in the Collateral

-9-

shall continue in full force and effect. During such period Borrower shall not, without the Lender's prior written consent, pledge, sell (except inventory in the ordinary course of business), assign, transfer, create or suffer to exist a Lien upon or encumber or allow or suffer to be encumbered in any way except for Permitted Encumbrances, and except for dispositions expressly permitted elsewhere herein, any part of the Collateral. Borrower shall defend the Lender's interests in the Collateral against any and all Persons whatsoever. At any time after an Event of Default has occurred and is continuing and after demand by the Lender for payment of all Obligations, the Lender shall have the right, after the giving of any required notices under Section 13 hereof and upon the effectiveness of the granting of relief from the stay of Section 362(a) of the Bankruptcy Code, to take possession of the indicia of the Collateral and the Collateral in whatever physical form contained, including, without limitation, labels, stationery, documents, instruments and advertising materials. If the Lender exercises such right to take possession of the Collateral, Borrower shall, upon demand, assemble it in the best manner possible and make it available to the Lender at a place reasonably convenient to the Lender. In addition, with respect to all Collateral, the Lender shall be entitled to all of the rights and remedies set forth herein and further provided by the Uniform Commercial Code or other applicable law. After the occurrence and during the continuance of an Event of Default and after the giving of any required notices under Section 13 hereof, Borrower shall, and the Lender may, at its option, instruct all suppliers, carriers, forwarders, warehousers or others receiving or holding cash, checks, inventory, documents or instruments in which the Lender holds a security interest to deliver same to the Lender and/or subject to the Lender's order and if they shall come into Borrower's possession, they shall be held by Borrower in trust as the Lender's trustee, and Borrower will immediately deliver them to the Lender in their original form together with any necessary endorsement.

      (g)    <u>Books and Records</u>. Borrower shall (i) keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to its business and affairs; (ii) set up on its books accruals with respect to all taxes, assessments, charges, levies and claims; and (iii) on a reasonably current basis set up on its books, from its earnings, allowances against doubtful receivables, advances and investments and all other proper accruals (including without limitation by reason of enumeration, accruals for premiums, if any, due on required payments and accruals for depreciation, obsolescence, or amortization of properties), which should be set aside from such earnings in connection with its business. All determinations pursuant to this subsection shall be made in all material respects in accordance with, or as required by, GAAP consistently applied in the opinion of such independent public accountant as shall then be regularly engaged by Borrower.

      (h)    <u>Financial Disclosure</u>. Borrower hereby irrevocably authorizes and directs all accountants and auditors employed by Borrower at any time during the Term and promptly after the written request of the Lender (with prior written notice to the Borrower so long as no Event of Default has occurred and is continuing) to deliver to the Lender copies of Borrower's financial statements (if any exist at or prior to the date of such request), trial balances or other accounting records of any sort in the accountant's or auditor's possession, and to disclose to the Lender any information such accountants may have concerning Borrower's financial status and business operations. Borrower hereby authorizes all federal, state and municipal authorities to furnish to the Lender copies of reports or examinations relating to Borrower, whether made by Borrower or otherwise; however, the Lender will attempt to obtain such information or materials directly from Borrower prior to obtaining such information or materials from such accountants or such authorities.

      (i)    <u>Priority</u>. Subject to entry of the Financing Orders by the Bankruptcy Court, Borrower agrees to grant Lender an allowed Superpriority Claim, and said Superpriority Claim shall survive any conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code.

13172237 v2

(j)    <u>Compliance with Laws</u>.  Borrower shall comply with all laws, acts, rules, regulations and orders of any Governmental Body with jurisdiction over it or the Collateral or any part thereof or to the operation of Borrower's business the non-compliance with which could reasonably be expected to have a Material Adverse Effect.  Borrower may, however, contest or dispute any acts, rules, regulations, orders and directions of those Governmental Bodies or officials in any reasonable manner, provided that any related Lien is inchoate or stayed and sufficient reserves are established to the reasonable satisfaction of the Lender to protect the Lender's Lien on or security interest in the Collateral. The Collateral at all times shall be maintained in accordance with the material requirements of all insurance carriers which provide insurance with respect to the Collateral so that such insurance shall remain in full force and effect.

(k)    <u>Inspection of Premises</u>.  Borrower shall (i) permit the Lender or any of its agents, attorneys, field examiners, auditors, financial consultants, appraisers and/or any other consultants or advisors access to Borrower's assets, properties, and premises at times to be mutually agreed, during normal business hours to, among other things, conduct appraisals and evaluations of the Collateral and any other assets or properties of Borrower, and (ii) fully cooperate and completely and promptly comply with any and all requests of the Lender and/or any of its agents for information or copies of documents. All fees, costs, and expenses of such agents, now or hereafter incurred by the Lender shall be reimbursed by Borrower in accordance with Section 15(e) hereof.

(l)    <u>Insurance</u>.  Borrower shall bear the full risk of any loss of any nature whatsoever with respect to the Collateral.  Subject to the orders of the Bankruptcy Court, at Borrower's own cost and expense in amounts and with carriers acceptable to the Lender, Borrower shall (i) keep all its insurable properties and properties in which Borrower has an interest insured against the hazards of fire, flood, sprinkler leakage, those hazards covered by extended coverage insurance and such other hazards, and for such amounts, as is customary in the case of companies engaged in businesses similar to Borrower's including, without limitation, business interruption insurance; (ii) maintain insurance in such amounts as is customary in the case of companies engaged in businesses similar to Borrower insuring against larceny, embezzlement or other criminal misappropriation of insured's officers and employees who may either singly or jointly with others at any time have access to the assets or funds of Borrower either directly or through authority to draw upon such funds or to direct generally the disposition of such assets; (iii) maintain public and product liability insurance against claims for personal injury, death or property damage suffered by others; (iv) maintain all such worker's compensation or similar insurance as may be required under the laws of any state or jurisdiction in which Borrower is engaged in business; and (v) furnish the Lender with (1)  evidence of the maintenance of all such insurance by the renewal thereof no later than the expiration date thereof, and (2) appropriate lender loss payable endorsements in form and substance satisfactory to the Lender, naming the Lender as an additional insured and lender loss payee as its interests may appear but only with respect to all insurance coverage covering damage, loss or destruction of Collateral, and providing (A) that all proceeds thereunder covering a loss of or damage to Collateral shall be payable to the Lender, (B) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy, and (C) that such policy and loss payable clauses may not be cancelled, amended or terminated unless at least thirty (30) days' prior written notice is given to the Lender.  Borrower shall provide copies of all such insurance policies (including the appropriate lender loss payee and additional insured endorsements) within thirty (30) days after the Lender's request, however, only certificates of such insurance shall be required at Closing.  In the event of any loss under any insurance covering Collateral, the carriers named in such insurance policies covering Collateral hereby are directed by the Lender and the Borrower to make payment for such loss to the Lender and not Borrower and the Lender jointly.  If any insurance losses with respect to Collateral are paid by check, draft or other instrument payable to Borrower and the Lender jointly, the Lender may endorse Borrower's name thereon and do such other things as the Lender may deem advisable to reduce the same to cash.  The Lender is hereby authorized to negotiate and compromise claims under insurance

13172237 v2

coverage with respect to Collateral. All loss recoveries with respect to Collateral received by the Lender upon any such insurance may be applied to the Obligations, in such order as the Lender in its sole discretion shall determine. Any surplus with respect to Collateral shall be paid by the Lender to Borrower or applied as may be otherwise required by law. Any deficiency thereon shall be paid by the Borrower to the Lender, on demand. Any loss recoveries not relating to items of Collateral shall be payable directly to Borrower and, if received by the Lender, the Lender shall promptly deliver same to Borrower. Anything hereinabove to the contrary notwithstanding, and subject to the fulfillment of the conditions set forth below, the Lender shall remit to the Borrower all proceeds of business interruption insurance, and all proceeds of insurance with respect to larceny, embezzlement or other criminal misappropriation, regardless of amount, shall be payable directly and promptly to the Borrower. The agreement of the Lender to remit insurance proceeds in the manner above provided shall be subject to satisfaction that no Event of Default or Default shall then have occurred and be continuing.

(m)     Failure to Pay Insurance. If Borrower fails to obtain insurance as hereinabove provided, or to keep the same in force, the Lender, if the Lender so elects, may obtain such insurance and pay the premium therefor on behalf of Borrower, and charge the Borrower therefor as an Advance and such expenses so paid shall be part of the Obligations, or, at the Lender's option, shall be paid to the Lender immediately upon demand.

(n)     Payment of Taxes. Subject to the orders of the Bankruptcy Court, Borrower will pay, when due, all taxes, assessments and other Charges lawfully levied or assessed upon Borrower or any of the Collateral including, without limitation, real and personal property taxes, assessments and charges and all franchise, income, employment, social security benefits, withholding, and sales taxes, except (i) those taxes, assessments or charges that are not material; (ii) those taxes, assessments or Charges to the extent that Borrower has contested or disputed those taxes, assessments or Charges in good faith, by expeditious protest, administrative or judicial appeal or similar proceeding; and (iii) those taxes which Borrower is prohibited from paying (or are not required to pay) by operation of the Bankruptcy Code, provided that, with respect to items (i) and (ii) referenced above in this Section 5(n), that any related tax Lien is stayed and sufficient reserves are established to the reasonable satisfaction of the Lender to protect the Lender's security interest in or Lien on the Collateral. If any tax by any governmental authority is or may be imposed on or as a result of any transaction between Borrower and the Lender which the Lender may be required to withhold or pay or if any taxes, assessments, or other Charges remain unpaid after the date fixed for their payment, or if any claim shall be made which, in the Lender's opinion, may possibly create a valid Lien on the Collateral, the Lender may without notice to Borrower pay the taxes, assessments or other Charges and Borrower hereby indemnifies and holds the Lender harmless in respect thereof. The Lender will not pay any taxes, assessments or Charges to the extent that Borrower has contested or disputed those taxes, assessments or Charges in good faith, by expeditious protest, administrative or judicial appeal or similar proceeding provided that any related tax Lien is stayed and sufficient reserves are established to the reasonable satisfaction of the Lender to protect the Lender's security interest in or Lien on the Collateral. The amount of any payment by the Lender under this Section 5(n) shall be charged to the Borrower as an Advance and added to the Obligations and, until Borrower shall furnish the Lender with an indemnity therefor (or supply the Lender with evidence satisfactory to the Lender that due provision for the payment thereof has been made), the Lender may hold without interest any balance standing to the Borrower's credit and the Lender shall retain its security interest in any and all Collateral held by the Lender.

(o)     Payment of Leasehold Obligations. Borrower shall at all times pay, when and as due, its rental obligations arising after the Petition Date under all leases under which it is a tenant, and shall otherwise comply, in all material respects, with all other terms of such leases (other than to the extent that the enforcement of such terms by the applicable landlord is stayed by virtue of the Bankruptcy Case) and, at the Lender's reasonable request will provide evidence of having done so.

(p)    Power of Lender to Act on Borrower's Behalf.  The Lender shall have the right, at any time after the occurrence and during the continuance of an Event of Default after the giving of any required notices under Section 13 hereof and upon the effectiveness of relief from the automatic stay of Section 362(a) of the Bankruptcy Code, to receive, endorse, assign and/or deliver in the name of the Lender or Borrower any and all checks, drafts and other instruments for the payment of money relating to receivables, and Borrower hereby waives notice of presentment, protest and non-payment of any instrument so endorsed.  Borrower hereby constitutes the Lender or the Lender's designee as Borrower's attorney with power at any time after the occurrence and during the continuance of an Event of Default after the giving of any required notices under Section 13 hereof and upon the effectiveness of relief from the automatic stay of Section 362(a) of the Bankruptcy Code (i) to endorse Borrower's name upon any notes, acceptances, checks, drafts, money orders or other evidences of payment or Collateral; (ii) to sign Borrower's name on any invoice or bill of lading relating to any of the receivables, drafts against customers, assignments and verifications of receivables; (iii) to send verifications of receivables to any customer; (iv) to demand payment of the receivables; (v) to enforce payment of the receivables by legal proceedings or otherwise; (vi) to exercise all of the Borrower's rights and remedies with respect to the collection of the receivables and any other Collateral; (vii) to settle, adjust, compromise, extend or renew the receivables; (viii) to settle, adjust or compromise any legal proceedings brought to collect receivables; (ix) to prepare, file and sign Borrower's name on a proof of claim in bankruptcy or similar document against any customer; (x) to prepare, file and sign Borrower's name on any notice of Lien, assignment or satisfaction of Lien or similar document in connection with the receivables; and (xi) to do all other acts and things necessary to carry out this Agreement.  All acts of said attorney or designee are hereby ratified and approved, and said attorney or designee shall not be liable for any acts of omission or commission nor for any error of judgment or mistake of fact or of law, unless done with gross (not mere) negligence or willful misconduct; this power being coupled with an interest is irrevocable while any of the Obligations remain unpaid.  The Lender shall have the right at any time following the occurrence and during the continuance of an Event of Default after the giving of any required notices under Section 13 hereof and upon the effectiveness of relief from the automatic stay of Section 362(a) of the Bankruptcy Code, to change the address for delivery of mail addressed to Borrower to such address as the Lender may designate and to receive, open and dispose of all mail addressed to Borrower.

(q)    No Liability.  The Lender shall not, under any circumstances or in any event whatsoever, have any liability for any error or omission or delay of any kind occurring in the settlement, collection or payment of any of the receivables or any instrument received in payment thereof, or for any damage resulting therefrom unless such liability arises from the Lender's willful misconduct or gross negligence as finally determined by a court of competent jurisdiction.  Following the occurrence and during the continuance of an Event of Default after the giving of any required notices under Section 13 hereof and after the effectiveness of relief from the automatic stay of Section 362(a) of the Bankruptcy Code, the Lender may, without any other notice or consent from Borrower, sue upon or otherwise collect, extend the time of payment of, compromise or settle for cash, credit or upon any terms any of the receivables or any other securities, instruments or insurance applicable thereto and/or release any obligor thereof.  The Lender is authorized and empowered to accept following the occurrence and during the continuance of an Event of Default after the giving of any required notices under Section 13 hereof and after the effectiveness of relief from the automatic stay of Section 362(a) of the Bankruptcy Code the return of the goods represented by any of the receivables, without notice to or consent by Borrower, all without discharging or in any way affecting Borrower's liability hereunder.

(r)    Exculpation of Liability.  Nothing herein contained shall be construed to constitute the Lender as Borrower's agent for any purpose whatsoever, nor shall the Lender be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the Collateral wherever the same may be located and regardless of the cause thereof except to the extent such shortage, discrepancy, damage, loss or destruction resulted directly from the gross (not mere) negligence or willful

-13-

misconduct of the Lender.  The Lender will not, whether by anything herein or in any assignment or otherwise, assume any of Borrower's obligations under any contract or agreement assigned to the Lender, and the Lender shall not be responsible in any way for the performance by Borrower of any of the terms and conditions thereof.

6. **Representations and Warranties**.

(a)    Authority.  Subject to entry of the Financing Orders, Borrower has the full power, authority and legal right to enter into this Agreement and the Other Documents to which it is a party and to perform all of its Obligations hereunder and thereunder, as the case may be.  Subject to entry of the Financing Orders, this Agreement and the Other Documents constitute the legal, valid and binding obligations of Borrower, enforceable in accordance with their terms.  The execution, delivery and performance of this Agreement and of the Other Documents by Borrower (i) subject to entry of the Financing Orders, are within Borrower's limited liability company powers, have been duly authorized, are not in contravention of law or the terms of Borrower's operating agreement, articles of organization or other applicable documents relating to Borrower's formation or organization, as the case may be, or to the conduct of Borrower's business or of any material agreement or undertaking arising after the Petition Date to which Borrower is a party or by which Borrower is bound, and (ii) will not conflict with nor result in any breach in any of the provisions of or constitute a default under or result in the creation of any Lien except Permitted Encumbrances upon any asset of Borrower under the provisions of any agreement, charter document or other instrument  arising after the Petition Date to which Borrower is a party or by which it or its property may be bound.

(b)    Formation and Qualification.  Borrower is duly organized and in good standing under the laws of the Commonwealth of Pennsylvania, which constitutes all jurisdictions in which qualification and good standing are necessary for Borrower to conduct its business and own its property and where the failure to so qualify could reasonably be expected to have a Material Adverse Effect.  Borrower has delivered to the Lender true and complete copies of its articles of organization, operating agreement or other organizational documents and will promptly notify the Lender of any amendment or changes thereto.

(c)    Survival of Representations and Warranties.  All representations and warranties of Borrower contained in this Agreement and the Other Documents, as the case may be, shall be true at the time of Borrower's execution of this Agreement and the Other Documents, as the case may be, and shall survive the execution, delivery and acceptance thereof by the parties thereto and the Closing.

(d)    No Litigation, Violation or Default.  Except as disclosed in Schedule 6(e), Borrower does not have any pending or threatened litigation, arbitration, actions or proceedings which could reasonably be expected to have a Material Adverse Effect.  Borrower is not in violation of any applicable statute, regulation or ordinance in any respect which could reasonably be expected to have a Material Adverse Effect, nor is Borrower in violation of any order of any court, governmental authority or arbitration board or tribunal which would reasonably be expected to have a Material Adverse Effect.

(e)    The Financing Orders.  On the date of the making of the initial Advances hereunder, the Interim Financing Order will have been entered and be in full force and effect and will not have been reversed, stayed, vacated or, without the Lender's consent, which consent shall be in its sole discretion, amended, supplemented or modified.  On the date of the making of any Advance, the Interim Financing Order or the Final Financing Order, as the case may be, shall have been entered and be in full force and effect and shall not have been reversed, stayed, vacated or, without the Lender's consent, which consent shall be in Lender's sole discretion, amended, supplemented or modified.  Upon the maturity (whether by the acceleration or otherwise) of any of the Obligations, the Lender shall, subject solely to

-14-

the provisions of Sections 3(f)(iv), 12 and 13 hereof and to such reservations of rights as may be expressly set forth in the Financing Orders, be entitled to immediate payment in full of such Obligations in cash, and the Lender shall be entitled to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court.

(f)      Good Faith.  This Agreement has been negotiated in good faith and at arm's length between the Borrower and the Lender.

7.      **Affirmative Covenants.**  Following the Closing Date, Borrower shall until payment or satisfaction in full of the Obligations and termination of this Agreement:

(a)      Conduct of Business and Maintenance of Existence and Assets.  (i) Conduct its business according to good business practices and maintain all of its properties useful or necessary in its business in good working order and condition (reasonable wear and tear excepted and except as may be disposed of in accordance with the terms of this Agreement), including, without limitation, all licenses, patents, copyrights, design rights, tradenames, trade secrets and trademarks and take all actions necessary to enforce and protect the validity of any intellectual property right or other right included in the Collateral; (ii) keep in full force and effect its existence and comply in all material respects with the laws and regulations governing the conduct of its business where the failure to do so could reasonably be expected to have a Material Adverse Effect; and (iii) make all such reports and pay all such franchise and other taxes and license fees  arising after the Petition Date and do all such other acts and things as may be lawfully required to maintain its rights, licenses, leases, powers and franchises under the laws of the United States or any political subdivision thereof where the failure to do so would reasonably be expected to have a Material Adverse Effect.

(b)      Violations.  Promptly notify the Lender in writing of any violation of any law, statute, regulation or ordinance of any Governmental Body, or of any agency thereof, applicable to Borrower or the Collateral which could reasonably be expected to have a Material Adverse Effect.

(c)      Execution of Supplemental Instruments.  Execute and deliver to the Lender from time to time, upon demand, such supplemental agreements, statements, assignments and transfers, or instructions or documents relating to the Collateral, and such other instruments as the Lender may reasonably request, in order for the full intent of this Agreement to be carried into effect.

(d)      Modification of the Automatic Stay.  The Interim Financing Order (and Final Financing Order, as applicable) shall contain language, which shall be satisfactory to the Lender in its sole discretion, vacating and modifying the automatic stay provisions of Section 362 of the Bankruptcy Code to the extent necessary to permit the Lender to (i) perfect the security interests and Liens granted hereunder and (ii) exercise its rights under Section 13 hereof of this Agreement.

8.      **Negative Covenants.**  Borrower shall not until satisfaction in full of the Obligations and termination of this Agreement:

(a)      Merger, Consolidation, Acquisition and Sale of Assets.

(i)      Enter into any merger, consolidation or other reorganization with or into any other Person or acquire all or a substantial portion of the assets or stock of any Person or permit any other Person to consolidate with or merge with it; or

(ii)    Except transactions involving the sale, lease, transfer or other disposition of inventory in the ordinary course of business, sell, lease, transfer or otherwise dispose of any of its properties or assets unless such sale is in accordance with the Sale Agreement, the Sale Motion and the Sale Order.

(b)    <u>Creation of Liens</u>.  Create or suffer to exist any Lien or transfer upon or against any of its property or assets now owned or hereafter acquired, except Permitted Encumbrances.

(c)    <u>Guarantees</u>.  Become liable upon the obligations of any Person by assumption, endorsement or guaranty thereof or otherwise.

(d)    <u>Loans</u>.  Make advances, loans or extensions of credit to any Person, including, without limitation, any affiliate, except with respect to the extension of commercial trade credit in connection with the sale of inventory in the ordinary course of its business.

(e)    <u>Indebtedness</u>.  Create, incur, assume or suffer to exist any Indebtedness except in respect of (i) trade debt, deposits placed with the Borrower by customers of the Borrower for boat orders, and as disclosed by the Borrower in its schedules filed in the Bankruptcy Case, (ii) Indebtedness existing on the Closing Date and set forth on <u>Schedule 8(e)</u> attached hereto (including any extensions, renewals or refinancings thereof), provided that there is no material change in the material terms thereof and the principal amount of such Indebtedness shall not be increased to an amount greater than the amount outstanding on the Closing Date without the prior written consent of the Lender, (iii) Indebtedness of the Prepetition Secured Parties under the Prepetition Documents as set forth in the Cash Collateral Order, (iv) other Indebtedness permitted pursuant to the Cash Collateral Order, and (v) Indebtedness to the Lender under or pursuant to this Agreement or the Other Documents.

(f)    <u>Nature of Business</u>.  Substantially change the nature of the business in which it is currently engaged, nor, except as specifically permitted hereby purchase or invest, directly or indirectly, in any assets or property other than in the ordinary course of business or other than those which are useful in, necessary for and are to be used in its business, as presently conducted.

(g)    <u>Amendment of Articles of Organization or Operating Agreement</u>.  Amend, modify or waive any material term or material provision of its articles of organization or operating agreement or other organizational documents which amendment, modification or waiver would reasonably be considered material and adverse to the Lender, unless required by law.

(h)    <u>Prepayment of Indebtedness</u>.  At any time, directly or indirectly, prepay or repurchase, redeem or retire any Indebtedness, except for the prepayment, repurchase, redemption, retirement or acquisition of any Indebtedness of Borrower owed to the Lender pursuant to this Agreement or the Other Documents.

9.    **Conditions to Initial Advances**.  The agreement of the Lender to make the initial Advance requested to be made on the Closing Date is subject to the satisfaction, or waiver by the Lender, immediately prior to or concurrently with the making of such Advance, of the following conditions precedent:

(a)    <u>Note</u>.  The Lender shall have received the Revolving Credit Note duly executed and delivered by an authorized officer of Borrower.

(b)    <u>Bankruptcy Matters</u>.  No trustee or examiner with expanded powers relating to the operation of the business of the Borrower shall have been appointed with respect to Borrower or its

13172237 v2

business, properties or assets, including without limitation, the Collateral and any other property that is security for the Obligations and Borrower shall have complied in full with all other requirements as provided for under the Interim Financing Order.

(c)     Interim Financing Order.  At the time of the making of the initial Advance, the Lender shall have received satisfactory evidence of the entry of the Interim Financing Order which Interim Financing Order (i) shall be in form and substance satisfactory to the Lender in Lender's sole discretion, (ii) shall have been entered not later than seven (7) days following the Petition Date and (iii) shall not have been vacated, stayed, reversed, modified or amended in any respect without the express written consent of the Lender, and, if the Interim Financing Order is the subject of a pending appeal in any respect, neither the making of such Advance, nor the performance by the Borrower of any of its obligations hereunder or under the Other Documents or under any other instrument or agreement referred to herein, shall be the subject of a presently effective stay pending appeal.

(d)     First Day Orders.  All of the "first day orders" entered by the Bankruptcy Court at the time of the commencement of the Bankruptcy Case shall be reasonably satisfactory in form and substance to the Lender.

(e)     Corporate Proceedings of Borrower.  The Lender shall have received a copy of the resolutions in form and substance reasonably satisfactory to the Lender, of the board of directors, partners, managers or members, as the case may be, of Borrower authorizing (i) the execution, delivery and performance of this Agreement, the Revolving Credit Note and any Other Document to which Borrower is a party, and (ii) the granting by Borrower of the security interests in and Liens upon the Collateral.  Such resolutions shall be certified by an authorized individual of Borrower as of the Closing Date and such certificate shall state that the resolutions thereby certified have not been amended, modified, revoked or rescinded as of the date of such certificate.

(f)     Incumbency Certificate of Borrower.  The Lender shall have received a certificate of an authorized individual of Borrower, dated the Closing Date, as to the incumbency and signature of the officers or manager of Borrower executing any certificate or other documents to be delivered by Borrower pursuant hereto, together with evidence of the incumbency of such authorized individual.

(g)     Good Standing Certificates.  The Lender shall have received copies of good standing certificates, or similar certifications, for Borrower, issued by the Department of State of the Commonwealth of Pennsylvania and each jurisdiction where the conduct of its business activities or the ownership of its properties necessitates qualification.

(h)     Insurance.  The Lender shall have received in form and substance satisfactory to the Lender, certificates of insurance for the Borrower's casualty insurance policies, together with loss payable endorsements on the Borrower's standard form of loss payee endorsement naming the Lender as lender loss payee with respect to the Collateral, and certificates of insurance for the Borrower's liability insurance policies, together with endorsements naming the Lender as an additional insured.

(i)     Consents.  The Lender shall have received any and all consents necessary to permit the effectuation of the transactions contemplated by this Agreement and the Other Documents; and, such consents of such third parties as might assert claims with respect to the Collateral, as the Lender and its counsel shall deem necessary.

(j)    Other.  All limited liability company and other proceedings, and all documents, instruments and other legal matters in connection with the transactions contemplated by this Agreement shall be satisfactory in form and substance to the Lender and its counsel.

10.    **Conditions to Each Advance**.  The agreement of the Lender to make any Advance requested to be made on any date (including, without limitation, the initial Advance), is subject to the satisfaction of the following conditions precedent as of the date such Advance is made.

(a)    Representations and Warranties.  Each of the representations and warranties made by Borrower in or pursuant to this Agreement and any Other Document, as the case may be, and each of the representations and warranties contained in any certificate, document or financial or other statement furnished at any time under or in connection with this Agreement or any Other Document shall be true and correct in all material respects on and as of such date as if made on and as of such date.

(b)    Financing Orders.  Subject to Section 9(c) hereof, the Financing Orders shall be in full force and effect and shall not have been stayed, reversed, modified or amended in any respect without the prior written consent of the Lender, provided, that at the time of the making of any Advance the aggregate amount of which, when added to the sum of the principal amount of all Advances then outstanding would exceed the amount authorized by the Interim Financing Order (collectively, the "Additional Credit"), the Lender shall have received satisfactory evidence of the entry of the Final Financing Order, which, in any event, shall have been entered by the Bankruptcy Court no later than twenty (20) days after the Petition Date and at the time of the extension of any Additional Credit the Final Financing Order shall be in full force and effect, and shall not have been vacated, stayed, reversed, modified or amended in any respect without the prior written consent of the Lender; and if either the Interim Financing Order or the Final Financing Order is the subject of a pending appeal in any respect, neither the making of the Advances nor the performance by the Borrower of any of its obligations under this Agreement or any of the Other Documents shall be the subject of a presently effective stay pending appeal.

(c)    Sale Motion.  For each Advance made on or after the fifth (5th) day following the Petition Date, the Borrower shall have filed a motion for approval of the sale of substantially all of the assets of the Borrower to the Lender, which shall be reasonably satisfactory in form and substance to the Lender (the "Sale Motion").

(d)    Asset Purchase Agreement.  For each Advance made on or after the tenth (10th) day following the Petition Date, Borrower and LF Trucking, Inc., a Pennsylvania corporation and co-Debtor in the Bankruptcy Case, as sellers (collectively, the "Sellers"), and the Lender and Levin Trucking, LLC, a Pennsylvania limited liability company, as purchasers (collectively, the "Purchasers"), shall have entered into a purchase and sale agreement for the purchase and sale of substantially all of the assets of the Sellers to the Purchasers (the "Sale Agreement"), which shall be reasonably satisfactory in form and substance to the Lender (the "Sale Motion").

(e)    For each Advance made on or after the twenty-first (21st) day following the Petition Date, an order reasonably satisfactory in form and substance to the Lender (the "Sale Order") shall have been entered by the Bankruptcy Court approving a sale to the Purchasers pursuant to the Sale Motion and the Sale Agreement, which Sale Order shall not be subject to a stay pending appeal.   Within two (2) Business Days after entry of the Sale Order, the Sellers and the Purchasers shall close on such sale pursuant to the Purchase Agreement.

(f)    No Default.  No Event of Default or Default shall have occurred and be continuing on such date, or would exist after giving effect to the Advances requested to be made, on such

-18-

date; provided, however that, the Lender, in its sole discretion, may continue to make Advances notwithstanding the existence of an Event of Default or Default and that any Advances so made shall not be deemed a waiver of any such Event of Default or Default.

        (g)    <u>Maximum Advances</u>. In the case of any Advances requested to be made, after giving effect thereto, the aggregate Advances shall not exceed the Maximum Advance Amount.

Each request for an Advance by the Borrower hereunder shall constitute a representation and warranty by Borrower as of the date of such Advance that the conditions contained in this subsection shall have been satisfied (to the extent that such conditions are required to be satisfied by such date).

        11.    **Information as to Borrower.**  Borrower shall, until payment or satisfaction in full of the Obligations and the termination of this Agreement deliver the following information:

        (a)    <u>Disclosure of Material Matters</u>. Immediately upon learning thereof, report to the Lender all matters materially affecting the value, enforceability or collectability of any portion of the Collateral including, without limitation, Borrower's reclamation or repossession of, or the return to Borrower of, a material amount of goods or material claims or material disputes asserted by any customer or other obligor.

        (b)    <u>Litigation</u>. Promptly notify the Lender in writing of any adversary proceeding, contested matter or administrative proceeding affecting Borrower, whether or not the claim is covered by insurance, and of any adversary proceeding, contested matter or administrative proceeding, which in any such case could reasonably be expected to have a Material Adverse Effect.

        (c)    <u>Material Occurrences</u>. Promptly, but in any event no later than five (5) days after such occurrence, notify the Lender in writing upon the occurrence of (i) any Event of Default or Default; (ii) any event, development or circumstance whereby any financial statements or other reports furnished to the Lender fail in any material respect to present fairly, in accordance with GAAP consistently applied, the financial condition or operating results of Borrower as of the date of such statements; (iii) each and every default by Borrower which would reasonably be expected to result in the acceleration of the maturity of any Indebtedness arising after the Petition Date, including the names and addresses of the holders of such Indebtedness with respect to which there is a default existing or with respect to which the maturity has been or could be accelerated, and the amount of such Indebtedness; and (iv) any other development in the business or affairs of Borrower which could reasonably be expected to have a Material Adverse Effect; in each case, to the extent permitted by applicable law, describing the nature thereof and the action Borrower proposes to take with respect thereto.

        (d)    <u>Additional Information</u>. Furnish the Lender with such additional information as the Lender shall reasonably request in order to enable the Lender to determine whether the terms, covenants, provisions and conditions of this Agreement and the Revolving Credit Note have been complied with by Borrower and execute and deliver to the Lender, upon request, such documents and agreements as the Lender may, from time to time, reasonably request to carry out the purposes, terms or conditions of this Agreement.

        (e)    <u>Weekly Reporting</u>. Furnish the Lender with weekly reporting of inventory tracking, accounts payable aging and accounts receivable aging of the Borrower by 5:00 p.m. on Thursday of each week for the preceding week.

        12.    **Events of Default.**  The occurrence of any one or more of the following events shall constitute an "Event of Default":

(a)    <u>Payment of Obligations</u>.  Failure by Borrower to pay any principal or interest on the Obligations when due, whether at maturity or by reason of acceleration pursuant to the terms of this Agreement, or by required prepayment or failure to pay any other liabilities or make any other payment, fee or charge provided for herein when due or in any Other Document.

(b)    <u>Misrepresentations</u>.  Any representation or warranty made by Borrower in this Agreement or any Other Document or in any certificate, document or financial or other statement furnished at any time in connection herewith or therewith, as the case may be, shall prove to have been misleading in any material respect on the date when made or deemed to have been made.

(c)    <u>Failure to Furnish Information</u>.  Failure by Borrower to (i) furnish financial information required to be provided hereunder when due, (ii) furnish financial information requested by the Lender within ten (10) days after such information is requested, or (iii) permit the inspection of its books or records.

(d)    <u>Liens Against Assets</u>.  Issuance of a notice of Lien (other than Permitted Encumbrances), levy, assessment, injunction or attachment against the Collateral or a material portion of Borrower's property which is not stayed or lifted within ten (10) days.

(e)    <u>Breach of Covenants</u>.  Except as otherwise provided for in this Section 12, failure or neglect of Borrower to perform, keep or observe any term, provision, condition or covenant herein contained or contained in any other agreement or arrangement, now or hereafter entered into between Borrower and the Lender relating to the Obligations.

(f)    <u>Judgment</u>.  Any judgment is rendered or judgment lien is filed against Borrower for any post-petition obligation (to the extent not covered by insurance to which the insurance provider has not contested coverage).

(g)    <u>Loss of Priority Lien</u>.  Any Lien created hereunder or provided for hereby or under any related agreement for any reason ceases to be or is not a valid and perfected Lien having the priority contemplated herein and in the Financing Orders.

(h)    <u>Invalidity of Credit Agreement</u>.  Any material provision of this Agreement shall, for any reason, cease to be valid and binding on Borrower, or Borrower shall so claim in writing to the Lender.

(i)    <u>Destruction of Collateral</u>.  Any portion of the Collateral shall be seized or taken by a Governmental Body, or Borrower or the title and rights of Borrower shall have become the subject matter of litigation which might, in the reasonable opinion of the Lender, upon final determination, result in material impairment or loss of the security provided by this Agreement or the Other Documents.

(j)    <u>Pre-Petition Payments</u>.  Except as permitted by the Financing Orders, the Borrower shall make any pre-petition payment other than pre-petition payments authorized by the Bankruptcy Court (w) in accordance with the Cash Collateral Order, (x) in accordance with other "first day" orders reasonably satisfactory to the Lender, (y) in connection with the assumption of executory contracts and unexpired leases and (z) in respect of accrued payroll and related expenses and employee benefits as of the Petition Date.

(k)    <u>Dismissal or Conversion of Bankruptcy Case</u>.  The Bankruptcy Case shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or Borrower shall file a motion or other pleading seeking the dismissal of the Bankruptcy Case under Section 1112 of the Bankruptcy

13172237 v2

Code or otherwise; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in the Bankruptcy Case, or an application shall be filed by Borrower for the approval of any other Superpriority Claim in the Bankruptcy Case which is pari passu with or senior to the claims of the Lender against Borrower hereunder, or there shall arise or be granted any such pari passu or senior Superpriority Claim.

(l)    Relief from Stay.  The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) or repossession on any assets of the Borrower.

(m)    The Financing Orders.  Borrower shall apply for authority to amend, supplement, stay, vacate or otherwise modify any of the Financing Orders without the consent of the Lender, and the Lender has sent notice of such default to Borrower.  Any of the Financing Orders shall be revoked, remanded, vacated, reversed, stayed, rescinded or shall cease to be in full force and effect, in each case without the consent of the Lender, modified or amended on appeal by any Bankruptcy Judge or District Court Judge or the Final Financing Order shall not have been entered within twenty-one (21) days of the Petition Date.

(n)    Lien Challenge.  Borrower shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of Borrower) any other Person's opposition of, any motion made in the Bankruptcy Court by Lender seeking confirmation of the amount of Lender's claim or the validity or enforceability of the Liens in favor of Lender.  Borrower shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of Borrower) any other Person's motion to disallow in whole or in part Lender's claim in respect of the Obligations or to challenge the validity, perfection and enforceability of Liens in favor or the Lender.

(o)    Filing of Reorganization Plan or Sale Motion.  A plan of reorganization or a motion for the sale of substantially all of the assets of the Sellers is filed by any party in interest in the Bankruptcy Case which does not contemplate a sale to the Purchasers.

13.    **Lenders' Rights and Remedies After Default.**

(a)    Rights and Remedies.  Upon the occurrence of an Event of Default and at any time thereafter (such default not having previously been cured), at the option of Lender during the continuance of such event, and without further order of or application to the Bankruptcy Court except as otherwise provided in the Financing Orders, the Lender may, by notice to the Borrower and its counsel (with a copy to (x) counsel for any statutory creditors' committee appointed in the Bankruptcy Case, (y) the United States Trustee for the Bankruptcy Court and (z) counsel to each of the Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties pursuant to the Cash Collateral Order), take one or more of the following actions, at the same or different times:  (i) terminate or suspend forthwith the commitment to make Advances hereunder; (ii) declare the Advances or any portion thereof then outstanding to be forthwith due and payable, whereupon the principal of such Advances together with accrued interest thereon and any unpaid accrued fees and all other liabilities of the Borrower accrued hereunder and under any Other Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any Other Document to the contrary notwithstanding; and (iii)

exercise any and all remedies under this Agreement and the Other Documents and under applicable law available to the Lender.

(b)    Lender's Discretion.  The Lender shall have the right in its sole discretion to determine which rights, Liens, security interests or remedies the Lender may at any time pursue, relinquish, subordinate, or modify or to take any other action with respect thereto and such determination will not in any way modify or affect any of the Lender's rights hereunder.

(c)    Setoff.  In addition to any other rights which the Lender may have under applicable law, upon the occurrence and during the continuance of an Event of Default hereunder, the Lender shall have a right to apply Borrower's property held by the Lender to reduce the Obligations; *provided that* in no event shall the Postpetition Collateral (as defined in the Cash Collateral Order) be available for such right of setoff.

(d)    Rights and Remedies Not Exclusive.  The enumeration of the foregoing rights and remedies is not intended to be exhaustive and the exercise of any right or remedy shall not preclude the exercise of any other right or remedies provided for herein or otherwise provided by law, all of which shall be cumulative and not alternative.

(e)    Allocation of Payments After Event of Default.  Notwithstanding any other provisions of this Agreement to the contrary, after the occurrence and during the continuance of an Event of Default, all amounts collected or received from Borrower (including the monetary proceeds of collections or of realization upon any Collateral) shall be applied in such order as the Lender shall determine in its sole discretion.

14.    **Effective Date and Termination.**

(a)    Term.  This Agreement, which shall inure to the benefit of and shall be binding upon the respective successors and permitted assigns of Borrower and the Lender, shall become effective on the date hereof and shall continue in full force and effect, and Advances borrowed under this Agreement will be paid in full in cash and the DIP Financing will terminate upon the earliest to occur of the following (the "Term"):  (i) **[April 7, 2020],** or such later date as may be agreed pursuant to this Agreement, (ii) unless extended with the consent of the Lender, the failure to meet any of the dates set forth in the Sale Motion or the entry of the Sale Order to occur, (iii) the closing of a sale pursuant to the Sale Agreement, the Sale Motion and the Sale Order, (iv) at the option of the Lender, at any time on or after an Event of Default, or (v) acceleration of the Obligations in accordance with this Agreement.

(b)    Termination.  The termination of this Agreement shall not affect Borrower's or the Lender's rights, or any of the Obligations having their inception prior to the effective date of such termination, and the provisions hereof shall continue to be fully operative until all transactions entered into, rights or interests created or Obligations have been fully disposed of, concluded or liquidated.  The security interests, Liens and rights granted to the Lender hereunder and the financing statements filed hereunder shall continue in full force and effect, notwithstanding the termination of this Agreement, until all of the Obligations of Borrower have been paid or performed in full after the termination of this Agreement or Borrower has furnished the Lender with an indemnification satisfactory to the Lender with respect thereto.  Accordingly, Borrower waives any rights which it may have under the Uniform Commercial Code to demand the filing of termination statements with respect to the Collateral, and the Lender shall not be required to send such termination statements to Borrower, or to file them with any filing office, unless and until this Agreement shall have been terminated in accordance with its terms and all Obligations paid in full in immediately available funds.  All representations, warranties, covenants, waivers and agreements contained herein shall survive termination hereof until all Obligations are paid or

performed in full.  Without limitation, all indemnification obligations contained herein shall survive the termination hereof and payment in full of the Obligations.

     15.    **Miscellaneous.**

     (a)    Indemnity.  Borrower shall indemnify the Lender and each of its officers, directors, affiliates, employees, attorneys and agents from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, fees and disbursements of counsel) which may be imposed on, incurred by, or asserted against the Lender in any litigation, proceeding or investigation instituted or conducted by any governmental agency or instrumentality or any other Person with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, this Agreement or the Other Documents, whether or not the Lender is a party thereto, except to the extent that any of the foregoing arises out of the gross negligence or willful misconduct of the party being indemnified.

     (b)    Notice.  Any notice or request hereunder may be given to the Borrower or to the Lender at their respective addresses set forth below or at such other address as may hereafter be specified in a notice designated as a notice of change of address under this Section 15(b).  Any notice, request, demand, direction or other communication (for purposes of this Section 15(b) only, a "Notice") to be given to or made upon any party hereto under any provision of this Agreement shall be given or made by telephone or in writing (which includes by means of electronic transmission (i.e., "e-mail") or facsimile transmission in accordance with this Section 15(b).  Any such Notice must be delivered to the applicable parties hereto at the addresses and numbers set forth under their respective names on Section 15(b) hereof or in accordance with any subsequent unrevoked Notice from any such party that is given in accordance with this Section 15(b).  Any Notice shall be effective:

     (i)    In the case of hand-delivery, when delivered;

     (ii)    If given by mail, four (4) days after such Notice is deposited with the United States Postal Service, with first-class postage prepaid, return receipt requested;

     (iii)    In the case of a telephonic Notice, when a party is contacted by telephone, if delivery of such telephonic Notice is confirmed no later than the next Business Day by hand delivery, a facsimile or electronic transmission or an overnight courier delivery of a confirmatory Notice (received at or before noon on such next Business Day);

     (iv)    In the case of a facsimile transmission, when sent to the applicable party's facsimile machine's telephone number, if the party sending such Notice receives confirmation of the delivery thereof from its own facsimile machine;

     (v)    In the case of electronic transmission, when actually received;

     (vi)    If given by any other means (including by overnight courier), when actually received.

(A)    If to Lender:    Levin Furniture, LLC
c/o Goldberg, Kamin & Garvin
1806 Frick Building
437 Grant St.
Pittsburgh, Pennsylvania 15219
Attention:  Jonathan M. Kamin
Telephone:
Email:

With a copy to:    Clark Hill PLC
One Oxford Centre
301 Grant Street, 14th Floor
Pittsburgh, Pennsylvania 15219-1425
Attention:  Jarrod J. Duffy / William C. Price
Telephone:  (412) 394-2324 / (412) 394-7776
Telecopier:  (412) 394-2555
Email:  jduffy@clarkhill.com / wprice@clarkhill.com

(B)    If to Borrower:    Sam Levin, Inc.

c/o Art Van Furniture, LLC
6500 14 Mile Road
Warren, MI 48092
Attention: Michael Zambricki
Email: mzambricki@artvan.com

with copies (which shall not constitute notice) to:

Benesch, Friedlander, Coplan & Aronoff LLP
222 Delaware Avenue, Suite 801
Wilmington, Delaware 19801
Attn: Gregory Werkheiser & Michael J. Barrie
Email: gwerkheiser@beneschlaw.com /
mbarrie@beneschlaw.com

(c)    Representation by Counsel.  Each party hereto acknowledges that it has been represented by counsel in connection with this Agreement.  The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the parties hereto.

(d)    Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Pennsylvania, without reference to the conflicts of law provisions thereof and, to the extent applicable, the Bankruptcy Code.

(e)    Expenses.  All costs and expenses including, without limitation, reasonable attorneys' fees and disbursements incurred by the Lender (i) in all efforts made to enforce payment of any Obligation or effect collection of any Collateral, or (ii) in connection with the modification, amendment, administration and enforcement of this Agreement or any consents or waivers hereunder and all related agreements, documents and instruments, or (iii) in instituting, maintaining, preserving, enforcing and

-24-

foreclosing on the Lender's security interest in or Lien on any of the Collateral, whether through judicial proceedings or otherwise, or (iv) in defending or prosecuting any actions or proceedings arising out of or relating to the Lender's transactions with Borrower, or (v) in connection with any advice given to the Lender with respect to its rights and obligations under this Agreement and any Other Document, may be charged to the Borrower and shall be part of the Obligations (the Lender shall promptly thereafter provide notice thereof to the Borrower).

        (f)    <u>Injunctive Relief.</u>  Borrower recognizes that, in the event it fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, any remedy at law may prove to be inadequate relief to the Lender; therefore, the Lender, if the Lender so requests, shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving that actual damages are not an adequate remedy.

        (g)    <u>Consequential Damages</u>.  Neither the Lender nor any of its agents or attorneys shall be liable to Borrower for any special, incidental, consequential or punitive damages arising from any breach of contract, tort or other wrong relating to the establishment, administration or collection of the Obligations.

        (h)    <u>Counterparts.</u>  This Agreement may be executed in counterpart, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement.

        (i)    <u>Modifications in Writing.</u>  No modification or amendment of the terms of this Agreement shall be valid unless such amendment is in writing and signed by Borrower and Lender.

        (j)    <u>Headings.</u>  The headings of the paragraphs of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

        (k)    <u>Effect of Financing Orders</u>.  The Liens and security interest referred to in this Agreement and any Other Document with respect to the Borrower shall be deemed valid and perfected by entry of the Interim Financing Order.

Subject to the Financing Orders and this Agreement, the Borrower hereby covenants, represents and warrants that upon entry of the Interim Financing Order (and the Final Financing Order, as applicable), the Obligations shall:  (i) pursuant to Section 364(c)(l) of the Bankruptcy Code, at all times constitute allowed claims in the Bankruptcy Case having priority over any and all administrative expenses, diminution claims and all other claims against the Borrower, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code; (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, at all times be secured by a valid, binding, continuing, enforceable and fully-perfected first priority senior security interest in and Liens upon the Collateral that is not subject to valid, perfected and non-avoidable Liens on the Petition Date; and (iii) pursuant to Section 364(d) of the Bankruptcy Code, the Advances shall be secured by valid, binding, continuing and enforceable senior priming security interests, senior priming liens on all the Collateral.

        (l)    <u>Release</u>.  Borrower, on behalf of itself and any Person claiming by, through, or under Borrower (collectively, the "<u>Borrower Group</u>") acknowledges that it has no claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature (including, for the avoidance of doubt, any claim under Chapter 5 of the Bankruptcy Code) whatsoever (collectively, "<u>Claims</u>") against the Lender and/or any of its former, present or future directors, officers, members, employees, agents, attorneys, financial advisors, legal representatives, affiliates, shareholders, stockholders, partners, successors and assigns (the Lender and its former, present or future directors, officers, members,

employees, agents, attorneys, financial advisors, legal representatives, affiliates, shareholders, stockholders, partners, successors and assigns are jointly and severally referred to as the "Lender Group"), that directly or indirectly arise out of, are based upon, or are in any manner connected with any Prior Event; and, should any Claims nonetheless exist, Borrower, on behalf of itself and all the other members of the Borrower Group, hereby (i) releases and discharges each member of the Lender Group from any liability whatsoever on such Claims that directly or indirectly arise out of, are based upon, or are in any manner connected with a Prior Event, and (ii) releases, remises, waives and discharges all such Claims against any member of the Lender Group.  As used herein the term "Prior Event" means any transaction, event, circumstance, action, failure to act or occurrence of any sort or type, including without limitation any approval or acceptance given or denied, whether known or unknown, which occurred, existed, was taken, permitted or begun prior to the execution of this Agreement.

[INTENTIONALLY LEFT BLANK]

13172237 v2

**IN WITNESS WHEREOF,** Borrower and Lender have caused this Agreement to be executed as of the date first set forth above.

<div style="margin-left: 50%;">

**BORROWER:**

Sam Levin, Inc.,
a Pennsylvania corporation

_____

By:
Name:
Title:


**LENDER:**

Levin Furniture, LLC,
a Pennsylvania limited liability company

_____

By:  Robert Levin, President

</div>

## **INDEX TO EXHIBITS**

Exhibit A          -          Interim Financing Order
Exhibit B          -          Revolving Credit Note

**EXHIBIT A**

**Interim Financing Order**

(see attached)

**EXHIBIT B**

**Revolving Credit Note**

(see attached)

## INDEX TO SCHEDULES

Schedule 1(f)    -    Permitted Encumbrances
Schedule 5(e)    -    Inventory Locations
Schedule 6(e)    -    Litigation
Schedule 8(e)    -    Indebtedness

223525600
13172237 v2

**SCHEDULE 1(f)**

**Permitted Encumbrances**

**SCHEDULE 5(e)**

**Inventory Locations**

**SCHEDULE 6(e)**

**Litigation**

**SCHEDULE 8(e)**

**Indebtedness**

## REVOLVING CREDIT NOTE

$7,000,000.00                                                Date:  March __, 2020
                                                             Pittsburgh, Pennsylvania

This Revolving Credit Note (this "Note") is executed and delivered under and pursuant to the terms of that certain Debtor-in-Possession Credit and Security Agreement, dated of even date herewith (as may be amended, modified, supplemented or restated, from time to time, the "DIP Credit Agreement"), by and between Sam Levin, Inc., a Pennsylvania corporation (the "Borrower"), and Levin Furniture, LLC, a Pennsylvania limited liability company (the "Lender").  Capitalized terms not otherwise defined herein shall have the meanings provided in the DIP Credit Agreement.

FOR VALUE RECEIVED, the Borrower hereby promises to pay to the order of the Lender at such place as Lender may from time to time designate to the Borrower in writing:

(i)       the principal sum of Seven Million Five Hundred Thousand and 00/100 Dollars ($7,000,000.00) or, if different from such amount, the unpaid principal balance of the Advances as may be due and owing under the DIP Credit Agreement, payable in accordance with the provisions of the DIP Credit Agreement and subject to acceleration upon the occurrence of an Event of Default under the DIP Credit Agreement or earlier termination of the DIP Credit Agreement pursuant to the terms thereof; and

(ii)      interest on the principal amount of this Note from time to time outstanding until such principal amount is paid in full at the Contract Rate in accordance with the provisions of the DIP Credit Agreement.  In no event, however, shall interest exceed the maximum interest rate permitted by law.  Upon and after the occurrence of an Event of Default, and during the continuation thereof, interest shall be payable at the Default Rate.

This Note is the Revolving Credit Note referred to in the DIP Credit Agreement and is secured by the Liens granted pursuant to the DIP Credit Agreement and the Other Documents, is entitled to the benefits of the DIP Credit Agreement and the Other Documents and is subject to all of the agreements, terms and conditions therein contained.

This Note may be voluntarily prepaid, in whole or in part, on the terms and conditions set forth in the DIP Credit Agreement.

If an Event of Default shall have occurred under the DIP Credit Agreement, then this Note may, as provided in the DIP Credit Agreement, be declared immediately due and payable, without notice, together with reasonable attorneys' fees if the collection hereof is placed in the hands of an attorney to obtain or enforce payment hereof.

This Note shall be construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania.  The Borrower hereby consents to the jurisdiction and venue of the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court") with respect to any suit arising out of or mentioning this Note provided, however, that in the event that the Bankruptcy Court does not have jurisdiction over any matter or if it has jurisdiction but does not exercise such jurisdiction for any reason, the Borrower hereby consents to the jurisdiction and venue of the courts of the Commonwealth of Pennsylvania or the United States District Court for the Western District of Pennsylvania, in each case located in Allegheny County, Pennsylvania.

The Borrower expressly waives any presentment, demand, protest, notice of protest, or notice of any kind except as expressly provided in the DIP Credit Agreement.

**WAIVER OF TRIAL BY JURY**. THE UNDERSIGNED HEREBY EXPRESSLY, KNOWINGLY AND VOLUNTARILY WAIVE ALL BENEFIT AND ADVANTAGE OF ANY RIGHT TO A TRIAL BY JURY, AND THEY WILL NOT AT ANY TIME INSIST UPON, OR PLEAD OR IN ANY MANNER WHATSOEVER CLAIM OR TAKE THE BENEFIT OR ADVANTAGE OF A TRIAL BY JURY IN ANY ACTION ARISING IN CONNECTION WITH THIS NOTE, THE DIP CREDIT AGREEMENT OR ANY OF THE OTHER DOCUMENTS.

[INTENTIONALLY LEFT BLANK]

13172258 v2

IN WITNESS WHEREOF, and intending to be legally bound, the undersigned has hereby executed this Revolving Credit Note on the date first set forth above.

**BORROWER:**

Sam Levin, Inc.,
a Pennsylvania corporation


By:_____
Name:_____
Title:_____

<u>ACKNOWLEDGMENT</u>

_____ OF _____                      )
                                                                                           )          SS:
COUNTY OF _____                      )


       On this, the _____ day of March, 2020, before me, a Notary Public, the undersigned officer, personally appeared _____ who acknowledged himself/herself to be the _____ of Sam Levin, Inc., a Pennsylvania corporation (the "<u>Company</u>"), and that he/she as such officer, being authorized to do so, executed the foregoing instrument for the purposes therein contained by himself/herself as such officer on behalf the Company.

       IN WITNESS WHEREOF, I hereunto set my hand and official seal.


                         _____
                                     Notary Public


My Commission Expires: