## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (CSS) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

### DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) APPROVING PROCEDURES FOR STORE CLOSING SALES, (II) AUTHORIZING CUSTOMARY BONUSES TO EMPLOYEES OF CLOSING STORES, (III) AUTHORIZING ASSUMPTION OF THE CONSULTING AGREEMENT UNDER §§ 363 AND 365 OF THE BANKRUPTCY CODE, (IV) AUTHORIZING THE DEBTORS TO RETAIN CERTAIN CONSULTANT ENTITIES AS SPECIAL ASSET DISPOSITION ADVISORS TO THE DEBTORS PURSUANT TO §327(A) OF THE BANKRUPTCY CODE AND (V) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>")

respectfully state as follows in support of this motion (this "<u>Motion</u>"):[2]

### Relief Requested

1.     The Debtors seek entry of interim and final orders, substantially in the forms

attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "<u>Interim Order</u>" and the "<u>Final</u>

<u>Order</u>"):  (a) authorizing and approving, on an interim and final basis, store closing or similar

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484);  Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2]     A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (D.I. 12) (the "<u>First Day Declaration</u>") filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") on March 8, 2020 (the "<u>Petition Date</u>").  Capitalized terms used but not otherwise defined in this Motion shall have the meanings given to them in the First Day Declaration.

themed sales ("Store Closings") in accordance with the terms of the store closing sale procedures (the "Store Closing Procedures," attached as **Exhibit 1** to **Exhibit A** hereto), with such sales to be free and clear of all liens, claims, and encumbrances; (b) authorizing the Debtors to pay customary bonuses to employees of the stores listed on **Exhibit 2** to **Exhibit B** attached hereto (collectively, the "Closing Stores"); (c) in accordance with sections 363 and 365 of the Bankruptcy Code, authorizing the Debtors to assume that certain Consulting and Marketing Services Agreement, dated as of March 5, 2020 (the "Consulting Agreement"), by and between Debtor AVF Holding Company, Inc. and the following entities: Hilco Merchant Resources, LLC ("HMR"), Hilco IP Services, LLC, d/b/a Hilco Streambank, Hilco Real Estate, LLC, Hilco Receivables, LLC (such entities collectively, the "Hilco Consulting Entities"), Gordon Brothers Retail Partners, LLC ("GBRP"), DJM Realty Services, LLC, d/b/a Gordon Brothers Real Estate, Gordon Brothers Commercial & Industrial, LLC, Gordon Brothers Brands, LLC (such entities collectively the "GB Consulting Entities", and together with the Hilco Consulting Entities the "Consultant"), a copy of which is attached as **Exhibit 3** to **Exhibit A** hereto; (d) authorizing the Debtors to retain certain of the entities comprising the Consultant that will be providing receivables collection (at the Debtors' option) and intellectual property disposition services as special asset disposition advisors and consultants to the Debtors, pursuant to Section 327(a) of the Bankruptcy Code[3]; and (e) granting related relief.  In addition, the Debtors request that the Court schedule a final hearing within approximately 25 days of the commencement of these chapter 11 cases to consider entry of the Final Order with respect to the relief sought in the Motion.

---

[3]    The Consultant affiliated entities that will provide these specific asset disposition services are: Hilco IP Services, LLC, d/b/a Hilco Streambank, Hilco Receivables, LLC, Gordon Brothers Commercial & Industrial, LLC, Gordon Brothers Brands, LLC

### Jurisdiction and Venue

2.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 105(a), 363, 365 and 554(a) of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 2002, 6003, and 6004, and Bankruptcy Local Rule 9013-1(m).

### The Store Closings

**I.      The Store Closing Decisions and the Consulting Agreement**

5.      As described more fully in the First Day Declaration, in the wake of extreme market conditions and faced with limited liquidity, the Debtors have commenced these chapter 11 cases to effectuate a going-concern sale of approximately 44 stores and two distribution centers operating under the Wolf and Levin banners and to wind down their remaining store locations and other operations through a going-out-of-business sales process. Given continuously declining profitability and operational challenges over the past three years, and despite the best efforts of the Company and its advisors to secure the capital necessary to preserve the entire business as a going

3

concern, the Company is simply unable to meet its financial obligations. The Company has worked in concert with its secured lenders to develop a budget for the use of cash collateral to facilitate an expedited sale and orderly wind-down process that will maximize value and recoveries for stakeholders in these cases.

6.     In connection with the aforementioned wind-down process, prior to the Petition Date the Debtors conducted a competitive process to engage an exclusive consultant(s) to provide a wide range of asset disposition consulting and related services to assist in and facilitate the Debtors' planned wind-down efforts.  During the course of that same proposal solicitation process, Hilco and Gordon Brothers were engaged in parallel discussions with the Debtors' prepetition term loan lenders, FS KKR Capital Corp. and FS KKR Capital Corp. II (collectively, "KKR") concerning the status of the prepetition term loan debt (the "Term Loans"), and the prospects for development of a creative consulting structure such that the Debtors' estates and their various stakeholders could be spared the burden of having to pay the types of consulting fees that are customary for the types of asset disposition services required by the Debtors.

7.     After arm's-length and extensive negotiations, these discussions ultimately yielded a series of agreements under which (a) the Debtors determined to engage the Consultant to provide the full range of asset disposition consulting services required by the Debtors in respect of merchandise inventories, fixed assets, receivables (subject to a Debtors' option), and intellectual property[4], (b) HGB AVF Lending, LLC ("HGB"), an entity controlled by affiliates of Hilco and Gordon Brothers, entered into an agreement with KKR under which HGB acquired KKR's

---

[4]    The Consulting Agreement presently provides that in addition to the consulting services described herein, the Debtors were to engage the Consultant to market and sell Debtors' real estate holdings.  Subsequent to execution of the Consulting Agreement, the Debtors and the Consultant agreed to exclude the real estate services from the scope of Consultant's engagement.

interests in the Term Loans (and as part of such transaction GBH agreed to share a portion of any recovery, if any, it may later receive on account of the Term Loans), and (c) the Consultant simultaneously agreed with the Debtors that the Consultant would **NOT** earn or be paid any consulting or other fee or compensation from the Debtors or their estates, other than reimbursement of certain out-of-pocket expenses incurred in connection with the conduct of the Store Closing Sales, any such reimbursement being strictly in accordance with a budget agreed to by the Debtors and the Debtors' secured lenders.

8.    Through this approach - whereby the Consultant's only opportunity to realize any compensation on account of the consulting services being provided under the Consulting Agreement is through a recovery realized by its affiliates on account of the Term Loans (a portion of which recovery, if any, will be shared with KKR) - the Debtors, in consultation with their professionals and key stakeholders, determined that the above-described arrangement provided the best framework for accomplishing the Debtors' paramount goal of an orderly and efficient liquidation of all assets.  At the same time, this arrangement fully aligned the estates' interests with those of the Term Lender in achieving maximum realizable value for Debtors' assets during the wind-down process.

9.    Based on an evaluation of the circumstances, the economic structure of the Consulting Agreement, and the Consultant's experience in conducting Store Closings on similar timelines, the Debtors' management, in consultation with the Debtors' advisors, determined that the Consultant provided the best and most competitive proposal.

10.    Accordingly, by this Motion, the Debtors seek relief in two essential parts; first, consistent with well-established precedent in this District, the Debtors seek – on an interim basis –to assume the Consulting Agreement under sections 363 and 365 of the Bankruptcy Code, so that

the HMR and GBRP, the Consultant-constituent entities that are providing the inventory and fixed asset disposition consulting services under the Consulting Agreement, may continue their role as the Debtors' consultant in connection with the conduct of the Store Closings on a post-petition basis without interruption; second, the Debtors seek to retain the remaining Consultant-constituent entities that are providing the receivables, and intellectual property-related disposition consulting services, pursuant to section 327 of the Bankruptcy Code.  In connection with the foregoing, the Debtors have determined, in the exercise of their business judgment, that (a) the continuation of services by the Consultant is necessary for efficient large-scale execution of the Store Closings, and the marketing and sale of the other Assets to maximize the value of the Assets being sold and (b) any change or elimination of the engagement with the Consultant would significantly disrupt the Debtors' reorganization efforts and impair the value of the Assets.[5]  Further, the Store Closings and the marketing and sale of the Assets are a critical component of the Debtors' ability to maximize value for all stakeholders, and assumption of the Consulting Agreement will allow the Debtors to continue to conduct the Store Closings in an efficient, controlled manner that will maximize value for the Debtors' estates.

11.     For the convenience of the Court and interested parties, a summary of the salient terms of the Consulting Agreement is set forth below:[6]

---

[5]     By this Motion, the Debtors' seek approval of the conduct of the Sales at the Stores and the associated disposition of the Merchandise and the owned M&E in a manner consistent with customary practices in this jurisdiction and in jurisdictions throughout the country in connection with Store Closings.  However, nothing in this Motion seeks approval of the Debtors' assumption and assignment of any of their non-residential real property leases or executory contracts. To the extent that the Debtors', through the services of the Consultant, find one or more buyers of the Real Estate Assets and/or the IP Assets, the Debtors' would file one or more separate motions seeking approval of such asset sales on as expedited a basis as the circumstances and/or economics of such sale dictate.

[6]     The following summary chart is for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Consulting Agreement, the Consulting Agreement shall govern in all respects.  Any capitalized terms used in the summary chart but not defined therein are used as defined in the Consulting Agreement.

13172884 v1

| Term | Consultant Agreement |
|---|---|
| **Services Provided by Consultant** | Services to be provided by Consultant include, among other things:<br><br>• Provision of qualified Supervisors to supervise and assist the Debtors in its conduct of the Sale;<br><br>• Provision of oversight, supervision, and guidance with respect to the conduct of the Sale and the liquidation and disposal of the Merchandise and the M&E;<br><br>• Recommendation and implementation of appropriate point of purchase, point of sale, and external advertising to effectively sell the Merchandise during the Sale Term;<br><br>• Advice regarding appropriate discounting of Merchandise, staffing levels for the Stores, and appropriate deferred compensation and incentive programs for Store Employees;<br><br>• Other advice regarding and during the Sale;<br><br>• Development of an advertising and marketing plan for the sale, auction, or other disposition of the M&E;<br><br>• Implementation of advertising and marketing as deemed necessary to maximize the net recovery on the M&E;<br><br>• Preparation for the sale of the M&E;<br><br>• Developing a Strategic Plan with the Debtors for disposition of the Properties;<br><br>• Subject to the Debtors' exercise of the election under the Consulting Agreement, collecting, settling, and otherwise resolving the Receivables on the Debtors' behalf;<br><br>• Collecting and securing available information regarding the Intellectual Property;<br><br>• Preparing marketing materials designed to advertise the availability of the Intellectual Property for sale, assignment, license, or other disposition; and<br><br>• Assisting the Debtors in connection with the transfer of the Intellectual Property to the acquirer(s) who offer the highest or otherwise best consideration for the Intellectual Property.<br><br>• To the extent that the Consultant locates a purchaser of the Assets, other that the Merchandise and the M&E, the Debtors (in consultation with the Secured Lenders) shall file one or motion seeking approval of such underlying transaction(s) on such notice (or Court approved shortened notice) as the terms and the economics of such transactions dictate. |
| **Sale Term** | The Store Closing began on March 6, 2020, and are to continue to no later than May 31, 2020; provided, however, absent the prior consent of the Debtors, the Sale shall conclude in the Stores no later than April 30, 2020. |

13172884 v1

| Asset Marketing Period | The period commencing on the Sale Commencement Date through the earlier of (i) the applicable Sale Termination Date for each of the Stores (or, with respect to any Distribution Center(s), the last day of available occupancy for each such center, as may be mutually agreed by the Debtors and the Consultant (in consultation with the Secured Lenders); (ii) April 30, 2020; or (iii) such other earlier or extended date as may be mutually agreed upon by the Debtors (in consultation with the Secured Lenders) and the Consultant |
|---|---|
| Sale Expenses | The Debtors shall be responsible for all Sale Expenses (including without limitation, the Consultant Incurred Expenses).  The Debtors, Consultant and Secured Lenders have agreed on a *pro forma* budget relating to the Sale describing in reasonable detail the projected Sale Expenses (the "Budget") in the form and content annexed hereto and made a part hereof as Exhibit B.  The Budget may only be modified by mutual agreement of the Debtors, the Consultant and the Secured Lenders. In connection with the Sale and subject to the limitations set forth in the Budget as to the Consultant Incurred Expenses, the Debtors shall be responsible for the payment of all expenses incurred in connection with the Sale, including, without limitation, all Sale Expenses (and Consultant shall not be responsible for any such expenses or Sale Expenses except as expressly provided for in Section 11 below).  Consultant Incurred Expenses shall not exceed the aggregate line item amount of Consultant Incurred Expenses set forth in the Budget without the prior written consent of the Debtors and Secured Lenders, which consent shall not be unreasonably withheld, delayed or conditioned. Subject to the limitations of the Sale Budget, the Debtors shall reimburse Consultant for any reasonable and documented Consultant Incurred Expense on a weekly basis in connection with the weekly Sale reconciliation provided for in Section 4 hereof upon presentation of invoices and statements for such expenses.  In addition, to the extent that the Consultant anticipates that it, or the Debtors will incur any additional out of pocket expenses in connection with the Services being provided by the Consultant in relating to its provision of Services in connection with the marketing and disposition of the other Assets, such expenses shall be subject to Supplemental Expense Budget to be agreed to between the Debtors (in consultation with the Secured Lenders) and the Consultant prior to such expenses being incurred. |
| Consultant's Compensation | In consideration of the Consultant providing the consulting, marketing and asset disposition-related Services provided for herein, the Consultant shall not earn any fee or other compensation from the Debtors, other than reimbursement of all Consultant Incurred Expenses and such other Sale Expenses as may be advanced by Consultant from time to time in the course of performing Services hereunder, in each case limited to the amounts set forth in the Budget and at the times provided herein. Any fees payable to Consultant shall be paid to Consultant by the Term Loan Lenders from their recovery on account of their secured claim. |
| Tracking of Proceeds of the Sales | The Debtors shall keep (i) a strict count of gross register receipts less applicable sales taxes, and (ii) cash reports of sales within each Store.  Register receipts shall show for each item sold the retail price (as reflected on Debtors' books and records) for such item, and the markdown or other discount granted by Consultant in connection with such sale.  The Debtors shall make all such records and reports available to Consultant and the Secured Lenders during regular business hours upon reasonable notice. |
| Expenses Deposit | The Interim Approval Order and the Final Approval Order shall include approval on the part of the Debtors to fund, and the Debtors shall thereafter promptly fund, to Consultant $3,353,912 (the "Expense Deposit").  The Debtors shall be entitled to apply the Expense Deposit to, or otherwise offset any portion of the Expense Deposit against, any weekly reimbursement or other amount owing to Consultant under this |

| | |
|---|---|
| | Agreement prior to the Final Settlement; provided, however, at no time prior to the Final Settlement shall the Expense Deposit be reduced below $1,000,000. Without limiting any of Consultant's other rights, Consultant may apply the Expense Deposit to any unpaid obligation owing by the Debtors to Consultant under this Agreement. Any portion of the Expense Deposit not used to pay amounts contemplated by this Agreement shall be returned to Debtors (or their designee) within three (3) business days following the Final Settlement. |
| **Debtors' Employees** | The Debtors and the Consultant shall cooperate to retain the employees of the Debtors (including the Store Employees) to be utilized to conduct the Sale at the Stores during the Sale Term, as such employees may be designated from time to time by Consultant, in its discretion.  Such employees shall remain employees of the Debtors, and Consultant shall have no liability to such employees (including, without limitation, all the Store Employees and any of Debtors' other current or former employees) of any kind or nature whatsoever, including, without limitation, with respect to severance pay, termination pay, vacation pay, pay in lieu of reasonable notice of termination, Worker Adjustment and Retraining Notification Act ("WARN Act") payments, or any other costs, expenses, obligations, or liabilities arising from the Debtors' employment  or termination of such employees prior to, during, and subsequent to the Sale Term.  Other than advising Debtors that Consultant no longer desires to utilize the services of any employee in connection with the sale or other disposition of the Assets, including as part of the Sale, Consultant shall not have the right to change the terms of employment of any employee(s). |
| **Fulfillment of Pre-Sale Customer Orders** | Consistent with the relief sought in the Debtors' companion Customer Programs Motion, in addition to providing the forgoing Services in connection with the Sale, the Consultant shall use commercially reasonable efforts to assist the Debtors in fulfilling certain pre-Sale Commencement Date orders for which the Debtors has received customer deposits (collectively, the "Pre-SCD Orders").<br><br>• On-Hand Fulfillment Orders. Consultant shall assist the Debtors in fulfilling certain Pre-SCD Orders having an aggregate retail value of approximately $22 Million (collectively, the "On-Hand Fulfillment Orders"), on account of which orders (i) the Debtors has received customer deposits in the aggregate amount of $18 Million (collectively, the "On-Hand Customer Deposits") and (ii) with respect to which all of the goods necessary to fulfill such orders are on-hand either at the Debtors' Distribution Centers or the Stores (collectively, the "On-Hand Fulfillment Merchandise").  As soon as reasonably practicable after the Sale Commencement Date, the Consultant shall assist the Debtors in earmarking the On-Hand Fulfillment Merchandise (and, to the extent necessary segregated by the Debtors) in order to fulfill and complete the On-Hand Fulfillment Orders. Consultant shall advise the Debtors in the development of efficient methods aimed at fulfilling the On-Hand Fulfillment Orders, and the Debtors and the Consultant shall use commercially reasonable efforts to deliver the On-Hand Fulfillment Merchandise as promptly as practicable, giving due consideration to the Debtors' existing distribution/fulfillment capabilities. Any usual and customary costs and expenses incurred in connection with the fulfillment of any On-Hand Fulfillment Orders, including, but not limited to, labor, sales commissions and delivery (collectively, the "On-Hand Fulfillment Processing Expenses"), shall be borne exclusively by the Debtors, and the Consultant shall not be responsible for any such costs or expenses.  Any funds received from customers on account of the On-Hand Fulfillment Orders, whether received prior to or after the Sale Commencement Date (including, without |

limitation, any On-Hand Customer Deposits), shall be retained by and/or remitted to the Debtors. To the extent any such funds are received from the customer in connection with the delivery of such On-Hand Fulfillment Goods, those funds shall be delivered by the Consultant to the Debtors on a weekly basis as part of the weekly reconciliation contemplated by <u>Section 4.2</u> hereunder. Subject to <u>Section 7.5</u> hereof, the On-Hand Fulfillment Merchandise shall be excluded from the definition of Merchandise hereunder; <u>provided</u>, that any proceeds realized by the Debtors upon fulfillment and completion of an On-Hand Fulfillment Order(s) in excess of the applicable On-Hand Customer Deposit shall constitute Gross Proceeds hereunder.

- <u>Back-Order Fulfillment Orders</u>. Following the Sale Commencement Date, Consultant shall also assist the Debtors in evaluating the status certain Pre-SCD Orders (collectively, the "<u>Back-Order Fulfillment Orders</u>"), on account of which orders (i) the Debtors has received customer deposits (collectively, the "<u>Back-Order Customer Deposits</u>") and (ii) with respect to which the goods necessary to fulfill such orders are <u>not</u> on-hand either at the Debtors' Distribution Centers or the Stores (collectively, the "<u>Back-Order Fulfillment Merchandise</u>"). To the extent that a Back-Order Fulfillment Order(s) can be filled by the Debtors within a reasonable time after the Sale Commencement Date, the Debtors and the Consultant shall work together to implement a protocol for fulfillment of such order(s). To the extent that the Debtors is unable to fulfill a Back-Order Fulfillment, such Back-Order Fulfillment Order shall be cancelled by the Debtors, and the Debtors and the Consultant shall offer the affected customer the option of either (i) a merchandise credit in the amount of such customer's respective Back-Order Customer Deposit (the "<u>Cancelled Back-Order Merchandise Credit</u>"), which Cancelled Back-Order Merchandise Credit must be used by the affected customer no later than April 15, 2020; or (ii) filing a claim in the Debtors' bankruptcy case for the full amount of such customer's Back-Order Customer Deposit.

- If a customer cancels a Pre-SCD Order, or refuses to accept completion/delivery of either On-Hand Fulfillment Merchandise or a Back-Order Fulfillment Order (where the goods become available), the subject the On-Hand Fulfillment Merchandise, Back-Order Fulfillment Merchandise, as the case may be, attributable to such cancelled Pre-SCD Orders, shall thereupon constitute Merchandise and be included in the Sale, and the affected customer can file a claim in the bankruptcy case for the full amount of such customer's deposit.

- During the Sale Term, the Debtors shall provide, and continue to provide through the Sale Term, Consultant with all reports reasonably requested by Consultant with respect to the status of all Pre-SCD Orders.

| **Additional Consultant Goods** | - In connection with the Sale, and subject to compliance with applicable law (or if and when applicable, the Approval Orders), Consultant shall have the right, at Consultant's sole cost and expense, to supplement the Merchandise in the Sale with additional goods procured by Consultant which are of like kind, and no lesser quality to the Merchandise ("<u>Additional Consultant Goods</u>"). The Additional Consultant Goods shall be purchased by Consultant as part of the Sale, and delivered to the Stores (or direct shipped to customers) at Consultant's sole cost and expense (including, without limitation, all acquisition costs, sales commissions, credit card processing |

fees, labor, freight and insurance relative to shipping and/or delivery of such Additional Consultant Goods).  Sales of Additional Consultant Goods shall be run through Debtors' point-of-sale systems; provided, however, that Consultant shall mark the Additional Consultant Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Consultant Goods from the sale of Merchandise.  Consultant and Debtors shall also cooperate so as to ensure that the Additional Consultant Goods are marked in such a way that a reasonable consumer could identify the Additional Consultant Goods as non-Debtors goods.  Additionally, Consultant shall provide signage in the Stores notifying customers that the Additional Consultant Goods have been included in the Sale. Absent the Debtors' written consent and subject to Consultant's agreement to reimburse Debtors for any associated expenses, Consultant shall not use Debtors' distribution centers for any Additional Consultant Goods.

- Consultant shall pay to the Debtors an amount equal to seven and one-half percent (7.5%) of the aggregate Gross Proceeds, net only of sales taxes collected in respect thereof, realized by Consultant from the sale of Additional Consultant Goods (the "Additional Consultant Goods Fee"). Consultant shall pay the Debtors any earned and accrued Additional Consultant Goods Fee on a weekly basis as part of each weekly sale reconciliation.  Except for sales taxes associated with the sale of Additional Consultant Goods and Debtors' Additional Consultant Goods Fee, all proceeds from the sale of Additional Consultant Goods shall be for the sole and exclusive account of Consultant, and shall be remitted to Consultant in connection with each weekly sale reconciliation.  Consultant shall be responsible for collecting and remitting sales taxes to the applicable taxing authorities on account of sales of Additional Consultant Goods.

- The Consultant, the Debtors, and the Secured Lenders intend that the transactions relating to the Additional Consultant Goods are, and shall be construed as, a true consignment from Consultant to Debtors in all respects and not a consignment for security purposes.  Subject solely to Consultant's obligations to pay to Debtors the Additional Consultant Goods Fee, at all times and for all purposes the Additional Consultant Goods and their proceeds shall be the exclusive property of Consultant, and no other person or entity, including, without limitation, the Lenders and Secured Lenders, shall have any claim against any of the Additional Consultant Goods or their proceeds. The Additional Consultant Goods shall at all times remain subject to the exclusive control of Consultant.  In furtherance of the foregoing, the Debtors acknowledge that the Additional Consultant Goods shall be consigned to Debtors as a true consignment under Article 9 of the Uniform Commercial Code (the "UCC").  The Consultant is hereby granted a first priority security interest in and lien upon (i) the Additional Consultant Goods and (ii) the Additional Consultant Goods proceeds (less any Additional Consultant Goods Fee), and Consultant is hereby authorized to file UCC financing statements and provide notifications to any prior secured parties, including, but not limited to, the Secured Lenders.

- The Debtors shall, at Consultant's sole cost and expense, insure the Additional Consultant Goods and, if required, promptly file any proofs of loss with regard to same with the Debtors' insurers.  Consultant shall be responsible for payment of any deductible (but only in relation to the

| | |
|---|---|
| | Additional Consultant Goods) under any such insurance in the event of any casualty affecting the Additional Consultant Goods. |
| **Debtors' Indemnification Obligations** | The Debtors shall indemnify and hold the Consultant and its affiliates, and their respective officers, directors, employees, agents and independent contractors (collectively, "Consultant Indemnified Parties"), harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to:<br><br>(a) Debtors' material breach or material failure of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith;<br><br>(b) any failure of Debtors to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term;<br><br>(c) any consumer warranty or products liability claims relating to any Merchandise;<br><br>(d) any liability or other claims asserted by customers, any of Debtors' employees, or any other person against any Consultant Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the "WARN Act"); except where due to the negligence or willful misconduct of Consultant or from a breach of the terms hereof by Consultant;<br><br>(e) any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees, agents, or representatives of Consultant (including, without limitation, any Supervisors) by Debtors or any of Debtors' employees, agents, or representatives (including, without limitation, any Debtors employees); and<br><br>(f) the negligence or willful misconduct of Debtors or any of its officers, directors, employees, agents or representatives. |
| **Consultant Indemnification Obligations** | The Consultant shall indemnify and hold Debtors and its affiliates, and their respective officers, directors, employees, agents, lenders and independent contractors (collectively, "Debtors Indemnified Parties"), harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to:<br><br>(a) Consultant's material breach or material failure of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith;<br><br>(b) any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees or agents of Debtors (including, without limitation, any Store Employees) by Consultant or any |

13172884 v1

|  | of Consultant's representatives (including, without limitation, any Supervisor);<br><br>(c)     any claims by any party engaged by Consultant as an employee or independent contractor (including, without limitation, any Supervisor) arising out of such employment or engagement; except where due to the negligence or willful misconduct of Debtors or Debtors Indemnified Parties or from a breach of the terms hereof by Debtors; and<br><br>(d)     the negligence or willful misconduct of Consultant or any of its officers, directors, employees, agents or representatives, or any Supervisor. |
|---|---|

## II.    **Store Closing Procedures**.

12.    In connection with and in facilitation of the ongoing conduct of the store closing sales, the Debtors further seek approval of the Store Closing Procedures, the form and substance of which are consistent with the procedures utilized by debtors in this and many other jurisdictions in connection with the similar such store closing processes.

13.    As is customary, the Store Closing Procedures provide, among other things, that: (a) all sales of Store Assets will be deemed free and clear of all liens, claims, interests, and other encumbrances; (b) the Merchandise and the M&E (as each term is defined in the Consulting Agreement) will be sold with the benefit of various marketing techniques and price markdowns to promote efficient liquidation; and (c) certain unsold M&E and other Store assets that cannot be promptly liquidated may be abandoned if and when the Debtors determine, in their business judgment, that retaining, storing, or removing such assets would result in unnecessary expense with little or no benefit to the estates. The Debtors seek approval of the Store Closing Procedures to, among other things, provide local regulatory authorities and media in which the Store Closings may be advertised with knowledge that the Debtors are conducting the Store Closings in compliance with the Court's order.

14.     The Debtors also respectfully request a waiver of any contractual restrictions that could otherwise inhibit or prevent the Debtors from maximizing value for creditors through the Store Closings.  In certain cases, the contemplated Store Closings may be inconsistent with various provisions of leases, subleases, or other documents with respect to the premises in which the Debtors operate, including, without limitation, reciprocal easement agreements, agreements containing covenants, conditions, and restrictions (including, without limitation, "go dark" provisions and landlord recapture rights), or other similar documents or provisions.  Such restrictions, unless waived, would hamper the Debtors' ability to maximize value in selling their inventory.

15.     As set forth in the Store Closing Procedures, the Debtors also request that no entity, including, without limitation, utilities, landlords, shopping center managers and personnel, creditors, and all persons acting for or on the behalf of the foregoing parties shall interfere with or otherwise impede the conduct of the Store Closings, nor institute any action against the Debtors in any court (other than this Court) or before any administrative body that in any way directly or indirectly interferes with, obstructs, or otherwise impedes the conduct of the Store Closings or the advertising and promotion (including through the posting of signs) of the Store Closings.

16.     The Debtors have determined, in the exercise of their business judgment and in consultation with their advisors, that the Store Closing Procedures will provide the best, most efficient, and most organized means of selling the Merchandise and the M&E to maximize the value of the Debtors' estates.  The Debtors intend to facilitate the Store Closings using current personnel at no increased cost (except as set forth herein), and estimate that, with perhaps a few exceptions, the Stores Closings will be completed by no later than April 30, 2020, with May 31, 2020 being the outside Sale Termination Date at locations that the Debtors (in consultation with

14

their secured lenders) and the Consultant agree generate a net positive return by continuing in the month of May 2020.

**III.    Liquidation Sale Laws and Dispute Resolution Procedures.**

17.    Certain states in which the Debtors operate stores have or may have licensing or other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including, without limitation, state and local laws, statutes, rules, regulations, and ordinances (the "Liquidation Sale Laws").  Liquidation Sale Laws may establish licensing, permitting, or bonding requirements, waiting periods, time limits, and bulk sale restrictions and augmentation limitations that would otherwise apply to the Store Closings.  Such requirements hamper the Debtors' ability to maximize value in selling their inventory.  Subject to the Court's approval, the Debtors intend to conduct the Store Closings in accordance with the Store Closing Procedures, and to the extent such procedures conflict with the Liquidation Sale Laws, the Store Closing Procedures should control.

18.    To facilitate the orderly resolution of any disputes between the Debtors and any Governmental Units (as defined in section 101(27) of the Bankruptcy Code) arising due to the Store Closing Procedures and the alleged applicability of any Liquidation Sale Laws, the Debtors respectfully request that the Bankruptcy Court authorize the Debtors to implement the following dispute resolution procedures (the "Dispute Resolution Procedures"), on an interim and final basis:

> a.    Provided that the Store Closings are conducted in accordance with the terms of the Interim Order or the Final Order, as applicable, and the Store Closing Procedures, and in light of the provisions in the laws of many Governmental Units (as defined in the Bankruptcy Code) that exempt court-ordered sales from their provisions, the Debtors will be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct Store Closings in accordance with the terms of the Interim Order or the Final Order, as applicable, and the Store Closing Procedures without the necessity of further showing compliance with any such Liquidation Sale Laws.

13172884 v1

b.      Within three business days after entry of the Interim Order, the Debtors will serve by email, facsimile, or first-class mail, copies of the Interim Order, the proposed Final Order and the Store Closing Procedures on the following:  (i) the landlords for the Stores; (ii) the Attorney General's office for each state in which the Store Closings are being held; (iii) the county consumer protection agency or similar agency for each county in which the Store Closings are being held; (iv) the division of consumer protection for each state in which the Store Closings are being held; (v) the chief legal counsel for each local jurisdiction in which the Store Closings are being held (collectively, the "Dispute Notice Parties").

c.      With respect to any additional Stores, within three business days after Court authorization to close additional stores (each, an "Additional Closing Store List"), the Debtors will serve by email, facsimile, or first-class mail, copies of the Interim Order or Final Order, as applicable, and the Store Closing Procedures on the Dispute Notice Parties.  To the extent that there is a dispute arising from or relating to the Sales, the Interim Order, or the proposed Final Order, as applicable, the Store Closing Procedures, which dispute relates to any Liquidation Sale Laws (a "Reserved Dispute"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute. Any time within ten days following entry of the Interim Order or service of any Additional Closing Store List, as applicable, any Governmental Unit may assert that a Reserved Dispute exists by sending a notice (the "Dispute Notice") explaining the nature of the dispute to:  (a) proposed counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 801, Wilmington, Delaware 19801, Attn: Gregory Werkheiser, Michael J. Barrie, Jennifer R. Hoover, Kevin M. Capuzzi, and John C. Gentile; (b) proposed special counsel to the Debtors, Montgomery McCracken Walker & Rhoads LLP, 437 Madison Avenue, New York, NY 10022, Attn. Maura I. Russell; (c) the Office of The United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Linda Richenderfer; (d) counsel to the administrative agent under the Debtors' ABL loan facilities (i) Morgan, Lewis & Bockius LLP, One Federal Street, Boston, Massachusetts 02110, Attn: Marjorie S. Crider, (ii) Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, New York 10178, Attn: Jennifer Feldsher, and (iii) Burr & Forman LLP, 1201 N. Market Street, Wilmington, Delaware 19801, Attn:  J. Cory Falgowski; (e) lead counsel to the Consultant, Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, New York 10036, Attn: Steven E. Fox; (f) counsel to the Prepetition Term Loan Agent, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf; and (g) counsel to any statutory committee appointed in these chapter 11 cases.  If the Debtors and the Governmental Unit are unable to resolve the Reserved Dispute within 15 days after service of the Dispute Notice, the Governmental Unit may file a motion with the Court requesting that the Bankruptcy Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

d.      In the event that a Dispute Resolution Motion is filed, nothing in the Interim Order or the Final Order, as applicable, shall preclude the Debtors, a landlord, or any other interested party from asserting (i) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (ii) that neither the terms of the Interim Order or the Final Order nor the conduct of the Debtors pursuant to the Interim Order or the Final Order violates such Liquidation Sale Laws.  Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of the Interim Order or the Final Order or to limit or interfere with the Debtors' ability to conduct or to continue to conduct the Store Closings pursuant to the Interim Order or the Final Order, absent further order of the Court.  Upon the entry of the Interim Order or the Final Order, as applicable, the Court grants authority for the Debtors  to conduct the Store Closings pursuant to the terms of the Interim Order or the Final Order, as applicable, the Store Closing Procedures and to take all actions reasonably related thereto or arising in connection therewith.  The Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code.  Nothing in the Interim Order or the Final Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

e.      If, at any time, a dispute arises between the Debtors and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in the Interim Order or the Final Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (c) and (d) above by serving a notice to the other party and proceeding thereunder in accordance with those subparagraphs.  Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo.*

**IV.    Fast Pay Laws.**

19.    Many states in which the Debtors operate have laws and regulations that require the Debtors to pay an employee contemporaneously with his or her termination (the "Fast Pay Laws" and, together with the Liquidation Sale Laws, the "Applicable State Laws").  These laws often require payment to occur immediately or within a period of only a few days from the date such employee is terminated.

20.    The nature of the Store Closings contemplated by this Motion will result in a substantial number of employees being terminated at or near the end of the Store Closings.  To be

17

clear, the Debtors intend to pay their terminated employees as expeditiously as possible, under normal payment procedures, and pursuant to applicable Court order.[7]   Moreover, the Debtors' approved Cash Collateral Budget expressly contemplates the payment of employee wages in the ordinary course during the Store Closings.  The Debtors therefore believe that their current systems will allow their employees to be paid expeditiously and in accordance with any Applicable State Laws.  However, given the number of employees who will likely be terminated during the Store Closings, the Debtors request a waiver of compliance with the Applicable State Laws to the extent that the Debtors' payroll systems limit their ability to so comply.

**V.     Store Closing Bonus Plan.**

21.     Through this Motion, the Debtors are requesting the authority, but not the obligation, to pay bonuses (the "Store Closing Bonuses") to store-level non-insider employees at the Closing Stores who remain in the employ of the Debtors during the Store Closings (the "Store Closing Bonus Plan").  The Debtors believe that the Store Closing Bonus Plan will motivate employees during the Store Closings and will enable the Debtors to retain those employees necessary to successfully complete the Store Closings.

22.     The amount of the bonuses offered under the Store Closing Bonus Plan will vary depending upon a number of factors, including the employee's position with the Debtors and the performance of the Closing Stores in which the relevant employees work.

23.     The Debtors will set the amounts of the Store Closing Bonuses and eligible employees in consultation with the Consultant, who typically utilizes such bonuses to retain

---

[7]     The Debtors are seeking such relief pursuant to the *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing, but not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief*, (the "Wages Motion") filed contemporaneously herewith.

13172884 v1

employees and incentivize higher recoveries during store closing sales and are well-acquainted with optimal methods for designing such bonus plans.[8]

24.     The total aggregate cost of the Store Closing Bonus Plan will also vary depending on how many Closing Stores are ultimately closed.  If the Debtors were to close every Closing Store, the aggregate amount of Store Closing Bonuses paid will be not more than approximately $600,000, assuming one hundred percent of the performance targets were met during the Store Closings at every Closing Store.

25.     Providing such non-insider bonus benefits is critical to ensuring that key employees that will be affected by the reduction in the Debtors' work force due to the Store Closings will continue to provide critical services to the Debtors during the ongoing Store Closing process.  For the avoidance of doubt, the Debtors do not propose to make any payment on account of Store Closing Bonuses to any insiders.

26.     Accordingly, the Debtors respectfully submit that the Store Closing Bonus Plan is in the best interests of their estates and request that the Court authorize the payments under the Store Closing Bonus Plan as a sound exercise of their business judgment.

## **Basis for Relief**

## I.     **The Debtors Have a Valid Business Justification for the Store Closings.**

27.     Section 363(b)(1) of the Bankruptcy Code, which governs asset sales outside of a debtor's ordinary course of business, provides that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  When selling assets outside of the ordinary course of business, a debtor

---

[8]     The final terms of the Store Closing Bonus Plan are still being formulated in consultation with the Consultant.

must articulate a valid business justification to obtain court approval. *See, e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citation omitted); *In re Abbotts Dairies, Inc.*, 788 F.2d 143, 147-48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2d Cir. 1983)); *In re Delaware & Hudson Ry, Co.*, 124 B.R. 169, 175–76 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the *Abbotts Dairies* decision). When a debtor demonstrates a valid business justification for a decision, a strong presumption arises "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that the Delaware business judgment rule has "vitality by analogy" in chapter 11 cases, especially where the debtor is a Delaware corporation).

28.    Store closing or liquidation sales are a routine occurrence in chapter 11 cases involving retail debtors. *See, e.g.*, *Ames Dept. Stores*, 136 B.R. at 359 (noting that liquidation sales are an important part of "overriding federal policy requiring [a] Debtor to maximize estate assets"). As such, bankruptcy courts in this jurisdiction have approved similar store closing sales. *See, e.g.*, *In re Destination Maternity Corporation*, No. 19-12256 (BLS) (Bankr. D. Del. Nov. 14, 2019); *In re Fred's Inc.*, No. 19-11984 (CSS) (Bankr. D. Del. Sept. 27, 2019); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019); *In re Things Remembered, Inc.*, No. 19-10234

(KG) (Bankr. D. Del. Feb. 28, 2019); *In re Charming Charlie Holdings, Inc.*, No. 17-12906 (CSS) (Bankr. D. Del. Jan. 13, 2017).[9]

29.     Sufficient business justification exists to approve the proposed Store Closings under section 363(b)(1) of the Bankruptcy Code.  The Debtors, with the assistance of their advisors, have determined that the Store Closings represent the best alternative to maximize recoveries to the Debtors' estates with respect to the Merchandise and the M&E  and provide the Debtors with much-needed liquidity.  There are meaningful amounts of Merchandise, in the aggregate, that will be monetized most efficiently and quickly through an orderly process conducted in consultation with an experienced liquidation firm.  Further, delay in commencing the Store Closings would diminish the recovery tied to monetization of the Merchandise and the M&E for several important reasons.  Many of the Closing Stores fail to generate positive cash flow and therefore are a significant drain on liquidity.  As such, the Debtors will realize an immediate benefit in terms of financial liquidity upon the sale of the Merchandise and the M&E  and the termination of operations at the Closing Stores.  Further, uninterrupted and orderly Store Closings will allow the Debtors to timely reject leases associated with the Closing Stores and, therefore, avoid the accrual of unnecessary administrative expenses for rent and related costs.  Suspension of the Store Closings until entry of the Final Order may cause the Debtors to incur claims for rent at many of these stores, creating a further drain on the Debtors' liquidity.

30.     Courts in this district and courts in other jurisdictions have approved sale guidelines in chapter 11 cases on an interim basis.  Importantly, a number of courts have granted retail debtors first day authority to implement such procedures.  *See, e.g.*, *In re Destination Maternity*

---

[9]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

*Corporation*, No. 19-12256 (BLS) (Bankr. D. Del. Oct. 22, 2019) (approving procedures on an interim basis); *In re Fred's, Inc.*, No. 19-11984 (CSS) (Bankr. D. Del. Sept. 11, 2019) (same); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Mar. 15, 2019) (same); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 7, 2019) (same) (*In re Payless Holdings LLC*, No. 17-42267 (E.D. Mo. April 7, 2017) (same).

**II.    The Court Should Approve the Sale of the Merchandise and the M&E  Free and Clear of all Liens, Encumbrances, and Other Interests Under Bankruptcy Code Section 363(f).**

31.    The Debtors request approval to sell the Merchandise and the M&E on a final "as is" basis, free and clear of any and all liens, claims, and encumbrances in accordance with section 363(f) of the Bankruptcy Code.   A debtor in possession may sell property under sections 363(b) and 363(f) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:  (a) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (b) such entity consents; (c) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (d) such interest is in bona fide dispute; or (e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f); *see also Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that since section 363(f) is written in the disjunctive, the court may approve a sale free and clear if any one subsection is met).   Moreover, the Third Circuit has indicated that a debtor possesses broad authority to sell assets free and clear of liens.  *See In re TWA Inc.*, 322 F.3d 283, 289 (3d Cir. 2003).

32.    Although the term "any interest" is not defined in the Bankruptcy Code, the Third Circuit has noted that the trend in modern cases is toward "a broader interpretation which includes

other obligations that may flow from ownership of the property." *Folger Adam Security, Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 258–59 (3d Cir. 2000).  As the Fourth Circuit held in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581–82 (4th Cir. 1996) (cited with approval by the Third Circuit in *Folger Adam*), the scope of section 363(f) is not limited to *in rem* interests in a debtor's assets.  Thus, a debtor can sell its assets under section 363(f) "free and clear of successor liability that otherwise would have arisen under federal statute." *Folger Adam*, 209 F.3d at 258.

33.     With respect to any other party asserting a lien, claim, or encumbrance against the Merchandise and the M&E, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f).  In connection with the sale of the Merchandise and the M&E , the Debtors propose that any liens, claims, and encumbrances asserted against the Merchandise and the M&E  be transferred to and attach to the amounts earned by the Debtors under the Store Closings with the same force, effect, and priority as such liens currently have on the Merchandise and the M&E .

## III.     The Court Should Waive Compliance with Applicable State Laws and Approve the Dispute Resolution Procedures

34.     The Debtors' ability to conduct the Store Closings in accordance with the Store Closing Procedures and without strict compliance with all Applicable State Laws is critical to the Store Closings' success.  Although the Debtors intend to comply with state and local health and safety laws and consumer protection laws in conducting the Store Closings, many Liquidation Sale Laws require special and cumbersome licenses, waiting periods, time limits, and other procedures for store closing, liquidation, or similar sales.

35.     To eliminate the time, delay, and expense associated with the administrative procedures necessary to comply with the Applicable State Laws, the Debtors propose the Store Closing Procedures as a way to streamline the administrative burdens on their estates while still

23

adequately protecting the broad and varied interests of both landlords and applicable governmental agencies charged with enforcing any Liquidation Sale Laws that may apply to the Store Closings. As such, the Debtors believe the Store Closing Procedures mitigate any concerns that their landlords or governmental agencies may raise with respect to the Store Closings and, therefore, the requested relief is in compliance with any applicable Liquidation Sale Laws.

36.    The Debtors submit that there is strong support for granting them the authority to not comply with the Liquidation Sale Laws. *First*, it is generally accepted that many state statutes and regulations provide that, if a liquidation or bankruptcy sale is court-authorized, a company need not comply with the Liquidation Sale Laws. *See, e.g.*, Ark. Code Ann. § 4-74-103 (exempting from the provisions of the chapter sales pursuant to any court order); Fla. Stat. Ann. 559.25(2) (same); Ga. Code Ann. § 10-1-393(b)(24)(C)(iv) (same); 815 ILCS 350/3 (same); La. Rev. Stat. Ann. § 51:43(1) (same); N.Y. Gen. Bus. Law § 584(a) (same); Or. Rev. Stat. Ann. § 646A.100(2)(b) ("'Going out of business sale' does not include a sale conducted by a bankruptcy trustee."); Tex. Bus. & Com. Code Ann. § 17.91(3) (exempting from subchapter sales conducted pursuant to court order). *Second*, pursuant to section 105(a) of the Bankruptcy Code, the Court has the authority to permit the Store Closings to proceed notwithstanding contrary Applicable State Laws as it is essential to maximize the value of the Debtors' business. *Third*, this Court will be able to supervise the Store Closings because the Debtors and their assets are subject to this Court's exclusive jurisdiction. *See* 28 U.S.C. § 1334. As such, creditors and the public interest are adequately protected by notice of this Motion and the ongoing jurisdiction and supervision of the Court because the Debtors are only seeking interim relief at the outset of these cases, and parties in interest will be able to raise any further issues at the final hearing.

37.     Further, bankruptcy courts have consistently recognized, with limited exception, that federal bankruptcy law preempts state and local laws that contravene the underlying policies of the Bankruptcy Code.  *See Belcufine v. Aloe (In re Shenango Group. Inc.)*, 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code. . . . [A] state statute [] cannot place burdens on [a debtor] where the result would contradict the priorities established by the federal bankruptcy code."), *aff'd*, 112 F.3d 633 (3d Cir. 1997).

38.     Courts in some jurisdictions have found that preemption of state law is not appropriate if the laws deal with public health and safety.  *See Baker & Drake. Inc. v. Pub. Serv. Comm'n of Nev. (In re Baker & Drake. Inc.)*, 35 F.3d 1348, 1353–54 (9th Cir. 1994) (holding that Bankruptcy Code did not preempt state law prohibiting taxicab leasing that was promulgated in part as public safety measure).  However, preemption is appropriate where, as is the case here, the only state laws involved concern economic regulation rather than the protection of public health and safety.  *See In re Baker & Drake. Inc.*, 35 F.3d at 1353 (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety").

39.     Under the circumstances of these chapter 11 cases, enforcing the strict requirements of the Liquidation Sale Laws would undermine the fundamental purpose of section 363(b) of the Bankruptcy Code by placing constraints on the Debtors' ability to maximize estate assets for the benefit of creditors.  Accordingly, authorizing the Store Closings without the delays and burdens associated with obtaining various state and local licenses, observing state and local waiting periods or time limits, and/or satisfying any additional requirements with respect to advertising and similar items is necessary and appropriate.  The Debtors do not seek a general waiver of all state and local

law requirements, but only those that apply specifically to retail liquidation sales.  Indeed, the requested waiver is narrowly tailored to facilitate the successful consummation of the Store Closings.  Moreover, the Debtors will comply with applicable state and local public health and safety laws, and applicable tax, labor, employment, environmental, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising.  Finally, the Dispute Resolution Procedures provide an ordered means for resolving any disputes arising between the Debtors and any Governmental Units with respect to the applicability of any Liquidation Sale Laws, and should therefore be approved.

40.    Further, this Court has recognized that the Bankruptcy Code preempts certain state laws and have granted relief similar to that requested herein.  *See, e.g.*, *In re Coldwater Creek*, No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) (stating that debtors were authorized to conduct store closing sales under the terms of the order "without the necessity of further showing compliance" with liquidation laws); *In re Boscov's*, No. 08-11637 (KG) (Bankr. D. Del. Aug. 15, 2008) (ordering that "[g]overnmental units shall not fine, assess or otherwise penalize Debtors or Agent (or any of the landlords of the Closing Stores) for conducting or advertising the Sales in a manner inconsistent with Liquidation Sales Laws, provided that the Sales are conducted and advertised in compliance with this Order"); *In re Goody's Family Clothing, Inc.*, No. 08-11133 (CSS) (Bankr. D. Del. June 13, 2008) (ordering that the "Store Closing Sales at the Closing Stores shall be conducted by the Debtors and the Store Closing Agent without the necessity of compliance with any federal, state or local statute or ordinance, lease provision or licensing requirement affecting store closing, 'going out of business', liquidation or auction sales, or affecting advertising, including signs, banners, and posting of signage, other than Safety Laws and General Laws").

13172884 v1

IV.    **The Court Should Waive Compliance with any Restriction in the Leases and Approve the Store Closing Procedures**

41.    Certain of the Debtors' leases governing the premises of the stores subject to any Store Closings may contain provisions purporting to restrict or prohibit the Debtors from conducting store closing, liquidation, or similar sales.  Such provisions have been held to be unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to properly administer its reorganization case and maximize the value of its assets under section 363 of the Bankruptcy Code.  *See Ames Dep't Stores*, 136 B.R. at 359 (deciding that enforcement of such lease restrictions would "contravene overriding federal policy requiring debtor to maximize estate assets. . . ."); *In re R. H., Macy and Co. Inc.*, 170 B.R. 69, 73–74 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to remain open throughout the lease term, because the debtor had a duty to maximize the value to the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store); *In re Tobago Bay Trading Co.*, 112 B.R. 463, 467-68 (Bankr. N.D. Ga., 1990) (finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced); *In re Lisbon Shops, Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in chapter 11 case where debtor sought to conduct a liquidation sale).

42.    This Court has long held that restrictive lease provisions affecting store liquidation sales in chapter 11 cases are unenforceable.  *See, e.g.*, *In re Destination Maternity Corporation*, No. 19-12256 (BLS) (Bankr. D. Del. Oct. 22, 2019) (ordering "the sale of the Store Closure Assets shall be conducted by the Debtors and the Consultant notwithstanding any restrictive provision of any lease, sublease, license, reciprocal easement agreement, restrictive covenant, or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Store

Closings or the Sales"); *In re Coldwater Creek*, Case No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) (ordering that store closing sales be conducted without the further need for compliance with, among other things, lease provisions); *In re Boscov's*, Case No. 08-11637 (KG) (Bankr. D. Del. Aug. 15, 2008) (same); *In re Goody's Family Clothing, Inc.*, Case No. 08-11133 (CSS) (Bankr. D. Del. June 13, 2008) (same); *In re Linens Holding Co.*, Case No. 08-10832 (CSS) (Bankr. D. Del. May 30, 2008) (same).

43.     Thus, to the extent that such provisions or restrictions exist in any of the leases of the stores subject to the Store Closings, the Debtors request that the Court authorize the Debtors conduct the Store Closings without reference to any such restrictive provisions or interference by any landlords or other persons affected, directly or indirectly, by the Store Closings.

## V.     The Court Should Approve the Abandonment of Certain Property in Connection with Any Liquidation Sales and Lease Rejections

44.     After notice and a hearing, a debtor "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."  11 U.S.C. § 554(a); *see also Hanover Ins. Co. v. Tyco Indus., Inc.*, 500 F.2d 654, 657 (3d Cir. 1974) (stating that a trustee "may abandon his claim to any asset, including a cause of action, he deems less valuable than the cost of asserting that claim").

45.     The Debtors are seeking to sell all M&E remaining in the Closing Stores.  However, the Debtors may determine that the costs associated with holding or selling certain property or M&E exceeds the proceeds that will be realized upon its sale or that such property is not sellable at all.  In such event, the property is of inconsequential value and benefit to the estates and/or may be burdensome to retain.

46.     To maximize the value of the Debtors' assets and to minimize the costs to the estates, the Debtors respectfully request authority to abandon any of their remaining M&E or other

28

property located at any of the Closing Stores without incurring liability to any person or entity. The Debtors further request that the landlord of each Closing Store with any abandoned M&E or other property be authorized to dispose of such property without liability to any third parties.

47.    Notwithstanding the foregoing, the Debtors will utilize all commercially reasonable efforts to remove or cause to be removed any confidential or personal identifying information (which means information that, alone or in conjunction with other information, identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or debit card number) in any of the Debtors' hardware, software, computers, or cash registers or similar equipment that are to be sold or abandoned.

## VI.    The Store Closing Bonus Plan Is a Sound Exercise of the Debtors' Business Judgment and Should Be Approved

48.    Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Under this section, a court may authorize a debtor to use property of the estate when such use has a "sound business purpose" and when the use of the property is proposed in good faith.  *See In re W.A. Mallory Co.*, 214 B.R. 834, 836 (Bankr. E.D. Va. 1997); *In re WBQ P'ship*, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995).

49.    Courts generally require a debtor to demonstrate that a valid business purpose exists for the use of estate property in a manner that is outside the ordinary course of business.  *See, e.g.*, *In re Lionel Corp.*, 722 F.2d 1063, 1070–71 (2d Cir. 1983).  The debtor's articulation of a valid business justification raises a presumption that the debtor's decision was made on an informed basis, in good faith, and with the honest belief that the action is in the best interest of the company. *See In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992).  Furthermore, once "the

debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  The business judgment rule shields a debtor's management from judicial second-guessing.  *See Integrated Res.*, 147 B.R. at 656; *Johns-Manville*, 60 B.R. at 615–16 (noting that "the Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions").  Thus, if a debtor's actions satisfy the business judgment rule, then the actions in question should be approved under section 363(b)(1) of the Bankruptcy Code.

50.     In this case, the Store Closing Bonus Plan is a sound exercise of the Debtors' business judgment and is in the best interests of the Debtors and their estates.  The store employees—along with their skills, knowledge, and hard work—are more critical now than ever.  Through their commitment and performance, they can ensure that the Debtors continue to maximize stakeholder value in a challenging economic environment and at a time when those employees' positions will soon be terminated.

51.     Additionally, the total cost of the Store Closing Bonus Plan is reasonable in light of competitive market practice and involves compensation structures often used in other restructuring situations to incentivize employees to continue optimal performances despite the added stress inherent in the chapter 11 process.

52.     The Store Closing Bonus Plan is comparable to employee incentive plans regularly paid as "expenses of sale" by liquidating agents in other "store closing" and similar-themed sales.  As in those other instances, the specific Store Closing Bonus Plan here was devised with the input of the Consultant based on its views of maximizing the sale process and recoveries for creditors.

30

As such, courts have approved incentive payments similar to those contemplated by the Store Closing Bonus Plan. *See, e.g.*, *In re Destination Maternity Corporation*, No. 19-12256 (BLS) (Bankr. D. Del. Nov. 14, 2019) (authorizing store closing retention bonus program on a final basis); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (same); *In re Toys "R" Us, Inc.*, No. 17- (Bankr. E.D. Va. Feb. 6, 2018) (same); *In re rue21, Inc.*, No. 17-22045 (GLT) (Bankr. W.D. Pa. June 12, 2017) (same); *In re Payless Holdings LLC*, No. 17-42267 (KAS) (Bankr. E.D. Mo. May 9, 2017) (same).

53.    The Debtors respectfully submit that the Store Closing Bonus Plan is a sound exercise of the Debtors' business judgment and should be approved pursuant to section 363 of the Bankruptcy Code as in the best interests of the Debtors, their estates, and all parties in interest in these chapter 11 cases.

**VII.    The Court Should Authorize the Assumption of the Consulting Agreement.**

54.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract . . . of the debtor." The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract is whether the debtor's reasonable business judgment supports such assumption or rejection. *See, e.g.*, *In re HQ Glob. Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject an executory contract is governed by the business judgment standard, and that such decision may only be overturned if found to be a product of bad faith, whim, or caprice); *see also In re Market Square Inn Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court").

55.    The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate."

31

*Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).   Any more exacting scrutiny would slow the administration of the debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.  *See Richmond Leasing Co. v. Capital Bank*, 762 F.3d 1301, 1311 (5th Cir. 1985).

56.    Assumption of the Consulting Agreement is beneficial to the Debtors' estates, and, therefore, is a reasonable exercise of the Debtors' business judgment.  In consultation with their advisors, the Debtors have determined that the stores to be closed are unduly burdensome, and the Merchandise and the M&E should be liquidated for the benefit of the Debtors' estates and their creditors.  The Store Closings are already in progress.  The Debtors determined that entering into the Consulting Agreement, after engaging in extensive negotiations with the Consultant and their prepetition lenders, will provide the greatest return to the Debtors' estates for the Merchandise and the M&E.  The Debtors believe, in their business judgment, that the terms set forth in the Consulting Agreement constitute the best available alternative for the conduct of the Store Closings and Sales.

57.    The Consultant has extensive expertise in conducting liquidation sales and can oversee and assist in the management and implementation of the Store Closings in an efficient and cost-effective manner.  Assumption of the Consulting Agreement will enable the Debtors to utilize the skills and resources of the Consultant to effectively and efficiently conduct the Store Closings for the benefit of all stakeholders.  Given the number of stores and the particular issues in administering the Store Closings, the Debtors may not be able to retain a liquidator able to conduct the process as efficiently and effectively as the Consultant, who already has significant experience

32

with the Debtors' business operations and outlay of stores.  If the Consulting Agreement is not approved, operative, and effective on an interim basis, the Store Closings would lose the benefit of the Consultant's oversight and might be delayed or suspended entirely, leading to a loss of additional liquidity and increased administrative expenses.  Moreover, it is imperative that the Consulting Agreement be approved on an interim basis so that the Debtors and the Consultant can immediately begin conducting the Store Closings and closing stores in accordance with the Store Closing Procedures, which will generate more proceeds for the Debtors and their estates.

**VIII.  The Court Should Authorize the Retention of the Consultant Pursuant to Section 327(a) in Connection with Assumption of the Consulting Agreement.**

58.    The Debtors have selected the Consultant because they believe that the Consultant has developed an expertise in such matters that will significantly enhance the value recovered for the Assets, whether through the disposition of such through the conduct of strategic store closings for the Merchandise and the M&E, or through targeting marketing of the other Assets through their various divisions having an expertise in each such asset categories.  Each entity comprising the Consultant is familiar with retail businesses generally, and the Debtors' business operations specifically, and are well regarded and a leader in the distressed asset acquisition and disposition field.

59.    The Debtors believe the employment of the Consultant as asset disposition consultants and advisors is in the best interest of the Debtors and their creditors since the Consultant will provide invaluable services as the Debtors attempt to maximize the realizable value recovered for its business and assets.  The matters for which the Consultant is to be engaged are matters in which no other professional employed in this case will render services duplicative of the services rendered by the Consultant.

33

60.     Based on the information the Consultant has to date provided to the Debtors, the Debtors believe that the Consultant does not hold an interest adverse to either the Debtors or their estates, and with respect to the subject matter on which the Consultant has been engaged is a "disinterested person" pursuant to sections 327(a) and 101(14) of the Bankruptcy Code.

61.     As is customary in this district, each entity comprising the Consultant will file declarations of their connections prior to the final hearing on this Motion (the "<u>Consultant's Declarations</u>").

62.     To the best of the Debtors' knowledge, and except as may be disclosed in the respective Consultant Declarations when filed, the Consultant has not provided services to the Debtors' creditors, equity security holders, or any other parties-in-interest, or its respective attorneys, in any matter relating to the Debtors or their estates.

63.     The Debtors respectfully requests that the Consultant be retained in conjunction with the Court's approval of the assumption of the Consulting Agreement, *nunc pro tunc* to the Petition Date.  Since the Petition Date, the Consultant has provided valuable services that were time sensitive and critical to protection of the interests of the Debtors' stakeholders.

**The Requirements of Bankruptcy Rule 6003 Are Satisfied**

64.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003.  For the reasons discussed above, authorizing the Debtors reject certain unexpired leases, approving store closing or similar themed sales in accordance with the Store Closing Procedures, and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases smoothly.  Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture.  For the reasons discussed herein, the relief

34

requested is necessary in order for the Debtors to operate their business in the ordinary course, preserve the going concern value of the Debtors' operations, and maximize the value of their estates for the benefit of all stakeholders.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## **Reservation of Rights**

65.    Nothing contained in this Motion or any actions taken by the Debtors pursuant to relief granted in the Interim Order and Final Order is intended or should be construed as:  (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' or any other party-in-interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code (other than the Consulting Agreement); (f) a waiver or limitation of the Debtors' or any other party-in-interest's rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

66.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Notice

67.     The Debtors will provide notice of this Motion to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the United States Attorney's Office for the District of Delaware; (d) the Internal Revenue Service; (e) the state attorneys general for all states in which the Debtors conduct business; (f) the Dispute Notice Parties; (g) all of the Debtors' landlords at the locations of the Closing Stores, and counsel thereto, if known; and (h) any party that requests service pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

68.     No prior request for the relief sought in this Motion has been made to this or any other court.


[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request entry of interim and final orders, substantially in the form**s** attached hereto as **Exhibit A** and **Exhibit B,** respectively, (a) granting the relief requested herein and (b) granting such other relief as is just and proper.

Dated:  March 9, 2020
Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

_/s/ Gregory W. Werkheiser_
Gregory W. Werkheiser (DE No. 3553)
Michael J. Barrie (DE No. 4684)
Jennifer Hoover (DE No. 5111)
Kevin Capuzzi (DE No. 5462)
John C. Gentile (DE No. 6159)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: gwerkheiser@beneschlaw.com
        mbarrie@beneschlaw.com
        jhoover@beneschlaw.com
        kcapuzzi@beneschlaw.com
        jgentile@beneschlaw.com

_Proposed Counsel to the Debtors and Debtors in Possession_