IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: START MAN FURNITURE, LLC (*f/k/a* ART VAN FURNITURE, LLC), *et al.*, <br><br> Debtors. | )<br>)<br>)<br>)<br>) | Chapter 7<br>Case No. 20-10553 (CTG)<br>(Jointly Administered) |
| TODD STEWART and JENNIFER SAWLE, on behalf of themselves and all others similarly situated, <br><br> Appellants and Cross-Appellees, <br><br> v. <br><br> ALFRED T. GIULIANO, Chapter 7 Trustee for Debtors START MAN FURNITURE, LLC, *et al.*, <br><br> Cross-Appellant and Appellee. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Adv. No. 20-50548 (CTG)<br><br><br>Civ. No. 22-450 (GBW)<br>Civ. No. 22-489 (GBW) |

## OPINION

Michael J. Joyce, JOYCE, LLC, Wilmington, DE; René S. Roupinian, Jack A. Raisner, Gail C. Lin, RAISNER ROUPINIAN LLP, New York, NY – Counsel to Appellants and Cross-Appellees.

Bradford J. Sandler, PACHULSKI STANG ZIEHL & JONES LLP, Wilmington, DE – Counsel to Alfred T. Giuliano, Cross-Appellant and Appellee.

December 13, 2022
Wilmington, Delaware

**WILLIAMS, U.S. DISTRICT JUDGE:**

This dispute arises from an adversary proceeding filed by former employees Todd Stewart and Jennifer Sawle ("Plaintiffs"), on behalf of themselves and all others similarly situated, against the above-captioned debtors asserting claims based upon debtors' failure to provide required notice to employees before a March 20, 2020 mass layoff under the Federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq.* (the "WARN Act"). Chapter 7 trustee Alfred T. Giuliano ("Trustee") filed a motion for summary judgment asserting three exceptions to the WARN Act as defenses: that notice was not required because debtors were "liquidating fiduciaries" and not "employers" under the WARN Act; or, in the alternative, that debtors were "employers" under the WARN Act, but that notice was not required because an "unforeseeable business circumstance" caused the mass layoff and/or a "natural disaster" caused the mass layoff.

As the mass layoff was contemporaneous with the beginning of the COVID-19 pandemic and unprecedented government-ordered shutdowns, the motion for summary judgment required the Bankruptcy Court to apply the WARN Act notice exceptions to unusual facts and circumstances. On March 21, 2022, the Bankruptcy Court issued an Order (Adv. D.I. 64, A001722)[1] and accompanying Opinion, *In re Art Van Furniture, LLC*, 638 B.R. 523 (Bankr. D. Del. 2022), which granted, in part, the Trustee's motion for summary judgment. The Honorable Christopher S. Sontchi[2] held that both the "unforeseeable business circumstance" and "natural

---

[1] The docket of the Chapter 7 cases, captioned *In re Smart Man Furniture, LLC, et al.*, No. 20-10553 (CTG) (Bankr. D. Del.), is cited herein as "B.D.I. __," and the docket of the adversary proceeding, captioned *Stewart v. Art Van Furniture, LLC*, Adv. No. 20-50548 (CTG) (Bankr. D. Del.), is cited herein as "Adv. D.I. __." The appendix (D.I. 15) filed in support of Plaintiffs' opening brief is cited herein as "PA__," the appendix (D.I. 13) filed in support of the Trustee's opening brief is cited herein as "A__," and the appendix (D.I. 22) filed in support of Trustee's answering brief is cited herein as "AB__."

[2] By order dated April 1, 2022, the Chapter 7 cases and adversary proceeding were reassigned to the Honorable Craig T. Goldblatt. (*See* Bankr. D.I. 1410).

1

disaster" exceptions applied and, therefore, the debtors were not required to provide the WARN Act's 60-day notice to employees before the layoff. Before the Court is Plaintiffs' appeal of those holdings, along with the Trustee's cross-appeal of the Bankruptcy Court's determination that the facts of the case did not satisfy the "liquidating fiduciary" exception to the WARN Act. For the reasons set forth herein, the Court will affirm the Order, in part, and reverse the Order, in part.

## I.    BACKGROUND

### A.    Events Leading to Chapter 11

Founded in 1959, Art Van Furniture, LLC ("Art Van," and, together with Sam Levin Inc. ("SLI") and certain other affiliates, the "Debtors") is a brick-and-mortar furniture and mattress retailer headquartered in Warren, Michigan. (A000001-A000032 ("Ladd Decl.") ¶ 5). Debtors operated 169 locations, including 92 furniture and mattress showrooms and 77 freestanding mattress and specialty locations throughout Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia. Pennsylvania-based companies Levin Furniture and Wolf Furniture were acquired by Art Van in November 2017.

In the months leading up to the Petition Date, Debtors struggled under the weight of poor sales and $208.5 million in secured debt, encumbering substantially all of their assets, consisting of: (i) $33.5 million in an asset-backed loan ("ABL Loan") from Wells Fargo Bank ("Wells Fargo") and (ii) a $175 million term loan (the "Term Loan") from FS KKR Capital Corp (the "Term Lenders" and together with Wells Fargo, the "Secured Lenders"). (Ladd Decl. ¶¶ 7-8, 13-14, 16-18, 31-36). On February 5, 2020, Debtors defaulted on the ABL Loan, and were only able to obtain a forbearance from Wells Fargo through February 28, 2020, giving Debtors just 23 days to find a buyer, an investor, or a means of recapitalizing the business. As a condition to the forbearance, Wells Fargo insisted that the Debtors begin preparing for going-out-of-business store closing ("GOB") sales. (Ladd Decl. ¶¶ 14, 36). Debtors were unable to secure financing or attract

a going concern buyer. On February 28, 2020, the forbearance period ended. (Ladd Decl. ¶ 16). Debtors negotiated a wind-down budget with Wells Fargo and entered into a consulting agreement with HilcoMerchant Resources, LLC ("Liquidator") (A001084-A001123) ("Consulting Agreement"). (Ladd Decl. ¶¶ 16-18).

Parallel with these efforts, Debtors continued to pursue alternative transactions, and in the days leading up to the Petition Date, reached an agreement-in-principle with Robert Levin, the former owner of Levin Furniture, regarding a going-concern sale of certain of the assets of SLI and LF Trucking, Inc. ("Levin Sale"). (Ladd Decl. ¶ 19). On March 4, 2020, Debtors entered into a letter agreement, which contemplated that the Levin Sale would: provide for cash and non-cash consideration, including the assumption of liabilities related to customer deposits, employee obligations, specified cure costs, and potential claims under § 503(b)(9) of the Bankruptcy Code; preserve nearly 1,000 jobs; and provide for the continued operation of approximately 44 retail store locations under the Wolf and Levin store banners and two related distribution centers. (Ladd Decl. ¶ 19). The letter agreement thus contemplated continued operations of the Levin Sale stores pending approval of the sale by the Bankruptcy Court in order to preserve the value of those stores for the buyer. (*Id.*) The Levin Sale was expected to be consummated in early April 2020. (Ladd Decl. at ¶ 18). Because Debtors had no money to operate these stores, the purchaser agreed to extend $10 million of debtor-in-possession ("DIP") financing to Debtor SLI (Bankr. D.I. 137 ("Levin DIP").

On March 5, 2020, Debtors publicly announced that they were going out of business. The same day, Debtors issued a WARN Act notice to approximately 1,400 potentially "affected employees" who worked in or reported to seven facilities in Michigan, two facilities in Illinois and one in Pennsylvania. Each of the Plaintiffs who worked at an affected location in Michigan were notified as follows:

3

Art Van Furniture, LLC (the "Company") has made the difficult decision to wind-down its operations, which will include the closure of its facilities located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI,49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321, and will be permanently terminating the employment of all employees at these locations.

The Company submits this notice to you to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act"). If no obligations exist, this notice is being provided to you voluntarily.

All terminations of employment will be permanent and you will not have bumping rights for other positions (i.e., you will not have the right to displace employees with less seniority). While an exact date has not yet been established for these closures, it is anticipated that your employment with the Company will terminate on May 5, 2020 or a date within 14 days thereafter which may be provided to you by the Company (your "Termination Date"). Nothing in this letter alters your at-will employment status with the Company.

You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the Company.

(A000875) ("GOB Sale WARN Notice").

## B. The Chapter 11 Cases

On March 8, 2020 ("Petition Date"), Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code with the intention of winding down their affairs through an orderly liquidation to maximize the liquidation value of the estates' assets and the recoveries for the Debtors' creditors. The Debtors' plan for an orderly liquidation and wind-down included liquidating their inventory through the GOB sales and the Levin Sale, paying down their secured debt, and using any remaining proceeds of their GOB sales to wind-down operations. (Ladd Decl. ¶ 2). Debtors' "first day motions" sought obtain approval of the wind-down budget, the Levin DIP, and the GOB sales, along with assumption of their Consulting Agreement with the Liquidator (A000110-A000237). On March 11, 2020, the Bankruptcy Court entered an interim cash collateral order, authorizing the Debtors to use cash collateral in accordance with the wind-down budget

until April 7, 2020 (unless terminated earlier due to default or entry of a final order) to conduct the GOB sales (A000238-A000302). The wind-down budget assumed that the GOB sales would continue unabated through April 30, 2020, and provided that "the failure by the Debtors to continue sales of the Assets in accordance with the Consulting Agreement and to assume the Consulting Agreement on a timely basis" is a default. Debtors therefore continued their ongoing GOB sales.

Shortly after the Petition Date, Debtors assert that their situation changed drastically, as "the restrictions on economic and other activity that various state and local governments determined to be necessary to slow the spread of the COVID-19 disease mandated that the Debtors discontinue all retail operations and other non-essential business operations." (A000304-A000333 ("Conversion Motion") ¶¶ 1-2). The unprecedented and extraordinary adverse effects during this period (social, economic, and business) caused by the COVID-19 pandemic that confronted the Debtors and many other businesses are a matter of public record. (*See* A000435-A001427) ("Sandler Decl."), at Exs. L & S (A001206-A001250)).[3] As a result, Debtors assert, customer traffic in their stores, which had been robust just days earlier, dissipated drastically in the week following the Petition Date. (*See* Conversion Motion ¶¶ 22, 26). Specifically, during the initial days of the GOB sales from March 5-8, 2020, deposits from inventory sales were in excess of $23

---

[3]     Among other signs of the escalation of the pandemic, on March 13, 2020, the then-President declared a national emergency (A001206-A001208); on March 14, 2020, the governor of Pennsylvania issued guidance urging all non-essential businesses to close (A001210); two days later, he amplified the message, declaring: "The Wolf Administration is relying on businesses to act now before the governor or the Secretary of Health finds it necessary to compel closures under the law for the interest of public health …" (A001213); on March 16, 2020, the governor of Michigan entered an executive order that closed Michigan's bars, theaters, casinos, and other public spaces, and further urged Michigan residents to "mak[e] smart choices" by "not putting [themselves] or others at risk by going out in public unless it is absolutely necessary" (A001216); and on March 19, 2020, Pennsylvania issued a "stay at home" or "shelter in place" order (A001220), with similar orders soon following in Michigan, Ohio, and Illinois, all of which were in lock-down by March 23, 2020 (A001223-A001251).

million; however, for the full week ending March 15, 2020, deposits from sales were just $8 million suggesting, among other things, a precipitous drop in customer traffic in the Debtors' stores. (*Id.* ¶ 22). Further, on March 19, 2020, the proposed purchaser for the Levin Sale notified the Debtors that it would not proceed with the transaction. (*Id.* ¶ 26). Debtors soon reached a determination that their plan for liquidation was no longer viable and that a more immediate shutdown of the Debtors' stores and remaining support operations was in the estates' and creditors' best interest. (*Id.* ¶¶ 1-2).

At a status conference held on March 19, 2022, Debtors' counsel told the Bankruptcy Court that despite "attempting to operate as much as possible in the ordinary course," Debtors had "t[old] employees not to report to work" effective that day. (PA00797-PA00826 ("3/19/20 Tr.") at 10:9-12). Counsel stated that it was the company's "hope" that the locations it had "at least temporarily, shuttered" that day would not be closed "forever," but asserted the need to "adapt consistent with our obligations and fiduciary duties." (*Id.* at 10:12-18). Debtors' counsel stated, "we are trying to explore with our lenders and our other stakeholders ... other options short of outright liquidation." (*Id.* at 12:9-14). Debtors' counsel specifically mentioned the possibility of a pause in the Chapter 11 liquidation process:

> So let me just say then, conceptually, we are looking at the possibility of…going idle or going into a state of dormancy for a period of time, and then the possibility then of either…reopening stores, some subset of stores as, either in furtherance of the going concern transaction…or…closing sales and an orderly liquidation, you know, essentially, once the economic and retail environment and the safety environment have improved to a degree that we can do that. … [T]here are a number of scenarios under consideration… we are right now, engaging in a dialogue with Wells Fargo and our term loan lenders to see if there's a way to pursue that alternative.

(*Id.* at 12:23-13:13). Debtors' counsel advised that for any alternatives to be possible, Wells Fargo needed to cooperate, as there was a need for:

> cooperation from the ABL agent and the term loan lenders and… assurances that, while we are having these dialogues…they'll ***take no precipitous action*** to make that -- an already difficult situation worse by [] sweeping all of the cash, for example, that are in the debtors' cash collection accounts and leaving us without even the cash necessary to fund those operating and restructuring expenses already incurred or that might be incurred imminently, as we're [] trying to navigate this situation.

(*Id.* at 13:17-14:3) (emphasis added). Wells Fargo's counsel described the unexpected nature of the Debtors' shut-down decision: "A lot of this information and the debtors' decisions, unfortunately, are coming at us minutes before … these hearings." (*Id.* at 14:9-15:2). Counsel explained while Wells Fargo wanted "to try to find a path forward … that makes sense for all stakeholders," the Debtors, "as opposed to other cases," had not "fully come to their creditors, other than to say this is somebody else's problem and, put -- you know, fix it for us or don't sweep or do these things." (*Id.* at 15:2-11). Counsel continued, "unfortunately, we haven't gotten the information that we need from the company to be able to even consider a full wind-down plan. (*Id.* at 15:16-18). Finally, counsel to the Official Committee of Unsecured Creditors conveyed its hope that "44 stores would be saved, thousands of jobs would be saved. Maybe that will happen down the road." (*Id.* at 20:18-21). The Committee favored "put[ting] everything on ice and let's come back to it in[] a month or two and see." (*Id.* at 22:4-9).

Later that same day, Debtors notified their employees that Debtors were permanently terminating its non-leader personnel the next day and its lead personnel three days later:

> On March 5, 2020, Art Van Furniture, LLC (the "Company") informed employees that it had made the difficult decision to wind-down its operations, to include the closure of its retail facilities located at [seven Michigan sites], which would in the permanent termination the employment [sic] of all employees at these locations.
>
> Since initial notice, the Company has been impacted by the novel COVID-19 virus and the resulting, and sudden, negative economic impact. Due to these unforeseen events, the Company can no longer support the wind-down of its retail operations through the originally projected termination date. The Company, therefore, submits this revised notice to you to satisfy any obligation that may exist under the

federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act").

All terminations of employment will be permanent and you will not have bumping rights for other positions (i.e., you will not have the right to displace employees with less seniority). The employment of Art Van's sales associates and other commissioned employees, visuals, housekeepers, drivers, helpers, and other hub warehouse staff, Selling Managers and Outlet Managers as well as any Sales or Store Manager who is not scheduled to perform services on March 21, 2020 or March 22, 2020, will be terminated on March 20, 2020. All CPU's and office staff, along with the Store Manager and/ or Sales Manager scheduled to work on March 21, 2020 or March 22, 2020 will be terminated at the end of the business day on March 22, 2020. Nothing in this letter alters your at-will employment status with the Company. You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the Company.

("COVID WARN Notice") (A001252).

At a subsequent hearing, on March 31, 2020, Debtors' counsel addressed the mass layoff, stating "we were not able to get to a point where we had the agent support and consent for the mothball arrangement primarily because of the company's liquidity issues and cash needs, both as they exist today based on obligations that have accrued thus far since the filing and the expected obligations[.]" (PA00828-PA00885 ("3/31/20 Tr.") at 7:1-6). Wells Fargo's counsel, however, painted a different picture. Counsel explained that the Debtors' decision to immediately suspend operations, including places where there were no shutdown orders in place, and "to terminate all" or "significantly all of their employees" "was not something that was done in coordination with the lenders, either the ABL lender or the term lender, or even the [store-closing] consultant ... who ... had remained to support the debtor's efforts to try to continue a GOB sale." (*Id.* at 12:23-13:13). Counsel further stated, "[s]o, as a result of terminating their employees, ... the debtors now have significant accrued PTO commissions, other benefits related to the terminated employees as well as healthcare obligations. Most of these were not included in any budget and certainly in the cash collateral budget because there was no contemplation of a wholesale mass

8

termination of employees." (*Id.* at 13:14-20). Wells Fargo's counsel further indicated these obligations might have been avoided had employees been laid off temporarily: "Could these have been mitigated if employees had been furloughed [or by] less drastic more spaced out termination we will never know… but now these expenses exist." (*Id.* at 13:20-25). "[J]ust the employee obligations alone" were over $14 million. (*Id.* at 14:1-4).

Wells Fargo declared a default under the interim cash collateral order, and terminated use of cash collateral. (Conversion Motion ¶ 27). Unable to continue the Chapter 11 cases without the Secured Lenders' consent to use their cash collateral, Debtors filed the Conversion Motion, and the Chapter 11 cases were converted to cases under Chapter 7 on April 6, 2020. (A001344-A001349).

### C.     The Chapter 7 Cases and the Adversary Proceeding

Plaintiffs Mr. Stewart and Ms. Sawle were two of the Debtors' employees, and each worked at one of Debtors' 82 stores in the State of Michigan. Mr. Stewart was a store manager at a store in Shelby Township, Michigan, and Ms. Sawle was a salesperson at a store in Lansing, Michigan. In accordance with the COVID WARN Notice, Mr. Stewart and Ms. Sawle were both terminated on March 20, 2022 (the "Layoff"). (A000335-A000345 ("Complaint") at ¶¶ 6, 7, 10). On March 23, 2020, Plaintiffs initiated the adversary proceeding by filing the Complaint which seeks judgment for unpaid wages and other benefits and damages for up to 60 days that would have been otherwise paid in accordance with the WARN Act.

The Trustee filed an answer on December 10, 2020 (A000346-A000362) ("Answer"). In the Answer, the Trustee conceded that Debtors Art Van and SLI—the direct employers of the furniture store employees—were WARN employers. (Answer at ¶¶ 1-2, 45 (A000347, A000356) (admitting Plaintiffs were employed by Art Van and were terminated along with other "employees of [Art Van] and [SLI]", both of which employed more than 100 employees, and denying only

"employer" status of other Debtor entities)). The Answer asserted the WARN employer defenses of "unforeseeable business circumstances" and "natural disaster" pursuant to 29 U.S.C. § 2102(b)(2)(A) & (B). (*See* A000358- A000359).

Ten months later, on October 29, 2021, the Trustee filed his First Amended Answer (A000369-A000387) ("Amended Answer") asserting, for the first time, that Art Van was not, in fact, a WARN employer, but rather a WARN-exempt "liquidating fiduciary." (*Id.* ¶ 58). Because the "unforeseeable business circumstances" and "natural disaster" defenses only apply to "employers," Trustee pled those defenses in the alternative. (*Id.* at ¶¶ 60-65). A mere two weeks later, on November 12, 2021, Trustee filed his motion for summary judgment on all three defenses. (A000388-A00434). On December 3, 2021, Plaintiffs filed their brief in opposition and cross-motion for deferred ruling (A001428-A001652) ("Cross-Motion"), arguing that Plaintiffs were given inadequate opportunity to conduct discovery before the filing of the summary judgment motion.

On March 21, 2022, the Bankruptcy Court issued its Opinion and Order granting summary judgment in the Trustee's favor on the WARN Act's "unforeseeable business circumstances" and "natural disaster" affirmative defenses. The Bankruptcy Court relied on "the facts as agreed to by the Plaintiffs and facts arising from orders or transcripts in this bankruptcy case." *In re Art Van Furniture*, 638 B.R. at 527-28. "Because the Court concludes that this combination of undisputed facts and facts in the record provide a sufficient basis for ruling on the Trustee's Summary Judgment Motion, the Plaintiffs' Cross-Motion to Defer Ruling is denied." *Id.*

**D.     The Appeal**

On April 4, 2022, Plaintiffs filed their Notice of Appeal from the Order. (Civ. No. 22-450 (GBW), D.I. 1). On April 14, 2022, Trustee filed his Notice of Cross-Appeal. (Civ. No. 22-489 (GBW), D.I. 1). The appeal is fully briefed. (D.I. 14, 21, 24). By order dated August 23, 2022,

the Court granted various parties[4] leave to file an amicus brief (D.I. 16-1) in support of Plaintiffs' opening brief, and Trustee has filed his response (D.I. 25). The cross-appeal is fully briefed as well. (D.I. 12, 20, 23). The Court did not hear oral argument because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.

## II.    JURISDICTION AND STANDARD OF REVIEW

The Order granting summary judgment in favor of the Trustee is final, and the Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a)(1). The district court uses an abuse of discretion standard when reviewing the trial court's decision as to whether a summary judgment motion was ripe for resolution. *Doe v. Abington Friends School*, 480 F.3d 252, 256 (3d Cir. 2007); *Lorenzo v. Griffith*, 12 F.3d 23, 27 n. 5 (3d Cir. 2003). In reviewing a bankruptcy court's grant of summary judgment, the district court applies a plenary, or de novo standard of review to legal determinations. *Biase v. Congress Fin. Corp. (In re Tops Appliance City, Inc.)*, 372 F.3d 510, 513 (3d Cir. 2004); *In re Hechinger*, 298 F.3d 219, 224 (3d Cir. 2002); *Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999). The reviewing court looks at whether the record demonstrates "a genuine issue of material fact and, if not, whether the moving party is entitled to judgment as a matter of law." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). Courts must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor. *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). A court should find for the moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

---

[4]    *Amici* in this case are the Communication Workers of America, the Service Workers International Union, the American Federation of Teachers, the American Federation of State, County and Municipal Employees, and the National Employment Law Project (collectively "*Amici*").

11

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

## III.  ANALYSIS

Congress passed the WARN Act to ensure that employees received adequate notice before their employer ordered a mass layoff or plant closing. 29 U.S.C. § 2102(a). As Congress found, advance notice of mass layoffs is critical to protecting workers, their families, and their communities. It gives workers time to retrain, apply for new jobs, and adjust their financial circumstances before losing their income. It enables state and local governments to help laid off employees find new jobs. And it places workers in the best position possible to protect their families' access to food, healthcare, and education. *See generally* H.R. Rep. No. 100-576, pt. 2, at 1045 (1988), *reprinted in* H. Subcomm. on Lab.-Mgmt. Relations of the Comm. on Educ. & Lab., 101st Cong., 2d Sess., Legislative History of S. 2527, 100th Cong., WARN, Pub. L. No. 100-379, at 571 (1990); U.S. Dep't of Labor, Economic Adjustment and Worker Dislocation in a Competitive Society: Report of the Secretary of Labor's Task Force on Economic Adjustment and Worker Dislocation 10 (1986).

With certain exceptions, the WARN Act requires an "employer" to provide its employees with sixty days' notice of a "plant closing" or "mass layoff." 29 U.S.C. § 2102. If the employer fails to do so, it may be liable to "each aggrieved employee" for up to sixty days' back pay and benefits. *Off'l Comm. of Unsecured Creditors v. United Healthcare System, Inc. (In re United Healthcare System, Inc.)*, 200 F.3d 170, 176 (3d Cir. 1999) (citing 29 U.S.C. § 2104(a)). "To prove a WARN Act violation, a plaintiff must show that: (1) the defendant was 'an employer;' (2) the defendant ordered a 'plant closing' or 'mass layoff;' (3) the defendant failed to give employees 60-days' notice before the closing or layoff; and (4) the plaintiff is an 'aggrieved' or 'affected' employee." *Easom v. US Well Serv., Inc.*, 527 F.Supp.3d 898, 903-04 (S.D. Tex. 2021) (citing 29

12

U.S.C. §§ 2102, 2104)). If a plaintiff proves these elements, "the employer may avoid liability by proving as an affirmative defense that it qualifies for one of the Act's exceptions: the 'faltering company' exception; the 'unforeseen business circumstances' exception; or the 'natural disaster' exception." *Id.* at 904 (citing 29 U.S.C. § 2102).

As numerous courts have held, "the WARN Act's exceptions permitting a reduction of the notice period run counter to the Act's remedial purpose and thus, are to be 'narrowly construed.'" *Easom v. US Well Servs., Inc.*, 37 F.4th 238, 244 (5th Cir. 2022) (quoting *Carpenters Dist. Council of New Orleans v. Dillard Dep't Stores, Inc.*, 15 F.3d 1275, 1282 (5th Cir. 1994)); *see generally Markowitz v. Ne. Land Co.*, 906 F.2d 100, 105 (3d Cir. 1990) (noting "the general rule of statutory construction that exemptions from remedial statutes such as the Act are to be narrowly construed"); *In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 249 (3d Cir. 2008).

Finally, Congress expressly authorized the Department of Labor ("DOL") to prescribe regulations carrying out the WARN Act. *See* 29 U.S.C. § 2107. "Such regulations shall, at a minimum, include interpretative regulations describing the methods by which employers may provide for appropriate service of notice as required by this chapter." *Id.*

## A.    The "Liquidating Fiduciary" Exception

Trustee argues on appeal that Art Van was not an "employer" under the WARN Act but rather a bankrupt entity functioning as a WARN-exempt "liquidating fiduciary." The WARN Act defines an "employer" as "any business enterprise that employs (A) 100 or more employees, excluding part-time employees; or (B) 100 or more employees who in the aggregate work at least 4,000 hours per week (exclusive of hours of overtime)." 29 U.S.C. § 2101(a)(1). The term "business enterprise" is not defined in the statute and not helpful in determining whether Art Van was an "employer" required to provide sixty days' notice prior to its termination of employees. As the Third Circuit noted in a similar situation, "[i]t is appropriate, therefore, to consider agency

13

regulations and comments as well as the caselaw." *In re United Healthcare*, 200 F.3d at 177. As Plaintiffs correctly point out, the DOL's interpretive WARN regulations are authoritative in the Third Circuit. *See id.* The DOL's comments to its regulations implementing the WARN Act ("DOL Commentary") explain whether a bankrupt entity is an "employer" under the WARN Act:

> [T]he Department does not think it appropriate to [exclude all bankrupt companies from the definition of "employer"]. Further, DOL agrees that a fiduciary *whose sole function* in the bankruptcy process is to liquidate a failed business for the benefit of creditors does not succeed to the notice obligations of the former employer because the *fiduciary is not operating a "business enterprise" in the normal commercial sense*. In other situations, *where the fiduciary may continue to operate the business for the benefit of creditors*, the fiduciary would succeed to the WARN obligations of the employer precisely because the fiduciary continues the business in operation.

Worker Adjustment and Retraining Notification, 54 Fed. Reg. 16042, 16045 (Apr. 20, 1989) (emphasis added). This DOL Commentary provides the basis for the "liquidating fiduciary"[5] exception to the WARN Act. *In re World Marketing Chicago, LLC*, 564 B.R. 587, 599 (Bankr. N.D. Ill. 2017) ("[B]ankruptcy courts that have considered the specific question of whether a liquidating fiduciary exception to the WARN Act applies have uniformly concluded that it does.").

The Bankruptcy Court determined that, while the Debtors announced their intention to liquidate prior to the Chapter 11 filing, and took steps toward liquidating, the Debtors' orderly wind-down process contemplated continued postpetition business operations for the benefit of creditors; therefore, the Bankruptcy Court determined, the "liquidating fiduciary" exception did not apply, and Debtors succeeded to the WARN obligations of an "employer." *In re Art Van Furniture*, 638 B.R. at 536. Trustee argues on appeal that the Bankruptcy Court erred in failing to apply the "liquidating fiduciary" exception because Debtors were not operating a "business

---

[5]    A debtor-in-possession or a trustee managing a Chapter 11 case is a fiduciary. *World Marketing,* 564 B.R. at 599 (citations omitted).

enterprise" in the "normal commercial sense;" rather, Trustee argues, Debtors' sole function at the time of the mass layoff was liquidating a failed business. (*See* D.I. 12 at 17-23).

The Court is not persuaded by Trustee's argument that Art Van was not an "employer" under the statute because it was not "operating a business enterprise" in the "normal commercial sense." As the DOL explained, Congress did not limit WARN's "employer" definition ("any business enterprise") to simply profit-making entities. Rather, any entity that is "engaged in business[,]"—even public and quasi-public entities—are WARN employers if they meet the employee threshold. 20 C.F.R. § 639.3(a)(1)(ii), 54 Fed. Reg. at 16042, 16065. For WARN purposes, engaging in business includes "supply[ing] a service or good on a mercantile basis." 20 C.F.R. § 639.3(a)(1)(ii). Art Van was a merchant that sold furniture and mattresses to retail customers in its stores.

The kind of "business" that Congress meant was further clarified in the DOL Commentary. Responding to a commenter who suggested that bankruptcy fiduciaries be categorically excluded from the definition of "employer," the DOL observed that such an exception could only apply to fiduciaries who have ceased their engagement in business entirely: "In other situations, *where the fiduciary may continue to operate the business for the benefit of creditors*, the fiduciary would succeed to the WARN obligations of the employer precisely because the fiduciary continues the business in operation." 54 Fed. Reg. at 16045 (emphasis added). Thus, a fiduciary that is a liquidating company remains an "employer" if the methods it uses to benefit creditors includes the continuation of operations in the normal commercial sense.

Addressing the issue of whether a liquidating company remains an "employer" under the WARN Act, the Third Circuit in its *United Healthcare* decision looked to whether the liquidating fiduciary "was operating an ongoing business enterprise, or whether it was merely engaged in the liquidation of assets." *United Healthcare*, 200 F.3d at 177. United Healthcare was a "not-for-

15

profit corporation that provided hospital and healthcare services." *Id.* at 172. The hospital's secured lender terminated all financing, rendering it unable to meet daily expenses, and its board voted to accept a third-party's offer to purchase all of its assets and close the hospital. *Id.* at 173. Three days later, the hospital surrendered its state-issued certificates of need, filed a voluntary Chapter 11 bankruptcy petition, and gave its employees notice that they would be terminated in 60 days. *Id.* Over the next 48 hours, the hospital transferred away or sent home all its patients, and its employees thereafter "were unable to perform their regular duties but instead cleaned, took inventory and prepared the company's assets for sale." *Id.* Sixteen days into the 60-day notice period, the hospital terminated the employees. *Id.* The court had to determine whether the hospital was a WARN "employer"—that is, a "business enterprise"—at the time of the layoffs. *Id.* at 176, citing 29 U.S.C. § 2101(a)(1). When the hospital surrendered its certificates of need and stopped treating patients, the court observed, the hospital had ceased "performing the everyday business functions of a hospital and health care service." 200 F.3d at 176. On the other hand, the hospital "remained a corporation" with employees. *Id.*

Finding no clear statutory guidance, the *United Healthcare* court considered the DOL regulation and Commentary and found that the question was whether United Healthcare was "engaged in business" during the time before the layoff. *Id.*, citing 20 C.F.R. § 639.3(a)(1)(ii). The inquiry, according to the Third Circuit, focuses on the entity's activities:

> [W]hether a bankrupt entity is an "employer" under the WARN Act depends on the nature and extent of the entity's business and commercial activities while in bankruptcy, and not merely on whether the entity's employees continue to work "on a daily basis." The more closely the entity's activities resemble those of a business operating as a going concern, the more likely it is that the entity is an "employer;" the more closely the activities resemble those of a business winding up its affairs, the more likely it is the entity is not subject to the WARN Act.

200 F.3d at 178. Applying this standard, the *United Healthcare* court considered the hospital's actions—its surrender of its certificates of need, its bankruptcy petition, and the discharge and

16

transfer of its patients. *Id.* The court then observed: "Significantly, after [the bankruptcy and certificate filings], but in any event no later than [after the patients left], its employees were no longer engaged in their regular duties but instead were performing tasks solely designed to prepare United Healthcare for liquidation." *Id.* United Healthcare's actions were not those of a WARN employer. *Id.* The activities revealed that the fiduciary had not continued operating the business as an ongoing concern. Therefore, it did not succeed to the employer's WARN obligations. *Id.*

As Plaintiffs correctly point out, the Third Circuit's "engaged in business" analysis is consistent with the DOL's "operating a business enterprise" standard. Both look objectively for the signs of normal operations within an entity's liquidation—not its thoughts, plans, or intentions—and focus upon the company's activities in the period immediately prior to the layoffs.

Unlike the case at bar, the business in *United Healthcare* presents a textbook case of a clean break between operations and liquidation-only activities: when it was open, the hospital was "performing the everyday business functions of a hospital and health care service," but upon losing its financing and having to close, the hospital's employees were reduced to liquidation-only activities—"cleaning, taking inventory and preparing assets for sale." *Id.* at 173. Because the entity's "sole function" at the time of the layoff was "liquidating a failed business," the liquidating fiduciary exception applied. 54 Fed. Reg. at 16045.

As Plaintiffs point out, the fiduciary here did not shut its doors and turn its retail-selling employers into cleaners and shippers of equipment, machines and other assets." (D.I. 20 at 9). Rather, the facts here demonstrate a "hybrid case," as the Bankruptcy Court characterized it— ongoing business operations within a liquidation. Art Van continued conducting retail sales which had been, and remained, precisely the commercial business they had always engaged in—and for the same purpose—to generate cash revenue. Art Van's lender funded it to continue normal retail operations to avoid a forced liquidation-type sale, like the one in *United Healthcare*. While

17

Debtors took a large step toward liquidation when it agreed to sell 44 of its Levin stores, that sale was conditioned upon those stores maintaining their normal operations while they remained in Debtors' hands. And Debtors' other "closing stores" operated no differently than its Levin "going forward" stores before Debtors pulled the plug on them all. Debtors maintained their retail operations in order to maximize and capture value for its creditors.

The Bankruptcy Court reached the wrong conclusion, according to Trustee, because the GOB sales operations which were ongoing at the time of the layoff were a "necessary" part of the Debtors' liquidation plan—merely "activities resembl[ing] those of a business winding up its affairs"—and did not constitute business operations in the normal commercial sense. "[T]here can be no reasonable dispute that the Debtors were at all relevant times—both pre-Petition Date and post-Petition Date—liquidating, as opposed to operating their business in the normal commercial sense, which they stopped doing before the Petition Date and certainly did not do in these Chapter 11 Cases." (D.I. 12 at 23). In support of this assertion, Trustee explains:

> Here, as in *United Healthcare*, the Debtors' actions from the beginning of the Chapter 11 Cases (and before) evidence a clear, open, and public intent from the outset to liquidate the Debtors' stores and other assets, and not to operate their business "in the normal commercial sense." … [A]ll of the Debtors' efforts at reorganizing as a going concern stopped even before the Petition Date, and in fact, all of the Debtors' efforts prepetition to reorganize were unsuccessful. As a result of this failure, and before the Petition Date, the Debtors hired the Liquidator, gave the GOB Sale WARN Notice and commenced GOB Sales, and issued a public statement telling the world that they were liquidating their assets. When the Debtors ultimately filed their Chapter 11 Cases on March 8, 2020, they intended to, and did, continue liquidating their assets through the GOB Sales and the Levin Sale. As of the Petition Date, and before the Layoff, the only business activities to be conducted by the Debtors were those necessary to continue liquidating their assets.

(*Id.* at 22-23). Trustee appears to argue that, by taking certain actions—hiring a liquidator, commencing the GOB Sales, issuing the GOB Sale WARN Notice, and publicly announcing their liquidation—Debtors immediately transformed themselves into WARN-exempt liquidating fiduciaries. But the relevant inquiry is not whether a fiduciary has a plan to liquidate. The question

18

is whether the act of liquidation included the running of operations. Most liquidations do not, and, as a result, most fiduciaries will not be WARN employers. But should a fiduciary come up with a plan to run its operations for the benefit of creditors or otherwise, that fiduciary comes within the WARN Act.

Trustee next asserts that Debtors' ongoing sales and business operations should lose their commercial, mercantile character because they were in service of their creditors, rather than their own profit. (*See* D.I. 12 at 6 (purpose of wind-down was to "maximize the liquidation value of the estates' assets and the recoveries for the Debtors' creditors"). Trustee's argument, however, ignores the bright line drawn by the DOL Commentary: "Where a fiduciary may continue to operate the business for the benefit of creditors, the fiduciary would succeed to the WARN obligations of the employer precisely because the fiduciary continues the business in operation." 54 Fed. Reg. at 16045. This portion of the DOL Commentary is absent from the Trustee's brief, despite the fact that it was relied upon by both the Bankruptcy Court and the Third Circuit.

Trustee further claims to find support in the *United Healthcare* case, arguing that case either "recognized" or "acknowledged" that "there would be gradations on the liquidating fiduciary scale and that a debtor's actions in connection with and/or in preparation of a goodwill/going concern sale (including limited postpetition business operations) can be consistent with and part of the liquidating fiduciary function and an exception to WARN liability." (D.I. 12 at 3, 21). Although such a proposition is not found in *United Healthcare* and is not supported with a cite, the Trustee asserts that the Bankruptcy Court's reading of *United Healthcare* was accordingly "overly narrow and erroneous." (*Id*. at 22). While the Third Circuit did speak of "gradations," and naturally understood the liquidating fiduciary function as including the sale of assets, the *United Healthcare* court specifically reserved the WARN exemption to cases in which an objective evaluation reveals no normal, ongoing commercial business activities. The Court

19

further finds no support for Trustee's assertion that the Third Circuit waived WARN liability for a fiduciary who operates the business either "in connection with and/or in preparation of" either a "goodwill" sale or a "going concern sale[.]" (*Id.* at 22). Nor did the Third Circuit make an exception when a fiduciary engages in a "limited postpetition business operations[.] (*Id.*) While all of these activities can be "consistent with and part of the liquidating fiduciary function," none of them support an exception to WARN liability.

Finally, Trustee places great weight on the fact that the asset-selling debtor in *United Healthcare* was still wrapping up a transfer of its "goodwill" asset when it terminated its employees. (*See* D.I. 12 at 19-21). According to Trustee, in reaching its conclusion that the hospital was a liquidating fiduciary, the *United Healthcare* court "expressly viewed the sale of the debtor's assets including the debtor's goodwill to an unrelated party named 'St. Barnabas' (the 'St. Barnabas Sale') early in the chapter 11 case as part and parcel of, and consistent with, the debtor's liquidation which was subject to the liquidating fiduciary exception." *Id.* at 179. But the sales activities in these two cases are not analogous. As Plaintiffs point out, "goodwill" and "going concern" are terms used for valuation purposes when selling a business; they represent the intangible assets such as loyalty that go with the sale of the tangible assets, and buyers may pay extra for these intangibles when they plan to keep the business going. What the terms do not convey is whether, at the point of sale, the business operations happen to be ongoing or not— which is the dispositive factor for the application of the WARN exemption. This argument further conflates the ongoing sale of abstract goodwill in *United Healthcare* with Debtors' ongoing brick and mortar operations. As the Third Circuit and Bankruptcy Court recognized, the dispositive issue is whether the business is operating, not whether accounting valuation terms such as "going concern" and "goodwill" apply.

20

In sum, the Bankruptcy Court's decision was a straightforward application of the DOL regulations and Commentary and Third Circuit precedent. Applying *United Healthcare*, the Bankruptcy Court took into account the fact that Art Van was a fiduciary liquidating a business. Debtors' post-petition activities here, however, were the same as its pre-petition ones, in that they were continuing to carry on the same business as a going concern, and "[w]here a fiduciary may continue to operate the business for the benefit of creditors, the fiduciary would succeed to the WARN obligations of the employer precisely because the fiduciary continues the business in operation." *United Healthcare*, 200 F.3d at 177 (citing 54 Fed. Reg. at 16045)). The Court will therefore affirm the Bankruptcy Court's determination that the facts of this case do not satisfy the "liquidating fiduciary" exception.

Because the Court agrees with the Bankruptcy Court that Art Van was not a WARN-exempt "liquidating fiduciary," the Court will turn to the affirmative defenses available to an "employer" under the Act.

## B. The "Natural Disaster" Exception

The "natural disaster" exception provides that "No notice under [the WARN Act] shall be required if the plant closing or mass layoff is *due to any form of natural disaster, such as a flood, earthquake, or the drought* currently ravaging the farmlands of the United States." 29 U.S.C. § 2102(b)(2)(B) (emphasis added). The statute and the DOL regulations state that the "natural disaster" exception applies to "any form of a natural disaster." *Id.*; 20 C.F.R. § 639.9(c). The regulations list "[f]loods, earthquakes, droughts, storms, tidal waves or tsunamis *and similar effects of nature*" as natural disasters under the WARN Act. *Id.* The regulations further state that "[t]o qualify for [the natural disaster] exception, an employer must be able to demonstrate that its plant closing or mass layoff is a *direct result* of a natural disaster." 20 C.F.R. § 639.9(c)(2) (emphasis added);

21

In granting summary judgment, the Bankruptcy Court determined that the COVID-19 pandemic is a "natural disaster" and that the March 20, 2020 layoff was "due to" the pandemic. Because the DOJ regulations list "[f]loods, earthquakes, droughts, storms, tidal waves or tsunamis *and similar effects of nature,*" 20 C.F.R. § 639.9(c) (emphasis added), the Bankruptcy Court framed the inquiry as "whether COVID-19 arose from the 'effects of nature.'" *In re Art Van Furniture*, 638 B.R. at 541. The Bankruptcy Court noted "[n]umerous courts … have considered this issue and concluded that the COVID-19 pandemic is a natural disaster." *Id.* The Bankruptcy Court was persuaded by the district court's analysis in *Easom v. US Well Services, Inc.*, 527 F. Supp. 3d 898 (S.D. Tex. 2021). The district court in *Easom* reasoned that "COVID-19 is clearly a 'disaster'" as "two million people lost their lives," and also qualifies as a "natural disaster" because "human beings were not responsible for starting or consciously spreading the virus." *Easom*, 527 F. Supp. 3d at 908. "Based on the reasoning in *Easom* and the many cases cited therein," the Bankruptcy Court was satisfied that the COVID-19 pandemic qualified as a "natural disaster" under the WARN Act.

On appeal, Plaintiffs and *Amici* argue that the Bankruptcy Court erred in relying on the statutory construction espoused in *Easom*—a decision which was subsequently overturned by the Fifth Circuit, 37 F.4th at 244—along with inapposite cases having nothing to do with the WARN Act. In so holding, Plaintiffs and *Amici* argue, the Bankruptcy Court expanded the scope of the "natural disaster" exception to cover not only the direct effect of natural disasters, but also economic downturns and government regulations spurred by a viral pandemic. Such an application of the "natural disaster" exception, they argue, would significantly impair the WARN Act's remedial purpose. The Court is persuaded by the Fifth Circuit's construction of the statute. Legislative history and DOL regulations and guidance would further support that construction.

22

As noted, in reaching its conclusion, the Bankruptcy Court relied principally on the district court's opinion in *Easom*. *See In re Art Van Furniture*, 638 B.R. at 540-42. In *Easom*, the employer argued, and the district court accepted, that COVID-19 was a form of natural disaster contemplated by Congress' use of the word "any" in "any form of natural disaster." *Easom*, 527 F. Supp. 3d at 909; 29 U.S.C. § 2102(b)(2)(B). The Fifth Circuit disagreed. *Easom*, 37 F.4th at 243-44. Citing Supreme Court precedent, the Fifth Circuit noted that even the breadth of the word "any" is limited by the canon of *noscitur a sociis*. *Id*. This canon "counsels that a word is given more precise content by the neighboring words with which it is associated." *Id*. at 243 & n.1 (citing *Yates v. United States*, 574 U.S. 528, 544 (2015)). "Courts rely on the canon of *noscitur a sociis* to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Yates*, 574 U.S. at 543. Here, the Fifth Circuit noted, Congress followed "any natural disaster" with a list of examples: "flood, earthquake, or drought." 29 U.S.C. § 2102(b)(2)(B). In doing so, the Fifth Circuit held, Congress meant to limit the term's scope to "hydrological, geological, and meteorological events," *Easom*, 37 F.4th at 244. That is, disasters that could physically affect a plant, store, or farm.

The Fifth Circuit further determined that a second canon of construction supported the view that COVID-19 is not a WARN "natural disaster." The canon *expressio unius est exclusion* provides that where, as here, "the items expressed are members of an 'associated group or series,' [that] justif[ies] the inference that items not mentioned were excluded by deliberate choice, not inadvertence." *Id*. at 244 (quoting *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003)). The Fifth Circuit reasoned that when it enacted WARN, "Congress was familiar with pandemics and infectious diseases" and had enacted other legislation addressing those phenomena. *Id*. "Congress' decision not to include disease in WARN's 'natural disaster' examples indicates a

deliberate exclusion." *Id.* The Court agrees with the Fifth Circuit's application of the canons of *noscitur a sociis* and *expressio unius est exclusion,* and is persuaded that Congress's decision to specify only disasters that could render continued operation of a facility physically impossible supports an inference that they did not intend to include other types of calamities, even if they could conceivably be considered a "natural disaster" under other definitions.

Finally, the Fifth Circuit looked beyond the clause to the statute itself. It found Congress' purpose in enacting it was "remedial" based on the legislative history recognized by the Third Circuit of Appeals: WARN was "adopted in response to the extensive worker dislocation that occurred in the 1970s and 1980s." *Id.* (citing *Hotel Emps. & Rest. Emps. Int'l Union Loc. 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 182 (3d Cir. 1999)). The panel therefore "declined to expand the definition of 'natural disaster' beyond what is justified by the Act's statutory language, context, and purpose." *Easom*, 37 F.4th at 244.

Even if the statute itself were ambiguous, Congress expressly authorized the DOL to prescribe regulations implementing the WARN Act. *See* 29 U.S.C. § 2107. The DOL has explained that "[w]here a plant closing or mass layoff occurs as an ***indirect result*** of a natural disaster, the ["natural disaster"] exception does not apply but the "unforeseeable business circumstance" exception … may be applicable." 20 C.F.R. § 639.9(c)(4) (emphasis added). The DOL regulations, which are due deference, therefore interpret the "unforeseeable business circumstance" exception—not the "natural disaster" exception—in the WARN Act to cover instances, like the one here presented, where a natural disaster causes downstream effects such as regulatory changes or economic downturns, which in turn prompt a mass layoff.[6]

---

[6]    The DOL further issued guidance explaining that layoffs related to COVID-19 should be considered under the "unforeseeable business circumstance" exception. *See* U.S. Dep't of Labor, Worker Adjustment and Retraining Notifications Act Frequently Asked Questions

Finally, in holding that COVID-19 qualifies as a "natural disaster" under the WARN Act, the Bankruptcy Court cited a handful of cases that found COVID-19 fit within clauses of unrelated statutes or contracts that referred to "natural disasters." *In re Art Van Furniture*, 638 B.R. at 542, n.111 ("Numerous courts, however, have considered this issue and concluded that the COVID-19 pandemic is a natural disaster"). But as *Amici* point out, these cases have nothing to do with the WARN Act and shed no light on how the particular language of the WARN Act should be construed. For example, one case dealt with the Pennsylvania Emergency Code, which applies to all "man-made [or] natural disaster[s]" as long as they threaten, cause, or result in "substantial damage to property, *hardship, suffering or possible loss of life*," as well as "war-caused disasters" that result in "substantial damage to property or *injury to persons in the United States*." 35 Pa. Stat. & Cons. Stat. Ann. § 7102 (West 2020) (emphasis added); *see Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 887 (Penn. 2020). Another dealt with the Pennsylvania Election Code, which grants "authority to provide relief when there is a natural disaster *or emergency*." *Penn. Democratic Party v. Boockvar*, 238 A.3d 345, 363 (Penn. 2020) (emphasis added) (internal quotation marks omitted). As *Amici* correctly point out, these are state statutes designed to ensure the government has adequate power to respond to emergencies *of any nature*; they are not provisions delineating a limited exception to a remedial federal statute. The fact that COVID-19 may qualify as a "natural disaster" in some statutory contexts does not mean it does so in all statutory contexts. Other cases included in the Bankruptcy Court's string citation considered clauses in contracts between private parties, which are even less probative here, and the wording and context of those clauses similarly show an intent to sweep far broader than the WARN Act's language. *See JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 507 F.Supp.3d 490, 496

---

2, https://bit.ly/3LFjN3G (last visited Dec. 11, 2022). While this guidance document is not controlling, it is consistent with the Fifth Circuit's determination in *Easom*.

(S.D.N.Y. 2020) (contractual provision referring to any "circumstances beyond our or your reasonable control, including, without limitation, as a result of natural disaster …"); *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *53–54 (Del. Ch. Nov. 30, 2020) (contractual provision referring generally to "natural disasters or calamities").

Based on the Fifth Circuit's thoughtful construction, the DOL regulations, and the remedial purpose of the statute, the Court must agree that the COVID-19 pandemic does not satisfy the WARN Act's "natural disaster" exception, and the Order is reversed with respect to that holding.

## C.    The "Unforeseeable Business Circumstances" Exception

The "unforeseeable business circumstances" (or "UBC") exception to the WARN Act provides that: "An employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. § 2102(b)(2)(A). The employer bears the burden of proving that this exception applies by establishing that two conditions are met: (1) the circumstance was unforeseeable, and (2) the layoffs were caused by that circumstance. *Gross v. Hale-Halsell Co.*, 554 F.3d 870, 875 (10th Cir. 2009) (citing *Roquet v. Arthur Andersen LLP*, 398 F.3d 585, 588 (7th Cir. 2005)). The court should evaluate the UBC exception objectively and at the time the decisions were made. *In re Jevic Holding Corp.*, 496 B.R. 151, 161 (Bankr. D. Del. 2013) (citations omitted).

Plaintiffs did not contest foreseeability; rather, they argued that the Trustee had not satisfied his burden of demonstrating that the pandemic "caused" the layoff. Regarding causation, the Bankruptcy Court accepted undisputed facts that the Debtors were in dire financial straits leading up to the Chapter 11 filing; the Debtors filed Chapter 11 to pursue an orderly wind-down of operations and liquidation of their assets; COVID-19, and the government-ordered business closures (or threatened closures) and the restriction of residents to their homes, prevented the

26

Debtors from conducting the GOB sales and completing the orderly liquidation of its business. *In re Art Van Furniture*, 638 B.R. at 538-39. Once an employer comes forward with evidence that, if unrebutted, would establish a defense to a WARN Act violation, the burden shifts to the employee to "produce 'evidence in the record creating a genuine issue of material fact.'" *FBI Wind Down, Inc.*, 614 B.R. 460, 472 (Bankr. D. Del. 2020)). Without an opportunity to conduct discovery, Plaintiffs countered that COVID-19 did not ***mandate*** the Debtors' mass layoff of employees on March 20, 2020, as other options, including a temporary employee furlough, existed. Moreover,

> Plaintiffs pointed to statements made by counsel for the Debtors, Wells Fargo, and the Creditor Committee at a hearing on March 19, 2020, where counsel all suggested that the parties were working on alternatives to "pulling the plug" and avoid an immediate shutdown. Plaintiffs also point out that the permanent mass layoff triggered "insurmountable obligations" of at least $16.5 million arising from commissions suddenly due when salespeople were laid off, and an even more substantial tail created by the partially self-funded health plan which was cancelled on March 19, 2020.

*In re Art Van Furniture*, 638 B.R. at 538, n.92 & 93. Finally, Plaintiffs cited Wells Fargo's statements at the March 19 hearing that, while it wanted to "find a path forward for all stakeholders," Debtors had not "fully come to their creditors," made Wells Fargo aware of its decisions only "minutes before these hearings," and that "there had been no contemplation of a wholesale mass termination of employees." (3/19/20 Tr. at 27:9-28:13, 30:1-9, 37:4-9).

The Bankruptcy Court determined the record evidence proffered by Plaintiffs did not demonstrate disputed issues of material facts casting doubt on the causation element of Debtors' defense—that "COVID-19 was the proverbial 'straw that broke the camel's back' and caused the March 20, 2020 layoff." *In re Art Van Furniture,* 638 B.R. at 539. Even viewing all inferences in favor of the Plaintiffs, the Bankruptcy Court determined that:

> Statements showing that the Debtors' actions were unanticipated or resulted in greater financial distress do not indicate disputed facts concerning the cause of the

27

> layoff. Rather, those facts underscore that the impact of COVID-19 was sudden and unexpected to other parties as well as the Debtors. Counsels' statements expressing a hope that the closure would only 'pause' the orderly liquidation process as the parties explored alternatives to 'outright liquidation' also do not refute the cause of the layoff. Plaintiffs' argument that temporary furloughs could have been a better option for the Debtors is not a factual dispute, but merely debating the Debtors' actions in hindsight.

*Id.* at 539. The Court agrees with the Bankruptcy Court's determination that this evidence does not meet the standard. Plaintiffs were required to "produce 'evidence in the record creating a genuine issue of material fact.'" *In re FBI Wind Down* 614 B.R. at 472. "The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (quoting *Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989)). Plaintiffs failed to produce such "evidence in the record." That might be the end of the matter had Plaintiffs been permitted to develop such record evidence in the first place.

The WARN Act's exceptions are narrow, fact-bound defenses that ask whether the circumstances to which the employer points actually caused the layoffs. The Bankruptcy Court denied Plaintiffs' Cross-Motion to defer ruling to take discovery on the Trustee's defenses. As Plaintiffs and *Amici* correctly argue, without an opportunity for discovery, employees have no ability to test this crucial question. The Court agrees that the Bankruptcy Court abused its discretion in granting summary judgment under Rule 56 without allowing Plaintiffs to take discovery under Rule 56(d).

"[I]t is well established that a court 'is obliged to give a party opposing summary judgment an adequate opportunity to obtain discovery.'" *Abington Friends*, 480 F.3d at 257 (citing *Dowling v. City of Philadelphia*, 855 F.2d 136, 139 (3d Cir. 1988)). This is necessary because, by its very nature, the summary judgment process presupposes the existence of an adequate record. *Abington*

28

*Friends*, 480 F.3d at 257; *see also* Fed. R. Civ. P. 56(c) (summary judgment is decided on the basis of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any"); *Liberty Lobby,* 477 U.S. at 257 (explaining the non-moving party's burden at summary judgment rests on the assumption that the party "had a full opportunity to conduct discovery").

The non-movant, in response to a motion for summary judgment, may bring a motion to defer a ruling. Fed. R. Civ. P. 56(d). "District courts usually grant properly filed Rule 56(f) [now Rule 56(d)] motions as a matter of course." *Abington Friends*, 480 F.3d at 256 (citing *St. Surin v. V.I. Daily News, Inc.*, 21 F.3d 1309, 1314 (3d Cir. 1994) (internal quotation marks omitted)). The propriety of such a motion is particularly evident when there are discovery requests outstanding or where relevant facts are under the control of the moving party. *See Ward v. United States*, 471 F.2d 667, 670 (3d Cir. 1973) (where moving party controls evidence, motions to continue summary judgment "should, we think, ordinarily be granted almost as a matter of course"); *Costlow v. United States*, 552 F.2d 560, 562–64 (3d Cir. 1977) (citing *Ward* and finding error in lower court's denial of such a motion)). If discovery is incomplete in any way material to a pending summary judgment motion, the court is not justified in denying the non-movant's motion to continue summary judgment. *See Miller v. Beneficial Mgmt. Corp.,* 977 F.2d 834, 845–46 (3d Cir.1992) (where defendant's employees, who participated in the promotion and salary decisions regarding the plaintiff, had not been deposed, lower court abused discretion in deciding summary judgment on plaintiff's discrimination claims without allowing opportunity for discovery).

It appears undisputed that Trustee moved for summary judgment having produced a total of three largely redacted documents (PA01014 ¶ 7), and less than two weeks after serving an Amended Answer asserting an additional affirmative defense. (PA00036; PA00063; PA00065; PA00097). Plaintiffs Cross-Motion to defer ruling on the summary judgment motion explained

29

that such a decision would be premature as Plaintiffs had not had an opportunity to conduct meaningful discovery on the Trustee's fact-intensive affirmative defenses. (PA00985-PA00986). The Roupinian Declaration attached to Plaintiffs' opposition and Cross-Motion detailed the numerous discovery requests which were pending at the time the Trustee moved for summary judgment. (PA01012-PA01015). The Declaration further identified the topics that were needed to respond to the factual allegations underlying Art Van's "unforeseeable business circumstance" affirmative defense. (*See* Declaration, ¶ 15 (PA01015) (Plaintiffs could not adequately oppose the defenses without discovery on "Defendants' purported liquidation process, the operations of the stores during the pendency of the bankruptcy, Defendants' efforts to obtain financing, and the decision-making process that led to the terminations of Defendants' employees.")) In sum, Plaintiffs had sought discovery of decisional documents and communications leading up to the employee terminations—documents which are probative of the cause element and therefore material to Plaintiff's ability to test the Trustee's affirmative defense. (PA00982-86; PA01274).

Indeed, Plaintiffs went beyond the requirements of Rule 56(d) by stating in their papers facts already in the record which may undermine Debtors' affirmative defenses, such as the discrepancies between Debtors' in-court and out-of-court explanations for the layoffs and abandonment of the wind-down plan, and Wells Fargo's claim that Art Van had not provided sufficient information to support the wind-down plan. But such an affirmative showing is not necessary for Rule 56(d) purposes. *See Abington*, 480 F.3d at 258 n.8 (rejecting defendant's argument that plaintiffs needed to "detail[] those facts within their knowledge that might" rebut the defendant's summary judgment theory, holding that "[w]e will not fault the Does for failing to provide information principally within the control of Abington and which they could only have known secondhand."); *Harley v. Paulson*, 2008 WL 5189931, at *6 (D.N.J. Dec. 9, 2008)

30

("Plaintiff must be given an opportunity to seek contradictory evidence in Defendant's possession.").

A court cannot grant summary judgment on the ground that "Plaintiffs' proffered evidence … is tenuous," while also denying Plaintiffs discovery into questions to which the Federal Rules entitle them. *Abington Friends*, 480 F.3d at 257 ("If discovery is incomplete in any way material to a pending summary judgment motion, a district court is justified in not granting the motion.") The Opinion faults Plaintiffs for failing to produce evidence in the record creating a genuine issue of material fact casting doubt as to the cause of the layoff, but any such evidence was in the Trustee's possession, and Plaintiffs were denied the opportunity to obtain the documents or deposition testimony necessary to test that element. Indeed, the Court has found no other decision granting summary judgment on the "unforeseeable business circumstance" defense—or any other affirmative defense under WARN—except on an evidentiary record after the close of discovery. The Bankruptcy Court's decision to deny the Cross-Motion to defer ruling was an abuse of discretion. Accordingly, this Court will reverse and remand the case to allow for discovery on the merits of the "unforeseeable business circumstance" defense.

## IV.    CONCLUSION

For the reasons set forth herein, the Order is affirmed in part and reversed in part. An appropriate order follows.

31