**Exhibit B**



| INVOICE NO. BALN417993 | KUEHNE+NAGEL |
|---|---|
| | KN SALES INVOICE |

**INVOICE TO**
ART VAN FURNITURE
6500 14 MILE RD
WARREN MI 48092
UNITED STATES

| | |
|---|---|
| **KN TRACKING NUMBER** | **1030 479 924** |
| KN ACCOUNTING NO. | 1030479924-2510 |
| ACCOUNT NUMBER | 8217017 |
| INVOICE NO. / DATE | BALN417993 03/04/2020 |
| DUE DATE | 04/03/2020 |

**CONSIGNEE**
ART VAN FURNITURE
6500 14 MILE RD
WARREN MI 48092
UNITED STATES

**SHIPPER**
JIAXING MOTION FURNITURE CO., LTD.
NO. 68 NANXING ROAD WEITANG STREET
314100 JIAXING ZHEJIANG
CHINA

**NOTIFY**

| | | | |
|---|---|---|---|
| **VESSEL NAME** | : ONE CONTINUITY | **VOYAGE NUMBER** | : 049E |
| **PL. OF RECEIPT** | : | **MOVEMENT TYPE** | : CY/CY |
| **P. OF LOADING** | : NINGBO | **ETD/ATD** | : 01/11/2020 |
| **P. OF DISCHARGE** | : VANCOUVER, BC | **ETA/ATA** | : 02/17/2020 |
| **PL. OF DELIVERY** | : WARREN, MI | **DANGEROUS GOODS** | : NO |
| **TERMS OF TRADE** | : FOB NINGBO | **INSURAN. STATUS** | : NOT ARRANGED BY KN |

| MARKS & NOS | QTY TYPE | DESCRIPTION OF GOODS | WGHT | VOL |
|---|---|---|---|---|
| | 3 40' HC | AS PER ATTACHED | 13230.00 | 186.960 |

| CODE | CHARGE NAME | USD | | |
|---|---|---|---|---|
| 550 | SEAFREIGHT | 8,703.00 | | |
| 570 | BUC - BUNKER CHARGE | 2,433.00 | | |
| 581 | AMS/ACI SECURITY FEE | 35.00 | | |
| 805 | ONCARRIAGE | 648.00 | | |
| 813 | FUEL CHARGE ONCARRIAGE | 162.00 | | |
| 830 | CHASSIS RENTAL FEE DESTINATION | 600.00 | | |
| 881 | ISPS FEE | 36.00 | | |
| 711 | ISF SERVICE FEE | 10.00 | | |
| 707 | CUSTOMS ENTRY FEE | 65.00 | | |
| | SUBTOTAL | USD | | 12,692.00 |
| | **INVOICE TOTAL** | USD | | **12,692.00** |
| | | | | =============== |
| | | | | PAYABLE |

CTD NUMBER: HLCUNG11912CDMM5
AMS NUMBER: BANQNGB4043473

THE SHIPMENT IS PRODUCING 29937.00 KG CO2 EMISSIONS FROM NINGBO TO WARREN, MI
PORT TO PORT AND INLAND EMISSIONS ARE BASED ON CCWG AND EN 16258 METHODOLOGIES,
RESPECTIVELY.
IMPORTER OF RECORD: PAYMENT TO THE BROKER WILL NOT RELIEVE YOU OF
LIABILITY FOR CUSTOMS CHG IN THE EVENT THE CHG ARE NOT PAID BY THE
BROKER. CUSTOMS CHG MAY BE PAID WITH A SEPARATE CHECK PAYABLE TO THE
"BUREAU OF CUSTOMS & BORDER PROTECTION" WHICH SHALL BE DELIV.TO CUSTOMS
BY THE BROKER (19 CFR 111.29(B)).
ENTRY NUMBER: 101-6405486-8
ENTRY DATE: 02/14/2020

THESE COMMODITIES, TECHNOLOGY OR SOFTWARE WERE EXPORTED FROM THE UNITED STATES IN ACCORDANCE WITH THE EXPORT ADMINISTRATION REGULATIONS. DIVERSION CONTRARY TO U.S. LAW IS PROHIBITED.

| KUEHNE + NAGEL INC. FMC#001162NF | Tel: 1 (410) 412-7263 | **Remit To:** Kuehne + Nagel Inc. | **Kuehne + Nagel Inc.** |
|---|---|---|---|
| 810 LANDMARK DRIVE | Fax: 1 (410) 412-7288 | CITI Bank N.A. / ABA # 021000089 | |
| SUITE 221-229 | www.kuehne-nagel.com | Swift Code CITIUS33 A/C# 30789655 | ANN HOUGH |
| GLEN BURNIE, MD 21061 USA | FMC#001162NF CHB#4455 | | |

KMSTDWSUS 00026573532020-03-04T07:27:03.886-05:00SAUSMULTT

# TERMS AND CONDITIONS OF SERVICE

These terms and conditions of service constitute a legally binding contract between Kuehne+Nagel, Inc. (the "Company") and the "Customer". In the event the Company renders services and issues a document containing Terms and Conditions governing such services, the Terms and Conditions set forth in such other document(s) shall govern those services to the extent they are inconsistent with these terms and conditions. When affiliates of the Company provide services to Customer, their standard trading terms and conditions will govern such services.

**1. Definitions.**
 (a) **"Company"** shall mean *Kuehne + Nagel, Inc.*, its subsidiaries, agents and/or representatives;
 (b) **"Customer"** shall mean the person for which the Company is rendering service, as well as its agents and/or representatives. It is the responsibility of the Customer to provide notice and copy(s) of these terms and conditions of service to its agents or representatives;
 (c) **"Documentation"** shall mean all information received directly or indirectly from Customer, whether in paper or electronic form;
 (d) **"Ocean Transportation Intermediaries"** ("OTI") shall include an "ocean freight forwarder" and a "non-vessel operating carrier";
 (e) **"Third parties"** shall include, but not be limited to, the following: "carriers, truckmen, cartmen, lightermen, forwarders, OTIs, customs brokers, agents, warehousemen and others to which the goods are entrusted for transportation, cartage, handling and/or delivery and/or storage or otherwise".

**2. Company as agent.** The Company acts as the "agent" of the Customer for the purpose of performing duties in connection with the entry and release of goods, post entry services, the securing of export licenses, the filing of export documentation on behalf of the Customer and other dealings with Government Agencies: as to all other services, Company acts as an independent contractor.

**3. Limitation of Actions.**
 (a) All claims against Company for a potential or actual loss must be made in writing and received by Company within ninety (90) days of the event giving rise to claim; the failure to give Company timely notice shall be a complete defense to any suit or action commenced by Customer.
 (b) All suits against Company must be filed and properly served on Company as follows:
   (i) For claims arising out of ocean transportation, within one (1) year from the date of the loss;
   (ii) For claims arising out of air transportation, within two (2) years from the date of the loss;
   (iii) For claims arising out of the preparation and/or submission of an import entry(s), within seventy five (75) days from the date of liquidation of the entry(s);
   (iv) For any and all other claims of any other type, within two (2) years from the date of the loss or damage.

**4. No Liability For The Selection or Services of Third Parties and/or Routes.** Unless services are performed by persons or firms engaged pursuant to express written instructions from the Customer, Company shall use reasonable care in its selection of third parties used for the handling, transportation, clearance and delivery of the shipment. Unless the Company carries, stores or otherwise physically handles the shipment, and the loss, damage, expense or delay occurs during such activity, the Company assumes no liability as a carrier, and is not to be held responsible for any loss, damage, expense or delay to the shipment. Advice by the Company that a particular person or firm has been selected to render services with respect to the goods, shall not be construed to mean that the Company warrants or represents that such person or firm will render such services nor does Company assume responsibility or liability for any action(s) and/or inaction(s) of such third parties and/or its agents, and shall not be liable for any delay or loss of any kind, which occurs while a shipment is in the custody or control of a third party or the agent of a third party; all claims in connection with the act of a third party shall be brought solely against such party and/or agents; in connection with any such claim, the Company shall reasonably cooperate with the Customer, which shall be liable for any charges or costs incurred by the Company.

**5. Quotations Not Binding.** Quotations as to fees, rates of duty, freight charges, insurance premiums or other charges given by the Company to the Customer are for informational purposes only and are subject to change without notice; no quotation shall be binding upon the Company unless the Company in writing agrees to undertake the handling or transportation of the shipment at a specific rate or amount set forth in the quotation and payment arrangements are agreed to between the Company and the Customer.

**6. Reliance On Information Furnished.**
 (a) Customer acknowledges that it is required to review all documents and declarations prepared and/or filed with the Customs Service, other Government Agency and/or third parties, and will immediately advise the Company of any errors, discrepancies, incorrect statements, or omissions on any declaration filed on Customers behalf;
 (b) In preparing and submitting customs entries, export declarations, applications, documentation and/or export data to the United States and/or a third party, the Company relies on the correctness of all documentation, whether in written or electronic format, and all information furnished by Customer; Customer shall use reasonable care to insure the correctness of all such information and shall indemnify and hold the Company harmless from any and all claims asserted and/or liability or losses suffered by reason of the Customer's failure to disclose information or any incorrect or false statement by the Customer upon which the Company reasonably relied. The Customer agrees that the Customer has an affirmative non-delegable duty to disclose any and all information required to import, export or enter the goods.

**7. Declaring Higher Value to Third Parties.** Third parties to whom the goods are entrusted may limit liability for loss or damage; the Company will request excess valuation coverage only upon specific written instructions from the Customer, which must agree to pay any charges therefor; in the absence of written instructions or the refusal of the third party to agree to a higher declared value, at Company's discretion, the goods may be tendered to the third party, subject to the terms of the third party's limitations of liability and/or terms and conditions of service.

**8. Insurance.** Unless requested to do so in writing and confirmed to Customer in writing, Company is under no obligation to procure insurance on Customer's behalf; in all cases, Customer shall pay all premiums and costs in connection with procuring requested insurance.

**9. Disclaimers; Limitation of Liability.**
 (a) Except as specifically set forth herein, Company makes no express or implied warranties in connection with its services;
 (b) Subject to (c) below, Customer agrees that in connection with any and all services performed by the Company, the Company shall only be liable for its negligent acts, which are the direct and proximate cause of any injury to Customer, including loss, delay or damage to Customer's goods, and the Company shall in no event be liable for the acts of third parties;
 (c) In connection with all services performed by the Company, Customer may obtain additional liability coverage, up to the actual or declared value of the shipment or transaction, by requesting such coverage and agreeing to make payment therefor, which request must be confirmed in writing to the Company prior to rendering services for the covered transaction(s).
 (d) In the absence of additional coverage under (b) above, the Company's liability shall be limited to the following:
   (i) where the claim arises from activities other than those relating to customs brokerage, $50.00 per shipment or transaction, or
   (ii) where the claim arises from activities relating to "Customs business," $50.00 per violation or the amount of brokerage fees paid to Company for the entry, whichever is less;
 (e) In no event shall Company be liable or responsible for consequential, indirect, incidental, statutory or punitive damages, even if it has been put on notice of the possibility of such damages.

**10. Advancing Money.** All charges must be paid by Customer in advance unless the Company agrees in writing to extend credit to customer; the granting of credit to a Customer in connection with a particular transaction shall not be considered a waiver of this provision by the Company.

**11. Indemnification/Hold Harmless.** The Customer agrees to indemnify, defend, and hold the Company harmless from any claims and/or liability arising from the importation or exportation of customers merchandise and/or any conduct of the Customer, which violates any Federal, State and/or other laws, and further agrees to indemnify and hold the Company harmless against any and all liability, loss, damages, costs, claims and/or expenses, including but not limited to reasonable attorney's fees, which the Company may hereafter incur, suffer or be required to pay by reason of such claims; in the event that any claim, suit or proceeding is brought against the Company, it shall give notice in writing to the Customer by mail at its address on file with the Company.

**12. C.O.D. or Cash Collect Shipments.** Company shall use reasonable care regarding written instructions relating to "Cash/Collect" on "Deliver (C.O.D.)" shipments, bank drafts, cashier's and/or certified checks, letter(s) of credit and other similar payment documents and/or instructions regarding collection of monies but shall have no liability if the bank or consignee refuses to pay for the shipment.

**13. Costs of Collection.** In any dispute involving monies owed to Company, the Company shall be entitled to all costs of collection, including reasonable attorney's fees and interest at 15% per annum or the highest rate allowed by law, whichever is less, unless a lower amount is agreed to by Company.

**14. General Lien and Right To Sell Customer's Property.**
 (a) General Lien. Company shall have a general and continuing lien on any and all property (and documents relating thereto) of Customer in its possession, custody, control, or en route / in transit, or coming into Company's actual or constructive possession or control, for monies owed to Company with regard to the shipment on which the lien is claimed, a prior shipment(s) and/or both, including for all claims for charges, expenses, or advances incurred by the Company in connection with any shipments of the Customer.
 (b) Notice. Company shall provide written notice to Customer of its intent to exercise such lien, the exact amount of monies due and owing, as well as any on-going storage or other charges. Customer shall notify all parties having an interest in its shipment(s) of Company's rights and/or the exercise of such lien.
 (c) Right to Sell. Unless, within thirty days of receiving notice of lien, Customer posts cash or letter of credit at sight, or an acceptable bond equal to 110% of the value of the total amount due, in favor of Company, guaranteeing payment of the monies owed, plus all storage charges accrued or to be accrued, Company shall have the right to sell shipment(s), including goods, wares, or merchandise as may be necessary to satisfy such lien, at public auction or private sale and any net proceeds remaining thereafter, after payment of amounts due Company, shall be refunded to Customer, provided that Customer shall remain liable for any deficiency arising from the sale.
 (d) Warehouseman's Lien. In connection with warehouse services provided by Company, Company shall have a general warehouse lien for all lawful charges for storage and preservation of goods; also for all lawful claims for money advanced, interest, insurance, transportation, labor, weighing coopering, and other charges and expenses in relation to such goods, and for the balance on any other accounts that may be due. Company further claims a general warehouse lien for all such charges, advances and expenses with respect to any other goods stored by Customer in any other facility owned or operated by Company. In order to protect its lien, Company reserves the right to require advance payment of all charges prior to shipment of goods.
 (e) Limitation of Damages for Goods Stored. Company shall not be liable for any loss or damage to goods tendered, stored or handled, however caused unless such loss or damage resulted from the failure by Company to exercise such care in regard to them as a reasonably careful person would exercise under like circumstances and Company is not liable for damages which could not have been avoided by the exercise of such care. Customer declares that damages for loss, damage or delay are limited to $.50 per pound provided, however, that such liability may be increased upon Customer requesting in writing such excess valuation coverage and agreeing to make payment therefor, which request must be confirmed in writing by the Company.
 (f) Liability. Any liability of Company for whatever reason shall in any event be limited to a maximum of $10,000 per event or series of events with one and the same cause of damage. In further consideration of the rates herein, and in keeping with the definitions of company's legal liability as a warehouseman contained herein and in Article 7-204 of the Uniform Commercial Code, Customer agrees to a shrinkage allowance of 0.5 % of the value of the goods stored for which, in the case of loss or damage to goods or mysterious disappearance, however caused, Company will not be liable.

**15. No Duty To Maintain Records For Customer.** Customer acknowledges that pursuant to **Sections 508 and 509 of the Tariff Act,** as amended, (19 USC § 1508 and 1509) it has the duty and is solely liable for maintaining all records required under the Customs and/or other Laws and Regulations of the United States; unless otherwise agreed to in writing, the Company shall only keep such records that it is required to maintain by Statute(s) and/or Regulation(s), but not act as **"recordkeeper"** or **"recordkeeping agent"** for Customer.

**16. Obtaining Binding Rulings, Filing Protests, etc.** Unless requested by Customer in writing and agreed to by Company in writing, Company shall be under no obligation to undertake any pre- or post Customs release action, including, but not limited to, obtaining binding rulings, advising of liquidations, filing of petition(s) and/or protests, etc.

**17. Preparation and Issuance of Bills of Lading.** Where Company prepares and/or issues a bill of lading, Company shall be under no obligation to specify thereon the number of pieces, packages and/or cartons, etc.; unless specifically requested to do so in writing by Customer or its agent and Customer agrees to pay for same, Company shall rely upon and use the cargo weight supplied by Customer. Relative to the liability limits set forth elsewhere in this Agreement, Customer and Company hereby waive all rights and remedies under the Carmack Amendment and the ICC Termination Act of 1995 (the "Act"), pursuant to Section 14101(b) of the Act. As required by regulation, Customer and Company do not waive the provisions governing registration, insurance, or safety fitness. Unless Company physically handles and carries the shipment, and the loss, damage, expense or delay occurs during such carriage activity, the Company assumes no liability as a carrier.

**18. No Modification or Amendment Unless Written.** These terms and conditions of service may only be modified, altered or amended in writing signed by both Customer and Company; any attempt to unilaterally modify, alter or amend same shall be null and void.

**19. Compensation of Company.** The compensation of the Company for all its services shall be included with and is in addition to the rates and charges of all carriers and all other agencies selected by the Company to transport and deal with the goods and such compensation shall be exclusive of any brokerage, commissions, dividends, or other revenue received by the Company from carriers, insurers and others in connection with the shipment. On ocean exports, upon request, the Company shall provide a detailed breakout of the components of all charges assessed and a true copy of each pertinent document relating to these charges. In any referral for collection or action against the Customer for monies due the Company, upon recovery by the Company, the Customer shall pay the expenses of collection and/or litigation, including a reasonable attorney fee.

**20. Severability.** In the event any Paragraph(s) and/or portions(s) hereof is found to be invalid and/or unenforceable, then in such event the remainder hereof shall remain in full force and effect.

**21. Governing Law;** Consent to Jurisdiction and Venue. These terms and conditions of service and the relationship of the parties shall be construed according to the laws of the State of **NEW YORK** without giving consideration to the principles of conflict of law.

*Customer and Company*
(a) irrevocably consent to the jurisdiction of the United States District Court and the State courts of    **NEW YORK;**
(b) agree that any action relating to the services performed by Company, shall only be brought in said courts;
(c) consent to the exercise of in personam jurisdiction by said courts over it, and
(d) further agree that any action to enforce a judgement may be instituted in any jurisdiction.

| | |
|---|---|
| **ATTACHMENT** | **KUEHNE+NAGEL**  |
**ATTACHMENT**

**KUEHNE+NAGEL** 

**KN SALES INVOICE**

| | |
|---|---|
| **KN TRACKING NUMBER** | **1030 479 924** |
| KN ACCOUNTING NO. | 1030479924-2510 |
| ACCOUNT NUMBER | 8217017 |
| INVOICE NO. / DATE | BALN417993 03/04/2020 |
| DUE DATE | 04/03/2020 |

| MARKS & NOS | QTY TYPE | DESCRIPTION OF GOODS | WGHT | VOL |
|---|---|---|---|---|
| HAMU1327440<br>SEAL NO.<br>HLB7350474 | 1 40' HC | CONTAINER SAID TO CONTAIN:<br>36 CTNS | 4410.00 | 62.320 |
| HLXU8077130<br>SEAL NO.<br>HLB7350560 | 1 40' HC | CONTAINER SAID TO CONTAIN:<br>36 CTNS | 4410.00 | 62.320 |
| TRLU7102038<br>SEAL NO.<br>HLB7350475<br><br>N/M | 1 40' HC | CONTAINER SAID TO CONTAIN:<br>36 CTNS<br>SOFA<br>PO#010-1932833-010<br>010-1932835-010<br>010-1932836-010<br><br>THIS SHIPMENT DOES NOT<br>CONTAIN ANY WOOD PACKING<br>MATERIALS<br>HS-CODE(S):940161<br>ALL MENTIONED CONTAINERS<br>SHIPPERS LOAD, STOW, COUNT<br>AND SEAL.<br>FREIGHT COLLECT | 4410.00 | 62.320 |
| | 3 40' HC | | 13230.00 | 186.960 |

DIGITAL COPY

# Blue Anchor America Line

**Bill of Lading**
for Multimodal Transport
And Port to Port Transport

| | |
|---|---|
| **Shipper** | |
| JIAXING MOTION FURNITURE CO.,LTD. NO. 166 ZHENGUO ROAD, WEITANG STREET, JIASHAN,ZHEJIANG PROVINCE, 314100 CHINA TEL:86-573-84219199 FAX:86-573-84755000 | |
| **Consignee** (This bill is non-negotiable unless marked "To order" or "To the order of ...." Here. See Clause 4). | **Notify Party 2** (No liability shall attach to the Carrier or to his Agent for failure to notify. See Clause 14). |
| ART VAN FURNITURE- WAREHOUSE 6500 E I4 MILE RD,WARREN,MI 48092 PHONE:586-983-2000 | |
| **Notify Party** (No liability shall attach to the Carrier or to his Agent for failure to notify. See Clause 14). | **Delivery Agent** |
| ART VAN FURNITURE- WAREHOUSE 6500 E I4 MILE RD,WARREN,MI 48092 PHONE:586-983-2000 | KUEHNE + NAGEL,INC. 810 LANDMARK DRIVE,SUITES 221-229 GLEN BURNIE MD 21061 UNITED STATES TEL 410-412-7263 FAX 410-412-7325 |

| Place of Receipt (Multimodal Transport only) | Pre-carriage by | Port of Loading | B/L-No. |
|---|---|---|---|
| | | NINGBO | BANQNGB4043473 4359-0372-912.051 |
| **Vessel** ONE CONTINUITY | **Voyage No.** 049E | **Port of Transshipment** | |
| **Port of Discharge** VANCOUVER, BC | **Place of Delivery (Multimodal Transport only)** WARREN, MI RRAMP | **Movement** CY/CY | **Freight Payable at** DESTINATION |

**PARTICULARS FURNISHED BY SHIPPER - CARRIER NOT RESPONSIBLE (See Clause 7.3)**

| Marks and Numbers | Number of Packages | Description of Goods | Gross Weight kgs | Measurement |
|---|---|---|---|---|
| TOTAL | 3 | AS PER ATTACHED FREIGHT COLLECT | 13230.00 | 186.960 |

Information Copy only
No Transport Document

| OCEANFREIGHT AND CHARGES Rates, Weight and/or Measurement subject to correction | Prepaid | Collect | **Declared Cargo Value**   *** NO VALUE DECLARED *** If Merchant enters a value, Carrier's per package limitation of liability shall not apply and the valorem rate will be charged. |
|---|---|---|---|

Received by the Carrier, as far as ascertained by reasonable means of checking, in apparent good order and condition unless otherwise herein stated, the total number or quantity of Containers or other packages or units indicated in the box entitled "Number of Packages" for carriage from the port of loading (or the place of receipt, if mentioned above) to the port of discharge (or the place of delivery, if mentioned above), such carriage being always subject to the terms, rights, defences, provisions, conditions, exceptions, limitations, and liberties hereof (INCLUDING ALL THOSE TERMS AND CONDITIONS ON THE REVERSE HEREOF NUMBERED 1-21 AND THOSE TERMS AND CONDITIONS CONTAINED IN THE CARRIER'S APPLICABLE TARIFF) and the Merchant's attention is drawn in particular to the Carrier's liberties in respect of on deck stowage (see clause 13) and the carrying vessel (see clause 12). The Merchant is obliged to surrender one original bill of lading, duly endorsed, in exchange for the Goods. The Carrier accepts a duty of reasonable care to check that any such document which the Merchant surrenders as a bill of lading is genuine and original. If the Carrier complies with this duty, it will be entitled to deliver the Goods against what it reasonably believes to be a genuine and original bill of lading, such delivery discharging the Carrier's delivery obligations. In accepting this bill of lading, any local customs or privileges to the contrary notwithstanding, the Merchant agrees to be bound by all Terms and Conditions stated herein whether written, printed, stamped or incorporated on the face or reverse side hereof, as fully as if they were all signed by the Merchant.
IN WITNESS WHEREOF the Carrier by its agents has signed three (3) original Bills of Lading all of this tenor and date and as soon as at least one original is surrendered the others shall be void.

**Place and date of issue:**
NINGBO    11/01/2020

| Total amount due | | | |
|---|---|---|---|
| [X] Shipped on board* | Date: 11/01/2020 Shipped on Board Vessel: ONE CONTINUITY | For and on behalf of the Carrier **Blue Anchor America Line** | |
| [ ] Receipt only* * please mark as appropriate | Shipped from Port of Loading: NINGBO | by    KUEHNE & NAGEL LIMITED As Agents for the Carrier | |

Version II, April 2011

# Blue Anchor America Line

# TERMS AND CONDITIONS

Kuehne + Nagel Inc.
O/b/o Blue Anchor America Line
10 Exchange Place
Jersey City, NJ 07302

**1. DEFINITIONS**
"Carriage" means the whole or any part of the operations and services of whatsoever nature undertaken by or performed by or on behalf of the Carrier in relation to the Goods covered by this bill of lading including but not limited to, the loading, transport, unloading, storage, warehousing and handling of the Goods and related documentary, customs and IT processes.
"Carrier" means Kuehne + Nagel Inc., Jersey City, trading as Blue Anchor America Line.
"Carrier's Agents" include but are not limited to the Kuehne + Nagel company which arranged the Carriage and/or issued this bill of lading and the Kuehne + Nagel company in the country where the Goods are discharged and/or delivered.
"COGSA" means the Carriage of Goods by Sea Act of the United States of America approved on 16th April 1936.
"Consolidation" includes stuffing, packing, loading or securing of Goods on or within Containers and Consolidate shall be construed accordingly.
"Container" includes any container (including but not limited to open top containers), trailer, transportable tank, platform, lift van, flat, pallet or any similar article of transport used to Consolidate goods and any ancillary equipment.
"Freight" includes freight, demurrage, detention costs and all expenses and monetary obligations, including but not limited to duties, taxes and dues, incurred by the Carrier and payable by the Merchant.
"Goods" means the whole or any part of the cargo received by the Carrier from the Merchant and includes any packing and any equipment or Container not supplied by or on behalf of the Carrier (but excludes any Container supplied by or on behalf of the Carrier).
"Hague Rules" means the provisions of the International Convention for the Unification of Certain Rules of Law relating to Bills of Lading signed at Brussels on 25th August 1924.
"Hague-Visby Rules" means the Hague Rules as amended by the Protocol signed at Brussels on 23rd February 1968. It is expressly provided that nothing in this bill of lading shall be construed as contractually applying the Hague-Visby Rules.
"Holder" means any Person for the time being in lawful possession of, or lawfully entitled to possession of, this bill of lading or in whom rights of suit and/or liability under this bill of lading have been lawfully vested or transferred.
"Indemnify" means defend, indemnify and hold harmless, including in respect of legal fees and costs, whether or not the obligation to indemnify arises out of negligent or non-negligent acts or omissions of the indemnifying party.
"Merchant" includes the Shipper and the Persons named in this bill of lading as consignee and notify party, the receiver of the Goods and the Person entitled to receive the Goods on notification by the Merchant, the Holder of this bill of lading, any Person owning or lawfully entitled to the possession of the Goods or this bill of lading, the Person on whose account the Goods are handed to the Carrier, any Person acting on behalf of any of the above mentioned Persons, including agents, servants and Sub-Carriers.
"Multimodal Transport" arises if the Carrier has indicated a place of receipt and/or a place of delivery on the front hereof in the relevant spaces.
"Non US Carriage" means any carriage which is not US Carriage.
"Package" where a Container is loaded with more than one package or unit, the packages or other shipping units enumerated on the face of this bill of lading as packed in such Container and entered in the box on the face hereof entitled "Total number of Containers or Packages received by the Carrier" are each deemed a Package.
"Person" includes an individual, corporation or other legal entity.
"Pomerene Act" means the United States Federal Bill of Lading Act 1916 49 U.S.C. 801 or any amendments thereto.
"Port to Port Transport" arises if it is not Multimodal Transport.
"Shipper" means the Person who tendered the Goods to the Carrier and any Person named as shipper in the bill of lading.
"Sub-Contractor" includes but is not limited to owners, charterers and operators of Vessels (other than the Carrier), stevedores, terminal and/or groupage operators, road, rail and air transport operators, forwarding agents, liner agents, customs brokers, warehousemen, longshoremen, customs inspection stations, port authorities, pilots and any independent contractors, servants or agents employed by the Carrier in performance of the Carriage and any direct or indirect sub-contractors, servants or agents thereof, whether in direct contractual privity with the Carrier or not.
"US Carriage" means carriage to, from or through any port of the United States of America.
"Vessel" means any waterborne craft used in the Carriage under this bill of lading including but not limited to ocean vessels, feeder vessels and inland water vessels whether named in the bill of lading or substituted vessels.
**2. CONTRACTING PARTIES**
2.1 By accepting this bill of lading, the Merchant confirms and agrees that the Carrier's Agents act as the Carrier's agents only and that the Merchant has no claim against the Carrier's Agents for any claims arising out of the Carriage.
**3. CARRIER'S TARIFF**
3.1 The provisions of the Carrier's applicable tariff, if any, are incorporated herein. Particular attention is drawn to the provisions therein, if any, relating to free storage time and to Container and vehicle demurrage. Copies of such provisions are obtainable from the Carrier or his agents upon request or, where applicable, from a government body with whom the tariff has been filed. In the case of inconsistency between this bill of lading and the applicable tariff, this bill of lading shall prevail.
**4. NEGOTIABILITY**
4.1 This bill of lading shall be non-negotiable unless made out "to order" in which event it shall be negotiable.
4.2 This bill of lading shall be prima facie evidence only of the Carrier taking the Goods described in the bill of lading under its control , provided that and only to the extent the Carrier had reasonable means of checking the Goods.
**5. SUB-CONTRACTING AND INDEMNITIES**
5.1 The Carrier shall be entitled to sub-contract on terms whatsoever the whole or any part of the Carriage and the Merchant agrees (to the extent that the Merchant is entitled to bring claims against Sub-Contractors) that any Sub-Contractor can, at its option, apply his own terms of contract with the Carrier to defend claims brought by the Merchant.
5.2 The Merchant undertakes:
(a) that no claim or allegation shall be made against any Sub-Contractor whatsoever, whether directly or indirectly, which imposes or attempts to impose upon any Sub-Contractor any liability whatsoever in connection with the Goods or the Carriage of the Goods, whether or not arising in contract, bailment, tort, negligence, breach of express or implied warranty or otherwise; and
(b) if any claim or allegation should nevertheless be made against a Sub-Contractor, to Indemnify the Carrier against all consequences thereof.
5.3 Without prejudice to the other provisions in this Clause 5, every Sub-Contractor shall have the benefit of all provisions herein benefiting the Carrier including Clause 21 hereof, the jurisdiction and law clause, as if these provisions were expressly for its benefit and in entering into this contract the Carrier, to the extent of these provisions, does so not only on his own behalf but also as agent or trustee for such Sub-Contractor and such Sub-Contractor shall to this extent be or be deemed to be parties to this contract.
**6. CARRIER'S LIABILITY**
6.1 US CARRIAGE
(a) For US Carriage this bill of lading shall have effect subject to the provisions of COGSA and the Pomerene Act regardless of whether said Act would apply of its own force. The provisions of COGSA are incorporated herein and save as otherwise provided herein shall apply the entire time the Goods are in the Carrier's custody, including before loading and after discharge as long as the Goods remain in the custody of the Carrier or its Sub-Contractor, including Goods carried on deck. Nothing contained herein is to be deemed as surrender by the Carrier of its rights, immunities, exemptions or limitations or an increase of any of its responsibilities or liabilities under COGSA. Except for clause 6.2, every other term, condition, limitation, defence and liberty whatsoever contained in this bill of lading shall apply to US Carriage.
(b) Where the Merchant requests the Carrier to procure Carriage by an inland carrier in the United States of America, such Carriage shall be procured by the Carrier as agent only to the Merchant and such Carriage shall be subject to the inland carrier's own contractual conditions and tariff.  If, for any reason, the Carrier is denied the right to act as agent only at these times, his liability for loss, damage or delay to the Goods shall be determined in accordance with clause 6 hereof.
(c) Neither the Carrier nor the Vessel shall in any event be or become liable in an amount exceeding US$500 per package or customary freight unit. For limitation purposes under COGSA, it is agreed that the meaning of the word "package" shall be: any palletised and/or unitised assemblage of cartons which has been palletised and/or unitised for the convenience of the Merchant, regardless of whether said pallet or unit is disclosed on the front hereof.
6.2 NON-US CARRIAGE
(a) Where the Non US Carriage is Port to Port Transport:
(i) the period of responsibility of the Carrier for any loss or damage to the Goods shall commence only at the moment the Goods are loaded on board the Vessel and shall end when the Goods have been discharged from the Vessel.
(ii) the liability of the Carrier for loss of or damage to the Goods shall be determined in accordance with any national law making the Hague Rules or Hague-Visby Rules compulsorily applicable to bills of lading and if no such national law is compulsorily applicable, then in accordance with the Hague-Visby Rules Article 1-8 inclusive (excluding Article 3 rule 8.
(iii) the Carrier shall be under no liability whatsoever for loss or damage to the Goods while in its actual or constructive possession before loading or after discharge, howsoever caused.  Notwithstanding the foregoing, in case and to the extent that any applicable compulsory law provides to the contrary, the Carrier shall have the benefit of every right, defence, limitation and liberty in the Hague Rules, Hague-Visby Rules, or any other rules as applied by clause (b) during such additional compulsory period of responsibility, notwithstanding that the loss or damage did not occur at sea.
(iv) if the Goods are discharged at a port other than the Port of Discharge or at a Place of Delivery instead of the Port of Discharge, and the Carrier in its absolute discretion agrees to a such effect, such further Carriage will be undertaken on the basis that this bill of lading is to apply to such Carriage as if the ultimate destination agreed with the Merchant had been entered on the front side of this bill of lading as the Port of Discharge or Place of Delivery.
(b) Where the Non US Carriage is Multimodal Transport and the Carrier can prove at what stage the loss or damage occurred:
(i) the liability of the Carrier shall be deter¬mined by the provisions contained in an international convention or national law, which applies compulsorily to the relevant stage of the Multimodal Transport and cannot be departed from by private contract to the detriment of the claimant; and
(ii) where an international convention or national law does not apply compulsorily to the stage of the movement where the loss or damage occurred, any liability of the Carrier shall be determined by sub-clause 6.2(c).
(c) Where the Non US Carriage is Multimodal Transport but the Merchant cannot prove at what stage the loss or damage occurred or if this sub-clause applies pursuant to sub-clause 6.2(b);
(i) the Carrier shall be relieved of liability for any loss or damage if such loss or damage arose or resulted from:
(A) the wrongful act or neglect of the Merchant or any Person acting on behalf of the Merchant other than the Carrier or its servant, agent or Sub-Contractor;
(B) compliance with the instructions of a Person entitled to give them;
(C) the lack of, or defective condition of packing in the case of Goods which, by their nature, are liable to wastage or to be da¬maged when not packed or when not properly packed;
(D) handling, loading, stowage or unloading of the Goods by the Merchant, or any person acting on behalf of the Merchant;
(E) inherent vice of the Goods;
(F) insufficiency or inadequacy of marks or numbers on the Goods, coverings, or unit loads;
(G) strikes or lockouts or stoppage or restraint of labour from whatever cause whether partial or general;
(H) an act, neglect or default in the navigation or management of the Vessel occurring during carriage by water;
(I) fire, unless the fire was caused by the actual fault or privity of the Carrier or lack of exercise of due diligence to make the Vessel seaworthy, properly to man, equip and supply the Vessel or to make her fit and safe for the reception, carriage and preservation of the Goods; for which the Merchant shall have the burden of proof
(J) a nuclear incident;
(K) any other cause or event which the Carrier could not avoid and the consequences whereof it could not prevent by the exercise of reasonable diligence.
(ii) The burden of proof that the loss or damage was due to one or more of the causes, or events, specified in sub-clause 6.2(c)(i) shall rest upon the Carrier.  When the Carrier establishes that, in the circumstances of the case, the loss or damage could be attributed to one or more of the causes, or events, specified in sub-clause 6.2(c)(i), it shall be presumed that it was so caused. The claimant shall, however, be entitled to prove that the loss or damage was not, in fact, caused either wholly or partly by one or more of these causes or events.
(iii) Where the loss or damage was partly caused by one of the causes at sub-clause 6.2(c)(i) the Carrier shall only be liable to the extent that another cause contributed to the loss or damage.
(d) Compensation and Limitation
(i) Subject to the Carrier's right to limit liability as provided for within this bill of lading, the Carrier's liability shall be calculated by reference to the value of the Goods at the place and time at which they were accepted for Carriage.
(ii) Where the Hague Rules, Hague-Visby Rules or any other rules compulsorily apply to the Carriage the Carrier's liability shall in no event exceed the amounts provided for in the applicable rules.
(iii) In all other cases compensation shall not exceed the limitation of liability of 2SDRs per kilo of gross weight of the Goods lost, damaged or in respect of which the claim arises.
(e) Time-bar
(i) Where the Hague Rules, Hague-Visby Rules or any other rules apply compulsorily to the Carriage, the time limit for bringing claims will be as prescribed by the applicable rules.
(ii) In all other cases, the Carrier shall be discharged of all liability whatsoever unless suit is brought within nine months after the delivery of the Goods or the date when the Goods should have been delivered.
6.3 LIABILITY APPLICABLE TO BOTH US CARRIAGE AND NON-US CARRIAGE
(a) The Carrier shall not, in any case, be liable for an amount greater than the actual loss to the Person entitled to make the claim.
(b) Ad Valorem: declared value of Package or shipping unit.
The Carrier's liability may be increased to a higher value by a declaration in writing of the value of the Goods by the Merchant upon delivery to the Carrier of the Goods for shipment, such higher value being inserted on the front of this bill of lading in the space provided and, if required by the Carrier, extra freight being paid. In such case, if the actual value of the Goods shall exceed such declared value, the value shall nevertheless be deemed to be the declared value and the Carrier's liability, if any, shall not exceed the declared value and any partial loss or damage shall be adjusted pro rata on the basis of such declared value.
(c) Delay, Consequential Loss
Save as otherwise provided herein, the Carrier does not undertake that the Goods shall arrive at any place at any particular time and shall in no circumstances be liable for direct, indirect or consequential loss or damage caused by delay or any other cause whatsoever and howsoever caused. Without prejudice to the foregoing, if the Carrier is found liable for delay, liability shall be limited to the Freight applicable to the relevant stage of the transport.
(d) Notice of Loss or Damage
The Carrier shall be deemed prima facie to have delivered the Goods as described in this bill of lading unless notice of loss of, or damage to, the Goods, indicating the general nature of such loss or damage, shall have been given in writing to the Carrier or to his representative at the place of delivery before or at the time of removal of the Goods into the custody of the Person entitled to delivery thereof under this bill of lading or, if the loss or damage is not apparent, within three consecutive days thereafter.
(e) The defences and limits of liability provided for in this bill of lading shall apply in any action against the Carrier whether the action be found in contract, bailment, tort, breach of express or implied warranty or otherwise.
(f) The Merchant shall Indemnify the Carrier against any claim or liability (and any expense arising therefrom) arising from the Carriage of the Goods insofar as such claim or liability exceeds the Carrier's liability under this bill of lading.
**7. MERCHANT'S WARRANTIES AND RESPONSIBILITIES**
7.1 Every Person defined as Merchant is jointly and severally liable to the Carrier for all the Merchant's undertakings, responsibilities and liabilities under or in connection with this bill of lading and to pay the Freight due under it without deduction or set-off.
7.2 The Merchant warrants that in agreeing to this bill of lading he is the agent of and has the authority of the Person owning or entitled to the possession of the Goods and this bill of lading or any Person who has a present or future interest in the Goods and this bill of lading.
7.3 The description and particulars of the Goods and Container set out on the face hereof are furnished by the Merchant and the Merchant warrants to the Carrier that the description and particulars including, but not limited to, verified gross mass, weight, content, measure, quantity, quality, condition, marks, numbers and value are correct.
7.4 The Merchant shall comply with all applicable laws, regulations and requirements (including but not limited to any imposed at any time before or during the Carriage relating to anti-terrorism measures) of customs, port and other authorities and shall bear and pay all duties, taxes, fines, imposts, expenses and losses (including without prejudice to the generality of the foregoing, freight for any additional Carriage undertaken) incurred or suffered by reason thereof or by reason of any illegal, incorrect or insufficient marking, numbering or addressing of the Goods.
7.5 The Merchant undertakes that the Goods are packed in a manner adequate to withstand the ordinary risks of Carriage having regard to their nature and in compliance with all laws, regulations and requirements which may be applicable. The Merchant shall be liable for any loss, damage or injury caused by faulty or insufficient packing or by faulty loading or packing within Containers when such loading or packing has been performed by the Merchant or an behalf of the Merchant, or by the defect or unsuitability of the Containers when supplied by the Merchant, and shall Indemnify the Carrier against any additional expenses so caused.
7.6 Any Container released into the care of the Merchant for packing, unpacking or any other purpose whatsoever shall be at the sole risk of the Merchant until proper redelivery to the Carrier at the time and place prescribed by the Carrier. If the Merchant fails to deliver the Container at such prescribed time and place, the Merchant shall pay the Carrier the applicable demurrage or detention charges arising therefrom. The Merchant is responsible for returning the empty Container, with interiors brushed and clean, to the point or place designated by the Carrier, his servants or agents. The Merchant shall be liable for any charges, loss or any other expenses arising therefrom. The Merchant shall be responsible for any loss and/or damage to, and any liabilities caused or incurred by such Container whilst in its custody and/or control.
7.7 The Merchant shall be liable for the loss, damage, contamination, soiling, detention or demurrage before, during and after the Carriage of property (including, but not limited to, Containers) of the Carrier and Sub-Contractor (other than the Merchant) caused by the Merchant or any Person acting on his behalf or for which the Merchant is otherwise responsible.

7.8 The Merchant shall Indemnify the Carrier against any loss, damage, claim, liability or expense whatsoever arising from any breach of the provisions of this clause 7 or from any cause in connection with the Goods for which the Carrier is not responsible.
**8. DANGEROUS GOODS**
8.1 No Goods which are or may become dangerous (whether or not so listed in codes), inflammable, damaging, injurious (including radioactive materials), noxious or which are or may become liable to damage any property or Person whatsoever shall be tendered to the Carrier for Carriage without:
(a) the Carrier's express consent in writing; and
(b) the Container and/or other covering in which the Goods are to be transported and/or the Goods themselves being distinctly marked on the outside so as to indicate the nature and character of any such Goods and so as to comply with all applicable laws, regulations and/or requirements.
8.2 If the Merchant fails to provide such information and the Carrier is unaware of the dangerous nature of the Goods and the necessary precautions to be taken and if, at any time, they are deemed to be a hazard to life or property, they may at any place be unloaded, destroyed or rendered harmless, as circumstances may require, without compensation, and the Merchant shall be liable for all loss, damage, delay or expenses arising from the Carriage. The burden of proof that the Carrier knew the exact nature of the danger constituted by the carriage of the Goods shall rest upon the Merchant.
8.3 The Merchant shall comply with rules which are mandatory according to the national law or by reason of international convention, relating to the carriage of Goods of a dangerous nature. If any Goods shipped with the knowledge of the Carrier as to their dangerous nature shall become a danger to the ship or cargo, they may in like manner be landed at any place or destroyed or rendered innocuous by the Carrier without liability on the part of the Carrier except to General Average, if any.
8.4 The Merchant shall Indemnify the Carrier against any loss, damage, claim, liability or expense whatsoever arising from any breach of the provisions of this clause 8 or from any cause in connection with the Goods for which the Carrier is not responsible.
**9. CONTAINERS**
9.1 Goods may be Consolidated by the Carrier in or on Containers and Goods may be Consolidated with Goods owned by other Persons.
9.2 The terms of this bill of lading shall govern the responsibility of the Carrier in connection with or arising out of the supply of a Container to the Merchant, whether supplied before or after the Goods are received by the Carrier or delivered to the Merchant.
9.3 If a Container has been Consolidated by or on behalf of the Merchant:
(a) the terms of this bill of lading shall be applicable;
(b) the Carrier shall not be liable for loss of or damage to the Goods:
(a) caused by the manner in which the Container has been stuffed;
(b) caused by the unsuitability of the Goods for carriage in Container actually used;
(c) caused by the unsuitability or defective condition of the Container actually used provided that where the Container has been supplied by or on behalf of the Carrier, this paragraph (iii) shall only apply if the unsuitability or defective condition would have been apparent upon reasonable inspection by the Merchant at or prior to the time when the Container was stuffed;
(d) if the Container is not sealed at the commencement of the Carriage except where the Carrier has agreed to seal the Container.
9.4 Where the Carrier is instructed to provide a Container, in the absence of a written request to the contrary accepted by the Carrier, the Carrier is not under an obligation to provide a Container of any particular type or quality.
9.5 Goods stowed in closed containers other than flats or pallets, whether by the Carrier or the Merchant, may be carried on deck, on an open lorry, on an open trailer, or an open railway wagon without notice to the Merchant. Such Goods, whether or not so carried, shall participate in General Average and shall be deemed to be within the definition of Goods for the purposes of the Hague Rules and Hague-Visby Rules.
9.6 The provisions of clause 6 also apply with respect to trailers, transportable tanks, flats and pallets which have not been filled, packed or stowed by the Carrier.
9.7 The Merchant shall Indemnify the Carrier against any loss, damage, claim, liability or expense whatsoever arising from any breach of the provisions of this clause 9 or from any cause in connection with the Goods for which the Carrier is not responsible.
**10. TEMPERATURE CONTROLLED CARGO**
10.1 The Merchant undertakes not to tender for Carriage any Goods which require temperature control without previously giving written notice (and filling in the box on the front of this bill of lading if this bill of lading has been prepared by the Merchant or a Person acting on his behalf) of their nature and particular temperature range to be maintained and in the case of a temperature controlled Container Consolidated by or on behalf of the Merchant further undertakes that the Container has been properly pre-cooled, that the Goods have been properly Consolidated in the Container and that its thermostatic controls have been properly set by the Merchant before receipt of the Goods by the Carrier.
10.2 If the above requirements are not complied with the Carrier shall not be liable for loss of or damage to the Goods caused by such non-compliance and the Merchant shall Indemnify the Carrier for any loss resulting from the Carrier's liability.
10.3 The Carrier shall not be liable for any loss of or damage to the Goods arising from defects, derangement, breakdown, stoppage of the temperature controlling machinery, plant, insulation or any apparatus of the Container, provided that the Carrier shall before or at the beginning of the Carriage exercise due diligence to maintain the refrigerated Container in an efficient state.
10.4 The Merchant shall Indemnify the Carrier against any loss, damage, claim, liability or expense whatsoever arising from any breach of the provisions of this clause 10 or from any cause in connection with the Goods for which the Carrier is not responsible.
**11. INSPECTION OF GOODS**
11.1 The Carrier or any Person authorised by the Carrier shall be entitled, but under no obligation, to open and/or scan any Container or package at any time and to inspect the contents.
11.2 If it appears at any time that the Goods, or any part of them, cannot safely or properly be carried, or carried further, either at all or without incurring any additional expense or taking measures in relation to the Container or Goods, the Carrier may without notice to the Merchant (but as his agent only) take any measures and/or incur any reasonable additional expense to carry or continue the Carriage thereof, and/or to sell or dispose of the Goods and/or to store the Goods ashore or afloat, under cover or in the open, at any place, whichever the Carrier in his absolute discretion considers most appropriate, which sale, disposal, abandonment or storage shall be deemed to constitute due delivery under this bill of lading. The Merchant shall Indemnify the Carrier against any reasonable additional expense so incurred.
11.3 The Carrier in exercising the liberties contained in this clause shall not be under any obligation to take any particular measures and shall not be liable for any loss, delay or damage howsoever arising from any action or lack of action under this clause.
**12. METHODS AND ROUTE OF TRANSPORTATION**
12.1 The Carrier may at any time and without notice to the Merchant:
(a) use any means of transport or storage whatsoever;
(b) load or carry the Goods on any Vessel whether named on the front hereof or not;
(c) transfer the Goods from one conveyance to another including transshipping or carrying the same on a Vessel other than the Vessel named on the front hereof or by any other means of transport whatsoever and even though transshipment or forwarding of the Goods may not have been contemplated or provided for herein;
(d) at any place unpack and remove Goods which have been stuffed in or on a Container and forward the same in any manner whatsoever;
(e) proceed at any speed and by any route in his discretion (whether or not the nearest or most direct or customary or advertised route) and proceed to or stay at any place whatsoever once or more often and in any order;
(f) load or unload the Goods from any conveyance at any place (whether or not the place is a port named on the front hereof as the intended Port of Loading or intended Port of Discharge);
(g) comply with any orders or recommendations given by any government or authority or any Person or body acting or purporting to act as or on behalf of such government or authority or having under the terms of the insurance on the conveyance employed by the Carrier the right to give orders or directions;
(h) permit the Vessel to proceed with or without pilots, to tow or be towed or to be dry-docked with or without cargo onboard;
(i) permit the Vessel to carry livestock, Goods of all kinds, dangerous or otherwise, contraband, explosives, munitions or warlike stores and sail armed or unarmed.
12.2 The liberties set out in sub-clause 12.1 above may be invoked by the Carrier for any purposes whatsoever whether or not connected with the Carriage of the Goods, including but not limited to loading or unloading the goods, bunkering, undergoing repairs, adjusting instruments, towing or being towed, sailing with or without pilots, drydocking, picking up or landing any Persons, including but not limited to Persons involved with the operation or maintenance of the Vessel and assisting Vessels in all situations. Anything done in accordance with sub-clause 12.1 above or any delay arising therefrom shall be deemed to be within the contractual Carriage and shall not be a deviation of whatsoever nature or degree.
**13. DECK CARGO**
13.1 Unless it is specifically stipulated that the Goods will be carried under deck on the front of this bill of lading, the Goods (whether containerised or not) may be stowed on or under deck without notice to the Merchant and any deck stowage shall not be a deviation of whatsoever nature or degree.
13.2 If carried on deck, the Carrier shall not be required to note, mark or stamp on the bill of lading any statement of such on deck carriage. Such Goods whether carried on deck or under deck shall participate in General Average and, subject to Clause 13.3, such Goods shall be deemed to be within the definition of Goods for the purposes of the Hague Rules or any legislation making such rules, COGSA or the Hague-Visby Rules compulsorily applicable to this bill of lading.
13.3 Goods which are stated on the front of the bill of lading to be carried on deck, and which are actually carried on deck, are carried without responsibility on the part of the Carrier for loss or damage of whatsoever nature arising during Carriage by sea or inland waterway whether caused by unseaworthiness or negligence or any other cause whatsoever.
**14. COLLECTION AND DELIVERY OF THE GOODS**
14.1 When collection or delivery takes place at the Merchant's premises, the place of collection or delivery shall be the usual place of loading or unloading the Goods into or from the vehicle and:
(a) the Carrier shall not be under any obligation to provide any plant, power or labour which may be required for the loading or unloading at such premises. This shall be the responsibility of the Merchant at his own risk and expense.
(b) any assistance given by the Carrier additional to the foregoing is given entirely at the Merchant's risk as to damage to or loss of Goods or injury to Persons.
14.2 If at any time the Carriage is or is likely to be affected by any hindrance, risk, delay, difficulty or disadvantage of any kind (including the condition of the Goods), whensoever and howsoever arising (whether or not the Carriage has commenced) the Carrier may:
(a) without notice to the Merchant abandon the Carriage of the Goods and where reasonably possible place the Goods or any part of them at the Merchant's disposal at any place which the Carrier may deem safe and convenient, notwithstanding that any charges, dues or other expenses may be or become payable. If crafts are used, other than at the request of the Merchant, in circumstances where the Goods or that part thereof so discharged could have been discharged ashore without additional delay, the Goods (or part thereof, as the case may be) shall nevertheless not be deemed to be discharged for the purposes of this clause until they are discharged from such craft, whereupon delivery shall be deemed to have been made and the responsibility of the Carrier in respect of such Goods shall cease.
(b) without prejudice to the Carrier's right to subsequently abandon the Carriage under Clause (a)14.2 (a) above, continue the Carriage.
(c) In any event the Carrier shall be entitled to full Freight on Goods received for Carriage and the Merchant shall pay any additional costs resulting from the above mentioned circumstances.
14.3 The liability of the Carrier in respect of the Goods shall cease on the delivery or other disposition of the Goods in accordance with the orders or recommendations given by any government or authority or any Person acting or purporting to act as or on behalf of such government or authority. This must include due delivery to the Merchant.
14.4 Any mention herein of parties to be notified of the arrival of the Goods is solely for information of the Carrier, and failure to give such notification shall not involve the Carrier in any liability nor relieve the Merchant of any obligation thereunder.
14.5 If delivery of the Goods or any part thereof is not taken by the Merchant at the time and place when and where the Carrier is entitled to call upon the Merchant to take delivery thereof, the Carrier shall be entitled and without prejudice to any other rights that he may have against the Merchant without notice to remove from a Container the Goods or that part thereof if Consolidated in or on a Container and to store the Goods or that part thereof ashore, afloat, in the open or under cover at the sole risk and expense of the Merchant and the costs of such storage (if paid or payable by the Carrier or any agent or Sub-Contractor of the Carrier) shall forthwith upon demand be paid by the Merchant to the Carrier. Such storage shall constitute due delivery hereunder, and thereupon the liability of the Carrier in respect of the Goods or that part thereof shall cease.
**15. BOTH-TO-BLAME COLLISION**
15.1 The latest version of BIMCO's Both-to-Blame Collision Clause is incorporated herein which is available on request.
**16. GENERAL AVERAGE**
16.1 General Average shall be adjusted at any part or place at the Carrier's option, and to be settled according to the York-Antwerp Rules 1994, this covering all Goods whether carried on or under deck. The New Jason Clause as approved by BIMCO shall be considered as incorporated herein which is available on request.
16.2 Notwithstanding sub-clause 16.1, the Merchant shall Indemnify the Carrier in respect of any claims of a General Average nature which may be made against him and shall provide such security as may be required by the Carrier in this connection.
16.3 Such security including a cash deposit as the Carrier may deem sufficient to cover the estimated contribution of the Goods and any salvage and special charges thereon shall, if required be submitted to the Carrier prior to delivery of the Goods.
16.4 The Carrier shall be under no obligation to take any steps whatsoever to collect security for General Average contributions due to the Merchant.
**17. FREIGHT**
17.1 Freight shall be deemed fully earned upon receipt of the Goods by the Carrier and shall be paid and be non-returnable in any event.
17.2 The Merchant's attention is drawn to the stipulations concerning currency in which the Freight is to be paid, rate of exchange, devaluation and other contingencies relative to Freight in the relevant tariff conditions. If no such stipulation as to devaluation exists or is applicable and if the currency in which the Freight is quoted is devalued or revalued between the date of the Freight agreement and the date when the Freight is paid, then all Freight shall be automatically and immediately changed in proportion to the extent of the devaluation or revaluation of the said currency. Payment shall be made in the currency named in the bill of lading, or, at the option of the Carrier, in another currency specified by the Carrier.
17.3 The Freight has been calculated on the basis of particulars furnished by or on behalf of the Merchant. The Carrier shall be entitled to production of the commercial invoice for the Goods or true copy thereof and to inspect, reweigh, re-measure and revalue the Goods and if the particulars are found by the Carrier to be incorrect, it is agreed that without prejudice to the rights of the Carrier as per clause 11 a sum equal either to five times the difference between the correct Freight and the Freight charged or to double the correct Freight less the Freight charged, whichever sum is the smaller, shall be payable as liquidated damages to the Carrier notwithstanding any other sum having been stated in this bill of lading as the Freight payable.
17.4 All Freight shall be paid without any set-off, counter-claim, deduction or stay of execution.
17.5 Despite the acceptance by the Carrier of instructions to collect Freight or other expenses from any other Person in respect of the transport under this bill of lading, the Merchant shall remain responsible for such monies on receipt of evidence of demand and the absence of payment for whatever reason.
17.6 All dues, taxes and charges levied on the Goods and other expenses in connection therewith shall be paid by the Merchant.
17.7 The Merchant shall reimburse the Carrier for any costs for deviation or delay or any other increase of costs of whatever nature caused by war, warlike operations, epidemics, strikes, government directions or force majeure.
**18. LIEN**
18.1 The Carrier shall have a lien on Goods and any documents relating thereto for all sums whatsoever due at any time to the Carrier under this bill of lading and for General Average contributions to whomsoever due.
18.2 The Carrier shall also have a lien on the Goods and any documents relating thereto for all sums due from the Merchant to the Carrier under any other contract.
18.3 The Carrier may exercise his lien at any time and at any place in his sole discretion, whether the Carriage is completed or not. In any event any lien shall (a) survive the delivery of the Goods and (b) extend to cover the cost of recovering any sums due.
18.4 To enforce and satisfy the Carrier's lien, the Carrier shall have the right to sell or otherwise dispose of the aforementioned Goods and documents by public auction or private treaty at the Merchant's expense and in the Merchant's name and without any liability towards the Merchant, provided that the Carrier has used reasonable efforts to notify the shipper and the consignee shown on the front side of the sea waybill prior to any sale or other disposal and that the Carrier will pass on to the Merchant any proceeds of a sale or other disposal exceeding the sums due and the costs relating to the sale or other disposal.
**19. VARIATION OF THE CONTRACT**
19.1 No servant or agent of the Carrier shall have power to waive or vary any of the terms hereof unless such waiver or variation is in writing and is specifically authorised or ratified in writing by a director or officer of the Carrier who has the actual authority of the Carrier to waive or vary.
**20. PARTIAL INVALIDITY**
20.1 If any provision in this bill of lading is held to be invalid or unenforceable by any court, tribunal or regulatory or self regulatory agency or body, such invalidity or unenforceability shall attach only to such provision. The validity of the remaining provisions shall not be affected thereby and this bill of lading shall be construed as if such invalid or unenforceable provision was not contained herein.
**21. JURISDICTION AND LAW**
21.1 This sea waybill is governed by United States law and the United States Federal Court of the Southern District of New York has exclusive jurisdiction to hear all disputes hereunder.
21.2 No proceedings may be brought before other courts, unless both parties expressly agree the choice of the other court or arbitration tribunal and the law to be then applicable.

(also available in pamphlet form from the Carrier and its agents and under www.america.blueanchorline.com)

**ATTACHMENT FOR**

| | |
|---|---|
| **BILL OF LADING** | |
| **ATTACHMENT FOR** | |
| BAL B/L NO.: | 4359-0372-912.051 |
| NINGBO | 11/01/2020 |

```
MARKS & NOS              QTY  PCS      DESCRIPTION OF GOODS      GRSS WT KGS        CBM
HAMU1327440               1   40' HC   CONTAINER SAID TO CONTAIN     4410.00     62.320
SEAL HLB7350474                        36 CTNS
HLXU8077130               1   40' HC   CONTAINER SAID TO CONTAIN     4410.00     62.320
SEAL HLB7350560                        36 CTNS
TRLU7102038               1   40' HC   CONTAINER SAID TO CONTAIN     4410.00     62.320
SEAL HLB7350475                        36 CTNS
N/M                                    SOFA
                                       PO#010-1932833-010
                                       010-1932835-010
                                       010-1932836-010

                                       THIS SHIPMENT DOES NOT
                                       CONTAIN ANY WOOD PACKING
                                       MATERIALS
                                       HS-CODE(S):940161
                                       ALL MENTIONED CONTAINERS
                                       SHIPPER'S LOAD, COUNT AND
                                       SEAL
          TOTAL           3                                         13230.00    186.960
```

Information Copy only
No Transport Document

2  OF  2