## Exhibit 1

**Purchase Agreement**

**Execution Version**

## ASSET PURCHASE AGREEMENT

By, between and among

**Alfred T. Giuliano, solely in his capacity as
the Chapter 7 Trustee of ART VAN FURNITURE, LLC**

**- and -**

**U.S. REALTY ACQUISITIONS L.L.C.**

**- and -**

**STORE SPE AVF II 2017-2, LLC, STORE SPE AVF I 2017-1, LLC,
STORE MASTER FUNDING XII, LLC, AND SCF RC FUNDING IV LLC
FOR THE LIMITED PURPOSES OF AGREEING TO THE PROVISIONS OF SECTION
1.04(c) AND 7.01 HEREOF**

dated as of

May 4, 2020

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of May 4, 2020, is entered into between and among Alfred T. Giuliano, solely in his capacity as the Chapter 7 Trustee (the "**Trustee**") of ART VAN FURNITURE, LLC, a Delaware limited liability company ("**Seller**") and U.S. REALTY ACQUISITIONS L.L.C., a Texas limited liability company ("**Buyer**"). Seller and Buyer are herein referred to jointly as the "**Parties**" and individually as a "**Party**."

STORE SPE AVF II 2017-2, LLC, STORE SPE AVF I 2017-1, LLC, STORE Master Funding XII, LLC, AND SCF RC Funding IV LLC (collectively, the "**Landlords**") are joining in this Agreement for the limited purpose of agreeing to the provisions of Sections 1.04(c) and 7.01 hereof.

## RECITALS

WHEREAS, Seller is a debtor in the jointly administered bankruptcy case number 20-10553 (CSS) (the "**Bankruptcy Case**") pending under chapter 7 of Title 11 of the United States Code (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

WHEREAS, Seller was engaged in the business of distribution and sale of furniture (the "**Business**") from, inter alia, the twenty-seven (27) leased facilities listed on Exhibit A hereto (the "**Leased Facilities**"), and is liquidating the Business, including the Leased Facilities in accordance with the Bankruptcy Code (the "**Chapter 7 Liquidation**");

WHEREAS, in connection with the Chapter 7 Liquidation, Seller desires to sell, transfer and assign to Buyer, and Buyer desires (directly or through one or more affiliates as provided for by Section 2.03 hereof) to purchase, acquire and assume from Seller, all of the Purchased Assets (as defined below), all as more specifically provided herein; and

WHEREAS, the Purchased Assets will be sold free and clear of all liens, claims and other encumbrances pursuant to and to the extent provided in the Sale Order (as defined below) approving the sale of the Purchased Assets under Section 363 of the Bankruptcy Code and the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I
## PURCHASE AND SALE

**Section 1.01  Purchase and Sale of Assets.** Subject to the terms and conditions of this Agreement, Seller shall sell to Buyer, and Buyer shall purchase from Seller, at the Closing (as

defined below), all of Seller's right, title and interest in and to the following assets to the extent owned by Seller (the "**Purchased Assets**"), free and clear of any mortgage, pledge, lien, charge, security interest, claim, or other encumbrances pursuant to and to the extent provided in the Sale Order ):

(a)     All machinery, equipment, tools, parts, accessories, furniture, fixtures, store-level computer hardware, office equipment, furnishings, signage, displays, display equipment, shelving, racking, pallets, storage equipment, conveyor equipment, store management equipment, telephone and fax equipment and systems, supplies, packing, shipping materials and related supplies, promotional materials, service parts, and other tangible personal property relating to the portion of the Business solely operated from the Leased Facilities, but in each case only if such personal property is both (i) owned by Sellers, and (ii) located at, in or around  the Leased Facilities, together with, to the extent transferable, all unexpired warranties of manufacturers, vendors, or other third parties, if any;

(b)     All of the inventory actually located at each of the Leased Facilities ("**Inventory**"); provided, however, the Inventory shall not include (x) any inventory that has already been sold to customers of Seller that was paid in full by cash, check or debit card during the post-petition period and is located at the Leased Facilities (which shall remain at the applicable Leased Facilities at no charge to Sellers or their estates and shall be made available there by Buyer for pickup by the customers at no cost or charge to such customers), and (y) any inventory Seller is prohibited to transfer under separate agreement or because of the Bankruptcy Court's *Amended Order Granting Jofran Sales, Inc.'s Motion for Injunctive Relief* [AP Docket No. 17] entered in Adversary Proceeding No. 20-50546 (CSS) (the items described in clauses (x) and (y), the "**Excluded Inventory**"); and

(c)     The following books, records, financial information, and documents pertaining to the Purchased Assets but solely to the extent located at, in or around the Leased Facilities as of the Closing: (i) supplier files, lists, and records; (ii) product literature and all marketing, advertising, and promotional materials; and (iii) correspondence and other non-privileged electronic transmissions relating to any and all of the foregoing (collectively, the "**Acquired Books and Records**"), but excluding any other documentation that does not fall into categories (i) through (iii) above and any documentation necessary for Seller to conclude the administration of the Bankruptcy Case, that is privileged or confidential, or that is  subject to a litigation hold (collectively, the "**Excluded Books and Records**").

**Section 1.02  Excluded Assets.** Notwithstanding the foregoing, the Purchased Assets shall not include any of Seller's right, title, and/or interest in or to any other assets (other than the Purchased Assets) (the "**Excluded Assets**"). Excluded Assets include, without limitation (a) any and all trade and other accounts receivable or any other rights to payment owed to Seller as of the Closing; (b) any cash or cash equivalents whatsoever, whether on hand, in banks, or elsewhere; (c) the Excluded Books and Records; (d) any and all causes of action and litigation rights existing as of the Closing in favor of Seller; (e) all tax refunds, and all rights or other tax benefits arising from Seller's net operating losses; (f) all prepaid expenses and deposits (including, without limitation, any deposits or other amounts in any form held by the Landlords under the Leases for the Leased Facilities); (g) any right, title, or interest in and to any insurance policies and cash surrender values thereunder or premium refunds therefrom; (h) all executory contracts and

unexpired leases or licenses, including, without limitation all unexpired real property leases and all related leasehold interests, if any; (i) all contract rights, title, or interests, including, any refunds or credits, arising out of, under or related to the Excluded Assets, (j) any tangible personal property or other assets held or used by Seller pursuant to a lease, rental agreement, or other contractual arrangement, (k) the Excluded Inventory, and (l) any customer data or other intellectual property of the Seller.

Section 1.03    **No Liabilities/Assumption of Liabilities.** Buyer shall not assume any liabilities or obligations of Seller of any kind, whether known or unknown, contingent, matured or otherwise, whether currently existing or hereinafter created.

Section 1.04    **Purchase Price.** Subject to adjustment, if applicable, pursuant to Section 1.06 below, Buyer shall pay the purchase price to Seller at the Closing (as defined herein). Subject to adjustment, if applicable, pursuant to Section 1.06, below, the aggregate purchase price for the Purchased Assets (the "**Purchase Price**") shall be the sum of:

(a)    Cash in the amount of $135,000, which represents $5,000 for the Purchased Assets (other than the Inventory) located at each of the Leased Facilities (the "**FF&E Purchase Price**"), *plus*

(b)    Cash in the amount of $6,656,212.09 which is the portion of the Purchase Price being paid for all Inventory (subject to adjustment, if applicable, in accordance with Section 1.06, below) and is 43% of the wholesale value of the Scheduled Inventory (as defined in Section 1.06(a) hereof) calculated based on the "Grand Total" of the "Sum of Ext Cost (Total)" column on "AVF Inv. Summary" worksheet tab and the "Grand Total" of the "Sum of Cost" column on the "LW Inv. Summary" worksheet tab of the "Inventory Data for Wells – V3" spreadsheet, which worksheets are attached hereto as Schedule 1.04(b)) (the "**Inventory Purchase Price**" and together with the FF&E Purchase Price, the "**Closing Cash Amount**"), *plus*

(c)    The Price Increase Amount, if any, *plus*

(d)    Consideration consisting of an unconditional waiver and discharge pursuant to the Sale Order of all postpetition rent owed to the Landlords with respect to the Leased Facilities which represents post-petition rents being waived against Art Van branded stores in the amount of $4,283,506 and of Levin branded stores in the amount of $1,174,487, for an aggregate waiver and discharge in the amount of $5,457,993.

Section 1.05    **Deposit by Buyer.**

(a)    A cash deposit in an amount equal to $679,000.00    (the "**Deposit**") (representing approximately ten percent (10%) of the Closing Cash Amount due and payable by Buyer at the Closing) shall be paid within one (1) business day after the date hereof, which Deposit shall be held in escrow in Giuliano Miller & Company's ("**GMC**") segregated client trust account, separate from any other funds of the Seller, the Trustee or GMC (the "**Escrow**"). The Deposit shall be held in escrow as indicated above for the benefit of the Buyer and Seller and shall be disbursed from escrow as provided for and in accordance with the terms of this Agreement.

4

(b)     The Deposit shall be disbursed from Escrow as follows:

(i)     Subject to the terms hereof, if the Closing shall occur, the Deposit shall be applied toward the Closing Cash Amount payable by Buyer;

(ii)     If this Agreement is terminated in accordance with Section 8.01 hereof (other than a termination under Section 8.01(e) or Section 8.01(f)), the Deposit shall be disbursed to Buyer; and

(iii)     If this Agreement is terminated in accordance with Section 8.01(e) or Section 8.01(f) hereof, the Deposit shall be disbursed to Seller;

(c)     If the Deposit is to be disbursed pursuant to Section 1.05(b)(i) hereof, no later than the Closing, Buyer and Seller shall deliver joint written instructions to the Trustee that state (A) Closing has occurred or will occur on the Closing Date, (B) the Deposit shall be disbursed to Seller, and (C) the applicable wire instructions for such disbursement as provided for by the Seller. The Trustee shall disburse the Deposit pursuant to the provided wire instructions on the Closing Date.

(d)     If the Deposit is to be disbursed pursuant to Section 1.05(b)(ii) hereof, the Buyer shall deliver written instructions to GMC (with a copy of such written instructions being delivered to the Trustee on behalf of the Seller on the same day) that state (A) the subsection under which this Agreement has been terminated, (B) the Deposit shall be disbursed to the Buyer (or such other persons or entities identified by the Buyer), and (C) the applicable wire instructions for such disbursement as provided for by the Buyer. If GMC does not receive a notice of objection from the Trustee on behalf of the Seller to such written instructions prior to the third (3rd) business day following receipt of the written instructions (with a copy of such written instructions being delivered to Buyer on the same day), the Trustee shall cause GMC to disburse the Deposit pursuant to the provided wire instructions within five (5) business days following GMC's receipt of the written instructions.

(e)     If the Deposit is to be disbursed pursuant to Section 1.05(b)(iii) hereof, the Trustee, on behalf of the Seller, shall deliver written instructions to GMC (with a copy of such written instructions being delivered to the Buyer on the same day) that state (A) the Agreement has been terminated pursuant to Section 8.01(e) or Section 8.01(f), (B) the Deposit shall be disbursed to the Seller, and (C) the applicable wire instructions for such disbursement as provided for by the Trustee, on behalf of the Seller. If GMC does not receive a notice of objection from the Buyer to such written instructions prior to the third (3rd) business day following receipt of the written instructions (with a copy of such written instructions being delivered to the Trustee on behalf of the Seller on the same day), the Trustee shall cause GMC to disburse the Deposit pursuant to the provided wire instructions within five (5) business days following GMC's receipt of the written instructions.

(f)     Any dispute regarding the payment of the Deposit that the parties are unable to resolve on their own shall be resolved by the Bankruptcy Court. Either party may file a motion on shortened notice, but in no event with less than 10 days' notice to the other party.

**Section 1.06    Purchase Price Adjustment.**

(a)         Subject to <u>Section 1.08</u>, following the Closing, Buyer shall retain WIS International to commence a physical inventory of all Inventory at each of the Leased Facilities (the "**Physical Inventory**") within five (5) business days (for purposes of this Agreement, a business day meaning any Monday through Friday that is not a state or federal holiday) after the date that the relevant state government permits Buyer to open the relevant Leased Facilities. The Physical Inventory shall be completed prior to Buyer opening such Leased Facility for business and the Trustee and Wells Fargo Bank, National Association (the "**ABL Lender**") shall be entitled to attend and monitor each Physical Inventory through a designee(s) and to receive true and complete copies of all preliminary and final supporting information compiled during or generated as a result of each Physical Inventory. Within five (5) business days of the completion of the Physical Inventory for a particular Leased Facility, the parties (and the ABL Lender) shall be provided with the preliminary results of the Physical Inventory for such Leased Facility (each, a "**Preliminary Inventory Report**"), which shall identify (xx) any inventory which is listed on <u>Schedule 1.06(a)</u> hereto (collectively, the "**Scheduled Inventory**") that is indicated on <u>Schedule 1.06(a)</u> as being at such Leased Facility but which is (i) not located at such Leased Facility, (ii) inventory on <u>Schedule 1.06(a)</u> that is Excluded Inventory, or (iii) inventory that is not owned by Seller (collectively (i) through (iii), the "**Missing Inventory**"), and (yy) any Inventory located at such Leased Facility which is not indicated on <u>Schedule 1.06(a)</u> as being located there that is owned by Seller and is not Excluded Inventory ("**Excess Inventory**"). If either Party disputes the results of any Preliminary Inventory Report, such Party shall advise the other Party and the ABL Lender of any asserted discrepancies within five (5) business days following its receipt of the applicable Preliminary Inventory Report, whereupon the Parties shall use good faith, commercially reasonable efforts to resolve any disagreements regarding the relevant Preliminary Inventory Report. Upon mutual agreement, the Parties shall revise the applicable Preliminary Inventory Report to reflect their mutual agreement regarding any Missing Inventory from and Excess Inventory at the applicable Leased Facility (as revised either to reflect Buyer's (in consultation with the ABL Lender) and Seller's mutual agreement or a determination of the Bankruptcy Court in accordance with the immediately following sentence, a "**Final Location Inventory Report**"). If Buyer and Seller are unable to agree upon the Final Location Inventory Report for any Leased Facility within fifteen (15) calendar days following the date on which the Preliminary Inventory Report is delivered, either Buyer or Seller shall have the right, prior to Buyer and Seller reaching mutual agreement upon Final Location Inventory Reports for all Leased Facilities, to submit at one time all of the disputed items in all of the Preliminary Inventory Reports to the Bankruptcy Court for resolution (whose determination of such disputed items shall be final and binding upon Buyer and Seller). Nothing in this Agreement shall prohibit Buyer from opening any Leased Facility for sales to consumers or commencing sales of the Inventory at such Leased Facility once the Preliminary Inventory Report is delivered in accordance with this Section 1.06(a) for such applicable Leased Facility.

(b)         Upon completion of Final Location Inventory Reports for all of the Leased Facilities in accordance with <u>Section 1.06(a)</u>, above, Buyer and Seller shall make a cash adjustment of the Inventory Purchase Price paid by the Buyer based upon the difference between (i) an amount equal to 43% of the aggregate wholesale value of the various items of Missing Inventory (such value determined as to each item of Missing Inventory in the manner described in <u>Section 1.04(b)</u>

hereof) as reflected collectively in the Final Location Inventory Reports for all Leased Facilities (such percentage of such aggregate value, the **"Overall Missing Inventory Value"**), and (ii) an amount equal to 43% of the aggregate wholesale value of the various items of Excess Inventory (such value determined as to each item of Excess Inventory by reference to Seller's cost inventory report and consistent with inputs used to determine the calculation of the Inventory Purchase Price as provided for in Section 1.04(b)) as reflected collectively in the Final Location Inventory Reports for all Leased Facilities (such percentage of such aggregate value, the **"Overall Excess Inventory Value"**). In the event that the Overall Missing Inventory Value exceeds the amount of the Overall Excess Inventory Value (such excess, the **"Price Reduction Amount"**), Seller shall, within five (5) business days following completion of the last of the Final Location Inventory Reports reimburse and pay to Buyer, by wire transfer of immediately available funds transferred in accordance with written wire transfer instructions provided by Buyer, an amount equal to the Price Reduction Amount. If the Overall Excess Inventory Value exceeds the amount of the Overall Missing Inventory Value (such excess, the **"Price Increase Amount"**), Buyer shall, within five (5) business days following completion of the last of the Final Location Inventory Reports pay to Seller, by wire transfer of immediately available funds transferred in accordance with written wire transfer instructions provided by the Trustee, an amount equal to the Price Increase Amount.

Section 1.07    **Allocation of Purchase Price.**  Buyer shall allocate the Purchase Price (as the same may be adjusted pursuant to Section 1.06, above) in any reasonable manner for tax purposes or otherwise, and the Seller shall not take any inconsistent position on such allocation.

Section 1.08    **Optional Total Physical Inventory.**  Notwithstanding anything to the contrary in Section 1.06(a), the Physical Inventory shall first be conducted for the eight (8) Leased Facilities set forth on Schedule 1.08 (the "**Initial Physical Inventory**").  After the completion of the Initial Physical Inventory, Buyer (with the consent of the ABL Lender) and Seller shall have the option to mutually agree to the value for the remaining Inventory in the other nineteen (19) Leased Facilities not subject to the Initial Physical Inventory.  If the Buyer (with the consent of the ABL Lender) and Seller agree on the value of the remaining Inventory in the other nineteen (19) Leased Facilities not subject to the Initial Physical Inventory and the value of the Inventory that is subject to the Initial Physical Inventory (the "**Agreed Inventory Value**"), Buyer (with the consent of the ABL Lender) and Seller will make an adjustment to the Inventory Purchase Price by either increasing it or decreasing it based on the Agreed Inventory Value and Buyer shall pay to Seller an amount equal to the difference between Inventory Purchase Price and the Agreed Inventory Value if the Agreed Inventory Value is greater than the Inventory Purchase Price, or Seller shall pay to Buyer an amount equal to the difference between Inventory Purchase Price and the Agreed Inventory Value if the Agreed Inventory Value is less than the Inventory Purchase Price.  Any such adjustment to the Inventory Purchase Price shall be made within five (5) business days of Buyer and Seller agreeing to the Agreed Inventory Value.  If Buyer and Seller cannot agree on an Agreed Inventory Value within five (5) business days after the conclusion of the Initial Physical Inventory, the Physical Inventory shall promptly continue in the manner set forth in Section 1.06(a) for the remaining nineteen (19) Leased Facilities that were not subject to the Initial Physical Inventory.

**Section 1.09    Physical Inventory Cost Allocation.** For the avoidance of doubt, the fees and expenses of WIS International related to the Initial Physical Inventory and the Physical Inventory shall be divided equally between the ABL Lender and the Buyer.

## ARTICLE II
## CLOSING

**Section 2.01    Closing.** Subject to the conditions set forth in <u>Sections 6.01 and 6.02</u>, the closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place remotely via exchange of documents by electronic mail or, if the parties agree in writing, at the offices of Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (or at such other place as Seller and Buyer may designate in writing) at 10:00 a.m. (Eastern Time) on the business day following the entry of the Sale Order, unless another time or date, or both, are agreed to in writing by the Parties, but in no event later than May 15, 2020 (the "**Outside Date**"). The date on which the Closing shall be held is referred to in this Agreement as the "**Closing Date.**"

**Section 2.02    Closing Deliverables.**

(a)    At the Closing, Seller shall deliver to Buyer the following:

(i)    a bill of sale (the "**Bill of Sale**"), in a form mutually acceptable to Buyer and Seller, and duly executed by Seller, transferring the Purchased Assets to Buyer;

(ii)    a certificate of the Chapter 7 trustee on behalf of Seller (and in form and content mutually acceptable to Buyer and the Trustee) certifying as to the certifications required to be made under <u>Section 6.01(a) and (b)</u> of this Agreement.

(iii)    A copy of the entered order or orders of the Bankruptcy Court in the form attached hereto as <u>Exhibit B</u> and with such other modifications approved in writing by Buyer and Seller (the "**Sale Order**");

(iv)    Copies or originals of all the Acquired Books and Records; and

(v)    such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement.

(b)    At the Closing, Buyer shall deliver to Seller the following:

(i)    The Closing Cash Amount *less* the amount of the Deposit, by wire transfer (pursuant to wire instructions provided by the Seller to Buyer no later than two (2) business days prior the Closing Date) in immediately available funds;

(ii)    written confirmation that the Deposit delivered to Seller and held by GMC pursuant to <u>Section 1.05</u> above shall be deemed delivered to Seller to be applied toward payment of the cash portion of the Purchase Price;

(iii)    a certificate of the Buyer (and in form and content mutually acceptable to the Trustee and Buyer) certifying as to the certifications required to be made under Section 6.02(a) and (b); and

(iv)    an executed counterpart of the Bill of Sale.

Section 2.03    **Designation of Subsidiary by Buyer.** Prior to the Closing, upon at least one (1) day's prior written notice to Seller, Buyer may designate a wholly-owned subsidiary of Buyer (and only one) to acquire all or part of the Purchased Assets at the Closing, in which event all references to "Buyer" herein shall be deemed to refer to Buyer and/or such affiliates as applicable. For the avoidance of all doubt, (i) no such designation of such a subsidiary to take title to any portion of the Purchased Assets at the Closing shall be deemed to release, relieve or otherwise affect any obligations under this Agreement of the entity which is signatory to this Agreement as Buyer, and (ii) any other designation of an entity to take title of any portion of the Purchased Assets at the Closing shall require Seller's written consent (which consent may be granted or withhold in the Trustee's reasonable discretion, but only after consultation with the ABL Lender.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER; AS IS TRANSACTION

Seller represents and warrants to Buyer that the statements contained in this ARTICLE III are true and correct as of the date hereof and as of the Closing Date:

Section 3.01    **Power and Authority; No Consents; Enforceability.** To Seller's actual knowledge, Seller has full limited liability company power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. Subject to entry of the Sale Order, the execution, delivery and performance by Seller of this Agreement and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby, to Seller's actual knowledge, have been duly authorized. To the actual knowledge of Seller, the execution, delivery and performance by Seller of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not, to the knowledge of Seller, violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Seller or the Purchased Assets. To the actual knowledge of Seller, except for the Sale Order, no consent, approval, waiver or authorization is required to be obtained by Seller from any person or entity (including any governmental authority) in connection with the execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby.

Section 3.02    **Title to Purchased Assets.** Seller has no actual knowledge to indicate that Seller does not own and have good and marketable title to the Purchased Assets. At the Closing, Seller will transfer to Buyer Seller's title to the Purchased Assets free and clear of any mortgage, pledge, lien, charge, security interest, claim, or other encumbrances pursuant to and to the extent provided in the Sale Order.

9

**Section 3.03   Compliance With Laws.** To the actual knowledge of Seller, Seller has complied, and is now complying, with all applicable federal, state and local laws, regulations, licensing and permitting requirements applicable to ownership and use of the Purchased Assets or the Leased Facilities.

**Section 3.04   Legal Proceedings**. To the actual knowledge of Seller, except for the Bankruptcy Case and any related Adversary Proceedings, there are no legal proceedings pending against the Seller, which affect or are likely to affect, the Purchased Assets. There are no legal proceedings pending or, to Seller's actual knowledge, threatened that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

**Section 3.05   "As Is, Where Is."** Buyer hereby expressly (i) acknowledges Seller is selling and Buyer is acquiring and accepting the Purchased Assets "as is, where is" and "with all faults" and, except for representations and warranties expressly made by or on behalf of Seller in this Article III or in the case of actual fraud or intentional misrepresentation made by Seller or the Trustee, Seller makes no representations or warranties of any type (express or implied) regarding the Purchased Assets, the Business or any other matter whatsoever, and (ii) confirms and agrees that Buyer is entering into this Agreement based solely upon Buyer's investigations and due diligence heretofore conducted by Buyer with respect to the Purchased Assets, the Business, the Leased Facilities and all other matters relating to the transaction contemplated herein and will rely solely upon such investigations and diligence (and not any representations, warranties or other assurances of Seller, Trustee, or any other person or entity acting on their respective behalf except for representations and warranties expressly made by or on behalf Seller in this Article III or in the case of actual fraud or intentional misrepresentation made by Seller or the Trustee in proceeding with the consummation of the transaction contemplated by this Agreement.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this ARTICLE IV are true and correct as of the date hereof and as of the Closing Date.

**Section 4.01   Organization and Authority of Buyer; Enforceability.** Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of the state of Texas. Buyer has full limited liability company power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite limited liability company action on the part of Buyer. This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement and the documents to be delivered hereunder constitute legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms.

10

**Section 4.02  No Conflicts; Consents.** The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the certificate of formation, limited liability company agreement or other organizational documents of Buyer; or (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Buyer. No consent, approval, waiver or authorization is required to be obtained by Buyer from any person or entity (including any governmental authority) in connection with the execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby.

**Section 4.03  New Leases.**  Buyer has entered into leases with the Landlords of the Leased Facilities which will become effective immediately upon the occurrence of the Closing and pursuant to which Buyer shall be entitled to occupy and possess the Leased Facilities following the Closing.

**Section 4.04  Financial Capability.**  Buyer has sufficient cash on hand or access to sufficient cash to fully fund the Purchase Price set forth in <u>Section 1.04</u> of this Agreement as and when required by this Agreement and to otherwise consummate the transaction contemplated herein.

**Section 4.05  Sophistication.** Buyer is a knowledgeable, experienced and sophisticated purchaser of assets like the Purchased Assets, has consummated various transactions comparable or larger in size and complexity to the transaction contemplated by this Agreement and is relying solely on its own sophistication, experience and expertise and that of Buyer's consultants in purchasing the Purchased Assets.

**ARTICLE V**
**COVENANTS**

Seller and Buyer hereby covenant and agree, as the case may be, as follows:

**Section 5.01  Maintenance of Purchased Assets.**  Between the date hereof and the Closing, Seller shall not sell, lease, transfer, convey, assign, or otherwise voluntarily dispose of in any manner whatsoever, any of the Purchased Assets. Seller agrees to use commercially reasonable efforts to maintain and preserve the Purchased Assets prior to the Closing in their present state and condition in all material respects, subject to ordinary wear and tear.

**Section 5.02  Breach of Representations and Warranties.** Between the date hereof and the Closing, each of the Parties agrees not to knowingly take, or fail to take, any action which by reason of taking or such failure to take would make any representations or warranties of such Party herein materially untrue, inaccurate, or otherwise misleading.

**Section 5.03  Pre-Closing Further Actions.** Each of the Parties agrees to use commercially reasonable efforts to take all business, organizational and other action necessary to consummate and carry out the transactions contemplated herein, subject to the terms and conditions of this Agreement.

**Section 5.04    Transfer Taxes.** All transfer, documentary, sales, use, stamp, registration, value added and other such taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the documents to be delivered hereunder shall be borne and paid by Buyer when due. Buyer and Seller shall cooperate to prepare and timely file any tax return or other document with respect to such taxes or fees.

**Section 5.05    Post-Closing Further Assurances.** Following the Closing (but, in the Seller's case, only for so long as the Bankruptcy Case is pending), each of the Parties shall (at no cost or expense to the Party to whom the request is being made or directed) execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required (and in each case not inconsistent with the Parties' respective obligations set forth in the other provisions hereof) to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the documents to be delivered hereunder.

## ARTICLE VI
## CLOSING CONDITIONS

**Section 6.01    Conditions Precedent to Obligations of Buyer.** The obligation of Buyer to consummate the transactions contemplated hereby is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Buyer in whole or in part):

(a)    The representations and warranties of Seller set forth in this Agreement shall be true and correct in all material respects at and as of the Closing Date as if made on and as of the Closing Date (or, to the extent given as of a specific date, as of such date). Buyer shall have received a certificate signed by the Trustee, dated the Closing Date, to the foregoing effect;

(b)    Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied  with by it prior to the Closing Date, including, without limitation, Section 5.04, and Buyer shall have received a certificate signed by the Trustee, dated the Closing Date, to the foregoing effect; and

(c)    The Sale Milestones shall have occurred or become effective, as applicable, no later than the dates or times identified in Sections 7.02 .

(d)    Seller shall have delivered, or caused to be delivered, to Buyer all of the items set forth in Section 2.02(a).

**Section 6.02    Conditions Precedent to Obligations of Seller.** The obligation of Seller to consummate the transactions contemplated hereby are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part):

(a)    The representations and warranties of Buyer set forth in this Agreement shall be true and correct in all material respects at and as of the Closing Date as if made on and as of the Closing Date (or, to the extent given as of a specific date, as of such date). Seller shall have

received a certificate signed by an authorized signatory of Buyer, dated the Closing Date, to the foregoing effect;

(b)     Buyer shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Buyer on or prior to the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Buyer, dated the Closing Date, to the foregoing effect; and

(c)     Buyer shall have delivered, or caused to be delivered, to Seller all of the items set forth in <u>Section 2.02(b)</u>.

Section 6.03   **Conditions Precedent to Obligations of Buyer and Seller.** The respective obligations of Buyer and Seller to consummate the Closing and the transactions contemplated hereby are subject to the fulfillment on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Buyer and Seller, on their own behalf, in whole or in part):

(a)     There shall not be in effect any order by a governmental authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; and

(b)     The Bankruptcy Court shall have entered the Sale Order and any stay period applicable to the Sale Order shall have expired or shall have been waived by the Bankruptcy Court.

Section 6.04   **Frustration of Closing Conditions.** Neither Buyer nor Seller may rely on the failure of any condition set forth in <u>Sections 6.01</u>, <u>6.02</u>, or <u>6.03</u>, as the case may be, if such failure was directly caused by such Party's failure to comply with any material provision of this Agreement. For the avoidance of doubt, however, Buyer acknowledges and agrees that (i) this Agreement and the transaction set forth herein shall be subject to higher or better offers submitted to Seller or the Bankruptcy Court (collectively, "**Alternative Offers**"), and (ii) that notwithstanding anything to the contrary in this Agreement, Seller or Buyer shall be entitled to terminate this Agreement upon the entry of an order of the Bankruptcy Court's approving an Alternative Offer in lieu of this Agreement and upon such termination, Seller shall be required to return the Deposit to Buyer.


# ARTICLE VII
# REJECTION OF LEASES AND RELEASE OF CERTAIN CLAIMS OF LANDLORDS; BANKRUPTCY ACTIONS AND MILESTONES

Section 7.01     **Rejection of Leases; Waiver of Postpetition Claims.** As set forth in <u>Exhibit B</u> annexed hereto, the Sale Order shall provide that, effective automatically upon the Closing, (i) the Landlords fully and unconditionally release and waive any and all postpetition claims against Seller and its affiliates and/or their respective bankruptcy estates with respect to the Leased Facilities, and (ii) the leases for each Leased Facility shall be deemed rejected and terminated as of the Closing Date.

**Section 7.02    Sale Order.** No later than May 8, 2020, the Bankruptcy Court shall have entered the Sale Order, which shall provide for the waiver of any appeal period not prohibited from being waived under the Bankruptcy Code.

The actions or events that are identified in <u>Sections 7.02</u> shall be referred to herein as the "**Sale Milestones**".

**ARTICLE VIII**
**TERMINATION**

**Section 8.01    Termination.** This Agreement may be terminated prior to the Closing as follows:

(a)    by Buyer, if the Closing shall not have occurred by the Outside Date; <u>provided</u>, <u>however</u>, that if the Closing shall not have occurred on or before the Outside Date due to a material breach of any representations, warranties, covenants, agreements or obligations contained in this Agreement by Buyer, then the Buyer may not terminate this Agreement pursuant to this <u>Section 8.01(a)</u>;

(b)    by mutual written consent of Buyer and Seller;

(c)    by Buyer, if any of the conditions to the obligations of Buyer set forth in <u>Section 6.01</u> shall have become incapable of fulfillment other than as a result of a material breach by Buyer of any covenant, agreement or obligation contained in this Agreement;

(d)    by Buyer, if there shall be a material breach by Seller of any representation or warranty, or any covenant, agreement or obligation contained in this Agreement which would result in a failure of a condition set forth in <u>Sections 6.01(a)</u>, <u>(b)</u>, or <u>(c)</u> and which material breach cannot be cured or has not been cured by the earlier of (i) ten (10) business days after the giving of written notice by Buyer to Seller of such breach or (ii) the Outside Date;

(e)    by Seller, if any of the conditions to the obligations of Seller set forth in <u>Section 6.02</u> shall have become incapable of fulfillment other than as a result of a material breach by Seller of any covenant, agreement or obligation contained in this Agreement;

(f)    by Seller, if there shall be a material breach by Buyer of any representation or warranty, or any covenant, agreement or obligation contained in this Agreement which would result in a failure of a condition set forth in <u>Sections 6.02(a) or (b)</u> and which breach cannot be cured or has not been cured by the earlier of (i) ten (10) business days after the giving of written notice by Seller to Buyer of such breach or (ii) the Outside Date;

(g)    by Buyer or Seller, if any of the conditions to the obligations of Buyer and Seller set forth in <u>Section 6.03</u> shall have become incapable of fulfillment by the Outside Date; <u>provided</u>, <u>however</u>, neither Buyer nor Seller shall be entitled to terminate this Agreement under this <u>Section 8.01(g)</u> if the failure of a condition set forth in <u>Section 6.03</u> is a result of its breach of any covenant, agreement or obligation contained in this Agreement; or

14

(h)     by Buyer or Seller in accordance with the second sentence of <u>Section 6.04</u> hereof.

**Section 8.02   Procedure Upon Termination.**   In the event of termination by Buyer or Seller, or both, pursuant to <u>Section 8.01</u>, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate, and the purchase of the Purchased Assets hereunder shall be abandoned, without further action by Buyer or Seller.

**Section 8.03   Effect of Termination.**

(a)     In the event that this Agreement is validly terminated as provided herein, subject to the terms of this <u>Section 8.03</u> or any other section of this Agreement whose terms expressly provide for the survival of such provision, term or obligation, then each of the Parties shall be relieved of its duties, covenants, agreements and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Buyer or Seller; <u>provided, however</u>, nothing herein shall be deemed to relieve Seller of the obligation to return to Buyer the Deposit in the event this Agreement is validly and properly terminated by Buyer pursuant to <u>Sections 8.01(a)</u>, <u>(c)</u>, <u>(d)</u>, <u>(g)</u>, or <u>(h)</u>, by Buyer and Seller pursuant to <u>Section 8.01(b)</u>, or by Seller pursuant to <u>Section 8.01(e)</u>, <u>Section 8.01(f)</u> or <u>Section 8.01(h)</u>.  If Buyer or Seller terminate this Agreement pursuant to a subsection of <u>Section 8.01</u> that requires the return of the deposit of the Deposit to Buyer, Seller shall return (or cause the return of the Deposit) to Buyer in accordance with <u>Section 1.05(b)(ii)</u>.

(b)     Nothing in this <u>Section 8.03</u> shall relieve Buyer or Seller of any liability for a breach of this Agreement prior to the date of termination or the Closing.

### ARTICLE IX
### MISCELLANEOUS

**Section 9.01   Expenses.**   All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such costs and expenses.

**Section 9.02   Notices.**   All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this <u>Section 9.02</u>):

If to Seller:          Alfred T. Giuliano, as Chapter 7 Trustee for Art
                       Van Furniture, LLC et al.
                       Attention:  Alfred T. Giuliano
                       2301 E. Evesham Road
                       Pavilion 800, Suite 210

15

Voorhees, NJ 08043
Email: atgiuliano@giulianomiller.com

with a copy to:

Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
E-mail: Jennifer.feldsher@morganlewis.com
Attention: Jennifer Feldsher

And

Pachulski Stang Ziehl & Jones
919 North Market Street, 17th Floor
Wilmington, DE 19801
Email: bsandler@pszjlaw.com;
jrosell@pszjlaw.com
Attention: Bradford J. Sandler and Jason H. Rosell

If to Buyer:

U.S. Realty Acquisitions L.L.C.
1601 Elm St., Suite 4210
Dallas, TX 75201
E-mail: kevin@usassetsinc.com
Attention: Kevin W. Williams

with a copy to:

Richards, Layton & Finger, P.A.
920 North King Street, 2nd Floor
Wilmington, DE 19801
E-mail: shapiro@rlf.com; kurtz@rlf.com
Attention: Zachary I. Shapiro and Mark A. Kurtz

Section 9.03  **Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

Section 9.04  **Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

Section 9.05  **Entire Agreement.** Notwithstanding anything to the contrary in this Agreement, this Agreement, the Sale Order and the documents to be delivered hereunder constitute the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and the documents to be delivered hereunder, the Exhibits and schedules (other than an exception expressly set forth as such in the schedules), the statements in the body of this Agreement will control.

16

**Section 9.06  Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns. Except as provided for in <u>Section 2.03</u>, neither Buyer nor Seller may assign its rights or obligations hereunder without the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 9.07  No Third-party Beneficiaries.**  This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 9.08  Amendment and Modification.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each Party hereto.

**Section 9.09  Waiver.** No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving. No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 9.10  Governing Law; Jurisdiction; Service of Process.**

(a)     This Agreement, and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement (including the Exhibits), or the negotiation, execution, termination, validity, performance or nonperformance of this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable to contracts made and to be performed in such State, without regard to any conflict of laws principles thereof.

(b)     Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement or any other transaction documents contemplated hereby and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement or any other transaction document contemplated hereby, any breach or default hereunder or thereunder, or the transactions, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 9.02</u>; <u>provided</u>, <u>however</u>, that if the Bankruptcy Case has closed, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the District of Delaware sitting in New Castle County or the courts of the State of Delaware sitting in New Castle County and any appellate court from any thereof, for the resolution of any such claim or dispute. The Parties hereby irrevocably waive, to the fullest extent permitted

by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(c)    To the fullest extent permitted by applicable law, each of the Parties hereby consents to process being served by any Party in any suit, action or proceeding arising out of this Agreement by delivery of a copy thereof in accordance with the provisions of <u>Section 9.02</u>.

**Section 9.11   Waiver of Jury Trial.** Each Party acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such Party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

**Section 9.12   Specific Performance.** The Parties agree that irreparable damage would occur in the event that any of the terms or provisions of this Agreement were not performed as required by this Agreement or were otherwise breached. Accordingly, the Parties agree that in the event of any breach or threatened breach by any Party to this Agreement of any covenant, obligation or other provision set forth in this Agreement, for the benefit of the other Party to this Agreement: (a) such other Party shall be entitled (in addition to any other remedy that may be available to it at law or in equity) to: (i) an order of specific performance to enforce the observance and performance of such covenant, obligation or other provision (including, without limitation, the obligation to consummate the transaction contemplated in this Agreement in accordance with the terms and provisions hereof); and (ii) an injunction restraining such breach or threatened breach; and (b) such other Party shall not be required to provide any bond or other security in connection with any such order or in connection with any related action or legal proceeding.

**Section 9.13   Survival; Cumulative Remedies.** All representations, warranties, covenants and agreements contained herein shall survive the Closing.  All rights and remedies that are available to a Party are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

**Section 9.14   Counterparts; Electronic Signatures.** This Agreement may be signed (by hand, electronic means or any other means permitted by applicable law) in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 9.15   Non-recourse.** Neither the Trustee (in any individual or other capacity other than as trustee of Seller's Chapter 7 estate) nor any past, present or future director, officer, employee, agent, advisor (including legal advisor), incorporator, member, manager, partner, creditor, stockholder, equity holder, interest holder or other affiliate of any Party shall have any liability for any obligations or liabilities under this Agreement of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby, provided, however, nothing in

18

this <u>Section 9.15</u> shall limit the liability of any person or entity arising from such person's or entity's actual fraud.

**Section 9.16    Abandoned Assets.** Except as otherwise provided in <u>Section 1.01</u> and <u>Section 1.02</u>, other than the Purchased Assets, all personal property remaining at the Leased Facilities after Closing is deemed abandoned (the "**Abandoned Assets**"). For the avoidance of doubt, no rolling stock is being abandoned or sold under this Agreement. Any personally identifiable information inside the Leased Facilities after Closing to which Buyer has access to in its ordinary course of business in connection with the Purchased Assets, Buyer shall use commercially reasonable efforts to destroy such personally identifiable information at Buyer's sole cost and expense. After Closing, to the fullest extent permitted by applicable law, the Landlords are entitled to dispose of any Abandoned Assets free and clear of all liens, claims and encumbrances of the Trustee, the Buyer, and/or any third party. The Parties knowingly and voluntarily waive any applicable law contrary to this <u>Section 9.16</u>.

[signature page follows]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

ART VAN FURNITURE, LLC

By

Alfred T. Giuliano, as Chapter 7 Trustee
for Art Van Furniture, LLC

U.S. REALTY ACQUISITIONS L.L.C.

By_____
Name:
Title:

STORE SPE AVF II 2017-2, LLC, STORE
SPE AVF I 2017-1, LLC,
STORE MASTER FUNDING XII, LLC,
AND SCF RC FUNDING IV LLC

By_____
Name:  Craig Ganz, Esquire
Title:  Counsel to the Landlords

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

ART VAN FURNITURE, LLC

By_____

    Alfred T. Giuliano, as Chapter 7 Trustee
    for Art Van Furniture, LLC

U.S. REALTY ACQUISITIONS L.L.C.

By_____

Name: Jeffrey Love

Title: Manager/President

STORE SPE AVF II 2017-2, LLC, STORE
SPE AVF I 2017-1, LLC,
STORE MASTER FUNDING XII, LLC, AND
SCF RC FUNDING IV LLC

By_____

Name:  Craig Ganz, Esquire

Title:  Counsel to the Landlords

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**ART VAN FURNITURE, LLC**

By_____

    Alfred T. Giuliano, as Chapter 7 Trustee
    for Art Van Furniture, LLC

**U.S. REALTY ACQUISITIONS L.L.C.**

By_____

Name:

Title:

**STORE SPE AVF II 2017-2, LLC, STORE
SPE AVF I 2017-1, LLC,
STORE MASTER FUNDING XII, LLC,
AND SCF RC FUNDING IV LLC**

By: _____

Name:  Craig Ganz, Esquire

Title:  Counsel to the Landlords

Exhibit A

Leased Facilities

| Store # | Address | City | State |
|---|---|---|---|
| 12 | 22035 Eureka Rd | Taylor | Michigan |
| 14 | 32301 N. Woodward Ave. | Royal Oak | Michigan |
| 15 | 13855 E 8 Mile Rd. | Warren | Michigan |
| 20 | 29905 7 Mile Rd | Livonia | Michigan |
| 30 | 5053 Dixie Hwy | Waterford | Michigan |
| 33 | 2660 Tittabawasse Rd | Saginaw | Michigan |
| 34 | 4095 E Court St | Burton | Michigan |
| 36 | 4150 Wilder Rd | Bay City | Michigan |
| 40 | 550 Ring Rd | Portage | Michigan |
| 44 | 14055 Hall Rd | Shelby Township | Michigan |
| 73 | 1234 32nd St | Port Huron | Michigan |
| 80 | 4101 E Grand River Ave | Howell | Michigan |
| 105 | 1619 Anderson Road | Petoskey | Michigan |
| 167 | 1293 E Higgins Rd | Schaumburg | Illinois |
| 193 | 900 E Boughton Rd | Woodward | Illinois |
| 315 | 1540 Gemini Place | Columbus | Ohio |
| 2-LF | 3664 Washington Rd | McMurray | Pennsylvania |
| 15-LF | 400 Chauvet Drive | Pittsburgh | Pennsylvania |
| 42-LF | 4661 Lindle Road | Harrisburg | Pennsylvania |
| 28-LF | 4 Sellers Drive | Altoona | Pennsylvania |
| 48-WF | Fort Evans Road | Leesburg | Virginia |
| 1-LF | 600 Main Street | Mt. Pleasant | Pennsylvania |
| 63-WF | 1530 E. Joppa Road | Towson | Maryland |
| 23 | 8300 N. Wayne Rd. | Westland | Michigan |
| 53 | 425 E. Eisenhower Pkwy. | Ann Arbor | Michigan |
| 59 | 630 Seminole Rd. | Muskegon | Michigan |
| 67 | 6100 B. Drive 49014 | Battle Creek | Michigan |

Exhibit B

Sale Order

Schedule 1.04(b)

Summary of Purchase Price

<u>Schedule 1.06(a)</u>

Scheduled Inventory

Schedule 1.08

Initial Physical Inventory Locations

| Store Number | Address | City | State |
|---|---|---|---|
| 1-LF | 600 MAIN STREET | Mt. Pleasant | Pennsylvania |
| 12 | 22035 EUREKA RD | Taylor | Michigan |
| 14 | 32301 WOODWARD AVE | Royal Oak | Michigan |
| 23 | 8300 N WAYNE RD | Westland | Michigan |
| 30 | 5053 DIXIE HWY | Waterford | Michigan |
| 40 | 550 RING RD | Portage | Michigan |
| 44 | 14055 HALL RD | Shelby Township | Michigan |
| 167 | 1293 E HIGGINS RD | Schaumburg | Illinois |