FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| ART VAN FURNITURE, LLC et al[1] | ) | Case No. 20-10553 (CSS) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |
| | ) | |
| | ) | |

**DECLARATION OF JAY STEINBACK IN SUPPORT OF MOTION  JS WESTFLO, LLC,
FOR RELIEF FROM AUTOMATIC STAY**

Pursuant to 28 U.S.C. § 1746, I, Jay Steinback, submit this Declaration under penalty of

perjury under the laws of the United States of America, and state as follows:

1.      I am the manager of  JS Westflo, LLC ( the "<u>Landlord</u>"). I am familiar with the

facts described herein.

2.      I submit this declaration in support of the Landlord's Motion for Relief From

Automatic Stay (the "<u>Motion</u>").

3.      Attached hereto as **<u>Exhibit 1</u>** is a true and correct copy of the lease executed

between the Debtor as tenant and Landlord JS Westflo, LLC as landlord  ("Lease").

4.      Attached hereto as **<u>Exhibit 2</u>** is a true and correct copy of the emails dated March

21 and 22, 2020 whereby the Debtor advised me that it was returning the keys to the leased

premises described in the Motion and providing the codes.

5.      Attached hereto as **<u>Exhibit 3</u>** is a true and correct copy of the text messages dated

March 31, 2020 whereby the Debtor advised me that it will not be paying additional rent for  the

leased premises.

---

[1]The debtors in these cases, along with the last four digits of the federal tax identification number for each of the debtors, where applicable are: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); Comfort Mattress, LLC (4463).

6.      As such, my lessor received an offer from a new tenant of all the premises subject to this Motion.  The lease would commence on June 1, 2020 and would result in significantly lower rent than was required to be paid on a monthly basis by the Debtor under the Lease.

7.      I have received no rent or other payments due on  the Lease reflected on Exhibit 1 since Debtor has filed this bankruptcy proceeding.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on May 12, 2020


_/s/ Jay Steinback_____
Jay Steinback

# EXHIBIT 1



Execution Version– Bridgeton

# LEASE AGREEMENT

JS Westflo, LLC
_____
## LANDLORD

and

Art Van Furniture, LLC

Trade Name: Art Van Furniture
_____
## TENANT

For

925 Northwest Plaza

Bridgeton, Missouri
_____
## LOCATION

Date of Lease: _____

# TABLE OF CONTENTS

ARTICLE I: BASIC LEASE PROVISIONS AND DEFINITIONS ...................................................................1
    Section 1.01. Basic Lease Provisions and Definitions. .........................................................................1

ARTICLE II: DEMISED PREMISES.............................................................................................................3
    Section 2.01. Demised Premises. .......................................................................................................3
    Section 2.02. Surrender of the Demised Premises. .............................................................................3

ARTICLE III: TERM OF LEASE...................................................................................................................4
    Section 3.01. Lease Term. ..................................................................................................................4
    Section 3.02. Commencement of Lease Term.....................................................................................4
    Section 3.03. Holding Over..................................................................................................................4
    Section 3.04. Option to Extend the Lease Term. .................................................................................4

ARTICLE IV: RENT......................................................................................................................................4
    Section 4.01. Minimum Annual Rent. ..................................................................................................4
    Section 4.02. Additional Rent. .............................................................................................................4

ARTICLE V: USE OF THE DEMISED PREMISES......................................................................................5
    Section 5.01. Use of the Demised Premises........................................................................................5
    Section 5.02. Rules and Regulations. .................................................................................................5
    Section 5.03. Quiet Enjoyment. ..........................................................................................................5
    Section 5.04. Environmental................................................................................................................6

ARTICLE VI: TENANT'S CONSTRUCTION AND MAINTENANCE ............................................................7
    Section 6.01. Tenant's Installations and Alterations............................................................................7
    Section 6.02. Signs, Awnings and Canopies.......................................................................................7
    Section 6.03. Laws, Waste or Nuisance. .............................................................................................7

ARTICLE VII: MAINTENANCE OF BUILDING; ACCESS TO DEMISED PREMISES.................................8
    Section 7.01. Landlord Responsibilities...............................................................................................8
    Section 7.02. Tenant Responsibilities. ................................................................................................8

ARTICLE VIII: REAL ESTATE TAXES .......................................................................................................9
    Section 8.01. Real Estate Taxes. ........................................................................................................9

ARTICLE IX: UTILITIES...............................................................................................................................9
    Section 9.01. Utilities & Trash Removal. .............................................................................................9

ARTICLE X: ASSIGNMENT; SUBLEASE....................................................................................................9
    Section 10.01. Assignment or Subletting.............................................................................................9

ARTICLE XI: NOTICES..............................................................................................................................10
    Section 11.01. Notices.......................................................................................................................10

ARTICLE XII: INDEMNITY; PROPERTY AND LIABILITY INSURANCE...................................................10
    Section 12.01. Indemnity. ..................................................................................................................10
    Section 12.02. Insurance...................................................................................................................10
    Section 12.03. Waiver of Subrogation. ..............................................................................................11
    Section 12.04. Insured's Release.......................................................................................................11

ARTICLE XIII: LIABILITY ..........................................................................................................................11
    Section 13.01. No Partnership............................................................................................................11
    Section 13.02. Successors. ...............................................................................................................11

Section 13.03.  Waiver................................................................................................................11

Section 13.04.  Consent Clause. ................................................................................................11

**ARTICLE XIV:  DAMAGE CLAUSE** ..............................................................................................**11**

Section 14.01.  Destruction. ......................................................................................................11

**ARTICLE XV:  CONDEMNATION** ..................................................................................................**12**

Section 15.01.  Condemnation. ..................................................................................................12

**ARTICLE XVI:  PRIORITY OF LEASE**............................................................................................**12**

Section 16.01.  Subordination and Attornment.............................................................................12

Section 16.02.  Estoppel.............................................................................................................13

Section 16.03.  Recording. .........................................................................................................13

**ARTICLE XVII:  DEFAULT AND REMEDIES**....................................................................................**13**

Section 17.01.  Tenant Default....................................................................................................13

Section 17.02.  Landlord's Remedies..........................................................................................14

Section 17.03.  Landlord Default. ...............................................................................................14

Section 17.04.  Tenant's Remedies.............................................................................................14

Section 17.05.  Legal Fees.........................................................................................................15

**ARTICLE XVIII:  MISCELLANEOUS PROVISIONS** ...........................................................................**15**

Section 18.01.  Tenant Defined; Use of Pronoun.........................................................................15

Section 18.02.  Delivery of Lease................................................................................................15

Section 18.03.  Entire Agreement................................................................................................15

Section 18.04.  Partial Invalidity. ................................................................................................15

Section 18.05.  Applicable Law. ..................................................................................................15

Section 18.06.  Rules of Construction. ........................................................................................15

Section 18.07.  Brokerage Commission. .....................................................................................15

Section 18.08.  Force Majeure. ...................................................................................................15

Section 18.09.  Bankruptcy or Insolvency of Tenant. ...................................................................16

Section 18.10.  Confidentiality. ...................................................................................................16

Section 18.11.  Landlord's Obligation To Cooperate With Tenant. ................................................16

Section 18.12.  Determination Of Days. ......................................................................................16

Section 18.13.  Claims Limitation. ...............................................................................................16

Section 18.14.  Compliance with Anti-Terrorism, Embargo, Sanctions & Anti-Money Laundering Laws.16

Section 18.15.  Tenant Contingencies.........................................................................................16

**EXHIBIT A: DEMISED PREMISES**...................................................................................................**19**

**EXHIBIT A-1:  LEGAL DESCRIPTION**..............................................................................................**20**

**EXHIBIT B:  SIGN SPECIFICATIONS**...............................................................................................**21**

**EXHIBIT C: ESTOPPEL**...................................................................................................................**22**

**EXHIBIT D: SUBORDINATION AND NON-DISTURBANCE AGREEMENT**.........................................**24**

**EXHIBIT E:  MEMORANDUM OF LEASE**..........................................................................................**27**

**EXHIBIT F:  RULES AND REGULATIONS AND RESTRICTED USES**...............................................**31**

**EXHIBIT G:  EASEMENT WITH COVENANT AND RESTRICTIONS** ..................................................**32**

Execution Version--Bridgeton

This lease (the "Lease") is made and entered into the date set forth below by and between JS Westflo, LLC, a Missouri limited liability company, herein called "Landlord," and **ART VAN FURNITURE, LLC**, a Delaware limited liability company, herein called "Tenant" and doing business as **Art Van Furniture**.

In consideration of the mutual covenants contained herein, and other good and valuable consideration, the sufficiency of which is hereby acknowledged, Landlord and Tenant, intending to be legally bound hereby, agree with each other as follows:

# ARTICLE I:  BASIC LEASE PROVISIONS AND DEFINITIONS

**Section 1.01.  Basic Lease Provisions and Definitions.**

Wherever used in this Lease, the following terms shall have the meanings indicated.  Each reference in this Lease to any of the Basic Lease Provisions in this Section 1.01 shall be deemed and construed to incorporate all of the terms provided under such Basic Lease Provision, provided that the Basic Lease Provisions shall be controlled by the specific terms and provisions of this Lease relating to the subject matter of the Basic Lease Provision.

**A. Demised Premises:**

| | |
|---|---|
| **Demised Premises or Premises** (See Section 2.02): | Approximately 45,314 square feet as depicted on Exhibit A. |
| **Address of Demised Premises:** | 925 Northwest Plaza, Bridgeton, MO 63074 |

**B. Lease Term:**

| | |
|---|---|
| **Lease Term** (See Section 3.01): | 60 months |
| **Lease Year:** | Each consecutive period of twelve months during the Term commencing on the Lease Commencement Date. |
| **Commencement Date**: | January 15, 2019 |
| **Expiration Date:** | December 31, 2023, unless sooner terminated as otherwise provided |
| **Renewal Option** (See Section 3.04): | **Four (4)** Renewal Option Term(s) of **sixty (60)** months each |

**C. Rent**

| | |
|---|---|
| **Minimum Annual Rent** (See Section 4.01): | A base monthly rent during the Lease Term shall be as follows: |

| Period | Annual Base Rent | Monthly Base Rent |
|---|---|---|
| Lease Year 1 | $389,700.40 | $32,475.03 |
| Lease Year 2 | $389,700.40 | $32,475.03 |
| Lease Year 3 | $389,700.40 | $32,475.03 |
| Lease Year 4 | $389,700.40 | $32,475.03 |
| Lease Year 5 | $389,700.40 | $32,475.03 |

| | |
|---|---|
| **Renewal Option Term Minimum Annual Rent:** | Minimum Annual Rent of $350,277.22 in the initial year of the first year of the First Renewal Year, with 2% annual increases commencing one the first day following the end of the preceding Lease Year of each subsequent Lease Year of any Renewal Term. |

| Period | Annual Base Rent | Monthly Base Rent |
|---|---|---|
| Renewal Year 1 | $350,277.22 | $29,189.77 |
| Renewal Year 2 | $357,282.76 | $29,773.56 |
| Renewal Year 3 | $364,428.42 | $30,369.04 |
| Renewal Year 4 | $371,716.99 | $30,976.42 |
| Renewal Year 5 | $379,151.33 | $31,595.94 |

| | |
|---|---|
| **Additional Rent** (See Section 4.02): | Throughout all terms of the Lease the Tenant shall pay as additional rent all amounts listed in Section 4.02. |

K:\LEGAL\FRANCHISE    (LEGAL)\AVF    Franchising    LLC\1-NON-REGISTRATION    STATES\MO\Rothman    Furniture\Workout Documents\Drafts\LEASE\Form of LEASE AGREEMENT.12-20-18.Execution Version.docx

1

**D.  Landlord and Tenant Notice:**

| | |
|---|---|
| **Landlord's Address for Notices:** | **JS Westflo, LLC**<br>45 Colonial Hills Drive,<br>St. Louis, Missouri 63141<br>Attn: Jay Steinback, Manager<br>Phone: 636-978-3500<br>Facsimile: 636-284-3096<br>Email: |

cc:

Danna McKitrick, P.C.
7701 Forsyth Blvd., Suite 800
St. Louis, Missouri 63105
Attn: Daniel Fort
Phone: 314-889-7177
Email: dfort@DMFIRM.com

Greensfelder, Hemker, & Gale, P.C.
10 South Broadway, Suite 2000
St. Louis, Missouri 63102
Attn: Patrick Sweeney
Phone: 314-345-4794
Email: pjs@greensfelder.com

| | |
|---|---|
| **Landlord's Address for Rent Payments:** | **JS Westflo, LLC**<br>45 Colonial Hills Drive,<br>St. Louis, Missouri 63141<br>Attn: Jay Steinback, Manager<br>Phone: 636-978-3500<br>Facsimile: 636-284-3096<br>Email: |
| **Tenant Name:** | ART VAN FURNITURE, LLC |
| **Trade Name**<br>(See Section 5.01): | **Art Van Furniture**<br>and such other trade name adopted by Tenant or its Affiliates |
| **Tenant's Notice Address:** | Attn: Lease Administration<br>6500 E. Fourteen Mile Road<br>Warren, Michigan 48092<br>Phone: (586) 939-0800<br>Facsimile: (586) 983-3029 |
| **Tenant's Billing Address:** | Attn: Accounting<br>6500 E. Fourteen Mile Road<br>Warren, Michigan 48092<br>Phone: (586) 939-0800<br>Facsimile: (586) 983-3029 |

1

## ARTICLE II:  DEMISED PREMISES

**Section 2.01. Demised Premises.**

Landlord represents and warrants to Tenant that, as of the Lease Date and as of the Lease Commencement Date: (a) Landlord is and shall be the fee owner of the Demised Premises more particularly described on Exhibit A hereto, commonly known as 925 Northwest Plaza, Bridgeton, Missouri; comprising of approximately 45,314 square feet ("Floor Area"), the term "Floor Area" as used in this Lease shall mean and include all areas for the exclusive use and occupancy by Tenant, measured from the exterior surface of the Demised Premises' exterior walls and from the center of interior demising partitions, and shall include, but not be limited to, restrooms, mezzanines, warehousing or storage areas, clerical or office areas and employees areas within the tenant's premises; Floor Area shall not include areas within the Demised Premises for mechanical systems and similar uses that do not exclusively serve the Demised Premises (b) the Demised Premises and Tenant's Use are in full compliance with all applicable "Laws" (as herein after defined), including without limitation, zoning ordinances, the Americans With Disabilities Act of 1990 (42 U.S.C. § 1201 et seq.), as amended and supplemented from time to time (the "ADA") and "Environmental Laws" (as defined in Section 5.04 of this Lease) and will not violate any recorded use restrictions affecting the Demised Premises; (c) the "Building Systems" (as herein defined) are and shall be in good working condition and (d) the Demised Premises are zoned and such zoning district permits, as a matter of right, Tenant's Use. Prior to the Lease Commencement Date, Landlord will furnish to Tenant evidence of Landlord's title to the Demised Premises in the form of a copy of a recent title policy or commitment, together with copies of all title exceptions identified thereon. Landlord shall at all times during the Term maintain at least the minimum parking ratio for the Demised Premises required by applicable Laws (without variance or exceptions therefrom). 0

If any title matter, would prohibit Tenant's use of the Demised Premises for a retail store for the sale of furniture, bedding, mattresses, or home furnishings, or otherwise materially affect Tenant's rights under this Lease (a "Title Objection"), then Tenant may terminate this Lease by written notice to Landlord without waiver of any of Tenant's other remedies at law or in equity, prior to the Lease Commencement Date.

In consideration of the mutual promises, covenants, and agreements herein contained, the adequacy of which is acknowledged by both parties, and in further consideration of the rent and other charges to be paid and the covenants to be performed by Tenant, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Demised Premises. Tenant, its employees, customers and invitees shall have the right to park in the parking facilities at no charge.

**Section 2.02. Surrender of the Demised Premises.**

At the Expiration Date or upon the earlier termination of this Lease in accordance with the terms and provisions hereof, Tenant agrees to: (a) surrender possession of the Demised Premises to Landlord; (b) return the Demised Premises to Landlord in at least the condition existing on the Lease Commencement Date (as such condition may be altered by any Alteration), ordinary wear and tear, damage by casualty and condemnation, act of god, and repairs which are the obligation of Landlord excepted; and (c) bear the costs of de-identification and shall repair or reimburse Landlord for the cost of any damage the results from Tenant's removal of trade dress items and Removable Property, as defined herein, from the Demised Premises. On the Expiration Date or within thirty (30) days thereafter, Landlord and Tenant (together with any professional inspector(s) retained by either party) shall conduct a walk-through inspection of the Demised Premises and shall complete (or cause to be completed) an inspection report to establish the condition of the Demised Premises on the Expiration Date. Unless Landlord notifies Tenant that the Demised Premises are not in the condition good condition required by this Section (including a detailed description thereof) within thirty (30) days of the Expiration Date ("Landlord's Damage Notice"), Landlord shall be deemed to have approved the condition of the Demised Premises. If either party elects to retain a professional inspector, any fees or costs charged by such inspector shall be paid by the party which retained such inspector.

In no event shall Landlord's Damage Notice require Tenant to remove any improvements and/or alterations attached to the realty except for as necessary to satisfy Tenant's de-identification obligation as set forth above. All furniture, trade fixtures, machinery and equipment ("Removable Property") installed in the Demised Premises at the expense of Tenant, or other occupant, shall remain the property of Tenant, or such other occupant; provided, however, Tenant shall, at any time and from time to time, during the Lease Term, have the option to relinquish its property rights with respect to Removable Property, which option shall be exercised by written notice of such relinquishment to Landlord and, from and after the exercise of said option, the property specified in said notice shall be the property of Landlord.  Notwithstanding the foregoing, Landlord agrees that although affixed to the Demised Premises, Tenant's trade fixtures, which include without limitation all machinery and equipment used in the operation of Tenant's business, telephone alarm systems, attached and unattached showcases and shelving and display units, which are placed on the Demised Premises by Tenant from time to time during the Term of this Lease shall be the property of Tenant and at the expiration of termination of this Lease may be removed from the Demised Premises by Tenant.

Execution Version--Bridgeton

# ARTICLE III:  TERM OF LEASE

**Section 3.01.  Lease Term.**

The Lease Term shall be for the period set forth in Section 1.01, unless sooner terminated in accordance with the terms and provisions herein. This Lease and the tenancy hereby created shall cease and terminate at the end of the Term hereof without the necessity of any notice from either the Landlord or the Tenant to terminate the same.

**Section 3.02.  Commencement of Lease Term.**

The Lease Term shall commence on the Commencement Date, as set forth in Section 1.01. The parties hereby acknowledge that certain obligations under various Articles herein may commence prior to the Commencement Date and the parties agree to be bound by all of such obligations from and after the date of this Lease.

**Section 3.03.  Holding Over.**

This Lease shall terminate without further notice on the Expiration Date. In the absence of any written agreement to the contrary, if Tenant should remain in occupancy of the Demised Premises after the expiration of the Lease Term, it shall so remain as a Tenant from month-to-month, at a Minimum Annual Rent, paid monthly, equivalent to one-hundred fifty (150%) percent of the amount of Minimum Annual Rent due and payable for the last month of the Term, together with Additional Rent payments due and owing under the Lease, and all other provisions of this Lease applicable to such tenancy shall remain in full force and effect. For the avoidance of doubt, Additional Rent payments by Tenant in any holdover period shall not be subject to the increased holdover rate.

**Section 3.04.  Option to Extend the Lease Term.**

(a)     Tenant shall have the right and option to extend the Lease Term upon the same terms and conditions, there shall be four (4) option terms of sixty (60) months each under option term (the "Renewal Option Term"), provided that at such time the option is exercised Tenant is not in default under this Lease beyond any applicable cure period.

(b)     Tenant shall notify Landlord of its election to exercise each Renewal Option Term by serving written notice one-hundred eighty (180) days before the last day of the then current Lease Term. If Tenant exercises any of its renewal options, then after the exercise of Renewal Option Term, all references to the Term of this Lease shall be deemed to mean the Term as extended pursuant to this Section 3.04. If Tenant does not exercise such option before the last day of the then current Lease Term, and Tenant continues in possession of the Demised Premises after such expiration, the Term will be extended automatically on a month-to-month basis in accord with Section 3.03, until thirty (30) days after the either party terminates the month-to-month tenancy and Tenant surrenders the Demised Premises to Landlord.

# ARTICLE IV:  RENT

**Section 4.01.  Minimum Annual Rent.**

Tenant hereby covenants and agrees to pay to Landlord the Minimum Annual Rent set forth in Section 1.01, unless suspended, abated or diminished, as hereinafter provided, in equal monthly installments together with all sums due as Additional Rent. Tenant's obligation to pay Rent under this Lease shall be deferred until Landlord provides Tenant with its Taxpayer Identification Number and Certification on Form W-9.

**Section 4.02.  Additional Rent.**

(a)     As used herein, the term "Additional Rent" shall mean all sums due to Landlord from Tenant under this Lease other than Minimum Annual Rent, including and not limited to all real estate taxes, charges under the ECR, insurance charges and other amounts due and payable to Landlord by Tenant hereunder. As used herein, "Rent" shall mean any and all payments of Minimum Annual Rent and Additional Rent, and shall, except as otherwise provided in this Lease, be paid to Landlord on or before the first day of each and every succeeding calendar month in advance during the Term.

(b)     Except as otherwise expressly provide in this Lease, the Minimum Rent and the Additional Rent shall be paid to Landlord without notice or demand and without deduction or offset, in lawful money of the United States of America at Landlord's address for notice noted in Section 1.01, or such other person or at such other place as Landlord may from time to time designate in writing.

(c)     All Rent payments shall commence on the Commencement Date.

Execution Version--Bridgeton

# ARTICLE V:  USE OF THE DEMISED PREMISES

**Section 5.01.  Use of the Demised Premises.**

(a)    Tenant shall use the Demised Premises as retail store for the sale of furniture, bedding, mattresses, and home furnishings provided such retail use is not in conflict with (i) any applicable zoning ordinances, or (ii) the exclusive uses and prohibited uses set forth on the attached Exhibit F "Restricted Uses," attached hereto and made a part hereof.  Landlord represents that Exhibit F accurately reflects all of the exclusive uses and prohibited uses that presently encumber the Premises under other recorded instruments.  Upon the expiration or earlier termination of the lease or other written instrument containing a Restricted Use, the Demised Premises shall not be subject to such Restricted Use, and such use shall no longer be a Restricted Use.  Upon the request of Tenant, Landlord shall promptly advise Tenant which Restricted Uses still encumber the Demised Premises and will furnish to Tenant the documentary support therefor.

(b)    Notwithstanding anything contained herein to the contrary, Tenant may change its trade name without Landlord's consent to the name that Tenant is changing all or substantially all other of Tenant's stores, provided that all costs for such name change and all signage changes related to such name change shall be borne exclusively by Tenant.

(c)    Landlord represents and warrants that Tenant shall have the right to occupy the Demised Premises twenty-four (24) hours per day, seven (7) days per week, and operate its retail business in compliance all applicable land use laws and governmental and association regulations. Landlord agrees to indemnify Tenant for any and all damages, costs, expenses or liabilities associated with any breach of the above warranty. If at any time during the Term or any extension thereof, through no fault of Landlord, Tenant is unable to occupy the Demised Premises twenty-four (24) hours a day seven (7) days a week or to provide the uses permitted herein, Landlord and Tenant will use best efforts to obtain an exclusion or variance for Tenant's retail business operations. In the event the parties are unable to obtain such exclusion or variance within a reasonable time, Tenant shall have the right to terminate this Lease upon thirty (30) days advance written notice to Landlord hereunder ("Termination Notice") without waiver of any of Tenant's other remedies at law or in equity. Tenant shall provide the Termination Notice within six (6) months of Tenant's receipt of written notification of the inability to operate in accordance with this Section or Tenant's right to terminate shall be null and void.

(d)    Tenant shall be permitted to use the sidewalks and the parking areas located in front of the Demised Premises to conduct sidewalk sales, tent sales, and similar outdoor sales events consistent with the ECR's and all applicable land use laws and governmental and association regulations.

(e)    Notwithstanding anything contained or set forth in this Lease to the contrary, nothing set forth in this Lease shall be construed, in any manner whatsoever, as an express or implied covenant of continuous operation on the part of Tenant, and Landlord acknowledges that there is no covenant of continuous operation with respect to the Demised Premises, arising hereunder or otherwise, express or implied, on the part of Tenant.  If Tenant elects, in Tenant's sole discretion, to cease business operations at the Demised Premises, such cessation of business shall not be deemed a breach or default of this Lease, and Tenant shall remain liable for the performance of its obligations and payment of all Rents hereunder.  However, in the event Tenant ceases operating a business at the Demised Premises for reasons other than temporary cessations due to casualty, eminent domain or alterations to the Demised Premises and if such cessation continues for more than one hundred eighty (180) consecutive days for any reason other than repairs, remodeling, inventory, or force majeure, then at any time thereafter for so long as such cessation continues, Landlord may elect to terminate this Lease by written notice given to Tenant. The termination notice shall state a date of termination and the Lease shall terminate on such date as if that was the originally fixed expiration date of the Term. The termination date shall be no less than thirty (30) days after the date of Landlord's notice of termination given under this section of the Lease in which event Tenant shall vacate the Demised Premises and surrender all rights to use and occupy the Demised Premises by such date and upon such termination, Tenant and Landlord shall have no continuing obligation to the other under this Lease.

**Section 5.02.  Rules and Regulations.**

Tenant shall comply with all reasonable rules and regulations as may be established by Landlord from time to time pertaining to the appearance and operation of the Demised Premises, provided such rules and regulations do not conflict with the terms of this Lease, are reasonable and customary for the operation of similar shopping centers in the municipality in which the premises are located, are uniformly enforced among all tenants, and do not otherwise materially and adversely interfere with Tenant's use, access, visibility or parking. Tenant shall conduct its business in the Demised Premises in all respects in a dignified manner and in accordance with high standards of retail store operation. Subject to the foregoing, Tenant agrees to abide by the Rules and Regulations set forth in Exhibit F, if applicable.

**Section 5.03.  Quiet Enjoyment.**

Landlord represents to and covenants with Tenant that:

a)    Landlord has obtained or will obtain all consents or approvals that Landlord may require mortgagees of the property of which the Demised Premises are a part ("Property") to permit Landlord to enter into this Lease;

b)    There are no agreements or restrictive covenants to which Landlord is a party or affecting the Demised Premises that in any way prohibit or restrict Tenant's proposed use of the Demised Premises;

c)    Landlord has no knowledge and has received no written notice of any planned or contemplated construction or improvements to any street, highway or driveway providing access to the Demised Premises or any property abutting the Demised Premises by any governmental entity or adjoining landholder; and

d)    Landlord shall not enter into any covenants, easements or other agreements after the date of this Lease that prohibit or restrict Tenant's proposed use of the Demised Premises or otherwise change the terms of this Lease without Tenant's prior written consent, which may be withheld in Tenant's sole discretion; and

e)    Tenant's proposed uses of the Demised Premises are currently permitted under the ECR's and all applicable land use laws and governmental and association regulations; and

f)    Landlord shall warrant and defend Tenant in the quiet enjoyment and possession of the Demised Premises during the Term.

g)    The legal description set forth on Exhibit A-1 is sufficient to identify the Premises depicted on Exhibit A and includes no additional property;

h)    The Site Plan correctly and completely shows all improvements on or to be made to the Premises;

i)    The Premises complies with the ECR's and all laws, rules, regulations and ordinances

The representations and covenants in this Lease are material inducements to Tenant in this Lease, the breach of which will cause irreparable and severe harm to Tenant. Without limiting any other right or remedy of Tenant, in the event of Landlord's breach of the representations and covenants in this Section, Tenant has the right, after providing Landlord with thirty (30) days' prior written notice a breach of a representations and covenants in this Section, and if Landlord has not cured such breach within thirty (30) days, if practicable, (i) to terminate this Lease during any time during the period that the breach continues without waiver of any of Tenant's other remedies at law or in equity, or (ii) to pay Substitute Rent during the period that the breach continues in a mutually agreed upon amount.

**Section 5.04. Environmental.**

(a)    Neither Tenant, its successors or assigns, nor any permitted assignee, permitted sublessee or other person acting at the direction of Tenant shall: (i) manufacture, treat, use, store or dispose of any Hazardous Materials (as hereinafter defined) on the Demised Premises or any part thereof in violation of any applicable Environmental Laws; or (ii) permit the release of a Hazardous Material on or from the Demised Premises or any part thereof. Notwithstanding the foregoing, Landlord hereby consents to the use by Tenant of materials routinely used in Tenant's business so long as said materials are used, kept, stored, and disposed of in a manner that complies with all laws relating to the use, storage, and disposal of same.

(b)    In the event of a release of Hazardous Material by Tenant or any of Tenant's agents, employees, contractors, subtenants or licensees, Tenant shall indemnify, protect, defend and hold Landlord harmless from and against any and all costs, fees, damages, losses, expenses and/or liabilities of any kind or nature in any way related to the release, removal, transportation and/or disposal of such Hazardous Materials. If any action or proceeding be brought against Landlord by reason of such claim, Tenant upon notice from Landlord shall defend the same at Tenant's expense by counsel reasonably satisfactory to Landlord. In the event Landlord incurs any costs, fees, damages, losses, expenses, and/or liabilities in connection with a release of Hazardous Materials by Tenant or any of Tenant's agents, employees, contractors, subtenants or licensees, Tenant shall pay such costs, fees, and/or expenses within ten (10) days of written request from Landlord. Landlord shall not incur any fees or costs before notifying Tenant that it is likely to incur such fees and costs unless Landlord is required to take corrective action.

(c)    Landlord represents and warrants that to the best of its knowledge as of the date of this Lease, no release (as hereinafter defined) of Hazardous Materials has occurred in the Demised Premises nor are Hazardous Materials are otherwise present in the Demised Premises. Landlord represents and warrants to the best of its knowledge as of the date of this Lease that the Demised Premises are in compliance with all federal, state and/or local statutes, regulations, rules, and/or ordinances, and with all orders, decrees or judgments of governmental authorities or courts having jurisdiction, relating to the use, generation, manufacture, collection, treatment, disposal, storage, control, removal or cleanup of Hazardous Materials ("Environmental Laws"). To the extent any Hazardous Materials are present in, at, on or about the Demised Premises and/or the Property through no fault of Tenant, Landlord shall be responsible for removing or otherwise remediating such Hazardous Materials as required by, and in full compliance with, all Environmental Laws at no cost to Tenant.

(d)    Landlord shall indemnify, protect, defend, and hold Tenant harmless from and against any and all costs, fees, damages, losses, expenses, and/or liabilities of any kind or nature in any way related to the existence, removal, transportation or disposal of any Hazardous Materials in, at, on or about the Demised Premises and/or the Property unless caused by Tenant or any of Tenant's agents, employees, contractors, subtenants or licensees. If any action or proceeding be brought against Tenant by reason of such claim, Landlord upon notice from Tenant shall defend the same at Landlord's expense by counsel reasonably satisfactory to Tenant.

Execution Version--Bridgeton

(e)    The term "Hazardous Material" shall mean any waste, substance or material that is: (i) identified in Section 101(14) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as the same may be amended from time to time (herein called "CERCLA"); or (ii) determined to be hazardous, toxic, a pollutant or contaminant, under federal, state or local law, including, but not limited to, petroleum and petroleum products. The term "release" shall have the meaning given to such term in Section 101(22) of CERCLA.

## ARTICLE VI:  TENANT'S CONSTRUCTION AND MAINTENANCE

**Section 6.01.  Tenant's Installations and Alterations.**

(a)    Tenant may not perform any major repairs or renovations to the Demised Premises without having first received Landlord's written consent thereto.  Notwithstanding anything contained herein to the contrary, Landlord agrees that it shall not unreasonably withhold or delay its consent to Tenant's request to perform interior non-structural repairs, renovations, remodeling or alterations.  Further notwithstanding anything contained herein to the contrary, Tenant may make interior non-structural alterations to the Demised Premises up to a total cost per year of Seventy-Five Thousand and 00/100 Dollars ($75,000.00) without Landlord's consent or approval required.

(b)    Landlord hereby grants Tenant the right to install, maintain, repair, use, operate and remove a satellite dish receiver or other transmission or reception device (the "Equipment") on the roof or exterior walls of the building of which the Demised Premises is a part in a location and manner of installation approved by Landlord, such approval not to be unreasonably withheld, conditioned or delayed.  Tenant shall be responsible for all costs and expenses associated with such installation, maintenance, repair, use, operation and removal of the Equipment including, without limitation, obtaining any and all governmental permits and approvals, as necessary.  Tenant hereby acknowledges and agrees that Landlord shall have no liability or responsibility whatsoever in connection therewith and, excepting negligence or willful misconduct of Landlord, its agents, contractors, employees, servants, invitees, licensees or concessionaires, shall have no liability or responsibility whatsoever for any damage, injury or loss to the Equipment or to Tenant's business as a result of any damage, injury or loss to the Equipment.  Tenant, at its sole cost and expense, shall install, maintain and repair the Equipment in a good and workmanlike manner and shall keep, maintain and operate the Equipment in compliance with all applicable building codes and other applicable codes and regulations.  Tenant shall, at its sole cost and expense, cause the Equipment to be removed from the roof of the Demised Premises at the expiration or sooner termination of this Lease.

**Section 6.02.  Signs, Awnings and Canopies.**

(a)    Tenant shall have the option to erect, at its sole cost and expense subject to the approval of the appropriate governmental agencies the following signage of such height and dimensions as Tenant shall determine and bearing such legend or inscription as Tenant shall determine upon all sides of the exterior of the Demised Premises the right to erect the exterior signage as shown in Exhibit B - Sign Specifications attached hereto and made a part hereof.  Notwithstanding anything contained herein to the contrary, Tenant shall have the right to the maximum building signage available under local law and specifically, to the maximum signage permitted by law consisting of individual channel letters as is typical for Tenant's typical store in the state where the Demised Premises are located.  Tenant shall also have the right to maximum signage on any pylon or monument signage now available or that may become available at any time during the Term or any extension thereof.  Landlord and Tenant will use best efforts to obtain an exclusion of variance or Tenant's signs to the extent reasonably necessary.  Tenant's standard window signs, temporary promotional window signs, banners, and displays depicted in "Tenant's Standard Corporate Identity Packet" attached hereto as Exhibit B are hereby approved by Landlord.

(b)    In the event that Tenant participates in any additional signage, such signage shall be placed in a location mutually acceptable to Landlord and Tenant and Tenant shall approve the overall composition, elevation and specifications of any additional signage.

(c)    Landlord shall not place upon the Demised Premises "for lease," "to let" or "for sale" signs, or other similar signs at any time during the Lease Term or any other Option Term, except that Landlord may place signs advertising the Demised Premises being "for lease," "to let" or "for sale", during the last one hundred and eighty (180) days of any Lease Term, if Tenant has not exercised its right to the next successive Renewal Term Option, or at any time after Tenant has ceased business operations for more than one hundred eighty (180) days.

**Section 6.03.  Laws, Waste or Nuisance.**

Landlord, at its sole costs and expense, will be responsible to maintain the premises to be in compliance with all applicable Laws pertaining to the Building. Tenant shall comply with all Laws pertaining to the conduct of its business in the Demised Premises. Tenant shall not perform any acts or carry on any practices which may injure the building or be a nuisance or menace to other tenants or the public.

Notwithstanding any provision of this Lease to the contrary, all exterior areas of the Demised Premises, including without limitation, customer parking areas, walkways, ramps, exterior of the buildings and ingress to and egress from the Demised Premises shall be constructed and maintained by Landlord at all times during the Term of this Lease and any renewal(s) in strict compliance with applicable requirements of the ADA.  Landlord represents and warrants to Tenant that all interior areas of the Demised Premises comply with ADA as of the Commencement Date.  Landlord shall indemnify, protect, defend and hold Tenant harmless from any and all costs, fees, damages, losses,

K:\LEGAL\FRANCHISE    (LEGAL)\AVF    Franchising    LLC\1-NON-REGISTRATION    STATES\MO\Rothman    Furniture\Workout Documents\Drafts\LEASE\Form of LEASE AGREEMENT.12-20-18.Execution Version.docx

7

Execution Version--Bridgeton

expenses, and/or liabilities of any kind or nature in any way related to Landlord's obligations under this Section. Tenant shall maintain the interior of the Demised Premises and construct and maintain its improvements thereto in strict compliance with applicable ADA requirements. Tenant shall indemnify, protect, defend, and hold Landlord harmless from any and all costs, fees, damages, losses, expenses and/or liabilities of any kind or nature in any way related to Tenant's obligations under this Section 6.03.

# ARTICLE VII:  MAINTENANCE OF BUILDING; ACCESS TO DEMISED PREMISES

### Section 7.01. Landlord Responsibilities.

Landlord shall maintain the following in good condition and repair (including replacements, as reasonably necessary): (i) the Building footings, foundations, structural steel columns and girders at Landlord's sole expense; and the Building roof and exterior walls (collectively "Landlord Maintenance Responsibilities"); and (ii) the "Building Systems" (as hereinafter defined). Landlord will also be responsible, at its sole cost and expense, for any repairs or replacements to the Building or Demised Premises that are of a capital nature under GAAP, including, without limitation, the Building Systems (collectively referred to herein as "Capital Replacements"), and Tenant shall have no obligation to pay for any Capital Replacements made by Landlord. Notwithstanding the foregoing, with respect to the heating, ventilating and air conditioning equipment serving the Demised Premises (the "HVAC"), Tenant is solely responsible for all HVAC costs associated with maintaining; repairing; and replacing, if necessary, throughout the term of this Lease. Tenant shall maintain a bi-annual service and maintenance contract for the HVAC with a qualified, licensed HVAC contractor to maintain and service the HVAC.

If Tenant becomes aware of any condition that is Landlord's responsibility to repair pursuant to this Lease, Tenant shall promptly notify Landlord of the condition. As used herein, the term "Building Systems" shall mean any structural, heating, ventilating, or air conditioning systems serving the Building and/or the Demised Premises.

Landlord shall be responsible for all Landlord Maintenance Responsibilities with regard to the Demised Premises. In addition, Landlord covenants and agrees that, within fifteen (15) days following written notice from Tenant and at Landlord's sole cost and expense, Landlord will make, or for those items that reasonably will take longer, commence and diligently pursue to completion, all necessary repairs and/or replacements to the structural elements, concrete slab and exterior surfaces of the Demised Premises including, but not limited to, the roof of the Demised Premises, roof covering and membrane (including interior ceiling and coverings if damaged by leakage), exterior paint, and all necessary structural repairs to the walls, concrete slab, footings, and foundations of the Demised Premises.

Furthermore, Landlord covenants and agrees to make, or for those items that reasonably will take longer, commence and diligently pursue to completion all necessary repairs and/or replacements within fifteen (15) days following written notice from Tenant and all other reasonable maintenance to the Premises, provided such repairs are not made necessary through negligence or willful misconduct of Tenant. Except as otherwise provided under Section 9.02(b) of this Lease, Tenant shall pay its share of all such costs and expenses for the maintenance and upkeep of the Premises.

In the event Landlord fails to make necessary repairs to the Demised Premises within said fifteen (15) day period following written notice or to commence such repairs and diligently pursue them to completion in the case of repairs that cannot be completed within said period, Tenant shall be permitted to make such repairs and bill Landlord for the reasonable costs of same. In the event of an emergency, Tenant shall attempt to provide Landlord with prompt notice, but shall be permitted to make necessary repairs and bill Landlord for the reasonable cost of same. In the event Landlord fails to pay any bona fide bill within thirty (30) days of receipt from Tenant, Tenant shall have the right to deduct such costs and expenses from subsequent Minimum Annual Rent installments to be made under this Lease.

### Section 7.02. Tenant Responsibilities.

Except to the extent the same is required to be maintained or repaired by Landlord pursuant to Section 7.01, Tenant shall, at its sole cost and expense, keep the Demised Premises and every part thereof in at least the condition and repair existing on the Lease Commencement Date (as such condition may be altered by any "Alterations", as hereinafter defined), ordinary wear and tear excepted. Tenant shall keep the Demised Premises and sidewalks, service-ways and loading areas adjacent to the Demised Premises neat, clean and free from dirt, rubbish, ice or snow at all times. Tenant shall have the option to employ JVS Services for property and HVAC maintenance in Tenant's sole discretion.

Tenant shall maintain a bi-annual service and maintenance contract for the HVAC with a qualified, licensed HVAC contractor to maintain and service the HVAC. Tenant will provide Landlord with a copy of such service and maintenance contract. So long as Tenant has complied with all of its obligations under this Section 7.02, Landlord will make all needed replacements to the existing HVAC, in service on the Lease Commencement Date (outside of routine maintenance covered by the Tenant's bi-annual service and maintenance contract) in accordance with Section 7.01.

# ARTICLE VIII:  REAL ESTATE TAXES

**Section 8.01.  Real Estate Taxes.**

Tenant shall pay, as Additional Rent, "Real Estate Taxes" in accordance with the following:

(a)    "Real Estate Taxes" shall mean and include all taxes, assessments (amortized over the longest period available to the Landlord and paid by Tenant in relation to the Lease Term) and other governmental charges, general and special, including, without limitation, assessments for public improvements or benefits, which shall, during the Term, be assessed, levied, and imposed by any governmental authority upon the land that comprises the Demised Premises.  Notwithstanding anything herein to the contrary, Real Estate Taxes shall not include: (i) any late fees or penalties (except those late fees and penalties caused by Tenant's failure to pay any Real Estate Taxes when due, which shall be Tenant's sole responsibility), (ii) any assessments for infrastructure or improvement districts, (iii) capital taxes, (iv) income taxes, (v) corporate taxes, (vi) corporation capital taxes, (vii) excise taxes, (viii) profits taxes, any municipal, county, state or federal income or (ix) franchise, business license, corporate, documentary transfer tax, succession, capital levy, excess profit or net profit taxes or tax increases of any kind in connection with the transfer, sale or change in ownership of all or part of the Demised Premises, or (x)other taxes personal to the Landlord.  Anything to the contrary notwithstanding, Tenant shall not be required to pay any public improvement assessments pertaining to the original construction of the Demised Premises which may have been levied prior to the Commencement Date, including any such assessments which may be payable after said date, but which relate to public improvements made prior to said date.

(b)    From and after the Commencement Date and throughout the Lease Term, Tenant shall timely pay Real Estate Taxes directly to the appropriate county and municipal governmental entities and provide Landlord with proof of payment. If Tenant's obligation to pay its share of Real Estate Taxes commences on a date other than the first day of the tax year of the taxing authority, Tenant shall pay a proportionate share of the Real Estate Taxes for the tax year in which the Commencement Date occurs, which share shall be based upon the length of time that this Lease shall have been in existence during such first tax year. Landlord shall furnish to Tenant a statement showing (i) the Real Estate Taxes for such tax year from such authority; (ii) Tenant's share of same, i.e. the Proportionate Share multiplied by said Real Estate Taxes; and (iii) the credit or balance due, as the case may be, after applying sums already paid against the Real Estate Percentage as reflected on said statement.  Any balance due to Landlord shall be payable by Tenant within thirty (30) days after delivery of the statement.

(c)    Tenant shall have the right to contest the amount of Taxes or the increases in Taxes which Tenant is obligated to pay under this Lease; provided, however, Tenant shall give Landlord written notice of any such intention to contest such Taxes.

# ARTICLE IX:  UTILITIES

**Section 9.01.  Utilities & Trash Removal.**

Landlord covenants and agrees that, the Demised Premises shall be properly serviced with gas, electric, telephone, water, sewer and other utilities sufficient to meet Tenant's requirements.  After installation and connection, Tenant shall be solely responsible for and promptly pay the respective provider all charges for trash and rubbish removal, heat, water, electricity, sewers or any other utility used or consumed in or for the Demised Premises commencing on the Commencement Date.  On or before the Commencement Date, Landlord shall provide at its sole cost and expense separate meters for all utilities supplied to the Demised Premises.  If the utility service is interrupted due to the negligence of Landlord, its agents or employees, there shall be a prorate abatement of Rent and all other charges payable by Tenant pursuant to this Lease based on the amount of time and area deemed nonfunctional by Tenant (such abatement to occur without any notice and cure period).  If the utility service is interrupted not due to the negligence of Landlord, its agents or employees Landlord shall be obligated to use commercially reasonable efforts to obtain the resumption of such utility services as quickly as reasonably possible.

Tenant shall pay the cost of removal of garbage or refuse from the Demised Premises directly to the service provider selected in Tenant's sole discretion. Tenant shall store all trash and garbage within the Demised Premises, or in a trash dumpster or similar container approved by Landlord as to type, location and screening prior to Lease Commencement Date; and Tenant shall arrange for the regular pick-up of such trash and garbage at Tenant's expense (unless Landlord finds it necessary to furnish such a service, in which event Tenant shall be charged an equitable portion of the total of charges to all tenants using the service).  Receipt and delivery of goods and merchandise and removal of garbage and trash shall be made only in the manner and areas prescribed by Landlord.

# ARTICLE X:  ASSIGNMENT; SUBLEASE

**Section 10.01.  Assignment or Subletting.**

Tenant may, on at least thirty (30) days' prior written notice, assign the Lease or sublet to an affiliate entity, without charge or penalty, so long as such assignee or sublessee meets Landlord's reasonable financial

qualifications. Landlord agrees to execute written documentation confirming any such assignment and release of Tenant all the conditions set forth herein are satisfied.

# ARTICLE XI:  NOTICES

**Section 11.01.  Notices.**

(a)     Any notice required or permitted to be given under this Lease or by law shall be in writing, addressed to the party at the address set forth above, and must be served by one of the following methods: (a) certified mail, return receipt requested, postage prepaid; (b) by a reputable prepaid overnight courier (such as Federal Express or UPS); or (c) electronic delivery, via email or facsimile provided one of the other methods is also used.

(b)     Either party may, at any time or from time to time, designate in writing additional or substitute addresses for that above set forth, and thereafter notices shall be directed to such additional or substitute address for that above set forth.  Any notice given in conformance with the above shall be deemed received on the earlier of (i) five (5) business days after the date given to the delivery service or (ii) the date on which the noticed party receives or refuses receipt of the notice.

# ARTICLE XII:  INDEMNITY; PROPERTY AND LIABILITY INSURANCE

**Section 12.01.  Indemnity.**

From and after the Commencement Date and subject to Section 12.03 below, Tenant shall protect, defend, indemnify and hold Landlord harmless from and against any and all claims, damages, losses, liens, judgments, penalties, expenses including reasonable attorneys and consultants fees, and/or liabilities arising out of or relating to injury to any person or loss of or damage to property that occurs within the Demised Premises, except for those caused solely by the intentional misconduct, negligent acts or omissions of Landlord or Landlord's agents, members, officers, employees or contractors.

**Section 12.02.  Insurance.**

(a)     Landlord shall, at all times during the Term, maintain in full force and effect or cause to be maintained in full force and effect on an occurrence basis the following insurance meeting the requirements of this section below in at least the following amounts: (i) Commercial General Liability Insurance with respect to the Demised Premises for bodily injury, death and property damage, and including contractual liability coverage, with a combined single limit not less than One Million Dollars ($1,000,000,000) per occurrence, Two Million Dollars ($2,000,000) annual aggregate, and Five Million Dollars ($5,000,000,000) umbrella, which shall name Tenant as an additional insured; (ii) Comprehensive Automobile Liability insurance, including Hired, Owned or Non-Owned vehicles (including vehicles provided by Tenant) and contractual liability, with bodily injury, death and property damage minimum limits of One Million Dollars ($1,000,000) per accident, which shall name Tenant as an additional insured, and (iii) Worker's Compensation insurance coverage adequate to comply with all statutory requirements covering all persons employed by Landlord and Employer's Liability with minimum limits of at least One Million Dollars ($1,000,000.00). Landlord shall be financially responsible for payment of its premiums, deductibles, retentions, self-insurance, coinsurance, uninsured amounts or any amount in excess of policy limits.

(b)     Tenant shall, at all times during the Term, maintain in full force and effect or cause to be maintained in full force and effect on an occurrence basis the following insurance meeting the requirements of Section 12.02(c) below in at least the following amounts: (i) Commercial General Liability Insurance with respect to the Demised Premises for bodily injury, death and property damage, and including contractual liability coverage, with a combined single limit amount of not less than One Million Dollars ($1,000,000,000) per occurrence, Two Million Dollars ($2,000,000) annual aggregate, and Five Million Dollars ($5,000,000,000) umbrella, which shall name Landlord as additional insureds; (ii) Comprehensive Automobile Liability insurance, including Hired, Owned or Non-Owned vehicles (including vehicles provided by Landlord) and contractual liability, with bodily injury, death and property damage minimum limits of One Million Dollars ($1,000,000) per accident, which shall name Landlord as additional insureds; (iii) Workers' Compensation insurance coverage adequate to comply with all statutory requirements covering all persons employed by Tenant and Employer's Liability insurance with minimum limits of at least One Million Dollars ($1,000,000); and (iv) special form-causes of loss property insurance covering the full replacement cost of all Tenant's personal property placed in the Premises. All insurance policies maintained by Tenant will be primary and will not apply as excess or require contribution from any coverage maintained by Landlord. Tenant shall be financially responsible for payment of its premiums, deductibles, retentions, self-insurance, coinsurance, uninsured amounts or any amount in excess of policy limits.

(c)     All insurance policies which shall be required to maintain by Landlord and Tenant, pursuant to this section  shall be written by insurers which have an A.M. Best & Company rating of "A-", Class "VII", or better and who are authorized to write such business in the State of where the Demised Premises is located. Prior to taking possession of the Demised Premises and thereafter upon request, the Tenant shall deliver to Landlord certificates of insurance evidencing insurance coverage required to be maintained by Tenant under this Lease. Upon request,

Landlord shall deliver to Tenant certificates of insurance evidencing the insurance coverage required to be maintained under this Lease by Landlord.

**Section 12.03.  Waiver of Subrogation.**

Landlord and Tenant hereby waive any rights each may have against the other on account of any loss or damage occasioned to Landlord or Tenant, as the case may be, their respective property, the Premises, or its contents to the extent the loss would be covered by a special form - causes of loss policy of property. The parties each, on behalf of their respective insurance companies insuring the property of either Landlord or Tenant against any such loss, waive any right of subrogation that it might have against Landlord or Tenant, as the case may be, if such loss or damage shall have been caused by the fault of the other party

**Section 12.04.  Insured's Release.**

Landlord and Tenant mutually agree that with respect to any loss which is covered by insurance then being carried by them respectively, or required to be carried, the one carrying or required to carry such insurance and suffering said loss hereby releases the other of and from any and all claims with respect to such loss to the extent of such insurance carried or required to be carried.

# ARTICLE XIII:  LIABILITY

**Section 13.01.  No Partnership.**

Any intention to create a joint venture or partnership relation between the parties hereto is hereby expressly disclaimed.

**Section 13.02.  Successors.**

This Lease and the covenants and conditions herein contained shall inure to the benefit of and be binding upon Landlord, its successors, and assigns, and shall be binding upon Tenant, its successors, assigns, executors, administrators, and legal representatives, and shall inure to the benefit of Tenant, its successors, and only such assignees of Tenant to whom Tenant has assigned in compliance with the provisions of this Lease.

**Section 13.03.  Waiver.**

The failure of either party to insist, in any one or more instances, upon a strict performance of any covenant of this Lease or to exercise any option or right herein contained shall not be construed as a waiver or relinquishment for the future of such covenant, righter option, but the same shall remain in full force and effect unless the contrary is expressed in writing.

**Section 13.04.  Consent Clause.**

Unless another time period is stipulated in this Lease for consent or approval or a second notice is required prior to inaction being deemed consent or approval hereunder, failure by a party to approve, disapprove or comment to the other party's request for consent or approval within thirty (30) days after receipt of such request shall be deemed approval. Wherever in this Lease the consent or approval of a party is required, unless otherwise specified, such consent shall not be unreasonably withheld, delayed or conditioned.  If in this Lease it is provided that Landlord's consent or approval as to any matter will not be unreasonably withheld, and it is established by a Court or other body having final jurisdiction that Landlord has been unreasonable, Landlord shall be deemed to have consented to or approved the matter for which its consent or approval was requested and Landlord may be liable to Tenant for money or money damages by reason of withholding or delaying its consent or approval.

# ARTICLE XIV:  DAMAGE CLAUSE

**Section 14.01.  Destruction.**

If the building that comprises the Demised Premises should be damaged by fire, the elements, unavoidable accident or other casualty to the extent that the Demised Premises are rendered inaccessible for retail purposes or totally or partially unusable in the ordinary course of Tenant's business, Tenant shall give immediate written notice thereof to Landlord.  Landlord shall thereafter, within forty-five (45) days after receipt of written notice of such damage, notify Tenant of the amount of time Landlord estimates it will take to repair such damage ("Landlord's Estimate").

If the loss to Landlord would be fully (exclusive of any deductible) covered by insurance required to be maintained by Landlord under this Lease or for Landlord's benefit, which loss renders the Demised Premises totally or partially inaccessible or unusable by Tenant in the ordinary conduct of Tenant's business, then either party may terminate this Lease by written notice to the other, except that if: (i) Landlord's Estimate is equal to or less than ninety (90) days from the date of Tenant's Receipt of Landlord's Estimate; (ii) such damage or destruction is not the result

of willful misconduct of Tenant; and (iii) Landlord is not prevented by applicable Laws from rebuilding to its preexisting condition, Landlord shall, at Landlord's expense, repair the same and this Lease shall remain in full force and effect and a proportionate reduction of the Minimum Annual Rent and Additional Rent shall be allowed Tenant for such portion of the Demised Premises as shall be rendered inaccessible or unusable to Tenant during the period of time that such portion is unusable or inaccessible. In the event such repairs are not complete within one hundred-twenty (120) days from the date of Tenant's Receipt of Landlord's Estimate, Tenant shall have the right to terminate this Lease by giving Landlord notice of Tenant's desire so to do, in which event this Lease shall be of no further force or effect and neither party shall have any liability to the other except for any liabilities which may exist prior to cancellation.

If, at any time prior to the expiration or termination of this Lease, the Demised Premises are totally or partially damaged or destroyed from a risk, the loss to Landlord that would not be fully (exclusive of any deductible) covered by insurance required to be maintained by Landlord under this Lease or for Landlord's benefit, then either party may terminate this Lease by written notice to the other.  If Tenant does not terminate this Lease and Landlord elects to repair or restore such damage or destruction, this Lease shall continue in full force and effect provided that such repairs or restorations are completed within ninety (90) days from the date of Tenant's Receipt of Landlord's Estimate and the Minimum Annual Rent and Additional Rent shall be proportionately reduced as provided in Section 25(b). In the event such repairs are not complete within one hundred-twenty (120) days, Tenant shall have the right to terminate this Lease by giving Landlord notice of Tenant's desire so to do, in which event this Lease shall be of no further force or effect and neither party shall have any liability to the other except for any liabilities which may exist prior to cancellation.

Notwithstanding the foregoing, if the Demised Premises are wholly or partially damaged or destroyed within the final six (6) months of the Term, Landlord or Tenant may, at its option, elect to terminate this Lease by giving the other party notice of its desire so to do, in which event this Lease shall be of no further force or effect and neither party shall have any liability to the other except for any liabilities which may exist prior to cancellation.

In the event of any damage to or destruction of the Demised Premises, Landlord shall not be required to repair, replace or compensate anyone for the personal property, trade fixtures, alterations, machinery, equipment or furniture of Tenant, unless said damage or destruction: (i) is covered by insurance maintained by Landlord; or (ii) is caused by Landlord's negligence and/or willful misconduct or of its agents, employees, contractors, invitees or licensees.

# ARTICLE XV:  CONDEMNATION

**Section 15.01.  Condemnation.**

If more than twenty-five percent (25%) of the Demised Premises shall be taken or condemned by any competent authority for any public or quasi public use or purpose, then Tenant may, at its option, terminate this Lease. Any award for the property of which the Demised Premises are a part, shall be the property of Landlord.  Tenant, however, shall be entitled to claim, prove and receive in the condemnation proceeding such awards excluding so called bonus awards as may be allowed for fixtures and other equipment installed by it and any other award expressly made to Tenant.

The Rent and additional sums in the case of any partial taking or condemnation, shall be apportioned as of the date of vesting of title and Tenant shall be entitled to a pro rata reduction in the annual Minimum Annual Rent and Additional Rent payable hereunder based on the portion that the floor area in the space taken bears to gross floor area of the Demised Premises immediately prior to such taking.

# ARTICLE XVI:  PRIORITY OF LEASE

**Section 16.01.  Subordination and Attornment.**

The rights of Tenant under this Lease shall be and are subject and subordinate at all times to the lien of any bank or institutional mortgage or deed of trust now or hereafter in force against the Property or upon any buildings hereafter placed upon the Property, and to all advances made or hereafter to be made upon the security thereof, on the condition that the note holder and mortgagee or beneficiary secured by such deed of trust or deeds of trust or mortgage(s), as the case may be, shall and does agree: a) to recognize this Lease so that Tenant's rights described herein are not diminished by reason of such subordination; and b) not to disturb the tenancy of Tenant in writing in the event of foreclosure if Tenant is not then in default beyond any applicable cure period. Tenant shall, from time to time upon receipt of request therefor by Landlord, deliver to Landlord such Subordination And Non-Disturbance Agreement ("SNDA") in the form attached as Exhibit D as requested by any lender or proposed lender to evidence such subordination.  Landlord shall pay Tenant a non-refundable fee in the amount of One Thousand and 00/100 Dollars ($1,000.00) for each SNDA requested from Tenant to cover Tenant's administrative, legal and other costs and expenses, and Tenant is authorized to deduct that amount from Rent.

Tenant shall, in the event any proceedings are brought for the foreclosure of, or in the event of exercise of the power of sale under any mortgage made by Landlord covering the Demised Premises, attorn to the purchaser

K:\LEGAL\FRANCHISE    (LEGAL)\AVF    Franchising    LLC\1-NON-REGISTRATION    STATES\MO\Rothman    Furniture\Workout Documents\Drafts\LEASE\Form of LEASE AGREEMENT.12-20-18.Execution Version.docx

12

upon any such foreclosure or sale and recognize such purchaser as Landlord under Lease on the condition that such purchaser expressly assumes all of the Landlord's obligations hereunder in writing.

### Section 16.02. Estoppel.

Tenant shall, from time to time upon receipt of request therefor by Landlord, execute and deliver a certificate to any proposed mortgagee or purchaser or to Landlord a written declaration in form substantially similar to Exhibit C, attached hereto, certifying (if such be the case) that this Lease is in full force and effect, that there are no defenses or offsets thereto, or stating those claimed by Tenant and certifying such other matters directly related to this Lease that may be reasonably requested by Landlord.  Landlord shall pay Tenant a non-refundable fee in the amount of One Thousand Dollars ($1,000.00) for each estoppel certificate requested from Tenant to cover Tenant's administrative, legal and other costs and expenses, and Tenant is authorized to deduct that amount from Rent.

### Section 16.03. Recording.

The parties agree that upon the request of either party, they will execute, acknowledge, and deliver a memorandum of lease, in form substantially similar to Exhibit E to the end that the same may be recorded at the expense of the requesting party.  Upon the expiration or earlier termination of the Lease and within ten (10) days following written notice from Landlord, Tenant agrees to execute a Memorandum of Lease Termination or Quitclaim Deed discharging any recording made pursuant to this Section.

# ARTICLE XVII:  DEFAULT AND REMEDIES

### Section 17.01. Tenant Default.

Any one of the following shall be deemed to be an "Event of Tenant Default":

(a)    Failure on the part of Tenant to make payment of Rent or any other monetary amount due under this Lease within five (5) days after Landlord has sent to Tenant notice of such default.

However, if: (i) Landlord shall have sent to Tenant one (1) notice of a monetary default, even though the same shall have been cured and this Lease not terminated; and (ii) during the twelve (12) month period following the sending of the latest of said notices of default by Landlord to Tenant, Tenant thereafter shall default in the timely payment of any Rent or monetary payment, the same shall be deemed to be an Event of Tenant Default upon Landlord giving Tenant written notice thereof, without the five (5) day grace period set forth above.

(b)    A receiver or trustee shall be appointed for the Demised Premises or for all or substantially all of the assets of Tenant or any guarantor of Tenant's obligation under this Lease.

(c)    Tenant shall not or permit to be done anything which creates a lien upon the Demised Premises or upon all or any part of the Property, and such lien is not released within thirty (30) days of Tenant receiving notice of lien or notice of intent to file, whichever is earlier.

(d)    Tenant or any guarantor of Tenant's obligations under this Lease shall become insolvent, or shall make a transfer in fraud of creditors, or shall make an assignment for the benefit of creditors.

(e)    Tenant or any guarantor of Tenant's obligations under this Lease shall file a petition under any section or chapter of the federal Bankruptcy Code, as amended, or under any similar law or statute of the United States or any state thereof; or Tenant or any guarantor of Tenant's obligations under this Lease shall be adjudged bankrupt or insolvent in proceedings filed against Tenant or any guarantor of Tenant's obligation under this Lease thereunder.

With respect to a non-monetary violation of this Lease, failure of Tenant to cure the same within thirty (30) days after Landlord has sent to Tenant notice of such failure or, if the failure is of such a nature that the cure cannot reasonably be completed within said thirty (30) day period, the failure of Tenant to commence the cure within said thirty (30) day period and thereafter to diligently and continuously pursue the completion of the cure.  Tenant shall be obligated to commence forthwith, to prosecute diligently and continuously, and to complete as soon as possible the curing of such violation; and if Tenant fails so to do, the same shall be deemed to be an Event of Tenant Default.

However, if: (i) Landlord shall have sent to Tenant one (1) notice of a non-monetary default within any twelve (12) month period, even though the same shall have been cured and this Lease not terminated; and (ii) during the twelve (12) month period following the sending of the latest of such notices of default by Landlord to Tenant, Tenant thereafter shall default in any non-monetary matter substantially similar to those for which Tenant previously received written notice, the same shall be deemed to be an Event of Tenant Default upon Landlord giving Tenant written notice thereof and Tenant shall have no grace period within which to cure the same.

Landlord agrees to use reasonable efforts to relet the Demised Premises so as to mitigate the Tenant's damages, but in no event shall Landlord be obligated to use efforts greater than that used by Tenant to relet the Demised Premises.

**Section 17.02.  Landlord's Remedies.**

If an Event of Tenant Default occurs and continues beyond any applicable cure period, Landlord shall have the following remedies:

(a)      Landlord may continue the lease in full force and effect for so long as Landlord does not terminate the Tenant's right to possession and Landlord may enforce all of Landlord's rights and remedies under this Lease, including the right to recover Rent and Additional Rent as it becomes due, provided that Tenant may assign or sublet its interest in the Demised Premises, subject to the reasonable consent of Landlord, during such time that Tenant continues to pay Rent and Additional Rent; or

(b)      Landlord may terminate Tenant's right to possession, in which case this Lease shall terminate and, upon such termination, the Landlord may recover from the Tenant:

(i)      The worth at the time of award of the unpaid Rent and Additional Rent that had been earned at the time of termination;

(ii)      The worth at the time of award of the amount by which the unpaid Rent and Additional Rent that would have been earned after termination until the time of award exceeds the amount of such rental loss that the Tenant proves could have been reasonably avoided;

(iii)      Subject to subsection (c), the worth at the time of award of the amount by which the unpaid Rent and Additional Rent for the balance of the Term after the time of award exceeds the amount of such rental loss that the Tenant proves could be reasonably avoided;

(c)      The "worth at the time of award" of the amounts referred to in paragraphs (i) and (ii) of subsection (b) is computed by allowing interest at such lawful rate as may be specified in this Lease or, if no such rate is specified in this Lease, at the legal rate. The worth at the time of award of the amount referred to in paragraph (iii) of subsection (b) is computed by discounting such amount at a rate equal to the lesser of the rate announced by the Wall Street Journal from time to time as the "prime rate" plus 2% per annum or the highest rate permitted by law (the interest rate determined hereby is referred to as the "Interest Rate").

**Section 17.03.  Landlord Default.**

If Landlord fails to perform any of the covenants or conditions required on its part to be performed pursuant to this Lease, where such failure continues for a period of thirty (30) days after receipt of written notice specifying the nature and extent of such default in detail (provided, however, that if such default is of a nature that it cannot be reasonably be cured within such thirty (30) day period, Landlord shall have such additional time as may be required to effect such cure provided Landlord commences the cure within such thirty (30) day period), Landlord shall be in default under this Lease for so long as such condition continues thereafter.

**Section 17.04.  Tenant's Remedies.**

In the event that Landlord shall at any time be in default in the observance or performance of any of the covenants and agreements required to be performed and observed by Landlord hereunder and any such default shall continue for a period of thirty (30) days after written notice to Landlord (provided, however, if the default, by its nature, is not reasonably susceptible to cure within thirty (30) days, Landlord shall have such longer period as is reasonably required so long as Landlord commences the cure within such 30-day period and thereafter diligently pursues such default to completion without interruption within a reasonable period of time, not to exceed ninety (90) days after such notice), Tenant shall be entitled at its election, in additional to all remedies otherwise provided in this Lease and otherwise available at law or in equity:

(a)      To bring suit for the collection of any amounts for which Landlord may be in default, or for the performance of any other covenant or agreement devolving upon Landlord, without terminating the Lease;

(b)      To terminate this Lease without waiving Tenant's rights to damages for Landlord's failure to perform any of its covenants or agreements hereunder. In the event Tenant shall elect to terminate this Lease, all rights and obligations of Tenant, and of any permitted successors or assigns, shall cease and terminate, except that Tenant shall have and retain full right to sue for and collect all amounts for the payment of which Landlord shall then be in default and all damages to Tenant by reason of any such breach; and/or

(c)      Cure such default for the account of Landlord, and Landlord, within ten (10) days of the receipt of a statement therefor, shall reimburse Tenant for any amount paid and any expense or reasonable contractual liability so incurred. Any sum not paid when due shall accrue interest ("Interest") thereafter at a rate equal to the lesser of the rate announced by the Wall Street Journal from time to time as the "prime rate" plus 2% per annum or the highest rate permitted by law (the interest rate determined hereby is referred to as the "Interest Rate"). In the event of an emergency, or where necessary to prevent injury to persons or damage to the Demised Premises, Tenant may cure any such default by Landlord before the expiration of the cure period set forth above, with such written or oral notice to Landlord as is appropriate under the circumstances. In the event Landlord fails to pay Tenant any sum due pursuant to this Section, within such ten (10) day period, Tenant shall be entitled thereafter to offset the amounts owed by Landlord against Rent due hereunder and if Tenant does not offset all such amounts owed by Landlord (including interest as set forth above) prior to the expiration of the Term, Tenant shall have the right to extend the Term for the time necessary to complete such offset. No deduction from the rent or

reimbursement to Tenant in accordance with this Section will constitute a default or breach by Tenant under this Lease.

**Section 17.05.  Legal Fees.**

In the event any action or proceeding at law or equity, arising out of or pursuant to this Lease, is commenced between the parties hereto, the prevailing party shall be entitled to recover its reasonable attorneys' fees, and all of the costs and expenses incurred in connection with the action or proceeding. In the event any dispute arising between the parties is resolved without court proceedings, the prevailing party shall be entitled to recover reasonable attorneys' fees, and costs in connection with such dispute.

# ARTICLE XVIII:  MISCELLANEOUS PROVISIONS

**Section 18.01.  Tenant Defined; Use of Pronoun.**

The word "Tenant" shall be deemed and taken to mean each and every person or party mentioned as a tenant herein, be the same one or more; and if there shall be more than one tenant, (i) the liability of each shall be individual, joint and several.  The use of the neuter singular pronoun to refer to Landlord or Tenant shall be deemed a proper reference even though Landlord or Tenant may be an individual, a partnership, a corporation or a group of two or more individuals, corporations or limited liability companies.  The necessary grammatical changes required to make the provisions of this Lease apply in the plural sense where there is more than one Landlord or Tenant and to either corporations, associations, partnerships or individuals, males or females, shall in all instances be assumed as though in each case fully expressed.

**Section 18.02.  Delivery of Lease.**

The parties shall be bound only upon the full execution of this Lease by an authorized officer and the delivery of such executed Lease to Tenant.

**Section 18.03.  Entire Agreement.**

This Lease and the exhibits, riders and/or addenda, if any attached, set forth the entire agreement between the parties.  Any prior conversations or writings are merged herein.  No subsequent amendment to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed.  If any provision contained in a rider or addenda is inconsistent with the provisions contained herein then the provisions contained in said rider or addenda shall supersede said provisions contained herein.  The captions, numbers and index appearing herein are inserted only as a matter of convenience and are not intended to define, limit, construe or describe the scope or intent of any paragraph, nor in any way affect this Lease.

**Section 18.04.  Partial Invalidity.**

If any provision of this Lease or the application thereof to any person or circumstance shall to any extent be invalid, the remainder of this Lease or the application of such provision to persons or circumstances other than those as to which it is held invalid shall not be affected thereby and each provision of this Lease shall be valid and enforced to the fullest extent permitted by law.

**Section 18.05.  Applicable Law.**

This Lease and the rights and obligations of the parties arising hereunder, shall be construed in accordance with the laws of the state in which the Demised Premises is located.  All headings preceding the text of the several provisions and sub provisions are inserted solely for convenience of reference and none of them shall constitute a part of this Lease or affect its meaning, interpretation or effect.  Venue for any action brought by Landlord and Tenant in relation to this Lease shall be in the County and judicial district or division in which the Demised Premises is located.

**Section 18.06.  Rules of Construction.**

The parties hereby agree that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Lease or any Addenda or Exhibits hereto and the parties agree that they had an equivalent role in creating this agreement.

**Section 18.07.  Brokerage Commission.**

Each party represents and warrants that that it has not had dealings with any real estate broker, finder or other person and that there are no claims for brokerage commissions or finders' fees in connection with the execution of this Lease.

**Section 18.08.  Force Majeure.**

Landlord and Tenant shall each be excused for the period of any delay in the performance of any obligations hereunder when prevented from doing so by a cause or causes beyond such party's control which

Execution Version--Bridgeton

shall include, without limitation, all labor disputes, riots, civil commotion, war, war-like operations, acts of terrorism, invasion, rebellion, hostilities, military or usurped power, sabotage, governmental regulations or controls, fire or other casualty, inability to obtain any material, services or financing or through acts of God or other cause beyond the control of the said party. Notwithstanding the above, unless caused solely by Landlord, no cause or event shall (i) release Tenant from, or permit a delay in, or excuse, the payment of any item of rent or additional rent as such becomes due and payable in accordance with the terms of this Lease, or (ii) delay or defer the Commencement Date after Landlord has notified the Tenant that the Demised Premises are ready for occupancy or Tenant has occupied the Demised Premises, whichever first occurs. If, however, Tenant is unable to carry on its business in the Demised Premises due to such occurrence of force majeure, Tenant's obligations under this Lease will abate until the condition ends and Tenant is able to resume unimpaired operation of its business at the Demised Premises. Should the abatement continue for a period of one hundred and eighty (180) days, and provided Tenant is not in default of this Lease beyond any applicable cure period, Tenant shall have the right to terminate this Lease on written notice to Landlord.

### Section 18.09. Bankruptcy or Insolvency of Tenant.

If any sale of Tenant's interest in the Demised Premises created by this Lease shall be made under execution or similar legal process, or if Tenant shall be adjudicated a bankrupt or insolvent, and such adjudication is not vacated within sixty (60) days or if a corporate reorganization of Tenant or an arrangement with its creditors shall be approved by a court under the United States Bankruptcy Code, or if Tenant shall make an assignment for the benefit of creditors, or if in any other manner Tenant's interest under this Lease shall pass to another by operation of law, then, in any of such events, Landlord may at its option re-enter the Demised Premises and declare this Lease and the tenancy hereby created terminated.

### Section 18.10. Confidentiality.

Landlord and Tenant acknowledge and agree that the terms and conditions contained in this Lease is confidential and proprietary to their business operations, and shall not be disclosed to any person(s) or entity(ies) other than their respective officers, employees, lenders, accountants, and attorneys, who shall each keep the terms and conditions herein confidential.

### Section 18.11. Landlord's Obligation To Cooperate With Tenant.

Landlord agrees during the Lease Term to cooperate with Tenant in good faith to effectuate the foregoing rights and benefits of Tenant, including without limitation: executing any and all documents and make all appearances required therefor.

### Section 18.12. Determination Of Days.

Wherever under the terms of the Lease, time for performance of a monetary obligation falls on a Saturday, Sunday or legal holiday, such time for receipt of monetary payment shall be extended to the next business day; otherwise all references herein to "days" shall be calendar days (unless otherwise provided herein).

### Section 18.13. Claims Limitation.

All actions or claims by Landlord for Rent shall be barred three (3) years after the end of each Lease Year. All actions or claims by Tenant for recovery of excess payments of Rent shall be barred three (3) years after the end of each Lease Year, except that in the case of any component of Additional Rent, the same will not be barred until three years after Tenant's receipt of Landlord's annual reconciliation statement furnished with respect to that Lease Year. The foregoing limitations shall not apply in the event of fraud or willful misstatement of the amounts so stated.

### Section 18.14. Compliance with Anti-Terrorism, Embargo, Sanctions & Anti-Money Laundering Laws.

Each party represents and warrants to the other party that the neither representing party, nor the principals, officers, partners, and/or members of that party: (i) are currently identified on the list maintained by the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC"), generally known as the "OFAC List" (formerly known as the Specially Designated Nationals and Blocked Persons List); (ii) are currently identified on the lists maintained by the U.S. Department of Commerce (the "DOC List") and/or the U.S. Bureau of Industry and Security (the "BIS List"); (iii) act for or on behalf of any person or persons listed on the OFAC List, the DOC List, the BIS List, and/or any other known list of denied persons, excluded persons, and excluded entities maintained by the federal agencies of the United States; and (iv) is a person or persons, or acts for or on behalf of any person or persons, with whom a citizen or business of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or Executive Order of the President of the United States of America.

### Section 18.15. Tenant Contingencies.

Tenant's obligation to pay Rent under this Lease shall be deferred until Landlord and Landlord's mortgagee provide Tenant with the SNDA and Landlord's Taxpayer Identification Number and Certification on Form W-9.

EXHIBITS:

EXHIBIT A – Demised Premises

EXHIBIT A-1 – Legal Description

EXHIBIT B – Sign Specifications

EXHIBIT C – Estoppel

EXHIBIT D – Subordination and Non-Disturbance Agreement

EXHIBIT E – Memorandum of Lease

EXHIBIT F – Rules and Regulations and Restricted Uses

EXHIBIT G – Easement with Covenant and Restrictions

[signatures commence on following page]

Execution Version--Bridgeton

IN WITNESS WHEREOF, the parties have respectively signed and sealed this Lease as of the day and year first above written.

**LANDLORD:**
**JS Westflo, LLC,**
**a Missouri limited liability company**

By: _____
    Name: _____
    Title: _____
    Date of Execution: _____

**TENANT:**
**Art Van Furniture, LLC,**
**a Delaware limited liability company**

By: _____
    Name: _____
    Title: CEO
    Date of Execution: Jan 10, 2019

END - THIS LEASE IS COMPRISED OF ARTICLES I THROUGH XVIII AND EXHIBITS A through G.

Execution Version--Bridgeton

1

## EXHIBIT A: DEMISED PREMISES



# EXHIBIT A-1:  LEGAL DESCRIPTION

Legal Description:

Parcel 1
Adjusted Lot 5 of the "Boundary Adjustment Plat of Lot 5 of Northwest Plaza Plat 4, Lot 5A of Northwest Plaza Plat 5, and Part of U.S. Survey 1203," according to the plat recorded in Plat Book 364, Pages 501-502 of the St. Louis County Records.
Parcel 2
Easement rights as to Adjusted Lot 5A of Northwest Plaza Plat 4, a subdivision in St. Louis County, Missouri, according to the plat thereof recorded in Plat Book 364, pages 501-502of the St. Louis County, Missouri, Records, according to (a) Reciprocal Easement Agreement dated November 2, 2012, recorded November 6, 2012, in Book 20233, Page 159, of the St. Louis County, Missouri, Records and (b) Easement with Covenants and Restrictions dated July 30, 2014, recorded August 5, 2014, in Book 21119, Page 1219, of the St. Louis County, Missouri, Records, as amended by [Amended and Restated Easement with Covenants and Restrictions] dated and recorded of even date herewith.


Address of Property:

925 Northwest Plaza, Bridgeton, MO 63074

Parcel Number:

12M210075; 12M210231; and 12M230231

Execution Version--Bridgeton

1

# EXHIBIT B:  SIGN SPECIFICATIONS

**TENANT'S STANDARD CORPORATE IDENTITY PACKET**





AVF LOGO ON BACKER AND RACEWAY MOUNTED FURNITURE LETTERS

NOTES:
RACEWAY TO MATCH BUILDING MATERIAL

AVF LOGO AND RACEWAY MOUNTED FURNITURE LETTERS

NOTES:
TO MATCH SW#6321 RED BAY

 STORE DESIGN AND CONSTRUCTION

EXTERIOR SIGNS STANDARDS
ART VAN LOGO + FURNITURE

08.30.2016



ELEVATION VIEW

END VIEW

| FABRICATION NOTES | ELECTRICAL NOTES | INSTALL NOTES |
|---|---|---|

FABRICATION NOTES

FURNITURE LETTERS
- 5" DEEP LIGHTED CHANNEL LETTER ON 4"X8" RACEWAY
- WHITE ACRYLIC LETTERS FACES WITH 1" WHITE TRIM CAPS AND RETURNS
- SLOAN VL LONG WHITE LED ILLUMINATION

ART VAN FRAME AND CHAIR LOGO
- 5" DEEP LIGHTED CHANNEL FRAME, LOGO MOUNTED ON BACKER
- WHITE ACRYLIC FACES ON CHAIR LOGO AND SQUARE CAPSULE WITH WHITE .63" RETAINER CAP AND RETURNS
- SLOAN VL LONG WHITE LED ILLUMINATION
- BACKER PANEL .80" ALUM. SHEET SKIN ON 4" ALUMINUM TUBE FRAME

ART VAN LOGO LETTERS
- 3" DEEP CHANNEL LETTERS ON BACKER
- WHITE ACRYLIC LETTERS FACES WITH 1" WHITE TRIM CAP AND RETURNS
- SLOAN VL LONG WHITE LED ILLUMINATION

ELECTRICAL NOTES
- SLOAN VL-PLUS LONG WHITE
- 20 AMP 120V CIRCUIT REQUIRED
- POWER SUPPLIES SELF CONTAINED IN LETTERS AND CAPSULES
- FLUSH MOUNTED JUNCTION BOX

INSTALL NOTES
- RACEWAY AND LOGO MECHANICALLY FASTENED
- FASTENERS AS REQUIRED
- 3/4" PLYWOOD BLOCKING ON WALL SURFACE TO SUPPORT RACEWAY

| STORE DESIGN AND CONSTRUCTION | EXTERIOR SIGNS STANDARDS ART VAN FURNITURE SIGN | 08.30.2016 |



PREFERRED OPTION:  RACEWAY MOUNTED LETTERS WITH ART VAN LOGO

NOTES:
ORACAL 8300-053 TR LIGHT BLUE
RACEWAY TO MATCH BUILDING MATERIAL

RACEWAY MOUNTED LETTERS WITHOUT ART VAN LOGO

NOTES:
ORACAL 8300-053 TR LIGHT BLUE
RACEWAY TO MATCH BUILDING MATERIAL

 STORE DESIGN AND CONSTRUCTION    EXTERIOR SIGNS STANDARDS    06.30.2016
PURESLEEP MATTRESS STORE



PREFERRED OPTION: RACEWAY MOUNTED LETTERS WITH ART VAN LOGO

NOTES:

ORACAL 8300-053 TR LIGHT BLUE

RACEWAY TO MATCH BUILDING MATERIAL



RACEWAY MOUNTED LETTERS WITHOUT ART VAN LOGO

NOTES:

2447 WHITE PLEX

RACEWAY TO MATCH PANTONE 298C

 STORE DESIGN AND CONSTRUCTION | EXTERIOR SIGNS STANDARDS PURESLEEP MATTRESS STORE | 08.30.2016



| FABRICATION NOTES | ELECTRICAL NOTES | INSTALL NOTES |
|---|---|---|
| • 5" STANDARD CHANNEL LETTER CONSTRUCTION<br>• 4"X8" 0.063 BRAKE-FORMED RACEWAY<br>• 0.063 BACK ON LIGHTED CAPSULE<br>• 0.040 RETURNS<br>• WHITE OUTLINE ON BLUE LETTER FACES | • SLOAN HL-PLUS LONG WHITE<br>• 20 AMP 120V CIRCUIT REQUIRED<br>• POWER SUPPLIES SELF CONTAINED IN LETTERS AND CAPSULES<br>• FLUSH MOUNTED JUNCTION BOX | • RACEWAY AND LOGO MECHANICALLY FASTENED<br>• FASTENERS AS REQUIRED<br>• 3/4" PLYWOOD BLOCKING ON WALL SURFACE TO SUPPORT RACEWAY |

STORE DESIGN AND CONSTRUCTION

EXTERIOR SIGNS STANDARDS
PURESLEEP SIGN

08.30.2016












STORE DESIGN AND CONSTRUCTION    EXTERIOR SIGNS STANDARDS
MONUMENT SIGN PANEL    08.30.2016

# EXHIBIT C: ESTOPPEL

TENANT ESTOPPEL CERTIFICATE

[LANDLORD]

_____
_____
_____
_____

Re:    Lease between _____, a _____ ("Landlord"), and _____, a _____ ("Tenant") dated _____, 20___, amended _____ (collectively "Lease") for space described as _____ ("Demised Premises").

1.    Tenant is the tenant under that certain lease agreement dated _____ (the **"Lease Agreement")**, between Tenant and _____ **("Landlord")**, whereby Tenant leases from Landlord the Premises, which Premises are more particularly described in the Lease Agreement. The Lease Agreement has been amended, modified, or supplemented by the following documents: _____ (the **"Amendments")**.The Lease Agreement and the Amendments, if any, are collectively referred to herein as the **"Lease".** The Lease is in full force and effect and has not been amended, modified, or supplemented, except as noted above. Tenant is in possession of the Premises and has not assigned, sublet, pledged, mortgaged, transferred, or otherwise conveyed all or any portion of its interest in the Premises or the Lease except as follows: None. Tenant understands that, in reliance on this certificate, a lender may make a loan secured in whole or in part by the Premises and/or a buyer may acquire the Premises.

2.    The Lease represents the entire agreement between Tenant and Landlord with respect to the leasing and occupancy of the Premises and there are no other written agreements or representations of any kind between Landlord and Tenant with respect thereto. Without limiting the foregoing and except as set forth in the Lease, Tenant does not have any rights of first refusal for additional space, options to increase or relocate its space, or options to purchase the Premises or any interest therein.

3.    To Tenant's current, actual knowledge, without any duty of inquiry: (i) all obligations of Landlord to be performed or complied with by Landlord through the date hereof have been fully performed and complied with including, without limitation, any obligations of Landlord to prepare the Premises for Tenant's occupancy (except as follows: None) and (ii) there exists no default, condition, state of facts, or event that, with the passing of time or the giving of notice, or both, would constitute a default by Landlord in the performance of its obligations under the Lease (except as follows: None). In addition, any tenant improvement allowance owing under the Lease has been paid other than: $_____

4.    The term of the Lease has commenced and will expire on _____, unless sooner terminated in accordance with the terms of the Lease. Tenant has no rights to extend the term of the Lease, except as otherwise set forth in the Lease.

5.    The current base rent under the Lease is $_____ per month, which has been paid for the period through _____. Tenant has not prepaid any rent or other amounts to Landlord more than one month in advance.

6.    No security deposit or other security has been given to Landlord under the Lease except as follows: $_____

7.    □ If the checkbox to the left is "checked" (i.e., contains an "X"), then notwithstanding anything set forth in this estoppel certificate to the contrary, Tenant is currently auditing operating expenses, taxes, etc., paid by Tenant pursuant to the Lease. Tenant is awaiting the results of such audit which may (i) reveal a previously unknown or undisclosed default of Landlord, (ii) create circumstances that might give rise to a default by Landlord under the terms of the Lease, or (iii) permit Tenant the right to a refund of charges or expenses previously paid or the right to offset against rent or other charges due or to become due under the Lease. Therefore, Tenant reserves the right to pursue any remedy available to Tenant with respect to any default, refund, offset, or otherwise disclosed by such audit.

8.    To Tenant's current, actual knowledge, without any duty of inquiry, Tenant has not filed and is not the subject of any filing for bankruptcy or reorganization under the bankruptcy or insolvency laws of the United States or of any state or territory of the United States.

9.    Notwithstanding anything set forth in this certificate to the contrary: (i) Tenant reserves the right to pursue any claim for overpayment of rent or any other charges under the Lease, if any, against Landlord and

any successor landlord after any such successor landlord succeeds to the right of any landlord, (ii) the Lease remains unchanged and this certificate does not modify, amend, or otherwise change the terms of the Lease (except with respect to the notice addresses set forth below) (i.e., the terms of the Lease shall control), (iii) any inaccurate statement in this certificate will not prevent Tenant from taking a contrary position in the future and will not subject Tenant to any damages or liability absent fraud; provided, however, that Tenant shall not be permitted to assert or enforce any claim against the party to whom this certificate is delivered (or against such party's property) which is inconsistent with the statements contained herein, except to the extent that the party against whom the claim would otherwise be asserted or enforced had actual knowledge of facts to the contrary at the time the party acted in reliance on the statement.

10.     Tenant's current address for the purpose of receiving notice under the Lease is as follows:

11.     Tenant represents that the person signing this certificate is duly authorized by Tenant to execute this certificate on Tenant's behalf.

**TENANT:**
**Rothman Furniture Stores, Inc.**

By:_____
Name: _____
Title:_____

# EXHIBIT D: SUBORDINATION AND NON-DISTURBANCE AGREEMENT

Store No.

RECORDING REQUESTED BY, AND
WHEN RECORDED RETURN TO:

_____
_____
_____
_____

### SUBORDINATION AND NON-DISTURBANCE AGREEMENT

This SUBORDINATION AND NON-DISTURBANCE AGREEMENT (the "Agreement") is made and entered into this ___ day of _____, 2_____, by and between Rothman Furniture Stores, Inc.("Tenant") and **[LENDER]**, a [entity type and jurisdiction] ("Lender") and JS Westflo, LLC, a Missouri limited liability company ("Landlord").

### RECITALS

**WHEREAS,** Landlord executed a Lease dated _____, in favor of Tenant, and a memorandum covering certain Demised Premises therein described located on a parcel of real estate, a legal description of which is attached hereto and incorporated herein by this reference as **Exhibit A** (said parcel of real estate and the Demised Premises being sometimes collectively referred to herein as the "Property"); and

**WHEREAS,** Landlord has executed a Deed of Trust (the "Mortgage") dated _____, 2_____ _____, and recorded on in Book _____, Page _____, of the County Records of _____ County, State of _____ in favor of Lender, payable upon the terms and conditions described therein; and

**WHEREAS,** it is a condition to said loan that said Mortgage shall unconditionally be and remain at all times a lien or charge upon the Property, prior and superior to the Lease and to the leasehold estate created thereby; and

**WHEREAS,** the parties hereto desire to assure Tenant's possession and control of the Property under the Lease upon the terms and conditions therein contained.

**NOW, THEREFORE,** for and in consideration of the mutual covenants and premises herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged and confessed by the parties hereto, the parties hereto do hereby agree as follows:

### AGREEMENT

1. The Lease is and shall be subject and subordinate to the lien of the Mortgage, and to all renewals, modifications, consolidations, replacements, and extensions thereof, and to all future advances made thereunder.

2. Should Lender become the owner of the Property, or should the Property be sold by reason of foreclosure or other proceedings brought to enforce the Mortgage that encumbers the Property, or should the Property be transferred by deed in lieu of foreclosure, or should any portion of the Property be sold under a trustee's sale, the Lease shall continue in full force and effect as a direct lease between the then owner of the Property covered by the Mortgage and Tenant, upon, and subject to, all of the terms, covenants and conditions of the Lease for the balance of the term thereof remaining, including any extensions therein provided. Tenant does hereby agree to attorn to Lender or to any such owner as its landlord, and Lender hereby agrees that it will accept such attornment.

3. Notwithstanding any other provision of this Agreement, Lender shall not be: a) liable for any default of Landlord under the Lease; b) subject to any offsets or defenses that have accrued prior to the date of foreclosure, unless Tenant shall have delivered to Lender written notice of the default that gave rise to such offset or defense and has permitted Lender the same right to cure such default as is permitted Landlord under the Lease; c) bound by any Rent that Tenant may have paid under the Lease more than one month in advance; d) bound by any amendment or modification of the Lease hereafter made without Lender's prior written consent; e) responsible for the return of any security deposit delivered to Landlord under the Lease and not subsequently received by Lender.

4. If Lender sends written notice to Tenant to direct its Rent payments under the Lease to Lender instead of Landlord, then Tenant agrees to follow the instructions set forth in such written instructions and deliver Rent payments to Lender; however, Landlord and Lender agree that Tenant shall be credited under the Lease for any Rent payments sent to Lender pursuant to such written notice.

5.  All notices that may or are required to be sent under this Agreement shall be in writing and shall be sent by first-class certified U.S. mail, postage prepaid, return receipt requested, and sent to the party at the address appearing below or such other address as any party shall hereafter inform the other party by written notice:

**Tenant:  6500 E. Fourteen Mile Rd, Warren, MI  48092**

**Landlord:**

**Lender:**

All notices delivered as set forth above shall be deemed effective three (3) days from the date deposited in the U.S. mail.

6.  Said Mortgage shall not cover or encumber and shall not be construed as subjecting in any manner to the lien thereof any of Tenant's improvements or trade fixtures, furniture, equipment or other personal property at any time placed or installed in the Demised Premises.

7.  This Agreement shall inure to the benefit of and be binding upon the parties hereto, their successors in interest, heirs, assigns, and any subsequent owner of the Property secured by the Mortgage.

8.  Should any action or proceeding be commenced to enforce any of the provisions of this Agreement or in connection with its meaning, the prevailing party in such action shall be awarded, in addition to any other relief it may obtain, its reasonable costs and expenses, not limited to taxable costs, and reasonable attorneys' fees.

9.  Except to the extend required by law, Tenant shall not be joined as a party/defendant in any action or proceeding that may be instituted or taken by reason or under any default by Landlord in the performance of the terms, covenants, conditions, and agreements set forth in the Mortgage.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed as of the day and year first above written.

**LENDER:**
[_____]


By: _____
Name: _____
Title: _____

**TENANT:**
[_____]


By: _____
Name: _____
Title: _____

**LANDLORD:**
[_____]


By: _____
Name: _____
Title: _____

1 **EXHIBIT A**

2 **TO SUBORDINATION AND NON-DISTURBANCE AGREEMENT**

3 **LEGAL DESCRIPTION OF DEMISED PREMISE**

Execution Version--Bridgeton

## EXHIBIT E:  MEMORANDUM OF LEASE

Prepared by and
Return to:

_____
_____
_____
_____

### MEMORANDUM OF LEASE

THIS MEMORANDUM OF LEASE is made and entered into effective this day of \_\_\_\_ day of _____,  2\_\_\_,  by  and  between  _____,  a(n) _____,  whose  address  is  _____ ("Landlord"), and [TENANT], **a** [COMPANY], whose address is 6500 E. Fourteen Mile Road, Warren, Michigan 48092 ("Tenant").

### W I T N E S S E T H:

WHEREAS, Landlord and Tenant entered into a lease agreement dated _____ (the "Lease), by which Landlord leased to Tenant certain real property located in the City of _____, _____ County, State of _____, commonly known as _____ (the "Premises") which Lease is incorporated herein by reference as if appearing in full; and

WHEREAS, the parties wish to provide record of public notice of the fact of the execution and existence of the Lease and all of the terms and conditions of the Lease.

NOW, THEREFORE, Landlord and Tenant do hereby state the following:

1.    Lease of the Premises.  Landlord does hereby lease the Premises to the Tenant, and the Tenant hereby leases the Premises from Landlord, upon the terms and conditions stipulated in the Lease.

2.    Term.  The initial term of this Lease is [TERM] (\*\*\*) months from the Commencement Date, as defined in the Lease, unless extended or sooner terminated as provided by the Lease.

3.    Option to Extend.  The terms of the Lease provide Tenant with [NUMBER] (\*\*\*) optional term extensions of [MONTHS] (\*\*\*) months each.

4.    Grant of Exclusive Use.  Section 5.02 of the Lease provides in part as follows:

[exclusive provision]

5.    Minimum Parking.  Section 9.01 (e) of the Lease provides in part as follows:

[minimum parking provision]

6.    Binding Effect.  The Lease and this Memorandum shall inure to the benefit of and shall be binding upon the Landlord, its successors and assigns, and upon the Tenant and its permitted successors and assigns.

6.    Notices.  All notices, certificates or other communications hereunder shall be sufficiently given and shall be deemed given when mailed by registered or certified mail, postage prepaid, or overnight mail or courier addressed as follows:

To Landlord:    _____
_____

Execution Version--Bridgeton

_____
_____
_____

To Tenant:                [TENANT]
                          6500 E. Fourteen Mile Road
                          Warren, Michigan 48092
                          Phone: (586) 939-0800
                          Facsimile: (586) 983-3029

With a copy to:           Art Van Furniture, Inc.
                          General Counsel
                          6500 E. Fourteen Mile Road
                          Warren, Michigan 48092
                          Phone: (586) 939-0800
                          Facsimile: (586) 983-3029

The Landlord or Tenant may, by notice given to the other, designate any further or different addresses to which subsequent notices, certificates or communications shall be sent.

7.    Conflict.  In the event of a conflict between the terms and provisions of this Memorandum and the Lease, the Lease shall govern and control.

IN WITNESS WHEREOF, the Landlord and Tenant have executed this Memorandum as of the date and year first above written.

[The remainder of this page is intentionally left blank.]
[Signatures to follow on next page.]

Execution Version--Bridgeton

**LANDLORD:**


By: _____
Name: _____
Title: _____


**TENANT:**


By: _____
Name: _____
Title: _____


STATE OF _____)
                        ) ss:
COUNTY OF _____)

    Before me, the undersigned authority, a Notary Public in and for said County and State aforesaid, personally appeared _____, with whom I am personally acquainted, and who, upon oath,    acknowledged   himself   to   be   the   _____   of _____, the within named bargainor, a corporation, and that he as such officer, being authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the corporation by himself as _____.

    Witness my hand and seal at office this _____ day of _____, 201__.


_____
Notary Public
My Commission Expires: _____




STATE OF _____)
                        ) ss:
COUNTY OF _____)

    Before me, the undersigned authority, a Notary Public in and for said County and State aforesaid, personally appeared _____, with whom I am personally acquainted, and who, upon oath,    acknowledged   himself   to   be   the   _____   of _____, the within named bargainor, a corporation, and that he as such officer, being authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of the corporation by himself as _____.

    Witness my hand and seal at office this _____ day of _____, 201__.


_____
Notary Public
My Commission Expires: _____

Execution Version--Bridgeton

**EXHIBIT A TO MEMORANDUM OF LEASE**

**LEGAL DESCRIPTION**

Execution Version--Bridgeton

## EXHIBIT F: RULES AND REGULATIONS AND RESTRICTED USES

THE OPERATION OF A BUSINESS WHOSE PRIMARY BUSINESS IS THE SALE OF GARDENING OR GARDENING PRODUCTS OR HOME IMPROVEMENT PRODUCTS ("EXCLUSIVE USE"), INCLUDING FOR EXAMPLE HARDWARE STORES, APPLIANCE STORES, CARPET, TILE, PAINT, WALL COVERINGS OR FLOORING STORES, PLUMBING STORES, LIGHT OR ELECTRICAL STORES, FARM SUPPLY STORES, LAWN AND GARDEN STORES, OR AS A HOME CENTER BUSINESS SIMILAR TO MENARD'S BUSINESS, INCLUDING FOR EXAMPLE ORSCHLEN FARM & HOME SUPPLY, RURAL KING SUPPLY, TRACTOR SUPPLY, ACE HARDWARE, ACO HARDWARE, BUILDER'S FIRSTSOURCE, BUSY BEAVER BUILDING CENTERS, DO IT BEST, 84 LUMBER COMPANY, HARBOR FREIGHT TOOLS USA, THE HOME DEPOT, LAMPERT YARDS, LOWE'S, LUMBERJACK BUILDING CENTERS, SEARS, SUTHERLAND LUMBER, TRUE VALUE, CHARLES KIRCHNER & SONS, CONSOLIDATED LUMBER, MILLS FLEET FARM, FARM & FLEET, NATIONAL HOME CENTERS, R.P. LUMBER COMPANY, RIGGS SUPPLY COMPANY, RUNNING FARM & FLEET, SEIGLE'S, STOCK BUILDING  SUPPLY, THEISEN SUPPLY, UNITED BUILDING CENTERS, BOMGAARS, BUCHHEIT, FARM KING SUPPLY, OLNEY RURAL KING SUPPLY, OR BIG R STORES; PROVIDED HOWEVER, THAT THIS RESTRICTION SHALL NOT EXCLUDE STORES SELLING THE FOREGOING ITEMS SO LONG AS SUCH SALES DO NOT CONSTITUTE THE PRIMARY BUSINESS OF SUCH STORE OR BUSINESS.   THE EXCLUSIVE USE SHALL NOT APPLY TO BUSINESSES OCCUPYING LESS THAN 5,000 SQUARE FEET OF SPACE.   THE EXCLUSIVE USE SHALL NOT APPLY TO SAM'S CLUB, COSTCO, TARGET, KMART, BASS PRO SHOPS, GROCERY STORES, AUTO PART STORES, SPORTING GOODS STORES, TOY STORES, PET STORES, FURNITURE STORES, BEDROOM STORES, DOLLAR STORES, WHOLESALERS (EXCEPT WHOLESALERS WHOSE PRIMARY BUSINESS IS HOME IMPROVEMENT PRODUCTS), OR ELECTRONICS STORES. ADDITIONALLY, NO PORTION OF THE SHOPPING CENTER WITHIN 100' OF THE MENARD TRACT AS DEPICTED IN EXHIBIT A-3 OF THE ECR SHALL BE USED AS A MOVIE THEATRE.

AN ADULT TYPE BOOKSTORE OR OTHER ESTABLISHMENT SELLING, DISPLAYING, LEASING OR EXHIBITING PORNOGRAPHIC MATERIALS OR PERFORMANCES OR SELLING PARAPHERNALIA FOR USE WITH ILLICIT DRUGS.

A MASSAGE PARLOR.

A MORTUARY.

A MOBILE HOME OR TRAILER COURT, LABOR CAMP, JUNKYARD OR STOCKYARD.

A LAND FILL, GARBAGE DUMP OR FACILITY USED FOR THE DUMPING, DISPOSING. INCINERATION OR REDUCTION OF GARBAGE.

AN AMUSEMENT PARK OR CARNIVAL.

A DISTILLING OR SMELTING FACILITY, EXCEPT AS AN INCIDENTAL PORTION OF A RETAIL USE.

A FACTORY USE OR PROCESSING OR RENDERING PLANT.

AN ABORTION CLINIC.

Execution Version--Bridgeton

## EXHIBIT G:  EASEMENT WITH COVENANT AND RESTRICTIONS

Attached



M K-14-153816



*2014080500849*

## GERALD E SMITH, RECORDER OF DEEDS
### ST. LOUIS COUNTY MISSOURI
41 SOUTH CENTRAL, CLAYTON, MO 63105

Book: 21119 Page: 1219

| TYPE OF INSTRUMENT | GRANTOR | TO | GRANTEE |
|---|---|---|---|
| **ESMT** | **WIGEON LLC ETAL** | | **JS WESTFLO LLC** |

PROPERTY DESCRIPTION:  **NORTHWEST PLAZA PLAT 2 LOT 2 PB 360 PG 336 W.O.P.**

| Lien Number | Notation | Locator |
|---|---|---|
| | | |

NOTE: I, the undersigned Recorder of Deeds, do hereby certify that the information shown on this Certification Sheet as to the **TYPE OF INSTRUMENT, the NAMES of the GRANTOR and GRANTEE as well as the DESCRIPTION of the REAL PROPERTY affected** is furnished merely as a convenience only, and in the case of any discrepancy of such information between this Certification Sheet and the attached Document, **the ATTACHED DOCUMENT governs.** Only the DOCUMENT NUMBER, the DATE and TIME of filing for record, and the **BOOK** and **PAGE** of the recorded Document is taken from this CERTIFICATION SHEET.

### RECORDER OF DEEDS DOCUMENT CERTIFICATION

STATE OF MISSOURI )
            SS.
COUNTY OF ST. LOUIS )

| Document Number |
|---|
| **00849** |

I, the undersigned Recorder of Deeds for said County and State, do hereby certify that the following and annexed instrument of writing, which consists of ___53___ pages, (this page inclusive), was filed for record in my office on the ___5___ day of ___August___ ___2014___ at ___04:19PM___ and is truly recorded in the book and at the page number printed above.

In witness whereof I have hereunto set my hand and official seal the day, month and year aforesaid.

**CLB2**
Deputy Recorder



Recorder of Deeds
St. Louis County, Missouri

Book: 21119 Page: 1219

Mail to:

TITLE PARTNERS AGENCY LLC
457 SOVEREIGN CT
BALLWIN, MO 63011

Destination code:    **129    M**

RECORDING FEE  **177.00**
(Paid at the time of Recording)

52'

wof

ML-14-158816

Title:  Easement with Covenants and Restrictions

Date:   July 30, 2014

Grantor:    Wigeon LLC, Gadwall LLC and Pintail LLC

Grantors Mailing Address:  1701 Macklind Ave., St. Louis, MO 63110

Grantee:  JS Westflo, LLC

Grantee's Mailing Address:  2101 E. Terra Lane, O'Fallon, MO 63366

Legal Description: See Exhibit A-1     Lgl pp 35 -45
+ EX "A 2"

Reference Book and Page:  N/A

Title Partners Agency, LLC
457 Sovereign Ct.
Ballwin, MO 63011     (1)

Book:21119 Page:1220

Book:21119 Page:1220

Book:21119 Page:1221

## EASEMENT WITH COVENANTS AND RESTRICTIONS

**THIS EASEMENT WITH COVENANTS AND RESTRICTIONS** ("ECR"), entered into as of the _____ day of July , 2014 ("Effective Date"), by and between Wigeon LLC, a Missouri limited liability company ("Wigeon"), Gadwall LLC, a Missouri limited liability company ("Gadwall"), and Pintail LLC, a Missouri limited liability company ("Pintail," and together with Wigeon and Gadwall, "Declarant") and JS Westflo, LLC ("JS") (Declarant, Developer (defined herein) and JS are each a "Party").

### WITNESSETH:

**WHEREAS**, on or about the date of this ECR, Developer is conveying a certain parcel of land located in the cities of Bridgeton and St. Ann, Missouri, more particularly described on **Exhibit A-1** attached hereto and made a part hereof (the "Property"); and

**WHEREAS**, Declarant is the owner of those certain parcels of land adjacent to the Property and more particularly described in **Exhibit A-2** (the "Benefited Property"); and

**WHEREAS**, Developer desires to impose certain restrictions on the Property to promote its orderly development and use in a manner compatible with the adjacent shopping center commonly known as "The Crossings at Northwest" (the "Shopping Center"), as more particularly shown on **Exhibit A-3**; and provide for easements and shared costs for certain common areas designated by Developer from time to time (the "Common Areas"); and each subdivided parcel at the Shopping Center is herein referred to as a "Parcel"; and

**WHEREAS**, the Property is subject to, among those other matters of record as of the Effective Date, the Governing Documents (as defined hereinafter); and

**WHEREAS**, as part of the consideration for the transfer of the Property, the Property and the recorded owner(s), from time to time, of fee title to the Property ("Property Owner") shall be subject to the restrictions set forth in this ECR.

**NOW, THEREFORE**, for the premises above and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1. **Construction and Development.** The development, construction or reconstruction of any building or other improvements or structures (including without limitation, utility lines, signs, parking areas, lights, curb-cuts, access ways, and landscaping) on the Property, and site preparation and site development work erected or performed on the Property from time to time (including without limitation, any expansion of the building on the Property) are subject to, and shall be performed, if at all, in accordance with (and the rights and limitations shall be controlled by), the provisions of the Governing Documents and the following:

SLC-7261452-10

Book:21119 Page:1221

(a)    Plans.

      (i)    The provisions of this Section 1(a)(i) shall govern in the event the Developer is not the Declarant or a related entity.  Property Owner shall submit to Developer **3** complete sets of detailed plans and specifications therefor, which includes the building and civil plans, sign plans, and landscaping and photometric plan, and which have been stamped/sealed by an architect or engineer, and shall integrate the architectural integrity of the Shopping Center (the "<u>Plans</u>") and an electronic version thereof (based on Computer Assisted Designs 14 or higher) via electronic mail or on a computer disk and the Plans shall be approved the applicable governmental and/or quasi-governmental authorities prior to the commencement of any work on the Property at least 30 days prior to the construction of any improvements.  The Plans shall show (to the extent applicable for such improvements) exterior architectural design, materials, location and layout of the building and any other structures and improvements to be located on the Property, and shall also include elevations, dimensions and heights; the location, size and design of the parking areas; layout of driveways and traffic flow patterns; curbs; curb cuts; sidewalks; walkways; landscaping; lighting standards and lighting plans; and all other improvements. Property Owner shall use commercially reasonable efforts to develop Plans that will promote the orderly development and use of the Property in a manner compatible with the adjacent Shopping Center and in a manner that is architecturally consistent with high quality retail shopping centers in the St. Louis metropolitan area.  The Plans, once approved by all applicable authorities, are hereinafter referred to as the "<u>Approved Plans</u>".  All construction shall be performed in accordance with the Approved Plans and no exterior improvements shall be made except in accordance with the Approved Plans.

      (ii)    The provisions of this Section 1(a)(ii) shall govern in the event the Developer is the Declarant or a related entity.  Property Owner shall submit to Developer **3** complete sets of the Plans and an electronic version thereof (based on Computer Assisted Designs 14 or higher) via electronic mail or on a computer disk and the Plans shall be approved by Developer, any third parties with pre-existing approval rights, and the applicable governmental and/or quasi-governmental authorities prior to the commencement of any work on the Property at least 30 days prior to the construction of any improvements.    The Plans shall show (to the extent applicable for such improvements) exterior architectural design, materials, location and layout of the building and any other structures and improvements to be located on the Property, and shall also include elevations, dimensions and heights; the location, size and design of the parking areas; layout of driveways and traffic flow patterns; curbs; curb cuts; sidewalks; walkways; landscaping; lighting standards and lighting plans; and all other improvements.  Developer and Property Owner shall use commercially reasonable efforts to reach agreement on the final version of the Plans and such Plans shall promote the orderly development and use of the Property in a manner compatible with the adjacent Shopping Center and in a manner that is architecturally consistent with high quality retail shopping centers in the St. Louis metropolitan area.   The Plans, once approved by Developer and all applicable authorities, are hereinafter referred to as the "<u>Developer</u>

Book:21119 Page:1222

Book: 21119 Page: 1222

SLC-7261452-10

Book:21119 Page:1223

Approved Plans". There shall be no changes to the Developer Approved Plans without Developer's prior written consent. All construction shall be performed in accordance with the Developer Approved Plans and no exterior improvements shall be made except in accordance with the Developer Approved Plans. Notwithstanding the foregoing, Developer shall not have the right to object to any portion of the Plans that incorporate the work set forth in **Exhibit C**.

(b)     Parking. Parking on the Property shall be totally self-contained within the boundaries of the Property to meet the requirements set forth in this subsection (b). Property Owner shall not park or permit any of its occupants or their respective customers, invitees, licensees, contractors, agents or employees to park on the Common Areas or any other portions of the Shopping Center. The on-site parking on the Property shall provide for at least the number of parking spaces required by Applicable Laws (as defined in Section 1(i)), without variance, or by any of the Governing Documents, whichever shall result in the greatest number of parking spaces. If the Property is being used for anything other than for a Permitted Use (as defined in Section 8), the parking ratio to be maintained thereon shall be the greater of that required under the Governing Documents or by Law.

(c)     Building.     All Buildings at the Property ("Buildings") shall be architecturally compatible with the architectural style of the Shopping Center and designed and constructed so that building wall footings shall not encroach on adjoining property. No Building shall have a metal exterior. All mechanical or other systems or structures on the roof of a Building shall be screened from view from all customer visibility, customer access and parking areas, by a roof parapet or wall in a style architecturally consistent with the design of the Building.   No Building, structure, improvement, loading dock, ramp, sidewalk or other related appurtenance, except and unless otherwise specifically allowed herein, shall be constructed on the Property except in compliance with all applicable laws and regulations. All Buildings on the Property shall be constructed and operated in such a manner which will preserve the sprinklered rate on the other Buildings in the Shopping Center and shall be constructed and maintained in compliance with all applicable codes and laws. No addition(s) to the existing Building shall exceed the height of the existing Building. The existing Building as of the date of execution of this ECR shall be deemed to be architecturally compatible with the Shopping Center so long as it is maintained in a condition compatible with Section 2 of this ECR. No new Building shall exceed the height of the existing Building. Prior to demolishing any portion of the existing Building, Property Owner shall obtain professional measurements of the existing Building that evidence the height of the existing Building and Property Owner shall submit such measurements to the Developer for review and approval.

(d)     Coordination.   Prior to the commencement of construction on the Property, and at Developer's election, a pre-construction coordination conference shall be held at or near the Property with Developer's representative and Developer's contractor. Property Owner's representative and Property Owner's contractor shall attend such

Book:21119 Page:1223

SLC-7261452-10

Book:21119 Page:1224

conference. Except where otherwise authorized by written agreement, all construction activities shall be kept within the boundaries of the Property (including without limitation staging and construction parking).

(e)     Utilities.   Property Owner, at its sole cost and expense, shall be responsible for the installation of lines and meters, and to connect utilities to the improvements, on the Property in accordance with applicable utility company and governmental requirements, and any applicable requirements of the Governing Documents and shall be at depths designated by consultants reasonably approved by Developer and shall comply with all rules and regulations of the applicable utility provider.  Property Owner hereby agrees to indemnify, defend and hold Developer harmless from and against all costs, expenses, reasonable attorneys' fees, claims, demands and judgments arising out of the failure of Property Owner to comply with this subsection (e).

(f)     Curb Cuts.   Unless otherwise agreed to by Property Owner and the Developer, Property Owner's access to the Property shall be via the curb cuts at the existing locations.  Property Owner shall be responsible for maintaining any portions of the curbs and curb cuts located on the Property.  Developer shall be responsible for maintaining those portions of the curbs and curb cuts not located on the Property and included within the Common Area.

(g)     Signs.  All temporary and permanent signs on the Property shall (i) comply with all sign criteria for the Governing Documents, and comply with all Applicable Laws, (ii) be compatible with the adjacent Shopping Center and be subject to Developer's approval, and (iii) be professionally designed, constructed and installed.

(h)     Grade; Paving.   Changes to the grade of the Property shall not obstruct the visibility of improvements or signs on the Shopping Center or any other lands adjoining the Property.  The slope of the parking areas shall not exceed a maximum of four percent (4%) nor be less than a minimum of two percent (2%) unless a lesser grade is required by law.  When any fresh dirt is dumped or grading occurs on the Property, the area shall be graded and sloped in accordance with a grading plan approved by Developer, which approval shall not be unreasonably withheld, conditioned or delayed, and shall be smoothed in a level manner consistent with the contours of the adjoining property, and shall not increase the flow of water onto an adjoining parcel beyond that as set forth on grading plans in place for the Shopping Center as of the date hereof, or otherwise as may unreasonably interfere with the use and enjoyment of such other parcel.  All sidewalks and pedestrian aisles on the Property shall be concrete and all automobile parking areas, drives and access roads shall be asphalt or concrete and designed in conformity with the recommendations of a registered soils engineer reasonably approved by Developer which shall require the installation of a suitable base and surfacing with an asphalted concrete or concrete wearing material of comparable design, structure, integrity and installation of a typical high quality shopping center in the St. Louis, Missouri area.

Book: 21119 Page: 1224

SLC-7261452-10

Book:21119 Page:1225

(i)    Compliance with Laws.  All construction on the Property pursuant to this ECR shall be performed in compliance with all laws, rules, orders, zoning ordinances, regulations, statutes, resolutions, approvals and requirements of all governmental or quasi-governmental authorities and the Board of Fire Underwriters or of any similarly constituted body (collectively "Applicable Laws").  If the Property Owner fails to so comply in any material respect and such failure affects or may affect Developer or the Shopping Center, Developer may, at its option and after **30** days' written notice to Property Owner of its intention to do so, take steps to insure compliance with the same for the account of Property Owner, and Property Owner shall upon demand pay to Developer the reasonable cost of such compliance including reasonable expenses, interest, attorneys' fees and costs incurred in connection therewith.

(j)    Opening Covenant.  Once construction of a new Building on the Property has commenced, such new Building shall be completed promptly subject to *force majeure* delays.  In the event Property Owner installs new Building footings on the Property, said new Building construction shall be completed within twelve (12) months of completion of said footings subject to *force majeure*.

(k)    Roof Top Equipment.  Any mechanical equipment that is located on the roof of any building or improvement shall be properly screened and enclosed in a manner that is architecturally and aesthetically harmonious with the Shopping Center.    No vertical rooftop signs shall be erected.

(l)    Conduct of Construction.  All construction at the Property shall be subject to the following requirements:  It shall be planned and carried on so as to prevent unreasonable congestion or blocking of any driveways or Common Areas in the Shopping Center, and at all times, all such driveways and Common Areas must remain fully accessible and open for use by the customers, business invitees, licensees or other persons transacting business within the Shopping Center.  Property Owner shall remove excess "spoil" materials and the like from the Property and shall maintain the Property in a clean and orderly fashion during the course of construction.  All construction activities shall be diligent and pursued to completion, and promptly following completion of such activities, any areas on the Property affected by any such construction activities shall be restored to as close to the condition as such area existed immediately prior to the commencement of such construction activityAll construction shall be planned and carried out so as to maximize safety and minimize interference with ongoing business at the Shopping Center, including, without limitation, by (i) erecting appropriate construction barricades or implementing other reasonable measures to restrict public access to the portions of the Property involved in the construction work, and (ii) providing security for any areas used for contractor's offices and storage of materials and supplies.  Property Owner agrees to consult with Developer from time to time during the course of any construction work to implement the reasonable suggestions of Developer in order to minimize interference with ongoing business at the Shopping Center or any part thereof and maximize safety.  All construction shall be performed in accordance with all

Book::21119 Page::1225

SLC-7261452-10

Book:21119 Page:1226

applicable laws, rules, regulations, orders, statutes, codes and ordinance using new materials and shall be performed in a good, safe and workmanlike manner.

Property Owner agrees to use reasonable efforts in connection with any construction on the Property to prevent any work stoppage, picketing, labor disruption or dispute, or any interference with the business of Developer or any other Property Owner or occupant in the Shopping Center or with the rights and privileges of any customer or other person(s) lawfully in and upon said Shopping Center.

(m)    Detention, Retention and Water Quality. Property Owner shall be responsible for the cost and obligations of complying with all surface water detention, retention and water quality requirements pertaining to the Property. This shall include but not be limited to permitting, constructing, maintaining and paying for all costs associated with the aforementioned.

(n)    Insurance and Indemnity. Property Owner shall:

(i)    Indemnify, defend, and hold harmless Declarant, Developer and their respective designees, parent companies, subsidiaries, affiliates, subcontractors, officers, directors, partners, affiliates, attorneys, agents (collectively, the "Indemnified Parties"), from and against any and all liability, cost and damage relating to any construction activities of, or on behalf of, Property Owner, including, without limitation, injury to persons, loss of life and/or damage to property, including penalties, and sanctions, reasonable attorney fees and expert fees (collectively, the "Liabilities"). Property Owner shall also cause its contractors and subcontractors to indemnify, defend, and hold harmless the Indemnified Parties from and against the Liabilities by including such indemnification in all contracts or subcontracts and naming the Indemnified Parties as third beneficiaries of such contracts or subcontracts.

(ii)    Maintain or cause to be maintained and cause all contractors and subcontractors working on the Property to maintain (A) commercial general liability insurance, including contractual liability coverage (which includes, without limitation, coverage for the contractual indemnity obligations of Property Owner in this ECR and coverage for ongoing operations and completed operation on a primary and non-contributory basis using Form CG 20 10 11 85 or its equivalent), with an insurer authorized to do business in the State in which the Property is located, with a limit of not less than **$2,000,000** per occurrence, **$2,000,000** in aggregate against liability for bodily injury, including death resulting therefrom, property damage and personal injury (provided that at least **$1,000,000** of such general liability insurance shall be primary coverage, with commercially reasonable deductibles), such coverage to include without limitation all construction work performed pursuant to the rights granted under this ECR, (B) builder's risk coverage with an insurer authorized to do business in the State in which the Property is located, in an amount reasonably acceptable to Developer, (C) excess/umbrella coverage excess of (A) and (B), in an amount of at least **$5,000,000**; (D) insurance to provide for full replacement value for the Buildings and improvements on

Book:21119 Page:1226

SLC-7261452-10

the Property; (E) workers compensation insurance in the statutory forms and amounts; and (F) automobile liability with a limit of not less than **$1,000,000** per occurrence

       (iii)   If any occupant of the Property shall sell alcohol for on- or off-premises consumption, maintain or cause any occupant to maintain liquor liability insurance in an amount not less than **$1,000,000**.

      Each of the Indemnified Parties as their interests may appear shall be identified as an additional insured on all such policies (excluding the workers compensation policies) and the policies will also include a waiver of subrogation where allowable by law. All of said insurance shall be written by insurance companies licensed in the State in which the Property is located and having a Best rating of at least A-VIII. All such insurance may not be cancelled or amended except upon 30 days' prior written notice to the Developer from the insurance company. Property Owner shall deliver, or cause to be delivered, to Developer either a duplicate original or certificate of insurance, with actual endorsement, together with reasonable evidence of the payment of the premiums therefore. If Property Owner fails to so deliver or caused to be delivered to Developer, then Developer may, at its discretion, purchase such insurance on Property Owner's behalf and receive reimbursement therefore upon demand. The limits set forth in this subsection (n) shall be subject to increase by Developer, provided such new limits are consistent with shopping center industry standards for similar occupants.

      (o)   <u>Impact Fees.</u>  Property Owner shall pay all fees (including without limitation impact and permit fees) relating to the Property Owner's construction, reconstruction, development or use on or of the Property.

      (p)   <u>Liens.</u>  Property Owner shall not create or permit to be created or permit to remain any lien, encumbrance or charge which might be or become a lien, encumbrance or charge upon the Shopping Center, or upon any improvements thereon, or upon any income therefrom. If any lien, arising out of any work performed, material furnished, or obligation incurred by Property Owner, shall at any time be filed against the Shopping Center, or any improvements thereon, Property Owner, within **30** days after written notice of the filing thereof, shall cause such lien to be discharged of record by payment, deposit, bond, order of a court of competent jurisdiction, or otherwise. If after the expiration of such period Property Owner shall fail to cause any lien to be discharged as aforesaid, then in addition to any other right or remedy it may have, Developer may, but shall not be obligated to, discharge it either by paying the amount claimed to be due or by procuring the discharge of such lien by deposit, bond, or other proceedings, and in any such event, Developer shall be entitled if Developer so elects, but shall not be obligated, to compel the prosecution of any action for the foreclosure of such lien by the lienor and to pay the amount of the judgment in favor of the lienor with interest, costs and allowances. Any amount so paid by Developer and all costs and expenses incurred by Developer in connection therewith, together with interest thereon, from the respective dates of Developer's making of the payments and incurring of the costs and expense,

SLC-7261452-10

Book:21119 Page:1228

shall be paid by Property Owner to Developer within 30 days of Property Owner receiving an invoice.

Nothing in this ECR shall be deemed or construed in any way as constituting the consent or request of Developer, express or implied by inference or otherwise, to any contractor, subcontractor, laborer or materialman for the performance of any labor or the furnishing of any materials for any specific construction on the Property that would give rise to the filing of any lien against the estate or interest of Developer in and to the Shopping Center, nor as giving Property Owner any right, power or authority to contract for or permit any rendering of any services or the furnishing of any materials that would give rise to the filing of any lien against the estate or interest of Developer in and to the Shopping Center. Notice is hereby given that Developer shall not be liable for any labor, services or materials furnished or to be furnished to Property Owner, or to anyone holding the Property through or under Property Owner, upon credit and that no lien for any such labor, services or materials shall attach to or affect the estate or interest of Developer in and to the Shopping Center.

(q)    Encroachments.  If any building, structure or other improvement to the Property constructed thereon by Property Owner or an occupant of the Property shall encroach upon any property, street or right-of-way adjoining or adjacent to the Property, or shall violate the agreements or conditions contained in any restrictive covenant affecting the Property or any part thereof, including the Governing Documents, or shall hinder or obstruct any easement or right-of-way to which the Property are subject or shall impair the rights of others under any such easement or right-of-way, then, in the case of any encroachment, promptly after written request from any person affected by such encroachment or Developer, Property Owner shall either (i) obtain valid and effective waivers or settlements of all claims, liabilities and damages resulting from each such encroachment, violation, hindrance, obstruction or impairment, whether the same shall affect Developer, Property Owner or both, or (ii) make such changes in the improvements on the Property and take such other action as shall be necessary to remove such encroachments, hindrances or obstructions and to end such violations or impairments.

(r)    Devices.  Any radio, electronic communications, television or satellite aerial or antenna or other similar device ("Device") shall be properly screened so as to not be visible from the parking areas of the Shopping Center or Lindbergh Boulevard or St. Charles Rock Road.  Property Owner shall be responsible for obtaining the consent of all regulatory license commissions and government agencies before erecting the Device, and thereafter maintaining such consent.  Any taxes or assessments levied against the Shopping Center or Developer because of the existence of such Device shall be Property Owner's sole responsibility.

(s)    Day of Performance.  Wherever herein there is a day or time period established for performance and such day or the expiration of such time period is a Saturday, Sunday or holiday, then such time for performance shall be automatically extended to the next business day.

Book:21119 Page:1228

Description: St Louis,MO Document (W) - Year.Date.DocID 2014.805.849 Page: 10 of 53
Order: OOOVVBX Comment:

Book:21119 Page:1229

    (t)    **Lighting.** The lighting system for the Property shall use a lamp source of light-emitting diode (LED) and shall be designed to provide a minimum maintained lighting intensity measured at grade at all points of at least:

        (i)    Five (5) footcandles at curb in front of the entrance to any Building;

        (ii)    Two and one half (2-1/2) footcandles at entry drives to Shopping Center;

        (iii)    Two and one half (2-1/2) footcandles in general parking areas; and

        (iv)    One and one half (1-1/2) footcandles at the perimeter of the parking areas.

    2.    **Maintenance.** The Property shall be maintained by the Property Owner, at its cost, in a sightly, safe condition and good state of repair comparable to the standard of maintenance followed in other high quality retail developments of comparable size in the Metropolitan St. Louis Area. Property Owner shall prevent soil, silt and other materials from eroding from the Property onto contiguous properties, drives and rights of way and shall promptly clean up all such soil, silt, and other materials which leave the Property. Property Owner shall keep its Property illuminated from dusk until dawn in accordance with Section 1(t) of this ECR. All landscaping areas shall be well maintained. The maintenance of the Property shall include, but not be limited to the following: maintaining the surfaces of all sidewalks, restriping, sealing and maintenance of paved and parking areas in a level, smooth and evenly-covered condition with the type of surfacing material originally installed or such substitute as shall in all respects be equal in quality, appearance, use and durability; removing all papers, ice and snow, mud and sand, debris, filth and refuse and thoroughly sweeping the area to the extent reasonably necessary to keep the area in a clean and orderly condition; maintaining, keeping in repair and replacing any necessary appropriate directional signs, markers and lines; operating, keeping in repair and replacing, where necessary, such artificial lighting facilities as shall be reasonably required; maintaining, mowing, weeding, trimming and watering all landscaped areas and making such replacements of shrubs and other landscaping as is necessary; keeping the Property free from any obstructions, including those caused by the sale or display of merchandise, unless such obstruction is permitted under the provisions of this ECR; and maintaining, cleaning, replacing and repairing any and all portions of the Building, drive isles, parking lots, sidewalks and greenspace on the Property.

    If Property Owner shall fail to maintain, repair or replace the Property as required by this ECR or the Governing Documents, within **15** days after receipt of written notice of the alleged breach from Developer, and for as long thereafter as a cure is diligently pursued, Developer, at its option, may perform such maintenance repair or replacement on Property Owner's behalf, and Developer by reason of so doing shall not be liable or responsible for any loss or damage thereby sustained by Property Owner or anyone holding under Property Owner. If Developer so performs any such obligation, the full

Book:21119 Page:1229

SLC-7261452-10

Book:21119 Page:1230

amount of the reasonable cost (including without limitation all reasonable costs incurred to collect such cost of performance) and expense entailed or the payment so made will immediately be owing by Property Owner to Developer, and Property Owner shall repay to Developer upon demand the full amount thereof with interest, at the lesser of 15% or the highest rate permitted by applicable law, thereon from the date of payment. If such repayment shall not be made within 10 days after such demand is made, Developer shall have the right, in addition to Developer's rights in Section 9, to place a lien on the Property and to utilize any remedies afforded an Affected Party pursuant to Section 17.

Property Owner shall not use or permit the use of hazardous materials on, about or under the Property, except in the ordinary course of its usual business operations conducted thereon, and any such use shall at all times be in compliance with all applicable environmental laws. Property Owner agrees to defend, protect, indemnify and hold harmless each other Developer and its affiliates from and against all claims or demands, including any action or proceeding brought thereon and all costs, losses, expenses and liabilities of any kind relating thereto, including but not limited to the cost of investigation, remedial response and reasonable attorneys' fees and cost of suit arising out of or resulting from any hazardous material used or permitted to be used by such Property Owner whether or not in the ordinary course of business.

For purpose of this section, the term "hazardous material" shall mean: petroleum products, asbestos, polychlorinated biphenyls, radioactive materials and other dangerous toxic or hazardous pollutants, contaminants, chemicals, materials or substances listed or identified in or regulated by any environmental law; and environmental law shall mean all Federal, State, County, municipal, and local statutes, laws, ordinances, rules, codes and regulations which relate to or deal with human health or the environment, all as may be amended from time to time.

No noxious fumes or excessive noise shall be permitted at the Property.

3.    **General Construction and Operating Requirements**.

The Property and Property Owner shall be subject to the following requirements:

(a)    Other than for a complete reconstruction after a casualty, all work conducted on the Property shall be completed within a reasonable period of time; provided, however, that if the work is delayed for *force majeure* reasons, then the time shall be extended as reasonably necessary to resolve the reasons for the delay. During such work, access to or parking for the Shopping Center shall not be blocked and all damage to property adjacent to the Property caused by activities related to such work shall be repaired to a condition as good as existing prior to such activities. Property Owner is responsible, at its sole cost and expense, for obtaining, or causing to be obtained, any and all required governmental approvals of the plans and specifications, including, but not limited to all building permit fees and all other fees, taxes, costs and expenses attributable to any work on the Property.

Book:21119 Page:1230

SLC-7261452-10

Book:21119 Page:1231

(b)     If any improvements located on the Property are damaged or destroyed by casualty, Property Owner shall either restore same or raze all damaged improvements and replace the same with grass or other landscaping.

(c)     Property Owner shall not use the Property or Shopping Center (or permit its occupants to use the Property or Shopping Center) for any of the following:

(i)     Any use prohibited in this ECR or under the Governing Documents; or

(ii)    Use any part of the Common Area, without the written consent of Developer, for any of the following:

(A)     Vend, peddle or solicit orders for sale or distribution of any merchandise, devise, service, periodical, book, pamphlet, or other matter whatsoever.

(B)     Exhibit any sign, placard, banner, notice or other written material.

(C)     Distribute any circular, booklet, handbill, placard, or other material.

(D)     Solicit membership in any organization, group or association or contribution for any purpose.

(E)     Parade, rally, patrol, picket, demonstrate, or engage in any conduct that might interfere with or impede the use of any of the Common Areas by any occupant, create a disturbance, attract attention, or harass, annoy, disparage, or be detrimental to the interest of any of the retail establishments within the Property or Shopping Center.

(F)     Throw, discard, or deposit any paper, glass, or extraneous matter of any kind, except in designated receptacles, or create litter or hazards of any kind.

(G)     Deface, damage or demolish any sign, light standard, or fixture, landscaping materials or other improvements within the Property or Shopping Center or the property of customers, business invitees, or employees situated within the Property or Shopping Center.

The listing of specific items as being prohibited is not intended to be exclusive, but to indicate in general the manner in which the right to use the Common Areas solely

Book:21119 Page:1231

SLC-7261452-10

Book:21119 Page:1232

as a means of access and convenience in shopping at the retail establishments in the Shopping Center is limited and controlled.

(iii)   Developer shall have the right to remove or exclude from or to restrain (or take legal action to do so) any unauthorized person from coming upon the Shopping Center or any portion thereof, and to prohibit, abate, and recover damages arising from any unauthorized act, whether or not such act is in express violation of the provisions of this subsection (c).

(d)   Trash dumpsters shall be located in an appropriate screened or fenced area as is compatible with the Shopping Center and subject to Developer's approval.

(e)   All interior, exterior and/or utility construction, replacement and maintenance to be performed on or to the Property or any improvements thereto shall conform to the requirements of this ECR and the Governing Documents, and shall be performed in a good and workmanlike manner using first class materials. In addition to the above, all exterior and/or utility construction shall be performed in compliance with the following provisions:

(i)   Property Owner shall notify Developer of Property Owner's intention to commence any exterior improvement work or major exterior repair work at least 10 days before commencement of any such work or delivery of any materials therefor. Subject to *force majeure*, once any such work is commenced the same shall thereafter be diligently prosecuted to completion. All improvement work and major repair work, except for emergency repair work, shall be scheduled so that it is commenced after January 5 and finished before November 20 of the same year. No such work shall be performed during the period from November 20 of one year through January 5 of the immediately succeeding year.

(ii)   Prior to the start of any construction, Property Owner shall erect or cause to be erected adequate fences in accordance with good construction practices substantially enclosing the area of its construction, as reasonably approved by Developer. The fences shall be maintained until the construction has been substantially completed (to the extent reasonably necessary to remove hazardous construction conditions). Property Owner shall take all other commercially reasonable safety measures reasonably required to protect Property Owner and Developer and other occupants at the Shopping Center and all customers, visitors, and invitees of each in and around the Property, the Shopping Center from injury or damage caused by or resulting from or in connection with the performance of any work.

(iii)   All work shall be performed in a manner so as not to unreasonably impair or interfere with the use, occupancy or enjoyment of, or with any business conducted at the Shopping Center. During construction of Property Owner's work, Property Owner shall have the right to place a construction trailer and reasonable construction equipment and materials, and allow workmen to park, related to Property

Book: 21119 Page: 1232

SLC-7261452-10

Book:21119 Page:1233

Owner's; and shall be fenced or otherwise barricaded in compliance with this subsection (e). During the initial construction of any improvements, Property Owner shall have access through the internal roads of Shopping Center (the "Construction Access"). Property Owner covenants and agrees that Property Owner's indemnity of Developer as set forth herein shall apply to the Construction Access and such additional locations as provided subject to the provisions of this ECR. At all times during the performance of any work all areas other than the construction site proper shall be kept free from any loose dirt, debris, equipment or construction materials relating to the work. All work shall be confined solely within the exterior boundaries of the Property.

(iv)    Upon completion of construction by Property Owner of any new improvements, Property Owner shall upon Developer's written request have an "as built" survey prepared and shall deliver **2** copies of the same to Developer. Said survey shall show the location of the Building and other improvements on the Property and shall show the design and layout of all Common Areas including parking spaces and traffic lanes.

(f)    Subject to required governmental approvals, Property Owner shall be allowed to have outdoor sales, including occasional special event sales and permanent outdoor sales areas adjoining the Building. Such outdoor sales must be consistent with the sales activities taking place within the Building.

4.    **Easements for Use of Common Areas, Utility, Water Flow.** Property Owner hereby grants to Declarant, the Developer, and their respective permittees, and the Declarant and the Developer hereby grant to Property Owner and its permittees a nonexclusive easement over, through and around the drive isles, parking lots, sidewalks and roadways as may be located from time to time on their respective Parcels for ingress and egress of motor vehicles and pedestrians and the Common Areas. Any such areas may be modified or change from time to time so long as reasonable ingress and egress over such Parcel is always provided. In addition to the foregoing, Developer hereby grants for the benefit of Property Owner, nonexclusive easements for vehicular and pedestrian access, ingress and egress over and across those portions of the Common Areas as may be changed or relocated from time to time; provided, however, notwithstanding the foregoing, in no event shall Property Owner be permitted to use the Common Areas for vehicular parking or for any other purpose other than as described above. The foregoing easements are limited to such portions of the Common Area as are now or hereafter from time to time set aside or intended to be set aside, maintained and authorized for such use under this ECR. Each Party hereby reserves the right to eject from the Common Area any person not authorized to use the same, including those persons utilizing the Common Area for park and ride or commuter purposes. In addition, each Party reserves the right to: close-off any portion of its Parcel for such reasonable period of time as may be legally necessary, in the opinion of such Party's counsel, to prevent the acquisition of prescriptive rights by anyone; provided, however, that prior to closing-off any portion of its Parcel, such Party shall give written notice to each other Party of its intention to do so, and shall attempt to coordinate such closing-off with each other Party so that no unreasonable interference with the passage of pedestrians or

Book: 21119 Page:1233

SLC-7261452-10

Book:21119 Page:1234

vehicles shall occur. Each Party reserves the right at any time and from time to time to exclude and restrain any Person who is not a permittee from using its Parcel. Each Party reserves the right to temporarily erect or place barriers in and around areas on its Parcel which are being constructed and/or repaired in order to insure either safety of Persons or protection of property. Developer reserves the right to make changes to the Common Areas and the Shopping Center in Developer's sole discretion.

The Property Owner hereby grants to the Developer and the Declarant, a non-exclusive, perpetual easements thru the perimeter five (5) feet of the Property, for the installation, use, operation, maintenance, repair, replacement, relocation and removal of public or private utility facilities serving the Shopping Center. The exact location of the facilities shall be subject to the approval of the Property owner and the utilities shall only be limited to lateral lines. Upon the installation of such facilities, the easement area for each such facility shall be two feet six inches (2.6') on each side of the centerline of each such facility as installed and, on a temporary basis only, as needed, such additional areas immediately adjacent to the foregoing easement area reasonably necessary for the Developer's equipment or the Declarant's equipment, as applicable. All Separate Utility Facilities installed on the Property, whether installed under this section or otherwise, and all Common Utility Facilities, shall be underground except:

(1)    ground mounted electrical transformers;

(2)    as may be necessary during periods of construction, reconstruction, repair or temporary service;

(3)    as may be required by governmental agencies having jurisdiction;

(4)    as may be required by the provider of such service;

(5)    manholes and fire hydrants; and

(6)    the above ground electric transmission line as currently situated.

Except as otherwise provided herein, the grantee of any easement for utilities not installed under the terms of this ECR and not for use in common by other Parties or for service of the Common Area ("Separate Utility Facilities") under this Section shall be responsible, as between the Property Owner and the grantee, for the installation, maintenance, repair and removal at grantee's cost of all Separate Utility Facilities installed by the grantee pursuant to the easement grant, as well as for all Separate Utility Facilities installed by the grantee on its own Parcel. Any such installation, maintenance, repair, replacement, relocation and removal of Separate Utility Facilities shall be performed by grantee only after thirty (30) days advance notice to Property Owner of grantee's intention to do such work. However, in the case of an emergency, any such

Book:21119 Page:1234

SLC-7261452-10

work may be immediately performed after giving such advance notice to Property Owner as is practicable under the circumstances. In addition, the Parties agree that all such installation, maintenance, repair and removal shall be performed in a manner that, given the circumstances involved, shall not unreasonably interfere with Property Owner's operations, and any and all portions of the surface area of Property Owner's Property which may have been excavated, damaged or otherwise disturbed as a result of such work shall be restored, at the sole cost and expense of grantee, to essentially the same condition as the same were in prior to the commencement of any such work. Each grantee, at its sole cost and expense, shall promptly repair, replace or restore any and all improvements of Property Owner which have been damaged or destroyed in the exercise by grantee of the easements granted hereunder, and the grantee shall defend, indemnify and hold Property Owner harmless from and against any and all liens, losses, liabilities, costs or expenses (including reasonable attorney's fees), incurred in connection with grantee's exercise of the Separate Utility Facilities easements under this subsection (b), except to the extent occasioned by Property Owner's negligent or wrongful act or omission to act. Property Owner hereby grants to Developer or any other owner of the Benefited Property an easement for temporary construction activities over any portion of the Property reasonably required for such construction, but such owner shall restore all damage caused by such activities.

No Party shall grant any easement for the benefit of any property not within the Shopping Center; provided, however, that the foregoing shall not prohibit the granting or dedicating of utility easements by a Party on its Parcel to governmental authorities or to public or private utility companies for utility lines. If a utility line is dedicated and accepted for maintenance by a governmental authority or public utility, then the operation and maintenance of such utility line shall thereafter be the responsibility of the person accepting the dedication.

"Common Utility Facilities" shall mean utility systems and facilities from time to time situated on or serving the Shopping Center, in the Common Area, for use or service in common, in whole or in part, by more than one (1) Party or for the service of the Common Area installed thereon under any easement granted by it.

Any alteration in the natural water flow which may occur as a natural consequence of normal construction activities and the construction and existence of Declarant's improvements substantially as shown on the Site Plan (including without limitation building and building expansion, curbs, drives and paving) shall be permitted.

Each grantee of an easement under this Section ("Grantee"), at its sole cost and expense, shall promptly repair, replace or restore any and all improvements of the grantor of such easement ("Grantor") which have been damaged or destroyed in the exercise by Grantee of the easements granted under this Section and shall defend, indemnify and hold Grantor harmless from and against all liens, losses, liabilities, costs or expenses (including reasonable attorneys' fees) incurred in connection with or arising out of

SLC-7261452-10

*Description: St Louis,MO Document (W) - Year.Date.DocID 2014.805.849 Page: 17 of 53*
*Order: OOOVVBX Comment:*

Grantee's exercise of said easements, except to the extent occasioned by Grantor's negligent or wrongful act or omission to act.

Property Owner and Developer hereby agree that the existing access drives that provide access to the Shopping Center from Lindbergh Boulevard as of the Effective Date (the "Existing Lindbergh Access") may be relocated by the Developer provided that the centerlines of the relocated access drives (the "Relocated Lindbergh Access") shall not be more than seventy five (75) feet from the centerlines of the Existing Lindbergh Access shown on Exhibit A-4 and provided further that (i) if Developer, at the time of such relocation, is not the Declarant or a related entity, no building or other improvements, which obstruct the sightlines between any building located on the Property and Lindbergh Boulevard, shall be constructed or maintained on any part of the land between the Property and the Relocated Lindbergh Access and (ii) if Developer, at the time of such relocation, is the Declarant or a related entity, no building, which obstruct the sightlines between any building located on the Property and Lindbergh Boulevard, shall be constructed or maintained on any part of the land between the Property and the Relocated Lindbergh Access.

5.   **Common Area Maintenance and Cost Sharing**. Commencing on the Effective Date the Developer shall operate and maintain the Common Area. Developer may hire companies affiliated with it to perform the maintenance and operation of the Common Area, but only if the rates charged by such companies are competitive with those of other companies furnishing similar services in the St. Louis metropolitan area and Developer shall disclose any affiliated relationships with vendors retained to provide services to the Shopping Center. Developer shall expend only such funds as are reasonably necessary, in Developer's discretion, for the operation, maintenance, repair, replacement (including removal, relocation and redesign), and insurance of the Common Area and shall promptly pay such costs ("Common Area Maintenance Costs") when incurred, which Common Area Maintenance Costs include all costs associated with operating, managing, maintaining, repairing or replacing (including removal, relocation and redesign), all elements of the Common Area including but not limited to Common Access Drives as defined in the Governing Documents, snow & ice removal within the Common Areas and from the Common Access Drives, curbs, gutters, utilities, sprinkler systems, green space, grass, shrubs, mulch, flowers, plantings, trees, signs, lights, light poles, security equipment, bollards, detention areas, water quality areas, and sidewalks; all costs of utilities serving the Common Area, and all taxes, payments in lieu of taxes, or assessments affecting the Common Area, all costs of security and insurance, and all costs of funding a commercially reasonable replacement reserve for the maintenance, repair and replacement (including removal, relocation and redesign) of improvements located in the Common Area, which reserve shall be calculated, with respect to capital improvements, by allocating the estimated cost of maintaining, repairing and replacing the Common Area improvements over the useful life or remaining useful life of the Common Area improvements. Developer shall self-conduct periodic reserve analyses, at least once every five (5) years, to determine appropriate levels of reserves to be maintained and identify capital improvements within the Common Area that may be

SLC-7261452-10

Book:21119 Page:1237

replaced, repaired (including removal, relocation and redesign) and maintained with reserve funds. All such reserve funds shall be held by the Developer and expended for the replacement, repair (including removal, relocation and redesign) and maintenance of improvements located within the Common Areas of the Benefitted Property. Attached to this ECR as **Exhibit A-4** is a depiction of the Common Areas (in black) as currently anticipated by the Developer, which depiction does not include all landscape, water quality, and other areas ancillary to, and included as part of, the Common Areas. Except for the limitation on relocation of the Existing Lindbergh Access set forth in Section 4 of this ECR, the Property Owner agrees that Developer may remove, relocate, redesign, and add to the areas depicted on **Exhibit A-4** in black. The cost associated with maintenance of the parking areas on the Benefitted Property shall not be Common Area Maintenance Costs. The gray shaded and hatchured areas on **Exhibit A-5** depict Developer's anticipated plan for construction and installation of new elements of the Common Area (the "New Work"), which depiction does not include all landscape, water quality, and other areas ancillary to, and included as part of, the New Work. The Property Owner and the Developer agree that the cost of the New Work shall be borne by Developer and not charged to Property Owner or the Property as Common Area Maintenance Costs. After completion of the New Work, all costs associated with operating, maintaining, repairing, and replacing (including removal, relocation and redesign) the New Work shall be included in Common Area Maintenance Costs. If, within one (1) year of the Effective Date, Developer relocates or redesigns the access drive located adjacent to and north of the Property (the "North Lindbergh Access"), the cost of such relocation or redesign shall not be charged to Property Owner or the Property as Common Area Maintenance Costs; otherwise, all costs associated with relocating and redesigning the North Lindbergh Access shall be included in Common Area Maintenance Costs.

In lieu of Developer's profit, administrative and overhead costs, Developer shall be permitted to charge an amount ("Administrative Fee") computed by multiplying the actual Common Area Maintenance Costs (exclusive of insurance premiums and utility charges) by ten percent (10%).

Property Owner shall be responsible for its Allocable Share of the Common Area Maintenance Costs and the Administration Fee. As used herein, Allocable Share shall be equal to a percent calculated by dividing the total acreage located on the Property Owner's Property by the total acreage of all other Parcels in the Shopping Center. In calculating the total acreage of all other Parcels in the Shopping Center, the following shall be excluded: acreage relating to (i) the Menard Parcel (as legally described on Exhibit A of that certain Declaration of Reciprocal Easements and Restrictive Covenants recorded at Book 20643 Page 817, such Declaration to be defined herein as the "Menard REA"), (ii) the Pintail Parcel B (as legally described on Exhibit A of the Menard REA), and (iii) the Common Area.

Within thirty (30) days following the commencement of such maintenance and operation of the Common Area by the Developer, Developer shall provide the Property Owner an estimated budget for the balance of the current calendar year for the Common

Book:21119 Page:1237

Description: St Louis,MO Document (W) - Year.Date.DocID 2014.805.849 Page: 19 of 53
Order: OOOVVBX Comment:

Area Maintenance Costs and Administrative Fee. Developer shall, at least thirty (30) days prior to the beginning of each subsequent calendar year, submit to the Property Owner an estimated budget for the Common Area Maintenance Costs and the Administrative Fee for the ensuing calendar year. Property Owner shall pay to the Developer in equal monthly payments, in advance, the Property Owner's Allocable Share of the Common Area Maintenance Costs and the Administration Fee based upon the amount set forth in such estimated budget. The estimated budget shall set forth the Allocable Share for Property Owner during such calendar year, Developer shall deliver to the Property Owner written notice of such change in Allocable Share and Property Owner shall make adjustments to its monthly payments, as necessary. The Developer shall reasonably estimate such costs for the partial year during which its maintenance obligations commence and Property Owner shall make its first payment in the month following Developer's undertaking of such maintenance and repair of the Common Area.

If an item of maintenance or replacement is to be accomplished in phases over a period of calendar years, such as resurfacing of the drives, then the estimated budget shall separately identify the cost attributable to such year (including the Common Area affected), and shall note the anticipated cost and timing (indicating the area of the Common Area affected) of such phased work during succeeding calendar years.

Developer shall use its diligent, good faith efforts to operate, maintain, repair, replace and insure the Common Area in accordance with the estimated budget. Notwithstanding the foregoing, Developer shall have the right to make emergency repairs to the Common Area to prevent injury or damage to person or property, it being understood that Developer shall nevertheless advise Property Owner of such emergency condition as soon as reasonably possible, including the corrective measures taken and the cost thereof. If the cost of the emergency action exceeds $25,000, then Developer may submit a supplemental billing to Property Owner, together with evidence supporting such payment, and Property Owner shall pay its Allocable Share (hereinafter defined) thereof within thirty (30) days; if the cost set forth above is not exceeded then such costs shall be included as part of the Common Area Maintenance Costs at the year end.

As soon as practicable after the end of each calendar year, the Developer shall provide Property Owner with a certified statement, together with supporting invoices and other related materials, setting forth the actual Common Area Maintenance Costs paid by it for the operation and maintenance of the Common Area, the Administrative Fee, and Property Owner's Allocable Share of the aggregate thereof. If the amount paid by Property Owner for such calendar year shall have exceeded Property Owner's Allocable Share, Developer shall refund the excess to Property Owner at the time such certified statement is delivered, or if the amount paid Property Owner for such calendar year shall be less than the Property Owner's Allocable Share, Property Owner shall pay the balance of its Allocable Share to Developer within thirty (30) days after receipt of the certified statement, together with invoices and back-up material reasonably requested by Property Owner. In the event Property Owner fails to timely pay the Developer, the Developer shall have the rights of an Affected Party under Section 17 hereof. As soon as practicable

SLC-7261452-10

Description: St Louis,MO Document (W) - Year.Date.DocID 2014.805.849 Page: 20 of 53
Order: OOOVVBX Comment:

Book:21119 Page:1239

after the end of each calendar year, the Developer shall provide Property Owner with a certified statement related to the replacement reserve fund activity for the preceding year.

Within two (2) years after receipt of any such certified statement, Property Owner shall have the right to audit Developer's books and records pertaining to the operation and maintenance of the Common Area and any replacement reserve fund for the calendar year covered by such certified statement; Property Owner shall notify Developer of its intent to audit at least fifteen (15) days prior to the designated audit date. In the event that such audit shall disclose any error in the determination of the Common Area Maintenance Costs, the Administrative Fee or in the Property Owner's Allocable Share, an appropriate adjustment shall be made forthwith. The cost of any audit shall be assumed by the Property Owner unless Property Owner shall be entitled to a refund in excess of five percent (5%) of the amount calculated by Developer as its Allocable Share for the calendar year, in which case Developer shall pay the cost of such audit.

Developer has up to five (5) years after the due date of any sum owed by Property Owner to request payment. After that five year period expires, any sum owed by Property Owner shall be forgiven.

In the event Declarant or an affiliate is not the Developer, and such Developer is in default of its obligations hereunder (after notice and cure required by Section 17), then Property Owner and other owners of fee simple title to parcels within the Benefited Property may remove the Developer from its obligations pursuant to this Section 5 and engage a suitable replacement professional property manager upon the written consent of the owners of at least seventy five percent (75%) of the total acreage used for purposes of calculating the Property Owner's Allocable Share.

6.   **Indemnity and Reservation of Easements**.

(a)   Property Owner agrees to defend, indemnify and hold Developer, Declarant, and the parties to the Governing Documents harmless from and against any and all claims and demands (except such claims and demands that result from the negligence of Developer, Declarant, or the parties to the Governing Documents, or their respective agents or other representatives, contractors, servants or employees) for, or in connection with, any accident, injury or damage whatsoever caused to any person or property (i) arising directly or indirectly, out of the business conducted in or the use and/or occupancy of the Property, or (ii) occurring in, on or about the Property or any part thereof, or (iii) arising directly or indirectly, from any act or omission or Property Owner or any occupant of the Property or any of their respective tenants, licensees, servants, agents or other representatives, employees or contractors, or (iv) from and against any and all costs, expenses and liabilities incurred in connection with any such claims and/or proceedings brought thereon.

(b)   To the extent utilities, utility lines or utility facilities (including, without limitation, gas, sewer, electric, telephone, water, cable, internet, etc.) and drainage systems and facilities (collectively, "Utilities") serving any part of the Shopping Center, or any other

Book::21119 Page::1239

SLC-7261452-10

Book:21119 Page:1240

improvements not the property of the Property Owner or other occupant of the Property as of the Effective Date, are located in, on, or under the Property outside of the easement areas reserved by the Governing Documents, easement areas platted, or areas subject to the obligations of the utility provider, Property Owner hereby grants a perpetual, non-exclusive easements and rights over, under, across and through the Property for the benefit of the Shopping Center, for the relocation, maintenance, repair and replacement of such Utilities and improvements to locations reasonably approved by Property Owner at the requesting Party's sole cost and expense. Property Owner is responsible for building and maintaining its own water quality structures as necessitated by any regulatory body, including but not limited to Metropolitan Sewer District.

(c)     Declarant hereby reserves and Property Owner grants to Developer a nonexclusive perpetual easement for vehicular and pedestrian ingress and egress over, across and through those driveways that exist from time to time on the Property, solely for the benefit of the owners and occupants of the Shopping Center, and to be used by the owners of the Shopping Center and its occupants, and their respective employees, agents, contractor and invitees. Except as specifically provided herein, Property Owner shall not unreasonably interfere or permit interference with the use and enjoyment of the easement reserved in this subsection (c).

(d)     Property Owner and the owners of the Benefited Property shall indemnify, defend and hold harmless Developer and its designees, parent companies, subsidiaries, affiliates, subcontractors, officers, directors, partners, affiliates, attorneys, and agents (collectively, the "Developer Indemnified Parties"), from and against any and all claims, proceedings, liabilities, losses, costs and expenses (including reasonable attorneys' fees and costs of defense) incurred by or asserted against Developer Indemnified Parties by third parties, including but not limited to any liability for which insurance coverage is required pursuant to this ECR above and not actually provided, that: (i) arises from any obligation of Developer pursuant to this ECR; (ii) arises from any violation of applicable federal, state or local law in connection with the Property or the Benefited Property; or (iii) otherwise arises as the result of any act or omission (or allegation thereof, including allegations of ordinary negligence) by Property Owner, Developer, or any owner of the Benefited Property. **THE OBLIGATION TO INDEMNIFY THE DEVELOPER INDEMNIFIED PARTIES UNDER THIS SECTION EXISTS EVEN IF THE ALLEGED CLAIM OR LOSS IS ALLEGEDLY CAUSED IN WHOLE OR IN PART BY THE ALLEGED NEGLIGENCE OF A DEVELOPER INDEMNIFIED PARTY**, provided, that notwithstanding anything in this Section, Developer Indemnified Parties shall not be indemnified to the extent that any loss or claim is adjudged to have been caused by any acts or omissions by Developer Indemnified Parties constituting gross negligence, actual (not constructive) fraud, malice, or willful misconduct.

7.     **Notices**. Every notice, demand, consent, request, approval, report, offer, acceptance, certificate, or other communication which may be, or is required to be, given or delivered under or with respect to this ECR or by Applicable Law shall be in writing in the English language and sent postage prepaid by United States certified mail, return receipt

Book:21119 Page:1240

SLC-7261452-10

requested, or overnight delivery by a nationally recognized express mail service, or via hand delivery, and directed to the other party at its address set forth below, or at such other address within the continental United States as any Party may hereafter designate by similar notice to the other:

DEVELOPER/ DECLARANT:       PROPERTY OWNER:

Wigeon, LLC                 JS Westflo, LLC
1701 Macklind               C/O Rothman Furniture Stores, Inc.
St. Louis, MO  63110        2101 E. Terra Lane
                            O'Fallon, MO 63366

Notices shall be deemed to have been given **3** days after deposit in the United States mail or 1 day after deposit with an express mail service as aforesaid. Notice given by hand delivery shall be deemed to have been given and shall be effective only when actually received by the addressee, proof of which shall be furnished by the sender of such notice.

8. **Restrictions**. The Property shall only be developed and used for any lawful retail use that is consistent with a first-class shopping center similar to the Shopping Center, provided such uses do not violate any of the restrictions on use set forth in the Governing Documents or in **Exhibit B** (the "Permitted Use").

9. **Enforcement.** If Property Owner or its successors or assigns or any party or parties claiming under them shall violate any of the foregoing covenants, Developer may prosecute any proceedings at law or in equity to enjoin such violation and to recover damages for such violation, including reasonable attorneys' fees and all Developer shall have all remedies set forth below. If either party elects to file any action in order to enforce the provisions of this ECR, the prevailing party, as determined by the court in such action, shall be entitled to recover all of its court costs and reasonable attorneys' fees and expenses as a result thereof from the losing party, upon final settlement, judgment or judgment on appeal thereof. Developer's remedies hereunder shall be cumulative.

10. **Binding Effect.** The restrictions contained herein shall be effective as of the Effective Date, shall run with the land burdened thereby, shall be binding upon all owners and occupants thereof, or any part thereof and improvements thereon, and their respective successors and assigns, shall constitute an encumbrance on the Property, and shall inure to the benefit of Developer, its successors and assigns, and shall be in effect for the term of twenty years from the date this ECR is recorded and shall be automatically renewed thereafter for an infinite number of consecutive ten year renewal periods unless terminated by a recorded written agreement from each Party (or its successors in interest). Upon termination of this ECR, all rights and privileges derived from and all duties and obligations created and imposed by the provisions of this ECR, shall terminate and have no further force

SLC-7261452-10

Book:21119 Page:1242

or effect. However, the termination of this ECR shall not limit or affect any remedy at Law or in equity that a Party may have against any other Party with respect to any liability or obligation arising or to be performed under this ECR prior to the date of such termination, except all easements granted herein shall be perpetual other than those easements that are abandoned, such abandoned easements shall be deemed terminated and no further force and effect.

11. . **Amendment.** This ECR may be amended by the written agreement of Developer or its designee and, to the extent Property Owner's rights and obligations would be materially and adversely affected by such amendment, Property Owner, but the ingress, egress, and utility easements referenced herein shall not be terminated without Property Owner's consent. A designee of Developer shall be designated by written instrument executed by Developer, which states that the designation is made pursuant to this ECR and which is recorded in the Register's or Recorder's Office for the County in which the Property is located.

12. **Invalidity.** If any term, covenant or restriction herein shall be invalid or unenforceable, the remainder shall not be affected thereby, and each term, covenant and restriction shall be valid and enforceable to the fullest extent permitted by law.

13. **Exhibits.** The Exhibits attached hereto are a part of this ECR and are incorporated herein by reference. Except as specifically provided herein, if any provision contained in any exhibit hereto is inconsistent or in conflict with any provisions of this ECR, the provisions of this ECR shall supersede the provisions of such exhibit and shall be paramount and controlling.

14. **Developer.** "Developer" shall initially mean Wigeon. A successor Developer may be designated by the then-serving Developer provided that (i) both the successor and existing Developer is Wigeon, Declarant, or an affiliate of either Wigeon or Declarant or (ii) the successor Developer is an affiliate of an owner (either as a single entity or through affiliated entities) of all of the Benefited Property. If a successor Developer will not be Wigeon, Declarant, or an affiliate of either Wigeon or Declarant, and all of the Benefited Property is not owned by one owner (either as a single entity or through affiliated entities), then the Property Owner and other owners of fee simple title to the Benefited Property may appoint a successor Developer upon the written consent of the owners of at least fifty-one percent (51%) of the total acreage used for purposes of calculating the Property Owner's Allocable Share. A Developer may resign at any time upon written notice to the Property Owner.

Notwithstanding the foregoing, until Property Owner receives written notice, from the person or entity then most recently identified in writing to Property Owner as the Developer, that a successor Developer has been established pursuant to this Section 14, Property Owner shall be entitled to assume conclusively that the Developer remains the person or entity then most recently identified in such a writing to Property Owner as the Developer.

Book:21119 Page:1242

SLC-7261452-10

Book:21119 Page:1243

For purposes of complying with Developer's obligations under Section 5, the term "Developer" shall also mean any agents or employees of Developer.

15. **Estoppel Certificates**. Developer and Property Owner, within **30** days after the written request of the other, shall issue an estoppel certificate, stating: (i) whether to its actual knowledge it knows of any default under this ECR and, if there are known defaults, specifying the nature thereof; (ii) whether to its actual knowledge this ECR has been modified or amended in any way that is not set forth in a document duly recorded in the applicable public land records (and if it has, then stating the nature thereof); and (iii) whether to its actual knowledge as of the date in giving the estoppel this ECR is in full force and effect; and (iv) facts, to its actual knowledge, in response to any other matter pertaining to this ECR concerning which a request for information is reasonably made.

16. **Governing Documents**. Property Owner's rights in and to the Property are subject and subordinate to all operating and easement agreements and ECRs of easements, covenants, conditions and restrictions affecting the Property including without limitation (a) the Menard REA and (b) that certain Reciprocal Easement Agreement recorded at Book 20233 Page 159 (collectively, the "Governing Documents"). In the event of a conflict between the Governing Documents and this ECR, the Governing Documents shall govern and control; provided, however, that in the event this ECR places restrictions on the Property or limits any rights the Property otherwise had under the Governing Documents, the more restrictive language of this ECR shall govern. Further, Declarant, for itself and Developer and their successors and assigns, hereby reserves and retains the rights or interest that it may have as "Developer" or "Declarant" under the Governing Documents and has the right to exercise all of the rights and obligations of "Developer" and "Declarant" under the Governing Documents based upon Developer's sole and absolute discretion. Developer and Declarant agree that it will not enter into any modification, supplement, or amendment to the Governing Documents or provide any consent thereunder without first obtaining Property Owner's Consent (not to be unreasonably withheld, conditioned or delayed), which causes a change in the use restrictions such that they are either more restrictive on the Property, or lessen the standard of maintaining, operating and/or replacing the Common Area, or materially and adversely affects Property Owner's rights under this ECR. Notwithstanding the foregoing to the contrary, Property Owner's consent shall not be required to modify the Governing Documents to the extent it relates to property other than the Property or the modification, change or relocation of the Common Area.

17. **Defaults and Remedies.**

(a)    Self Help. If any Party shall default in the performance of an obligation of such Party under this instrument (such Party being herein called a "Defaulting Party"), the Developer or any occupant thereof (the Owner of such other Parcel being hereinafter referred to as an "Affected Party"), such Affected Party, in addition to all other remedies it may have at law or in equity, after thirty (30) days' prior written notice to the

Book:21119 Page:1243

SLC-7261452-10

Defaulting Party, or in the event of an emergency (the word "emergency" meaning circumstances which, if not promptly abated, are reasonably likely to result in bodily injury or death or property damage), after such notice as is practical under the circumstances, shall have the right to perform such obligation on behalf of the Defaulting Party. In such event, if the Affected Party does, in fact, perform such obligation on behalf of the Defaulting Party, the Defaulting Party shall promptly, after being given written notice of the fact and amount of such expenditure by the Affected Party, reimburse the Affected Party the actual cost thereof (not exceeding prevailing rates for like or similar work and materials), together with interest thereon from the date of the Affected Party's outlay at the lesser of (i) 15% or (ii) the highest rate permitted by applicable law, plus attorneys' fees and other costs of collection.

(b)     <u>Injunctive and Other Remedies</u>. In the event of a breach by any Party of any obligation of such Party under this ECR, any of the other Parties shall be entitled to all remedies available at law or equity including but not limited to injunctive relief.

(c)     <u>Non-Waiver</u>. No delay or omission of any Party in the exercise of any right accruing upon any default of any other Party shall impair such right or be construed to be a waiver thereof, and every such right may be exercised at any time during the continuance of such default. A waiver by a Party of a breach of, or a default in, any of the terms and conditions of this ECR by any other Party shall not be construed to be a waiver of any subsequent breach of or default in the same or any other provision of this ECR. Except as otherwise specifically provided in this ECR, (i) no remedy provided in this ECR shall be exclusive but each shall be cumulative with all other remedies provided in this ECR and (ii) all remedies at law or in equity shall be available.

(d)     <u>Non-Terminable Agreement</u>. No breach of the provisions of this ECR shall entitle any Party to cancel, rescind or otherwise terminate this ECR, but such limitation shall not affect, in any manner, any other rights or remedies which any Party may have hereunder by reason of any breach of the provisions of this ECR.

(e)     <u>Force Majeure</u>. In the event any Party shall be delayed or hindered in or prevented from the performance of any act required to be performed by such Party by reason of Acts of God, strikes, lockouts, unavailability of materials, failure of power, prohibitive governmental laws or regulations, riots, insurrections, the act or failure to act of another Party, adverse weather conditions, war or other reason beyond such Party's reasonable control and with respect to which, in each of the aforesaid circumstances, the Party is diligently and in good faith and with reasonable dispatch seeking to abate and remove the circumstances causing the delay or hindrance or prevention from performance of the act required to be performed by such Party, then the time for performance of such act shall be extended for a period equivalent to the period of such delay. Lack of adequate funds or financial inability to perform or financial or economic losses or hardship resulting from performance shall not be deemed to be a cause beyond the reasonable control of such Party.

SLC-7261452-10

Book:21119 Page:1245

## 18. **TDD/CID**

(a)     Property Owner hereby acknowledges and consents to the possible creation by Developer or its assignee of a Transportation Development District (" TDD") and the imposition by the TDD of a sales tax of up to one percent (1%) ("**TDD Sales Tax**") at the Property. Property Owner or its tenant shall collect and pay or cause to be collected and paid the TDD Sales Tax which may originate from the Property as required by law. Property Owner agrees to timely file or cause to be timely filed a separate TDD Sales Tax Return with the City or the TDD, as applicable. Property Owner agrees not object to or oppose the formation of the TDD and waives all rights to file suit to set aside the TDD Sales Tax, or otherwise question the validity of the proceedings relating thereto. Property Owner agrees to cooperate and take all action reasonably necessary to maintain the TDD.   Property Owner further agrees to provide Developer (or its assignee), the City, the State and the TDD with its Missouri Taxpayer Identification Number (and any changes thereto), copies of all or authorization for the release of all sales tax returns (and amendments) filed with the State, and any other documents related to State sales tax revenues originating from the Property. For purposes of the initial Board of Directors, and thereafter at all times so long as Developer(or its assignee) or any affiliate of Developer (or its assignee) (including, but not limited to, any affiliate of or entity controlled by Robert B. Glarner, Jr. or P. David Glarner) is the holder of any obligation issued by or secured by the TDD, with respect to an election of the Board of Directors of the TDD, Property Owner agrees to vote at any property owner's meeting to elect representatives of Developer(or its assignee) to the Board of Directors. In the event that Property Owner has multiple operations within the City, Property Owner agrees to file separate State sales tax returns and reports for its activities originating from the Property. For so Property Owner shall (and shall include in all leases relating to the Property a covenant of the tenant(s) to) timely collect and remit the TDD Sales Tax as provided by law and, at the direction of Developer(or its assignee), shall enforce such lease provisions. Property Owner shall work with Developer(or its assignee) to execute any and all documents reasonably requested by Developer(or its assignee) related to the creation or operation of the TDD including but not limited to a petition imposing the TDD Sales Tax and consent to file a petition creating the TDD.

(b)     Property Owner hereby also acknowledges and consents to the possible creation by Developer (or its assignee) of a Community Improvement District ("CID") and the imposition by the CID of a sales tax of up to one percent (1%) ("**CID Sales Tax**") at the Property. Property Owner shall collect and pay or cause to be collected and paid the CID Sales Tax which may originate from the Property as required by law. Property Owner agrees to timely file or cause to be timely filed a separate CID Sales Tax Return with the City or the CID, as applicable. Property Owner agrees not object to or oppose the formation of the CID and waives all rights to file suit to set aside the CID Sales Tax or otherwise question the validity of the proceedings relating thereto.   Property Owner agrees to cooperate and take all action reasonably necessary to maintain the CID.   Property Owner further agrees to provide Developer(or its assignee), the City,  the State and the CID with its Missouri Taxpayer Identification Number (and

Book:21119 Page:1245

Description: St Louis,MO Document (W) - Year.Date.DocID 2014.805.849 Page: 27 of 53
Order: OOOVVBX Comment:

any changes thereto), copies of all or authorization for the release of all sales tax returns (and amendments) filed with the State, and any other documents related to State sales tax revenues originating from the Property.   In the event that Property Owner as multiple operations within the City, Property Owner agrees to file separate State sales tax returns and reports for its activities originating from the Property. Property Owner acknowledges that the Board of Directors of the CID will likely be appointed by the Mayor with the consent of the City Council.  For purposes of the initial Board of Directors, and thereafter at all times so long as Developer(or its assignee) or any affiliate of Developer(or its assignee) (including, but not limited to, any affiliate of or entity controlled by Robert B. Glarner, Jr. or P. David Glarner) is the holder of any obligation issued by or secured by the CID, Property Owner hereby agrees to support the appointment of Developer(or its assignee)'s representatives to the CID Board of Directors and Property Owner or its representatives will not accept any appointment to the Board. Property Owner shall (and shall include in all leases relating to the Property a covenant of the tenant(s) to) timely collect and remit the CID sales tax as provided by law and, at the direction of Developer(or its assignee), shall enforce such lease provisions. Property Owner shall execute any and all documents requested by Developer(or its assignee) related to the creation or operation of the CID including but not limited to a petition to establish the CID and voting to impose the CID Sales Tax.

(c)     Property Owner further acknowledges that the TDD Sales Tax and/or the CID Sales Tax may be used for costs and improvements not located on the Property and that the TDD and CID may include more than just the Property and Property Owner will not object to the same.

(d)     Property Owner further acknowledges that certain costs incurred by Property Owner in the development of the Property would be eligible expenses under the CID or TDD, and agrees that the benefit of reimbursement for such expenses shall be given to Developer(or its assignee) or its designee to enable Developer (or its assignee) or its designee to obtain reimbursement. Within thirty (30) days of payment of any costs to develop the Property, Property Owner shall provide to Developer (or its assignee) itemized invoices, receipts or other information evidencing CID and/or TDD eligible expenses associated with the Property. Property Owner shall reasonably cooperate with Developer (or its assignee) in providing additional documentation that may be needed to obtain TDD and/or CID eligible reimbursement under the CID and/or TDD within thirty (30) days after written request. Developer shall reimburse Property Owner up to $500 for its reasonable expenses incurred in connection with providing the documentation requested under this section.

19.    **Taxes**. Property Owner agrees to pay or cause to be paid, prior to delinquency, directly to the appropriate taxing authorities all real property taxes and assessments which are levied against the Property Owner's Property.

20.    **Miscellaneous**.

SLC-7261452-10

Book:21119 Page:1247

a.      One or more waivers of any term, covenant, or condition of this ECR by any Party should not be construed as a waiver of any subsequent breach of the same or any other term, covenant, or condition; nor shall any delay or omission by any Party in seeking a remedy for breach of this ECR, or exercising any right accruing to such Party or reason of any such breach, be deemed a waiver by such Party of its rights or remedies with respect to such breach.

b.      Except as otherwise expressly provided or unless the context otherwise requires, the defined terms of this ECR shall include the plural as well as the singular, and the use of any gender herein shall be deemed to included any other gender.

c.      The captions of the Sections of this ECR are for convenience only and shall be considered not referred to in resolving any questions of interpretation and construction of this ECR.

d.      This ECR may be executed in multiple originals or counterparts, each of which will be an original and, when all of the Parties have signed at least 1 copy, such copies together will constitute a fully-executed and binding agreement.

e.      This ECR shall be governed by and shall be construed and enforced in accordance with the laws of the State in which the Property is located, without regard to its principles of conflict of laws.

f.      If any provision of this ECR or the application thereof to any person or circumstance shall to any extent be held void or invalid or unenforceable, then the remainder of this ECR or the application of such provision to persons or circumstances other than those as to which it is held void or invalid or unenforceable shall not be affected thereby, and each and every other provision of this ECR shall be valid and enforceable to the fullest extent permitted by law.

g.      If either Developer or Property Owner is delayed, prevented or stopped from performing any act, undertaking, or obligation under this ECR by reason of an "event of force majeure", including an act of God, excessive adverse weather, strike, lockout or labor troubles, failure of power, acts of public enemies of the state in which the Premises is located or the United States of America, riots, insurrection, war, invasion, riot, sabotage, mob violence, inability to obtain or general shortage of labor, equipment, supplies or materials in the open market, failure of transportation, orders of government or civil or military authorities, and any other cause whatsoever (except financial) beyond the reasonable control of the Party to so perform, then the period of such delay, stoppage or prevention shall be deemed added to the time herein provided for the performance of any such obligation by Developer or Property Owner. In no event shall this subsection apply to the inability to obtain insurance or obtain monies to perform or fulfill a Party's obligations or undertakings pursuant to this ECR.

SLC-7261452-10

Book:21119 Page:1248

h. Nothing herein shall be construed to give any Party any interest in any award or payment made to any other Party in connection with any exercise of eminent domain or transfer in lieu thereof affecting said Party's Parcel or giving the public or any government any rights in said Parcel or any portions thereof. In the event of any exercise of eminent domain or transfer in lieu thereof of any part of the Common Areas located on any Parcel, the award attributable to the land and improvements or such portion of the Common Areas shall be payable only to the owner thereof, and no claim thereon shall be made by the owners of any other portion of the Common Areas.

i. Any mortgage or deed of trust affecting any portion of the Parcels shall at all times be subject and subordinate to the terms of this ECR, and any party foreclosing any such mortgage or deed of trust, or acquiring title by deed in lieu of foreclosure or trustee sale, shall acquire title subject to all of the terms and conditions of this ECR.

[Signature appears on the following pages]

Book: 21119 Page: 1248

SLC-7261452-10

**IN WITNESS WHEREOF**, the Parties have executed this ECR as of the date first above written.

**WIGEON LLC, a Missouri limited liability company**

By: **SWISS LLC**, a Missouri limited liability company, Manager

By: _____
    P. David Glarner, Manager

STATE OF MISSOURI     )
                      ) SS
COUNTY OF ST. LOUIS   )

On this 25th day of July, in the year 2014, before me, a Notary Public in and for said state, personally appeared P. David Glarner, Manager of Swiss LLC, a Missouri limited liability company, Manager of Wigeon LLC, a Missouri limited liability company, known to me to be the person who executed the foregoing instrument in behalf of said limited liability company and acknowledged to me that he executed the same for the purposes therein stated.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.

_____
              Notary Public

My commission expires: _____

> **KRISTY SCHIRES**
> Notary Public - Notary Seal
> STATE OF MISSOURI
> St. Charles County
> My Commission Expires: Aug. 27, 2014
> Commission # 10394549

**GADWALL LLC, a Missouri limited liability company**

By: **SWISS LLC**, a Missouri limited liability company, Manager

By: _____
    P. David Glarner, Manager

SLC-7261452-9

Description: St Louis,MO Document (W) - Year.Date.DocID 2014.805.849 Page: 31 of 53
Order: OOOVVBX Comment:

Book:21119 Page:1249

JS WESTFLO, LLC, a Missouri limited liability company

By: _____
       Jay Steinback, Manager

STATE OF MISSOURI        )
                                         ) SS
COUNTY OF ST. LOUIS    )

On this 30ᵗʰ day of July, in the year 2014, before me, a Notary Public in and for said state, personally appeared Jay Steinback, Manager of JS Westflo, LLC, a Missouri limited liability company, known to me to be the person who executed the foregoing instrument in behalf of said limited liability company and acknowledged to me that he executed the same for the purposes therein stated.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.

_____
Notary Public                    DANIEL W. FORT

My commission expires: ___8/2/2014___

DANIEL W. FORT
Notary Public, Notary Seal
State of Missouri
Saint Louis County
Commission # 10468455
My Commission Expires August 02, 2014

SLC-7261452-10

Book:21119 Page:1250

Book:21119 Page:1250

Description: St Louis,MO Document (W) - Year.Date.DocID 2014.805.849 Page: 32 of 53
Order: OOOVVBX Comment:

Book:21119 Page:1251

STATE OF MISSOURI      )
                       ) SS
COUNTY OF ST. LOUIS    )

On this 25TH day of July, in the year 2014, before me, a Notary Public in and for said state, personally appeared P. David Glarner, Manager of Swiss LLC, a Missouri limited liability company, Manager of Gadwall LLC, a Missouri limited liability company, known to me to be the person who executed the foregoing instrument in behalf of said limited liability company and acknowledged to me that he executed the same for the purposes therein stated.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.

                                    Notary Public
                              Kristy Schires        KRISTY SCHIRES

My commission expires: _____

> KRISTY SCHIRES
> Notary Public - Notary Seal
> STATE OF MISSOURI
> St. Charles County
> My Commission Expires: Aug. 27, 2014
> Commission # 10394549

**PINTAIL LLC, a Missouri limited liability company**

By: **SWISS LLC**, a Missouri limited liability company, Manager

By: _____
            P. David Glarner, Manager

STATE OF MISSOURI      )
                       ) SS
COUNTY OF ST. LOUIS    )

On this 25th day of July, in the year 2014, before me, a Notary Public in and for said state, personally appeared P. David Glarner, Manager of Swiss LLC, a Missouri limited liability company, Manager of Pintail LLC, a Missouri limited liability company, known to me to be the person who executed the foregoing instrument in behalf of said limited liability company and acknowledged to me that he executed the same for the purposes therein stated.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.

                                    Notary Public        KRISTY Schires

My commission expires: _____

> KRISTY SCHIRES
> Notary Public - Notary Seal
> STATE OF MISSOURI
> St. Charles County
> My Commission Expires: Aug. 27, 2014
> Commission # 10394549

SLC-7261452-9

Book:21119 Page:1251

Book:21119 Page:1252

## CONSENT OF MORTGAGEE

The undersigned, being the holder of a valid First Deed of Trust and Second Deed of Trust upon a portion of the property described in this ECR, does hereby consent to the terms of this ECR as set forth herein, and does further subordinate the lien of its First Deed of Trust and Second Deed of Trust to said terms, said First Deed of Trust dated November 5, 2012 and recorded on November 6, 2012 in the Office of the Recorder of Deeds of St. Louis County, Missouri, in Book 20233, Page 181, and said Second Deed of Trust dated November 5, 2012 and recorded on November 6, 2012 in the Office of the Recorder of Deeds of St. Louis County, Missouri, in Book 20233, Page 205.

**GREAT SOUTHERN BANK, a Missouri chartered trust company**

By: _____

Printed Name: _Brian M. Davies_____

Its: _Vice President_____

STATE OF MISSOURI     )
                     ) SS
COUNTY OF ST. LOUIS    )

On this 24th day of July in the year 2014, before me, a Notary Public in and for said state, personally appeared _Brian M. Davies_ [name of officer], _Vice President_ [title of person, president, vice president, etc.] of Great Southern Bank, a Missouri chartered trust company, known to me to be the person who executed this instrument in behalf of said bank and acknowledged to me that he ~~or she~~ executed the same for the purposes therein stated.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.

_____
Notary Public

_Pamela D. Harris_

My commission expires: _6/2/2017_

```
PAMELA D. HARRIS
Notary Public – Notary Seal
STATE OF MISSOURI
St. Louis City
My Commission Expires June 2, 2017
Commission #13722057
```

SLC-7261452

Book:21119 Page:1252

Book: 21119 Page:1253

## CONSENT OF MORTGAGEE

The undersigned, being the holder of a valid Third Deed of Trust upon a portion of the property described in this ECR, does hereby consent to the terms of this ECR as set forth herein, and does further subordinate the lien of its Third Deed of Trust to said terms, said Third Deed of Trust dated November 5, 2012 and recorded on November 6, 2012 in the Office of the Recorder of Deeds of St. Louis County, Missouri, in Book 20233, Page 240.

**HRIF FUND 2, LLC, a Missouri limited liability company**

By: Heartland Regional Investment Fund, L.L.C., its Managing Member

By: St. Louis Economic Development Partnership, its Managing Member

By: _____

Printed Name: _Doug Rasmussen_

Its: _SR VP_

STATE OF MISSOURI      )
                       ) SS
COUNTY OF ST. LOUIS    )

On this _24_ day of July in the year 2014, before me, a Notary Public in and for said state, personally appeared _Doug Rasmussen_, _SR VP_ of St. Louis Economic Development Partnership, Managing Member of Heartland Regional Investment Fund, L.L.C., Managing Member of HRIF FUND 2, LLC, a Missouri limited liability company, known to me to be the person who executed this instrument in behalf of said limited liability company and acknowledged to me that he or she executed the same for the purposes therein stated.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.

_____
Notary Public
_Kelly Cochran_

My Commission Expires: _____

Kelly Cochran - Notary Public
Notary Seal, State of
Missouri - St. Charles County
Commission #13455861
My Commission Expires 4/2/2017

SLC-7261452

Book: 21119 Page: 1253

Book:21119 Page:1254

## EXHIBIT A-1 TO ECR

## LEGAL DESCRIPTION OF THE PROPERTY

Lot 5 of Northwest Plaza Plat 4 recorded at Plat Book 260 page 275 of the St. Louis County records.

Lot 5A of Northwest Plaza Plat 5 recorded at Plat Book 260 page 276 of the St. Louis County records.

35

SLC-7261452-10

Book:21119 Page:1254

Book:21119 Page:1255

## EXHIBIT A-2 TO ECR– BENEFITED PROPERTY

**Gadwall Parcel:**

LOT 2 OF NORTHWEST PLAZA PLAT 2

PB. 360, PAGES 336-337

LAND DESCRIPTION

A TRACT OF LAND BEING PART OF LOTS 3, 4, AND 5 OF THE PARTITION OF ERASTUS POST'S ESTATE, ACCORDING TO PLAT THEREOF ATTACHED TO THE COMMISSIONER'S REPORT RECORDED IN BOOK 25, PAGE 509 OF THE ST. LOUIS COUNTY RECORDS, IN U.S. SURVEYS 406 AND 1203, TOWNSHIP 46 NORTH, RANGE 5 EAST, CITY OF ST. ANN, ST. LOUIS COUNTY, MISSOURI AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT A SET 1/2" IRON ROD SET FOR THE NORTHWEST CORNER OF LOT 8 OF IMPERIAL GARDENS, ACCORDING TO PLAT RECORDED IN PLAT BOOK 107, PAGE 84 OF THE ST. LOUIS COUNTY RECORDS; THENCE NORTH 36°37'38" WEST 48.37 FEET TO THE POINT OF BEGINNING OF THE HEREON DESCRIBED TRACT OF LAND, SAID POINT BEING ON A CURVE FOR WHICH THE RADIUS POINT BEARS SOUTH 36°37'38" EAST 318.45 FEET; THENCE IN A SOUTHWESTERLY DIRECTION ALONG SAID CURVE AN ARC DISTANCE OF 75.25 FEET; THENCE SOUTH 39°50'03" WEST 25.65 FEET TO A POINT OF CURVATURE TO THE RIGHT, SAID CURVE HAVING A RADIUS OF 700.00 FEET; THENCE ALONG SAID CURVE AN ARC DISTANCE OF 85.11 FEET TO A POINT ON A CURVE FOR WHICH THE RADIUS POINT BEARS SOUTH 60°39'47" WEST 201.99 FEET; THENCE IN A SOUTHEASTERLY DIRECTION ALONG SAID CURVE AN ARC DISTANCE OF 164.44 FEET; THENCE SOUTH 17°18'26" WEST 266.91 FEET TO A POINT OF CURVATURE TO THE RIGHT, SAID CURVE HAVING A RADIUS OF 5.00 FEET; THENCE ALONG SAID CURVE AN ARC DISTANCE OF 13.09 FEET; THENCE NORTH 12°40'33" WEST 833.04 FEET; THENCE SOUTH 70°03'34" WEST 23.93 FEET; THENCE SOUTH 41°21'32" WEST 78.96 FEET TO A POINT OF CURVATURE TO THE RIGHT, SAID CURVE HAVING A RADIUS OF 75.00 FEET; THENCE ALONG SAID CURVE AN ARC DISTANCE OF 46.95 FEET; THENCE SOUTH 77°13'23" WEST 213.72 FEET TO A POINT OF CURVATURE TO THE RIGHT , SAID CURVE HAVING A RADIUS OF 15.00 FEET; THENCE ALONG SAID CURVE AN ARC DISTANCE OF 23.58 FEET; THENCE NORTH 12°41'56" WEST 63.61 FEET; THENCE SOUTH 77°20'47" WEST 69.07 FEET TO A POINT OF CURVATURE TO THE RIGHT, SAID CURVE HAVING A RADIUS OF 40.00 FEET; THENCE ALONG SAID CURVE AN ARC DISTANCE OF 62.83 FEET; THENCE NORTH 12°39'13" WEST 202.98 FEET TO A POINT OF CURVATURE TO THE RIGHT, SAID CURVE HAVING A RADIUS OF 200.00 FEET; THENCE ALONG SAID CURVE AN ARC DISTANCE OF 120.54 FEET;

Book: 21119 Page: 1255

SLC-7261452-10

36

THENCE NORTH 21°52'39" EAST 694.06 FEET; THENCE NORTH 29°16'23" EAST 78.32
FEET; THENCE NORTH 22°04'54" EAST 99.63 FEET; THENCE NORTH 01°57'36" WEST
20.49 FEET; THENCE NORTH 17°55'16" EAST 112.55 FEET; THENCE NORTH 01°58'06"
EAST 76.47 FEET; THENCE NORTH 03°48'41" WEST 160.89 FEET; THENCE NORTH
06°40'18" EAST 32.55 FEET; THENCE NORTH 20°42'33" EAST 42.91 FEET TO THE
SOUTHEASTERLY LINE OF CITY OF BRIDGETON, MISSOURI CITY LIMITS; THENCE
NORTH 42°07'29" EAST ALONG THE SOUTHEASTERLY LINE OF SAID CITY OF
BRIDGETON, MISSOURI CITY LIMITS A DISTANCE OF 570.46 FEET; THENCE
DEPARTING LAST SAID SOUTHEASTERLY LINE SOUTH 40°45'21" EAST 39.02 FEET;
THENCE SOUTH 13°29'39" EAST 107.57 FEET; THENCE SOUTH 19°53'48" EAST 72.55
FEET; THENCE SOUTH 12°12'29" EAST 801.81 FEET; THENCE SOUTH 22°30'10" WEST
399.73 FEET TO A POINT OF CURVATURE TO THE LEFT, SAID CURVE HAVING A
RADIUS OF 469.98 FEET; THENCE ALONG SAID CURVE AN ARC DISTANCE OF 58.96
FEET TO A POINT ON THE CURVE; THENCE SOUTH 74°41'07" EAST 77.21 FEET;
THENCE SOUTH 69°23'51" EAST 370.35 FEET; THENCE SOUTH 02°28'31" WEST 240.97
FEET TO A POINT OF CURVATURE TO THE RIGHT, SAID CURVE HAVING A RADIUS
OF 390.00 FEET; THENCE ALONG SAID CURVE AN ARC DISTANCE OF 261.50 FEET
TO A POINT OF COMPOUND CURVATURE, SAID CURVE HAVING A RADIUS OF
356.28 FEET; THENCE ALONG SAID CURVE AN ARC DISTANCE OF 188.27 FEET;
THENCE SOUTH 71°10'12" WEST 20.78 FEET TO A POINT OF CURVATURE TO THE
LEFT, SAID CURVE HAVING A RADIUS OF 318.45 FEET; THENCE ALONG SAID
CURVE AN ARC DISTANCE OF 98.92 FEET TO THE POINT OF BEGINNING AND
CONTAINING 37.53 ACRES MORE OR LESS.

**Pintail Parcels:**

LOT 1 OF NORTHWEST PLAZA PLAT 1

P.B. 360, PAGE 335

LAND DESCRIPTION

A TRACT OF LAND BEING PART OF LOTS 3 AND 4 OF THE PARTITION OF ERASTUS
POST'S ESTATE, ACCORDING TO PLAT THEREOF ATTACHED TO THE
COMMISSIONER'S REPORT RECORDED IN BOOK 25, PAGE 509 OF THE ST. LOUIS
COUNTY RECORDS, IN U.S. SURVEYS 406 AND 1203, TOWNSHIP 46 NORTH, RANGE
5 EAST, CITY OF ST. ANN, ST. LOUIS COUNTY, MISSOURI AND MORE
PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT A FOUND IRON PIPE SET FOR THE SOUTHWEST CORNER OF LOT
4 OF TOMROY SUBDIVISION, ACCORDING TO PLAT RECORDED IN PLAT BOOK 20,
PAGE 43 OF THE ST. LOUIS COUNTY RECORDS; THENCE NORTH 27°03'16" EAST
ALONG THE WESTERLY LINE OF SAID LOT 4 A DISTANCE OF 103.62 FEET TO A
FOUND IRON PIPE SET FOR THE SOUTHEAST CORNER OF A TRACT OF LAND
GRANTED TO THE STATE OF MISSOURI FOR WIDENING OF ST. CHARLES ROCK
ROAD BY DEED RECORDED IN BOOK 7783, PAGE 2320 OF THE ST. LOUIS COUNTY
RECORDS; THENCE ALONG THE SOUTHWESTERLY LINE OF SAID STATE OF

SLC-7261452-10

37

MISSOURI TRACT THE FOLLOWING COURSES AND DISTANCES: NORTH 54°06'00" WEST 21.20 FEET; THENCE NORTH 45°34'09" WEST 50.56 FEET TO A POINT ON THE SOUTHWESTERLY LINE OF ST. CHARLES ROCK ROAD, SAID POINT BEING 40 FEET PERPENDICULAR DISTANCE SOUTH OF THE CENTERLINE OF SAID ROADWAY; THENCE NORTH 54°06'00" WEST ALONG THE SOUTHWESTERLY LINE OF SAID ST. CHARLES ROCK ROAD A DISTANCE OF 262.65 FEET TO THE POINT OF BEGINNING OF THE HEREON DESCRIBED TRACT OF LAND, SAID POINT BEING ON A CURVE FOR WHICH THE RADIUS BEARS SOUTH 35°54'00" WEST 66.50 FEET; THENCE DEPARTING LAST SAID SOUTHWESTERLY LINE IN A SOUTHEASTERLY DIRECTION ALONG LAST SAID CURVE AN ARC DISTANCE OF 104.29 FEET; THENCE SOUTH 35°45'09" WEST 35.09 FEET TO A POINT OF CURVATURE TO THE RIGHT, SAID CURVE HAVING A RADIUS OF 30.00 FEET; THENCE ALONG SAID CURVE AN ARC DISTANCE OF 47.20 FEET; THENCE NORTH 54°05'43" WEST 306.86 FEET; THENCE NORTH 09°05'43" WEST 16.65 FEET; THENCE NORTH 35°54'17" EAST 52.70 FEET TO A POINT OF CURVATURE TO THE RIGHT, SAID CURVE HAVING A RADIUS OF 67.00 FEET; THENCE ALONG SAID CURVE AN ARC DISTANCE OF 105.24 FEET TO THE SOUTHWESTERLY LINE OF AFOREMENTIONED ST. CHARLES ROCK ROAD; THENCE SOUTH 54°06'00" EAST ALONG THE SOUTHWESTERLY LINE OF SAID ST. CHARLES ROCK ROAD A DISTANCE OF 215.04 FEET TO THE POINT OF BEGINNING AND CONTAINING 1.00 ACRES MORE OR LESS.

LOT 3 OF NORTHWEST PLAZA PLAT 2

P.B. 360, PAGES 336-337

LAND DESCRIPTION

A TRACT OF LAND BEING PART OF LOT 4 OF THE PARTITION OF ERASTUS POST'S ESTATE, ACCORDING TO PLAT THEREOF ATTACHED TO THE COMMISSIONER'S REPORT RECORDED IN BOOK 25, PAGE 509 OF THE ST. LOUIS COUNTY RECORDS, IN U.S. SURVEYS 406 AND 1203, TOWNSHIP 46 NORTH, RANGE 5 EAST, CITY OF ST. ANN, ST. LOUIS COUNTY, MISSOURI AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT A FOUND IRON PIPE SET FOR THE SOUTHWEST CORNER OF LOT 4 OF TOMROY SUBDIVISION, ACCORDING TO PLAT RECORDED IN PLAT BOOK 20, PAGE 43 OF THE ST. LOUIS COUNTY RECORDS; THENCE NORTH 27°03'16" EAST ALONG THE WESTERLY LINE OF SAID LOT 4 A DISTANCE OF 103.62 FEET TO A FOUND IRON PIPE SET FOR THE SOUTHEAST CORNER OF A TRACT OF LAND GRANTED TO THE STATE OF MISSOURI FOR WIDENING OF ST. CHARLES ROCK ROAD BY DEED RECORDED IN BOOK 7783, PAGE 2320 OF THE ST. LOUIS COUNTY RECORDS; THENCE ALONG THE SOUTHWESTERLY LINE OF SAID STATE OF MISSOURI TRACT THE FOLLOWING COURSES AND DISTANCES: NORTH 54°06'00" WEST 21.20 FEET; THENCE NORTH 45°34'09" WEST 50.56 FEET TO A POINT ON THE SOUTHWESTERLY LINE OF ST. CHARLES ROCK ROAD, SAID POINT BEING 40 FEET PERPENDICULAR DISTANCE SOUTH OF THE CENTERLINE OF SAID ROADWAY; THENCE NORTH 54°06'00" WEST ALONG THE SOUTHWESTERLY LINE OF SAID ST.

SLC-7261452-10

38

Book:21119 Page:1257

Book: 21119 Page: 1257

Book: 21119  Page: 1258

CHARLES ROCK ROAD A DISTANCE OF 929.72 FEET; THENCE DEPARTING THE SOUTHWESTERLY LINE OF ST. CHARLES ROCK ROAD SOUTH 38°30'59" EAST 13.66 FEET TO THE POINT OF BEGINNING OF THE HEREON DESCRIBED TRACT OF LAND; THENCE SOUTH 38°30'59" EAST 63.51 FEET; THENCE SOUTH 46°26'02" EAST 21.45 FEET; THENCE SOUTH 54°22'52" EAST 133.15 FEET TO A POINT OF CURVATURE TO THE RIGHT, SAID CURVE HAVING A RADIUS OF 57.00 FEET; THENCE ALONG SAID CURVE AN ARC DISTANCE OF 89.82 FEET; THENCE SOUTH 35°54'00" WEST 121.81 FEET; THENCE SOUTH 24°53'22" WEST 93.10 FEET TO A POINT OF CURVATURE TO THE RIGHT, SAID CURVE HAVING A RADIUS OF 20.00 FEET; THENCE ALONG SAID CURVE AN ARC DISTANCE OF 35.26 FEET; THENCE NORTH 54°06'00" WEST 271.01 FEET; THENCE NORTH 35°54'00" EAST 313.28 FEET TO THE POINT OF BEGINNING AND CONTAINING 1.87 ACRES MORE OR LESS.

**Wigeon Parcel:**

A TRACT OF LAND IN U.S. SURVEYS 406 AND 1203, TOWNSHIP 46 NORTH, RANGE 5 EAST AND BEING PART OF LOTS 3, 4, AND 5 OF THE PARTITION OF ERASTUS POST'S ESTATE, ACCORDING TO PLAT THEREOF ATTACHED TO THE COMMISSIONER'S REPORT RECORDED IN BOOK 25, PAGE 509 OF THE ST. LOUIS COUNTY RECORDS, AND ALL OF LOTS 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, AND 18 OF TOMROY SUBDIVISION, ACCORDING TO PLAT RECORDED IN PLAT BOOK 20, PAGE 43 OF THE ST. LOUIS COUNTY RECORDS, IN CITY OF ST. ANN AND CITY OF BRIDGETON, ST. LOUIS COUNTY, MISSOURI AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A FOUND 1/2" IRON ROD SET FOR THE SOUTHEAST CORNER OF LOT 7 OF ABOVE SAID TOMROY SUBDIVISION, SAID POINT BEING ON THE WESTERLY LINE OF ADIE ROAD, 40 FEET WIDE; THENCE SOUTH 20°36'09" WEST ALONG THE WESTERLY LINE OF SAID ADIE ROAD A DISTANCE OF 1391.06 FEET TO THE NORTHERLY LINE OF CORAL GARDENS, ACCORDING TO PLAT RECORDED IN PLAT BOOK 56, PAGE 65 OF THE ST. LOUIS COUNTY RECORDS; THENCE ALONG THE NORTHERLY LINE OF SAID CORAL GARDENS AND THE NORTHERLY AND WESTERLY LINE OF IMPERIAL GARDENS, ACCORDING TO PLAT RECORDED IN PLAT BOOK 107, PAGE 84 OF THE ST. LOUIS COUNTY RECORDS THE FOLLOWING COURSES AND DISTANCES: NORTH 83°23'04" WEST 566.19 FEET; THENCE SOUTH 19°35'56" WEST 736.17 FEET TO THE NORTHERLY LINE OF OLD ST. CHARLES ROCK ROAD, 40 FEET WIDE; THENCE ALONG THE NORTHERLY LINE OF SAID ST. CHARLES ROCK ROAD THE FOLLOWING COURSES AND DISTANCES: NORTH 71°03'04" WEST 289.33 FEET; THENCE NORTH 65°56'34" WEST 224.23 FEET; THENCE NORTH 54°42'52" WEST 832.48 FEET; THENCE NORTH 56°21'26" WEST 47.52 FEET TO THE SOUTHEAST CORNER OF A TRACT OF LAND DEDICATED TO THE STATE OF MISSOURI BY DEED RECORDED IN BOOK 6320, PAGE 847 OF THE ST. LOUIS COUNTY RECORDS (PARCEL 1); THENCE ALONG THE EASTERLY AND NORTHERLY LINES OF SAID STATE OF MISSOURI DEDICATION THE FOLLOWING COURSES AND DISTANCES: NORTH 33°38'34" EAST 10.00 FEET; THENCE NORTH 56°21'26" WEST 79.00 FEET; THENCE NORTH 33°38'34" EAST 4.00 FEET; THENCE

Book: 21119  Page: 1258

Description: St Louis,MO Document (W) - Year.Date.DocID 2014.805.849 Page: 40 of 53
Order: OOOVVBX Comment:

Book:21119 Page:1259

NORTH 56°21'26" WEST 116.23 FEET TO THE EASTERLY LINE OF A TRACT OF LAND NOW OR FORMERLY OWNED BY LENETTE REALTY BY DEED RECORDED IN BOOK 5418, PAGE 451 OF THE ST. LOUIS COUNTY RECORDS; THENCE ALONG THE EASTERLY AND NORTHERLY LINES OF SAID LENETTE REALTY TRACT THE FOLLOWING COURSES AND DISTANCES: NORTH 13°10'41" EAST 305.40 FEET; THENCE NORTH 78°36'15" WEST 200.10 FEET TO THE EASTERLY LINE OF LINDBERGH BOULEVARD, VARIABLE WIDTH, AKA STATE ROUTE 67; THENCE ALONG THE EASTERLY LINE OF SAID LINDBERGH BOULEVARD THE FOLLOWING COURSES AND DISTANCES: NORTH 13°10'41" EAST 247.73 FEET TO A POINT OF CURVATURE TO THE RIGHT, SAID CURVE HAVING A RADIUS OF 2025.30 FEET; THENCE ALONG SAID CURVE AN ARC DISTANCE OF 241.55 FEET TO A POINT OF COMPOUND CURVATURE, SAID CURVE HAVING A RADIUS OF 2123.50 FEET; THENCE ALONG SAID CURVE AN ARC DISTANCE OF 456.82 FEET TO A POINT ON THE CURVE, SAID POINT BEING THE SOUTHWEST CORNER OF A TRACT OF LAND DEDICATED TO THE STATE OF MISSOURI BY DEED RECORDED IN BOOK 7605, PAGE 2366 OF THE ST. LOUIS COUNTY RECORDS; THENCE ALONG THE SOUTHERLY AND EASTERLY LINES OF SAID STATE OF MISSOURI DEDICATION THE FOLLOWING COURSES AND DISTANCES: SOUTH 57°39'22" EAST 4.43 FEET TO A POINT ON A CURVE FOR WHICH THE RADIUS BEARS SOUTH 57°39'22" EAST 2093.79 FEET; THENCE IN A NORTHEASTERLY DIRECTION ALONG SAID CURVE AN ARC DISTANCE OF 530.76 FEET; THENCE NORTH 46°52'04" EAST 260.93 FEET TO THE EASTERLY LINE OF AFOREMENTIONED (ORIGINAL) LINE OF LINDBERGH BOULEVARD; THENCE ALONG THE EASTERLY LINE OF SAID LINDBERGH BOULEVARD THE FOLLOWING COURSES AND DISTANCES: SOUTH 47°53'27" EAST 31.30 FEET; THENCE NORTH 42°06'33" EAST 100.00 FEET; THENCE NORTH 44°58'33" EAST 100.13 FEET TO A FOUND IRON PIPE; THENCE NORTH 44°01'33" EAST 95.00 FEET TO A POINT ON THE EASTERLY LINE OF A TRACT OF LAND DEDICATED TO THE STATE OF MISSOURI BY DEED RECORDED IN BOOK 6320, PAGE 847 OF THE ST. LOUIS COUNTY RECORDS (PARCEL 3); THENCE ALONG THE EASTERLY LINE OF SAID STATE OF MISSOURI DEDICATION THE FOLLOWING COURSES AND DISTANCES: NORTH 56°53'01" EAST 207.54 FEET; THENCE NORTH 54°15'27" EAST 208.50 FEET; THENCE NORTH 67°06'30" EAST 92.78 FEET; THENCE SOUTH 82°11'30" EAST 113.17 FEET TO A POINT ON THE SOUTHERLY LINE OF ST. CHARLES ROCK ROAD, VARIABLE WIDTH, AKA STATE ROUTE 180; THENCE SOUTH 54°06'00" EAST ALONG THE SOUTHERLY LINE OF SAID ST. CHARLES ROCK ROAD A DISTANCE OF 56.00 FEET TO THE SOUTHWEST CORNER OF A TRACT OF LAND DEDICATED TO THE STATE OF MISSOURI BY DEED RECORDED IN BOOK 6320, PAGE 847 OF THE ST. LOUIS COUNTY RECORDS (PARCEL 4); THENCE ALONG THE SOUTHERLY AND EASTERLY LINES OF SAID STATE OF MISSOURI DEDICATION THE FOLLOWING COURSES AND DISTANCES: SOUTH 54°06'00" EAST 144.00 FEET; THENCE NORTH 35°54'00" EAST 10.00 FEET TO THE SOUTHERLY LINE OF AFOREMENTIONED ST. CHARLES ROCK ROAD; THENCE ALONG THE SOUTHERLY LINE OF SAID ST. CHARLES ROCK ROAD SOUTH 54°06'00" EAST 1050.81 FEET TO THE SOUTHERLY LINE OF A TRACT OF LAND DEDICATED TO THE STATE OF MISSOURI BY DEED RECORDED IN BOOK 7783, PAGE 2320 OF THE ST. LOUIS COUNTY RECORDS; THENCE ALONG THE SOUTHERLY LINE OF SAID STATE OF MISSOURI

Book:21119 Page:1259

SLC-7261452-10

40

DEDICATION THE FOLLOWING COURSES AND DISTANCES: SOUTH 45°34'09" EAST 50.56 FEET; THENCE SOUTH 54°06'00" EAST 21.20 FEET TO THE WESTERLY LINE OF LOT 4 OF AFOREMENTIONED TOMROY SUBDIVISION; THENCE ALONG THE WESTERLY LINES OF LOTS 4, 5, 6, AND 7 THE FOLLOWING COURSES AND DISTANCES; SOUTH 27°03'16" WEST 103.62 FEET; THENCE SOUTH 30°34'47" WEST 102.75 FEET; THENCE SOUTH 31°37'32" WEST 50.63 FEET; THENCE SOUTH 23°24'13" WEST 50.01 FEET TO THE SOUTHWEST CORNER OF SAID LOT 7; THENCE SOUTH 68°15'44" EAST ALONG THE SOUTHERLY LINE OF SAID LOT 7 A DISTANCE OF 242.48 FEET TO THE POINT OF BEGINNING AND CONTAINING 121.93 ACRES MORE OR LESS.

## LESS AND EXCEPT THE FOLLOWING PROPERTY:

(1)    ALL OF LOT 2 OF NORTHWEST PLAZA PLAT 2, PER PLAT THEREOF RECORDED IN PLAT BOOK 360, PAGES 336-337 ON OCTOBER 26, 2012 IN THE ST. LOUIS COUNTY RECORDS.

THE ABOVE ALSO BEING FURTHER DESCRIBED AS:

A TRACT OF LAND BEING PART OF LOTS 3, 4, AND 5 OF THE PARTITION OF ERASTUS POST'S ESTATE, ACCORDING TO PLAT THEREOF ATTACHED TO THE COMMISSIONER'S REPORT RECORDED IN BOOK 25, PAGE 509 OF THE ST. LOUIS COUNTY RECORDS, IN U.S. SURVEYS 406 AND 1203, TOWNSHIP 46 NORTH, RANGE 5 EAST, CITY OF ST. ANN, ST. LOUIS COUNTY, MISSOURI AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT A SET 1/2" IRON ROD SET FOR THE NORTHWEST CORNER OF LOT 8 OF IMPERIAL GARDENS, ACCORDING TO PLAT RECORDED IN PLAT BOOK 107, PAGE 84 OF THE ST. LOUIS COUNTY RECORDS; THENCE NORTH 36°37'38" WEST 48.37 FEET TO THE POINT OF BEGINNING OF THE HEREON DESCRIBED TRACT OF LAND, SAID POINT BEING ON A CURVE FOR WHICH THE RADIUS POINT BEARS SOUTH 36°37'38" EAST 318.45 FEET; THENCE IN A SOUTHWESTERLY DIRECTION ALONG SAID CURVE AN ARC DISTANCE OF 75.25 FEET; THENCE SOUTH 39°50'03" WEST 25.65 FEET TO A POINT OF CURVATURE TO THE RIGHT, SAID CURVE HAVING A RADIUS OF 700.00 FEET; THENCE ALONG SAID CURVE AN ARC DISTANCE OF 85.11 FEET TO A POINT ON A CURVE FOR WHICH THE RADIUS POINT BEARS SOUTH 60°39'47" WEST 201.99 FEET; THENCE IN A SOUTHEASTERLY DIRECTION ALONG SAID CURVE AN ARC DISTANCE OF 164.44 FEET; THENCE SOUTH 17°18'26" WEST 266.91 FEET TO A POINT OF CURVATURE TO THE RIGHT, SAID CURVE HAVING A RADIUS OF 5.00 FEET; THENCE ALONG SAID CURVE AN ARC DISTANCE OF 13.09 FEET; THENCE NORTH 12°40'33" WEST 833.04 FEET; THENCE SOUTH 70°03'34" WEST 23.93 FEET; THENCE SOUTH 41°21'32" WEST 78.96 FEET TO A POINT OF CURVATURE TO THE RIGHT, SAID CURVE HAVING A RADIUS

Book: 21119   Page:1260

Book: 21119   Page: 1260

SLC-7261452-10

4/1

Book: 21119 Page: 1261

OF 75.00 FEET; THENCE ALONG SAID CURVE AN ARC DISTANCE OF 46.95 FEET; THENCE SOUTH 77°13'23" WEST 213.72 FEET TO A POINT OF CURVATURE TO THE RIGHT , SAID CURVE HAVING A RADIUS OF 15.00 FEET; THENCE ALONG SAID CURVE AN ARC DISTANCE OF 23.58 FEET; THENCE NORTH 12°41'56" WEST 63.61 FEET; THENCE SOUTH 77°20'47" WEST 69.07 FEET TO A POINT OF CURVATURE TO THE RIGHT, SAID CURVE HAVING A RADIUS OF 40.00 FEET; THENCE ALONG SAID CURVE AN ARC DISTANCE OF 62.83 FEET; THENCE NORTH 12°39'13" WEST 202.98 FEET TO A POINT OF CURVATURE TO THE RIGHT, SAID CURVE HAVING A RADIUS OF 200.00 FEET; THENCE ALONG SAID CURVE AN ARC DISTANCE OF 120.54 FEET; THENCE NORTH 21°52'39" EAST 694.06 FEET; THENCE NORTH 29°16'23" EAST 78.32 FEET; THENCE NORTH 22°04'54" EAST 99.63 FEET; THENCE NORTH 01°57'36" WEST 20.49 FEET; THENCE NORTH 17°55'16" EAST 112.55 FEET; THENCE NORTH 01°58'06" EAST 76.47 FEET; THENCE NORTH 03°48'41" WEST 160.89 FEET; THENCE NORTH 06°40'18" EAST 32.55 FEET; THENCE NORTH 20°42'33" EAST 42.91 FEET TO THE SOUTHEASTERLY LINE OF CITY OF BRIDGETON, MISSOURI CITY LIMITS; THENCE NORTH 42°07'29" EAST ALONG THE SOUTHEASTERLY LINE OF SAID CITY OF BRIDGETON, MISSOURI CITY LIMITS A DISTANCE OF 570.46 FEET; THENCE DEPARTING LAST SAID SOUTHEASTERLY LINE SOUTH 40°45'21" EAST 39.02 FEET; THENCE SOUTH 13°29'39" EAST 107.57 FEET; THENCE SOUTH 19°53'48" EAST 72.55 FEET; THENCE SOUTH 12°12'29" EAST 801.81 FEET; THENCE SOUTH 22°30'10" WEST 399.73 FEET TO A POINT OF CURVATURE TO THE LEFT, SAID CURVE HAVING A RADIUS OF 469.98 FEET; THENCE ALONG SAID CURVE AN ARC DISTANCE OF 58.96 FEET TO A POINT ON THE CURVE; THENCE SOUTH 74°41'07" EAST 77.21 FEET; THENCE SOUTH 69°23'51" EAST 370.35 FEET; THENCE SOUTH 02°28'31" WEST 240.97 FEET TO A POINT OF CURVATURE TO THE RIGHT, SAID CURVE HAVING A RADIUS OF 390.00 FEET; THENCE ALONG SAID CURVE AN ARC DISTANCE OF 261.50 FEET TO A POINT OF COMPOUND CURVATURE, SAID CURVE HAVING A RADIUS OF 356.28 FEET; THENCE ALONG SAID CURVE AN ARC DISTANCE OF 188.27 FEET; THENCE SOUTH 71°10'12" WEST 20.78 FEET TO A POINT OF CURVATURE TO THE LEFT, SAID CURVE HAVING A RADIUS OF 318.45 FEET; THENCE ALONG SAID CURVE AN ARC DISTANCE OF 98.92 FEET TO THE POINT OF BEGINNING AND CONTAINING 37.53 ACRES MORE OR LESS.

(2)    ALL OF LOT 1 OF NORTHWEST PLAZA PLAT 1, PER PLAT THEREOF RECORDED IN PLAT BOOK 360, PAGE 335 ON OCTOBER 26, 2012 IN THE ST. LOUIS COUNTY RECORDS.

THE ABOVE ALSO BEING FURTHER DESCRIBED AS:

A TRACT OF LAND BEING PART OF LOTS 3 AND 4 OF THE PARTITION OF ERASTUS POST'S ESTATE, ACCORDING TO PLAT THEREOF ATTACHED TO THE

Book: 21119 Page: 1261

SLC-7261452-10                                42

Book: 21119  Page:1262

COMMISSIONER'S REPORT RECORDED IN BOOK 25, PAGE 509 OF THE ST. LOUIS COUNTY RECORDS, IN U.S. SURVEYS 406 AND 1203, TOWNSHIP 46 NORTH, RANGE 5 EAST, CITY OF ST. ANN, ST. LOUIS COUNTY, MISSOURI AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT A FOUND IRON PIPE SET FOR THE SOUTHWEST CORNER OF LOT 4 OF TOMROY SUBDIVISION, ACCORDING TO PLAT RECORDED IN PLAT BOOK 20, PAGE 43 OF THE ST. LOUIS COUNTY RECORDS; THENCE NORTH 27°03'16" EAST ALONG THE WESTERLY LINE OF SAID LOT 4 A DISTANCE OF 103.62 FEET TO A FOUND IRON PIPE SET FOR THE SOUTHEAST CORNER OF A TRACT OF LAND GRANTED TO THE STATE OF MISSOURI FOR WIDENING OF ST. CHARLES ROCK ROAD BY DEED RECORDED IN BOOK 7783, PAGE 2320 OF THE ST. LOUIS COUNTY RECORDS; THENCE ALONG THE SOUTHWESTERLY LINE OF SAID STATE OF MISSOURI TRACT THE FOLLOWING COURSES AND DISTANCES: NORTH 54°06'00" WEST 21.20 FEET; THENCE NORTH 45°34'09" WEST 50.56 FEET TO A POINT ON THE SOUTHWESTERLY LINE OF ST. CHARLES ROCK ROAD, SAID POINT BEING 40 FEET PERPENDICULAR DISTANCE SOUTH OF THE CENTERLINE OF SAID ROADWAY; THENCE NORTH 54°06'00" WEST ALONG THE SOUTHWESTERLY LINE OF SAID ST. CHARLES ROCK ROAD A DISTANCE OF 262.65 FEET TO THE POINT OF BEGINNING OF THE HEREON DESCRIBED TRACT OF LAND, SAID POINT BEING ON A CURVE FOR WHICH THE RADIUS BEARS SOUTH 35°54'00" WEST 66.50 FEET; THENCE DEPARTING LAST SAID SOUTHWESTERLY LINE IN A SOUTHEASTERLY DIRECTION ALONG LAST SAID CURVE AN ARC DISTANCE OF 104.29 FEET; THENCE SOUTH 35°45'09" WEST 35.09 FEET TO A POINT OF CURVATURE TO THE RIGHT, SAID CURVE HAVING A RADIUS OF 30.00 FEET; THENCE ALONG SAID CURVE AN ARC DISTANCE OF 47.20 FEET; THENCE NORTH 54°05'43" WEST 306.86 FEET; THENCE NORTH 09°05'43" WEST 16.65 FEET; THENCE NORTH 35°54'17" EAST 52.70 FEET TO A POINT OF CURVATURE TO THE RIGHT, SAID CURVE HAVING A RADIUS OF 67.00 FEET; THENCE ALONG SAID CURVE AN ARC DISTANCE OF 105.24 FEET TO THE SOUTHWESTERLY LINE OF AFOREMENTIONED ST. CHARLES ROCK ROAD; THENCE SOUTH 54°06'00" EAST ALONG THE SOUTHWESTERLY LINE OF SAID ST. CHARLES ROCK ROAD A DISTANCE OF 215.04 FEET TO THE POINT OF BEGINNING AND CONTAINING 1.00 ACRES MORE OR LESS.

(3)    ALL OF LOT 3 OF NORTHWEST PLAZA PLAT 2, PER PLAT THEREOF RECORDED IN PLAT BOOK 360, PAGES 336-337 ON OCTOBER 26, 2012 IN THE ST. LOUIS COUNTY RECORDS.

THE ABOVE ALSO BEING FURTHER DESCRIBED AS:

A TRACT OF LAND BEING PART OF LOT 4 OF THE PARTITION OF ERASTUS POST'S ESTATE, ACCORDING TO PLAT THEREOF ATTACHED TO THE COMMISSIONER'S REPORT RECORDED IN BOOK 25, PAGE 509 OF THE ST. LOUIS COUNTY RECORDS, IN U.S. SURVEYS 406 AND 1203, TOWNSHIP 46 NORTH, RANGE 5 EAST, CITY OF ST.

Book: 21119  Page:: 1262

SLC-7261452-10

43

ANN, ST. LOUIS COUNTY, MISSOURI AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT A FOUND IRON PIPE SET FOR THE SOUTHWEST CORNER OF LOT 4 OF TOMROY SUBDIVISION, ACCORDING TO PLAT RECORDED IN PLAT BOOK 20, PAGE 43 OF THE ST. LOUIS COUNTY RECORDS; THENCE NORTH 27°03'16" EAST ALONG THE WESTERLY LINE OF SAID LOT 4 A DISTANCE OF 103.62 FEET TO A FOUND IRON PIPE SET FOR THE SOUTHEAST CORNER OF A TRACT OF LAND GRANTED TO THE STATE OF MISSOURI FOR WIDENING OF ST. CHARLES ROCK ROAD BY DEED RECORDED IN BOOK 7783, PAGE 2320 OF THE ST. LOUIS COUNTY RECORDS; THENCE ALONG THE SOUTHWESTERLY LINE OF SAID STATE OF MISSOURI TRACT THE FOLLOWING COURSES AND DISTANCES: NORTH 54°06'00" WEST 21.20 FEET; THENCE NORTH 45°34'09" WEST 50.56 FEET TO A POINT ON THE SOUTHWESTERLY LINE OF ST. CHARLES ROCK ROAD, SAID POINT BEING 40 FEET PERPENDICULAR DISTANCE SOUTH OF THE CENTERLINE OF SAID ROADWAY; THENCE NORTH 54°06'00" WEST ALONG THE SOUTHWESTERLY LINE OF SAID ST. CHARLES ROCK ROAD A DISTANCE OF 929.72 FEET; THENCE DEPARTING THE SOUTHWESTERLY LINE OF ST. CHARLES ROCK ROAD SOUTH 38°30'59" EAST 13.66 FEET TO THE POINT OF BEGINNING OF THE HEREON DESCRIBED TRACT OF LAND; THENCE SOUTH 38°30'59" EAST 63.51 FEET; THENCE SOUTH 46°26'02" EAST 21.45 FEET; THENCE SOUTH 54°22'52" EAST 133.15 FEET TO A POINT OF CURVATURE TO THE RIGHT, SAID CURVE HAVING A RADIUS OF 57.00 FEET; THENCE ALONG SAID CURVE AN ARC DISTANCE OF 89.82 FEET; THENCE SOUTH 35°54'00" WEST 121.81 FEET; THENCE SOUTH 24°53'22" WEST 93.10 FEET TO A POINT OF CURVATURE TO THE RIGHT, SAID CURVE HAVING A RADIUS OF 20.00 FEET; THENCE ALONG SAID CURVE AN ARC DISTANCE OF 35.26 FEET; THENCE NORTH 54°06'00" WEST 271.01 FEET; THENCE NORTH 35°54'00" EAST 313.28 FEET TO THE POINT OF BEGINNING AND CONTAINING 1.87 ACRES MORE OR LESS.

(4)   ALL OF LOT 4 OF NORTHWEST PLAZA PLAT 3, PER PLAT THEREOF RECORDED IN PLAT BOOK 361, PAGE 268 ON AUGUST 12, 2013 IN THE ST. LOUIS COUNTY RECORDS.

THE ABOVE ALSO BEING FURTHER DESCRIBED AS:

A TRACT OF LAND IN U.S. SURVEYS 406 AND 1203, TOWNSHIP 46 NORTH, RANGE 5 EAST AND BEING PART OF LOTS 3 AND 4 OF THE PARTITION OF ERASTUS POST'S ESTATE, ACCORDING TO PLAT THEREOF ATTACHED TO THE COMMISSIONER'S REPORT RECORDED IN BOOK 25, PAGE 509 OF THE ST. LOUIS COUNTY RECORDS, AND PART OF LOTS 9, 10, 11, 12, 13, 14, 15, 16, 17, AND 18 OF TOMROY SUBDIVISION, ACCORDING TO PLAT RECORDED IN PLAT BOOK 20, PAGE 43 OF THE ST. LOUIS

Book:21119 Page:1263

Book: 21119 Page: 1263

Book:21119 Page:1264

COUNTY RECORDS, IN CITY OF ST. ANN AND CITY OF BRIDGETON, ST. LOUIS COUNTY, MISSOURI AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT A FOUND 1/2" IRON ROD SET FOR THE SOUTHEAST CORNER OF LOT 7 OF ABOVE SAID TOMROY SUBDIVISION, SAID POINT BEING ON THE WESTERLY LINE OF ADIE ROAD, 40 FEET WIDE; THENCE NORTH 68°15'44" WEST ALONG THE SOUTHWESTERLY LINE OF SAID LOT 7 A DISTANCE OF 20.00 FEET; THENCE DEPARTING THE SOUTHWESTERLY LINE OF SAID LOT 7 SOUTH 20°36'09" WEST 64.13 FEET TO THE POINT OF BEGINNING OF THE HEREON DESCRIBED TRACT OF LAND; THENCE SOUTH 20°36'09" WEST 713.97 FEET; THENCE NORTH 69°23'51" WEST 821.14 FEET; THENCE NORTH 20°35'14" EAST 740.08 FEET; THENCE NORTH 26°41'29" WEST 27.00 FEET; THENCE NORTH 20°35'14" EAST 248.04 FEET; THENCE NORTH 35°54'17" EAST 57.38 FEET; THENCE NORTH 53°09'49" EAST 38.03 FEET; THENCE SOUTH 54°05'43" EAST 387.03 FEET; THENCE SOUTH 35°45'09" WEST 17.51 FEET; THENCE SOUTH 20°35'14" WEST 71.01 FEET; THENCE SOUTH 30°49'27" EAST 19.39 FEET; THENCE SOUTH 65°00'16" EAST 143.96 FEET; THENCE SOUTH 52°13'10" EAST 56.68 FEET; THENCE SOUTH 27°42'53" WEST 102.95 FEET; THENCE SOUTH 04°25'30" EAST 52.79 FEET; THENCE SOUTH 69°24'46" EAST 214.45 FEET TO THE POINT OF BEGINNING AND CONTAINING 17.33 ACRES MORE OR LESS.

(5)    All of Lot 5 of Northwest Plaza Plat 4 recorded at Plat Book 362 page 275 of the St. Louis County records.

(6)    All of Lot 5A of Northwest Plaza Plat 5 recorded at Plat Book 362 page 276 of the St. Louis County records.

DEPICTION OF PARCELS (SOLELY FOR PURPOSES OF QUICKLY IDENTIFYING THE PARCELS; ACTUAL LEGAL DESCRIPTIONS OF PARCELS TO GOVERN):

Book:21119 Page:1264

SLC-7261452-10

45

Book:21119 Page:1265



46

SLC-7261452-10

Description: St Louis,MO Document (W) - Year.Date.DocID 2014.805.849 Page: 47 of 53
Order: OOOVVBX Comment:

Book: 21119 Page: 1266

## EXHIBIT A-3 TO ECR– SHOPPING CENTER



47

Book: 21119 Page: 1266

SLC-7261452-10

Description: St Louis,MO Document (W) - Year.Date.DocID 2014.805.849 Page: 48 of 53
Order: OOOVVBX Comment:

Book:21119 Page:1267

### EXHIBIT A-4 TO ECR– DEPICTION OF COMMON AREAS CURRENTLY ANTICIPATED BYDEVELOPER AND LOCATIONS OF EXISTING LINDBERGH ACCESS



Book:21119 Page:1267

SLC-7261452-10

48

Description: St Louis,MO Document (W) - Year.Date.DocID 2014.805.849 Page: 49 of 53
Order: OOOVVBX Comment:

Book:21119 Page:1268

## EXHIBIT A-5 TO ECR - PORTIONS OF COMMON AREA ANTICIPATED TO BE INSTALLED AND CONSTRUCTED BY DEVELOPER

### [attached]

Book:21119 Page:1268

49

SLC-7261452-10

Book:21119 Page:1269



Book:21119 Page:1269

SLC-7261452-10

50

**EXHIBIT B TO ECR**

**Prohibited Uses for the Property:**

The operation of a business whose primary business is the sale of gardening or gardening products or home improvement products ("Exclusive Use"), including for example hardware stores, appliance stores, carpet, tile, paint, wall coverings or flooring stores, plumbing stores, light or electrical stores, farm supply stores, lawn and garden stores, or as a home center business similar to Menard's business, including for example Orschlen Farm & Home Supply, Rural King Supply, Tractor Supply, Ace Hardware, ACO Hardware, Builder's FirstSource, Busy Beaver Building Centers, Do It Best, 84 Lumber Company, Harbor Freight Tools USA, The Home Depot, Lampert Yards, Lowe's, LumberJack Building Centers, Sears, Sutherland Lumber, True Value, Charles Kirchner & Sons, Consolidated Lumber, Mills Fleet Farm, Farm & Fleet, National Home Centers, R.P. Lumber Company, Riggs Supply Company, Running Farm & Fleet, Seigle's, Stock Building Supply, Theisen Supply, United Building Centers, Bomgaars, Buchheit, Farm King Supply, Olney Rural King Supply, or Big R Stores; provided however, that this restriction shall not exclude stores selling the foregoing items so long as such sales do not constitute the primary business of such store or business. The Exclusive Use shall not apply to businesses occupying less than 5,000 square feet of space. The Exclusive Use shall not apply to Sam's Club, Costco, Target, Kmart, Bass Pro Shops, grocery stores, auto part stores, sporting goods stores, toy stores, pet stores, furniture stores, bedroom stores, dollar stores, wholesalers (except wholesalers whose primary business is home improvement products), or electronics stores. Additionally no portion of the Shopping Center within 100' of the Menard Tract as depicted in Exhibit A-3 shall be used as a movie theatre.

An adult type bookstore or other establishment selling, displaying, leasing or exhibiting pornographic materials or performances or selling paraphernalia for use with illicit drugs.

A massage parlor.

A mortuary.

A mobile home or trailer court, labor camp, junkyard or stockyard.

A land fill, garbage dump or facility used for the dumping, disposing, incineration or reduction of garbage.

An amusement park or carnival.

A distilling or smelting facility, except as an incidental portion of a retail use.

A factory use or processing or rendering plant.

An abortion clinic.

5 / 1

Book:21119 Page:1270

Book:21119 Page:1271

## EXHIBIT C TO ECR – PLANS AND SPECIFICATIONS FOR THE PROPERTY

JS Westflo, LLC will be replacing roofing materials, restriping and resurfacing parking surfaces, replacing HVAC and mechanical systems, in addition to completing interior renovations. All work shall be completed, constructed and maintained in compliance with all applicable codes and laws and the terms of this ECR.



Book: 21119 Page: 1271

5 2

SLC-7293194-2

# EXHIBIT 2

**From:** "Donohoe, Laura" <ldonohoe@artvan.com>
**Date:** March 22, 2020 at 2:36:07 PM CDT
**To:** Matt Moynihan <Matt@vue.vc>, Jay Steinback <jay@vue.vc>
**Cc:** "Williams, Tyler" <tyler.williams@artvan.com>, "Case, Michael" <mcase@artvan.com>
**Subject: RE:  EXTERNAL: Re: St. Louis keys**

Hi Matt,

Individual stores are not keyed the same however I have a master key that works at all stores.  I will send a copy of that to you at O'Fallon so you'll only have 1 key for all stores.

Thanks!

---

**From:** Matt Moynihan [mailto:Matt@vue.vc]
**Sent:** Sunday, March 22, 2020 2:33 PM
**To:** Donohoe, Laura <ldonohoe@artvan.com>; Jay Steinback <jay@vue.vc>
**Cc:** Williams, Tyler <tyler.williams@artvan.com>; Case, Michael <mcase@artvan.com>
**Subject:** Re: EXTERNAL: Re: St. Louis keys

Hello Laura
I picked up the Keys to 321 and 326. Fairview 323 and Affton 324 did not open today they left all keys in the store when they left yesterday. I talked to both store Managers and they were told by Laura Thompson to leave them in the store. Jay mentioned that he was told all the stores were keyed the same. Ofallon 321 Keyes did not work at the Bridgeton store 326.

Can you send Keys for Fairveiw 323 and affton 324 to us.  You can send them to the Ofallon store. I will be there daily to get mail. 2101 E. Terra lane O'fallon Mo 63366

**Matt Moynihan**
Director of Logistics & Operations
JVS Express
Cell - 314-565-2594

1

**From:** "Donohoe, Laura" <ldonohoe@artvan.com>
**To:** Jay Steinback <jay@vue.vc>
**Cc:** "Williams, Tyler" <tyler.williams@artvan.com>, "Case, Michael" <mcase@artvan.com>, Matt Moynihan <matt@vue.vc>
**Sent:** 3/21/2020 3:57 PM
**Subject:** Re: EXTERNAL: Re: St. Louis keys

Hi Jay,
If Matt's available to collect keys that would be great - thanks for offering!
As far as alarm codes, I've programmed a generic code into your stores - 6500.  After this weekend, I'll delete the other codes so you'll only have one code to to worry about for now.
Thanks again.

Sent from my iPhone

On Mar 21, 2020, at 3:29 PM, Jay Steinback <jay@vue.vc> wrote:

> Thank you Tyler,
>
> Laura and Michael first off, we are horrified about everything that has happened to your company and all your co-workers.
>
> We would like to gain access to the buildings so our maintenance team can begin making rounds to ensure building security and maintenance.
>
> Matt Moynihan (cc'd) is available today or tomorrow to drive around to gather keys and get codes for the alarms.
>
> As things progress and change we will continue to be in touch over the coming weeks.
> St Louis is going into lockdown Monday so it would be great to get this taken care of this weekend.
>
> Thank you and best of luck to you all, please be safe.

**Jay Steinback**
CEO
VUE Enterprises
Realty Shop STL
JVS Express



Cell - (314) 398-0456

On Mar 21, 2020, at 3:13 PM, Williams, Tyler
<tyler.williams@artvan.com> wrote:

+ Jay

Adding Jay to this email.  He has a guy in the market that can
pick up a key direct from store manager if that saves us the hassel
of FedEx.  I'll let the two of you connect.

Best,

Tyler Williams
Sr. Director of Real Estate, Construction & Store Design
Art Van Furniture / PureSleep Mattress Stores
Tyler.Williams@artvan.com
(407) 383-9157 cell

"Make it a great day!"

-----Original Message-----
From: Donohoe, Laura
Sent: Saturday, March 21, 2020 4:07 PM
To: Williams, Tyler <tyler.williams@artvan.com>
Cc: Case, Michael <mcase@artvan.com>
Subject: Re: St. Louis keys

I can FedEx the master directly to him if you have his info.

Sent from my iPhone

On Mar 21, 2020, at 2:40 PM, Williams, Tyler
<tyler.williams@artvan.com> wrote:

Can we give one of the master keys for St. Louis to
the LL, Jay Steinbeck? He'll be able to address any
issues that may occur on site, as needed.

Laura - if we're good with that, I'll put you in
touch direct with Jay.

Tyler Williams
407.383.9157 cell

Sent from my iPhone

# EXHIBIT 3

