# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | Case No. 20-10553 (CSS) |
| ART VAN FURNITURE, LLC, et al., | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| _____ | ) | Docket No.: 142 |

## OPINION[1]

**BENESCH, FRIEDLANDER, COPLAN
& ARONOFF LLP**
Gregory W. Werkheiser
Michael J. Barrie
Jennifer R. Hoover
Kevin M. Capuzzi
Kate Harmon
John C. Gentile
222 Delaware Avenue, Suite 801
Wilmington, DE 19801

**ANDREW R. VARA
UNITED STATES TRUSTEE**
Linda R. Richenderfer
Trial Attorney
Office of the United States
Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE 19801


Date: July 21, 2020

Sontchi, C.J. _____

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## INTRODUCTION[2]

Before the Court is an objection by the United States Trustee (the "U.S. Trustee") to the retention application of Benesch, Friedlander, Coplan & Aronoff LLP ("Benesch") as Debtors' bankruptcy counsel (the "Objection").[3]  At issue is whether the Court should deny the application under Bankruptcy Code Section 327.[4]  The U.S. Trustee argues that Benesch violated its conflicts waiver with Wells Fargo, N.A. ("Wells Fargo") when, after the Debtors' defaulted under the Interim Cash Collateral Order, Benesch worked with Wells Fargo to develop "post-suspension restructuring alternatives."  Benesch opposes the Objection on the grounds that its post-default efforts and all necessary aspects of the Chapter 11 proceeding fell within the scope of its conflicts waiver.

For the reasons set forth below, the Court will overrule the Objection and approve the retention application.  Specifically, the Court finds that the U.S. Trustee has not met its burden in connection with the Objection.  Additionally, based on the terms and the context of the conflicts waiver, the Court finds that Benesch was not in breach of the waiver when it negotiated with Wells Fargo to develop "post-suspension restructuring alternatives."  Finally, the Court does not find sufficient evidence in the record of either an actual conflict or a potential conflict that would require the disqualification of Benesch.

---

[2] Capitalized terms used but not defined herein have the meaning ascribed to them *infra*.

[3] D.I. 260.

[4] 11 U.S.C. § 327.

## JURISDICTION & VENUE

This Court has subject matter jurisdiction, pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding, pursuant to 11 U.S.C. § 157(b). Venue is proper before the United States Bankruptcy Court for the District of Delaware under 28 U.S.C. §§ 1408 and 1409. The Court has the judicial authority to enter a final order.

## BACKGROUND

### I.    Procedural History

On March 8, 2020 (the "Petition Date"), Art Van Furniture, LLC and its affiliates, (the "Company" or the "Debtors") filed voluntary petitions with the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court" or the "Bankruptcy Court") for relief under Chapter 11 of the Bankruptcy Code.[5]

Days earlier, on March 4, 2020, Benesch received a $250,000 retainer from the Debtors. That same day, Wells Fargo granted specific consent for Benesch to represent Art Van, Furniture, Inc. in connection with its bankruptcy proceedings (the "Wells Fargo Waiver" or the "Waiver"). On March 11, 2020, the Court entered the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the*

---

[5] Del. Bankr. 20-10553, D.I. 1. The Debtors in these cases are as follows: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

*Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Interim Cash Collateral Order").[6]

On March 16, 2020, the Debtors submitted an application for entry of an order authorizing the employment and retention of Benesch as bankruptcy counsel to the Debtors (the "Application").[7] On the same day, Benesch filed the Declaration of Jennifer Hoover in support of the Application and disclosed Wells Fargo as a current client of Benesch and the existence of the Waiver.[8]  On March 19, 2020, pursuant to paragraph 21 of the Interim Cash Collateral Order, Wells Fargo issued a Notice of Events of Default, which terminated the Debtors' right to use Cash Collateral, other than as permitted during the Remedies Notice Period, which expired on April 6, 2020.[9]  Following these events, Benesch continued to work with advisors for Wells Fargo and the Committee to develop "post-suspension restructuring alternatives."[10]  These efforts were unsuccessful, and, on April 3, 2020, the Debtors filed a motion to convert the Chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code.[11]

---

[6] D.I. 93.

[7] Del. Bankr. 20-10553, D.I. 142.  The Application was filed with a Declaration from Benesch partner Jennifer R. Hoover the ("Hoover Declaration") (D.I. 142, Exh. A).  All references to this case will be cited hereinafter as "D.I." along with the appropriate docket index number unless otherwise stated.

[8] D.I. 142, Sch. A.   Supplementary declarations were filed at D.I. 256, 323, 585, 586.

[9] D.I. 598, Exh. B (Notice of Events of Default and Termination Declaration); D.I. 93 (Interim Cash Collateral Order) (noting that during the Remedies Notice Period "the Debtors may use Cash Collateral solely to meet payroll obligations and pay expenses necessary or reasonably advisable to avoid immediate and irreparable harm to the Debtors' estates in accordance with the Budget and as otherwise agree to by the Prepetition ABL Agent in its sole discretion.").   On March 30, 2020, Wells Fargo issued a Notice of Termination Declaration and Carve Out Trigger Notice. *See* D.I. 598, Exh. C.

[10] D.I. 247.

[11] D.I. 247.

On April 6, 2020, the U.S. Trustee filed *Objection of United States Trustee to Debtors'*
*Application for Entry of an Order Authorizing and Approving the Retention of Benesch,*
*Friedlander, Coplan & Aronoff LLP as Bankruptcy Counsel to the Debtors Nunc Pro Tunc to the*
*Petition Date* (the "Objection").[12]   On this same day, Benesch filed a supplemental
declaration in which the Debtors disclosed additional conflict waivers obtained from
PNC and KKR.[13]   The Court also entered an order on April 6th converting the Debtors
Chapter 11 cases to cases under Chapter 7.[14]

On April 24, 2020, Benesch filed a reply and a second supplemental declaration of
Ms. Hoover in support of the Application.[15]   On May 29, 2020, the Debtors filed a third
supplemental declaration of Ms. Hoover along with the declaration of Michael J. Barrie
in support of the Applications.[16]

On June 3, 2020, the Court held a hearing in connection with the Application.  The
U.S. Trustee is the only party that has objected to the Application.

---

[12] *See* D.I. 260.

[13] *See Supplemental Declaration of Jennifer R. Hoover in Support of the Debtors' Application to Employ and Retain*
*Benesch, Friedlander, Coplan & Aronoff LLP as Bankruptcy Counsel to the Debtors Nunc Pro Tunc to the Petition*
*Date* (the "Supplemental Declaration") (D.I. 256).

[14] *See Order (I) Converting Their Chapter 11 Cases to Cases Under Chapter 7, (II) Establishing a Deadline for Filing*
*Final Chapter 11 Fee Applications and Setting a Hearing Thereon, and (III) Granting Related Relief* (the
"Conversion Order") (D.I. 263).

[15] *See Reply of Benesch, Friedlander, Coplan & Aronoff LLP in Support of the Debtors Application to Employ and*
*Retain Benesch, Friedlander, Coplan & Aronoff LLP as Bankruptcy Counsel to the Debtors Nunc Pro Tunc to the*
*Petition Date* (the "Reply") (D.I. 322); *See Second Supplemental Declaration of Jennifer R. Hoover LLP in Support*
*of the Debtors' Application to Employ and Retain Benesch, Friedlander, Coplan & Aronoff LLP as Bankruptcy*
*Counsel to the Debtors Nunc Pro Tunc to the Petition Date* (the "Second Supplemental Declaration") (D.I. 323).

[16] *See Third Supplemental Declaration of Jennifer R. Hoover in Support of the Debtors' Application to Employ and*
*Retain Benesch, Friedlander, Coplan & Aronoff LLP as Bankruptcy Counsel to the Debtors Nunc Pro Tunc to the*
*Petition Date* (the "Third Supplemental Declaration") (D.I. 585); *See Declaration of Michael J. Barrie in Support*
*of the Debtors' Application to Employ and Retain Benesch, Friedlander, Coplan & Aronoff LLP As Bankruptcy*
*Counsel to the Debtors Nunc Pro Tunc to the Petition Date* (the "Barrie Declaration") (D.I. 586).

## II.    The Retention Application Dispute

At all relevant times, Benesch represented the Debtors in these Chapter 11 cases and Wells Fargo, the Debtors' ABL Lender, in unrelated matters.[17]  As a result, Benesch obtained conflict waivers from both the Debtors and Wells Fargo.[18]  Paragraphs three and four of the Wells Fargo Waiver form the core of the disagreement between the parties. These paragraphs contain the terms "Dispute" and "Transaction," which have been defined in and expressly incorporated from the Wells Fargo Conflicts Policy.[19]    The Waiver provides, in relevant part:

> Art Van Furniture, Inc. (the "Adverse Party") has asked Benesch, Friedlander, Coplan & Aronoff LLP (the "Firm") to represent it in connection with a liquidation of Adverse Party, including in a potential Chapter 11 Bankruptcy proceeding ("Art Van Liquidation"). Wells Fargo Bank, N.A., is a secured lender in the Art Van Liquidation.    The Firm is not representing the Adverse Party in disputing the amount, validity or extent of the debt. . . . The Firm currently represents . . . Wells Fargo Lines of Business in unrelated credit facility and loan transaction matters . . . .
>
> If Wells Fargo consents to the proposed representation, the Firm . . . agrees that it will not . . . (3) represent the Adverse Party in any subsequent Dispute with Wells Fargo arising out of: (i) the Transaction or any related transaction between the Adverse Party and Wells Fargo . . . . The Firm further agrees, if applicable, that any workout or restructuring of the Transaction or any related transactions in the context of a default by either the Adverse Party or Wells Fargo, or any bankruptcy proceeding involving the Adverse Party or Wells

---

[17] D.I. 142, Sch. B-1.

[18] D.I. 582, Exh. 1; *id.* at Exh. 4.

[19] The Well Fargo Conflict Policy refers to "Wells Fargo & Company Policy Regarding Conflicts of Interest." *See* D.I. 586 at 7.

> Fargo, will be considered a Dispute arising out of the
> Transaction.[20]

Wells Fargo's Conflicts Policy defines "Dispute" as "[a] pending, threatened, or likely

litigation, arbitration, bankruptcy, adversary proceeding, contested motion, discovery,

discovery, alternative dispute resolution process or loan workout, including without

limitation, any foreclosure or collection action." It defines "Transaction" as "[a]ny matter

which is not a Dispute."

The U.S. Trustee opposes the Court's approval of the Application because it

contends Benesch represented the Debtors in workout or restructuring efforts following

the Debtors' March 19, 2020 default under the Interim Cash Collateral Order (the

"Default").[21] The U.S. Trustee argues that this representation is beyond the scope of the

Waiver, which purportedly "appears not to allow Benesch to represent the Debtors in a

dispute arising out of a transaction . . . or in a workout or restructuring of any related

transaction in the context of a default."[22] In support of the foregoing argument, the U.S.

Trustee highlights paragraph three of the Waiver, which again provides:

> If Wells Fargo consents to the proposed representation, the
> Firm . . . agrees that it will not . . . (3) represent the Adverse
> Party in any subsequent Dispute with Wells Fargo arising out
> of: (i) the Transaction or any related transaction between the
> Adverse Party and Wells Fargo . . . . The Firm further agrees,
> if applicable, that any workout or restructuring of the
> Transaction or any related transactions in the context of a
> default by either the Adverse Party or Wells Fargo, or any
> bankruptcy proceeding involving the Adverse Party or Wells

---

[20] D.I. 142, Sched. B-1.

[21] D.I. 260 at 5; D.I. 361 at 1.

[22] D.I. 260 at 5.

           Fargo, will be considered a Dispute arising out of the
           Transaction.[23]

Pursuant to this paragraph, the U.S. Trustee lodges this objection based on: (i) its "public interest standing," (ii) its specific authority under 28 U.S.C. § 586(a)(3)(1) to monitor application filed under 11 U.S.C. § 327, and (iii) its general authority to oversee the administration of Chapter 11 cases under 28 U.S.C. § 586.

      Benesch argues that it is compliant with the Bankruptcy Code Section 327's requirements for the retention of professionals. It asserts that it is and neither holds nor represents an interest adverse to the Debtors or their estates.[24] Benesch asserts that at no point during the process of obtaining consent did Wells Fargo ever indicate "that the waiver would not encompass the adverse representation of the Debtors during their chapter 11 cases in matters relating to the Debtors' access to and use of cash collateral or other matters likely to arise in the course of Benesch's representation of the Debtors as their general bankruptcy counsel."[25] Benesch contends that the Waiver encompassed "all necessary aspects" of the Art Van Furniture Inc. engagement, which the Waiver defined as "a liquidation of [Art Van Furniture Inc.], including a potential Chapter 11 Bankruptcy Proceeding ('Art Van Liquidation')."[26] As such, it argues that, under the Waiver, its post-default cash collateral negotiations are a "Dispute" and, therefore, that the final sentence of paragraph three—which concerns "the Transaction"—is inapplicable. In the

---

[23] D.I. 142, Sched. B-1.

[24] D.I. 142, Exh. 1.

[25] D.I. 586, Exh. 10 at 9.

[26] D.I. 586 at 6.

alternative, it argues that even if the "Art Van Liquidation" qualified as "the Transaction," the broad definition of its engagement "necessarily includes everything involved 'in a potential Chapter 11 Bankruptcy Proceeding.'"[27]

## ANALYSIS

The parties dispute whether the Court should approve the Application largely because the Waiver does not define the relationship between Benesch's representation and key terms such as "Dispute" and "Transaction." As a result of this ambiguity, it is unclear whether all or some of Benesch's actions fall within the scope of the law firm's permitted activities under the Waiver. Furthermore, neither party's briefs has earnestly addressed this relationship, which is critical both to the interpretation of the Waiver and to the outcome of this proceeding. To resolve this dispute, the Court will examine the relevant portions (sections 3(i) and 3(ii)) of paragraph three in connection with the aforementioned defined terms.

### I.    Bankruptcy Code 327

Pursuant to Bankruptcy Code Section 327, Debtors can employ professional persons with court approval as long as they (i) "do not hold or represent an interest adverse to the estate" and are (ii) disinterested persons.[28] The purpose of this fact-intensive test is to "ensure effective representation of the estate . . . [by certifying] that the professional is able to act in the best interest of the estate and can competently

---

[27] D.I. 322 at 14.

[28] *In re BH & P, Inc.*, 949 F. 2d 1300 (3d Cir. 1991).

and vigorously represent the trustee or debtor-in-possession."[29]  Additionally, Section

327(c) provides that a professional "is not disqualified for employment . . . solely because

of such person's employment by or representation of a creditor, unless there is an

objection by another creditor or the United States trustee . . . [and] there is an actual

conflict of interest."[30]

The Third Circuit has comprehensively set forth the standard under Section 327 in

*Marvel:*

> (1) Section 327(a), as well as § 327(c), imposes a per se
> disqualification as trustee's counsel of any attorney who has
> an actual conflict of interest; (2) the district court may within
> its discretion—pursuant to § 327(a) and consistent with §
> 327(c)—disqualify an attorney who has a potential conflict of
> interest and (3) the district court may not disqualify an
> attorney on the appearance of conflict alone.[31]

It has further noted that a "denomination of a conflict as 'potential' or 'actual' and the

decision concerning whether to disqualify a professional based on that determination in

situations not yet rising to the level of an actual conflict are matters committed to the

bankruptcy court's sound exercise of discretion."[32]

## II.    The U.S. Trustee Did Not Carry Its Burden Under the Objection

The U.S. Trustee, pursuant to 11 U.S.C. § 307, has administrative oversight of cases

filed under Chapter 11 of the Bankruptcy Code and, pursuant to 28 U.S.C. § 586(a)(3)(A),

---

[29] *In re Boy Scouts of Am.  and Delaware BSA, LLC*, No. 20-10343 (Bankr. D. Del. May 29, 2020) (issuing bench ruling regarding the retention application of Sidley Austin LLP).

[30] 11 U.S.C § 327(c).

[31] *In re Marvel Entm't Grp, Inc.*, 140 F.3d 463, 476 (3d Cir. 1998).

[32] *In re Marvel Entm't Grp, Inc.*, 140 F.3d at 477.

the authority to object to compensation applications filed under Section 327 of the Bankruptcy Code.[33]  However, for the Court to sustain its objection, "a party objecting to an application for compensation on the basis of a conflict of interest bears the burden of establishing the conflict."[34]  While the U.S. Trust was within its authority to object to the Application, the U.S. Trustee has not met its burden.

Defining the relationship between legal authority and specific facts is the essence of an argument and the basis upon which Courts grant relief.  The Objection lacks this essence.  It merely cites legal authority and a paragraph from the Waiver to conclude that "[t]he Wells Fargo waiver appears not to allow Benesch to represent the Debtors in a dispute arising out of a transaction (the cash collateral agreement) or in a workout or restructuring of any related transaction in the context of a default."[35]  The Objection does not describe which parts of the Waiver it believes Benesch violated.  Nor does it specifically describe which parts of Benesch's representation constituted a Dispute, Transaction, related transaction, workout, or restructuring.  It was only during the June 3, 2020, hearing that the U.S. Trustee detailed its argument: that the Debtors' March 19, 2020 default under the Interim Cash Collateral Order triggered the Waiver, which it believed Benesch violated when it subsequently worked with advisors for Wells Fargo to develop "post-suspension restructuring alternatives.

---

[33] *See In re Fleming Cos., Inc.*, 304 B.R. 85, 89 (Bankr.  D. Del. 2003).

[34] *See In re Ellipso, Inc.*, 462 B.R. 241, 249-50 (Bankr. D. D.C. 2011) (*citing Leslie Fay Companies, Inc.* 222 B.R. 718, 721 (Bankr. S.D.N.Y 1998); *In re Kliegl Bros. Universal Elec. Stage Lighting Co., Inc.*, 189 B.R. 874, 880 (Bankr. E.D.N.Y. 1995)(*holding* that "in a case involving an objection under 11 U.S.C. § 327(c), the burden would be on the objecting creditor [or United States Trustee] to prove conflict of interest." ).

[35] D.I. 260 at 5.

### III.    Benesch Did Not Violate Paragraph Three, Section 3(i) of the Waiver

Benesch did not violate paragraph three, section 3(i) of the Waiver when, after the Default, it worked with Wells Fargo and other parties in interest to develop "post-suspension restructuring alternatives. Section 3(i) provides that "the Firm . . . agrees that it will not . . . represent the Adverse Party in any subsequent Dispute with Wells Fargo arising out of . . . the Transaction or any related transaction between the Adverse Party and Wells Fargo[.]"

The parties do not dispute that Benesch is the "Firm" and that Art Van Furniture, Inc. is the "Adverse Party" under the Waiver.  However, they disagree about whether Benesch's post-Default negotiations with Wells Fargo and the Interim Cash Collateral Order represent a "Dispute" or "the Transaction" under the terms of the Waiver.  The Waiver defines Dispute as "[a] pending, threatened, or likely litigation, arbitration, bankruptcy, adversary proceeding, contested motion, discovery, discovery, alternative dispute resolution process or loan workout, including without limitation, any foreclosure or collection action."[36]  It defines "Transaction" as "[a]ny matter which is not a Dispute."

The Court finds that Benesch's post-default representation of the Debtors in connection with the Interim Cash Collateral Order constitutes a "loan workout" and, therefore, a Dispute under the Waiver.  While neither the Waiver nor the Wells Fargo Conflict Policy defines the term "loan workout," it is ordinarily defined as "a mutual agreement between a lender and borrower to renegotiate the terms on a loan that is in

---

[36] D.I. 586 at 10.

default."[37]   Benesch's efforts to develop "post-suspension restructuring alternatives" with Wells Fargo was an attempt to renegotiate the use of cash collateral in connection with the Prepetition ABL Loan.[38]  These negotiations were mutual insofar as they were a response to Wells Fargo's emphasis on its availability "to discuss a path forward in the Debtors' chapter 11 cases, including the potential for further consensual use of cash collateral . . ."[39]

While Benesch's post-Default negotiation efforts relate to the Prepetition ABL Loan, they "arose out of" a default under this Court's bankruptcy order (i.e. the Interim Cash Collateral Order).  This order was part of the Debtors' bankruptcy.  As the Wells Fargo Conflicts Policy provides, a bankruptcy — a category of Dispute — cannot be "the Transaction."   Therefore, because the Dispute (the loan workout) arose out of a bankruptcy order it could not have arisen out of "the Transaction."

Accordingly, the Court finds that Benesch did not violate paragraph three, section 3(i) of the Waiver.

### IV.    Benesch Did Not Violate Paragraph Three, Section 3(ii) of the Waiver

The Court also finds that Benesch did not violate paragraph three, section 3(ii) of the Waiver.[40]  It provides:

---

[37] *See* https://www.investopedia.com/terms/w/workout-agreement.asp.  *See Welded Construction v. Prime NDT Servs., Inc.  (In re Welded Construction, L.P.)*, 605 B.R. 35, 40 (Bankr. D. Del. 2019) ("In contract interpretation, the language is to be given its plain and ordinary meaning.").

[38] The Debtors were in default of the Prepetition ABL Loan as early as February 5, 2020. *See* D.I. 591, Exh. 1 (Forbearance Agreement).

[39] D.I. 598, Exh. B.

[40] The initial part of paragraph three, section 3(ii) states that the "Firm . . . agrees that it will not . . . represent the Adverse Party in any subsequent Dispute with Wells Fargo arising out of . . . any prior Dispute for

> The Firm further agrees, if applicable, that any workout or restructuring of the Transaction or any related transactions in the context of a default by either the Adverse Party or Wells Fargo, or any bankruptcy proceeding involving the Adverse Party or Wells Fargo, will be considered a Dispute arising out of the Transaction.[41]

According to this language, the U.S. Trustee argues that "[t]he Wells Fargo waiver appears not to allow Benesch to represent the Debtors . . . in a workout or restructuring of any related transaction in the context of a default." As a result, the U.S. Trustee asserts that the Debtors' March 19th default under the Interim Cash Collateral Order triggered the Waiver, which Benesch violated in subsequent negotiations with Wells Fargo. The Court finds that the language of the waiver and the context during which it was granted do not support the U.S. Trustee's interpretation.

### A. The Interim Cash Collateral Order Was Not "The Transaction"

It is unclear whether the U.S. Trustee believes that the Interim Cash Collateral Order represents "the Transaction" or "a related transaction" under the Waiver. However, given the absence of an explanation as to what the purported transaction is related to, it appears that the U.S. Trustee believes that the Interim Cash Collateral Agreement represented "the Transaction" under the Waiver. This assertion is flawed.

The Court is not persuaded that the Interim Cash Collateral Order is "the Transaction" under the Waiver because the definite article "the" precedes the term "Transaction." A definite article (e.g. the) is used before a noun to indicate specificity,

---

which a general or specific consent has been given by Wells Fargo, as applicable." This provision is inapplicable and is not in contention.

[41] D.I. 142, Sched. B-1.

while an indefinite article (e.g. a or an) is used to indicate non-specificity. Except for the references to "a related transaction," the Waiver only refers to "the Transaction." Therefore, because the definite article "the" precedes the term "Transaction" the Waiver must be referring to a specific agreement that was likely central to the relationship between the Debtors and Wells Fargo. Based on the sequence of events of this case, it is highly unlikely that the specific agreement to which the Waiver referred was the Interim Cash Collateral Order. The Waiver was signed on March 4, 2020, while the motion to authorize the use of cash collateral was not filed until March 9, 2020. There is no indication that the Interim Cash Collateral Order, which the Court did not enter until March 11, 2020, was the specific agreement to which the Waiver referred.

It is more likely, however, that the Prepetition ABL Loan was "the Transaction" to which the Waiver refers. The Prepetition ABL Loan was central to the relationship between the Debtors and Wells Fargo when the Waiver was signed.

### B. The Debtors Were "in the Context of Default" Before March 19, 2020

Contrary to the U.S. Trustee's assertion, the Court finds that the Debtors were "in the context of a default" before March 19, 2020. The Prepetition Forbearance Agreement and the Interim Cash Collateral Order—both of which are agreements by and between the Debtors and Wells Fargo—stipulate to the existence of a default under the Prepetition ABL Credit Agreement that began on February 5, 2020.[42] The Forbearance Agreement states that the default "occurred and is continuing as a result of the Loan

---

[42] D.I. 591, Exh. 1 (Forbearance Agreement); D.I. 93 at 12 (Interim Cash Collateral Order).

Parties' failure to deliver the 2019 Annual Financial Statements within one hundred twenty (120) days following the end of the Fiscal Year ended September 30, 2019."[43] Under the terms of the Prepetition ABL Credit Agreement, this default permits Wells Fargo and the Prepetition ABL Lenders "to exercise their rights and remedies . . . including, without limitation foreclosure upon the Collateral furnished to secure the Obligations."[44] These "obligations . . . are secured by a security interest in substantially all of the Debtors' assets,"[45] which includes the Debtors' cash.  As the Debtors' have highlighted:

> "substantially all of the cash held in the Bank Accounts is subject to properly-perfected security interests in favor of Wells Fargo Bank, N.A., solely in its capacity as administrative agent under the ABL Facility (the "ABL Agent"), and Virtus Group, LP, solely in its capacity as administrative agent under the Term Loan Facility."

The Debtors have also highlighted that as part of the Forbearance Agreement, "Wells Fargo required [the Debtors] to begin immediate preparations for a 'going out of business' liquidation in the event ongoing efforts to raise capital did not materialize before the forbearance period expired.'"[46]  Consequently, because the Debtors were "in the context of default," the availability and condition of substantially all of the Debtors assets—including the cash collateral—would have been of paramount importance to

---

[43] D.I. 591, Exh. 1 at 2.

[44] D.I. 591, Exh. 1 at 2.

[45] D.I. 4 at 7.

[46] D.I. 12 at 7.

Wells Fargo. These assets would presumably be the subject of any future negotiations and bankruptcy proceedings.

### C. It is Unlikely That the Waiver Was Intended to Bar Benesch From Workout or Restructuring Efforts in Connection with the Prepetition ABL Loan in these Chapter 11 Proceedings

The Waiver does not define the terms "workout" or "restructuring." However, a "workout" is ordinarily defined as "a mutual agreement between a lender and borrower to renegotiate the terms on a loan that is in default."[47] Additionally, a reorganization is ordinarily defined as "the practice . . . of changing the way in which a government, business entity, or system is organized."[48] This includes "[c]onsolidations and mergers, as well as the sale of the corporate assets."[49]

On March 4, 2020, in the "context of default," and days before the Petition Date, it would not make sense for Wells Fargo to consent to a conflicts waiver that would severely restrict Benesch's ability to represent the Debtors in connection with a critical component of the representation—the Prepetition ABL Loan or any related transaction. After the Debtors February 5, 2020 default, Wells Fargo must have anticipated that, under any future scenario, it would need to negotiate with the Company. Irrespective of the identity of the negotiating sale parties or the environment in which negotiations would take place (i.e. in or out of court), the assets of the Company (including cash), on which Wells Fargo had valid and perfected liens, would be central to negotiations. As a result, any

---

[47] *See* https://www.investopedia.com/terms/w/workout-agreement.asp.

[48] Black's Law Dictionary (11th ed. 2019).

[49] *See* § 22:3 Purposes of sale of substantially all assets, 4 Treatise on the Law of Corporations § 22:3 (3d).

negotiation regarding the assets of the company would necessarily involve Wells Fargo and would effectively be a workout of the Prepetition ABL Loan.

Against this backdrop, it would also not it make sense for Wells Fargo, just four days before the Petition Date, to sign a waiver that would deny Benesch from representing the Company in "any workout or restructuring of the Transaction or any related transaction in the context of any bankruptcy proceeding involving [Art Van Furniture, Inc] or Wells Fargo" when Well Fargo was actively engaged in prepetition workout and restructuring efforts with the Company.[50]  Before the Petition Date, both before and after Art Van Furniture, Inc. retained Benesch, the Company engaged with Wells Fargo in workout efforts when it negotiated the cash collateral motion,[51]  and in restructuring efforts when it solicited thirty-one potential buyers and developed a wind down process.[52]  At a time when Wells Fargo was negotiating the use of cash collateral and the sale of assets, it would not make sense for Wells Fargo to restrict Benesch's engagement on workout and restructuring activities that would be executed in and central to Chapter 11 proceedings.

Accordingly, the Court finds that Benesch did not violate paragraph three, section 3(ii) of the Waiver.

---

[50] D.I. 142, Exh. A.

[51] *See* D.I. 5 (Cash Collateral Motion).

[52] D.I. 586 at 4 ("By the time Benesch was engaged in early March, the Debtors . . . at the behest of [Wells Fargo and the ABL Lenders] . . . were working . . . to implement the liquidation of most of the Debtors' retail operations and the sale of the Debtors' inventory sold through a program of store-closing sale").

**V.    Benesch's Representation of the Debtors Does Not Represent an Actual Conflict or a Potential Conflict that Necessitates the Disqualification of the Application**

Notwithstanding the Waiver, the Trustee has not presented, nor does this Court find, sufficient evidence of either an actual conflict or a potential conflict that would require the denial of Benesch's Application.  Benesch served as Debtors' Counsel from March 4, 2020, until April 6, 2020—when the Chapter 11 cases were converted to cases under Chapter 7 of the Bankruptcy Code.  During the time Benesch represented the Debtors in Chapter 11 proceedings, Benesch did not represent Wells Fargo in these cases or in any related transactions.  As Benesch has highlighted, both in relative and in absolute terms, Wells Fargo has represented a de minimis component of its aggregate revenue in each of the last three years.  Benesch's revenue from its representation of Wells Fargo stood at approximately one-tenth of one percent of total firm revenue in 2018 and has declined in each subsequent year.[53]  Additionally, there is no evidence in the record that indicates that Benesch lacked zealousness in its representation of the Debtors.  Lastly, this Court has previously, approved retention applications of law firms that served as debtor's counsel and counsel to Wells Fargo in unrelated transactions and cases while Wells Fargo was a party in interest in the debtor's bankruptcy proceeding.[54]

---

[53] *See* D.I. 585 at 3.

[54] *See e.g.*  Del. Bankr. 13-12329 (*In re FBI Wind Down, Inc.*), D.I. 298. (granting Paul Hastings's application to serve as counsel for the debtors (for which Wells Fargo was a prepetition secured lender under and ABL Facility) when Wells Fargo served as current clients in unrelated cases and transactions); Del. Bankr. 13-13281 (*In re Constar Int'l Holdings, LLC*), D.I. 274 (granting Dechert LLP's application to serve as counsel for the debtors (for which Wells Fargo served as a prepetition secured lender under the Revolving Loan Facility) when Wells Fargo served as current clients in unrelated cases and transactions.

## CONCLUSION

In sum, the Court will overrule the Objection.  The Court does not find that the U.S. Trustee has met its burden in connection with its objection to the Debtors' application to employ Benesch as bankruptcy counsel to the Debtors.  The Court does not find that Benesch violated the Waiver when, after the Debtors defaulted under the Interim Cash Collateral Order, Benesch negotiated with Wells Fargo and other parties in interest to develop "post-suspension restructuring alternatives."  More generally, the Court does not find sufficient evidence in the record of either an actual conflict or a potential conflict that would require the disqualification of Benesch's Application.  Consequently, Benesch's retention application will be granted.  Benesch is directed to submit a proposed form of order under certification of counsel.