# **Exhibit B**

Lease

**LEASE AGREEMENT**

**BY AND BETWEEN**

**Cole WF Chicago IL, LLC,
a Delaware limited liability company**

**("Landlord")**

**and**

**Art Van Furniture, Inc.,
A Michigan Corporation**

**("Tenant")**

Property Address:
2606 North Elston Avenue
Chicago, Illinois  60647

## Table of Contents

Page

1. Term: ........................................................................................................................... 1
2. Rent: ........................................................................................................................... 2
3. Delivery and Possession: .......................................................................................... 3
4. Improvements: ........................................................................................................... 4
5. Tenant's Use: ............................................................................................................. 4
6. Taxes and Additional Rent: ....................................................................................... 4
7. Signage/Trade Names: .............................................................................................. 5
8. Parking: ...................................................................................................................... 5
9. Use of Roof: .............................................................................................................. 6
10. Tenant's Covenants: ................................................................................................... 6
11. Surrender of Premises, Removal of Tenant's Property: ........................................... 13
12. Landlord Covenants: ................................................................................................ 13
13. Landlord's Maintenance and Repairs: ...................................................................... 13
14. Hazardous Materials: ................................................................................................ 15
15. ADA Compliance: ..................................................................................................... 16
16. Intentionally omitted. ............................................................................................... 16
17. Performance by Tenant: ............................................................................................ 16
18. Default and Remedies: .............................................................................................. 16
19. Bankruptcy or Insolvency of Tenant: ....................................................................... 18
20. Force Majeure: .......................................................................................................... 19
21. Estoppel Certificate: ................................................................................................. 19
22. Attornment: ............................................................................................................... 19
23. Subordination: ........................................................................................................... 19
24. Condemnation: .......................................................................................................... 20
25. Fire or Other Casualty: ............................................................................................. 20
26. Miscellaneous Insurance Requirements .................................................................. 21
27. Notices: ..................................................................................................................... 21
28. Tender of Defense: .................................................................................................... 22
29. Intentionally Omitted. ............................................................................................... 23
30. Not a Joint Venture: .................................................................................................. 23
31. Successors and Assigns: ........................................................................................... 23
32. Waiver: ...................................................................................................................... 23

Table of Contents
(continued)

Page

| | | |
|---|---|---|
| 33. | Memorandum of Lease: | 23 |
| 34. | Holding Over: | 24 |
| 35. | Interpretation of Agreement: | 24 |
| 36. | Attorneys' Fees: | 24 |
| 37. | Broker's Commissions: | 24 |
| 38. | Confidentiality: | 24 |
| 39. | Intentionally Omitted. | 25 |
| 40. | Intentionally Omitted. | 25 |
| 41. | Specially Designated National List: | 25 |
| 42. | Tenant Contingencies: | 25 |
| 43. | Famsa Contingency. | 26 |
| 44. | Limitation of Liability. | 26 |
| 45. | Entire Agreement: | 27 |

## Exhibits

| | |
|---|---|
| A | Site Plan |
| B | Legal Description of Land |
| C | Tenant's Work |
| D | Commencement Memorandum |
| E | (Intentionally Omitted) |
| F | Restricted Uses |
| G | Tenant's Signage |
| G-2 | Pylon Signage |
| H | (Intentionally Omitted) |
| I | Landlord's Rules & Regulations |
| J | Subordination & Non-Disturbance Agreement |
| K | Memorandum of Lease |

4820-6569-1410.5

# LEASE AGREEMENT

This **LEASE AGREEMENT** (**"Lease"**), is made as of ___April 19___, 2013 (**"Effective Date"**), by and between Cole WF Chicago IL, LLC, a Delaware limited liability company (**"Landlord"**), and Art Van Furniture, Inc., a Michigan Corporation, doing business as Art Van Furniture (**"Tenant"**).

In consideration of the rents and covenants and subject to the terms herein set forth, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the parcel or parcels of real estate that consists of approximately 99,598 square feet, which is legally described on **Exhibit B** (**"Legal Description"** attached hereto and incorporated herein by reference) and is located at 2606 North Elston Avenue, Chicago, Illinois 60647, together with all rights, privileges and appurtenances associated therewith, and all buildings, fixtures and other improvements now or hereafter located on such real estate (whether or not affixed to such real estate), including, without limitation, the building consisting of approximately 48,000 square feet square feet of Floor Area (defined below) (the "**Building**") and the related parking area (collectively, the "**Premises**"). The Premises are depicted on **Exhibit A** attached hereto and incorporated herein by reference.

1.    **TERM:**

    **a)**    **Commencement.**  The term of this Lease ("**Term**") shall be a period of ten (10) Lease Years (defined below), plus six (6) months, commencing on the first to occur of the following events (hereinafter, the **"Lease Commencement Date"**):

        (i)    The date that Tenant commences business at the Premises; or

        (ii)    One hundred eighty (180) days after the date that Tenant accepts delivery of the Premises for Tenant's exclusive possession. Notwithstanding language in this section to the contrary, Tenant may elect to defer Tenant's acceptance of possession of the Premises, as described more fully in Section 3(a) of the Lease.

    **b)**    **Lease Year.**  The term **"Lease Year"** as used herein shall mean a period of twelve (12) consecutive full calendar months. The first (1st) Lease Year shall begin on the Lease Commencement Date if the Lease Commencement Date is the first (1st) day of a calendar month; otherwise, the first (1st) Lease Year shall commence upon the first (1st) day of the calendar month next following the Lease Commencement Date. Each succeeding Lease Year shall commence upon the anniversary date of the first (1st) Lease Year.

    **c)**    **Expiration.**  The Term shall end and this Lease expire on the last day of the sixth (6th) calendar month following the expiration of the tenth (10th) Lease Year, subject to Tenant's renewal option(s) as provided in subsection (d) below.

    **d)**    **Option to Renew.**  Provided Tenant is not in default beyond any applicable cure period at the time Tenant delivers a Renewal Notice (as defined below) and as of the beginning date of the applicable renewal period, Tenant shall have three (3) options to renew this Lease for a term of five (5) years for each option, upon all the terms, covenants, and conditions set forth herein (**"Renewal Term"**). The right to exercise such options shall be conditioned upon Tenant's giving Landlord written notice of its election to renew (the **"Renewal Notice"**) by the later of (i) the date that is 180 days before the expiration of the Term or any Renewal Term, as the case may be, or (ii) the date that is thirty (30) days

after Tenant's receipt of written notice from Landlord indicating that the time period within which Tenant may exercise its option has expired (an "**Option Reminder Notice**"). If the Term has expired before such notice from Landlord, and Tenant continues in possession of the Premises after such expiration, the Term will be extended automatically on a month-to-month basis until the earlier of (a) thirty (30) days after the date Landlord has given an Option Reminder Notice, or (b) Tenant surrenders the Premises to Landlord, or Tenant exercises its option, in which case the Renewal Term will be deemed to have commenced upon the expiration of the Term (or prior Renewal Term as the case may be). After the exercise of a renewal option, all references to the Term of this Lease shall be deemed to mean the Term as extended pursuant to this Section.

2. **RENT:**

Tenant covenants and agrees to pay Rent, without offset or deduction, except as expressly authorized elsewhere in this Lease, to the Landlord, its successors and assigns at the following rates and times:

a) **Minimum Monthly Rent.** Tenant shall pay the following Minimum Monthly Rent in advance on or before the first (1st) day of each calendar month during the Term and Renewal Term(s), if any:

| Lease Years (Months | Rent Per Sq. Ft. Per Year | Annual Minimum Rent | Monthly Minimum Rent |
|---|---|---|---|
| 1* (*months 1-6) | $0.00 | $0.00 | $0.00 |
| 1** – 5 (**months 7-60) | $ 9.00 | $432,000.00 | $36,000.00 |
| 6 yr. – 10 yr. 6 mo. (months 61-126) | $ 11.00 | $528,000.00 | $44,000.00 |
| **Renewal Terms** | | | |
| 10 yr. 7 mo. – 15 yr. 6 mo. (months 127-186) | $11.50 | $552,000.00 | $46,000.00 |
| 15 yr. 7 mo. – 20 yr. 6 mo. (months 187-246) | $12.00 | $576,000.00 | $48,000.00 |
| 20 yr. 7 mo. – 25 yr. 6 mo. (months 247-306) | $12.50 | $600,000.00 | $50,000.00 |

All Rent payable under this Lease shall be paid and delivered to the Landlord at the place designated by the Landlord for notices under this Lease, or such other place as it may subsequently designate in writing.

a) **Rent Commencement Date.** Tenant's obligation to pay Minimum Monthly Rent shall commence one hundred eighty (180) days after the Lease Commencement Date (hereinafter referred to as the "**Rent Commencement Date**"). Tenant's obligation to pay Real Property Taxes and all other expenses described in Section 6 of this Lease shall commence on the Lease Commencement Date.

**b)** **Commencement Memorandum.** Following delivery of the Premises, Landlord and Tenant shall execute a Commencement Memorandum confirming the Lease Commencement Date, Rent Commencement Date, Expiration Date and total square footage of the Floor Area of the Premises upon the commencement of this Lease in substantially the same form as **Exhibit D ("Commencement Memorandum,"** attached hereto and incorporated by reference) and the Rent and all amounts due hereunder shall be adjusted to reflect the total square footage of the Floor Area of the Premises. Landlord and Tenant hereby acknowledge and agree that all Rent payable by Tenant pursuant to this Lease is calculated on the assumption that the Floor Area of the Premises consists of the number of square feet of Floor Area listed in the introductory section of this Lease. Tenant shall have the right, within 45 days following the Delivery Date, to have the measurement of the Premises verified by a licensed architect, and in the event that Tenant discovers that the square footage of the Floor Area of the Premises differs from 48,000 by 1% or more, all Rent payable by Tenant pursuant to this Lease will be adjusted accordingly in the Commencement Date Memorandum.  If Tenant does not exercise such right within such 45-day period, then the square footage of 48,000 will be deemed accepted by Tenant.

**c)** **Floor Area, Proportionate Share Defined.** The term **"Floor Area"** as used in this Lease shall mean and include all areas for the exclusive use and occupancy by Tenant, measured from the exterior surfaces of the Building's exterior walls, and shall include, but not be limited to, restrooms, mezzanines, warehousing or storage areas, clerical or office areas and employees areas within the tenant's premises. Floor Area shall not include areas within the Premises for mechanical systems and similar uses that do not exclusively serve the Premises.

**d)** **Definition of Rent.** Any and all payments of Minimum Monthly Rent and Taxes, payable by or the responsibility of Tenant under this Lease shall constitute "Rent" for purposes of this Lease. Any Rent payable to Landlord by Tenant for any fractional month shall be prorated based on a three hundred sixty-five (365) day year.

3.    **DELIVERY AND POSSESSION:**

**a)** **Delivery of Premises; Early Access.** Landlord covenants that Landlord is able to deliver exclusive possession of the Premises to Tenant on or before April 30, 2013 (the **"Anticipated Delivery Date"**), which will be the date of the termination of the Famsa Lease (as hereinafter defined); however, Tenant shall not be required to accept delivery of possession of the Premises until Tenant is able to coordinate the opening of its store at the Premises with its opening of other stores in the Chicago area. Accordingly, Tenant may defer the acceptance of possession of the Premises for a period of up to ninety (90) days after the Effective Date, and Tenant shall provide Landlord with not less than five (5) business days' notice prior to the date that Tenant elects to accept possession of the Premises (the date that Tenant accepts possession of the Premises by written notice to the Landlord is referred to as the **"Delivery Date"**).  From and after the Delivery Date, Landlord acknowledges and agrees that Tenant shall have complete access to the Premises for delivery and installation of all equipment, fixtures, and other personal property upon delivery of possession to Tenant in accordance with this Lease.

Under the terms of the Famsa Termination Agreement (as hereinafter defined), Landlord and/or its agents have the immediate right to access the Premises from and after April 17, 2013.  Landlord hereby agrees that Tenant may access the Premises from and after the Effective Date as Landlord's agent, so long as (i) prior to any such entry, Tenant provides Landlord with evidence of the insurance required under Section 10(f) of this Lease, and (ii) Tenant agrees that the terms of Sections 10(m), 14 and 28 of this Lease will apply in connection with such entry.

**b)** **Tenant's Acceptance.** Subject to the provisions of Section 3(a) of this Lease, Tenant shall accept the Premises in its current as-is condition, with all faults, and ready for commencement of Tenant's Work to be performed pursuant to **Exhibit C** (Tenant's Work). Tenant's acceptance of the Premises shall be evidenced by the executed Commencement Memorandum (**Exhibit D**).

4.    **IMPROVEMENTS:**

**a)    Condition at Delivery.** Landlord shall deliver the Premises vacant, in "broom clean" condition, with the HVAC system in good working order.

**b)    Intentionally Omitted.**

**c)    Tenant's Work.** Following Tenant's acceptance of delivery of the Premises, Tenant shall commence Tenant's Work described in **Exhibit C** (Tenant's Work), and shall diligently pursue such installation and work to completion. Landlord shall be permitted to post Notices of Non-Responsibility in connection with completion of Tenant's Work by Tenant's contractor and subcontractors at the Premises.

5.    **TENANT'S USE:**

Tenant may engage in any lawful retail use of the Premises not in conflict with (i) any applicable zoning ordinances, or (ii) Declaration of Restrictive Covenant dated February 8, 2006, executed by Tenton LLC as declarant, recorded with the Cook County Recorder of Deeds on February 14, 2006 as Document No. 0604619069 (the "**Declaration**"), a copy of which has been provided to Tenant. Landlord represents that the Declaration includes all of the exclusive uses and prohibited uses that presently encumber the Land under recorded instruments. Upon the expiration or earlier termination of the Declaration, the Premises shall not be subject to the Declaration. Within thirty (30) days following the written request of Tenant, Landlord shall promptly advise Tenant whether the Declaration still encumbers the Premises.

**a)    Intentionally Omitted.**

**b)    24-Hour Operation.** Landlord agrees that Tenant may operate its retail business twenty-four (24) hours per day, seven (7) days per week, subject to the requirements of applicable law.

**c)    Tent Sales.** Tenant may use the sidewalks and the parking areas located in front of the Premises for sidewalk sales, tent sales, and similar outdoor sales events, subject to the requirements of applicable law, so long as Tenant, at its sole cost and expense, obtains any approvals required under applicable law.

**d)    Title Review.** Prior to delivery of the Premises, Landlord shall provide Tenant with its most recent report on title covering the Premises, together with copies of all underlying documents shown as exceptions thereon and a copy of Landlord's most recent survey of the Land. If any title matter that affects the Premises would prohibit or restrict Tenant's use of the Premises for a retail store for the sale of furniture, bedding, mattresses, electronics, or home furnishings, or otherwise materially affect Tenant's rights under this Lease (a "**Title Objection**"), then Tenant may terminate this Lease by written notice to Landlord, provided said notice is delivered within thirty (30) days of receipt of said title report, survey, and use provisions.

6.    **TAXES AND ADDITIONAL RENT:**

**a)    Personal Property.** Tenant shall pay before delinquency all taxes, assessments, license fees, and other charges that are levied and assessed on Tenant's personal property, alterations, and trade fixtures.

**b)    Real Property Taxes.** Tenant shall pay to Landlord, as Additional Rent, the Real Property Taxes, which shall be paid on an annual basis within thirty (30) days following Tenant's receipt of an invoice from Landlord. The term "**Real Property Taxes**" shall mean and include all taxes,

assessments (amortized over the longest period available to the Landlord and paid by Tenant in relation to the Lease Term) and other governmental charges, general and special, including, without limitation, assessments for public improvements or benefits, which shall, during the Term, be assessed, levied, and imposed by any governmental authority upon the Tax Parcel. Real Property Taxes shall not include any late fees or penalties, any assessments for infrastructure or improvement districts, any municipal, county, state or federal income or franchise taxes of Landlord or documentary transfer taxes or tax increases of any kind in connection with the transfer, sale or change in ownership of all or part of the Land. Tenant shall not be responsible to pay the Real Property Taxes until it has been furnished a tax bill or other suitable evidence of the tax bills and assessments, which will be forwarded to Tenant promptly following Landlord's receipt. The Real Property Taxes for 2011 payable in 2012 were $205,089.78.

c) **Direct Utilities.** Tenant will directly pay the respective provider for all utilities directly procured and consumed by Tenant at the Premises. Landlord will provide at its sole cost and expense separate meters for all utilities supplied to the Premises.

d) **Intentionally Omitted.**

e) **Intentionally Omitted.**

f) **Intentionally Omitted.**

g) **Intentionally Omitted.**

h) **Intentionally Omitted.**

7. **SIGNAGE/TRADE NAMES:**

a) **Tenant Signage.** Tenant shall have the right to install building signage on the walls of the exterior of the Building consisting of at least three thousand (3,000) square feet of signage, subject to Tenant's obtaining municipal approval for that signage and compliance with restrictions of record and applicable law. The signage may consist of individual channel letters as is typical for Tenant's typical store in the state where the Premises are located. Tenant shall also have the right to display Tenant's standard window signs, temporary promotional window signs, banners, and displays depicted in Tenant's Standard Corporate Identity Packet attached hereto as **Exhibit G ("Tenant's Signage,"** incorporated herein by reference) are hereby approved by Landlord, provided, however, that Tenant shall comply with restrictions of record and applicable law in connection with Tenant's Signage. Tenant shall have the right to operate its business and install signage under the trade name "Art Van Furniture", or any other successor trade name used in the operation of Tenant's other stores.

b) **Landlord Signage.** During the last three (3) months of the Term hereof or any extension or renewal thereof, Landlord shall have the right to post a "For Rent" sign not exceeding six (6) square feet in size, and to show the Premises at reasonable hours to prospective tenants, it being understood and agreed that this Lease and the tenancy hereby created shall cease and terminate at the end of the Term hereof without the necessity of any notice from either the Landlord or the Tenant to terminate the same.

c) **Pylon Sign.** In addition, Tenant shall have the right to install its sign face on the sign located on Elston Avenue, as depicted in **Exhibit G-2 ("Pylon Signage,"** attached hereto and incorporated by reference) in the location previously used by the former occupant of the Premises.

8. **PARKING:**

Tenant shall have the non-exclusive use of the parking on the Premises, which Landlord represents contains no less spaces than are required under applicable local ordinances.

9.     **USE OF ROOF:**

Notwithstanding any provision of this Lease to the contrary, Tenant shall have the right to, at its sole cost and expense, install and maintain a satellite dish or other transmission or reception device and related equipment, cabling, etc. (collectively, "**Satellite Equipment**") on the roof of the Building if necessary for its business operations provided that Tenant shall seek prior approval from Landlord which approval shall not be unreasonably withheld. The expenses associated with installation of the Satellite Equipment shall include, but not be limited to, all of the incremental costs related to repairing the roof of the Building in conjunction with such installation and any damage to the Building that results from the installation of the Satellite Equipment.  In the event Tenant exercises its right to install Satellite Equipment, Tenant shall use best efforts to assure that said installation is in compliance with all applicable codes, regulations, laws, and statutes. Tenant shall be solely responsible for obtaining all required permits and the maintenance of the Satellite Equipment.  Tenant agrees that it shall keep and maintain the Satellite Equipment in good condition and repair, at Tenant's sole cost and expense, in accordance with all applicable laws, rules, regulations, statutes, ordinances or other requirements of any kind or nature of any governmental or quasi-governmental authority and consistent with first-class shopping centers in the municipality in which the Premises is located.  Furthermore, Tenant agrees that it shall not damage nor shall it permit any damage to the roof in conjunction with the Satellite Equipment. Upon the expiration or sooner termination of this Lease, the Satellite Equipment shall be removed by Tenant at Tenant's sole cost and expense or, at Landlord's election, by Landlord at Tenant's sole cost and expense, and Tenant shall reimburse Landlord for the costs of repair of any damage to the roof of the Building caused by the removal of the Satellite Equipment.

10.    **TENANT'S COVENANTS:**

Tenant covenants and agrees as follows:

**a)**    **Prompt Payment.** Tenant will pay when due all Rent and other charges herein described and all utility bills attributable to the Premises as the same shall become due. Should Tenant fail to pay any Rent or other charges hereunder, then Landlord will have the rights and remedies set forth in Section 18(a) below.

**b)**    **Use of the Premises.** Tenant will not use or permit the Premises, or any part thereof, to be used for any disorderly or unlawful purpose or any purpose that conflicts with the Restricted Uses. Tenant shall not permit any objectionable or unpleasant odors to emanate from the Premises; nor place or permit any radio, television, loudspeaker or amplifier on the roof or outside the Premises or where the same can be seen or heard from outside the Building (subject to Tenant's rights with respect to the Satellite Equipment); nor place any antenna, awning or other projection on the exterior of the Premises; nor take any other action which would constitute a nuisance; nor do anything which would tend to injure the reputation of the Premises.  Tenant shall not cause or permit to be used any advertising materials or methods that are objectionable to Landlord, including, without limiting the generality of the foregoing, loudspeakers, music or other noise-making devices, vehicles, balloons or flying objects, mechanical or moving display devices, parked vehicles with signs or advertisements, unusually bright or flashing lights, and similar devices, the effect of which may be seen or heard outside the Building.

**c)**    **Assignments or Subletting.** Tenant will not transfer or assign this Lease nor let or sublet the whole or any part of the Premises without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. It will not be unreasonable for Landlord to withhold its consent to an assignment, sublet or other transfer in which, among other factors that may be examined by Landlord, any one or more of the following applies: (1) the tangible net worth of the

proposed transferee (or a proposed guarantor) is not equal to or greater than the tangible net worth of Tenant as of the Effective Date; provided, however, that the foregoing will not apply with respect to a proposed subletting; (2) the proposed transferee does not possess adequate business experience for a sufficient period of time for the operation of a business enterprise of the nature intended to be operated at the Premises, (3) the proposed transferee will not operate a store in the Premises that is consistent with the quality and character of the retail tenants in the area in which the Premises is located, (4) the proposed transferee would subject the Premises to a use which would involve increased insurance upon the Building, require any addition to (including improvements thereon) or modification of the Premises (excluding leasehold fixturing), or all or any portion of the Building in order to comply with building code or other governmental requirements, or the nature of such proposed or likely use of the Premises would involve any increased risk of the use, release or mishandling of any Hazardous Substances; (5) the proposed transfer would cause the Landlord to be in violation of any lease in the Building existing as of the effective date of such transfer, any recorded restriction applicable to the Premises as of the effective date of such transfer, or any applicable law; (6) the proposed transferee or an affiliate thereof is an occupant of the Building and/or has negotiated to lease space the Building from Landlord during the prior six (6) months; (7) the proposed transferee does not assume all obligations under the Lease or otherwise agree to be subject to the terms of the Lease; (8) Mortgagee will not approve the proposed transfer; or (9) an default by Tenant has occurred and is continuing, either at the time of the request for consent from Landlord or on the effective date of the proposed transfer, unless, as an express condition of such transfer, the proposed transferee (y) cures all monetary defaults on or before the effective date of such transfer and/or (z) agrees to cure all non-monetary defaults promptly following the effective date of such transfer. Consent by Landlord to any assignment or subletting shall not constitute a waiver of the necessity for such consent to any subsequent assignment or subletting. Notwithstanding any provision of this Lease to the contrary, Tenant may assign or sublease the Premises without Landlord's consent to a corporation controlling, controlled by, or under common control with, Tenant, to the surviving corporation in a merger or other corporate reorganization in which Tenant is involved, or to a purchaser of all or substantially all of the assets of Tenant (collectively **"Tenant Affiliate"**). A public offering, issuance, sale or or distribution of Tenant's stock (including distributions pursuant to an employee benefit program), in any amount, shall not constitute an assignment for the purposes of this Lease. Except for an assignment or sublease to a Tenant Affiliate in accordance with this Section, Tenant shall at all times remain liable for the payment of Rent herein and for compliance with all of its other obligations under this Lease. Notwithstanding any provision of this Lease to the contrary, Tenant may sublease without the Landlord's consent as follows: (i) up to twenty-five thousand (25,000) square feet of space in the Premises to a third party, so long as such third party operates store in the Premises that is consistent with the quality and character of the retail tenants in the area in which the Premises is located and (ii) space to licensees or concessionaires, provided such licensee or concessionaire appears as an integrated part of Tenant's store and otherwise complies with the provisions of this Lease.

      **d)**    **Repairs and Maintenance.** Tenant shall, at its sole cost and expense: (1) operate, maintain, repair, replace and keep the interior of the Premises, together with all interior electrical, plumbing, and any other utilities that exclusively serve the Premises up to the point of departure from the Premises, and all interior doors in good order and condition, and make necessary repairs thereto whether or not required by Tenant's particular use, including replacement of cracked or broken glass; (2) maintain the parking areas, access roads, curbs, landscaping and sidewalks on the Premises in good condition and repair, including, without limitation (y) sweeping and upkeep maintenance of the landscaping and (z) the keeping of sidewalks and parking area clear of debris, snow, and ices, subject to reasonable and ordinary wear and tear, free from actual or constructive waste; and (3) pay all maintenance and operating costs of the Premises in the ordinary course of business. Without limiting the coverage of the previous sentence, it is understood that Tenant's responsibilities therein include the repair and replacement of all lighting, heating and air conditioning ("**HVAC**"), plumbing and other electrical or mechanical installation, equipment and fixtures and also include all utility repairs in ducts, conduits, pipes and wiring, and any sewer stoppage located in, under and above the Premises. If any repairs required to be made by Tenant hereunder are not made within thirty (30) days after written notice

delivered to Tenant by Landlord, Landlord may at its option make such repairs without liability to Tenant for any loss or damage which may result to its stock or business by reason of such repairs; and Tenant shall pay to Landlord upon demand, as Additional Rent hereunder, the cost of such repairs plus interest at the Default Rate, such interest to accrue continuously from the date of payment by Landlord until repayment by Tenant. Tenant shall, at Tenant's sole cost, maintain a regular HVAC maintenance agreement with an HVAC contractor selected by Tenant and shall provide a copy of said maintenance agreement to Landlord; provided, however, that so long as Tenant's maintenance staff includes a certified contractor, Tenant's maintenance staff may complete maintenance of the HVAC system, in which event Tenant shall provide Landlord with a copy of any log kept by such maintenance staff no later than thirty (30) days following the expiration of each calendar quarter. Tenant agrees that the foregoing obligations include all routine repair, maintenance and servicing of the HVAC system. However, any replacements of the HVAC system (other than replacements of noncapital components, such as air filters) are the responsibility of Landlord. A "**replacement**" as that term is used in this Section 10(d) means that the compressor, condenser, motors, the chiller, duct work, wiring or heating/cooling coils must be removed and/or replaced by new equipment, in the reasonable judgment of Landlord's HVAC consultant. Tenant waives any right to (a) require Landlord to maintain repair or rebuild all or any part of the Premises, except as set expressly set forth in this Lease or (b) make repairs at the expense of Landlord pursuant to any applicable laws at any time in effect, except as expressly set forth in this Lease.

Landlord will cause a mold assessment to be completed of the Premises prior to the Delivery Date (the "**Initial Mold Assessment**"). Landlord will provide a copy of the Initial Mold Assessment to Tenant promptly following receipt therof. If the Initial Mold Assessment discloses that any mold is present in the Premises, then Landlord shall cause Mold Remediation (as hereinafter defined, including the undertaking of all recommendations contained in the Initial Mold Assessment) to be completed by April 30, 2013, at no cost to Tenant. Landlord shall retest the interior air quality following Mold Remediation, which testing shall demonstrate the completion of Mold Remediation, to the reasonable satisfaction of Tenant's architect. Tenant shall, during the Term of this Lease and any renewals thereof, (i) provide prompt written notification to Landlord of any adverse change to the Premises, including, without limitation, the presence of biocontaminants, such as mold; (ii) promptly undertake appropriate assessment, remedial and preventative actions sufficient to meet any guidelines or regulations adopted by applicable authoritative bodies or regulatory agencies in connection with a determination of any adverse change, and, in any event with respect to mold contamination, Tenant shall undertake (a) removal of the mold, (b) abatement of the underlying cause of the mold (including water intrusion), and (c) repair of any leaks and associated water damage at the Premises (collectively, "**Mold Remediation**"). Notwithstanding anything to the contrary in the foregoing, if the mold is caused by Landlord's failure to comply with its obligations set forth in Section 13 below, so long as Tenant has complied with its obligations under Section 13 to provide notice to Landlord, then Tenant will not be required to complete the foregoing remediation.

e)    **No Trash or Refuse.** Tenant will not permit trash or refuse to accumulate on the Premises, but will remove same and will keep such refuse in proper appropriate containers until so removed and it will keep the sidewalks and alleys contiguous to the Premises free of rubbish, refuse, empty boxes, and the like. Tenant shall arrange for regular, prompt, and reliable trash removal for all trash generated at, or associated with the Premises, at Tenant's sole expense, and at such times, in such manner, and in such locations, as Landlord may reasonably direct.

     **f)**    **Tenant Insurance.** Tenant shall maintain the following policies of insurance:

     (i)    All Risk Property Insurance covering all structures and improvements on the Land, in amounts sufficient to provide for replacement of said structures and improvements.

     (ii)    Tenant shall keep all improvements, fixtures and equipment located in the Premises, including all alterations and additions installed by either Landlord or Tenant, insured under the covered causes of loss – special form (also known as the "all risks" peril approach) including windstorm, water damage from drain or sewer backup, and flood coverage if property is located in a FEMA-designated flood zone. Any required flood insurance must meet the criteria set forth under the National Flood Insurance Reform Act of 1994, as amended and replaced from time to time and FEMA's then-current Mandatory Purchase of Flood Insurance Guidelines. The insurance shall be in an amount sufficient to prevent Landlord and Tenant from becoming co-insurers (i.e., being penalized) under the provisions of any applicable property insurance policies, but in any event in an amount not less than ninety percent (90%) of the replacement cost value of the aforementioned property. Tenant shall also obtain and maintain Damage to Premises Rented to You Liability insurance with limits of not less than one hundred thousand dollars ($100,000.00).

     (iii)    Commercial General Liability Insurance covering the Premises, with combined single limits of not less than two million dollars ($2,000,000.00) per occurrence for bodily injury or property damage, naming Landlord as an additional insured. Such insurance shall be endorsed to provide that the insurance shall be primary to and not contributory to any similar insurance carried by Landlord, and shall contain a severability of interest clause.

     (iv)    Workers' Compensation Insurance providing statutory benefits to employees of Tenant in the state where the Premises are located with a waiver of subrogation in favor of Landlord and Employer's Liability Insurance with limits of not less than one hundred thousand dollars ($100,000) per accident or disease and five hundred thousand dollars ($500,000) aggregate by disease

     (v)    Excess liability insurance policy with limits of liability not less than two million dollars ($2,000,000.00).

     (vi)    Commercial Automobile Liability:   One million dollars ($1,000,000.00) Combined Single Limit per accident for Owned, Non-Owned; and Hired autos.

     Tenant further shall not do or suffer to be done, or keep or suffer to be kept, anything, in the Premises that will contravene Landlord's policies insuring against loss or damage by fire or other hazards. Tenant shall annually furnish Landlord with a certificate of all insurance required in this provision of the Lease, showing same to be in full force and effect, and naming Landlord as an additional insured as to liability coverage. If Tenant shall not comply with its covenants to maintain insurance as provided herein, Landlord may, at its option, cause such insurance to be issued and, in such event, Tenant agrees to pay the premiums for such insurance promptly upon Landlord's demand therefor.

     In addition to the requirements of Section 26(e) below, all policies of insurance to be procured by Tenant or pursuant to the terms of this subsection or **Exhibit "I"** shall be issued on forms and include endorsements that are acceptable to Landlord.

     In the event Tenant shall fail, refuse, or neglect to procure and/or maintain any insurance required in this Lease or by law or governmental regulations, Tenant shall be deemed in default under this Lease and should Tenant fail to cure such default within ten (10) days after written notice from Landlord, then Landlord may, but shall not be required to, at any time (without the granting of notice)

procure such insurance and pay the premiums therefore, in which event Tenant shall pay all sums so paid by Landlord, together with interest thereon as provided in this Lease, and any and all other incidental costs and expenses incurred by Landlord in connection therewith within five (5) days after demand by Landlord or its designated representative or legal counsel.

Failure of Landlord to take any action pursuant to any requirement for the maintenance or procurement of insurance, including but not limited to a failure to establish the existence of such insurance coverage at any time, or to inform Tenant of non-compliance with this subsection, shall not be considered as a waiver of any rights and imposes no obligation or liability on Landlord.

All insurance provided by Tenant as required under subparts (i) of this subsection shall be maintained in favor of Tenant and Landlord, as their respective interests may appear. The policy or policies shall also name any mortgagees and loss payees of either party, if applicable.

All liability insurance provided by Tenant as required under subpart (ii) of this subsection shall name Landlord, Landlord's lender (if any), Landlord's management agent and others designated by Landlord as additional insureds.

Tenant shall only maintain such deductibles applicable to property and liability insurance coverages as are approved by Landlord, in Landlord's sole discretion.  Landlord hereby approves the following deductibles: (i) $100,000 for Tenant's property insurance and (ii) $25,000 for Tenant's liability insurance. Tenant shall have sole responsibility for the payment of all deductibles and all policies of insurance that include deductibles shall clearly state that such deductibles apply only to Tenant and not to Landlord. Tenant shall not be permitted to self-insure any of the coverages required to be obtained by Tenant under this Lease.

Copies of certificates of insurance shall be delivered to Landlord within prior to the Delivery Date and thereafter within thirty (30) days prior to the expiration of the term of each policy. A separate evidence of insurance must be used for property coverages required under subparts (a) and (b) and a certificate for liability insurance coverages under subpart (c). The standard Acord "Evidence of Insurance" Certificate, or standard Acord "Property Insurance" Evidence 28 with an edition date of January 1995 or later must be used to verify the insurance coverages required for property coverage as required in subparts (i) of this subsection, including applicable deductibles. Standard Acord Certificate 25 or its equivalent must be used to indicate the coverages applicable for the liability coverages as required under subpart (iii) of this subsection. This certificate of insurance shall also (1) confirm that the certificate holder (and others as required) are additional insureds, (2) that the required additional insured endorsement when issued, be attached to this certificate of insurance, and (3) show the amount of any deductible that may apply. All policies of insurance delivered to Landlord must contain a provision that the company writing the policy will give Landlord thirty (30) days notice in writing in advance of any cancellation or lapse or the effective date of any reduction in the amounts of insurance.

**g)      Compliance with Laws.** Tenant will, at its own expense, promptly comply with all lawful statutes, ordinances, rules, orders, regulations, and requirements of the federal, state, county or municipal governments now in force or hereafter enacted pertaining to (i) the conduct of its business in the Premises and (ii) interior of the Premises, including, without limitation, constructing and maintaining its improvements thereto in compliance with the Americans With Disabilities Act (**"ADA"**).

h)   **Inspections by Landlord.** Tenant will permit Landlord, or its agent, upon forty-eight (48) hour prior written notice and accompanied by a store manager, to enter the Premises at any reasonable time during the Term of this Lease for the purpose of inspecting the Premises, Tenant's improvements and maintenance thereof, provided that in the case of an emergency situation (as defined above) such notice shall not be required.

i)   **No Continuous Operation.** Notwithstanding anything contained or set forth in this Lease to the contrary, nothing set forth in this Lease shall be construed, in any manner whatsoever, as an express or implied covenant of continuous operation on the part of Tenant, and Landlord acknowledges that there is no covenant of continuous operation with respect to the Premises, arising hereunder or otherwise, express or implied, on the part of Tenant. Notwithstanding the foregoing, Tenant agrees to open fully stocked, fixtured and staffed store in the Premises conducting business in the same manner as other stores operated by Tenant under the "Art Van Furniture" for one (1) business day. If Tenant elects, in Tenant's sole discretion, to cease business operations at the Premises, such cessation of business shall not be deemed a breach or default of this Lease, so long as Tenant provides no less than thirty (30) days prior written notice to Landlord of its intention to cease operation of business from the Premises (the "**Go Dark Notice**"), and Tenant shall remain liable for the performance of its obligations hereunder. However, in the event Tenant ceases operations at the Premises for more than one hundred twenty (120) consecutive days for any reason other than repairs, remodeling or force majeure, Landlord may elect to terminate this Lease and recover possession of the Premises by giving Tenant thirty (30) days prior written notice of such election to terminate (the "**Recapture Notice**"). In such event, the Lease shall terminate on the date specified in the Recapture Notice, which date shall not be earlier than thirty (30) days nor later than ninety (90) days after Tenant's receipt of the Recapture Notice. In connection with the foregoing, following Landlord's receipt of a Go Dark Notice, (i) Landlord and/or its agents shall have the immediate right, but not the obligation, to enter upon the Premises at any time for the purpose of showing the Premises to prospective tenants, and (ii) Landlord and Tenant shall have the right to engage in marketing activities regarding the Premises, which may include, without limitation, the right (but not the obligation) to engage an agent or broker to market the Premises. Tenant agrees that no exercise by Landlord of any rights contained in this Lease shall entitle Tenant to any damage for any injury or inconvenience occasioned thereby nor to any abatement of rent due under the Lease. Nothing set forth herein constitutes any representation or warranty by Landlord regarding actions that may be taken in connection with Landlord's attempt to relet the Premises, including, without limitation, any representations or warranties regarding an ability to relet the Premises, the amount of time that it may take to relet the Premises, or the types of marketing activities that Landlord will engage in regarding the Premises.

j)   **Exterior and Structural Changes.** Tenant will not alter the exterior of the Premises and will not make any changes of a structural nature or that impact the roof without first obtaining the Landlord's written approval, such approval may be withheld in Landlord's sole discretion. Tenant agrees that, except for the equipment installed pursuant to Section 9, any permanent exterior or structural improvements made by it shall immediately become the property of the Landlord and shall remain upon the Premises at the termination of this Lease in the absence of an agreement to the contrary.

k)   **Compliance with Landlord's Rules and Regulations.** Tenant shall comply with all rules and regulations as may be established by Landlord from time to time pertaining to the appearance and operation of the Premises, provided such rules and regulations do not conflict with the terms of this Lease. Landlord may amend such rules and regulations from time to time, provided that such other rules and regulations will not materially increase Tenant's obligations or decrease Tenant's rights under this Lease, and may be adopted only after thirty (30) days' prior written notice to Tenant. In the event of any inconsistency or conflict between such rules and regulations and the Lease, the terms of the Lease shall control. Tenant shall conduct its business in the Premises in all respects in a dignified manner and in accordance with high standards of retail store operation. Subject to the foregoing, Tenant agrees to abide

by the Rules and Regulations attached hereto as **Exhibit I ("Landlord's Rules & Regulations,"** incorporated herein by reference).

**l)      Interior Alterations**. Tenant shall not make any alterations, additions or improvements in excess of one hundred thousand dollars ($100,000.00) to the Premises without the prior written consent of Landlord, except for the installation of unattached, movable trade fixtures which may be installed without drilling, cutting or otherwise defacing the Premises. Notwithstanding the foregoing, Tenant shall not make any alterations, additions or improvements to any structural component of the Premises without the prior written consent of Landlord, which consent Landlord may withhold in its sole discretion. All alterations, additions, improvements and fixtures (other than Tenant's unattached, readily movable furniture and office equipment) which may be made or installed by either party upon the Premises shall remain upon and be surrendered with the Premises and become the property of Landlord at the termination of this Lease. All contractors and subcontractors of Tenant shall maintain the insurance as required in **Exhibit I**, and shall provide Landlord with a certificate of such insurance upon request. Landlord shall have the right to bar any contractor or subcontractor from the Premises who fails to maintain such insurance or to provide a certificate of such insurance upon request.

All construction work done by Tenant within the Premises shall be performed in a good and workmanlike manner, in compliance with all governmental requirements, and in such manner as to cause a minimum of interference with other construction in progress and in accordance with the requirements of applicable law and any restrictions of record. In connection with its completion of any alterations, additions or improvements to the Premises, Tenant shall obtain lien waivers for all contractors, subcontractors and suppliers, and Tenant shall provide Landlord with copies of such lien waivers and with any other evidence reasonably required by and satisfactory to Landlord that such work has been paid for.

**m)      No Liens.** The interest of Landlord in the Premises and the Land shall not be subject to liens for improvements made by Tenant. Landlord shall have the right to record this Lease, or a short thereof, or any other notice permitted under applicable law in the appropriate governmental office to assure that the interest of Landlord shall not be subject to any such lien. Tenant shall not permit any mechanics' or materialmen's liens to stand against the Premises or the Land for any labor or material furnished Tenant in connection with work of any character performed on the Premises by or at the direction of Tenant. Tenant shall cause any contractor, subcontractor or materialman to place in all contracts and subcontracts for Tenant's improvements the following:  that notwithstanding anything in said contracts or subcontracts to the contrary, Tenant's contractors, subcontractors, suppliers and materialmen (hereinafter collectively referred to as **"Contractors"**), will perform the work and/or furnish the required materials at the sole cost of Tenant and that no lien for labor, services or materials will be filed or claimed by the Contractors against Landlord's interest in the Premises or the property of which the Premises are a part. If, because of any act or omission of Tenant, any mechanic's lien or other lien, charge or order for the payment of money shall be filed against Landlord, the Building, the Premises or any portion thereof, Tenant shall, at its own cost and expense, cause the same to be discharged of record or bonded within 10 days after notice from Landlord to Tenant of the filing thereof, and Tenant shall indemnify and save harmless Landlord against and from all costs, liabilities, suits, penalties, claims and demands, including reasonable legal fees, resulting therefrom. Upon Tenant's failure to cause any such liens to be discharged of record or bonded, Landlord shall have the right, in addition to all other rights and remedies provided under this Lease or by law, to cause such liens to be satisfied, removed or discharged by whatever means Landlord chooses at the entire cost and expense of Tenant, such cost and expense to include legal fees and disbursements, and Tenant shall reimburse Landlord for such costs and expenses within 10 days of demand thereof.

## 11.   SURRENDER OF PREMISES, REMOVAL OF TENANT'S PROPERTY:

At expiration or termination of this Lease, Tenant agrees to: (a) surrender possession of the Premises to Landlord; (b) remove at Tenant's expense, Tenant's trade fixtures; and (c) otherwise return the Premises to Landlord in good condition, ordinary wear and tear, damage by casualty, condemnation, act of god and/or Landlord's failure to make repairs excepted. In no event shall Landlord's notice require Tenant to remove any improvements and/or alterations attached to the realty. Notwithstanding the foregoing, Landlord agrees that although affixed to the Premises, Tenant's trade fixtures, which include without limitation all machinery and equipment used in the operation of Tenant's business, telephone alarm systems, attached and unattached showcases and shelving and display units, which are placed on the Premises by Tenant from time to time during the Term of this Lease shall be the property of Tenant and at the expiration of termination of this Lease may be removed from the Premises by Tenant. Tenant agrees to be responsible and perform repairs occasioned by the removal of Tenant's trade fixtures and equipment from the Premises in accordance with the provisions of this Section.

## 12.   LANDLORD COVENANTS:

Landlord represents to and covenants with Tenant that:

**a)**      Landlord has obtained or will obtain all consents or approvals that Landlord may require from other tenants or mortgagees of the property of which the Premises are a part (**"Property"**) to permit Landlord to enter into this Lease;

**b)**      Landlord shall not enter into any covenants, easements or other agreements after the date of this Lease that prohibit or restrict Tenant's proposed use of the Premises or otherwise change the terms of this Lease without Tenant prior written consent, which may be withheld in Tenant's sole discretion; and

**c)**      Upon payment by Tenant of the Rent herein provided and upon the observance and performance of all the covenants, terms and conditions of this Lease on Tenant's part to be observed and performed, Tenant shall peaceably and quietly hold and enjoy the Premises for the Term, without hindrance or interruption by Landlord or any other person or persons, either lawfully or equitably claiming by, through or under Landlord and Landlord shall defend Tenant's rights to such use and occupancy, subject only to the other terms and conditions of this Lease.;

**d)**      **Intentionally Omitted**.

**e)**      **Intentionally Omitted**.

## 13.   LANDLORD'S MAINTENANCE AND REPAIRS:

Landlord covenants that it shall, at its sole cost and expense: (1) keep the foundation, the exterior walls (except plate glass windows, doors, door closure devices and other exterior openings; window and door frames, molding, locks and hardware; special store fronts; lighting, heating, air conditioning, plumbing and other electrical or mechanical installation, equipment and fixtures; signs, placards, decorations or advertising media of any type; and interior painting or other treatment of interior walls), the roof, foundation, structure, concrete slab, building systems, utilities up to the point of connection to the Building, and foundation; and (2) complete alterations, repairs, replacements or improvements to the Premises that are necessary (as determined by Landlord) and are considered capital improvements or replacements under generally accepted accounting principles. Landlord, however, shall not be required to make any non-insured repairs occasioned by the act or negligence of Tenant, its

agents, employees, subtenants, licensees and concessionaires; and the provisions of the previous sentence are expressly recognized to be subject to the provisions of Sections 24 and 25 of this Lease. In addition, Landlord acknowledges and agrees that it may have obligations with respect to the HVAC system pursuant to Section 10(d) above. Landlord covenants and agrees that, within thirty (30) days following written notice from Tenant, Landlord will make, or for those items that reasonably will take longer, commence and diligently pursue to completion, all necessary repairs and/or replacements to the structural elements and exterior surfaces of the Premises including, but not limited to, the roof of the Premises, exterior paint, and all necessary structural repairs to the walls, concrete slab, footings, and foundations of the Premises. Furthermore, but subject to the obligations of Tenant under Section 10(d) above, Landlord covenants and agrees to make, or for those items that reasonably will take longer, commence and diligently pursue to completion all necessary repairs and/or replacements within thirty (30) days following written notice from Tenant to the electrical and plumbing exterior to the Premises, gutters, sprinkler system (if any), parking areas, access roads, curbs, and sidewalks that make up the common areas (**"Common Areas"**), any subterranean utility infrastructure servicing the Premises and all other reasonable maintenance to the Common Areas of the Land, provided such repairs are not made necessary through negligence or willful misconduct of Tenant, in which case Tenant shall reimburse Landlord for the costs incurred in connection with any such repairs within thirty (30) days following receipt of a bill therefor accompanied by invoices or other documentation to substantiate the amount paid on the account of Tenant. Landlord shall not commence any repairs, without first obtaining Tenant's written consent, which consent may be withheld if any such changes, alterations or additions materially and adversely affect Tenant's business, otherwise such consent shall not be unreasonably withheld or delayed. Except in the case of an emergency situation (which means a situation where life or significant property is in immediate danger), if the exercise by Landlord of its rights under this Section materially and adversely affects Tenant's access to the Premises for more than twenty four (24) hours, Rent will abate until completion of the activities in question. In the case of an emergency situation, Landlord shall use its commercially reasonable efforts to remedy the problem within seventy-two (72) hours. In the event such emergency situation is caused by the gross negligence or willful misconduct of Landlord or its agents or employees or is not remedied within seventy-two (72) hours, provided that Landlord shall have additional time, if it has commenced the repairs within such period and is diligently pursuing the repairs, Tenant shall receive a Rent abatement as outlined above.

If Landlord fails to make repairs required under this section within thirty (30) days after receipt by Landlord of such written notice (or if more than thirty (30) days shall be required because of the nature of the default, if Landlord shall fail to commence to cure such default and thereafter prosecute the curing of such default to completion with due diligence), Tenant may, at its option, upon an additional five (5) days' prior written notice to Landlord, which second notice must state in bold-faced, all capital letters: **"FAILURE TO COMMENCE A CURE WITHIN 5 DAYS FOLLOWING RECEIPT OF THIS NOTICE WILL RESULT IN THE EXERCISE OF SELF-HELP RIGHTS,"** without waiving any claim for damages for breach of agreement, at any time thereafter, cure such default for the account of Landlord, and any amount paid or any contractual liability incurred by Tenant in so doing shall be deemed paid or incurred for the account of Landlord, and Landlord agrees to reimburse Tenant therefor and Tenant shall provide documentation to substantiate the amount paid on the account of Landlord. Notwithstanding the foregoing, in the event of an emergency situation (which shall mean a situation where life or significant property is in immediate danger), Tenant shall immediately notify Landlord of any necessary repairs (provided such repairs are included in this Section as being the responsibility of Landlord). If Landlord does not make such repairs within 24 hours after Landlord's receipt of Tenant's notice (provided that Landlord shall have additional time, if it has commenced the repairs within 24 hours and is diligently pursuing the repairs), and if such need for repairs reasonably prevents Tenant from operating at the Premises, then Tenant may perform such repairs on Landlord's behalf. Landlord shall reimburse Tenant for the costs incurred in connection with any cure permitted

hereunder within thirty (30) days following receipt of a bill therefor accompanied by invoices or other documentation to substantiate the amount paid on the account of Landlord.  Landlord shall reimburse Tenant for the costs incurred in connection with such cure within thirty (30) days following receipt of a bill therefor accompanied by invoices or other documentation to substantiate the amount paid on the account of Landlord.  Under no circumstances shall Landlord be responsible to Tenant for any and all special, consequential, indirect, speculative or punitive damages sustained by Tenant as a result of Landlord's breach.  If Landlord shall fail to reimburse Tenant within such thirty (30)-day period, upon an additional five (5) days' prior written notice to Landlord, which second notice must state in bold-faced, all capital letters:  **"FAILURE TO PAY AMOUNTS DUE WITHIN 5 DAYS FOLLOWING RECEIPT OF THIS NOTICE WILL RESULT IN THE EXERCISE OF OFFSET RIGHTS,"** Tenant shall have the right to deduct such amount, plus interest at the Default Rate, from the next payment of Minimum Monthly Rent or such succeeding payments of Minimum Monthly Rent due until Tenant recovers the entire reimbursement amount; provided, however, Tenant may not deduct more than fifty percent (50%) from any particular installment of Minimum Monthly Rent or other sums due.

14.   **HAZARDOUS MATERIALS:**

Neither Tenant, its successors or assigns, nor any assignee, sublessee or other person acting at the direction of Tenant, or their respective agents, contractors, employees, licensees, or invitees (each, a **"Tenant Party"**), shall: (i) manufacture, treat, use, store or dispose of any Hazardous Materials (as hereinafter defined) on the Premises or any part thereof in violation of any applicable Environmental Laws; or (ii) permit the release of a Hazardous Material on or from the Premises or any part thereof. Notwithstanding the foregoing, Landlord hereby consents to the use by Tenant of cleaning supplies, and small quantities of paints, stains and solvents for furniture touch up, in quantities typical of a retail furniture store, so long as said materials are used, kept, stored, and disposed of in a manner that complies with all laws relating to the use, storage, and disposal of same.

Tenant shall perform any monitoring, investigation, clean-up, removal and other remedial work, including, without limitation, payment of all penalties and costs related to such work required as a result of any release or discharge of Hazardous Materials affecting the Premises or any violation of Environmental Laws by any Tenant Party.  Landlord shall have the right to intervene in any governmental action or proceeding involving any Remedial Work, and to approve performance of the work, in order to protect Landlord's interests.  Firther, in the event of a release of Hazardous Material by any Tenant Party, Tenant shall indemnify, protect, defend and hold Landlord harmless from and against any and all costs, fees, damages, losses, expenses and/or liabilities of any kind or nature in any way related to the release, removal, transportation and/or disposal of such Hazardous Materials. If any action or proceeding be brought against Landlord by reason of such claim, Tenant upon notice from Landlord shall defend the same at Tenant's expense by counsel reasonably satisfactory to Landlord. In the event Landlord incurs any costs, fees, damages, losses, expenses, and/or liabilities in connection with a release of Hazardous Materials by Tenant or any of Tenant's agents, employees, contractors, subtenants or licensees, Tenant shall pay such costs, fees, and/or expenses within ten (10) days of written request from Landlord. Landlord shall not incur any fees or costs before notifying Tenant that it is likely to incur such fees and costs unless Tenant takes corrective action.

Landlord represents and warrants that as of the date of this Lease, to Landlord's Knowledge (as hereinafter defined), based solely on the Phase I Environmental Site Assessment issued on August 9, 2007 by LandAmerica Assessment Corporation for Project Number 07-52170, including the "No Further

Remediation" letter dated October 11, 2007 issued by the Illinois Environmental Protection Agency referenced therein, (i) the Premises are free of any Hazardous Materials and (ii) the Premises are in compliance with all federal, state and/or local statutes, regulations, rules, and/or ordinances, and with all orders, decrees or judgments of governmental authorities or courts having jurisdiction, relating to the use, generation, manufacture, collection, treatment, disposal, storage, control, removal or clean up of Hazardous Materials (**"Environmental Laws"**). Landlord shall promptly remediate (or cause to be remediated), at no cost or expense to Tenant, all or any portion of the Premises to the extent of any violation of Hazardous Materials Law caused by Landlord (or Landlord's employees, agents or contractors) or any other third parties.

The term **"Hazardous Material"** shall mean any waste, substance or material that is: (i) identified in Section 101(14) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as the same may be amended from time to time (herein called **"CERCLA"**); or (ii) determined to be hazardous, toxic, a pollutant or contaminant, under federal, state or local law, including, but not limited to, petroleum and petroleum products. The term **"release"** shall have the meaning given to such term in Section 101(22) of CERCLA.

## 15.  ADA COMPLIANCE:

Notwithstanding any provision of this Lease to the contrary, all exterior areas of the Premises, including without limitation, customer parking areas, walkways, ramps, exterior of the Building and ingress to and egress from the Building shall be maintained by Landlord at all times during the Term of this Lease and any renewal(s) in strict compliance with applicable requirements of the Americans With Disabilities Act (**"ADA"**). To the extent that Tenant undertakes any changes or improvements to the interior of the Premises, Tenant shall complete those improvements in accordance with applicable ADA requirements. Tenant shall indemnify, protect, defend, and hold Landlord harmless from any and all costs, fees, damages, losses, expenses and/or liabilities of any kind or nature in any way related to Tenant's obligations under this Section.

## 16.  INTENTIONALLY OMITTED.

## 17.  PERFORMANCE BY TENANT:

Tenant covenants and agrees that it will perform all agreements herein expressed on its part to be performed, and that it will promptly upon receipt of written notice specifying action desired by Landlord in connection with any such covenant comply reasonably or commence to comply with such notice. Furthermore, if Tenant does not comply with the notice within thirty (30) days after receipt of the notice, in addition to the remedies available under Section 18 below, Landlord may, at its option, enter upon the Premises, and do the things specified in such notice, and Landlord shall have no liability to Tenant in any loss or damage resulting in any way from such action by Landlord, except as caused by Landlord's gross negligence and/or willful misconduct or that of its agents, employees, contractors, invitees or licensees. Tenant hereby agrees to pay promptly upon demand any expense incurred by Landlord in taking such action.

## 18.  DEFAULT AND REMEDIES:

**a)**    **Tenant Default.** If the Rent, or any other charge agreed to be paid and all other sums of money that under the provisions hereof may be due Landlord, is not paid when due, Tenant shall be in

default; provided, however that Landlord agrees that Landlord shall, prior to exercising any remedies for nonpayment set forth herein, provide Tenant with written notice of nonpayment and Tenant shall not be in default if it cures such nonpayment within ten (10) days of receipt of such notice. Landlord's obligation to give such notice shall be a two-time obligation during any twelve (12)-month period and, once such notices are given by Landlord, Landlord shall have no further obligation to give written notice with respect to such default or any subsequent monetary defaults during such twelve (12)-month period. In addition, should Tenant fail to pay any Rent or other charges hereunder on or before the due date thereof, such unpaid amount shall accrue a late charge in the amount of the greater of (i) Five Hundred Dollars ($500.00), or (ii) two percent (2%) of the unpaid amount, and shall in addition thereto bear interest at the rate of ten percent (10%) per annum (the "**Default Rate**"). Notwithstanding the foregoing, Tenant shall not be required to pay a late charge or interest at the Default Rate if Landlord is required to provide notice under this subsection and Tenant pays the amounts due and owing within the applicable cure period. If Tenant shall violate any covenant contained herein, other than the covenant to pay Rent or other sums of money due Landlord, and shall fail to comply with such covenant within thirty (30) days after being given written notice of such violation by Landlord (or, if the default cannot be cured within that thirty (30)-day period, if Tenant does not commence the cure within the thirty (30)-day period and proceed with reasonable diligence to complete the cure), Tenant shall be in default. In the event of Tenant's default, Landlord shall have the following remedies:

1) Landlord may continue the lease in full force and effect for so long as Landlord does not terminate the Tenant's right to possession and Landlord may enforce all of Landlord's rights and remedies under this Lease, including the right to recover Rent and Additional Rent as it becomes due, provided that Tenant may assign or sublet its interest in the Premises, subject to the reasonable consent of Landlord, during such time that Tenant continues to pay Rent and Additional Rent; or

2) Landlord may terminate Tenant's right to possession, in which case this Lease shall terminate and Tenant shall immediately surrender the Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy which Landlord may have for possession or arrearage in Rent (including any interest which may have accrued pursuant to the terms of this Lease), enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying the Premises or any part thereof, by force if necessary, without being liable for prosecution or any claim for damages therefor. In the event of re-entry, Landlord shall use commercially reasonable efforts to relet the Premises. In connection with Landlord's efforts to relet the Premises, Tenant agrees that Landlord has no obligation to:  (i) relet the Premises prior to leasing any other space within the Building; (ii) relet the Premises (A) at a rental rate or otherwise on terms below market, as then determined by Landlord in its sole, but reasonable discretion;  (B) to any entity not satisfying Landlord's then standard financial credit risk criteria; (C) for a use (1) that would violate applicable law or any Restrictions; (2) that would impose a greater than the customary burden upon the parking in the Premises and adjacent areas, HVAC or other facilities for retail tenants; and/or (3) that would involve the non-customary use of Hazardous Materials; and (D) for a period of time extending beyond the end of the Term of this Lease; (iii) divide the Premises, install new demising walls or otherwise reconfigure the Premises to make same more marketable; (iv) pay, and/or grant any allowance for, tenant finish or other costs associated with any new lease, even though same may be amortized over the applicable lease term, unless Tenant unconditionally delivers Landlord, in good and sufficient funds, the full amount thereof in advance; and/or (v) relet the Premises, if to do so, Landlord would be required to make ADA-type modifications or otherwise install or replace any sprinkler, security, safety, HVAC or other operating systems.  Additionally, Landlord shall not be required to unreasonably accept any tenant offered by Tenant or to observe any instructions given by Tenant relative to such reletting.  In the event of a reletting, shall apply the Rent from the reletting first, to the payment of Landlord's expenses incurred

and paid because of Tenant's default, second, to the expenses of reletting payable under subsection 3) below, and third, to the payment of Rent and all those sums due from Tenant, with Tenant remaining liable for any deficiency. Any deficiencies shall be payable by Tenant monthly on the date provided for the payment of Minimum Monthly Rent. In no event is Landlord entitled to accelerate Rent.

3) It is further agreed that, in addition to payments required pursuant to subsections 1) and 2) above, Tenant shall compensate Landlord for all expenses incurred by Landlord in repossession (including among other expenses, any increase in insurance premiums caused by the vacancy of the Premises), all expenses incurred by Landlord in reletting (including among other expenses, repairs, remodeling, replacements, advertisements and brokerage fees), all concessions granted to a new tenant upon reletting (including among other concessions, renewal options), all losses incurred by Landlord as a direct or indirect result of Tenant's default (including among other losses any adverse reaction by Landlord's lender or by other tenants or potential tenants of the Building) and a reasonable allowance for Landlord's administrative efforts, salaries and overhead attributable to Tenant's default and Landlord's pursuing the rights and remedies provided herein and under applicable law.

**b)    Landlord Default.** If Landlord shall violate any covenant contained in this Lease, and shall fail to comply with such covenants within thirty (30) days after being given written notice of the violation by Tenant (or if the default cannot be cured within that thirty (30)-day period, if Landlord does not commence the cure within the thirty (30)-day period and proceed with reasonable diligence to complete the cure), Landlord shall be in default. In the event of Landlord's default, Tenant shall have the following remedies: (i) Tenant may, at its option, upon an additional five (5) days' prior written notice to Landlord, which second notice must state in bold-faced, all capital letters: **"FAILURE TO COMMENCE A CURE WITHIN 5 DAYS FOLLOWING RECEIPT OF THIS NOTICE WILL RESULT IN THE EXERCISE OF SELF-HELP RIGHTS,"** without waiving any claim for damages for breach of agreement, at any time thereafter, cure such default for the account of Landlord, and any amount paid or any contractual liability incurred by Tenant in so doing shall be deemed paid or incurred for the account of Landlord, and Landlord agrees to reimburse Tenant therefor and Tenant shall provide documentation to substantiate the amount paid on the account of Landlord, or (ii) Landlord shall be responsible to Tenant for any and all actual damages sustained by Tenant as a result of Landlord's breach but not special, consequential, indirect, speculative or punitive damages. If Landlord fails to pay any sum to Tenant when due, and that failure continues for ten (10) days after receipt of notice from Tenant, upon an additional five (5) days' prior written notice to Landlord, which second notice must state in bold-faced, all capital letters: **"FAILURE TO PAY AMOUNTS DUE WITHIN 5 DAYS FOLLOWING RECEIPT OF THIS NOTICE WILL RESULT IN THE EXERCISE OF OFFSET RIGHTS,"** Tenant shall have the right to deduct such amount from the next payment of Minimum Monthly Rent or such succeeding payments of Minimum Monthly Rent due until Tenant recovers the entire a reimbursement amount; provided, however, Tenant may not deduct more than fifty percent (50%) from any particular installment of Minimum Monthly Rent or other sums due.

**19.    BANKRUPTCY OR INSOLVENCY OF TENANT:**

If any sale of Tenant's interest in the Premises created by this Lease shall be made under execution or similar legal process, or if Tenant shall be adjudicated a bankrupt or insolvent, and such adjudication is not vacated within sixty (60) days or if a corporate reorganization of Tenant or an arrangement with its creditors shall be approved by a court under the United States Bankruptcy Code, or if Tenant shall make an assignment for the benefit of creditors, or if in any other manner Tenant's interest under this Lease shall pass to another by operation of law, then, in any of such events, Landlord may at its option re-enter the Premises and declare this Lease and the tenancy hereby created terminated.

20.    **FORCE MAJEURE:**

Anything in this Lease to the contrary notwithstanding, providing such cause is not due to the willful act or neglect of the party charged, that party shall not be deemed in default with respect to the performance of any of the terms, covenants, and conditions of this Lease other than the payment of Rent if same be due to any strike, lockout, civil commotion, war-like operation, invasion, rebellion, hostilities, military or usurped power, sabotage, governmental regulations or controls, through act of god or other cause beyond the control of the said party. If, however, Tenant is unable to carry on its business due to such occurrence of force majeure, Tenant's obligations under this Lease will abate until the condition ends and Tenant is able to resume unimpaired operation of its business at the Premises.

21.    **ESTOPPEL CERTIFICATE:**

Within fifteen (15) business days after receipt of request therefor by Landlord, or in the event that upon any sale, assignment or hypothecation of the Premises and/or the land thereunder by Landlord an Estoppel Certificate shall be required from Tenant, Tenant agrees to deliver a certificate to any proposed mortgagee or purchaser or to Landlord, certifying (if such be the case) that this Lease is in full force and effect, that there are no defenses or offsets thereto, or stating those claimed by Tenant and certifying such other matters directly related to this Lease that may be reasonably requested by Landlord.

22.    **ATTORNMENT:**

Tenant shall, in the event any proceedings are brought for the foreclosure of, or in the event of exercise of the power of sale under any mortgage made by Landlord covering the Premises, attorn to the purchaser upon any such foreclosure or sale and recognize such purchaser as Landlord under Lease on the condition that such purchaser expressly assumes all of the Landlord's obligations hereunder in writing.

23.    **SUBORDINATION:**

The rights of Tenant under this Lease shall be and are subject and subordinate at all times to the lien of any bank or institutional mortgage or deed of trust now or hereafter in force against the Premises, and to all advances made or hereafter to be made upon the security thereof, on the condition that the note holder and mortgagee or beneficiary secured by such deed of trust or deeds of trust or mortgage(s), as the case may be, shall and does agree: a) to recognize this Lease so that Tenant's rights described herein are not diminished by reason of such subordination; and b) not to disturb the tenancy of Tenant in writing in the event of foreclosure if Tenant is not then in default beyond any applicable cure period. Within fifteen (15) business days after receipt of request therefor by Landlord, Tenant shall deliver to Landlord such subordination and non-disturbance agreement in the form attached as **Exhibit J ("Subordination and Non-Disturbance Agreement,"** incorporated by reference) as requested by any lender or proposed lender to evidence such subordination. Landlord shall deliver a Subordination and Non-Disturbance Agreement (with such revision as may be agreed to by Tenant and the existing mortgagee), executed by the existing mortgagee to Tenant, within sixty (60) days after the Effective Date; provided, however, that, so long as Landlord has used, and continues to use, diligent efforts to obtain such Subordination and Non-Disturbance Agreement and is waiting for the mortgagee to act, Tenant will allow Landlord to continue to attempt to deliver the Subordination and Non-Disturbance Agreement for an additional period of thirty (30) days prior to exercising any remedies hereunder, including the remedies set forth in

Section 42 of the Lease, for Landlord's failure to provide such Subordination and Non-Disturbance Agreement.

**24.    CONDEMNATION:**

If more than twenty-five percent (25%) of the Building and/or the parking areas on the Premises shall be taken or condemned by any competent authority for any public or quasi public use or purpose, then Tenant may, at its option, terminate this Lease. Any award for the property of which the Premises are a part, shall be the property of Landlord. Tenant, however, shall be entitled to claim, prove and receive in the condemnation proceeding such awards excluding so called bonus awards as may be allowed for fixtures and other equipment installed by it and any other award expressly made to Tenant.

The Rent and additional sums in the case of any partial taking or condemnation, shall be apportioned as of the date of vesting of title and Tenant shall be entitled to a pro rata reduction in the Minimum Monthly Rent and Additional Rent payable hereunder based on the portion that the floor area in the space taken bears to gross floor area of the Premises immediately prior to such taking.

**25.    FIRE OR OTHER CASUALTY:**

**a)    Notice of Destruction.** If the Building should be damaged by fire, the elements, unavoidable accident or other casualty to the extent that the Building is rendered inaccessible for retail purposes or totally or partially unusable by Tenant in the ordinary course of Tenant's business, Tenant shall give immediate written notice thereof to Landlord. Landlord shall thereafter, within sixty (60) days after receipt of written notice of such damage, notify Tenant of the amount of time Landlord estimates it will take to repair such damage ("**Landlord's Estimate**").

**b)    Loss Covered by Insurance.** If the loss to Landlord would be fully (exclusive of any deductible) covered by insurance required to be maintained by Tenant under this Lease or for Landlord's benefit, which loss renders the Building totally or partially inaccessible or unusable by Tenant in the ordinary conduct of Tenant's business, then either party may terminate this Lease by written notice to the other, except that if: (i) Landlord's Estimate is equal to or less than two hundred seventy (270) days from the date of such casualty; (ii) such damage or destruction is not the result of act of Tenant; and (iii) Landlord is not prevented by applicable Laws from rebuilding the Building to its preexisting condition, Landlord shall, to the extent insurance proceeds are available, repair the same and this Lease shall remain in full force and effect and a proportionate reduction of the Minimum Monthly Rent and Additional Rent shall be allowed Tenant for such portion of the Premises as shall be rendered inaccessible or unusable to Tenant during the period of time that such portion is unusable or inaccessible. In the event such repairs are not complete within two hundred seventy (270) days, Tenant shall have the right to terminate.

**c)    Loss Not Covered by Insurance.** If, at any time prior to the expiration or termination of this Lease, the Building is totally or partially damaged or destroyed from a risk, the loss to Landlord that would not be fully (exclusive of any deductible) covered by insurance required to be maintained by Tenant under this Lease or for Landlord's benefit, then either party may terminate this Lease by written notice to the other.  If Tenant does not terminate this Lease and Landlord elects to repair or restore such damage or destruction, this Lease shall continue in full force and effect provided that such repairs or restorations are completed within two hundred seventy (270) days of the casualty and the Minimum Monthly Rent and Additional Rent shall be proportionately reduced as provided in Section 25(b). In the event such repairs are not complete within two hundred seventy (270) days, Tenant shall have the right to terminate.

**d)      Destruction Near End of Term.** Notwithstanding the foregoing, if the Building is wholly or partially damaged or destroyed within the final six (6) months of the Term, Landlord or Tenant may, at its option, elect to terminate this Lease.

**e)      Destruction of Improvements and Personal Property.** In the event of any damage to or destruction of the Building, Landlord shall not be required to repair, replace or compensate anyone for the personal property, trade fixtures, alterations, machinery, equipment or furniture of Tenant, unless said damage or destruction: (i) is covered by insurance maintained by Landlord; or (ii) is caused by Landlord's negligence and/or willful misconduct or of its agents, employees, contractors, invitees or licensees.

26.    **MISCELLANEOUS INSURANCE REQUIREMENTS**

**a)      Waiver of Subrogation.** Landlord and Tenant hereby waive and release any and all right of recovery against the other, including employees and agents (whether in contract or tort) arising during the Term for any and all loss of or damage to any property located within or constituting part of the Land, Building or Premises to the extent such loss would have been covered by any insurance required under this Lease (whether or not the party suffering the loss or damage actually carries any insurance, recovers under any insurance or self-insures the loss or damage). Landlord and Tenant shall each have their insurance policies issued in such form as to waive any right of subrogation as might otherwise exist, and shall obtain any special endorsements required by their insurer to evidence compliance with the aforementioned waiver. This mutual waiver is in addition to any other waiver or release contained in this Lease.

**b)      General Insurance Standards.** In addition to the requirements set forth in Section 10(f), all insurance policies (except for Workers' Compensation) required to be maintained under this Lease by either Landlord or Tenant shall be procured from insurance companies rated at (AVII) or better by the then current edition of Best's Insurance Reports published by A.M. Best Co. and qualified to do business in the State where the Premises are located. Liability insurance limits may be provided through any combination of primary and/or excess insurance policies. Each party shall provide the other with certificates of insurance, concurrently with the execution of the lease and upon each renewal thereafter, evidencing that the required coverages are in full force and effect.

27.    **NOTICES:**

All notices from Tenant to Landlord required or permitted by any provision of this Lease shall be in writing and sent by facsimile with written transmission confirmation, overnight delivery service or registered or certified mail, postage prepaid and directed to Landlord at:

> Cole WF Chicago IL, LLC
> c/o Cole Real Estate Investments
> 2325 East Camelback Road, Suite 1100
> Phoenix, AZ 85016
> Attn: Asset Manager

All notices from Landlord to Tenant so required or permitted shall be in writing and sent by facsimile with written transmission confirmation, overnight delivery service or registered or certified mail, postage prepaid and directed to Tenant at:

> 6500 E. Fourteen Mile Rd
> Warren, MI  48092

5501256.4, 9/24/12 – 10:00am

4820-6569-1410.5

Fax:  586-983-3029

and a copy to:

General Counsel
6500 E. Fourteen Mile Rd
Warren, MI  48092
Fax:  586-983-3029

Either party may, at any time or from time to time, designate in writing a substitute address for that above set forth, and thereafter notices shall be directed to such substitute address for that above set forth. Notices to either party shall be effective three (3) business days after depositing in the United State Postal system, upon confirmed facsimile transmission or on the next business day if sent by overnight courier in accordance with this Section.

28.    **TENDER OF DEFENSE:**

Tenant shall accept the tender of defense on behalf of Landlord Parties (as hereinafter defined) from and against any claim, suit, demand, and expenses, including, without limitation, reasonable architects' and attorneys' fees, asserted by third parties arising, directly or indirectly, out of or in connection with (i) any Personal Injury, Bodily Injury or Property Damage (as hereinafter defined) whatsoever occurring in or at the Premises; (ii) any Bodily Injury to an employee of a Tenant Party arising out of and in the course of employment of the employee and occurring anywhere in the Premises; (iii) the use or occupancy, or manner of use or occupancy, or conduct or management of the Premises or of any business therein; (iv) any act, error, omission or negligence of any of the Tenant Parties in, on or about the Premises, subject either to the doctrines of contributory negligence or comparative negligence.

Landlord shall accept the tender of defense on behalf of Tenant Parties (as hereinafter defined) from and against any claim, suit, demand, and expenses, including, without limitation, reasonable architects' and attorneys' fees, asserted by third parties arising, directly or indirectly, out of or in connection with any act, error, omission or negligence of any of the Landlord Parties in, on or about the Premises, subject either to the doctrines of contributory negligence or comparative negligence.

The party tendering the defense (the "**Tendering Party**") shall notify the other party (the "**Defending Party**") in writing with reasonable promptness after a claim, suit, demand, etc. is made. Any such notice shall specify such circumstances and make reference to the provisions of this agreement under which such tender of defense may be claimed.  Failure to so notify shall relieve the Defending Party of liability to defend only to the extent, if any, the Defending Party is prejudiced by such failure. The Tendering Party shall furnish the Defending Party with all assistance reasonably required by the Defending Party to defend against the third-party claim, including (without limitation) reasonably access to all relevant books and records. The direction and control of all proceedings involving the third party shall be in the Defending Party and as between the Defending Party and the Tendering Party, the Defending Party shall be liable for all fees and expenses in connection with any such proceedings. The indemnification contained in this section shall not include any item for which the Tendering Party is reimbursed by insurance to the extent of such reimbursement and in no event shall any insurance company be considered to be a third-party beneficiary of any such indemnification.

Notwithstanding anything in this Lease to the contrary, Tenant and Landlord hereby waive and release any and all rights of recovery, whether arising in contract or tort, against the other, including their

5501256.4, 9/24/12 – 10:00am

22

4820-6569-1410.5

employees, agents and contractors, arising during the Term for any and all loss or damage to the Premises, which loss or damage arises from the perils that are insured against under each party's property insurance policies or could be insured against under the ISO Causes of Loss-Special Form Coverage (formerly known as "all-risk"), including any deductible thereunder (whether or not the party suffering the loss or damage actually carries such insurance, recovers under such insurance or self insures the loss or damage), or which right of recovery arises from any loss or damage that could be insured under time element insurance, including without limitation loss of earnings or rents resulting from loss or damage caused by such a peril. This mutual waiver is in addition to any other waiver or release contained in this Lease. If there is a conflict between this Section and any other provision of this Lease, this Section shall control. Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises or the contents thereof, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided for above.

For purposes of this section: (i) the term "**Tenant Parties**" means Tenant, Tenant's Representatives, and all persons and entities claiming through any of these persons or entities; (ii) the term "**Landlord Parties**" means Landlord, Landlord's lender, and their respective Representatives; and (iii) the terms "**Bodily Injury**", "**Personal Injury**" and "**Property Damage**" will have the same meanings as in the form of commercial general insurance policy issued by Insurance Services Office, Inc. most recently prior to the date of the injury or loss in question.

## 29.    INTENTIONALLY OMITTED.

## 30.    NOT A JOINT VENTURE:

Any intention to create a joint venture or partnership relation between the parties hereto is hereby expressly disclaimed.

## 31.    SUCCESSORS AND ASSIGNS:

This Lease and the covenants and conditions herein contained shall inure to the benefit of and be binding upon Landlord, its successors, and assigns, and shall be binding upon Tenant, its successors, assigns, executors, administrators, and legal representatives, and shall inure to the benefit of Tenant, its successors, and only such assignees of Tenant to whom Tenant has assigned in compliance with the provisions of this Lease.

## 32.    WAIVER:

The failure of either party to insist, in any one or more instances, upon a strict performance of any covenant of this Lease or to exercise any option or right herein contained shall not be construed as a waiver or relinquishment for the future of such covenant, righter option, but the same shall remain in full force and effect unless the contrary is expressed in writing.

## 33.    MEMORANDUM OF LEASE:

The parties agree that upon the request of either party, they will execute, acknowledge, and deliver a memorandum of lease, substantially in the form of the attached **Exhibit K** ("**Memorandum of**

**Lease**", incorporated by reference), to the end that the same may be recorded at the expense of the requesting party. Upon the expiration or earlier termination of the Lease and within ten (10) days following written notice from Landlord, Tenant agrees to execute a Memorandum of Lease Termination discharging any recording made pursuant to this Section.

## 34. HOLDING OVER:

This Lease shall terminate without further notice at the expiration of the Lease Term or Renewal Term if Tenant has exercised same. Any holding over by Tenant after expiration of the Lease Term shall not constitute a renewal or extension of the Lease or give Tenant any rights in or to the Premises except as expressly provided in this Lease. Any holding over after the expiration of the Lease without the consent of Landlord shall be construed to be a tenancy from month to month on the same terms and conditions herein specified except for Minimum Monthly Rent, which shall be one hundred fifty percent (150%) of the Minimum Monthly Rent payable for the last month of the previous Lease Term (initial or renewal, as applicable).

## 35. INTERPRETATION OF AGREEMENT:

This Lease shall be construed under the laws of the state in which the Premises are located. All headings preceding the text of the several provisions and sub provisions are inserted solely for convenience of reference and none of them shall constitute a part of this Lease or affect its meaning, interpretation or effect. Venue for any action brought by Landlord and Tenant in relation to this Lease shall be in the County and judicial district or division in which the Premises are located.

## 36. ATTORNEYS' FEES:

If any action at law or equity is commenced between the parties hereto, the prevailing party shall be entitled to its reasonable attorneys' fees, including fees for In-House Counsel, and costs in connection with such action. In the event any dispute arising between the parties is resolved without court proceedings, the prevailing party shall be entitled to recover reasonable attorneys' fees, including fees for In-House Counsel, and costs in connection with such dispute.

## 37. BROKER'S COMMISSIONS:

Each party represents that it has not had dealings with any real estate broker, finder other person with respect to this Lease, except for Bobowski & Associates (**"Broker"**), whose commission shall be paid by the Landlord pursuant to a separate agreement. Each party shall indemnify and hold harmless the other party against any breach of the foregoing representation.

## 38. CONFIDENTIALITY:

Landlord and Tenant acknowledge and agree that the terms and conditions contained in this Lease is confidential and proprietary to their business operations, and shall maintain the confidentiality of such information using the same degree of care such party uses to prevent the unauthorized disclosure of its own confidential information. Landlord and Tenant may only share such statements with their respective mortgagees, prospective mortgagees, purchasers and partners, and attorneys, accountants, and other advisors of such party (collectively, **"Representatives"**) who are informed of the existence and terms of this requirement. Further, each party shall direct such Representatives to abide by the terms of

this requirement. The parties agree that the foregoing requirements do not apply to information that (i) is generally available to the public or (ii) becomes generally available to the public other than as a result of a breach of the obligations of this section.

**39.    INTENTIONALLY OMITTED.**

**40.    INTENTIONALLY OMITTED.**

**41.    SPECIALLY DESIGNATED NATIONAL LIST:**

Each party represents and warrants to the other party that the representing party (a) is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or the U.S. Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control, and (b) is not engaged in this lease transaction, directly or indirectly, on behalf of, or instigating or facilitating this lease transaction, directly or indirectly, on behalf of any such person, group, entity or nation. The breaching party shall defend, indemnify, and hold harmless the other party from and against all claims, damages, losses, risks, liabilities, and expenses (including reasonable attorney's fees and costs) arising from or related to any breach of the foregoing representation. Further notwithstanding the foregoing, with respect to the direct and indirect interests in Cole Credit Property Trust II, Inc., or any other identified affiliate of Landlord, as applicable, Tenant acknowledges that Landlord has relied, and shall be permitted to rely, exclusively on the implementation by its U.S. broker-dealer network of the normal and customary investor screening practices mandated by applicable law and Financial Industrial Regulatory Authority regulations in satisfaction of the foregoing representation.

**42.    TENANT CONTINGENCIES:**

Tenant's obligations under this Lease are contingent upon the following:

a.    Tenant's receipt of all Permits (as hereinafter defined), subject to the requirements set forth below;

b.    Landlord's approval of Tenant's plans as described on the attached <u>Exhibit C</u>;

c.    Landlord's delivery of a Subordination and Non-Disturbance Agreement pursuant to Section 23 above;

As soon as reasonably practicable following Landlord's approval of Tenant's plans as described on the attached <u>Exhibit C</u>, but in no event later than thirty (30) days following such approval, Tenant shall apply for all permits, licenses and authorizations, and all other approvals from the government bodies having jurisdiction (federal, state and local), necessary or desirable permits and approvals, including, but not limited to, 24 hour operations, building permit for Tenant's Work, and a sign permit for Tenant's signs, as described in Section 7 of the Lease (collectively, the "**Permits**"). Landlord will assist and cooperate in obtaining the Permits, including (without limitation) the execution of such documents as may be necessary for processing of the applications for the Permits; provided, however, that Landlord will not be required to incur any expense in connection with such cooperation. Tenant shall diligently

pursue the issuance of the Permits, and shall exhaust all appeals if any application for a Permit is denied. If Tenant has not obtained the Permits within one hundred twenty (120) days after the date that Landlord approves of the plans and specifications for Tenant's Work (the "**Permit Application Period**"), so long as Tenant has complied with its obligations under this Section 42, if the applicable governmental authority has rendered a final decision denying the application for the Permits, then Tenant may terminate the Lease by delivering written notice Landlord, in which event this Lease shall terminate effective as of Landlord's receipt of notice from Tenant, and the parties hereto shall be released from all obligations accruing from and after the termination of the Lease (except for those obligations that expressly survive a termination of this Lease).  If Tenant has complied with its obligations under this Section 42, and the applicable governmental authority has not yet rendered a final decision denying the application for any of the Permits within the Permit Application Period, then the Permit Application Period will be extended for a reasonable time to allow for Tenant to continue pursuing the Permits, provided, however, that if Tenant has not obtained the Permits within one hundred eighty (180) days after the date that Landlord approves of the plans and specifications for Tenant's Work, then Landlord may terminate the Lease by delivering written notice to Tenant, in which event this Lease shall terminate effective as of Tenant's receipt of notice from Tenant, and the parties hereto shall be released from all obligations accruing from and after the termination of the Lease (except for those obligations that expressly survive a termination of this Lease).  If Landlord does not deliver a Subordination and Non-Disturbance Agreement within the timeframes set forth in Section 23 above, then Tenant may terminate the Lease by delivering written notice Landlord, in which event this Lease shall terminate effective as of Landlord's receipt of notice from Tenant, and the parties hereto shall be released from all obligations accruing from and after the termination of the Lease (except for those obligations that expressly survive a termination of this Lease).

43.    **FAMSA CONTINGENCY.**

Tenant acknowledges and agrees that the Premises are currently leased to Famsa, Inc., under the terms of a lease agreement between Landlord and Famsa, Inc. (the "Famsa Lease").  Landlord and Famsa, Inc. have entered an agreement terminating the Famsa Lease (the "Famsa Termination Agreement").  Pursuant to the Famsa Termination Agreement, Famsa, Inc. is required to pay a termination fee to Landlord as a condition precedent to the Famsa Lease being terminated, which fee is to be paid on April 30, 2013 (the "Termination Fee").  Landlord will use commercially reasonable efforts to cause Famsa, Inc. to pay the Termination Fee.  If Famsa, Inc does not pay the Termination Fee within thirty (30) days following the Effective Date, then either party may terminate this Lease upon written notice to the other party, in which event the parties shall be relieved of any further obligations or liabilities hereunder.  Tenant agrees that Landlord shall have no obligation or liability hereunder if Landlord is unable to cause Famsa, Inc. to pay the Termination Fee, so long as Landlord uses commercially reasonable efforts to cause Famsa, Inc. to pay the Termination Fee.

44.    **LIMITATION OF LIABILITY.**

Notwithstanding anything to the contrary contained in this Lease, it is expressly understood and agreed that any money judgment against Landlord resulting from any default or other claim arising under this Lease shall be satisfied only out of the rents, issues, profits and other income (collectively "**income**") actually received from the operation of the Building, and no other real, personal or mixed property of Landlord or its representatives (the term "**Landlord**" for purposes of this Section 44 only shall mean any and all members and any and all partners, both general and/or limited, if any, which

comprise Landlord), wherever situated, shall be subject to levy on any judgment obtained against Landlord and if such income is insufficient for the payment of such judgment, Tenant shall not institute any further action, suit, claim or demand, in law or in equity, against Landlord for or on the account of such deficiency. Tenant hereby waives, to the fullest extent permitted by law, any right to satisfy a money judgment against Landlord except from income received by Landlord from the operation of the Building. In the event of the transfer and assignment by Landlord of its interest in this Lease and in the building containing the Premises to a transferee that assumes Landlord's obligations under this Lease, whether by written agreement or by operation of law, Landlord shall thereby be released from any further obligations hereunder, and Tenant agrees to look solely to such successor in interest of Landlord for performance of such obligations. Any security given by Tenant to secure performance of Tenant's obligations hereunder may be assigned and transferred by Landlord to such successor in interest, and Landlord shall thereby be discharged of any further obligation relating thereto.

## 45.  ENTIRE AGREEMENT:

This Lease sets forth all the promises, agreements, conditions, and understandings between Landlord and Tenant relative to the Premises, and there are no promises, agreements, conditions or understandings, either oral or written, expressed or implied, between them other than set forth herein. Except as herein otherwise provided, no subsequent alterations, amendment, change or additions to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by both of them.

[Signatures are found on the following page.)

**IN WITNESS WHEREOF,** Landlord and Tenant have caused this Lease to be executed in their names by their duly authorized officers.

**Landlord:**

**COLE WF CHICAGO IL, LLC,**
a Delaware limited liability company

By: Cole REIT Advisors II, LLC, a Delaware
    limited liability company, its Manager

By:_____
    Todd J. Weiss, Senior Vice President

Signature Date: _____4-19-13_____

**Tenant:**

**Art Van Furniture, Inc.,** a Michigan corporation

By: STEVE GLUCKSMEN
Its: VICE President

Signature Date: _____2/25/13_____

# EXHIBIT A

## SITE PLAN



5501256.4, 9/24/12 – 10:00am

4820-6569-1410.5

## EXHIBIT B

## LEGAL DESCRIPTION OF THE LAND

Real property in the City of Chicago, County of Cook, State of Illinois, described as follows:

That part of Lot 7 in the Snow Estate Subdivision by Superior Court Partition of that part of the Southwest Quarter of Section 30, Township 40 North, Range 14 East of the Third Principal Meridian, lying North and East of the North Branch of the Chicago River, also Lots 2, 3, 4, 6, 7, 9 and 11 in the Assessor's Division of that part of the Southwest Quarter of Section 30 aforesaid, lying between railroad and river in Cook County, Illinois, according to the map recorded January 29, 1873 in Book 3 of Plats Page 91 described as follows:

Beginning at the Southeast corner of said Lot 7 where it abuts the land and right of way of the Chicago and Northwestern Railway Company; thence Northeasterly along the Southeasterly line of said Lot 7, 817 74/100 feet to center of highway; thence Northwesterly along the center of said highway, 132 feet; thence Southwesterly nearly parallel with the Southeasterly line of said Lot 7, 829 62/100 feet to lands of said railroad company, being a point 132 08/100 feet from the point of beginning; thence Southeasterly along the Southwesterly line of said Lot 7, 132 08/100 feet to the point of beginning (except however (1) that part condemned for railroad purposes in case 206259, entitled Chicago and Northwestern Railway Company against Virgil M. Brand, and others in the Superior Court of Cook County, Illinois, described as follows: commencing at the intersection of the Southeasterly line of Lot 7 with the Northeasterly line of the right of way of the Chicago and Northwestern Railway Company, and running thence Northwesterly along said Northeasterly line of said right of way, 132 08/100 feet to the Southeasterly line of the land owned by Chicago and Northwestern Railway Company; thence Northeasterly on a line parallel with the Southeasterly line of said Lot 7, 63 50/100 feet; thence Southerly on a curved line convex to the West and having radius of 130 feet, a distance of 100 40/100 feet; and thence on a straight line tangent to said curve, 48 feet more or less to the point of beginning (2) that part of said Lot 7 conveyed by Chicago Telephone Company to Herman H. Heftier by deed dated February 27, 1918 and recorded March 16, 1918 as document 6288135 and described as follows: beginning at the intersection of the Southeasterly line of said Lot 7 with the Northeasterly line of the right of way of the Chicago and Northwestern Railway Company; thence Northeasterly along the Southeasterly line of said Lot 7, 61 19/100 feet; thence Westerly at an angle of 54 degrees 36 minutes with the Southeasterly line of said Lot 7, 88 feet more or less to the Southwesterly line of the property conveyed to the Chicago Telephone Company by deed from Virgil Brand, dated June 30, 1905 AD. and recorded July 1, 1905 in the Recorder's Office of Cook County, Illinois in Book 9085 of records, Page 249 as instrument 3718660; thence Southeasterly along the Southwesterly line of the property so conveyed to Chicago Telephone Company by Virgil Brand by the Deed aforesaid, to the point of beginning (also excepting the Northeasterly 33 feet thereof taken for Elston Avenue), in Cook County, Illinois.

APN: 14-30-310-015 and 14-30-310-016

2606 North Elston Avenue, Chicago, IL

## EXHIBIT C

## TENANT'S WORK

Within 10 days after the Delivery Date, Tenant will have utilities, including electric, water utility and natural gas (if available) services to the Premises transferred to Tenant's name. Tenant's Work, completed by Tenant at its sole cost and expense, shall conform to all applicable State and local codes and shall include, but not be limited to the following:

1.      Tenant's Work shall be deemed to be all of that work necessary to completely improve the Premises, so that the Premises will be ready for occupancy and use for which the Premises are leased pursuant to the terms hereof. Tenant will be responsible for obtaining any building permit required by any controlling governmental authority in connection with Tenant's Work. Tenant's Work shall be performed in conformance with all controlling governmental ordinance, law, statutes, rules and regulations, and in conformance with any building permit issued by any controlling governmental authority. All of Tenant's Work shall be performed pursuant to plans and specifications properly and competently prepared by an architect licensed in the State, and performed by qualified, licensed and insured contractors and subcontractors. Landlord reserves the right to approve and disapprove workmanship and construction and completion of improvements. Tenant agrees to perform and cause Tenant's contractor and subcontractors to perform Tenant's Work in a manner so as not to damage, delay, or interfere with any work being performed by Landlord or its contractors in the Premises or in or about any other portion of the Center and to comply with all construction procedures and regulations described by Landlord for Tenant's Work and the coordination of such work with any work being performed by Landlord and its contractors.

2.      Tenant shall prepare and submit to Landlord for Landlord's approval at Landlord's sole discretion, three (3) sets of plans and specifications professionally prepared by an architect licensed in the State for Tenant's Work, which shall be in such detail as Landlord may reasonably require and shall include all improvements to be constructed by Tenant, any proposed storefront signs, interior finishes and colors, lighting, fixtures, equipment, decoration, furnishing, and display cases and materials proposed to be installed in or on the Premises. Such plans and specifications shall be submitted to Landlord within sixty (60) days after the execution of this Lease. Within thirty (30) days after the plans and specifications are delivered to Landlord, Landlord shall approve or notify Tenant in writing of any objections or required alterations needed to same, and if Landlord fails to notify Tenant in writing of its objections within said thirty (30) day period, Landlord shall be deemed to have approved the plans and specifications. Tenant shall have thirty (30) days after receipt of Landlord's written objections to the detailed plans and specifications to revise same so as to satisfy any objections of Landlord, and in connection therewith shall be required to incorporate any changes requested by Landlord and resubmit plans to Landlord for approval. If the parties are unable, in good faith, to resolve any dispute as to the plans and specifications within said thirty (30) day period, then Landlord shall have the right to accept Tenant's Plans and Specifications as previously submitted by Tenant or either Landlord or Tenant may terminate this Lease upon written notice to the other party, in which event all deposits shall be returned to Tenant and the parties shall be relieved of any further obligations or liabilities hereunder; provided, however, that in the event either party shall act in bad faith in connection with the preparation or

approval of any plans or specifications, such party acting in bad faith shall be deemed to have breached its obligations under this Lease.

3.      As soon as practicable and in any event within ten (10) days after the Delivery Date, provided Tenant's plans are approved by Landlord, copies of all permits are in Landlord's possession, and Landlord has received all required insurance certificates from Tenant and Tenant's contractors, Tenant shall commence and diligently proceed to complete Tenant's Work, and in any event Tenant's Work shall be completed by the Lease Commencement Date as specified in the Lease.

4.      Upon completion of Tenant's Work, Tenant shall obtain lien waivers for all contractors, subcontractors and suppliers, and Tenant shall provide Landlord with copies of such lien waivers and with any other evidence reasonably required by and satisfactory to Landlord that Tenant's Work has been paid for. It shall also be the sole responsibility of Tenant to obtain a Certificate of Occupancy or other similar document issued by the controlling governmental agency which allows Tenant to open the Premises to the public, and copy of same shall be provided to Landlord. Tenant shall not be entitled to open for business until this provision has been complied with by Tenant.

5.      Intentionally Omitted.

6.      Any and all construction, improvements, additions, and modifications made and/or installed by either Landlord or Tenant shall be made or installed to conform to the minimum requirements of the insurance service office of the state having jurisdiction, insuring companies, the National Fire Protection Association, the National Board of Fire Underwriters, and all federal, state and municipal codes. All work will meet or exceed minimum requirements of The Americans with Disabilities Act (ADA) where applicable. Failure to conform to such minimum standards by Tenant shall constitute a default on the part of Tenant, and if within ten (10) days after notification of default by Landlord to Tenant the Tenant has not cured or, in the event such default cannot be cured within ten (10) days, Tenant has not commenced to cure and diligently pursue such curative action to completion, Landlord may cancel this Lease as provided for in the Lease

7.      This Lease expressly provides that the interest of the Landlord shall not be subject to liens for improvements made by Tenant. If any construction lien, mechanic's lien, materialmen's lien or any other lien is recorded against the Premises or against Tenant's leasehold interest in the Premises by reason of work, labor, services or materials supplied or claimed to have been supplied to Tenant, Tenant shall, within ten (10) days after notice of the filing thereof, cause such lien to be discharged of record by payment, deposit, bond, order of a court of competent jurisdiction, or otherwise. Tenant shall have the right to contest the validity of any lien or claim provided Tenant shall first have posted a bond to insure that, upon final determination of the validity of such lien or claim, Tenant will pay any judgment rendered against it with all proper costs and charges and will have such lien released without cost to Landlord. In any event, Landlord's interest in the Premises shall not be subject to any lien arising out of any work, labor, services or materials supplied or claimed to have been supplied to or for Tenant. Landlord shall have the right to record this Lease, or a short thereof, or any other notice permitted under applicable law in the appropriate governmental office to assure that the interest of Landlord shall not be subject to any such lien. Prior to or concurrently with the hiring by Tenant of any contractor to make any improvements to the Premises, Tenant shall notify such contractor of Landlord's exemption from construction liens as provided herein.

8.      Tenant agrees not to make any alterations or additions that would materially change the Premises or the appearance of same from that previously approved by Landlord nor to install any additional equipment therein without, in each instance, obtaining the prior written consent of Landlord. All alterations and additions to the Premises shall be made in accordance with all applicable laws, and where applicable, Tenant shall be required to obtain all necessary governmental permits prior to commencing. In the event of making such alterations or additions as herein provided, Tenant hereby indemnifies and holds Landlord harmless from all expenses, liens, claims, or damages, to either persons or property or the Premises, arising out of or resulting from the undertaking, making of, or the existence of such alterations or additions. In the event Tenant, at any time during the Lease Term, removes any of its Trade Fixtures, any damage caused by such removal shall be repaired and the Trade Fixtures shall be replaced within three (3) business days with fixtures of similar quality and sufficient quantity to conduct Tenant's business.

9.      Tenant and its contractors and subcontractors shall perform the original construction or alterations in such manner so as not to obstruct access to the premises of any other tenant in the Center; nor shall the performance of such original construction or subsequent alterations interfere with the transaction of business in the Center or disrupt any other tenants' building services or equipment. Should Landlord determine that the performance of the original construction or subsequent alterations interferes with or disrupts business in the Center for reasons such as dust, noise, odors, debris, etc., then Landlord may direct Tenant to perform such work after normal business hours. In the event Tenant, Tenant's contractors, or anyone acting for and on behalf of Tenant, causes or leaves debris, garbage or refuse on the Center or outside the Premises during original construction or alteration and fails to immediately clean up the same, Landlord may in its sole discretion cause the same to be done and bill Tenant for its costs (including without being limited to labor, material, outside services and use of equipment) to which shall be added 50% for overhead. Payment for any such billing shall be due upon demand.

10.     Any Tenant having above average sound levels within the Premises (i.e., record shop, veterinarian office, pet store, musical instrument shop, etc.) must sound insulate demising walls to achieve a minimum of STC rating of fifty (50). Any Tenant having machinery or equipment or performing any service which may cause noise, vibration or odor to be transmitted to the structure of the building or to any space therein to such a degree as to be objectionable to Landlord or to any tenants in the building shall, at Tenant's expense, place and maintain such machinery or equipment on vibration eliminators, install exhaust venting equipment to eliminate odors or install other devices approved by Landlord, sufficient to eliminate said noise, vibration, and/or odor.

11.     Alarm System: All alarm systems and other protective devices must be approved by Landlord prior to their purchase and installation.

12.     Locks: Upon taking over possession of the Premises from Landlord, Tenant shall make arrangements to re-key the locks to the Premises at Tenant's sole cost and expense.

13.     Heating and Air Conditioning Maintenance Provisions: Tenant, at its sole cost, shall maintain the air conditioning (includes heating) unit(s) for the Premises in good condition and repair throughout the term of this Lease, in accordance with manufacturer's recommended maintenance.

As a part of its air conditioning maintenance obligation, Tenant shall enter into an annual contract with an air conditioning repair firm, fully licensed to repair air conditioning units in the State and with insurance amounts required by Landlord, which firm shall:

(a)    Regularly service the air conditioning unit(s) of the Premises on a monthly basis, changing belts, filters and other parts as required;

(b)    Perform emergency and extraordinary repairs on the air conditioning unit(s);

(c)    Keep a detailed record of all services performed on the Premises and prepare a yearly service report to be furnished to the Landlord at the end of each calendar year.

Tenant shall furnish to Landlord a copy of the air conditioning maintenance contract, prior to occupancy described above, and proof that the annual premium for the maintenance contract had been paid. Nothing stated herein above shall limit Tenant's obligation to maintain the air conditioning unit(s) in good condition and repair throughout the term of this Lease.

14.    <u>Permits</u>:   County and City Governments require a building permit for minor and major interior improvements. Often building permits are required for minor repairs such as new carpets and painting. Tenant shall be responsible for all building permits required by local governing agency. Tenant shall be responsible for executing the required notice of commencement for its contractors.

15.    <u>Landlord Required Contractors</u>:   Tenant shall be required to use Landlord's designated contractor for any roof penetration, fire sprinkler relocation, or fire alarm work within the Premises.

16.    <u>Tenant Standard Construction Specifications</u>:

(a)    Demising walls between spaces are to be one hour fire rated, full height to roof deck with a closure strip at deck.

(b)    The wall above the storefront on the back side of the soffit in all areas is to be a one hour fire rated wall, full height to roof deck with a closure strip at the deck.

(c)    Storefront is provided by Landlord.

(d)    All toilet facilities should meet Federal and State ADA handicap requirements.

(e)    Location of all HVAC units or any other roof-mounted equipment is to be verified by the landlord. Any cutouts in the roof or exterior walls or any other modifications to the existing retail center shall be approved by Landlord's structural engineer or roofing engineer or other designated agent.

(f)    Power for signage, if illumination is authorized and approved by Landlord, shall be provided through each individual lease space by Tenant with relay connection house light circuit. All signage shall be on a time control device illuminating all signage at dusk until 11 p.m.

(g)    All fees, permits and other charges relating to Tenant construction shall be the exclusive responsibility of Tenant.

(h)     Tenant's contractor will, prior to beginning any work, introduce the foreman to neighboring tenants as point of contact for disturbance problems.

(i)     No loud music will be played at the Premises during the demolition/construction process so as not to disturb the neighboring tenants.

(j)     All demolition/construction personnel will park at the rear of the center or an area designated by Landlord.

(k)     All material delivery and debris removal is to be through rear entrance of the Premises. Should no rear entrance exist, activity may be through front entrance.

(l)     Tenant's contractor will provide portable restroom for demolition/construction personnel, located per Landlord's specifications. (This applies in the event Premises do not already provide restroom facilities).

(m)     All construction debris must be disposed of either in a construction dumpster (provided by Tenant or Tenant's contractor) located according to Landlord's specifications or, prior to delivery of dumpster, Tenant or Tenant's contractor shall provide for removal and disposal of all construction debris off site. SHOPPING CENTER DUMPSTERS ARE NOT TO BE USED FOR CONSTRUCTION DEBRIS.

(n)     All trash and debris must be removed daily. The outside of the Premises should be kept free of debris and building materials.

(o)     Roof penetrations and seals must be completed by Landlord's roof contractor.

(p)     All saw-cutting must be cut through (4" to 6") certified fill sand must be used for backfill, vapor barrier and new concrete must be doweled and tied in. Tenant's contractor must notify Landlord 24 hours in advance of saw-cutting so that inspections of the work prior to backfilling and after dowel and tie-in may be done.

(q)     All saw-cutting, jack-hammering and any other loud work will, within reason, be completed prior to or after neighboring tenants' business hours so as to limit disturbance.

(r)     No oil based paints, noxious solvents, etc. should be applied inside the Premises.

(s)     Tenant is required to use Landlord designated fire sprinkler contractor.

(t)     All wall penetrations shall be accomplished by core drilling.

(u)     All penetrations to the pavement area shall be accomplished by saw-cutting. Soil removed is not to be used as back-fill. Certified fill shall be used as back-fill (to reach 98% compaction). Asphalt base shall match existing base and asphalt patched back shall match existing asphalt. NO COLD PATCH ASPHALT WILL BE ALLOWED TO REPAIR ASPHALT.

(v)     No Common Area maintenance utilities are allowed to be used for the purpose of Tenant's Work.

(w)     No washing of paint brushes, rollers, or other paint equipment shall be allowed in landscaping areas.

(x)     No washing out of concrete related debris shall be done in or on the Premises.

(y)     No construction materials shall be stored outside Tenant's premises.

(z)     Any and all alterations made to the Landlord's fire alarm system must be made by Landlord's contractor after approval by Landlord.

## EXHIBIT D

## COMMENCEMENT MEMORANDUM

**WHEREAS,** Cole WF Chicago IL, LLC, a Delaware limited liability company ("Landlord") and **Art Van Furniture, Inc.** a Michigan Corporation ("Tenant") entered into a lease dated _____ (the "Lease") for the property commonly known as [address], [City], [State] (the "Premises"), a more accurate and complete description of which is attached to the Lease as **Exhibit B-1**; and

**WHEREAS,** Section 2(c) of the Lease calls for Landlord and Tenant to execute a Commencement Memorandum confirming the Lease Commencement Date, Rent Commencement Date, Termination Date and Total Leasable Square Footage of the Premises upon completion of construction and delivery of the Premises to Tenant; and

**WHEREAS,** the completion of construction and delivery of the Premises to Tenant has occurred and Tenant has opened for business as of _____; **and**

**WHEREAS,** in accordance with the terms and conditions of the Lease, Landlord and Tenant hereby execute this Commencement Memorandum.

**NOW THEREFORE,** Landlord and Tenant hereby agree as follows:

1.    The **LEASE COMMENCEMENT DATE** as defined in Paragraph 1(a) of the Lease is _____.

2.    The **RENT COMMENCEMENT DATE** as defined in Paragraph 2(b) of the Lease   is _____.

3.    The **TERMINATION DATE** as described in Paragraph 1(c) of the Lease is_____ _____, 2____, unless Tenant notifies Landlord of its intent to exercise its option(s) to renew as defined in Paragraph 1(d) of the Lease.

4.    The **TOTAL LEASABLE SQUARE FOOTAGE** of the Premises as determined by the project architect for the building shell and confirmed by Tenant in accordance with the terms of the Lease is _____ **SQUARE FEET.**

5.    All capitalized terms not defined herein shall have the meaning given them in the Lease.

**IN WITNESS WHEREOF,** each of the undersigned has executed this Commencement Memorandum as of the ___ day of _____.

**Landlord:**

**COLE WF CHICAGO IL, LLC,**
a Delaware limited liability company

By: Cole REIT Advisors II, LLC, a Delaware
    limited liability company, its Manager


    By:_____

**Tenant:**

**Art Van Furniture, Inc.,** a Michigan corporation


_____
By:
Its:

5501256.4, 9/24/12 – 10:00am

37

4820-6569-1410.5

Todd J. Weiss, Senior Vice President

Signature Date: _____

Signature Date: _____

5501256.4, 9/24/12 – 10:00am

4820-6569-1410.5

# EXHIBIT E

(Intentionally Omitted)

# EXHIBIT F

(Intentionally Omitted)

# EXHIBIT G

## TENANT'S SIGNAGE





5501256.4, 9/24/12 – 10:00am

4820-6569-1410.5

**EXHIBIT G-2**

**PYLON SIGNAGE**



# EXHIBIT H

(Intentionally Omitted)

## EXHIBIT I

## LANDLORD'S RULES & REGULATIONS

1)    Landlord reserves the right of access to the face of the exterior walls and the roof, and further reserves the right to install, maintain, use, repair and replace pipes ducts, conduits, and wires leading through the Premises at times and in locations determined solely by Landlord, so long as the same do not materially interfere with Tenant's use thereof.

2)    Landlord may designate specific areas in which cars used by Tenant, its concessionaires, officers, employees and agents must be parked, and in that regard Tenant shall, upon request, furnish to Landlord the license numbers of the cars operated by such persons.

3)    Landlord reserves the right to grant to third persons the non-exclusive right to cross over and use in common with Landlord and all tenants of the Center the Common Area or such portion thereof as may be designated from time to time by Landlord.

4)    Landlord may at any time temporarily close any Common Area to make repairs or changes, to prevent any acquisition of public rights therein or to discourage non-customer parking, and may do such other acts in and to the Common Area as in Landlord's judgment may be desirable to improve the Common Area.

5)    The delivery or shipping of merchandise, supplies and fixtures to and from the Building shall be subject to such rules and regulations of Landlord in its sole discretion, deems for the proper operation of the Building.

6)    No radio, television, roof top or exterior wall aerial or other similar device shall be installed within or upon the Building without Landlord's prior consent in writing. Any such installation made without prior written consent shall be subject to removal by Landlord without notice at any time, and without liability for damage caused by such removal.

7)    No loudspeakers, televisions, phonographs, radios or other devices shall be used, heard or seen outside of the Building without the prior written consent of Landlord.

8)    Tenant shall maintain the inside of the Building at a temperature sufficiently high to prevent freezing of water in pipes and fixtures inside the Building.

9)    Tenant, at its expense, shall employ the services of a reputable termite and pest extermination contractor at such regular intervals as Landlord may require or as shall be necessary to keep the Premises in top condition.

10)    Tenant shall not burn any trash or garbage of any kind in or about the Premises or within one mile of the outside property lines of the Premises.

11)    Tenant is prohibited from improperly disposing of cigarette butts. Tenant and its employees must dispose of cigarette butts into an appropriate container.

12)    Tenant shall not display any banners without Landlord's prior written approval.

13)    Tenant shall not (i) display any merchandise or maintain any stands in front of the Building without Landlord's prior written consent; (ii) erect or maintain any barricade or scaffolding which may obscure the signs, entrances or show windows of any other tenant in the Center, or interfere with any such other tenant's business; (iii) create or maintain, or allow others to create or maintain, any nuisances, including, without limitation, loud noises, sound effects, offensive odors and smoke or dust in or about the Building; (iv) place or maintain any signs in any parking area or other portion of the Premises outside of the Building; (v) suffer, permit, or commit any waste with respect to the Premises or any portion thereof; or (vi) maintain or allow to be maintained any excessively bright lights, or any changing, flashing, or flickering lighting or similar devices, the effect of which shall be visible from the exterior of the Building; (vii) display a portable sign.

14)    Subject to interruptions by reason of force majeure, Tenant shall carry at all times in the Building a stock of merchandise, and staff the Building in a manner reasonably designed to produce the maximum amount of gross receipts. Tenant shall install and maintain at all times displays of merchandise in the display windows (if any) of the Building.

15)    Tenant shall not conduct within the Premises any fire, auction, bankruptcy, "going-out-of-business", "lost our lease", or similar sales.

16)    Insurance:  All Contractors and/or Subcontractors providing service to the Premises whether for Tenant or Landlord shall obtain and maintain insurance for the coverage and amounts of coverage not less than those set forth in the Schedule of Insurance outlined below and shall provide to Landlord, before Services are provided this property certificates issued by or on behalf of insurance companies satisfactory to the Landlord, admitted to do business in the state in which the Services are to be performed and holding a current Best's rating of A- or better, to evidence such coverage. Such certificates shall explicitly confirm the existence of any deductible or retention and should such retention or deductible exceed one hundred thousand dollars ($100,000), Contractor and/or Subcontractor shall warrant that its tangible net worth will remain in excess of twenty-five million dollars ($25 million). All policies of insurance shall provide that there shall be no cancellation, non-renewal or material reduction of such coverage without 30 days prior written notice to Landlord. In the event of any failure by Contractor and/or Subcontractor to comply with the provisions of this paragraph, Landlord may at its option, by written notice to Contractor and/or Subcontractor, (i) suspend all work until there is a full compliance with this paragraph, or (ii) if Contractor and/or Subcontractor fails to furnish a certificate of insurance within ten (10) days after Landlord's notice, contract for such insurance at Contractor's and/or Subcontractor's expense, provided that Landlord shall have no obligation to obtain and maintain such insurance amounts and coverage.

## SCHEDULE OF INSURANCE

Any Contractor and/or Subcontractor, during its performance at this property shall maintain in effect with Insurers no less than the types, amounts and limits of insurance indicated below, and the existence of any deductible or retention shall not relieve Contractor and/or Subcontractor of the responsibility to maintain the coverage, limits and terms below:

a)      Workers' Compensation/Employers' Liability:  Statutory Workers' Compensation Insurance. Employers' Liability with limits no less than $500,000.00 per accident for Bodily Injury and $500,000.00 per employee/aggregate for disease. Exemption forms will not be accepted.

b)      The Contractor and/or Subcontractor shall maintain Commercial General Liability for bodily injury and property damage with limits of no less than $1 million per occurrence/general aggregate per project, and personal and advertising injury with limits of no less than $2 million.

c)      Under no circumstances will a Liability policy be accepted with one of the following endorsement attached: Exclusion-Damage to Work Performed by Subcontractors On Your Behalf, CG 22 94; or Exclusion-Damage to Work By Subcontractors On Your Behalf-Designated Sites or Operations, CG 22 95, or their equivalent.

d)      Also unacceptable to any insurance policy are the following endorsements:   Exclusion-Explosion, Collapse, and Underground Property Damage Hazard, CG 21 42, or its equivalent, and Total Pollution Exclusion, CG 21 49, or its equivalent.

e)      Commercial Automobile Liability:   $1,000,000.00 Combined Single Limit per accident for Owned, Non-Owned; and Hired autos.

f)      Umbrella Liability Insurance:  Excess of, (a), (Employers' Liability only), (b) and (c) above with a minimum combined single limit of $2,000,000.00.

g)      Any deductibles applicable under any insurance required of Contractor and/or Subcontractor will clearly state that they apply only to the Contractor and/or Subcontractor and not to the Landlord.

h)      Landlord, Landlord's lender (if any), Landlord's management agent and others designated by Landlord shall be an Additional Insured on policies under (b), (c) and (d) above. All insurance policies required under this paragraph 16 shall be endorsed to waive all rights of subrogation against Landlord. Certificates of Insurance provided to Landlord shall confirm such waivers. No Contractor or Subcontractor shall be permitted to self-insure any of the coverages listed above.

## EXHIBIT J

Store No.
RECORDING REQUESTED BY, AND
WHEN RECORDED RETURN TO:

_____
_____
_____
_____

### SUBORDINATION AND NON-DISTURBANCE AGREEMENT

This **SUBORDINATION AND NON-DISTURBANCE AGREEMENT** (the "Agreement") is made and entered into this \_\_\_ day of _____, 2_____, by and between **Art Van Furniture, Inc.** ("Tenant") and **[Name of Lender]**, a [entity type and jurisdiction] ("Lender") and **[NAME OF LANDLORD]**, a [entity type and jurisdiction] ("Landlord").

### RECITALS

**WHEREAS,** Landlord executed a Lease dated _____, in favor of Tenant, and a memorandum covering certain Premises therein described located on a parcel of real estate, a legal description of which is attached hereto and incorporated herein by this reference as **Exhibit A** (said parcel of real estate and the Premises being sometimes collectively referred to herein as the "Property"); and

**WHEREAS,** Landlord has executed a Deed of Trust (the "Mortgage") dated _____, 2_____ _____, and recorded on in Book _____, Page _____, of the County Records of _____ County, State of _____ in favor of Lender, payable upon the terms and conditions described therein; and

**WHEREAS,** it is a condition to said loan that said Mortgage shall unconditionally be and remain at all times a lien or charge upon the Property, prior and superior to the Lease and to the leasehold estate created thereby; and

**WHEREAS,** the parties hereto desire to assure Tenant's possession and control of the Property under the Lease upon the terms and conditions therein contained,

**NOW, THEREFORE,** for and in consideration of the mutual covenants and premises herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged and confessed by the parties hereto, the parties hereto do hereby agree as follows:

### AGREEMENT

1. The Lease is and shall be subject and subordinate to the Mortgage, and to all renewals, modifications, consolidations, replacements, and extensions thereof, and to all future advances made thereunder.

2. Should Lender become the owner of the Property, or should the Property be sold by reason of foreclosure or other proceedings brought to enforce the Mortgage that encumbers the Property, or should the Property be transferred by deed in lieu of foreclosure, or should any portion of the Property be

5501256.4, 9/24/12 – 10:00am

4820-6569-1410.5

sold under a trustee's sale, the Lease shall continue in full force and effect as a direct lease between the then owner of the Property covered by the Mortgage and Tenant, upon, and subject to, all of the terms, covenants and conditions of the Lease for the balance of the term thereof remaining, including any extensions therein provided. Tenant does hereby agree to attorn to Lender or to any such owner as its landlord, and Lender hereby agrees that it will accept such attornment.

3.    Notwithstanding any other provision of this Agreement, Lender shall not be: a) liable for any default of Landlord under the Lease, except that Lender agrees to cure any default of Landlord that is continuing as of the date Lender forecloses the Property within thirty (30) days from the date Tenant delivers written notice to Lender of such continuing default, unless such default is of such a nature to reasonably require more than thirty (30) days to cure and then Lender shall be permitted such additional time as is reasonably necessary to effect such cure, provided Lender diligently and continuously proceeds to cure such default; b) subject to any offsets or defenses that have accrued prior to the date of foreclosure, unless Tenant shall have delivered to Lender written notice of the default that gave rise to such offset or defense and has permitted Lender the same right to cure such default as is permitted Landlord under the Lease; c) bound by any Rent that Tenant may have paid under the Lease more than one month in advance; d) bound by any amendment or modification of the Lease hereafter made without Lender's prior written consent; e) responsible for the return of any security deposit delivered to Landlord under the Lease and not subsequently received by Lender.

4.    If Lender sends written notice to Tenant to direct its Rent payments under the Lease to Lender instead of Landlord, then Tenant agrees to follow the instructions set forth in such written instructions and deliver Rent payments to Lender; however, Landlord and Lender agree that Tenant shall be credited under the Lease for any Rent payments sent to Lender pursuant to such written notice.

5.    All notices that may or are required to be sent under this Agreement shall be in writing and shall be sent by first-class certified U.S. mail, postage prepaid, return receipt requested, and sent to the party at the address appearing below or such other address as any party shall hereafter inform the other party by written notice:

> **Tenant:  6500 E. Fourteen Mile Rd, Warren, MI  48092**
> **Landlord:**
> **Lender:**

All notices delivered as set forth above shall be deemed effective three (3) days from the date deposited in the U.S. mail.

6.    Said Mortgage shall not cover or encumber and shall not be construed as subjecting in any manner to the lien thereof any of Tenant's improvements or trade fixtures, furniture, equipment or other personal property at any time placed or installed in the Premises. In the event the Property or any part thereof shall be taken for public purposes by condemnation or transfer in lieu thereof or the same are damaged or destroyed, the rights of the parties to any condemnation award or insurance proceeds shall be determined and controlled by the applicable provisions of the Lease.

7.    This Agreement shall inure to the benefit of and be binding upon the parties hereto, their successors in interest, heirs, assigns, and any subsequent owner of the Property secured by the Mortgage.

8.    Should any action or proceeding be commenced to enforce any of the provisions of this Agreement or in connection with its meaning, the prevailing party in such action shall be awarded, in addition to any other relief it may obtain, its reasonable costs and expenses, not limited to taxable costs, and reasonable attorneys' fees.

5501256.4, 9/24/12 – 10:00am

4820-6569-1410.5

9.    Tenant shall not be joined as a party/defendant in any action or proceeding that may be instituted or taken by reason or under any default by Landlord in the performance of the terms, covenants, conditions, and agreements set forth in the Mortgage.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed as of the day and year first above written.

**LENDER:**

By:   _____

Name: _____

Title: _____

**TENANT:**

**Art Van Furniture, Inc.**

By:   _____

Name: _____

Title: _____

**LANDLORD:**

**[NAME OF LANDLORD]**

By:   _____

Name: _____

Title: _____

SUBORDINATION AND NON-DISTURBANCE AGREEMENT

EXHIBIT A

LEGAL DESCRIPTION OF PREMISES

## EXHIBIT K

## MEMORANDUM OF LEASE

Prepared by and
Return to:

_____

_____

_____

_____

## MEMORANDUM OF LEASE

THIS MEMORANDUM OF LEASE is made this _____ day of _____, 2013, by _____ _____, a _____, whose address is _____ ("Landlord"), and **ART VAN FURNITURE, INC.**, a Michigan corporation, whose address is 6500 E. Fourteen Mile Rd., Warren, Michigan 48092 ("Tenant").

Landlord and Tenant entered into a lease agreement dated _____, 2013 (the "Lease"), by which Landlord leased to Tenant certain real property located in _____, _____ _____ County, Illinois, commonly known as _____ (the "Premises") legally described on the attached Exhibit 1.

This instrument is made for the purpose of giving public notice of the fact of the execution and existence of the Lease, and all of the terms and conditions of the Lease are incorporated by reference into this instrument, including the following:

1. The term of the Lease is for a period of _____ (_____) Lease Years, commencing on the Lease Commencement Date, as defined in the Lease.

2. The Lease grants to the Tenant the option to renew the Lease for _____ (_____) consecutive additional periods of _____ (_____) years each.

3. To the extent of any inconsistencies between the Lease and this Memorandum of Lease, the terms of the Lease shall control.

The parties have signed this Memorandum of Lease on the date first set forth above.

(Signatures are found on the following pages.)

_____,

a _____

By:_____

Title:_____

STATE OF             )
                          ) ss.
COUNTY OF  _____)

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, CERTIFY THAT _____, the _____ of _____ _____, a _____, personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person, and acknowledged that [he][she] signed, sealed and delivered the instrument as [his][her] own free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and notarial seal, this \_\_\_\_ day of _____, 2013.

_____
*
Notary Public, _____ County, \_\_\_\_
My commission expires:_____

**ART VAN FURNITURE, INC.,** a
Michigan corporation

By:_____

Title:_____

STATE OF                      )
                              ) ss.
COUNTY OF _____)

     I, the undersigned, a Notary Public in and for said County, in the State aforesaid, CERTIFY THAT _____, the _____ of Art Van Furniture, Inc., a Michigan corporation, personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person, and acknowledged that [he][she] signed, sealed and delivered the instrument as [his][her] own free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and notarial seal, this _____ day of _____, 2013.

_____
*
Notary Public, _____ County, _____
My commission expires:_____

**EXHIBIT 1**
**TO**
**MEMORANDUM OF LEASE**

<u>Legal Description</u>

PIN:_____

## ASSIGNMENT AND ASSUMPTION AGREEMENT

ろ๒   **THIS ASSIGNMENT AND ASSUMPTION AGREEMENT**, dated as of August
_____, 2018, by and between (a) **JPMCC 2007-C1 NORTH ELSTON AVENUE, LLC**, a
Delaware limited liability company ("**Assignor**") and (b) **ELSTON ACQUISITION LLC**, a
Delaware limited liability company ("**Assignee**").

      A.     Assignor and Assignee, by assignment, entered into that certain Agreement for
Sale and Purchase of Property ("**Agreement**") dated July 5, 2018, for the sale and purchase of
certain "**Property**" consisting of "**Real Property**" (as more particularly described in **Exhibit A**
attached hereto), "**Personal Property**" and "**Intangible Property**" (as more particularly
described in this Assignment and Assumption Agreement), as said terms are defined in the
Agreement;

      B.     Assignor desires to assign, transfer, set over and deliver to Assignee all of
Assignor's right, title and interest in and to the Intangible Property as hereinafter provided; and

      C.     Assignee desires to assume the duties and obligations of Assignor with respect to
the Intangible Property.

      NOW, THEREFORE, in accordance with the Agreement and in consideration of the sum
of Ten Dollars ($10.00), the sufficiency and receipt of which are hereby acknowledged, the
parties do hereby covenant and agree as follows and take the following actions:

      1.     Assignor does hereby assign, transfer, set over and deliver unto Assignee all of
the Assignor's right, title and interest, if any, in and to the following property to the extent the
same is transferable by Assignor (collectively, "**Intangible Property**"):

      (a)     the Lease Agreement dated as of April 19, 2013 between Assignor, as
successor in interest to Cole WF Chicago IL, LLC, a Delaware limited liability company and Art
Van Furniture, Inc., a Michigan corporation, including all amendments and renewals thereof
("**Lease**");

      (b)     any and all service, maintenance, supply, operating, vendor, employment,
travel, cable service, collective bargaining, yellow pages, parking, advertising, offsite rental or
equipment contracts, leases or other agreements, however termed, written or oral, affecting the
use, ownership, maintenance, or operation of all or any part of the Property (but specifically
excluding the Lease and any management agreements), in effect as of the date of this
Assignment and Assumption Agreement (collectively, "**Service Contracts**");

      (c)     any and all licenses, permits, authorizations, certificates of occupancy and
other approvals issued by any governmental authority having jurisdiction over the Property or
any portion thereof that are in effect for the current use and operation of the Property or any
portion thereof (collectively, "**Permits**");

      (d)     any and all guaranties, warranties, websites, domain names, telephone
exchange numbers, architectural or engineering plans and specifications, and development rights

that exist as of the date of this Assignment and Assumption Agreement and that relate to the Real Property or the Personal Property, if any, but excluding any rights and/or claims, choses in action and/or judgments, settlements, proceeds or other rights to payment and/or pending or anticipated actions of Assignor and/or Assignor's affiliates (i) against any former tenants (and/or guarantors of the leases entered into by such tenants) at the Property and from and/or against any former owners of the Property and/or any former borrowers or guarantors under, arising from or related to any loan held by Assignor and/or Assignor's affiliates; and (ii) against any insurer or any other party in connection with or relating to any Pre-Existing Insurance Claims or any Proceeds from Pre-Existing Insurance Claims (collectively, "**General Intangibles**"); and

    (e) any and all rights to the name of the improvements upon the Real Property.

  2. THE INTANGIBLE PROPERTY IS BEING ASSIGNED "**AS IS**", "**WHERE IS**", AND "**WITH ALL FAULTS**" AS OF THE DATE OF THIS ASSIGNMENT AND ASSUMPTION AGREEMENT, WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER AS TO ITS CONDITION, FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY OR ANY OTHER WARRANTY, EXPRESS OR IMPLIED. ASSIGNEE IS HEREBY ACQUIRING THE INTANGIBLE PROPERTY BASED SOLELY UPON ASSIGNEE'S OWN INDEPENDENT INVESTIGATIONS AND INSPECTIONS OF THAT PROPERTY AND NOT IN RELIANCE ON ANY INFORMATION PROVIDED BY ASSIGNOR OR ASSIGNOR'S AGENTS OR CONTRACTORS. ASSIGNOR SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST OR PRESENT, EXPRESS OR IMPLIED, CONCERNING THE INTANGIBLE PROPERTY OR ASSIGNOR'S TITLE THERETO.

  3. Assignee hereby accepts the foregoing assignment of the Intangible Property and hereby assumes all duties and obligations of Assignor under the Lease, Service Contracts, Permits and General Intangibles assigned herein. Assignee shall defend, indemnify and hold harmless Assignor from and against any and all Claims asserted against or incurred by Assignor as a result of any acts or omissions of Assignee, from and after the date of this Assignment and Assumption Agreement, in connection with the Lease, Service Contracts, Permits and General Intangibles assigned herein. "**Claims**" means any and all claims, demands, causes of action, whether administrative or judicial, losses, costs (including any and all reasonable attorneys' fees, court costs, and reasonable costs of investigation, litigation, and settlement), expenses, sanctions, orders, curtailments, interest, liabilities, penalties, fines, expenses, liens, judgments, compensation, fees, loss of profits, injuries, death, response costs and/or damages, of any kind whatsoever, whether direct or indirect, known or unknown, fixed or contingent, joint or several, criminal or civil, or in law or in equity.

  4. This Assignment and Assumption Agreement shall be (a) binding upon, and inure to the benefit of, the parties to this Assignment and Assumption Agreement and their respective heirs, legal representatives, successors and assigns, and (b) construed in accordance with the laws of the State where the Real Property is located, without regard to the application of choice of law principles.

5.     The parties may execute this Assignment and Assumption Agreement in one or more identical counterparts, all of which when taken together will constitute one and the same instrument. If so executed, each of such counterparts is to be deemed an original for all purposes, and all such counterparts shall, collectively, constitute one agreement, but in making proof of this Assignment, it shall not be necessary to produce or account for more than one such counterpart.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

This Assignment and Assumption Agreement has been signed and delivered by the parties as of the date first above written.

Witnesses:

**ASSIGNOR:**

**JPMCC 2007-C1 NORTH ELSTON AVENUE, LLC**, a Delaware limited liability company

By:    Wells Fargo Bank, N.A., as Trustee for the Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2007-C1, Commercial Mortgage Pass-Through Certificates, Series 2007-C1, as sole member

    By:  LNR Partners, LLC, a Florida limited liability company, as attorney-in-fact

Signature: _____

Print Name: _____Zamira Colon_____

Signature: _____

Print Name: _____Angela Ospina_____

    By: _____

    Name: _____Steven D. Ferreira_____

    Title:  Vice President

**[SIGNATURES CONTINUE ON NEXT PAGE]**

This Assignment and Assumption Agreement has been signed and delivered by the parties as of the date first above written.

Witnesses:

**ASSIGNEE:**

**ELSTON ACQUISITION LLC,** a Delaware limited liability company

Signature: *Mark Lewensohn*
Print Name: Mark Lewensohn

By: _____
Name: Andrew Farbman
Title: _____Authorized Signatory_____

Signature: *Greg Salter*
Print Name: Greg Salter

## EXHIBIT A

## LEGAL DESCRIPTION

That part of Lot 7 in the Snow Estate Subdivision by Superior Court Partition of that part of the Southwest Quarter of Section 30, Township 40 North, Range 14 East of the Third Principal Meridian, lying North and East of the North Branch of the Chicago River, also Lots 2, 3, 4, 6, 7, 9 and 11 in the Assessor's Division of that part of the Southwest Quarter of Section 30 aforesaid, lying between railroad and river in Cook County, Illinois, according to the map recorded January 29, 1873 in Book 3 of Plats Page 91 described as follows: Beginning at the Southeast corner of said Lot 7 where it abuts the land and right of way of the Chicago and Northwestern Railway Company; thence Northeasterly along the Southeasterly line of said Lot 7, 817 74/100 feet to center of highway; thence Northwesterly along the center of said highway, 132 feet; thence Southwesterly nearly parallel with the Southeasterly line of said Lot 7, 829 62/100 feet to lands of said railroad company, being a point 132 08/100 feet from the point of beginning; thence Southeasterly along the Southwesterly line of said Lot 7, 132 08/100 feet to the point of beginning (except however (1) that part condemned for railroad purposes in case 206259, entitled Chicago and Northwestern Railway Company against Virgil M. Brand, and others in the Superior Court of Cook County, Illinois, described as follows: commencing at the intersection of the Southeasterly line of Lot 7 with the Northeasterly line of the right of way of the Chicago and Northwestern Railway Company, and running thence Northwesterly along said Northeasterly line of said right of way, 132 08/100 feet to the Southeasterly line of the land owned by Chicago and Northwestern Railway Company; thence Northeasterly on a line parallel with the Southeasterly line of said Lot 7, 63 50/100 feet; thence Southerly on a curved line convex to the West and having radius of 130 feet, a distance of 100 40/100 feet; and thence on a straight line tangent to said curve, 48 feet more or less to the point of beginning (2) that part of said Lot 7 conveyed by Chicago Telephone Company to Herman H. Heftier by deed dated February 27, 1918 and recorded March 16, 1918 as document 6288135 and described as follows: beginning at the intersection of the Southeasterly line of said Lot 7 with the Northeasterly line of the right of way of the Chicago and Northwestern Railway Company; thence Northeasterly along the Southeasterly line of said Lot 7, 61 19/100 feet; thence Westerly at an angle of 54 degrees 36 minutes with the Southeasterly line of said Lot 7, 88 feet more or less to the Southwesterly line of the property conveyed to the Chicago Telephone Company by deed from Virgil Brand, dated June 30, 1905 AD. and recorded July 1, 1905 in the Recorder's Office of Cook County, Illinois in Book 9085 of records, Page 249 as instrument 3718660; thence Southeasterly along the Southwesterly line of the property so conveyed to Chicago Telephone Company by Virgil Brand by the Deed aforesaid, to the point of beginning (also excepting the Northeasterly 33 feet thereof taken for Elston Avenue), in Cook County, Illinois.

Commonly known as:  2606 N. Elston Avenue, Chicago IL 60647.

P.I.N.:  14-30-310-015-0000 and 14-30-310-016-0000

## TENANT ESTOPPEL CERTIFICATE

May 16, 2018

**JPMCC 2007-C1 NORTH ELSTON AVENUE, LLC, a Delaware limited liability company**
c/o LNR Partners, LLC
1601 Washington Avenue, Suite 700
Miami Beach, Florida 33139

Re:    Lease between **JPMCC 2007-C1 NORTH ELSTON AVENUE, LLC,** a Delaware limited liability company, or its predecessors, as landlord ("***Landlord***"), and **ART VAN FURNITURE, LLC (formerly known as Art Van Furniture, Inc.), a limited liability company,** as tenant ("***Tenant***") dated April 19, 2013, for approximately 48,000 square feet of space (the "***Leased Premises***") and located at 2606 North Elston Avenue, Chicago, Illinois 60647 (the "***Property***"), as amended, supplemented and/or modified by the following amendments, modifications, side letters, guaranties, letters of credit and other documents: None (as so amended, supplemented and/or modified, the "Lease")

Gentlemen:

The undersigned Tenant understands and acknowledges (a) that Landlord currently intends to sell the Property to a buyer (together with its successors and assigns, "***Buyer***"), and, in connection with such purchase and/or subsequent ownership of the Property, Buyer may obtain one or more mortgage loans (collectively, the "***Loan***") from one or more lenders (together with their respective successors and assigns, collectively, "***Lender***"), which Loan is or will be evidenced by one or more notes secured by one or more mortgages or deeds of trust upon the Property (collectively, the "***Mortgage***"), and (b) that both Buyer, in purchasing the Property, and Lender, in making the Loan, are relying upon Tenant's certification herein.

Tenant hereby certifies to Buyer and Lender that:

1.    The Lease is in full force and effect.  There are no amendments, supplements or modifications of any kind to the Lease except as referenced above.

2.    The Lease represents the entire agreement between Tenant and Landlord with respect to the leasing and occupancy of the Leased Premises; there are no other promises, agreements, understandings, or commitments of any kind between Landlord and Tenant with respect thereto.  Tenant has not given Landlord any notice of termination under the Lease.

3.    There has not been and is now no subletting of the Leased Premises, or any part thereof, or assignment by Tenant of the Lease, or any rights therein, to any party, other than as follows: None.

4.    The Lease has commenced pursuant to its terms and is in full force and effect and except as otherwise set forth in the Lease.

1

5.    No uncured default, event of default, or breach by Landlord exists under the Lease, no facts or circumstances exist that, with the passage of time or giving of notice, will or could constitute a default, event of default, or breach by Landlord under the Lease.  Tenant has made no claim against Landlord alleging Landlord's default under the Lease.

6.    Tenant is open for business and in operation in the Leased Premises.

7.    Tenant is in full and complete possession of the Leased Premises and has accepted the Leased Premises, including any work of Landlord performed thereon pursuant to the terms and provisions of the Lease, and all common areas of the Property (including, without limitation, parking areas, sidewalks, access ways and landscaping) are in compliance with the Lease and are satisfactory for Tenant's purposes.

8.    To the best of Tenant's knowledge and belief, there are no rental, lease, or similar commissions payable with respect to the Lease, except as may be expressly set forth therein.

9.    The term of the Lease commenced on October 26, 2013 and terminates on October 31, 2023 unless sooner terminated in accordance with the terms of the Lease. Tenant commenced paying rent on April 24, 2014. Tenant has no option to renew or extend the term of the Lease except as follows: three (3) options to renew for a period of five (5) years each.

10.    The base rent in the monthly amount of $36,000.00 is currently payable under the Lease.  The date of Tenant's last payment of base rent was May 1, 2018.

11.    Tenant is current with respect to, and is paying the full rent and other charges stipulated in the Lease with no offsets, deductions, defenses or claims; and Tenant is not in default under the Lease.

12.    As of the date hereof, Tenant is not entitled to any credits, reductions, offsets, defenses, free rent, rent concessions or abatements of rent under the Lease or otherwise against the payment of rent or other charges under the Lease.

13.    Tenant hereby agrees that it will deliver to Lender a copy of all notices Tenant serves on or receives from Buyer with respect to the Lease at any address specified in a written notice by Lender to Tenant given to Tenant in accordance with the notice provisions set forth in the Lease.

14.    All of the obligations of Landlord under the Lease have been duly performed and completed, including, without limitation, any obligations of Landlord to make or to pay the Tenant for any improvements, alterations or work done on the Leased Premises, and the improvements described in the Lease have been constructed in accordance with the plans and specifications therefor and have been accepted by Tenant.

15.    The Lease is in full force and effect, and no advance rentals have been paid under the Lease other than as follows: None.

16.    Tenant has no unsatisfied claims against Landlord.

17.    A security deposit in the amount of $0.00 has been given by Tenant under the terms of, or with respect to, the Lease.

18.    Tenant has no option or right to purchase the Property of which the Leased Premises are a part, or any part thereof.

19.    Tenant has not at any time and does not presently use the Leased Premises for the generation, manufacture, refining, transportation, treatment, storage or disposal of any hazardous substance or waste or for any purpose which poses a substantial risk of imminent damage to public health or safety or to the environment.

20.    The undersigned representative of Tenant is duly authorized and fully qualified to execute this instrument on behalf of Tenant thereby binding Tenant.

21.    Neither Tenant nor any guarantor of the Lease is presently the subject of any proceeding pursuant to Title 11 of the United States Code entitled "Bankruptcy", and any successor statute or statutes and any rules and regulations from time to time promulgated thereunder, as amended.

22.    Notwithstanding anything set forth in this certificate to the contrary: (i) Tenant reserves the right to pursue any claim for overpayment of rent or any other charges under the Lease, if any, against Landlord and any successor landlord after any such successor landlord succeeds to the right of any landlord (ii) the Lease remains unchanged and this certificate does not modify, amend, or otherwise change the terms of the Lease (i.e., the terms of the Lease shall control), (iii) any inaccurate statement in this certificate will not prevent Tenant from taking a contrary position in the future and will not subject Tenant to any damages or liability absent fraud; provided, however, that Tenant shall not be permitted to assert or enforce any claim against the party to whom this certificate is delivered (or against such party's property) which is inconsistent with the statements contained herein.

23.    Tenant acknowledges and agrees that Landlord, Buyer, Lender, and their respective successors and assigns shall be entitled to rely on Tenant's certifications set forth herein, and that Tenant and Tenant's successors and assigns shall be bound by the certifications set forth herein.

**TENANT:**

**ART VAN FURNITURE, LLC**

By:    _____

Name: Michael Zambricki
Title: Secretary

3