# IN THE UNITED STATES BANKRUPTCY COURT
# FOR DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ART VAN FURNITURE, LLC, *et al.*,[1]<br><br>Debtor. | Chapter 7<br><br>Case No. 20-10553 (CSS)<br><br>(Jointly Administered)<br><br>Adversary Proceeding No:_____ |
| PNC BANK, NATIONAL ASSOCIATION, and PNC MERCHANT SERVICES COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>ART VAN FURNITURE, LLC, *et al.*; ALFRED T. GIULIANO, as Chapter 7 Trustee; LEVIN FURNITURE, LLC, and LEVIN TRUCKING, LLC,<br><br>Defendants. | |

## **COMPLAINT**

Pursuant to Rules 7001 and 9014 of the Federal Rules of Bankruptcy Procedure and § 105 of the Bankruptcy Code, 11 U.S.C. § 105, PNC Bank, National Association ("*PNC Bank*") and PNC Merchant Services Company ("*PNC Merchant Services*" and, collectively with PNC Bank, "*PNC*"), by and through its undersigned counsel, brings this Complaint to obtain a declaration that (1) PNC is entitled to file a claim against the "Customer Claim Advance Fund"

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

1

as that term is defined below, (2) PNC's claim is entitled to the same priority as a "Program Eligible Customer" and is allowed to the extent that PNC funded the chargebacks of Program Eligible Customers entitled to file claims against the Customer Claim Advance Fund, and (3) PNC's claim is timely. In support thereof, PNC respectfully states as follows:

## INTRODUCTION

1. On March 8, 2020, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

2. On March 10, 2020, the Court entered an order [D.I. 71] providing for the joint administration of the Debtors' cases.

3. On April 6, 2020, the Court entered an order [D.I. 263] converting the Debtors' cases to cases under chapter 7 of the Bankruptcy Code.

4. On April 7, 2020, Alfred T. Giuliano (the "Trustee") was appointed as the chapter 7 trustee of the Debtors [D.I. 264]. The meeting of creditors pursuant to Bankruptcy Code section 341 was held and concluded on May 8, 2020 [D.I. 480].

## ADDITIONAL PARTIES

5. PNC Bank, National Association is a national banking association, organized in Delaware.

6. Upon information and belief, Levin Furniture, LLC is a Pennsylvania limited liability company formed to purchase certain assets from debtor Sam Levin, Inc.

7. Upon information and belief, Levin Trucking, LLC is a Pennsylvania limited liability company formed to purchase certain assets from debtor LF Trucking, Inc.

## JURISDICTION AND VENUE

8. This Court has original jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 because it arises under Title 11 or arises in or relates to the Debtors' cases filed in this Court, *In re Art Van Furniture, LLC*, jointly administered at Case No. 20-10553.

9. The Court has jurisdiction over this matter as a core proceeding under 28 U.S.C. § 157(b) because it involves matters concerning the administration of the estate and the prior discharge of debts and claims.

10. Venue is proper in this Court under 28 U.S.C. § 1409(a) because it arises under, arises in, and/or relates to the Debtors' cases filed in this Court.

## CREATION OF THE CUSTOMER CLAIMS ADVANCE FUND

11. On May 18, 2020, the Trustee filed a motion (the "Levin Sale Motion") pursuant to sections 105, 363, 365, and 554 of Title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order authorizing the (i) sale of the Purchased Assets to Levin Furniture, LLC (the "Furniture Buyer") and Levin Trucking, LLC (the "Trucking Buyer", and together with the Furniture Buyer, the "Purchaser") free and clear of all liens, claims, and encumbrances; (ii) the rejection of the leases of the Subject Stores (the "Rejected Leases"); (iii) assumption of Assumed Contracts; and (iv) granting related relief, all as more fully described in the Levin Sale Motion. [D.I. 511].

12. On May 27, 2020, the Court entered an order approving the Levin Sale Motion (the "Levin Sale Order") [D.I. 573] and the associated Asset Purchase Agreement (the "APA") attached to the Levin Sale Order.

13. Among other relief granted by the Sale Order, and as part of the consideration to be paid by the Purchaser for the acquisition of Debtor's assets, a $10 million fund (the

"Customer Claim Advance Fund") funded by the Purchaser was created to make refunds of deposits placed on customer orders or deposits at the stores subject to the Levin Sale Order. The $10 million amount of the Customer Claim Advance Fund was represented to the Court to be the Debtor's and the Purchaser's best estimate of the approximate total liability of such deposits.

14. As stated in the Levin Sale Motion, "the aggregate purchase price includes $10 million which has been earmarked for the benefit of customers that placed orders or deposits at the Subject Stores - which, upon information and belief, approximates the total liability to such customers and is designed to make Levin customers in Ohio and Pennsylvania whole by allowing them to receive their ordered furniture, receive store credit, or receive a cash refund." Levin Sale Motion, ¶ 17.

15. As set forth in the APA, the Customer Claim Advance Fund is to be administered as follows:

> 6.13 <u>Advance by Purchaser for Reconciliation of Customer Claims</u>. As part of the Purchase Price and all other amounts to be paid by Purchaser pursuant to the APA, at the Closing, Purchaser shall deposit with the Trustee by wire transfer an amount equal to $10,000,000.00 (the "Customer Claim Advance") which shall be held in an interest bearing segregated account in a bank authorized by the Office of the United States Trustee for Region 3, in the name of the Trustee on behalf of the Debtor (the "Customer Claim Advance Fund"). The Customer Claim Advance Fund shall not be subject to the liens, claims, or encumbrances of any creditor of the Debtors, except as may be specifically provided in Section 6, and shall be administered in accordance with the following procedures:
>
> (a) Following the Closing, a representative of the Purchaser and a representative of the Trustee shall jointly notify all customers (including those who have already filed a claim in the Debtors' bankruptcy cases) and who have made deposits for merchandise purchased from the Subject Stores, and who did not receive such merchandise (the "Levin Deposit Customers") that they may submit a claim to the Trustee (the "Resolution Request") within thirty (30) days of the issuance of such notification. The wording of the notification shall be subject to the reasonable joint approval of the Parties and shall provide the requirements to submit a Resolution Request;

(b) The Resolution Request shall provide the following information: (1) the date, the amount of the deposit made by such Levin Deposit Customer and a receipt of such deposit (or other proof sufficient that the deposit was made); (2) whether such deposit was made by credit card (and if so, the identity of the credit card company), finance company (and its identity), debit card (and if so, the identity of the debit card company), cash, or check; (3) whether such Levin Deposit Customer has requested reimbursement from its credit card company, debit card company, or its finance company, as the case may be; and (4) written confirmation that such reimbursement request has been approved or denied; and (5) the Levin Deposit Customer's name, phone number, mailing address, email address (if applicable), and other contact information so that the Trustee and the Purchaser can contact the customer. The notice shall also indicate the following, to the extent the Levin Deposit Customer did not receive a refund from his or her credit card, debit card, or finance company, that a representative of the Purchaser (and Trustee if desired by the Trustee) will contact them (the "Remedies Discussion") to review that the customer, at the customer's option, may choose: (a) request that Purchaser fulfill their order by obtaining the previously ordered furniture and delivering the same to the Levin Deposit Customer giving credit of the full amount of such deposit to such order so long as the merchandise is available; or (b) request Purchaser provide the Levin Deposit Customer with store credit or gift card in an amount not less than the full amount of his or her deposit; or (c) a cash refund, which may not be in the full amount of their deposit, may not be issued to them until the earlier of end of the administration of the Bankruptcy Cases or one-hundred and eighty (180) days from the date that they file their Resolution Request. The Trustee shall be charged with administering the Customer Claim Advance and paying the same to the customer at the appropriate time during the pendency of the Bankruptcy Cases. A Levin Deposit Customer whose information satisfies the criteria as set forth in subparagraphs (b)(1)-(5) hereof shall be known as a "Program Eligible Customer."

(c) The Program Eligible Customer must send its written election (the "Election") to the address or email address established by the Trustee within thirty (30) days of the Remedies Discussion, or they shall no longer be deemed to be a Program Eligible Customer, absent an agreement by Purchaser and the Trustee, in their reasonable discretion, to extend the date for returning the Election. The Election shall indicate that the customer withdraws any claim it filed in the Bankruptcy Cases or has against the Estates seeking reimbursement for any deposit.

(d) Upon receipt of the Election back from a Program Eligible Customer, the Seller shall notify the Purchaser of the election from such Program Eligible Customer and shall provide a representative of the Purchaser with the relevant information from the Program Eligible Customer.

(e) If the Program Eligible Customer chooses a cash refund, then the Seller shall issue a refund (which may not be a refund in full) to the Program

Eligible Customer upon the earlier of (1) one hundred and eighty (180) days from the date of the Closing or (2) the conclusion of the Bankruptcy Cases from the Customer Claim Advance Fund. Such refund shall be accompanied by a letter, in a form and substance reasonably acceptable to both the Trustee and the Purchaser.

(f) The Seller may utilize amounts from the Customer Claim Advance to pay and/or reimburse itself for any Trustee's fees and the reasonable out of pocket costs and expenses incurred by Seller in the review, evaluation, investigation, negotiation, handling, payment and resolution of each Levin Customer Deposit, including, without limitation, the fees and expenses of the Trustee and his professionals) (collectively, "Covered Expenses"). Provided however, that such Covered Expenses shall be submitted to the Bankruptcy Court on regular notice. No such fees and expenses shall be paid until approved by the Bankruptcy Court after the opportunity for notice and hearing. For the avoidance of doubt, all Covered Expenses shall be payable solely from the Estate Recovery or the Customer Claim Advance and not from any other assets of the Estates.

(g) Seller shall use commercially reasonable efforts to promptly resolve all Levin Deposit Customer Claims. Upon the earlier of the (1) resolution of the last claim, or (2) one-hundred and eighty (180) days from the issuance of the notification described in subparagraph (a) above, subject to extension granted by the Bankruptcy Court or by agreement of Purchaser and Seller. All funds remaining in the Customer Claim Advance, (the "Excess Funds") which have not been paid in cash to Program Eligible Customers less an amount up to the sum of $1,000,000 (the "Estate Recovery") to the extent it exists above satisfying the cash payments to the Program Eligible Customers and the Covered Expenses, shall be returned to the Purchaser. The Covered Expenses shall first be paid from the Estate Recovery, and to the extent the Estate Recovery is insufficient to pay the Covered Expenses, they shall be paid from Customer Claim Advance Fund prior to being paid to any customer. The Customer Claim Advance Fund shall be property of the Estates and distributed by the Trustee in the following order of priority: first, to both Program Eligible Customers who elect to receive cash and the Covered Expenses, and second, to the Estate Recovery, and third, to the Purchaser, which shall be a creditor of the Estates with rights of payment solely from the Excess Funds less the Covered Expenses. The Purchaser shall have no obligation to fund the Estate Recovery beyond the amounts provided for herein.

(h) The Trustee shall hold the Estate Recovery and the Purchaser shall be deemed to have assumed unsecured claims limited up to an amount equal to the Estate Recovery, which shall be distributed by the Trustee in accordance with the priorities set forth in the Bankruptcy Code. Notwithstanding anything to the contrary, neither Party shall have any obligation, liability, or responsibility under this Section 6.13 once the Trustee returns the Excess Funds to Purchaser.

   (i) Purchaser shall be entitled to advertise (pursuant to advertisements approved by Trustee in his reasonable discretion) that Trustee and Purchaser are working to honor all such Levin Customer Deposit claims resulting from transactions with the Debtors in the Subject Stores.

   (j) The Trustee shall provide Purchaser with a periodic accounting in reasonable detail, which shall reconcile and account for the Customer Claim Advance, the amount of Program Eligible Customers, and distributions made in accordance with this Section 6.

APA, Section 6.13

16. On October 12, 2020, the Trustee filed the Monthly Operating Report for the reporting period of September 1, 2020 through September 30, 2020 (the "September MOR"). [D.I. 1027].

17. According to the September MOR, the Trustee paid $155,917.65 in customer refunds in September. September MOR, pp. 9-10.

18. On November 10, 2020, the Trustee filed the Monthly Operating Report for the reporting period of October 1, 2020 through October 31, 2020 (the "October MOR"). [D.I. 1079].

19. According to the October MOR, the Trustee paid $48,339.16 in customer refunds in October. October MOR, pp. 9-10.

20. As of March 9, 2021, it appears that the Trustee has not filed Monthly Operating Reports for any time periods after October, 2020.

21. The total amount paid from the Customer Claim Advance Fund as reflected in the filed MOR's is $204,256.81, as compared to the $10,000,000 in estimated claims.

22. Accordingly, the amount paid to date from the Customer Claim Advance Fund appears to be a mere fraction of the amount of claims estimated by Debtor and Purchaser at the time the Fund was created. Thus, over $9 million remains in the Customer Claim Advance Fund

7

as of six months after its creation, notwithstanding the Trustee's representation in the Levin Sale Motion that the $10 million amount "upon information and belief, approximates the total liability to such customers and is designed to make Levin customers in Ohio and Pennsylvania whole by allowing them to receive their ordered furniture, receive store credit, or receive a cash refund." Levin Sale Motion, ¶ 17.

23. As set forth more fully below, the reason that the claims made against the Customer Claim Advance Fund are grossly below expectations is that PNC has made most of the customers whole (approximately $5,477,720.12), and PNC now stands in those customers' shoes.

24. Under the provisions of the APA governing the administration of the Fund, any funds remaining after processing of claims are paid, first, in the amount of $1 million to the Debtor's Estate, and then the balance is returned to the Purchaser.

25. If PNC is not reimbursed for its claims against the Fund, then the Purchaser will receive a substantial windfall (in the millions of dollars) and the consideration paid for the Debtor's assets will be materially different than what was approved by this Court in the Sale Order.

### PNC MADE THE MAJORITY OF THE BENEFICIARY CUSTOMERS WHOLE

26. PNC Bank, National Association, PNC Merchant Services Company ("PNC Merchant Services") and debtor Sam Levin, Inc. (the "Levin Debtor") are parties to that certain Merchant Services Bankcard Agreement dated as of January 23, 2015 (as subsequently amended, the "Merchant Services Agreement"). A true and correct copy of the Merchant Services Agreement is attached hereto and incorporated herein as <u>Exhibit A</u>.

27. Collectively, PNC and PNC Merchant Services are identified as the "Servicers" to the Merchant Services Agreement, while the Levin Debtor is identified as the "Customer."

28. The Merchant Services Agreement generally provides that PNC is entitled to collect certain transaction, processing and service fees from the Levin Debtor in exchange for servicing Visa, Discover and Mastercard bankcard accounts used by the Levin Debtor's customers to facilitate the purchase of the Levin Debtor's furniture products.

29. More specifically, PNC is "a member of Visa U.S.A., Inc. ... Discover Card ... [and] Master Card International Incorporated." Merchant Services Agreement at pg. 1.

30. PNC "is responsible for its VISA, Discover and MasterCard bankcard programs and has authorized PNC Merchant Services [Company] . . . to act as an agent of and in conjunction with [PNC] in performing authorization, processing and settlement services for merchants participating in [PNC's] Discover, MasterCard and VISA bankcard programs." Id.

31. Paragraph six (6) of the Merchant Services Agreement is entitled "Settlement of Card Transactions." Therein, the parties agree that, "All settlements to [Levin Debtor] for [bankcard] transactions will be net of . . . Chargebacks, and any other amounts then due from [Levin Debtor] to SERVICERS." Merchant Services Agreement ¶6.2. Further, "All credits to [Levin Debtor's] Settlement Account . . . are provisional and are subject to, among other things, SERVICERS' final audit, Chargebacks (including SERVICERS' related losses) [Levin Debtor] agrees that SERVICERS may debit or credit [Levin Debtor's] Settlement Account for any deficiencies, overages, fees and pending Chargebacks, or may deduct such amounts from settlement funds due to [Levin Debtor]." Id. ¶6.3 (emphasis added).

32. The term "Settlement Account" is defined as "an account at a financial institution designated by [Levin Debtor] as the account to be debited and credited by SERVICERS for Card

9

transactions, fees, Chargebacks and other amounts due hereunder or in connection herewith (i.e., fines, attorneys' fees, etc.)." Id. at Annex 1, ¶1.19.

33. The term "Chargeback" is defined as "the procedure by which a Sales Draft or other indicia of a Card transaction (or disputed portion thereof) is returned to [PNC] or the Card issuing bank, for failing to comply with Association Rules, the liability of which is [Levin's] responsibility." Id. at Annex 1, ¶1.8.

34. The Merchant Services Agreement also contains a "Chargebacks" provision, which defines the specific scenarios where Levin is contractually obligated for the costs of a chargeback incurred by PNC. Id. ¶8. Relevant to the instant matter:

> [Levin Debtor] shall be responsible for all Chargeback amounts relating to Card transactions where: . . .
>
> \* \* \*
>
> (vi) the Cardholder disputes the sale, quality or delivery (or availability for pre-arranged pick-up) of merchandise;
>
> (vii) the circumstances in which the Sales Draft was created or submitted by, or credit was received by, [Levin Debtor] constituted or otherwise involved a breach of any term, condition, representation, warranty or duty of [Levin Debtor] hereunder;
>
> \* \* \*
>
> (xi) the Cardholder asserts any claim or defense which the Cardholder has as a consumer of goods or services;
>
> \* \* \*

(xiii)  the Card transaction is otherwise subject to Chargeback by the Card issuing bank or Cardholder in accordance with the Association Rules or applicable law; or

(xiv)  the Card transaction is subject to Chargeback in accordance with the procedures set forth in the Operating Guide.

Merchant Services Agreement ¶8.1(vi)-(vii), (xi), and (xiii)-(xiv) (emphasis added).

35. Importantly, "[Levin Debtor] grants to SERVICERS a lien and security interest in and to any of [Levin Debtor's] funds pertaining to the Card transactions contemplated by this Agreement now or hereafter in the possession of SERVICERS. In addition to any rights granted under applicable law, SERVICERS are hereby authorized to set off, recoup, appropriate, and apply any and all such funds against and on account of [Levin Debtor's] Obligations[.]"  Id. ¶16.4.

36. Accordingly, PNC is entitled to be made whole for chargebacks that it funded for the benefit of the customers, the Levin Debtor, and, ultimately the Purchaser.

37. PNC brings this action to determine (1) that PNC is entitled to file a claim against the "Customer Claim Advance Fund", (2) such claim of PNC shall be entitled to the same priority as a "Program Eligible Customer," and shall be allowed to the extent that PNC funded the chargebacks of Customers that were otherwise entitled to file claims against the Customer Claim Advance Fund, and (3) PNC's claim shall be considered timely.

**COUNT I – DECLARATION THAT PNC IS ENTITLED TO FILE CLAIMS AGAINST THE CUSTOMER ADVANCE FUND AND THAT SUCH CLAIMS SHALL BE <u>DEEMED ALLOWED AND TIMELY</u>**

38. PNC repeats, re-alleges, and incorporates by reference, as if fully set forth herein, the allegations of each of the preceding paragraphs set forth above.

39. Pursuant to the Merchant Services Agreement, PNC covered reimbursements in an aggregate amount of $5,477,720.12 in form of Chargebacks, which made Levin Debtor's customers whole, which customers are, or otherwise would have been, Program Eligible Customers.

40. Levin Debtor has failed to repay such Chargebacks to PNC pursuant to the Merchant Services Agreement.

41. As a result, there exist direct, substantial and present interests of PNC which are in controversy regarding PNC's legal and equitable right to stand in the shoes of Levin Debtor's customers who are, or otherwise would have been, Program Eligible Customers to make claims against the Customer Claim Advance Fund which was created to compensate the same loss that PNC has incurred by virtue of the Chargebacks.

42. Thus, PNC requires a judicial determination regarding its eligibility to make claims against the Customer Claim Advance Fund on account of the Chargebacks, and the priority of its claims against the Customer Advance Fund.

43. Such a declaratory judgment is an appropriate remedy because the determination sought will resolve the controversy around PNC's legal and equitable entitlement to make a claim against the Customer Claim Advance Fund, and will resolve uncertainty that exists among the adverse parties' competing interests to the Customer Claim Advance Fund.

44. Pursuant to Federal Rule of Bankruptcy Procedure 7008, Plaintiffs consent to entry of final orders or judgment by the bankruptcy court.

## PRAYER FOR RELIEF

WHEREFORE, PNC respectfully requests that the Court grant it the following relief:

1. Enter a declaratory judgment providing that:

(a) the Chargebacks incurred by PNC in the amount of $5,477,720.12 may be claimed by PNC against the Customer Advance Fund; and

(b) Claims made by PNC in connection therewith shall be deemed allowed on a first-priority basis, *pari passu* with the claims of other Program Eligible Customers or such other priority as is just and equitable, timely claims eligible for cash distribution from the Customer Claim Advance Fund provided that such claims are made within thirty (30) days of a declaratory judgment in PNC's favor, and provided further that such claims are consistent with the spirit of the compensation set aside for Program Eligible Customers; and

2. Granting PNC such other relief as may be necessary and appropriate.

Respectfully submitted, this 12th day of March, 2021.

           **BUCHANAN INGERSOLL & ROONEY PC**

           /s/ Geoffrey G. Grivner
           Geoffrey G. Grivner (#4711)
           919 North Market Street, Suite 990
           Wilmington, DE 19801
           Telephone: (302) 552-4200
           Facsimile: (302) 552-4295
           Email: geoffrey.grivner@bipc.com

              -and-

           James D. Newell, Esquire
           James G. McLean, Esquire
           Zakarij Thomas, Esquire (*pro hac vice* pending)
           Union Trust Building
           501 Grant Street, Suite 200
           Pittsburgh, PA 15219
           Telephone: (412) 562-8800
           Email: zakarij.thomas@bipc.com

*Attorneys for PNC Bank, National Association, and PNC Merchant Services Company*

4811-3599-9444, v. 1